DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
Marshall S. Huebner
Darren S. Klein
Christopher S. Robertson
Moshe Melcer

*Proposed Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **SPIRIT AIRLINES, INC.,** | **Case No. 24-11988 (___)** |
| **Debtor.**[1] | |

**MOTION OF THE DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO SATISFY PREPETITION TRADE CLAIMS IN
THE ORDINARY COURSE OF BUSINESS, (II) AUTHORIZING FINANCIAL
INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS
AND TRANSFERS, AND (III) GRANTING RELATED RELIEF**

Spirit Airlines, Inc. (the "**Debtor**" and, together with its affiliates, collectively, the

"**Debtors**,"[2] "**Spirit**," or the "**Company**"), the debtor and debtor in possession in the above-

captioned chapter 11 case (the "**Chapter 11 Case**"), hereby files this *Motion of the Debtor for*

---

[1] The last four digits of the Debtor's employer identification number is 7023. The Debtor's mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

[2] Capitalized terms used but not immediately or otherwise defined herein shall have the meanings ascribed to them elsewhere herein, in the First Day Declaration, or in the RSA (including the Plan), as applicable. As further described in paragraph 9 of the First Day Declaration, the Debtor expects that its four subsidiaries—Spirit Finance Cayman 1 Ltd., Spirit Finance Cayman 2 Ltd., Spirit Loyalty Cayman Ltd., and Spirit IP Cayman Ltd.—will file their own chapter 11 petitions in the near term, at which time Spirit will request that the Court (a) jointly administer all five chapter 11 cases (collectively, the "**Chapter 11 Cases**") and (b) extend any relief granted with respect to the First Day Pleadings (including this Motion) to such subsidiaries. Notwithstanding that as of the date hereof there is only one Spirit debtor and only one chapter 11 case, the Debtor may refer herein to all five Spirit entities as "Debtors," solely for ease of reference. Accordingly, and for the avoidance of doubt, the background information herein and the bases for the relief requested herein apply to all five Spirit entities unless otherwise indicated.

*Entry of Interim and Final Orders (I) Authorizing the Debtors to Satisfy Prepetition Trade Claims in the Ordinary Course of Business, (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief* (this "**Motion**").  This Motion is supported by the *Declaration of Fred Cromer in Support of the Chapter 11 Proceedings and First Day Pleadings* (the "**First Day Declaration**") filed contemporaneously herewith and incorporated herein by reference.  In further support of this Motion, the Debtor respectfully states as follows:

<u>**Relief Requested**</u>

1.      By this Motion, and pursuant to sections 105(a), 363(b), 503(b), 507(a)(2), and 546(h) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtor seeks entry of interim and final orders, substantially in the forms attached hereto as <u>**Exhibit A**</u> and <u>**Exhibit B**</u> (the "**Proposed Orders**"), (a) authorizing, but not directing, the Debtors to satisfy in the ordinary course of business, in their sole discretion and business judgment, the allowed prepetition claims (collectively, the "**Prepetition Trade Claims**") of creditors that provide goods or services related to the Debtors' operations (the "**Trade Creditors**"), (b) granting administrative priority status under sections 503(b) and 507(a)(2) of the Bankruptcy Code to all undisputed Prepetition Order Claims (as defined below) of the Debtors owing to Trade Creditors arising from the post-petition delivery of goods or provision of services ordered before the Petition Date, and authorizing, but not directing, the Debtors to satisfy such claims in the ordinary course of business, in their sole discretion, (c) authorizing the Debtors, in their sole discretion, to return goods they purchased from Trade Creditors prior to the Petition Date for credit against such Trade Creditors' prepetition claims, and (d) authorizing the applicable financial institutions to receive, process, honor, and pay all checks or wire transfers used by the Debtors to pay the foregoing.

**Jurisdiction and Venue**

2.      The United States Bankruptcy Court for the Southern District of New York (the

"**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.).

3.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The

Debtors confirm their consent to the entry of a final order by the Court in connection with this

Motion.  Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant

to 28 U.S.C. §§ 1408 and 1409.

**Background**

A.      **General Background**

4.      On November 18, 2024 (the "**Petition Date**"), the Debtor filed a voluntary petition

for relief under chapter 11 of the Bankruptcy Code.  The Company remains in possession of its

property and continues to operate and manage its businesses as a debtor in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment

of a trustee or examiner, and no statutory committee has been appointed in the Chapter 11 Cases.

5.      Spirit is a leading ultra low-cost carrier committed to delivering value to its guests

by offering an enhanced travel experience with flexible, affordable options.  Spirit employs over

21,000 direct employees and independent contractors, and serves destinations throughout the

United States, Latin America, and the Caribbean with one of the youngest and most fuel-efficient

fleets in the United States.

6.      Spirit commenced the Chapter 11 Cases to implement a comprehensive financial

restructuring that, once effectuated, will eliminate approximately $800 million of prepetition

funded debt and provide the company with $350 million of new equity capital upon emergence.

The terms of the proposed restructuring are set forth in a restructuring support agreement (the

"**RSA**") among Spirit and the Consenting Stakeholders—who collectively hold approximately 80% of the debt to be restructured under the Plan, and over two thirds in amount of each of the Plan's voting classes.  This deleveraging and recapitalization promises to increase Spirit's financial flexibility and fuel the Company's ongoing initiatives to provide its Guests with enhanced travel experiences and greater value. Importantly, the transactions memorialized in the RSA contemplate that Allowed Priority Claims and General Unsecured Claims against the Debtors will be paid in full or otherwise remain unimpaired (*i.e.*, "ride through" the Chapter 11 Cases).

7.      Additional information about the events leading up to the Petition Date, the RSA, and the Debtors' businesses, affairs, capital structure, and prepetition indebtedness can be found in the First Day Declaration.

**B.      The Prepetition Trade Claims**[3]

8.      Spirit is one of America's leading passenger airlines.  Spirit's fleet contains over 200 aircraft and, in 2023, it transported more than 44.1 million passengers between its over 80 destinations throughout the United States, Latin America, and the Caribbean.  Spirit's gross revenues in 2023 were over $5.36 billion, most of which came from its domestic and international passenger airline services.

9.      Airline operations—especially for commercial passenger airlines—are highly regulated and notoriously complex, and require consistency, predictability, continuity, and high levels of cooperation and coordination, both internally and externally.  Spirit's ability to seamlessly service its guests requires it to incur numerous fixed, liquidated, and undisputed payment obligations to the Trade Creditors in the ordinary course of business.  The Prepetition Trade Claims

---

[3] The summaries and descriptions herein of the Debtors' operations and the goods and services they provide are qualified in their entirety by reference to any operative laws, regulations, agreements, policies, practices, terms, or other documents.  All historical amounts herein represent the Debtors' good-faith estimate.

include, among others, (a) non-priority prepetition claims held by Spirit's vendors, operational partners and other trade claimants (the "**Vendors & Operational Partners**" and, such claims, the "**Vendor & Operational Partner Claims**"), (b) non-priority prepetition claims held by suppliers, service providers, and distributors based outside the United States (the "**Foreign Vendors**" and, such claims, the "**Foreign Vendor Claims**"), and (c) prepetition claims held by third-party shippers, warehousemen, contractors, maintenance workers, and other service providers (collectively, the "**Lien Claimants**" and such claims, the "**Lien Claims**").[4]  Many of the Trade Creditors are essential to the Debtors' businesses and, given the nature of Spirit's operations, loss of access to these Trade Creditors, even temporarily, may create significant operational disruption and cause irreparable harm to the Debtors' commercial standing and goodwill.  The preservation of key business relationships is therefore among management's primary goals as the Debtors transition into chapter 11.

### *Vendors & Operational Partners*

10.    The Debtors' Vendors provide necessary goods and/or services to the Debtors, without which the Debtors could not continue to operate their businesses or would operate at significantly reduced profitability.  The Vendors are, by and large, the sole source or limited source for the goods or services they each supply (this is especially true for Fuel Vendors and airport-based vendors) and provide material economic or operational advantages when compared to other available vendors.  Because of the highly regulated nature of their businesses, the Debtors are also required by applicable law to procure many of the goods and services the Vendors provide.

---

[4]  Although this Motion is intended to be comprehensive, the Debtor may have inadvertently omitted some subcategories of Trade Creditors.  The Debtor requests that any relief granted in connection with this Motion apply to all such Trade Creditors, regardless of whether any subcategory thereof is specifically identified herein.  For the avoidance of doubt, a Trade Creditor may properly characterized by more than one of the types of Trade Creditors enumerated herein.

Similarly, applicable regulations often inhibit an airline's ability to switch expeditiously from one supplier of goods or services to another.

11.     For airlines, one primary category of Vendors is fuel-related vendors, including airline fuel consortiums (associations which manage fuel procurement, storage, and distribution at major airports), suppliers of fuel (*e.g.*, jet gasoline, diesel, lubricants), and suppliers providing other fuel-related services (collectively, the "**Fuel Vendors**").  These Fuel Vendors enable Spirit to efficiently store and supply fuel for its fleet of aircraft but also to fuel large fleets of motor vehicles and specialized ground equipment at the airports where it operates.  At most airports in the United States, separate Fuel Vendors provide airlines with services to procure and store fuel, another Fuel Vendor sells the fuel when needed, and one or more additional Fuel Vendors provide "into-plane" fueling services.  Fuel Vendors are generally paid in advance; however, some Fuel Vendors still offer the Debtors trade and/or credit terms.  An uninterrupted and ready fuel supply is critical to the Debtors' ability to operate, as is the continued service of the Fuel Vendors who fuel the Debtors' aircraft.  Consequently, it is imperative that the Debtors continue performing under their fuel purchase, services, and distribution agreements with the Fuel Vendors.  Crucially, at many of the airports where the Debtors operate, there are no replacement Fuel Vendors—for example, fuel consortiums are airport-specific and membership cannot be replicated.  The loss of one or more of the Fuel Vendors would result in substantial downtime for airport operations, thereby causing serial flight delays and cancellations, as well as a significant loss of value for the Debtors' estates.  During the first nine months of 2024, the Debtors paid approximately $1,290,000,000 on account of goods and services provided by Fuel Vendors.  The Debtors estimate that, as of the Petition Date, approximately $5,200,000 remains outstanding on account of goods and services provided by Fuel Vendors (collectively, the "**Fuel Vendor Claims**").

12.     The following are general descriptions and examples of certain other types of Vendors, and the goods and/or services they provide:

(a)     Aircraft parts and maintenance services.  This category includes original equipment manufacturers, parts suppliers, and service providers (*e.g.*, mechanics, inspectors) who equip, service, upgrade, maintain, and repair Spirit's aircraft to ensure continued and safe operations.  These vendors, many of which must stay current with government regulations and/or licensing, provide essential and, in some cases, legally-required goods and services to the Debtors, including upgrades, solid waste disposal, data and record management, repairs, and maintenance.  These vendors are essential because they have been developed to serve the Debtors' particular fleet and needs, and they have been fully approved through the Debtors' internal processes and by applicable regulatory authorities.

(b)     Safety and security services.  This category includes vendors who provide goods and services related to safety and security, including in connection with flight operations, the handling of hazardous materials, aircraft and facilities security, first aid, access restrictions, fire safety, screening equipment, background checks, environmental compliance, and related training programs.  The Debtors are required by applicable law or contracts to obtain and maintain many of these goods and services—and, in fact, this category also includes vendors who ensure the Debtors' continued compliance with such laws (which are constantly changing)—rendering such vendors critical to the Debtors' operations.  Additionally, many of the vendors who provide such goods and services were required to receive, and have received, security clearances following lengthy background checks; as a result, if the Debtors are forced to change such vendors on little or no notice, a qualified replacement would likely take time to locate and put in place, and the Debtors might have to suspend or reduce affected operations until the services are restored or replaced.

(c)     Customer amenity providers and other related "customer-facing" services.  This category includes vendors who supply food, beverages, seat covers, other amenities, and related services.  This category also includes advertising, marketing, and media services.  Any drop-off in the supply or quality of the Debtors' "customer-facing" products could damage business and result in a loss of customer confidence and goodwill.

(d)     Ground services.  This category includes vendors who provide baggage handling services, ground equipment servicing and maintenance, de-icing services, and other ground support services.  Many of these goods and services are required by applicable law, and are only provided by one vendor at certain airports.  Any loss of continuity could cause reduced efficiency and increased operating costs.

(e)     Crew and employee-related services.  The Debtors require, both as a practical matter and as required by applicable law or contracts, significant infrastructure to support their workforce of over 30,000 employees and contract workers.  The Debtors' payroll systems (both local and foreign), work rules (including those arising under collective

bargaining agreements), and other employee assessment tools have been painstakingly integrated into industry-specific systems over a long period of time. Other employee-related services include regulatory training services, crew lodging providers, personal protective equipment providers, ground transport services, and healthcare and medical service providers. If any of these vendors refused to supply the necessary parts or to maintain their products (including related software), the Debtors would be required to purchase and implement entirely new systems or programs at exorbitant cost and with significant delay, which could disrupt the Debtors' operations.

(f)     Information technology (IT) and support services.  The Debtors' businesses require vast, integrated, and complex information systems, tools, and services, including in connection with: reservations; ticketing; payment; flight, ground, airport, and other operations; software; loyalty programs; revenue management, financial, and treasury functions; network planning; customer service and feedback; security; crew management; air-to-ground connectivity; aircraft, ground, and facilities maintenance; fuel management; crisis management; quality assurance; payroll and timekeeping systems; contract management; human resources; data warehousing and analysis; productivity and other analytics; marketing; and information security and storage. Without steady access to, and constant processing of, certain information, such as the amount of fuel or weight on each plane, the Debtors would be practically and legally unable to fly their aircraft. Further, even if the Debtors could replace such vendors, replacement would likely take substantial time and therefore likely come at great cost to the Debtors' business.

(g)     Flight operations.  In the regular course of the Debtors' business, the Debtors use various systems, services, and products central to flight operations, including radio services and flight charts. Many of the vendors who provide these services and products are sole source vendors with no feasible replacements. As aircraft communications and up-to-date flight charts are indispensable components of flight operations, the Debtors need assurance that the flow of such services and products will be unaffected by the Chapter 11 Cases.

(h)     Common carriers, expeditors, transportation service and logistics providers, and other related vendors.  The Debtors' operations rely on domestic and foreign commercial common carriers, road feeder services, movers, terminal transfer services, shippers, freight forwarders and consolidators, delivery and logistics services, customs brokers, and certain other third-party vendors to ship, transport, store, move through customs, and deliver goods through established national and international distribution networks. Such services are critical to the smooth operation of the Debtors' businesses.

(i)     Other necessary and related services.  The Debtors' operations further rely on other necessary and related goods and services, and the vendors who provide them, such as shuttle drivers, janitorial services, and printing services (including for cargo labels, security stickers, baggage tags, boarding passes, and safety cards).

13.     The Debtors also rely on business-services vendors and certain other operational partners and providers of services that are necessary for the Debtors' day-to-day operations, including landlords, utility providers, and providers of professional services (such as accountants and other ordinary course professionals retained in matters unrelated to the Chapter 11 Cases and that, therefore, the Debtors will not separately retain under section 327 of the Bankruptcy Code) (the "**Operational Partners**").[5]

14.     The Debtors have reviewed their business relationships and have determined that their Vendors & Operational Partners are essential, such that the loss of these particular goods or services would risk immediate and irreparable harm to the Debtors' business, market share, and preparedness to continue large-scale operations.  Without these Vendors & Operational Partners, and the goods and services they supply, the Debtors cannot operate in a safe, legal, and profitable manner.  During the first nine months of 2024, the Debtors paid approximately $2,700,000,000 on account of goods and services provided by its Vendors & Operational Partners (other than Fuel Vendors).  The Debtors estimate that, as of the Petition Date, approximately $101,000,000 remains outstanding on account of the Vendors & Operational Partners Claims (other than Fuel Vendor Claims.

### *Foreign Vendors*

15.     Similarly, in the ordinary course of business, the Debtors regularly procure goods and services from certain Foreign Vendors that operate in foreign jurisdictions and have little to no connection to the United States.  The Debtors' obligations to the Foreign Vendors relate to or are on account of, among other things, servicing Spirit's foreign destinations, localized operational

---

[5]  For the avoidance of doubt, the Debtor is not requesting the authority to pay the claims of any attorneys via this Motion, but reserves the right to file a motion seeking entry of an order authorizing the retention and compensation of such professionals utilized in the ordinary course of business.

overhead costs, and other day-to-day operational support.  If the Foreign Vendors are not paid, they may withhold vital goods and services, thereby interrupting the Debtors' operations and impairing the value of the Debtors' estates.  Despite the global reach of the automatic stay, it is possible that certain Foreign Vendors may seek to enforce claims against the Debtors in foreign jurisdictions, thereby (a) threatening the Debtors' ability to operate their businesses in a safe, value-maximizing, and efficient manner and (b) imperiling the success of the Chapter 11 Cases. Furthermore, some of the Foreign Vendors, who are unfamiliar with United States bankruptcy law and who may be beyond the jurisdiction of the Court, may not be willing to conduct business with "chapter 11 debtors" absent payment of claims, including accrued prepetition claims, on a current basis.  Therefore, the Debtors' ability to maintain their businesses and preserve and maximize the value of their estates depends, in part, on their ability to maintain key relationships with the Foreign Vendors.  During the first nine months of 2024, the Debtors paid approximately $10,000,000 on account of goods and services provided by Foreign Vendors.  The Debtors estimate that, as of the Petition Date, approximately $2,000,000 remains outstanding on account of goods and services provided by Foreign Vendors (collectively, the "**Foreign Vendor Claims**").

## *Lien Claimants*

16.     In the ordinary course of business, the Debtors use and make payments to vendors such as third-party shippers, warehousemen, contractors, maintenance workers, and other service providers (collectively, the "**Lien Claimants**") that, among other things, (a) service and repair the Debtors' aircraft fleet and related equipment and (b) transport, ship, deliver, and store goods on behalf of the Debtors.  In the event that the prepetition claims of the Lien Claimants (collectively, the "**Lien Claims**") remain unpaid, the Lien Claimants may assert Liens (as defined below) on the goods in their possession, equipment, or property under applicable non-bankruptcy law, or refuse

to deliver or release such goods (even where payment for the goods themselves has already been made), or otherwise impede the Debtors' use of their property until the Lien Claimants' claims are satisfied and their Liens redeemed.[6]

17.    The Debtors have, over time, nurtured and developed their relationships with these Lien Claimants and have come to rely on the high-quality and priority service they receive.  In addition, many Lien Claimants have developed in-depth knowledge of the Debtors' specific operational, shipping, delivery, and storage requirements; specifically, their aircraft fleet.  The Debtors do not believe that there are viable alternatives to timely replace the Lien Claimants should they cease serving the Debtors, and the cost of any service disruption to the Debtors' estates in many cases would likely be greater than the amount of the applicable Lien Claims.  Moreover, pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which would further drain estate assets.  It is therefore essential to the continuity of the Debtors' operations, business, and the preservation and maximization of value of the Debtors' estates that the Debtors maintain their relationships with these Lien Claimants, and that the Lien Claimants continue serving the Debtors.

*Prepetition Order Vendors*

18.    A significant portion of the goods and services that the Debtors purchase from the Trade Creditors are shipped directly to and received by the Debtors on an as-needed basis.  As a consequence of the commencement of the Chapter 11 Cases, the Debtors believe that the Trade Creditors may be particularly concerned that they will not be paid for the delivery or shipment of

---

[6]  Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting such Liens, to the extent consistent with section 546(b) of the Bankruptcy Code, might be excluded from the automatic stay.  Under section 546(b) of the Bankruptcy Code, a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection."  11 U.S.C. § 546(b)(1)(A).  For the avoidance of doubt, for purposes hereof any such claims shall constitute Lien Claims.

goods or the provision of services after the Petition Date if such deliveries, shipments, or provisions were based on prepetition purchase orders or other contracts (collectively, the "**Prepetition Orders**"), or that the claims arising therefrom (the "**Prepetition Order Claims**") would be treated as general unsecured claims; Trade Creditors holding such Prepetition Order Claims (the "**Prepetition Order Vendors**") may recall or refuse to provide goods or services to the Debtors unless the Debtors issue substitute purchase orders post-petition or obtains an order of the Court (a) granting administrative priority status under sections 503(b) and 507(a)(2) of the Bankruptcy Code for undisputed Prepetition Order Claims or (b) authorizing the Debtors, in their sole discretion, to satisfy those obligations in the ordinary course of business.

### *503(b)(9) Claimants*

19.    The Debtors also believe that a significant portion of their outstanding accounts payables as of the Petition Date, some of which relate to the Trade Creditors, may be entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code because such claims (to the extent undisputed) are on account of goods received by the Debtors in the ordinary course of business during the 20-day period prior to the Petition Date (the "**503(b)(9) Claims**" and, the Trade Creditors holding such claims, the "**503(b)(9) Claimants**"), which the Debtors may satisfy in accordance with section 363(c)(1) of the Bankruptcy Code.

### *Prepetition Trade Claim Caps*

20.    While the Debtors hope and expect to ensure a continuing post-petition supply of goods and services by consensual negotiation with their Trade Creditors, the Debtors recognize that their fiduciary duties require them to consider and plan for the potential that certain Trade Creditors may refuse to provide future goods or services unless the Debtors satisfy their prepetition claims.  Replacing trade partners, even where possible, would likely take a substantial length of

time, result in substantially higher costs for the Debtors, and cause severe operational disruption.

Moreover, replacement trade partners may lack critical knowledge of the Debtors' operations or

fail to meet the Debtors' standards, thereby placing the Debtors' operations, and the safety of the

Debtors' customers and employees, at risk.

21.     As illustrated in the table below, the Debtors estimate that the maximum amounts

needed to satisfy the Prepetition Trade Claims during the first 30 days of the Chapter 11 Cases and

during the pendency of the Chapter 11 Cases are approximately, in the aggregate, $86,100,000 and

$161,200,000, respectively.

| Category | First 30 Days of Chapter 11 Cases | Pendency of Chapter 11 Cases |
|---|---|---|
| Vendor & Operational Partner Claims (other than Fuel Claims) | $47,300,000 | $101,000,000 |
| Fuel Claims | $3,400,000 | $5,200,000 |
| Foreign Vendor Claims | $1,400,000 | $2,000,000 |
| Lien Claims | $27,000,000 | $46,000,000 |
| 503(b)(9) Claims | $7,000,000 | $7,000,000 |
| **Total** | **$86,100,000** | **$161,200,000** |

The Debtors are not seeking to pay these amounts immediately or in one lump sum; rather, the

Debtors intend to pay these amounts, in their sole discretion, as necessary and as they become due

and payable in the ordinary course of business.  As of the Petition Date, the Debtors' liquidity

balance was approximately $833.4 million.  As such, the Debtors' cash on hand and the cash

generated by the Debtors' businesses would provide ample liquidity for these payments as well as

the Debtors' ongoing obligations while they operate their businesses in the ordinary course during

the pendency of the Chapter 11 Cases.

*Conditions to Satisfaction of Prepetition Trade Claims*

22.     The Debtor seeks the authority to satisfy, in its sole discretion, Prepetition Trade

Claims in the ordinary course of business.  The Debtor proposes that it may, in its sole discretion,

condition payment of any such Trade Claim upon the applicable Trade Creditor's entry into an agreement to continue supplying goods or services to the Debtors on such Trade Creditor's "Customary Trade Terms"[7] during the pendency of the Chapter 11 Cases. However, in certain circumstances, a Trade Creditor may refuse to provide goods or services to the Debtors on their Customary Trade Terms even after payment of its claim. To accommodate these circumstances, the Debtor seeks approval to enter into other agreements, in the Debtor's sole discretion, with each such Trade Creditor on a case-by-case basis.

23.     To ensure that such Trade Creditors transact with the Debtors on Customary Trade Terms, the Debtors propose the procedures set forth in paragraph 7 of the Proposed Orders, to be implemented in the Debtors' sole discretion, as a condition to satisfying Prepetition Trade Claims.

24.     To the extent that an agreement relating to a Trade Claim is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not currently seek to assume such contract. Accordingly, if the Court authorizes the payments described above, such payments should not be deemed to constitute post-petition assumption, reaffirmation, or adoption of the programs, policies, or agreements as executory contracts pursuant to section 365 of the Bankruptcy Code, and the Debtors reserve all rights in connection therewith. In addition, nothing in this Motion shall be an admission as to any Lien or Interest (as defined below), including any possessory Lien.

---

[7]  As used herein, "Customary Trade Terms" means, with respect to a Trade Creditor, (a) the normal and customary trade terms, practices, and programs (including credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability, and other applicable terms and programs) that were most favorable to the Debtors and in effect between such Trade Creditor and the Debtors in the one-year period prior to the Petition Date or (b) such other trade terms that would be common in the industry and are acceptable to the Debtors in their sole business judgment.

**Basis for Relief**

**A.  Satisfaction of the Prepetition Trade Claims Constitutes a Sound Exercise of the Debtors' Business Judgment and is Necessary for the Preservation of the Debtors' Estates**

25.     The Debtors believe that the payment of the Prepetition Trade Claims to the applicable Trade Creditors would be in the ordinary course of their businesses because (a) such payments are commonplace and routine in the Debtors' industry and (b) the Debtors have frequently made such payments.  *See In re Lavigne*, 114 F.3d 379, 384–85 (2d Cir. 1997) (holding that "[t]he touchstone of 'ordinariness' is thus the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business" based on creditors' expectations and industrywide norms) (alteration in original) (citations and quotations omitted).   As a result, the Debtors believe that payment of the Prepetition Trade Claims is warranted under section 363(c) of the Bankruptcy Code, which authorizes a debtor to "enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing." 11 U.S.C. § 363(c)(1).  Nevertheless, out of an abundance of caution, the Debtor seeks entry of orders authorizing the Debtors to pay the Prepetition Trade Claims to the applicable Trade Creditors to the extent that such authorization is required under section 363(b) of the Bankruptcy Code.

26.     Section 363(b)(1) of the Bankruptcy Code empowers a court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  To approve the use of estate property under section 363(b)(1) of the Bankruptcy Code, courts in the Second Circuit require a debtor to demonstrate a "good business reason to grant such an application" after considering "all salient factors."  *In re Lionel Corp. ("Lionel")*, 722 F.2d 1063, 1071 (2d Cir. 1983); *see also In Matter of Motors Liquidation Co.*, 829 F.3d 135, 162 (2d Cir. 2016) (characterizing *Lionel*'s "good business reason" standard as "minimal"); *In re*

*Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("Section 363(b) gives the court broad flexibility in tailoring its orders to meet a wide variety of circumstances.") (citing *Lionel*). Where a debtor establishes "a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *See In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted). If there is a valid business justification for the use of estate property, there is a "strong presumption" that such usage is being done in good faith and for the best interests of the estate, such that an objecting party has the burden to rebut such presumption. *In re MF Glob. Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012).

27.     The Debtor submits that the relief requested in this Motion represents a sound exercise of the Debtors' business judgment, is within the Debtors' ordinary course of business, is necessary to avoid immediate and irreparable harm, and is justified under section 363 of the Bankruptcy Code. Indeed, the relief sought herein is amply justified by the critical need for the continued receipt and/or distribution of goods and services and the preservation and maximization of the value of the Debtors' estates. The prompt payment of the Prepetition Trade Claims, which may be necessary to obtain the delivery and/or provision of the related goods and services, is within the Debtors' ordinary course of business and crucial for orderly and efficient operation of the Debtors' business. Unless the Debtors have the authority to pay for these essential goods and services, their business and estates will suffer irreparable harm. In fact, courts in this jurisdiction routinely grant relief similar to that requested herein in cases where trade creditors are not anticpated to be impaired. *See, e.g.*, *In re 2U, Inc.*, No. 24-11279 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2024) [ECF No. 160] (granting relief to pay all prepetition trade claims in a prepackaged chapter 11 case); *In re Credivalores – Crediservicios S.A.*, No. 24-10837 (DSJ) (Bankr. S.D.N.Y. June 12,

2024) [ECF No. 69] (same); *In re Charter Commc'n, Inc.*, No. 09-11435 (JMP) (Bankr. S.D.N.Y.

Apr. 15, 2009) [ECF No. 172] (granting relief to pay all prepetition trade claims in a ***prearranged***

chapter 11 case). The Debtor submits that the circumstances described herein warrant similar

relief.

28. Finally, in addition to the bases set forth above for the relief requested herein,

section 105(a) of the Bankruptcy Code confers the Court with broad equitable powers to "issue

any order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title." 11 U.S.C. § 105(a). Accordingly, the Court has expansive equitable powers to fashion any

order or decree that is in the interest of preserving or protecting the value of the Debtors' assets.

*See U.S. v. Energy Res. Co.*, 495 U.S. 545, 549 (1990) (finding that section 105(a) of the

Bankruptcy Code is "consistent with the traditional understanding that bankruptcy courts, as courts

of equity, have broad authority to modify creditor-debtor relationships") (citations omitted);

*Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 375 (2007) (characterizing the

bankruptcy court's power under section 105 of the Bankruptcy Code as "broad").

29. More specifically, the Debtor submits that payment of the Prepetition Trade Claims

is necessary and appropriate and, therefore, may be authorized by the Court pursuant to what is

referred to interchangeably as the "doctrine of necessity" or "necessity of payment rule," which is

derived from section 105(a) of the Bankruptcy Code. The doctrine of necessity functions in a

chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable powers

to allow a debtor to pay prepetition claims "where such payment is essential to the continued

operation of the debtor." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 176 (citing *In re Lehigh & New*

*England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (noting that a court may authorize payment of

prepetition claims when payment is essential to continued operation of the debtor, such as where

"creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid")).

30.     The United States Supreme Court first articulated the doctrine of necessity over 140 years ago when it affirmed a lower court's authorization of the use of receivership funds to pay pre-receivership debts owed to employees, vendors, and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership.  *See Miltenberger v. Logansport, C. & S.W.R. Co. ("Miltenberger")*, 106 U.S. 286, 311–12 (1882).  This doctrine—which is frequently invoked early in restructurings—has become an accepted and common component of modern bankruptcy jurisprudence and its application by courts can be traced back to the Supreme Court's reasoning in *Miltenberger*.  *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175–76 (noting that the doctrine of necessity "is not a novel concept," tracing its provenance to *Miltenberger*).

31.     Here, the Debtor submits that the relief requested herein is essential, appropriate, and in the best interests of the Debtors' estates and stakeholders.  The Debtors believe that payment of the Prepetition Trade Claims will be necessary to continue operations, dramatically reduce the financial burden on the Debtors' estates, maintain goodwill and positive relationships with their Trade Creditors, and maximize and preserve the value of the Debtors' assets and estates for the benefit of all parties in interest.  The need for the flexibility to pay such claims is particularly acute in the period immediately following the Petition Date.  During this period, the Debtors, their attorneys and financial advisors, and other professionals will focus on stabilizing the Debtors' businesses and operations and maximizing and preserving the value of the Debtors' estates in chapter 11; however, at the same time, while the Debtors are occupied with steadying their businesses and strategic planning, Trade Creditors may attempt to assert their considerable

leverage and deny the provision of goods and services going forward, suddenly and without notice, in an effort to cripple operations and coerce payment. Furthermore, if the relief sought herein is not granted, such Trade Creditors would have no incentive to continue supplying goods or services to the Debtors on Customary Trade Terms. Accordingly, payment of the Prepetition Trade Claims falls within the Debtors' sound business judgment and would benefit, rather than prejudice, the Debtors' creditors by preserving the property of the Debtors' estates. The Debtor therefore submits that the relief requested herein is appropriate under sections 363(b) and 105(a) of the Bankruptcy Code.

**B.    The 503(b)(9) Claims May Give Rise to Priority Claims Under Section 507(a)(2) of the Bankruptcy Code**

32.    Under section 507(a)(2) of the Bankruptcy Code, the 503(b)(9) Claims may be afforded priority status. As priority claims, these amounts must be paid in full before any of the Debtors' general unsecured obligations can be satisfied. The Debtors believe that sufficient assets should exist to pay all such amounts in full under the proposed plan of reorganization. Accordingly, to the extent that such amounts are property of the Debtors' estates and give rise to priority claims, the relief requested herein may only affect the timing of the payment of such amounts and would not prejudice the rights of general unsecured creditors.

**C.    Goods and Services Ordered Prepetition and Delivered or Provided to the Debtors Post-Petition May Be Entitled to Administrative Expense Status Under Section 503(b)(1) of the Bankruptcy Code, and Payment of the Prepetition Order Claims is within the Ordinary Course of Business**

33.    The Prepetition Order Claims, for goods and services ordered prepetition, would likely be administrative in nature. Under section 503(b)(1) of the Bankruptcy Code, claims are accorded administrative expense priority where such claims are for the actual, necessary costs and expenses of preserving the bankruptcy estate. *See* 11 U.S.C. § 503(b)(1). Claims on account of goods or services received post-petition are entitled to administrative expense status, even if

provided pursuant to a prepetition order.  *See In re Chateaugay Corp.*, 10 F.3d 944, 956 (2d Cir. 1993).  Indeed, with respect to goods in particular, even if such goods had been received in the ordinary course of the debtor's business 20 days *before* the Petition Date, the related claims would receive administrative expense priority as 503(b)(9) Claims.  Thus, granting the relief requested herein likely will not provide the Prepetition Order Vendors with any greater priority than they would otherwise have.

**D.   The Debtors Are Authorized to Return Goods Under Section 546(h) of the Bankruptcy Code**

34.     In the ordinary course of business, the Debtors occasionally receive goods that may be defective, not up to standards, or otherwise not suitable or necessary for their operations.  In some cases, the Debtors return such goods for a credit or other form of refund.  Through this Motion, the Debtor seeks only the relief that is contemplated by section 546(h) of the Bankruptcy Code, which permits a debtor, with the consent of a creditor and subject to the prior rights of holders of security interests in such goods or the proceeds of such goods, to return goods shipped to the debtor by the creditor before the commencement of the case for credit against the creditor's prepetition claim, so long as the court determines (on a motion made no later than 120 days after the order for relief and after notice and a hearing) that such return is in the best interests of the estate.  *See* 11 U.S.C. § 546(h).

35.     The Debtor submits that an order authorizing, but not directing, them to return unsuitable goods delivered before the Petition Date for credit against such Trade Creditor's prepetition claims, subject to any prior rights of holders of security interests in such goods (or the proceeds thereof), is in the best interests of the Debtors' estates.  Such relief would enable the Debtors to (a) obtain proper credit for otherwise unusable goods, cost-effectively and without

undue financial risk, (b) efficiently manage inventory, and (c) enhance the Debtors' financial

performance and the value of the assets of their estates.

E.    **Failure To Pay Lien Claims Could Subject the Debtors' Assets to the Perfection of Statutory Liens**

36.    The Lien Claimants who provided prepetition goods or services to the Debtors may

hold liens against the Debtors' property (the "**Liens**" and, interests arising from the Liens, the

"**Interests**").  The Lien Claimants' Liens and/or Interests may be perfected notwithstanding the

automatic stay established by section 362(a) of the Bankruptcy Code.  Although the Liens and

Interests of the Lien Claimants may not be perfected presently, applicable law generally provides

that they may be perfected in the future, which perfection may relate back to the creation of the

relevant Liens and Interests.  Section 546(b) of the Bankruptcy Code explicitly respects such

relation back, and section 362(b)(3) of the Bankruptcy Code exempts post-petition actions to

perfect liens from the automatic stay otherwise established by section 362(a) of the Bankruptcy

Code, so long as such perfection would relate back to before the petition date under the applicable

law respected by section 546(b) of the Bankruptcy Code.[8]  *See* 11 U.S.C. §§ 362(a)–(b), 546(b).

37.    Therefore, to the extent that such Liens and/or Interests are perfected or may be

perfected, paying the Lien Claims would not reduce unsecured creditor recoveries in the Chapter

11 Cases.  Indeed, payment now only provides such parties with what they would be entitled to

receive eventually upon consummation of the Plan, without any interest costs that might otherwise

accrue during the Chapter 11 Cases.  Far from being harmed, the Debtors' unsecured creditors may

benefit if the Debtors satisfy the Lien Claims.  Accordingly, the Debtor seeks authority to pay all

or a portion of the Lien Claims as it determines, in its sole discretion, is necessary or appropriate

---

[8]  The Debtors reserve the right to contest any Lien or Interest and efforts to exercise associated remedies during the Chapter 11 Cases.

to avoid disruption to the Debtors' operations and to preserve and maximize the value of the Debtors' estates.

**F.    The Court Should Authorize Applicable Financial Institutions to Honor and Process Related Checks and Transfers**

38.    The Debtor also requests that all applicable financial institutions be authorized to (a) receive, process, honor, and pay all checks presented for payment of, and to honor all fund transfer requests the Debtors make related to, the claims that the Debtor requests authority to pay in this Motion, regardless of whether the checks were presented or fund transfer requests were submitted before, on, or after the Petition Date and (b) rely on any Debtor's designation of any particular check as approved by the Proposed Orders.

## Debtors' Reservation of Rights

39.    Nothing contained herein is intended or should be construed as, or deemed to constitute, an agreement or admission as to the amount, priority, character, or validity of any claim against any Debtor on any grounds, a waiver or impairment of any Debtor's rights to dispute any claim on any grounds, or an assumption or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  Each Debtor expressly reserves its rights to contest any Prepetition Trade Claims or any other claim related thereto, under applicable bankruptcy and non-bankruptcy law.  Likewise, if the Court grants the relief sought herein, any payment or transfer made pursuant to the Court's order is not intended, and should not be construed, as an admission as to the amount, priority, character, or validity of any claim or a waiver of any Debtor's rights to subsequently dispute such claim.

## Satisfaction of Bankruptcy Rule 6003 and Waiver of Bankruptcy Rule 6004

40.    To the extent necessary, the Debtor respectfully submits that this Motion satisfies Bankruptcy Rule 6003(b), which provides that, "[e]xcept to the extent that relief is necessary to

-22-

avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ."  Fed. R. Bankr. P. 6003.  As set forth in this Motion and the First Day Declaration, the Debtors believe that (a) an orderly transition into chapter 11 is critical to preserve and maximize the value of the Debtors' estates and (b) any delay in granting the relief requested herein could cause immediate and irreparable harm.  Accordingly, the Debtor submits that the relief requested herein satisfies Bankruptcy Rule 6003.

41.     To implement successfully the relief sought herein, the Debtor requests that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances.  The Debtor also requests that, to the extent applicable to the relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief requested in this Motion is necessary for Spirit to operate its businesses without interruption and to preserve and maximize value for its estates and parties in interest.  Accordingly, the Debtor respectfully submits that ample cause exists to justify the (a) finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and (b) waiving of the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## Notice

42.     Notice of this Motion will be provided to the following parties (or their counsel) (collectively, the "**Notice Parties**"):  (a) the Office of the United States Trustee for the Southern District of New York; (b) those creditors holding the 20 largest unsecured claims against the

Debtor's estate; (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the United States Attorney's Office for the Southern District of New York; (f) the state attorneys general for states in which the Debtor conducts business; (g) the Department of Transportation; (h) the Consenting Stakeholders; (i) the Prepetition Agents/Trustees; (j) the DIP Secured Parties; and (k) any other party that is identified on Spirit's master service list,[9] is entitled to notice under Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), or has requested notice pursuant to Bankruptcy Rule 2002.  A copy of this Motion and any order entered in respect thereto will also be made available on the Debtors' case information website located at https://dm.epiq11.com/SpiritGoForward.  Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtor respectfully submits that no other or further notice is required.

*[Remainder of page intentionally left blank]*

---

[9]  Accessible by visiting https://dm.epiq11.com/SpiritGoForward.

WHEREFORE, the Debtor respectfully requests that the Court enter the Proposed Orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated:   November 18, 2024
              New York, New York

DAVIS POLK & WARDWELL LLP

/s/ *Darren S. Klein*
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000
Marshall S. Huebner
Darren S. Klein
Christopher S. Robertson
Moshe Melcer

*Proposed Counsel to the Debtor and Debtor in Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **SPIRIT AIRLINES, INC.,** | Case No. 24-11988 (___) |
| Debtor.[1] | |

### INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO SATISFY PREPETITION TRADE CLAIMS IN THE ORDINARY COURSE OF BUSINESS, (II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS, AND (III) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**")[2] of Spirit Airlines, Inc. (the "**Debtor**"), the debtor and debtor in possession in the above-captioned Chapter 11 Case, for entry of interim and final orders, pursuant to sections 105(a), 363(b), 503(b), 507(a)(2), and 546(h) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (a) authorizing, but not directing, the Debtors to satisfy in the ordinary course of business, in their sole discretion and business judgment, the allowed prepetition claims (collectively, the "**Prepetition Trade Claims**") of creditors that provide goods or services related to the Debtors' operations (the "**Trade Creditors**"), (b) granting administrative priority status under sections 503(b) and 507(a)(2) of the Bankruptcy Code to all undisputed Prepetition Order Claims of the Debtors, and authorizing, but not directing, the Debtors to satisfy such claims in the ordinary course of business, in their sole discretion, (c) authorizing the Debtors, in their sole discretion, to return goods they purchased from Trade Creditors prior to the Petition Date for credit against such Trade Creditors' prepetition claims, and (d) authorizing the applicable financial

---

[1] The last four digits of the Debtor's employer identification number is 7023. The Debtor's mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

institutions to receive, process, honor, and pay all checks or wire transfers used by the Debtors to pay the foregoing, as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157; and the Court having found that it may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of the Chapter 11 Case and related proceedings being proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties, such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed and considered the Motion and the First Day Declaration; and the Court having held a hearing to consider the relief requested in the Motion on an interim basis (the "**Hearing**"); and the Court having determined that the legal and factual bases set forth in the Motion and the First Day Declaration and at the Hearing establish just cause for the relief granted herein; and the Court having found that the relief requested in the Motion represents a sound exercise of the Debtor's business judgment, and is in the best interests of the Debtor, its creditors, its estate, and all other parties in interest; and the Court having determined that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtor and its estate as contemplated by Bankruptcy Rule 6003; and all objections and reservations of rights filed or asserted in respect of the Motion, if any, having been withdrawn, resolved, or overruled with prejudice; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.       The Motion is granted on an interim basis and as set forth herein (this "**Interim Order**").

2.       The Debtor is authorized, but not directed, to satisfy all or part of, in its sole discretion, the Prepetition Trade Claims in the ordinary course of business.

3.       The undisputed Prepetition Order Claims are hereby granted administrative priority status under sections 503(b) and 507(a)(2) of the Bankruptcy Code.

4.       The Debtor, in its sole discretion, may condition payment of any Prepetition Trade Claim upon agreement by such Trade Creditor to continue supplying goods or services to the Debtor on such Trade Creditor's Customary Trade Terms during the pendency of the Chapter 11 Cases or on such other terms and conditions as are acceptable to the Debtor.

5.       As a further condition of receiving payment on account of a Prepetition Trade Claim, the Debtor is authorized, in its sole discretion, to require that the applicable Trade Creditor agree to take whatever action is necessary to remove any existing Liens at such Trade Creditor's sole cost and expense and waive any right to assert a Lien on account of the paid Prepetition Trade Claim.

6.       Any party that accepts payment from the Debtor on account of a Prepetition Trade Claim shall be deemed to have agreed to the terms and provisions of this Interim Order and is bound hereby.

7.       The following procedures, which the Debtor may implement in its sole discretion as a condition to satisfying Prepetition Trade Claims, are approved:

(a)      Payment of Prepetition Trade Claims may include a communication of a statement substantially similar to the below:

> By accepting this payment, the payee agrees to the terms of the Order of the United States Bankruptcy Court for the Southern District of New York, dated [●], 2024, in *In re Spirit Airlines, Inc.* (No. 24-__), entitled "*[Interim] [Final] Order (I) Authorizing the*

*Debtor to Satisfy Prepetition Trade Claims in the Ordinary Course of Business, (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief*" [ECF No. [●]], a copy of which can be found at https://dm.epiq11.com/SpiritGoForward, and, submits to the jurisdiction of that court for enforcement thereof.

(b)    As a condition to receiving payment on account of a Prepetition Trade Claim, the Debtor may require, in its sole discretion, that the applicable Trade Creditor agree to take whatever action is necessary to remove any existing Liens at such Trade Creditor's sole cost and expense and waive any right to assert a Lien on account of the paid Prepetition Trade Claim.

(c)    If a Trade Creditor accepts payment for a Prepetition Trade Claim and thereafter refuses to supply goods or services to the Debtor on the Customary Trade Terms, then the Debtor may, in its sole discretion, and without further order of the Court (i) declare that the payment of such Prepetition Trade Claim is a voidable post-petition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtor may recover from such Trade Creditor in cash or in goods (including by setoff against post-petition obligations) and (ii) demand that such Trade Creditor immediately return such payments in respect of its Prepetition Trade Claim to the extent that the aggregate amount of such payments exceeds the post-petition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, or adjustments of any type whatsoever. Upon recovery of such payment by the Debtor, such Trade Creditor's Prepetition Trade Claim shall be reinstated in such an amount as to restore the Debtor and the applicable Trade Creditor to their original positions, as the payment of the Prepetition Trade Claim had not been made.

8.    The Debtor is authorized, but not directed, to return (in its sole discretion) goods that were delivered before the Petition Date for an offset of the purchase price of such goods against such Trade Creditors' prepetition claims, subject to the limitations imposed by any orders of the Court and any prior rights of holders of security interests in such goods (or the proceeds thereof). In addition, the Debtor is authorized, but not directed, to return (in its sole discretion) goods that were delivered after the Petition Date for an offset of the purchase price of such goods against such Trade Creditors' post-petition claims, subject to the limitations imposed by any orders of the Court and any prior rights of holders of security interests in such goods (or the proceeds thereof).

9.     The Debtor shall maintain a matrix of all payments made in satisfaction of Trade Creditors' prepetition claims in excess of $1 million, which matrix shall be provided to the U.S. Trustee on the twentieth day of each month (subject to Bankruptcy Rule 9006) for the preceding month.

10.     All applicable banks and other financial institutions are hereby authorized to receive, process, honor, and pay any and all checks, drafts, wires, check transfer requests, or automated clearinghouse transfers evidencing amounts paid by the Debtor under this Interim Order whether presented prior to, on, or after the Petition Date.  Such banks and financial institutions are authorized to rely on the Debtor's representations as to which checks are issued or authorized to be paid pursuant to this Interim Order without any duty of further inquiry and without liability for following the Debtor's instructions.

11.     The Debtor is authorized, but not required, to (a) issue new post-petition checks or effect new fund transfers (in each case, in its sole discretion) on account of the Prepetition Trade Claims to replace any prepetition checks or fund transfer requests that may be dishonored or rejected and (b) reimburse the applicable Trade Creditor or other payee, as the case may be, for any fees or costs incurred by them in connection with a dishonored or voided check or funds transfer.

12.     A final hearing to consider the relief requested in the Motion shall be held on _____, 2024 at ____ _.m. (prevailing Eastern Time) and any objections or responses to the Motion shall be filed and served on the Notice Parties so as to be actually received on or prior to _____, 2024 at 12:00 p.m. (prevailing Eastern Time).

13.     Nothing in this Interim Order or any action taken by the Debtor in furtherance of the implementation hereof shall be deemed to constitute an assumption or rejection of any

executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, and all of the Debtor's rights with respect to such matters are expressly reserved.

14.    Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall (a) create, nor is it intended to create, any rights in favor of, or enhance the status of any claim held by, any person or entity or (b) be deemed to convert the priority of any claim from a prepetition claim into an administrative expense claim.

15.    Nothing in this Interim Order nor the Debtor's payment of claims pursuant to this Interim Order shall be construed as or deemed to constitute (a) an agreement or admission by the Debtor as to the amount, priority, character, or validity of any claim against the Debtor on any grounds, (b) a grant of third-party beneficiary status or bestowal of any additional rights on any third party, (c) a waiver or impairment of any rights, claims, or defenses of the Debtor's or any party in interest's rights to dispute the amount, priority, character, or validity of any claim on any grounds, whether under bankruptcy or non-bankruptcy law, (d) a promise by the Debtor to pay any claim, (e) an implication or admission by the Debtor that such claim is payable pursuant to this Interim Order, or (f) a waiver of the Debtor's or any party in interest's right to contest any Lien or Interest and efforts to exercise associated remedies during the Chapter 11 Case.

16.    Notwithstanding Bankruptcy Rule 6004, this Interim Order shall be effective and enforceable immediately upon its entry.

17.    The Debtor is authorized to take any action it deems necessary or appropriate to implement and effectuate the terms of, and the relief granted in, this Interim Order without seeking further order of the Court.

18.     The Court retains jurisdiction over any matter arising from or related to the

implementation, interpretation, and enforcement of this Interim Order.

Dated:     _____, 2024
           New York, New York

           _____
           UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **SPIRIT AIRLINES, INC.,** *et al.*, | Case No. 24-11988 ( ) |
| Debtors.[1] | (Joint Administration Requested) |

## FINAL ORDER (I) AUTHORIZING THE DEBTORS TO SATISFY PREPETITION TRADE CLAIMS IN THE ORDINARY COURSE OF BUSINESS, (II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS, AND (III) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**")[2] of Spirit Airlines, Inc. and its affiliates (collectively, the "**Debtors**"), each of which is a debtor and debtor in possession in the above-captioned Chapter 11 Cases, for entry of interim and final orders, pursuant to sections 105(a), 363(b), 503(b), 507(a)(2), and 546(h) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (a) authorizing, but not directing, the Debtors to satisfy in the ordinary course of business, in their sole discretion and business judgment, the allowed prepetition claims (collectively, the "**Prepetition Trade Claims**") of creditors that provide goods or services related to the Debtors' operations (the "**Trade Creditors**"), (b) granting administrative priority status under sections 503(b) and 507(a)(2) of the Bankruptcy Code to all undisputed Prepetition Order Claims of the Debtors, and authorizing, but not directing, the Debtors to satisfy such claims in the ordinary course of business, in their sole discretion, (c) authorizing the Debtors, in their sole discretion, to return goods they purchased from Trade Creditors prior to the Petition Date for credit against such Trade Creditors' prepetition

---

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Airlines Inc. (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

claims, and (d) authorizing the applicable financial institutions to receive, process, honor, and pay all checks or wire transfers used by the Debtors to pay the foregoing, as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157; and the Court having found that it may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of the Chapter 11 Cases and related proceedings being proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties, such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed and considered the Motion and the First Day Declaration; and the Court having held a hearing, if necessary, to consider the relief requested in the Motion on a final basis (the "**Hearing**"); and the Court having determined that the legal and factual bases set forth in the Motion and the First Day Declaration and at the Hearing, if any, establish just cause for the relief granted herein; and the Court having found that the relief requested in the Motion represents a sound exercise of the Debtors' business judgment, and is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest; and all objections and reservations of rights filed or asserted in respect of the Motion, if any, having been withdrawn, resolved, or overruled with prejudice; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1. The Motion is granted on a final basis and as set forth herein (this "**Order**").

2.     The Debtors are authorized, but not directed, to pay all or part of, in their sole discretion, the Prepetition Trade Claims in the ordinary course of business.

3.     The undisputed Prepetition Order Claims are hereby granted administrative priority status under sections 503(b) and 507(a)(2) of the Bankruptcy Code.

4.     The Debtors, in their sole discretion, may condition payment of any Prepetition Trade Claim upon agreement by such Trade Creditor to continue supplying goods or services to the Debtors on such Trade Creditor's Customary Trade Terms during the pendency of the Chapter 11 Cases or on such other terms and conditions as are acceptable to the Debtors.

5.     As a further condition of receiving payment on account of a Prepetition Trade Claim, the Debtors are authorized, in their sole discretion, to require that the applicable Trade Creditor agree to take whatever action is necessary to remove any existing Liens at such Trade Creditor's sole cost and expense and waive any right to assert a Lien on account of the paid Prepetition Trade Claim.

6.     Any party that accepts payment from the Debtors on account of a Prepetition Trade Claim shall be deemed to have agreed to the terms and provisions of this Order and is bound hereby.

7.     The following procedures, which the Debtors will implement in their sole discretion as a condition to satisfying Prepetition Trade Claims, are approved:

(a)     Payment of Prepetition Trade Claims may include a communication of a statement substantially similar to the below:

> District of New York, dated [●], 2024, in *In re Spirit Airlines, Inc.* (No. 24-__), entitled "*[Interim] [Final] Order (I) Authorizing the Debtors to Satisfy Prepetition Trade Claims in the Ordinary Course of Business, (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief*" [ECF No. [●]], a copy of which can be found at

https://dm.epiq11.com/SpiritGoForward,  and,  submits  to  the jurisdiction of that court for enforcement thereof.

(b)     As a condition to receiving payment on account of a Prepetition Trade Claim, the Debtors may require, in their sole discretion, that the applicable Trade Creditor agree to take whatever action is necessary to remove any existing Liens at such Trade Creditor's sole cost and expense and waive any right to assert a Lien on account of the paid Prepetition Trade Claim.

(c)     If a Trade Creditor accepts payment for a Prepetition Trade  Claim and thereafter refuses to supply goods or services to the Debtors on the Customary Trade Terms, then the Debtors may, in their sole discretion, and without further order of the Court (i) declare that the payment of such Prepetition Trade Claim is a voidable post-petition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover from such Trade Creditor in cash or in goods (including by setoff against post-petition obligations) and (ii) demand that such Trade Creditor immediately return such payments in respect of its Prepetition Trade Claim to the extent that the aggregate amount of such payments exceeds the post-petition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, or adjustments of any type whatsoever.  Upon recovery of such payment by the Debtors, such Trade Creditor's Prepetition Trade Claim shall be reinstated in such an amount as to restore the Debtors and the applicable Trade Creditor to their original positions, as if the payment of the Prepetition Trade Claim had not been made.

8.     The Debtors are authorized, but not directed, to return (in their sole discretion) goods that were delivered before the Petition Date for an offset of the purchase price of such goods against such Trade Creditors' prepetition claims, subject to the limitations imposed by any orders of the Court and any prior rights of holders of security interests in such goods (or the proceeds thereof).  In addition, the Debtors are authorized, but not directed, to return (in their sole discretion) goods that were delivered after the Petition Date for an offset of the purchase price of such goods against such Trade Creditors' post-petition claims, subject to the limitations imposed by any orders of the Court and any prior rights of holders of security interests in such goods (or the proceeds thereof).

9.     The Debtor shall maintain a matrix of all payments made in satisfaction of Trade Creditors' prepetition claims in excess of $1 million, which matrix shall be provided to the U.S.

Trustee on the twentieth day of each month (subject to Bankruptcy Rule 9006) for the preceding month.

10.    All applicable banks and other financial institutions are hereby authorized to receive, process, honor, and pay any and all checks, drafts, wires, check transfer requests, or automated clearinghouse transfers evidencing amounts paid by the Debtors under this Order whether presented prior to, on, or after the Petition Date.  Such banks and financial institutions are authorized to rely on the Debtors' representations as to which checks are issued or authorized to be paid pursuant to this Order without any duty of further inquiry and without liability for following the Debtors' instructions.

11.    The Debtors are authorized, but not required, to (a) issue new post-petition checks or effect new fund transfers (in each case, in their sole discretion) on account of the Prepetition Trade Claims to replace any prepetition checks or fund transfer requests that may be dishonored or rejected and (b) reimburse the applicable Trade Creditor or other payee, as the case may be, for any fees or costs incurred by them in connection with a dishonored or voided check or funds transfer.

12.    Nothing in this Order or any action taken by any Debtor in furtherance of the implementation hereof shall be deemed to constitute an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, and all of the Debtors' rights with respect to such matters are expressly reserved.

13.    Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall (a) create, nor is it intended to create, any rights in favor of, or enhance the status of any claim held by, any person or entity or (b) be deemed to convert the priority of any claim from a prepetition claim into an administrative expense claim.

14.     Nothing in this Order nor any Debtor's payment of claims pursuant to this Order shall be construed as or deemed to constitute (a) an agreement or admission by any Debtor as to the amount, priority, character, or validity of any claim against any Debtor on any grounds, (b) a grant of third-party beneficiary status or bestowal of any additional rights on any third party, (c) a waiver or impairment of any rights, claims, or defenses of any Debtor's or any party in interest's rights to dispute the amount, priority, character, or validity of any claim on any grounds, whether under bankruptcy or non-bankruptcy law, (d) a promise by any Debtor to pay any claim, (e) an implication or admission by any Debtor that such claim is payable pursuant to this Order, or (f) a waiver of any Debtor's or any party in interest's right to contest any Lien or Interest and efforts to exercise associated remedies during the Chapter 11 Cases.

15.     Notwithstanding Bankruptcy Rule 6004, this Order shall be effective and enforceable immediately upon its entry.

16.     The Debtors are authorized to take any action they deem necessary or appropriate to implement and effectuate the terms of, and the relief granted in, this Order without seeking further order of the Court.

17.     The Court retains jurisdiction over any matter arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated:     _____, 2024
           New York, New York

           _____
           UNITED STATES BANKRUPTCY JUDGE