**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **SPIRIT AIRLINES, INC.,** *et al.*, | Case No. 24-11988 (SHL) |
| Debtors.[1] | Jointly Administered |

## DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SPIRIT AIRLINES, INC. AND ITS DEBTOR AFFILIATES

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
Marshall S. Huebner
Darren S. Klein
Christopher S. Robertson
Moshe Melcer
Kayleigh Yerdon (*pro hac vice* pending)

*Proposed Counsel to the Debtors and Debtors in Possession*

Dated: December ___, 2024
New York, New York

---

**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES OR OTHER INSTRUMENTS AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES OR OTHER INSTRUMENTS.**

---

[1] The Debtors' names and last four digits of their respective employer identification numbers or registration numbers in the applicable jurisdictions are as follows: Spirit Airlines, Inc. (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT**

The Debtors are soliciting votes on the *Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and its Debtor Affiliates* from the Holders of the following Classes of outstanding Claims:

| Voting Class | Name of Class Under the Plan |
|:---:|:---:|
| 4 | Senior Secured Notes Claims |
| 5 | Convertible Notes Claims |

If you are in Class 4 or Class 5, you are receiving this Disclosure Statement and the accompanying materials because you are entitled to vote on the Plan.  Before submitting a ballot to vote on the Plan, you should review this *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and its Debtor Affiliates*.

TO BE COUNTED AS A VOTE ON THE PLAN, YOUR BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED IN ACCORDANCE WITH THE INSTRUCTIONS RECEIVED FROM YOUR NOMINEE SO THAT THE MASTER BALLOT OR PRE-VALIDATED BALLOT REFLECTING YOUR VOTE IS <u>ACTUALLY RECEIVED</u> BY THE DEBTORS' CLAIMS AND SOLICITATION AGENT, EPIQ CORPORATE RESTRUCTURING, LLC (THE "CLAIMS AND SOLICITATION AGENT" OR "EPIQ") ON OR BEFORE <u>JANUARY 21, 2025, AT 5:00 P.M.</u> (PREVAILING EASTERN TIME) (THE "VOTING DEADLINE").

PLEASE SUBMIT YOUR BENEFICIAL BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE, WHICH MAY INCLUDE (A) SUBMITTING THIS BENEFICIAL BALLOT OR (B) CONVEYING YOUR VOTE VIA EMAIL, TELEPHONE, INTERNET APPLICATION, FACSIMILE, VOTER INFORMATION FORM, OR OTHER ACCEPTED AND CUSTOMARY MEANS OF DELIVERING SUCH INFORMATION TO YOUR NOMINEE.  PLEASE ALLOW SUFFICIENT TIME FOR ALL STEPS.

PLEASE READ YOUR BALLOT CAREFULLY FOR FURTHER INFORMATION AND INSTRUCTIONS.  FAILURE TO ABIDE BY SUCH INSTRUCTIONS MAY RESULT IN YOUR BALLOT NOT BEING COUNTED.

If you have any questions regarding the voting procedures or any of the solicitation materials you received, or you need to obtain additional solicitation materials, please contact Epiq by: (a) calling 888-863-4889 (in the U.S.) or +1-971-447-0326 (international) or (b) emailing <u>SpiritGoForward@epiqglobal.com</u> with reference to "Spirit Airlines" in the subject line.  You may also visit the Debtors' Case Information Website at <u>https://dm.epiq11.com/SpiritGoForward</u>.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases (once the cases have been filed) for a fee via at <u>www.nysb.uscourts.gov</u> or free of charge at <u>https://dm.epiq11.com/SpiritGoForward</u>.

**Preliminary Statement and Disclaimers**[2]

Spirit Airlines, Inc. and its affiliates (collectively, the "**Debtors**," "**Spirit**," or the "**Company**") submit this disclosure statement (including all appendices, exhibits, schedules, and supplements, and as altered, amended, supplemented, or otherwise modified from time to time, the "**Disclosure Statement**") in connection with the Solicitation of votes on the *Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and its Debtor Affiliates* (including all appendices, exhibits, schedules, and supplements, and as altered, amended, supplemented, or otherwise modified from time to time in accordance therewith, the "**Plan**"). A copy of the Plan is attached hereto as **Exhibit G** and is incorporated herein by reference in its entirety.

The Bankruptcy Court has established **5:00 p.m. on January 21, 2025** as the deadline for Filing and serving objections to the final approval of the Disclosure Statement and Confirmation of the Plan. *See* ECF No. [●]. A hearing for the Bankruptcy Court to consider final approval of the Disclosure Statement and confirmation of the Plan (as such hearing may be continued from time to time, the "**Combined Hearing**") will commence at **11:00 a.m. on January 29, 2025**. The Combined Hearing may be adjourned or continued from time to time by the Bankruptcy Court or the Debtors by announcement of the adjournment or continuance at a hearing before the Bankruptcy Court or by Filing a notice on the docket of the Chapter 11 Cases. In accordance with the Plan, the Plan may be modified, if necessary, before, during, or as a result of the Combined Hearing without further action by the Debtors and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

The purpose of the Disclosure Statement is to describe the Plan and its provisions and to provide adequate information, as required under section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors who have the right to vote on the Plan so that they can make informed decisions in doing so. Holders of Claims entitled to vote on the Plan should have received a Ballot together with this Disclosure Statement to enable them to vote on the Plan in accordance with the voting instructions and make any other elections or representations required pursuant to the Plan.

The Disclosure Statement contains detailed information regarding, among other things, (a) the terms of the Plan,[3] (b) the classification and treatment of Holders of all Classes of Claims and Interests, (c) the effect of the Plan on Holders of Claims and Interests and other parties in interest thereunder, (d) certain risk factors to consider, (e) certain tax issues related to the Plan and the Plan Distributions, and (f) the means for implementation of the Plan.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan. There is no assurance that the

---

[2] Capitalized terms used but not immediately or otherwise defined herein shall have the meanings ascribed to them elsewhere herein or in the Plan. To the extent that a definition in this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern. The rules of interpretation set forth in Article I.B of the Plan shall apply hereto. All times herein are expressed in prevailing Eastern Time.

[3] The descriptions and summaries herein are intended to serve as summaries and are qualified in their entirety by reference to the operative agreements, schedules, exhibits, and other documents (including the Plan) and applicable law. In the event of any inconsistencies between the summaries or descriptions set forth herein and the respective documents, the latter shall control. Monetary figures referenced herein may be estimates.

Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or, in the alternative, waived.

This Disclosure Statement contains summaries of certain provisions and certain other documents and information. The financial information (including any financial projections) included herein is provided solely for the purpose of soliciting votes on the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan. While the summaries in the Disclosure Statement shall not constitute or be construed as an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, the Debtors believe that the summaries contained in the Disclosure Statement are fair and accurate. The summaries of the financial information (including any financial projections) in the Disclosure Statement and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents.

Except as otherwise provided herein or in accordance with applicable law, the Debtors are under no duty to update or supplement the Disclosure Statement. The Bankruptcy Court's approval of the Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Disclosure Statement. The statements and information contained herein have been made as of the date hereof unless otherwise specified. Holders of Claims reviewing the Disclosure Statement should not assume at the time of such review that there have been no changes to the facts or information set forth herein since the date of the Disclosure Statement. All Holders of Claims entitled to vote on the Plan are advised and encouraged to read the Plan and Disclosure Statement in their entirety before voting on the Plan. No Holder should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in the Disclosure Statement (including the documents attached hereto). The Disclosure Statement does not constitute, and shall not be deemed to constitute, legal, business, financial, tax, or other advice, including as it relates to Holders or any other party in interest. Any Entity desiring any such advice should consult with their own advisors.

Although the Debtors have attempted to ensure the accuracy of the financial information (including any financial projections) provided herein or incorporated herein by reference, such information contained herein has not been audited, except to the extent specifically indicated otherwise herein. The financial information (including any financial projections) provided herein has been prepared by the Debtors' management and their financial advisor. Such information, while presented with numerical specificity, is necessarily based on a variety of estimates and assumptions that, although considered reasonable by management, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market, financial, and other uncertainties and contingencies, many of which are beyond the Debtors' control. The Debtors caution that no representations can be made as to the accuracy of such information or the ability to achieve the projected results. Some assumptions inevitably will not materialize. Further, events and circumstances occurring subsequent to the date on which the financial information (including any financial projections) was prepared may be different from those assumed or may have been unanticipated and, thus, the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. Such information, therefore, may not be relied upon as a guarantee or other assurance of the actual results that will occur.

With respect to any pending, threatened, or potential litigation or other actions against the Debtors, nothing in the Disclosure Statement, nor any action taken by a Debtor in connection herewith, shall constitute or be construed as an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather constitutes, and is to be construed as, a statement made in the context of settlement negotiations in accordance with rule 408 of the Federal Rules of Evidence and any applicable analogous state or foreign laws or rules.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors.  No Entity is or has been authorized to give any information with respect hereto and the matters addressed herein, other than that which is contained herein or incorporated herein by reference.  No representations concerning the Debtors, or the value of their property have been authorized by the Debtors other than as set forth herein.  Any information, representations, or inducements made to obtain a vote on the Plan other than, or inconsistent with, the information contained herein should not be relied upon by any Holder.

The Disclosure Statement contains forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, as amended, all of which are based on various estimates and assumptions.  Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein.  When used in the Disclosure Statement, the words "believe," "expect," "anticipate," "estimate," "intend," "project," "plan," "likely," "may," "will," "should," "shall," or other words or phrases of similar import generally identify forward-looking statements.  Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved.  These statements are only predictions and are not guarantees.  Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement.  All forward-looking statements attributable to the Debtors or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in the Disclosure Statement.  Forward-looking statements speak only as of the date on which they are made.  Except as required by law, the Debtors expressly disclaim any obligation to update or revise any forward-looking statement, whether as a result of new information, subsequent events, anticipated or unanticipated circumstances, or otherwise.  See Articles VI–VIII of this Disclosure Statement for a discussion of certain considerations and risk factors that Holders entitled to vote on the Plan should consider.

The Debtors will rely on (a) section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution, if applicable, of New Equity Interests (other than the Equity Rights Offering Holdback Shares, the Backstop Shares, and the Backstop Premium Shares) under the Plan, and to the extent such exemption is not available, then such New Equity Interests will be offered, issued, and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws and (b) Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act, and similar Blue-Sky Laws provisions, to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution, if applicable, of the Equity Rights Offering Holdback Shares, the

Backstop Shares, and the Backstop Premium Shares to certain Holders of Allowed Senior Secured Notes Claims and certain eligible Holders of Allowed Convertible Notes Claims.

The Debtors will rely on Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, or Regulation S under the Securities Act, and similar Blue-Sky Laws provisions, to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution to Holders of Allowed Senior Secured Notes Claims and to certain eligible Holders of Allowed Convertible Notes Claims of the Exit Secured Notes under the Plan.

The Bankruptcy Court has not granted final approval of this Disclosure Statement or the Plan, and the securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "**Securities Act**"), or any securities regulatory authority of any state under any state securities law ("**Blue-Sky Laws**"). This Disclosure Statement has not been approved or disapproved by the SEC or any state or non-U.S. regulatory authority and neither the SEC nor any state or non-U.S. regulatory authority has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. Neither the Solicitation of votes on the Plan, nor this Disclosure Statement, is intended to constitute an offer to sell or the Solicitation of an offer to buy securities in any state or other jurisdiction in which such offer or Solicitation is not authorized or is unlawful.

\*\*\*

# TABLE OF CONTENTS

ARTICLE I.
                EXECUTIVE SUMMARY ...................................................................1

    **A.**    Introduction.......................................................................................... 1

    **B.**    Overview of the Restructuring Transactions ........................................ 2

    **C.**    Voting ................................................................................................. 3

    **D.**    Summary of Treatment of Claims and Interests and Description of Recoveries Under the Plan.................................................................................... 4

    **E.**    Confirmation ....................................................................................... 7

    **F.**    Effects of Confirmation and Plan Implementation ............................... 7

ARTICLE II. COMPANY OVERVIEW ........................................................................8

    **A.**    Operations .......................................................................................... 8

    **B.**    Prepetition Corporate and Capital Structure ...................................... 12

    **C.**    Credit Card Processing Arrangements ............................................... 14

ARTICLE III.
                PREPETITION EVENTS ..............................................................14

    **A.**    Recent Macroeconomic Trends ......................................................... 14

    **B.**    Strategic Initiatives .......................................................................... 15

    **C.**    Elavon Agreement Amendments ....................................................... 16

    **D.**    Advisor Engagement......................................................................... 17

    **E.**    The Debtors' Entry Into the Restructuring Support Agreement .......... 17

ARTICLE IV.
                POST-PETITION EVENTS ...........................................................18

    **A.**    The First Day Pleadings.................................................................... 18

    **B.**    The Scheduling Order ....................................................................... 19

ARTICLE V.
                CONFIRMATION REQUIREMENTS ...........................................19

    **A.**    The Combined Hearing...................................................................... 20

    **B.**    Classification.................................................................................... 20

    **C.**    Consensual Confirmation.................................................................. 20

    **D.**    Feasibility and Best Interests of Creditors ........................................ 21

          1.    Best Interests Test .................................................................21

          2.    Liquidation Analysis..............................................................22

          3.    Application of the Best Interests Test.......................................22

          4.    Feasibility.............................................................................23

          5.    Valuation of the Debtors........................................................23

    **E.**    Confirmation Without Necessary Acceptances; Cramdown ............... 24

ARTICLE VI.
      PLAN-RELATED RISK FACTORS ................................................................25

    **A.**    Certain Bankruptcy Considerations ..................................................... 25
        1.    The Plan May Not Be Accepted ....................................................25
        2.    The Plan May Not Be Confirmed or Recognized..........................25
        3.    Parties in Interest May Object to the Amount or Classification
            of Claims......................................................................................26
        4.    The Debtors May Object to the Amount or Classification of a
            Claim.............................................................................................26
        5.    Nonconsensual Confirmation........................................................27
        6.    The Chapter 11 Cases May Be Converted to Cases under
            Chapter 7 of the Bankruptcy Code................................................27
        7.    Plan Releases May Not Be Approved............................................27
        8.    Allowance of Claims May Substantially Dilute the Recovery to
            Holders of Claims under the Plan ..................................................27
        9.    Certain Tax and Securities Implications of the Plan......................28
        10.    The Chapter 11 Cases ...................................................................28
        11.    Failure To Consummate the Plan...................................................28
        12.    Any Valuation of Any Assets for Plan Distributions is
            Speculative and Could Potentially Be Zero ..................................28
        13.    Support of the Consenting Stakeholders is Subject to the Terms
            of the Restructuring Support Agreement .......................................29
        14.    The Backstop Commitments for the Equity Rights Offering
            May Be Terminated .......................................................................29
        15.    The Reorganized Debtors May Not Be Able To Achieve Their
            Projected Financial Results...........................................................29
        16.    The Financial Projections Are Subject to Inherent Uncertainty
            Due to the Numerous Assumptions Upon Which They Are
            Based.............................................................................................29
        17.    Historical Financial Information May Not Be Indicative of
            Future Financial Performance........................................................30
        18.    The Terms of the Plan Documents are Subject to Change Based
            on Negotiations and Approval of the Bankruptcy Court ...............30
        19.    Certain Significant Holders of New Equity Interests May Have
            Substantial Influence Over the Reorganized Debtors Following
            the Effective Date .........................................................................30
        20.    Holders of the New Equity Interests May Experience Dilution
            of Their Ownership Interests .........................................................30
        21.    The Interests of Holders of the New Equity Interests Will Be
            Subordinated to the Reorganized Debtors' Indebtedness ..............31
        22.    The Reorganized Debtors May Not Pay Dividends on Account
            of the New Equity Interests...........................................................31
        23.    The New Equity Interests May Be Subject to Restrictions on
            Transfers .......................................................................................31
        24.    The Exit Financing Facilities Will Be Secured Only to the
            Extent of the Value of the Assets Granted as Security Therefor;

the Fair Market Value of the Reorganized Debtors Upon Any Foreclosure May Not Be Sufficient to Repay the Exit Financing Facilities in Full ...............................................................32

25. The Exit Financing Facilities May Include Covenants that Impose Restrictions on the Reorganized Debtors' Finances and Business Operations...........................................................32

26. The Reorganized Debtors May Not Be Able to Service Their Funded Debt, Including the Exit Financing Facilities ...................32

27. The Reorganized Debtors May Not Be Able to Comply with Foreign Ownership Requirements ................................................33

**B.** Factors Affecting the Debtors' Businesses, Operations, and Financial Condition if the Debtors Reorganize Under the Plan ........................................ 33

1. The Debtors' Loyalty Program Contracts Subject Them to Contract Termination and Renewal Risks ....................................33

2. Risks Related to the Company's Leverage and Liquidity ............33

3. Certain Claims May Not Be Discharged and May Have a Material Adverse Effect on the Reorganized Debtors' Financial Condition and Results of Operations .............................................34

4. The Reorganized Debtors' Access to Capital May Be Further Limited due to Deterioration of Conditions in the Global Capital Markets, Weakening of Macroeconomic Conditions, and Negative Changes in Financial Performance ..........................34

5. Disruptions in Technologies or Systems Could Adversely Impact the Reorganized Debtors' Operational Results.................35

6. The Reorganized Debtors' Ability to Operate Their Businesses Effectively Could Be Impaired if They Fail to Attract and Retain Key Management and Personnel or to Manage Labor Costs.............................................................................................36

7. The Reorganized Debtors' Ability to Operate Their Businesses Effectively Could Be Impaired if They Fail to Attract and Retain Key Suppliers and Service Providers ................................36

8. The Reorganized Debtors' Ability to Operate Their Businesses Effectively Could Be Impaired in the event of an Emergency, Accident, or Similar Incident.......................................................37

**ARTICLE VII.**
CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .............................................................................................37

**A.** General..........................................................................................................37

**B.** Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors........ 39

1. Entity Classification of the Debtors.............................................39

2. Implementation of the Transactions Contemplated by the Plan ....39

3. Cancellation of Debt Income .......................................................40

4. Other Income ...............................................................................41

5. Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes......................................................................................41

C.      Certain U.S. Federal Income Tax Consequences of the Plan to Certain U.S.
Holders of Notes Claims.........................................................................43
1.      Consequences Relating to Receipt of the Consideration ...............43
2.      Consequences Relating to Ownership and Disposition of the
Consideration .................................................................47
D.      Certain U.S. Federal Income Tax Consequences of the Plan to Certain Non-
U.S. Holders of Notes Claims.................................................................51
1.      Consequences Relating to Receipt of the Consideration ...............51
2.      Consequences Relating to Ownership and Disposition of the
Consideration. ................................................................53
E.      Backup Withholding on Distributions and Information Reporting. .....................55

ARTICLE VIII.
CERTAIN SECURITIES LAW MATTERS .......................................................56
A.      New Equity Interests........................................................................ 56
1.      Offering and Issuance of New Equity Interests ...........................56
2.      Private Placement Securities......................................................57
3.      Subsequent Transfers of New Equity Interests ............................58
B.      Equity Rights Offering........................................................................ 60
C.      Exit Secured Notes Financing.............................................................. 61
1.      Offering and Issuance of the Exit Secured Notes Financing .........61

## **TABLE OF EXHIBITS**

**Exhibit A**      Organizational Chart

**Exhibit B**      Financial Projections

**Exhibit C**      Valuation Analysis

**Exhibit D**      Liquidation Analysis

**Exhibit E**      Schedule of Retained Causes of Action

**Exhibit F**      Restructuring Support Agreement

**Exhibit G**      Joint Chapter 11 Plan of Reorganization

## ARTICLE I.
## EXECUTIVE SUMMARY

**A.      Introduction**

On November 18, 2024, the Debtors executed the Restructuring Support Agreement[1] with the initial Consenting Stakeholders, who collectively held approximately 80% of the debt to be restructured under the Plan, and over two thirds in amount of each of the Voting Classes.  On the same date, Debtor Spirit Airlines, Inc. commenced the Chapter 11 Cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").  As of November 25, 2024, Consenting Stakeholders that collectively hold approximately 96% of Class 4 (Senior Secured Notes Claims) and over 90% of the Class 5 (Convertible Notes Claims) had entered into the Restructuring Support Agreement.

On November 26, 2024, the Debtors Filed the Plan[2] and this Disclosure Statement with the Bankruptcy Court, and a motion requesting conditional approval of this Disclosure Statement.  The Bankruptcy Court conditionally approved this Disclosure Statement for Solicitation on December [17], 2024.

The Plan is the outcome of extensive negotiations among the Debtors and certain of their key stakeholders—including, as of the Petition Date, Holders of over 78.6% of Class 4 (Senior Secured Notes Claims) and over 84.1% of the Class 5 (Convertible Notes Claims) (who are expected to ACCEPT the Plan along with the other Holders of Class 4 (Senior Secured Notes Claims) and Class 5 (Convertible Notes Claims) who have entered into the Restructuring Support Agreement)—and provides a framework for, among other things, a significant reduction of the Company's prepetition indebtedness, to further advance the Company's efforts in positioning itself for long-term success.  The Plan is not expected to impair general unsecured creditors, employees, customers, vendors, suppliers, aircraft lessors, or holders of secured aircraft indebtedness, but, if effectuated, is expected to lead to the cancellation of the Company's existing equity.

The Company is confident that, upon emergence, it will be well-positioned to create value for all its economic stakeholders.  The Debtors also believe that the Plan (1) is reflective of a global compromise among the Debtors and their key stakeholders and (2) treats Holders of Claims against and Interests in the Debtors in an economic and fair manner in accordance with the Bankruptcy Code's priority scheme and the good-faith compromises and settlements of certain claims and controversies among the Debtors and key stakeholders.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.  The Debtors and the Consenting**

---

[1]    The restructuring support agreement (together with the exhibits thereto, the "**Restructuring Support Agreement**") is attached hereto as **Exhibit F** (without the Plan attached thereto) and is incorporated herein by reference in its entirety.

[2]    The Plan was also filed on the first day of the Chapter 11 Case as an exhibit contained in the First Day Declaration [ECF No. 2].

**Stakeholders believe that confirmation and consummation of the Plan are in the best interests of the Debtors, their Estates, and their creditors. The Plan provides for an equitable distribution to Holders of Claims and the compromise and settlement of certain claims and controversies among the Debtors and key stakeholders. The Debtors believe that any alternative to confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in the loss of hundreds of jobs, the potential demise of the Company's well-recognized and respected brands, the loss of significant value (and a corresponding reduction in the distributions to Holders of Claims in certain Classes), and the potential for delay, litigation, and additional costs. Consequently, the Debtors and the Consenting Stakeholders urge all eligible Holders of Claims eligible to vote on the Plan to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Claims and Solicitation Agent on or before the voting deadline.**

**B.    Overview of the Restructuring Transactions**

The Restructuring Support Agreement provides the framework for a comprehensive series of restructuring transactions (the "**Restructuring Transactions**"), some to be implemented through the Plan, designed to deleverage the Company's capital structure and preserve the going-concern value of the Debtors' businesses, maximize recoveries available to all constituents, and provide for an equitable distribution to the Debtors' stakeholders. Upon Plan consummation, the proposed Restructuring Transactions would restructure approximately $1.635 billion of outstanding funded debt[3] and reduce the Debtors' total funded debt by approximately $795 million.

More specifically, and among other things, the Restructuring Transactions include:

- A $300 million senior secured superpriority debtor-in-possession facility to be provided by certain of the Consenting Stakeholders. The cash provided under the DIP Facility and the Company's available cash should allow the Company to operate in the ordinary course and serve its guests "business as usual" during the pendency of the Chapter 11 Cases.

- Exchanging $700 million of Senior Secured Notes and $140 million of Convertible Notes for the Exit Secured Notes Financing.

- Equitizing the remaining Senior Secured Notes and Convertible Notes (approximately $795 million in aggregate) in the form of New Common Equity in the Reorganized Company.

- A fully-backstopped equity rights offering (the "**Equity Rights Offering**") through which the Reorganized Debtors will raise $350 million of New Common Equity to further support the reorganized balance sheet.

- A Management Incentive Plan to be adopted by the New Board, which will provide for the grants of equity and equity-based awards (in the form of MIP Interest, which may equal up to 10% of New Equity Interests) to employees, directors, consultants,

---

[3]    $1.11 billion of outstanding Senior Secured Notes, $25.1 million of outstanding 2025 Convertible Notes, and $500 million of 2026 Convertible Notes.

and other service providers of the Reorganized Debtor(s), as determined at the discretion of the New Board.

- Entry into a new Exit Revolving Credit Facility.

- Mutual and consensual releases between, among others, the Debtors, the Reorganized Debtors, the DIP Secured Parties, the Consenting Senior Secured Noteholders, the Consenting Convertible Noteholders, the Prepetition Agents/Trustees, the Prepetition RCF Lenders, the Backstop Commitment Parties, the Distribution Agent, any Committee and all members thereof, and their respective Related Parties.

In addition, except as otherwise provided in the Plan or a Final Order, each Executory Contract and Unexpired Lease shall be deemed automatically assumed (subject to the payment of any applicable Cure Cost), pursuant to sections 365 and 1123 of the Bankruptcy Code, as of the Effective Date, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (1) has been previously assumed, assumed and assigned, or rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court, in which case, such Final Order shall control; (2) previously expired or was terminated pursuant to its terms; (3) is the subject of a motion or notice of intent to assume, assume and assign, or reject pending as of the Effective Date; or (4) is otherwise rejected pursuant to the terms hereof (including any Schedule of Rejected Contracts), in which case such rejections shall be deemed effective on the Effective Date (or earlier, if so set forth herein or on any Schedule of Rejected Contracts).

## C.    Voting

Pursuant to the Plan, the Debtors created ten separate Classes of Claims and Interests, as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Deemed to accept |
| 2 | Other Priority Claims | Unimpaired | Deemed to accept |
| 3 | Prepetition RCF Claims | Unimpaired | Deemed to accept |
| 4 | Senior Secured Notes Claims | Impaired | Entitled to vote |
| 5 | Convertible Notes Claims | Impaired | Entitled to vote |
| 6 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 7 | Section 510(b) Claims | Impaired | Presumed to Reject |
| 8 | Intercompany Claims | Unimpaired or Impaired | Deemed to accept or presumed to reject |
| 9 | Intercompany Interests | Unimpaired or Impaired | Deemed to accept or presumed to reject |
| 10 | Existing Interests | Impaired | Presumed to reject |

A Holder's ability to vote on the Plan and receive Plan Distributions depends on, among other things, which Class its Claim is in, as set forth in the table above, and whether it held such Claim on December 10, 2024 (the "**Voting Record Date**").

The Debtors are soliciting votes on the Plan from Holders of Claims classified in Classes 4 and 5 of the Plan (the "**Voting Classes**" and, Holders of Claims in such classes, the "**Voting Holders**"). Detailed instructions regarding how to vote on the Plan are contained on the ballots (the "**Ballots**") distributed to Voting Holders. To be counted as a vote on the Plan, each Ballot must be completed, executed, and returned in accordance with the instructions that were transmitted on or with such Ballot, such that the Ballot is <u>actually received</u> by the Claims and Solicitation Agent by the Voting Deadline (*i.e.*, January 21, 2025, at 5:00 p.m.[4]). Except to the extent that the Debtors so determine or as permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof). Any Ballot that does not comply with the instructions that were transmitted with such Ballot or does not comply with the Scheduling Order may not be counted.

### D.    Summary of Treatment of Claims and Interests and Description of Recoveries Under the Plan

Under the Plan, all Allowed Administrative Claims, Professional Fee Claims, DIP Superpriority Claims, and Priority Tax Claims will be paid in full in cash or receive such treatment that renders them Unimpaired under the Bankruptcy Code. The table below provides a summary of the classification, description, treatment, and anticipated recovery of all other Allowed Claims and Interests under the Plan (except to the extent (1) an Allowed Claim has been paid or otherwise satisfied or (2) a Holder has agreed to receive less favorable treatment than it would otherwise be entitled to). This information is provided in summary form below for illustrative purposes only and is qualified in its entirety by reference to the provisions of the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. A Holder's ability to receive Plan Distributions depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan. The recoveries available to holders of Claims are estimates and actual recoveries may materially differ based on, among other things, whether the amount of Claims actually Allowed exceeds the estimates provided below. In such an instance, the recoveries available to holders of Allowed Claims could be materially lower when compared to the estimates provided below. The recoveries available to holders of Claims are estimates and actual recoveries may materially differ based on, among other things, whether the amount of Claims actually Allowed exceeds the estimates provided below (including, for the avoidance of doubt, on account of accrued and unpaid interest, costs, fees, expenses, and indemnities as of the Petition Date).

---

[4] All times herein are expressed in prevailing Eastern Time.

| Class | Claims or Interests | Treatment | Projected Allowed Amount | Projected Plan Recovery |
|-------|---------------------|-----------|--------------------------|-------------------------|
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, at the option of the (Reorganized) Debtor(s) (with the consent of the Required Consenting Stakeholders), either of the following:<br>(i) payment in full in Cash, payable on the later of (A) the Effective Date and (B) the date that is 30 Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter; or<br>(ii) Reinstatement or such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | N/A | 100% |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, at the option of the (Reorganized) Debtor(s) (with the consent of the Required Consenting Stakeholders), any of the following:<br>(i) payment in full in Cash;<br>(ii) Reinstatement or such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code; or<br>(iii) other treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | N/A | 100% |
| 3 | Prepetition RCF Claims | Each Holder of an Allowed Prepetition RCF Claim shall receive, at the option of the (Reorganized) Debtor(s) (with the consent of the Required Consenting Stakeholders), any of the following:<br>(i) payment in full in Cash upon the effectiveness of the Exit Revolving Credit Facility; or<br>(ii) Reinstatement or such other treatment rendering its Allowed Prepetition RCF Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | N/A | 100% |
| 4 | Senior Secured Notes Claims | Each Holder of a Senior Secured Notes Claim shall receive its Pro Rata share of:<br>(i) 76.0% of the New Equity Interests, subject to dilution by the Equity Rights Offering (including the Equity Rights Offering Shares, the Equity Rights Offering Holdback Shares, and the Backstop Shares), the Backstop Premium Shares, and the MIP Interests;<br>(ii) the Senior Secured Notes Subscription Rights (after accounting for the Equity Rights Offering Holdback);<br>(iii) $700 million of the Exit Secured Notes; and<br>(iv) to the extent not paid as adequate protection, cash in an amount equal to all accrued and unpaid interest (at the non-default rate) under the Senior Secured Notes Indenture through the Effective Date. | $1.11 billion | 90.20% |

| Class | Claims or Interests | Treatment | Projected Allowed Amount | Projected Plan Recovery |
|---|---|---|---|---|
| 5 | Convertible Notes Claims | Each Holder of a Convertible Notes Claim shall receive:<br>(i) its Convertible Notes Equity Distribution;<br>(ii) its Pro Rata share of the Convertible Notes Subscription Rights (after accounting for the Equity Rights Offering Holdback);<br>(iii) its Pro Rata share of the Total Convertible Notes Exit Secured Notes Entitlement, subject to adjustment for any Ineligible Convertible Noteholder Adjustment; and<br>(iv) cash in an amount equal to all accrued and unpaid interest (at the non-default rate) under the Convertible Notes Indenture through the Effective Date. | $525.1 million | 43.85% |
| 6 | General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim shall receive Reinstatement or such other treatment rendering its Allowed General Unsecured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.  On and after the Effective Date, the Reorganized Debtors shall continue to pay each Holder of an Allowed General Unsecured Claim in the ordinary course of business. | N/A | 100% |
| 7 | Section 510(b) Claims | All Section 510(b) Claims shall be cancelled, released, extinguished, and otherwise eliminated, and Holders of Section 510(b) Claims shall not receive any Plan Distributions or retain any interest in property on account of such Section 510(b) Claims. | N/A | N/A |
| 8 | Intercompany Claims | All Allowed Intercompany Claims shall either be, in the discretion of the (Reorganized) Debtors (with the consent of the Required Consenting Stakeholders), (i) cancelled, released, extinguished, and otherwise eliminated and Holders of such Intercompany Claims shall not receive any Plan Distributions or retain any interest in property on account of such Intercompany Claims or (ii) Reinstated. | N/A | N/A |
| 9 | Intercompany Interests | All Allowed Intercompany Interests shall either be, in the discretion of the (Reorganized) Debtors, (i) cancelled, released, extinguished, and otherwise eliminated and Holders of such Intercompany Interests shall not receive any Plan Distributions or retain any interest in property on account of such Intercompany Interests or (ii) Reinstated. | N/A | N/A |
| 10 | Existing Interests | All Existing Interests shall be cancelled, released, extinguished, or otherwise eliminated and Holders of such Existing Interests shall not receive any Plan Distributions or retain any interest in property on account of such Existing Interests. | N/A | N/A |

Plan Distributions will be funded, as applicable, with (1) Cash on hand, including any proceeds from the Equity Rights Offering and the Exit Financing Facilities, and (2) the other Assets of the Reorganized Debtors.

### E.    Confirmation

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.  Accordingly, and pursuant to the Bankruptcy Court's *Order (I) Approving the Disclosure Statement on an Interim Basis, (II) Scheduling a Combined Hearing for Final Approval of the Disclosure Statement and Confirmation of the Plan, (III) Establishing Certain Dates and Deadlines in Connection with the Solicitation and Confirmation of the Plan, (IV) Approving the Forms of Ballots, Solicitation Package, and Notices, (V) Approving the Solicitation and Tabulation Procedures, (VI) Approving the Equity Rights Offering Procedures and Related Materials, and (VII) Authorizing the Debtors to (A) Assume and Perform Under the Backstop Commitment Agreement and (B) Pay the Backstop Obligations* [ECF No. [●]] (the "**Scheduling Order**"), the Combined Hearing is scheduled for **11:00 a.m. on January 29, 2025**.

Pursuant to the Scheduling Order, objections to final approval of the Disclosure Statement or confirmation of the Plan, if any, must (1) be in writing, in English, and in text-searchable format, (2) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and any other orders of the Bankruptcy Court, (3) state, with specificity, the legal and factual bases thereof and, if practicable, a proposed modification to the Plan that would resolve such objection, (4) be filed with the Court no later than **5:00 p.m. on January 21, 2024** (the "**Confirmation Objection Deadline**"), and (5) be served on the following parties so as to be actually received prior to the Confirmation Objection Deadline:  (i) [proposed] counsel to the Debtors, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Marshall S. Huebner, Darren S. Klein, Christopher S. Robertson, Moshe Melcer, and Kayleigh Yerdon; (ii) counsel to the Consenting Senior Secured Noteholders, Akin Gump Strauss Hauer & Feld LLP, 1 Bryant Park, New York, New York 10036, Attn: Michael Stamer and Jason P. Rubin; (iii) counsel to the Consenting Convertible Noteholders, Paul Hastings LLP, 71 S. Wacker Drive, Chicago, Illinois 60606, Attn: Matthew L. Warren and Geoffrey King; and (iv) the U.S. Trustee, 1 Bowling Green, New York, NY 10014, Attn: Shara Cornell (shara.cornell@usdoj.gov), Annie Wells (annie.wells@usdoj.gov), and Eric Bradford (eric.bradford@usdoj.gov).

The Debtors served a notice (the "**Combined Hearing Notice**") on parties in interest, including all known Holders, which contains additional information about the Combined Hearing and related deadlines.  For reference, the Plan, this Disclosure Statement, the Scheduling Order, the Combined Hearing Notice, and all other Filings on the public docket of the Chapter 11 Cases are accessible on the Case Information Website (https://dm.epiq11.com/SpiritGoForward) free of charge.

### F.    Effects of Confirmation and Plan Implementation

Following Confirmation, and subject to satisfaction or waiver of each condition precedent in Article IX of the Plan, the Plan will be consummated on the Effective Date.  Among other things, on the Effective Date, certain release, injunction, exculpation, and discharge provisions—which are integral to the Restructuring Transactions—set forth in Article VIII of the Plan will become effective.  Accordingly, it is important to read the provisions contained in Article VIII of the Plan very carefully so that you understand how Confirmation and Consummation—which effectuates

such release, injunction, exculpation, and discharge provisions—may affect you and any Claim or Interest you may hold so that you may cast your vote accordingly.  These provisions will also be included on the Combined Hearing Notice.

The Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized, and pursuant to the New Organizational Documents, for the purposes of satisfying their obligations under the Plan and the continuation of their businesses.

Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Estates, wherever located, including all claims, rights, and Causes of Action, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, and other encumbrances and interests.  On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property, wherever located, and prosecute, compromise, or settle any Claims (including any Administrative Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court, and free and clear of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, other than restrictions expressly imposed by this Plan, and the Confirmation Order.  Such claims and Causes of Action include any of the Debtors' rights to indemnification from third parties and the Debtors' rights in respect of any Insurance Contracts.

Upon Consummation, the Reorganized Debtors shall have, retain, reserve, and be entitled to commence, assert, and pursue all Retained Causes of Action, including those set forth on the schedule of Causes of Action that are not released, exculpated, or waived pursuant to the Plan or otherwise, attached hereto as **Exhibit E** (as amended, supplemented, or otherwise modified from time to time the "**Schedule of Retained Causes of Action**").

If the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their business.  It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of extended Chapter 11 Cases, or of a hypothetical liquidation scenario, see Article V of this Disclosure Statement, and the Liquidation Analysis attached hereto as **Exhibit D**.

## ARTICLE II.
## COMPANY OVERVIEW

**A.    Operations**

1.      Company History and Business Model

The Company was founded in 1964 as Clippert Trucking Company, a Michigan corporation.  In 1990 the Company began chartering air operations and adopted the name Spirit Airlines, Inc. in 1992.  In 1994, Spirit reincorporated in Delaware, and in 1999 it relocated to Florida, first to Miramar, and in 2024, to Dania Beach.

Spirit began operating as a ULCC nearly 20 years ago.  Spirit's ULCC business model historically allowed it to compete principally by offering customers unbundled base fares that

remove components traditionally included in the price of an airline ticket.  By offering customers unbundled base fares, customers are able to save by paying only for the amenities they choose, such as baggage, seat assignments, priority boarding, refreshments, and Wi-Fi.  Nonetheless, as further described herein, Spirit continuously adapts to market conditions, and recently introduced new offerings, including brand new premium selections, as part of a significant transformation that delivers an even friendlier, more comfortable and cost-effective travel experience.

Spirit's ULCC model is predicated on a low-cost structure, primarily through high fleet utilization.  Spirit uses low fares to address underserved markets, which helps it to increase passenger volume and load factors on the flights it operates.  Spirit also has high-density seating configurations on its aircraft and a simplified onboard product designed to lower costs.  High passenger volumes and load factors help increase sales of ancillary products and services, which in turn allows Spirit to further reduce its base fares.

Spirit has developed a substantial network of domestic destinations as well as targeted markets in the Caribbean and Latin America, with a focus on high-volume routes flown by price-sensitive travelers.  Spirit has conducted international flights since 2003 and has valuable experience navigating foreign regulatory regimes and business practices, allowing it to compete effectively against other low-cost carriers.  For the period of 2021 through 2023, no revenue from any one foreign country represented more than 4% of Spirit's total passenger revenue.

The airline industry is highly competitive.  The principal competitive factors in the airline industry include fare pricing, total price, flight schedules, aircraft type, passenger amenities, number of routes served from a city, customer service, safety record and reputation, code-sharing relationships, loyalty programs, and redemption opportunities.  Spirit typically competes in markets served by traditional U.S. network airlines, and other low-cost carriers and ULCCs, and, to a lesser extent, regional airlines.

However, the airline industry (particularly in the United States) is contending with shifting consumer demand and operational headwinds, such that it is unrecognizable from what it was pre-pandemic.  Among other things, non-ULCC carriers have increased their low-fare offerings, and business travel is still not operating at pre-pandemic levels; these, in turn, increase capacity for leisure travel.  However, manufacturing issues and maintenance recalls throughout the industry have introduced significant capacity constraints.  Taken together with inflationary and other macroeconomic headwinds, airlines are facing increased unit costs, and low-fare carriers—whose business models rely on much slimmer margins—are disproportionately affected.

2.      Fleet

Spirit flies only single-aisle Airbus aircraft, which are commonly referred to as "A320 family" aircraft.  This provides significant operational and cost advantages compared to airlines that operate multiple aircraft types.  By operating a single aircraft type, Spirit avoids the incremental costs of training crews across multiple types.  Flight crews are interchangeable across all of Spirit's aircraft, and maintenance, spare parts inventories, and other operational support remains highly simplified compared to airlines with more complex fleets. Due to the commonality among Airbus single-aisle aircraft, Spirit can retain the benefits of a fleet comprised of a single

type of aircraft while still having the flexibility to match the capacity and range of the aircraft to the demands of each route.

A320 family aircraft include the A319, A320, and A321 models, which have broadly common design and equipment but differ most notably in fuselage length, service range, and seat capacity. Within the A320 family of aircraft, models using existing engine technology may carry the suffix "ceo," denoting the "current engine option," while models equipped with new-generation engines may carry the suffix "neo," denoting the "new engine option." As of the Petition Date, Spirit had a fleet of 213 A320 family aircraft (two A319s, 64 A320s, 30 A321s, 26 A321neos, and 91 A320neos), and the average age of the fleet was 5.8 years. Spirit leases 162 of its aircraft. Of the 51 aircraft Spirit owns, 24 are financed through fixed-rate long-term debt and 27 are financed through enhanced equipment trust certificates. Spirit also leases five spare engines financed under operating leases and owns 32 spare engines.

3.       Airbus Order/PDP Financing

In December 2019, Spirit entered into an A320 NEO Family Purchase Agreement with Airbus S.A.S. ("**Airbus**") for the purchase of 100 new Airbus A320neo family aircraft, with options to purchase up to 50 additional aircraft. This agreement (as amended from time to time in accordance with its terms) included a mix of Airbus A319neo, A320neo, and A321neo aircraft with such aircraft scheduled for delivery through 2031. As of June 30, 2024, the firm aircraft orders consisted of 92 A320 family aircraft with Airbus, including A320neos and A321neos, with deliveries expected through 2031. As of June 30, 2024, Spirit had secured financing for nine aircraft scheduled for delivery from Airbus through 2030, to be financed through sale leaseback transactions. Spirit has a financing letter of agreement with Airbus that provides backstop financing for most of the remaining aircraft to be purchased. In addition, on July 30, 2024, Spirit entered into a direct lease transaction with AerCap Holdings N.V. ("**AerCap**") covering 36 aircraft that were originally part of Spirit's order book with Airbus. Under this agreement, AerCap will assume the delivery positions for the 36 aircraft and lease them to Spirit upon delivery from Airbus, and thereby reduce the Company's firm aircraft orders to 56 aircraft.

During the third quarter of 2021, Spirit entered into an Engine Purchase Support Agreement which requires it to purchase a certain number of spare engines in order to maintain a contractual ratio of spare engines to aircraft in the fleet. As of June 30, 2024, Spirit is committed to purchase 16 PW1100G-JM spare engines, with deliveries through 2031. Spirit may elect to supplement these deliveries through additional acquisitions or adjust or defer deliveries, or change models of aircraft in its delivery stream, from time to time, as demand conditions merit.

Under Spirit's purchase agreements for aircraft and engines, it is required to pay pre-delivery deposit payments ("**PDPs**") relating to future deliveries at various times prior to each delivery date. During the six months ending June 30, 2024, Spirit paid $1.8 million in PDPs and $10.8 million in capitalized interest for future deliveries of aircraft and spare engines.

4.       Intellectual Property

Spirit's success depends, in part, on brand recognition and customer loyalty. As of the Petition Date, Spirit utilized trademarks, service marks and other intangible assets in its airline

operations.  The Spirit brand and the Free Spirit loyalty program (as described further below) are two of the most critical pieces of intellectual property Spirit uses on a daily basis.  In 2020, in connection with the Senior Secured Notes offering, Spirit transferred ownership of these assets to newly created, wholly-owned subsidiaries and entered into license agreements pursuant to which it uses its brand and runs its loyalty program.

5.    Loyalty Program/Credit Card Receivables

Spirit maintains a frequent flyer program called "Free Spirit" (the "**Frequent Flyer Program**"), under which customers can accumulate points by (a) flying on Spirit, (b) signing up for and using a Free Spirit-branded credit card, and (c) purchasing points from, or shopping with, the Company's partners.  Customers may then redeem points by purchasing tickets or other goods and services from participating travel companies, hotel and car rental agencies, restaurants, and retailers.  Most redemptions of Free Spirit points are for Spirit tickets and do not lead to significant cash expenditures by Spirit.

In addition to the Frequent Flyer Program, Spirit maintains a loyalty program called the Spirit Saver$ Club (the "**Loyalty Subscription**").  In exchange for an annual fee, the Loyalty Subscription offers its members access to discounted tickets from Spirit, and discounted shopping and travel from its partners.

6.    Employees/Unions

Crucial to its businesses, Spirit employs a talented and dedicated workforce that enables it to maintain its high standards of quality, safety, and sustainability.  Spirit's workforce consists of a combination of full-time and part-time employees, as well as individuals employed by staffing, consulting, and other agencies, service providers, and individuals providing services directly as independent contractors (collectively, the "**Employees**").

As of the Petition Date, Spirit employed approximately 12,800 people (collectively, the "**Direct Employees**"), including 12,300 full-time Direct Employees and 500 part-time Direct Employees.  Approximately 1,600 Direct Employees receive a salary and 11,200 Direct Employees are paid on an hourly basis.  As of June 30, 2024, approximately 84% of Spirit's Direct Employees were represented by unions.  With the exception of Spirit's unionized aircraft maintenance technicians, Spirit's unionized Direct Employees are subject to collective bargaining agreements with Spirit.  Spirit's unionized Direct Employees include approximately 3,400 pilots,[5] 5,800 flight attendants, 740 aircraft maintenance technicians, 400 ramp service employees, 330 customer service agents, and 100 flight dispatchers.

In addition, the Debtors rely upon the services of approximately 8,000 individuals (including independent contractors and temporary and seasonal employees) through staffing, consulting, and other employment agencies and service providers (collectively, the "**Contract Workers**").  The number of Contract Workers fluctuates depending on the Company's needs, but Contract Workers typically account for approximately 40% of the Debtors' total workforce.

---

[5]  This figure includes approximately 170 pilots who were furloughed on September 1, 2024, as previously disclosed in Spirit's financial statements for the second quarter of 2024 filed with the SEC.

**B.**     **Prepetition Corporate and Capital Structure**

Spirit Airlines, Inc. is a public operating company that began trading on the New York Stock Exchange in 2011 with the ticker symbol "SAVE." As of the Petition Date, Spirit Airlines, Inc. had 240,000,000 shares of voting Common Stock authorized, of which 109,523,815 were outstanding. On the Petition Date, the New York Stock Exchange suspended the Common Stock, and began the process of having such Common Stock delisted.

As of the Petition Date, the Debtors had approximately $3.6 billion in aggregate debt outstanding, as reflected in the summary below:

| Funded Debt | Approximate Outstanding Principal Amount |
|---|---|
| Revolving Credit Facility | $300.0 million |
| 8.000% Senior Secured Notes due 2025 | $1.11 billion |
| Aircraft Debt | $1.5 billion |
| ***Total Secured Debt*** | ***$2.9 billion*** |
| 4.750% Convertible Senior Notes due 2025 | $25.1 million |
| 1.000% Convertible Senior Notes due 2026 | $500 million |
| Unsecured Term Loans due 2031 | $136 million |
| ***Total Debt*** | ***$3.6 billion*** |

1.     <u>Revolving Credit Facility</u>

On March 30, 2020, Spirit entered into the Revolving Credit Facility Agreement[6] with the Prepetition RCF Lenders, pursuant to which the Prepetition RCF Lenders provided Spirit with credit commitments in an initial aggregate principal amount of $110 million (later increased to $300 million) under the Prepetition RCF Credit Facility. Revolving availability under the Prepetition RCF Credit Facility is subject to the lesser of the credit commitments thereunder and the value of the borrowing base from time to time. The Company pledged certain take-off and landing rights at LaGuardia Airport, certain engines, and certain aircraft spare parts as collateral to secure its obligations under the Prepetition Revolving Credit Facility. No cash is pledged as collateral under the Prepetition Revolving Credit Facility. As of the Petition Date, Spirit had outstanding borrowings under the Prepetition RCF Credit Facility of approximately $300 million.

2.     <u>Senior Secured Notes</u>

In 2020, Spirit Airlines, Inc. formed its four subsidiaries: Spirit Finance Cayman 1 Ltd. ("**HoldCo 1**"), Spirit Finance Cayman 2 Ltd. ("**HoldCo 2**" and, together with HoldCo 1, the "**HoldCos**"), Spirit Loyalty Cayman Ltd. (the "**Loyalty Issuer**"), and Spirit IP Cayman Ltd. (the "**Brand Issuer**" and, together with Loyalty Issuer, the "**Co-Issuers**"). The Co-Issuers are wholly-owned direct subsidiaries of HoldCo 2, HoldCo 2 is a wholly-owned direct subsidiary of HoldCo

---

[6]   As used herein, "**Revolving Credit Facility Agreement**" refers to that certain credit and guaranty agreement, dated as of March 30, 2020 (as amended, amended and restated, supplemented, or otherwise modified from time to time), among Spirit Airlines, Inc., as borrower, each lender from time to time party thereto (the "**Prepetition RCF Lenders**"), and Citibank, N.A., as administrative agent and collateral agent (in such capacities, the "**Prepetition RCF Agent**"), pursuant to which the Prepetition RCF Lenders provided Spirit Airlines, Inc. with a revolving credit facility (the "**Prepetition Revolving Credit Facility**").

1, and HoldCo 1 is a wholly-owned direct subsidiary of Spirit Airlines, Inc., other than, in the case of each HoldCo and each Co-Issuer, a single share each such entity issued to a special shareholder, who granted a proxy to vote such shares to the collateral agent for the Senior Secured Notes. Each such "special shareholder" was given consent rights over any bankruptcy filing for the applicable Co-Issuer or HoldCo; similarly, an independent director was appointed to the boards of each Co-Issuer and HoldCo, which director also must approve such a bankruptcy filing. A chart illustrating Spirit's corporate structure is attached hereto as **Exhibit A**. The Co-Issuers and HoldCos (collectively, the "**Cayman Subsidiaries**") are Cayman Islands exempted companies incorporated with limited liability, and both HoldCos are special purpose holding companies.

The Co-Issuers and HoldCos were created, and the aforementioned governance features were put in place, for the purpose of raising new capital. To that end, in September 2020, the Co-Issuers co-issued $850 million of 8.00% senior secured notes (the "**Senior Secured Notes**"), which were guaranteed by the Spirit Airlines, Inc. and the HoldCos, pursuant to the Senior Secured Notes Indenture. The Senior Secured Notes are secured by, among other things, a first priority lien on the core assets of Spirit's loyalty programs (comprised of cash proceeds from its Frequent Flyer Program, membership fees from the Spirit Saver$ Club, and intellectual property utilized in connection with the loyalty programs), as well as Spirit's brand intellectual property, which Spirit transferred to the Brand Issuer via certain contribution agreements as part of the 2020 transactions. Spirit Airlines, Inc. has not pledged any cash as collateral with respect to the Senior Secured Notes.

The Co-Issuers subsequently redeemed $340 million of notes in connection with common shares placed with the 2026 Convertible Notes issued in 2021, and in November 2022, the Co-Issuers issued an additional $600 million of Senior Secured Notes. As of the Petition Date, $1.11 billion in Senior Secured Notes were outstanding.

3.    Intercompany Loan

On September 17, 2020, Spirit Airlines, Inc. entered into the Loyalty Program Intercompany Note with Spirit IP Cayman Ltd. and Spirit Loyalty Cayman Ltd, pursuant to which Spirit IP Cayman Ltd. and Spirit Loyalty Cayman Ltd. provided Spirit Airlines, Inc. loans in an initial aggregate principal amount of $850 million corresponding to the aggregate principal amount of the Senior Secured Notes issued by Spirit IP Cayman Ltd. and Spirit Loyalty Cayman Ltd. on such date. The Loyalty Program Intercompany Note is unsecured. The Loyalty Program Intercompany Note was amended and restated on November 17, 2022 to increase the aggregate principal amount of the loans thereunder to $1,110 million as part of a follow on offering of Senior Secured Notes on or about such date. As of the Petition Date, Spirit Airlines, Inc. had outstanding borrowings under the Loyalty Program Intercompany Note of approximately $1,127 billion.

4.    Convertible Notes

On May 12, 2020, Spirit Airlines, Inc. completed the public offering of $175.0 million aggregate principal amount of 4.75% convertible senior notes due 2025 (the "**2025 Convertible Notes**"). The 2025 Convertible Notes bear interest at the rate of 4.75% per year and will mature on May 15, 2025. On April 30, 2021, Spirit Airlines, Inc. completed the public offering of $500.0 million aggregate principal amount of 1.00% convertible senior notes due 2026 (the "**2026 Convertible Notes**" and, together with the 2025 Convertible Notes, the "**Convertible Notes**").

The 2026 Convertible Notes bear interest at the rate of 1.00% per year and will mature on May 15, 2026.  The holders of the Convertible Notes may convert their notes at their option in a certain set of circumstance.  Upon conversion, Spirit Airlines, Inc. will pay or deliver cash, shares of Spirit Airlines, Inc.'s common stock, or a combination thereof, at Spirit's election.  The Convertibles Notes are unsecured.  As of the Petition Date, there were $25.1 million in 2025 Convertible Notes and $500.0 million in 2026 Convertible Notes outstanding.

5.      Unsecured Term Loans

During 2020 and 2021, Spirit entered into three separate Payroll Support Program Agreements with the United States Department of the Treasury under the Coronavirus Aid, Relief, and Economic Security Act (as extended by the Consolidated Appropriations Act of 2021 and the American Rescue Plan Act).  These agreements provided Spirit with grants and unsecured term loans, and the Company used such funding to pay its Employees' salaries, wages, and benefits; in exchange, among other things, the Company issued warrants to the United States Department of the Treasury that may be exercised for shares of the Debtor's Common Stock.

C.      **Credit Card Processing Arrangements**

As is common in the airline industry, almost all of Spirit's sales are through credit card transactions, such that, on average during the first seven months of 2024, cash receipts from the various banks who process such transactions account for over 95% of Spirit's receipts.  Spirit's contractual arrangements with credit card processors permit them, under certain circumstances, to retain a holdback or other collateral, which Spirit records as restricted cash, when future air travel and other future services are purchased via credit card transactions.  The required holdback is the percentage of Spirit's overall credit card sales that their credit card processors hold to cover refunds to customers if Spirit fails to fulfill its flight obligations.

**ARTICLE III.**
**PREPETITION EVENTS**

Over the last several years, Spirit, like many airlines, has been forced to contend with significant macroeconomic and industry-specific headwinds that have strained its businesses and resources, and ultimately led to entry into the Restructuring Support Agreement.  This section describes the circumstances and immediate catalysts underlying the commencement of the Chapter 11 Cases.

A.      **Recent Macroeconomic Trends**

As the seventh largest carrier in the United States, Spirit was not immune to the macroeconomic effects of the COVID-19 pandemic, an oversupplied domestic market, and larger rivals who have capitalized on premium and cost-conscious travelers alike.  In the post-pandemic period, the U.S. airline industry has seen material change as a result of shifting customer demand and operating headwinds.  Business travel through 2023 had not fully returned to pre-COVID volumes, and premium leisure demand soared which, in combination with unbundled fare competition, allowed Legacy (*e.g.*, Delta Air Lines) and Value (*e.g.*, Southwest Airlines) carriers to compete for an even greater portion of basic economy share relative to the ULCCs.  Thus, margin advantage has re-shifted to favor Legacy and Value carriers that enjoy optionality to attract

price-conscious customers while responding to premium leisure demand. Inflationary headwinds also have driven increases in unit costs for all airlines, disproportionately affecting the needs-based travel market and margins for low-fare carriers. This inflationary backdrop also impacts cost pressures by all airlines, including crew and other wages, fuel, airport and third-party costs, and other operational costs.

## B.    Strategic Initiatives

In the wake of these significant macroeconomic and industry-specific headwinds, the Company engaged in several initiatives to reduce costs and remain competitive in the airline industry.

### 1.    Frontier Merger Agreement

In, 2022, Spirit entered into a merger agreement with Frontier Group Holdings, Inc., the parent company of Frontier Airlines, Inc. (together, "**Frontier**"), in an effort to accelerate investment in growth and create America's most competitive ULCC that could compete even more aggressively with the dominant "Big Four" airlines (*i.e.*, American, Delta, Southwest, and United), among others. Under the Frontier merger agreement, Spirit and Frontier were to combine in a stock and cash transaction. On June 6, 2022, Spirit received an unsolicited proposal from JetBlue and, consistent with its fiduciary duties, continued to work with Frontier under the terms of the existing Frontier merger agreement while also engaging in discussions with JetBlue. On July 27, 2022, Spirit announced that it had terminated the merger agreement with Frontier.

### 2.    JetBlue Merger Agreement

On July 28, 2022, Spirit entered into a merger agreement with JetBlue Airways Corporation ("**JetBlue**"), pursuant to which Spirit would have merged with a wholly-owned JetBlue subsidiary, with Spirit continuing as the surviving entity. The combined company was projected to have annual revenues of approximately $11.9 billion based on 2019 revenues.

In March 2023, the United States Department of Justice sued to block the Company's merger with JetBlue, alleging that the transaction was anticompetitive. On January 16, 2024, a federal judge blocked the JetBlue merger, determining that the merger would reduce competition and give airlines more leeway to raise ticket prices. Within an hour of the court blocking the merger, Spirit's stock traded down by 60%. Spirit and its advisors determined that the regulatory obstacles would not permit them to close the transaction in a timely fashion under the merger agreement. Thus, on March 1, 2024, Spirit and JetBlue agreed to terminate the merger agreement. As part of the termination, JetBlue paid Spirit $69 million.

### 3.    Pratt & Whitney

Equipment recalls have also introduced significant capacity restraints and downtime for the Company, as similarly suffered by other U.S. carriers. On July 25, 2023, RTX Corporation, the parent company of Pratt & Whitney, announced that it had determined that a rare condition in the powdered metal used to manufacture certain engine parts required accelerated inspection of the PW1100G-JM geared turbo fan ("**GTF**") fleet, which powers the Company's A320neo family of aircraft.

On March 26, 2024, the Company entered into an agreement with International Aero Engines, LLC ("**IAE**"), an affiliate of Pratt & Whitney, pursuant to which IAE would provide the Company with a monthly credit through the end of 2024, subject to certain conditions, as compensation for each of the Company's aircraft unavailable for operational service due to GTF engine issues from October 1, 2023 through the end of 2024. Furthermore, on April 3, 2024, the Company entered into an amendment to a purchase agreement with Airbus, which defers all aircraft on order that were scheduled to be delivered in the second quarter of 2025 through the end of 2026 to 2030–2031. Pratt & Whitney agreed to issue the Company $30.6 million in credits related to the aircraft on ground days during the first three months of 2024, of which the Company recognized $17.8 million. Negotiated credits are expected to range from $150-200 million in 2024.

4.      Project Bravo

In light of the various market dynamics, the Company embarked upon a comprehensive strategic transformation to improve its financial profile and re-align its business model to adapt to the revised customer and competitive landscape. On July 30, 2024, the Company unveiled new premium offerings for customers that became available in August 2024. These offerings include brand-new premium selections as part of a significant transformation to deliver a friendlier, more comfortable, and more cost-effective travel experience. The four new travel options include: Go Big, Go Comfy, Go Savvy, and Go, which provide a range of options across the entire flying experience, including free Wi-Fi, cabin baggage, snacks, and drinks, all with the flexibility of no change or cancel fees.

5.      Aircraft Transactions

On January 3, 2024, the Company completed a series of sale-leaseback transactions with respect to 25 aircraft, resulting in repayment of approximately $465 million of indebtedness on those aircraft and net cash proceeds to the Company of approximately $419 million.

On October 29, 2024, Spirit Airlines, Inc. entered into an aircraft sale and purchase agreement with GA Telesis, LLC ("**GAT**"), under which Spirit agreed to sell 23 Airbus A320ceo/A321ceo aircraft for an expected total purchase price of approximately $519 million. Some aircraft were delivered to GAT prior to the Petition Date while the remaining aircraft are scheduled for delivery in the coming weeks, as further described in the *Motion of the Debtor for Entry of an Order Authorizing the Debtor to Assume and Perform Under an Aircraft Sale Agreement with G.A. Telesis LLC (including, without limitation, Selling Aircraft Free and Clear of Encumbrances). See* ECF No. 97.

**C.      Elavon Agreement Amendments**

On May 21, 2009, Spirit entered into a signatory agreement (as amended from time to time in accordance with its terms, the "**Credit Card Processing Agreement**") with an affiliate of U.S. Bank National Association ("**U.S. Bank**" or "**Elavon**"), pursuant to which Elavon processes credit card payments for the Debtors. On July 2, 2024, the Company entered into a letter agreement (the "**First Elavon Amendment**") which modified the Credit Card Processing Agreement to, among other things, extend the term thereof until December 31, 2025, including automatic extensions for two successive one-year terms (subject to the right of either party to opt out of any extension term

by written notice to the other within a specified period of time prior to the commencement of any extension term); however, under the First Elavon Amendment, if a specified amount of the Senior Secured Notes were not extended or refinanced by September 20, 2024 (the "**Senior Secured Notes Extension Deadline**"), then the expiration date under the Credit Card Processing Agreement was changed to December 31, 2024 (the "**Early Maturity Date**") (with no automatic extensions). In accordance with the First Elavon Amendment, in July 2024, the Company also deposited $200 million into a U.S. Bank deposit account and $50 million in pledged cash into a restricted U.S. Bank account. The $200 million deposited into the deposit account is considered a compensating balance arrangement that does not legally restrict the Company's use of this cash.

On September 9, 2024, the Company entered into a letter agreement further modifying the Credit Card Processing Agreement to extend the Senior Secured Notes Extension Deadline from September 20, 2024 to October 21, 2024. On October 11, 2024, the Company entered into a letter agreement further modifying the Credit Card Processing Agreement to extend (a) the Senior Secured Notes Extension Deadline from October 21, 2024 to December 23, 2024 and (b) the Early Maturity Date from December 31, 2024 to March 3, 2025.

### D.    Advisor Engagement

In the spring of 2024, in the face of approaching maturities and in the wake of the JetBlue merger termination, the Company embarked on a comprehensive strategic transformation to improve its financial profits and re-align its business model to adapt to the shifting customer and competitive landscape. In parallel, Spirit also entered discussions regarding the restructuring of its Senior Secured Notes and Convertible Notes. The Company worked with its investment banker, Perella Weinberg Partners ("**Perella Weinberg**"), and legal counsel, Davis Polk & Wardwell LLP ("**Davis Polk**"), to explore strategic alternatives, and subsequently engaged Alvarez & Marsal North America, LLC ("**A&M**" and, together with Perella Weinberg and Davis Polk, the "**Advisors**") as financial advisor, to assist with the restructuring efforts and to facilitate the commencement of the Chapter 11 Cases.

The Company and its Advisors continuously assessed options to refinance its upcoming maturities and focused on evaluating various transactions that could right-size its assets and capital structure and set the Company on a path for long-term success despite industry-wide and macroeconomic headwinds. In April 2024, the Company and its Advisors initiated a process to formulate, evaluate, and consider various potential strategic and financial alternatives with a view to maximizing enterprise value. However, after many months of considering alternatives, viable out-of-court restructuring options became increasingly unlikely, and, after full consideration of the Company's potential strategic and financial alternatives, it became clear that an in-court process would likely be necessary to maximize value for the Company and its creditors while positioning the Company for long-term success.

### E.    The Debtors' Entry Into the Restructuring Support Agreement

Over the last several months, the Company and its Advisors engaged in extensive good-faith negotiations with various key parties at arm's length, including members of the Ad Hoc Group of Senior Secured Noteholders (holding approximately 78.6% of the Senior Secured Notes as of the Petition Date), the Ad Hoc Group of Convertible Noteholders (holding approximately

84.1% of the Convertible Notes as of the Petition Date) (together, the "**Ad Hoc Groups**"), and their respective advisors, with the aim of reaching agreement on a consensual and comprehensive series of restructuring transactions that would materially decrease the Company's leverage and position it for success going forward.  As part of this process, (certain members of) the Ad Hoc Groups (and their respective advisors) were provided access to confidential and non-public information and documentation relating to the Company's operations, to better understand the scope and complexity of Spirit's businesses, including operations, financial projections, and potential liabilities.  During these negotiations, the Company and the Ad Hoc Groups exchanged and considered, with the assistance of their respective advisors, numerous restructuring proposals, including for several out-of-court restructuring options, before concluding that an in-court restructuring was the only viable path.[7]

The negotiations culminated on November 18, 2024, with the execution of the Restructuring Support Agreement by Spirit Airlines, Inc. and the Consenting Stakeholders, which requires each party to support the consummation of the "Restructuring Transactions" through the "prearranged" Plan.  The Restructuring Support Agreement is supported by the Ad Hoc Groups, which holders have agreed, among other things, to take an impaired recovery on their claims, permit the non-impairment of the Debtors' general unsecured creditors, backstop the Equity Rights Offering, and/or provide exit financing through the Exit Secured Notes Financing.[8]

## ARTICLE IV.
## POST-PETITION EVENTS

### A.      The First Day Pleadings

On the Petition Date, the Debtors also Filed several "first day" motions (collectively, the "**First Day Pleadings**") designed to ease the Debtors' transition into chapter 11, maximize the value of the Debtors' assets, and minimize the effects of the commencement of the Chapter 11 Cases.  The Bankruptcy Court has entered orders with respect to each of the First Day Pleadings, enabling the Debtors to preserve value and efficiently administer the Chapter 11 Cases, including by (1) approving the Put Option Premium  and adequate protection for certain prepetition secured creditors, (2) authorizing the Debtors to maintain existing cash management system, bank accounts, and business forms, and continue to perform intercompany transactions, (3) authorizing the Debtors to pay certain prepetition taxes and fees, (4) authorizing the Debtors to pay their obligations under prepetition insurance policies, continue paying brokerage fees, enter into new premium financing agreements in the ordinary course of business, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of business, (5) granting authority to pay employees' wage Claims and related obligations in the ordinary course of business and maintain certain employee benefit programs, (6) approving procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services, and determining that the Debtors are not required to provide additional

---

[7]  Over the last few months, the Company and Frontier restarted negotiations around a possible merger transaction.  In recent weeks, certain members of the Ad Hoc Groups were made aware of such discussions as well. Those discussions were discontinued and are no longer ongoing.

[8]  While the Debtors believe that the Restructuring Transactions are in the best interests of the Debtors, their estates, and all parties in interest, nevertheless, and for the avoidance of doubt, Spirit maintains a broad "fiduciary out" under the Restructuring Support Agreement.  *See* Ex. E, § 6.03.

adequate assurance, (7) authorizing the Debtors to honor prepetition obligations to customers and continue customer practices, (8) authorizing the Debtors to honor prepetition obligations to its vendors and other commercial counterparties, (9) authorizing the Debtors to implement restrictions and procedures regarding shares and Stock in the Debtors, and (10) approving the DIP Documents and the financing to be provided to the Debtors thereunder (following an additional hearing).  *See* ECF Nos. 46, 47, 50, 51, 52, 53, 54, 56, 57, 58, 59, 60, 80, and 92.

To assist the Debtors in carrying out their duties as debtors in possession, and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors also intend to file applications approving the retention of various professionals, including A&M, Davis Polk, and PWP, though these applications will not be filed until several weeks after the Petition Date.

On November 25, 2024, the Cayman Subsidiaries filed their own bankruptcy petitions.  On November 26, 2024, the Bankruptcy Court entered orders directing that the Chapter 11 Cases should be jointly administered for procedural purposes and ordering that the relief granted with respect to the First Day Pleadings shall apply to the Cayman Subsidiaries.

**B.      The Scheduling Order**

On December [17], 2024, the Court entered the Scheduling Order which, among other things, (1) conditionally approved the Disclosure Statement as containing adequate information, in compliance with section 1125(a) of the Bankruptcy Code, for the purpose of soliciting votes on the Plan, (2) approved the forms of Ballots, Solicitation Package, and other related notices, and (3) established certain dates and deadlines in connection with the solicitation and confirmation of the Plan, including the following:

| Event | Date |
| --- | --- |
| Voting Record Date | December 10, 2024 |
| Distribute Combined Hearing Notices and Notices of Nonvoting Status | Within four Business Days after entry of the Scheduling Order or as soon as reasonably practicable thereafter |
| Voting Deadline, Deadline for Holders of Unimpaired Claims to opt out of the Third-Party Releases, and Confirmation Objection Deadline | 5:00 p.m. on January 21, 2025 |
| Combined Hearing | 11:00 a.m. on January 29, 2025 |

**ARTICLE V.
CONFIRMATION REQUIREMENTS**

The following is a brief summary of the Plan confirmation process.  Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and consult their own legal, financial, and other advisors.

A.      **The Combined Hearing**

Pursuant to the Scheduling Order, the Combined Hearing will take place on **January 29, 2025, at 11:00 a.m.**   The Combined Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment Filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation.  Objections to Confirmation of the Plan must be filed and served by the Confirmation Objection Deadline and in accordance with the Scheduling Order.

B.      **Classification**

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims (excluding administrative claims) against, and equity interests in, a debtor into separate classes based upon their legal nature.  Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtors believe that the Plan classifies all Claims and Interests in compliance with the provisions of the Bankruptcy Code because valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created hereunder.  Accordingly, the classification of Claims and Interests in the Plan complies with section 1122 of the Bankruptcy Code.

C.      **Consensual Confirmation**

In general, the Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a chapter 11 plan accept the plan.  As further set forth in section 1124 of the Bankruptcy Code, a class is impaired unless the plan (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or interest entitles the holder of such claim or interest or (2) cures any default, reinstates the original terms of the obligation, and does not otherwise alter the legal, equitable, or contractual rights to which the claim or interest entitles the holder of such claim or interest.  In addition, Classes that receive no Plan Distributions are not entitled to vote on the Plan and are deemed to have rejected the Plan.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds in dollar amount and more than one half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.  For the avoidance of doubt, votes will be tabulated in accordance with the Scheduling Order.

The Bankruptcy Court can confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code.  One of these technical requirements is that the Bankruptcy Court finds, among other things, that the Plan has been accepted by the requisite votes of all Classes of Impaired Claims and Interests, unless approval

will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes.

In addition to the voting requirements, section 1129 of the Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (1) the Plan has classified Claims in a permissible manner, (2) the Plan complies with applicable provisions of the Bankruptcy Code, (3) the Plan has been proposed in good faith and not by any means forbidden by law, (4) the disclosure required by section 1125 of the Bankruptcy Code has been made, (5) the Plan has been accepted by the requisite votes of Holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code), (6) the Plan is "feasible" and Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation or reorganization is proposed in the Plan, (7) the Plan is in the "best interests" of all Holders of Claims in an Impaired Class by providing such holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such holders would receive or retain in a chapter 7 liquidation, unless each holder of a Claim in such Class has accepted the Plan, and (8) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Combined Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date.  The Debtors believe that the Plan fully complies with all the applicable requirements of section 1129 of the Bankruptcy Code (see "Best Interests Test" and "Feasibility" below), other than those pertaining to voting, which has not yet concluded.

**D.    Feasibility and Best Interests of Creditors**

1.    <u>Best Interests Test</u>

As noted above, even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code (the "**Best Interests Test**").

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan.  If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

2.      Liquidation Analysis

Amounts that Holders of Claims or Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtors prepared by the Debtors' management with the assistance of the Debtors' financial advisor (the "**Liquidation Analysis**"), which is attached hereto as **Exhibit D**.  As described in **Exhibit D**, the Debtors developed the Liquidation Analysis based on forecasted values as of January 31, 2025, unless otherwise noted in the Liquidation Analysis.  The recoveries may change based on further refinements of Allowed Claims and as the Debtors' claims objection and reconciliation process progresses.

As described in the Liquidation Analysis, underlying the analysis is a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management and financial advisor, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management or a hypothetical chapter 7 trustee.  The Liquidation Analysis is based on assumptions regarding liquidation decisions that are subject to change.  Accordingly, the values reflected in the Liquidation Analysis might not be realized if the Debtors were, in fact, to undergo a liquidation.

This Liquidation Analysis is solely for the purposes of (a) providing "adequate information" under section 1125 of the Bankruptcy Code to enable Voting Holders to make an informed judgment about the Plan and (b) providing the Bankruptcy Court with appropriate support for the satisfaction of the "Best Interests Test," pursuant to section 1129(a)(7) of the Bankruptcy Code, and should not be used or relied upon for any other purpose, including the purchase or sale of Securities of, or Claims or Interests in, the (Reorganized) Debtors or any of their Affiliates.

Events and circumstances occurring subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner.  The (Reorganized) Debtors do not intend to and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially Filed or to reflect the occurrence of unanticipated events.  Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of the actual results that will occur.

In deciding whether to vote to accept or reject the Plan, Voting Holders must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

3.      Application of the Best Interests Test

The Debtors believe that the continued operation of the Company as a going concern satisfies the Best Interests Test for the Impaired Classes.  Notwithstanding the difficulties in quantifying recoveries to Holders of Claims with precision, the Debtors believe that, based on the Liquidation Analysis, the Plan meets the Best Interests Test.  As the Plan and Liquidation Analysis indicate, Confirmation of the Plan will provide each Holder of an Allowed Claim in an Impaired

Class with an equal or greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code.

    4.    <u>Feasibility</u>

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to Confirmation, that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation is contemplated by the Plan. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors, with the assistance of their financial advisor, analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses. As part of this analysis, the Debtors prepared the financial projections attached hereto as **<u>Exhibit B</u>** (the "**Financial Projections**").

The Financial Projections present information with respect to all the Reorganized Debtors. The Financial Projections do not reflect the full impact of "fresh start reporting" in accordance with American Institute of Certified Public Accountants Statement of Position 90-7 "Financial Reporting by Entities in Reorganization under the Bankruptcy Code." Fresh start reporting may have a material impact on the analysis.

The Debtors prepared the Financial Projections solely for the purpose of (a) providing "adequate information" under section 1125 of the Bankruptcy Code to enable Voting Holders to make an informed judgment about the Plan and (b) providing the Bankruptcy Court with appropriate support that the Plan is feasible, pursuant to section 1129(a)(11) of the Bankruptcy Code, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the (Reorganized) Debtors or any of their Affiliates.

In addition to the cautionary notes contained elsewhere herein, it is underscored that the Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are subject to significant uncertainties. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the financial results. Therefore, the actual results achieved throughout the period analyzed in the Financial Projections may vary from the Financial Projections, and the variations may be material. Also, as noted above, the Financial Projections currently do not reflect the full impact of any "fresh start reporting," which may materially impact the Reorganized Debtors' "Consolidated Balance Sheets" and prospective "Results of Operations." All Voting Holders are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of, and voting on, the Plan.

Based upon the Financial Projections, the Debtors believe that they will be able to make all Plan Distributions and payments under the Plan and that Confirmation of the Plan is not likely to be followed by liquidation of the Debtors or the need for further restructuring.

    5.    <u>Valuation of the Debtors</u>

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors deemed it prudent to estimate the post-Consummation going

concern value of the Reorganized Debtors.  Accordingly, an analysis regarding the imputed estimated post-Consummation going-concern value of the Reorganized Debtors is attached hereto as **Exhibit C** (the "**Valuation Analysis**") and incorporated herein by reference.

## E.   Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code, which requires that a court find that a plan (1) "does not discriminate unfairly" and (2) is "fair and equitable" with respect to each non-accepting impaired class of claims or interests.

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

A plan "does not discriminate unfairly" if (1) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (2) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests.

The Debtors believe that, under the Plan, all Impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class.  Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any impaired Class of Claims or Interests.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

1.   Secured Creditors.  Either (a) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (b) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (c) subject to section 363(k) of the Bankruptcy Code, the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (a) or (b) above.

2.   Unsecured Creditors.  Either (a) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim

or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

3. <u>Holders of Interests</u>. Either (a) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (b) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

The Debtors believe that the distributions provided under the Plan satisfy the "fair and equitable" standard. Accordingly, to the extent necessary, the Debtors are seeking Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to each rejecting Class of Claims or Interests, and the Plan constitutes a motion for such nonconsensual Confirmation.

**ARTICLE VI.**
**PLAN-RELATED RISK FACTORS**

**THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH HEREIN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

**A.      Certain Bankruptcy Considerations**

1. <u>The Plan May Not Be Accepted</u>

The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan for the Debtors, or otherwise, that may not have the support of the Holders, or may liquidate their Estates under chapter 7 or chapter 11 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative plan would be similar to or as favorable to Holders as those proposed in the Plan.

2. <u>The Plan May Not Be Confirmed or Recognized</u>

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan. Even if the Bankruptcy Court determines that the Disclosure Statement, the balloting procedures, and the results were appropriate, the Bankruptcy Court could still decline to confirm the Plan—if it found that any of the statutory requirements for Confirmation had not been met. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate the

resolicitation of votes.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims ultimately would receive with respect to their Claims in a subsequent plan.

3.    Parties in Interest May Object to the Amount or Classification of Claims

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtors.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors may seek (a) to modify the Plan to provide for whatever classification might be required for Confirmation or (b) to use the acceptances received from any Holder of Claims pursuant to this Solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, if it were to find that a classification was inappropriate and required a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this Solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim agrees to a less favorable treatment of its Claim.  The Debtors believe that the Plan complies with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification or treatment could result in a delay in the Confirmation or Consummation of the Plan and could increase the risk that the Plan will not be consummated.

4.    The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided herein, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth herein cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described therein.

5.      Nonconsensual Confirmation

In the event that any Impaired Class of Claims or Interests does not vote to accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan if at least one Impaired Class has accepted the Plan, and, as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Class. The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation may result in, among other things, increased expenses relating to professional compensation.

6.      The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors or any Debtor, the Bankruptcy Court may convert such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate such Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of (a) the likelihood that the Assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling the businesses as going concerns at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during a liquidation, including Claims resulting from the rejection of Unexpired Leases and Executory Contracts in connection with cessation of operations.

7.      Plan Releases May Not Be Approved

There can be no assurance that the third-party release, exculpation, discharge, and injunction provisions, as provided in the Plan will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

8.      Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan

There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual Allowed amounts of Claims may differ from these estimates. These estimated amounts are based on certain assumptions with respect to a variety of factors. Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein. Because certain Plan Distributions are linked to the amount and value of Allowed Claims, any material increase in the amount of Allowed Claims over the amounts

estimated by the Debtors would materially reduce the recovery to certain Holders of Allowed Claims under the Plan.

9.        Certain Tax and Securities Implications of the Plan

There are a number of material tax and securities law considerations, risks, and uncertainties associated with the Plan, which are discussed in Article VII and Article VIII of this Disclosure Statement, entitled "Certain U.S. Federal Income Tax Consequences of the Plan," and "Certain Securities Law Matters" (which Holders of Claims and other interested parties should read carefully). Each Holder should consult its own advisors regarding these matters, based upon the particular circumstances pertaining to such Holder.

10.        The Chapter 11 Cases

Although the Plan is designed to minimize the length of the Chapter 11 Cases, and the Debtors believe that, after Confirmation of the Plan, the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case. It is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy (irrespective of whether Confirmation occurs). Even if the Plan is confirmed on a timely basis, matters may arise after the date hereof, including in the Chapter 11 Cases, that could have an adverse effect on the Debtors' businesses. The uncertainty surrounding a prolonged restructuring could have other adverse effects on the Debtors (*e.g.*, it could adversely affect (a) the Debtors' ability to raise additional capital, (b) the Debtors' liquidity, (c) how the Debtors' businesses are viewed by investors, lenders, and credit ratings agencies, (d) the Debtors' enterprise value, and (e) the Debtors' business relationships). The Chapter 11 Cases will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

11.        Failure To Consummate the Plan

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date hereof, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Effective Date will occur.

12.        Any Valuation of Any Assets for Plan Distributions is Speculative and Could Potentially Be Zero

The Debtors have not obtained or requested an opinion from any bank or other firm as to the value of the Plan Distributions. As such, any valuation of any of the Plan Distributions is necessarily speculative, and the value of certain of such assets could potentially be zero. Accordingly, the ultimate value, if any, of the Plan Distributions could materially affect, among other things, recoveries to the Debtors' creditors, including Holders of Allowed Claims in Classes 4 and 5.

13.    <u>Support of the Consenting Stakeholders is Subject to the Terms of the Restructuring Support Agreement</u>

Pursuant to the Restructuring Support Agreement, the Consenting Stakeholders have agreed to support the Plan.  Nevertheless, the Restructuring Support Agreement is subject to termination upon the occurrence of certain termination events set forth therein.  Accordingly, the Restructuring Support Agreement may be terminated after the date of this Disclosure Statement, and such a termination would present a material risk to Confirmation or Consummation of the Plan because the Plan may no longer have the support of creditors holding Claims in number and amount sufficient to obtain Confirmation of the Plan.

14.    <u>The Backstop Commitments for the Equity Rights Offering May Be Terminated</u>

The Debtors' ability to confirm or consummate the Plan may be adversely affected if the backstop commitments to the Equity Rights Offering are withdrawn or are otherwise terminated prior to Confirmation or Consummation.

15.    <u>The Reorganized Debtors May Not Be Able To Achieve Their Projected Financial Results</u>

Actual financial results may differ materially from the Financial Projections.  If the Reorganized Debtors do not achieve projected revenue or cash flow levels, the Reorganized Debtors may lack sufficient liquidity to continue operating their businesses consistent with the Financial Projections after the Effective Date.  The Financial Projections represent management's view based on currently known facts and hypothetical assumptions about their future operations; they do not guarantee the Reorganized Debtors' future financial performance.

16.    <u>The Financial Projections Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based</u>

The Financial Projections are based on numerous assumptions, including the timing for Confirmation and Consummation of the Plan, the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize.  Particular uncertainties with respect to the Reorganized Debtors' operations and financial results arise from the risks and uncertainties including those pointed out in <u>Article IV.B</u> of this Disclosure Statement.  Because the actual results achieved throughout the periods covered by the Financial Projections may vary from the projected results, the Financial Projections may not be relied upon as an assurance of the actual results that will occur.

Except with respect to the Financial Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that might occur subsequent to the date hereof (including finalizing the Exit Financing Documents) or the date of any Financial Projections or any other analysis herein (whichever is earlier), as such events could have a material impact on the information contained herein.  Neither the Debtors nor the Reorganized Debtors intend to update the Financial Projections.  The Financial Projections, therefore, may not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Financial Projections.

17.     <u>Historical Financial Information May Not Be Indicative of Future Financial Performance</u>

The Debtors' capital structure will be significantly altered under any plan ultimately confirmed by the Bankruptcy Court.  Under fresh start reporting rules that may apply to the Reorganized Debtors upon the Effective Date (the impact of which is not reflected in the Financial Projections), the Reorganized Debtors' assets and liabilities would be adjusted to fair values and its accumulated deficit will be restated to zero.  Accordingly, if fresh start reporting rules apply, the Reorganized Debtors' financial condition and results of operations following their emergence from chapter 11 would not be comparable to the financial condition and results of operations reflected in their historical financial statements.  In connection with the Chapter 11 Cases and the development of the Plan, it is also possible that additional restructuring and related charges may be identified and recorded in future periods.  Such charges could be material to the Debtors' consolidated financial position and results of operations in any given period.

18.     <u>The Terms of the Plan Documents are Subject to Change Based on Negotiations and Approval of the Bankruptcy Court</u>

The terms of the Plan Documents (including the Exit Financing Documents, the Equity Rights Offering Documents, and the New Organizational Documents) are subject to material change based on negotiations between the Debtors, the Consenting Stakeholders, and the lenders under each Exit Financing Facility.  As a result, the final terms of the Plan Documents may be less favorable to certain Holders (though, in any event, such final terms would be consistent with the Plan and the requirements of the Bankruptcy Code).  Moreover, the Bankruptcy Court may require changes to the terms of certain Plan Documents before approving them.

19.     <u>Certain Significant Holders of New Equity Interests May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date</u>

Holders of Claims who receive a substantial percentage of the outstanding shares of the New Equity Interests may be able to influence matters not requiring approval by smaller holders of the New Equity Interests, including the election of directors and the approval of a change of control of the Reorganized Debtors.  This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and may consequently affect the value of the New Equity Interests.  Further, the possibility that one or more Holders of a significant portion of New Equity Interests may sell all or a large portion of their New Equity Interests in a short period of time may adversely affect the market price of the New Equity Interests.

20.     <u>Holders of the New Equity Interests May Experience Dilution of Their Ownership Interests</u>

Holders of the New Equity Interests shall be subject to dilution of their ownership interests in connection with any other equity that may be issued post-emergence, including by the MIP Interests and the conversion of any options, warrants, convertible securities, exercisable securities, or other Securities issued post-emergence.

21.     The Interests of Holders of the New Equity Interests Will Be Subordinated to the Reorganized Debtors' Indebtedness

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Equity Interests would rank below all debt claims against the Reorganized Debtors, including the Exit Financing Facilities. As a result, Holders of the New Equity Interests would not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all applicable holders of debt have been paid in full.

22.     The Reorganized Debtors May Not Pay Dividends on Account of the New Equity Interests

The Reorganized Debtors may not pay any dividends on account of the New Equity Interests. In such circumstances, the success of an investment in the Reorganized Debtors would depend entirely upon any future appreciation in the value of the New Equity Interests. There is, however, no guarantee that the New Equity Interests would appreciate in value or even maintain their initial implied valuation.

23.     The New Equity Interests May Be Subject to Restrictions on Transfers

Any New Equity Interests issued to an entity that is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code, and the Backstop Shares, Backstop Premium Shares, and Equity Rights Offering Holdback Shares, would be subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable law. In addition, the New Equity Interests may not be freely tradable if, at the time of a transfer, the holder is an "affiliate" of the Reorganized Debtors, as defined in Rule 144(a)(1) of the Securities Act or had been such an "affiliate" within 90 days of the transfer. "Affiliate" holders would be permitted to sell New Equity Interests without registration only if they comply with an exemption from registration, such as the provisions of Rule 144 under the Securities Act that apply to sales to "control securities." Although the Reorganized Debtors expect to register the New Equity Interests that constitute "restricted securities" or "control securities" for resale on or as soon as reasonably practicable after the Effective Date, such registration requires review of a registration statement by the SEC staff and may take a substantial amount of time.

The terms of the New Organizational Documents may contain prohibitions on the transfer of the New Equity Interests designed to limit an ownership change for purposes of Section 382 of the U.S. Internal Revenue Code or otherwise the Reorganized Debtors may implement a stockholder rights plan designed for such purpose, in each case effective upon the Effective Date. Furthermore, the terms of the New Organizational Documents may contain additional transfer restrictions. These terms would be binding on all recipients of New Equity Interests under the Plan, including any recipients who do not vote to accept the Plan or affirmatively consent to the New Organizational Documents.

24.     <u>The Exit Financing Facilities Will Be Secured Only to the Extent of the Value of the Assets Granted as Security Therefor; the Fair Market Value of the Reorganized Debtors Upon Any Foreclosure May Not Be Sufficient to Repay the Exit Financing Facilities in Full</u>

The fair market value of the collateral securing the Exit Financing Facilities may be or become less than the total amount of debt secured by such collateral; therefore, upon any foreclosure, the noteholders or lenders under the Exit Financing Facilities may not be paid back in full, and the amounts such noteholders or lenders would receive upon a sale of the applicable collateral is inherently uncertain at this time.

If a subsequent bankruptcy or similar proceeding is commenced by or against the Reorganized Debtors, and if the indebtedness under the Exit Financing Facilities exceed the value of the collateral securing them, the Exit Financing Facilities noteholders or lenders may be deemed to have unsecured claims to the same extent that such loans exceed the value of the collateral, in which case, such unsecured claims would not be entitled to the benefits of any security in such collateral.  Additionally, some or all accrued but unpaid interest may be disallowed in any bankruptcy proceeding.

The security interests granted in favor of the administrative agents or trustees under the Exit Financing Facilities are subject to practical problems generally associated with the realization of security interests in collateral and, accordingly, such agents or trustees may be unable to foreclose upon the collateral.

25.     <u>The Exit Financing Facilities May Include Covenants that Impose Restrictions on the Reorganized Debtors' Finances and Business Operations</u>

The Exit Financing Facilities may include restrictive covenants that could limit the Reorganized Debtors' ability to react to market conditions or satisfy any extraordinary capital needs, or otherwise restrict the Reorganized Debtors' financing and operations, and there can be no assurance that the Reorganized Debtors would be able to comply with such covenants.  If the Reorganized Debtors were to fail to comply with such covenants and terms, the Reorganized Debtors may be required to obtain waivers from the applicable lenders under the Exit Financing Facilities, and, if such waivers were not obtained, there could be a material adverse effect on the Reorganized Debtors' financial condition and future performance.

26.     <u>The Reorganized Debtors May Not Be Able to Service Their Funded Debt, Including the Exit Financing Facilities</u>

The Reorganized Debtors' ability to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may not be able to maintain a level of cash flow sufficient to permit them to pay the principal, premium, if any, and interest on their debt, including the loans issued pursuant to the Exit Financing Facilities.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, dispose of assets or operations, seek additional capital, or

restructure or refinance debt, including the Exit Financing Facilities.  These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

27.     The Reorganized Debtors May Not Be Able to Comply with Foreign Ownership Requirements

Under the U.S. Department of Transportation ("**DOT**") regulations and federal law, the Reorganized Debtors must be owned and controlled by U.S. citizens.  In order to qualify, at least 75% of Reorganized Debtors' stock must be voted by U.S. citizens, 51% of Reorganized Debtors' outstanding equity must be owned by U.S. citizens, and its president and at least two-thirds of its board of directors and senior management must be U.S. citizens.  The Reorganized Debtors may not satisfy such requirements and not obtain DOT's and other applicable regulatory approvals. The Reorganized Debtors may, with the consent of the Required Consenting Stakeholders, implement appropriate structures for the issuance of New Equity Interests, including potentially alternative forms of New Equity Interests, pursuant to the Plan in order to comply with any applicable DOT rules and regulations, including to address any applicable limitations on the amount of Reorganized Debtors' voting stock that may be owned or voted by non-U.S. citizens, and any other applicable law or regulations.

**B.      Factors Affecting the Debtors' Businesses, Operations, and Financial Condition if the Debtors Reorganize Under the Plan**

1.      The Debtors' Loyalty Program Contracts Subject Them to Contract Termination and Renewal Risks

The Debtors' loyalty program derives a substantial portion of their revenue from a limited number of co-branding or partner agreements.  The loyalty program attracts customers as well as air and non-air partners and builds customer fidelity by offering a variety of awards, benefits, and services in connection with its loyalty program.  The Debtors' co-branding or partner agreements provide for circumstances upon which they may be terminated prior to the expiration of their terms by one or both parties, or immediately and automatically with no further action from the Debtors or the applicable counterparty at any time.  The failure to satisfy such metrics or standards, unless waived by the counterparty, may give the Reorganized Debtors' partners the right to declare a default, terminate the agreement, renegotiate the agreement, or take other actions that may be detrimental to the Reorganized Debtors.  A termination of any of these agreements may have a material adverse effect on our financial condition, operating revenues and/or net income.

2.      Risks Related to the Company's Leverage and Liquidity

The Reorganized Debtors will have substantial aircraft-related fixed obligations which, together with other incurred debt, could impair their liquidity and thereby harm their business, results of operations, and financial condition.  The Reorganized Debtors' ability to pay the fixed and other costs associated with their contractual obligations depends on operating performance,

cash flow, and their ability to secure adequate financing, which in turn depend on success of their business strategy, fuel price volatility, weakening or improvement in the U.S. economy, as well as general economic and political conditions and other factors that are beyond their control.

The amount of aircraft-related fixed obligations, obligations under debt arrangements, and the related need to obtain financing could have a material adverse effect on the Reorganized Debtors' business, results of operations, and financial condition and could:  (a) require a substantial portion of cash flow from operations for operating lease and maintenance deposit payments, and principal and interest on indebtedness, thereby reducing the availability of their cash flow to fund working capital, capital expenditures, and other general corporate purposes; (b) limit their ability to make required PDP payments, including those payable to aircraft and engine manufacturers for aircraft and spare engines on order; (c) limit their ability to obtain additional financing to support expansion plans and for working capital; (d) reduce the Reorganized Debtors' flexibility in planning for, or reacting to, changes in their business and the airline industry and, consequently, place the Reorganized Debtors' at a competitive disadvantage to their competitors; and (e) cause the Reorganized Debtors to lose access to one or more aircraft and forfeit rent deposits.

3.     Certain Claims May Not Be Discharged and May Have a Material Adverse Effect on the Reorganized Debtors' Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With few exceptions, all Claims that arose prior to the Petition Date or before Confirmation of the Plan (a) will be subject to compromise or treatment under the Plan or (b) will be discharged or transferred in accordance therewith. However, all other remaining Claims could be asserted against the applicable Reorganized Debtor and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

4.     The Reorganized Debtors' Access to Capital May Be Further Limited due to Deterioration of Conditions in the Global Capital Markets, Weakening of Macroeconomic Conditions, and Negative Changes in Financial Performance

In general, the Company relies on banks and capital markets to fund its operations, contractual commitments, and refinance existing debt.  These markets are experiencing, and may in the future experience, high levels of volatility, such that access to capital can be constrained for an extended period.  Other factors, including the Reorganized Debtors' financial performance, could cause the Reorganized Debtors to incur increased borrowing costs and to have greater difficulty accessing public and private markets in the future for both secured and unsecured debt. If the Reorganized Debtors are unable to secure financing on acceptable terms, their other sources of capital may not be adequate to fund operations, contractual commitments, and refinance existing debt.

Moreover, a deterioration in worldwide economic conditions may adversely affect the Reorganized Debtors' business, operating results, financial condition, liquidity, and ability to obtain financing or access capital markets.  Other negative conditions in the general economy both in the U.S. and globally, including conditions resulting from changes in gross domestic product growth, declines in consumer confidence, labor shortages, inflationary pressures, rising interest

rates, and financial and credit market fluctuations, could result in decreases in spending on air travel and otherwise, increases in labor costs and delayed deliveries of aircraft, all of which could materially and adversely affect the growth of our business.

Specifically, interest rates on future credit facilities and debt offerings could be higher than current levels, causing the Reorganized Debtors' financing costs to increase; accordingly, such changes could have an adverse impact on the Reorganized Debtors' ability to issue equity or incur debt for acquisitions or other purposes. As to inflation, while the Reorganized Debtors cannot predict any future trends in the inflation rate, there is currently significant uncertainty in the near-term economic outlook. Continued inflation would further raise Reorganized Debtors' costs for labor, materials, and services, which could negatively impact profitability and cash flows. Additionally, the Reorganized Debtors may be unable to raise fares in amounts equal to the rate of inflation.

Finally, any downgrade in the Reorganized Debtors' ratings for its debt securities and facilities could limit their ability to access the capital markets, increase their borrowing costs, or adversely affect the market price of their outstanding debt. Credit rating agencies will continually review the Reorganized Debtors' ratings and ratings for its debt securities and facilities. Credit rating agencies also evaluate the Reorganized Debtors' industry and may change their credit rating based on their overall view thereof.

5.      Disruptions in Technologies or Systems Could Adversely Impact the Reorganized Debtors' Operational Results

The Company is highly dependent on technology and automated systems to operate its businesses and achieve low operating costs. These technologies and systems include computerized airline reservation systems, flight operations systems, financial planning, management, and accounting systems, telecommunications systems, websites, maintenance systems, and check-in kiosks. The execution of the Reorganized Debtors' strategic plans could be negatively affected by (a) their ability to timely and effectively implement, transition, and maintain related information technology systems and infrastructure, (b) their ability to effectively balance their investment of incremental operating expenses and capital expenditures related to their strategies against the need to effectively control cost, and (c) their dependence on third parties with respect to our ability to implement the Reorganized Debtors' strategic plans. Disruption in or changes to these systems could result in an interruption to the Reorganized Debtors' operations or loss of important data. Any of the foregoing could result in a material adverse effect on Reorganized Debtors' business, reputation, operational results, and financial condition.

The Company is subject to cybersecurity risks and may incur increasing costs in an effort to minimize those risks. Its business employs systems and websites that allow for the secure storage and transmission of proprietary or confidential information regarding its customers, employees, suppliers, and others, including personal identification information, credit card data, and other confidential information. Security breaches could expose the Reorganized Debtors to a risk of loss or misuse of this information, litigation, and potential liability. The security measures implemented by the Reorganized Debtors may not be effective, and systems may be vulnerable to theft, loss, damage, and interruption from a number of potential sources and events, including unauthorized access or security breaches, natural or man-made disasters, cyberattacks (including

ransom attacks in which malicious persons encrypt their systems, steal data, or both, and demand payment for decryption of systems or to avoid public release of data), computer viruses, power loss, or other disruptive events.

6.      The Reorganized Debtors' Ability to Operate Their Businesses Effectively Could Be Impaired if They Fail to Attract and Retain Key Management and Personnel or to Manage Labor Costs

The Reorganized Debtors' ability to operate its businesses will depend on its ability to attract and retain highly skilled management personnel with industry experience. Competition for these persons in the Reorganized Debtors' industry is intense, and the Reorganized Debtors may not be able to continue to employ senior executives and key personnel or attract and retain qualified personnel in the future.

Moreover, the Reorganized Debtors' businesses are labor intensive. Increased labor costs, union disputes, employee strikes, and other labor-related disruption may adversely affect their businesses, results of operations, and financial condition. The Company cannot assure that its labor costs going forward will remain competitive, as labor agreements may be amended or become amendable and new agreements could have terms with higher labor costs; its competitors may significantly reduce their labor costs, thereby reducing or eliminating the Reorganized Debtors' comparative advantages as to one or more of such competitors; or the Company's labor costs may increase in connection with its growth.

7.      The Reorganized Debtors' Ability to Operate Their Businesses Effectively Could Be Impaired if They Fail to Attract and Retain Key Suppliers and Service Providers

The Company is party to agreements with third-party service providers to furnish certain facilities and services required for its operations, such as ground handling, catering, passenger handling, engineering, maintenance, refueling, reservations, and airport facilities. Although the Company seeks to monitor performance of third parties, the efficiency, timeliness, and quality of contract performance by third-party service providers are often beyond its control, and any failure by its service providers to perform their contracts, including as a result of operational failures or a force majeure, may have an adverse impact on the Reorganized Debtors' businesses and operations.

Moreover, the Company is party to agreements with third-party distribution channels to distribute a portion of its tickets. To remain competitive, the Reorganized Debtors need to successfully manage their distribution costs and rights, and improve the functionality of third-party distribution channels, while maintaining an industry-competitive cost structure. Negotiations with key third parties designed to manage costs, increase distribution flexibility, and improve functionality could be contentious or result in diminished or less favorable distribution of tickets, and may not provide the functionality required to maximize ancillary revenues. Any inability to manage third-party distribution costs, rights, or functionality at a competitive level or any material diminishment in the distribution of the Reorganized Debtors' tickets could have a material adverse effect on their competitive position and the results of their operations.

The Company also depends on a limited number of suppliers for aircraft and engines.  The Company's businesses strategy includes saving costs by operating a single-family aircraft fleet, single-aisle aircraft, powered by engines manufactured by specific parties.  Therefore, the Company is exposed to the risk of its suppliers becoming unable to perform their contractual obligations, or to the risk of the Company becoming unable to acquire or lease aircraft or engines from these or other owners, operators, or lessors on acceptable terms.

8.      The Reorganized Debtors' Ability to Operate Their Businesses Effectively Could Be Impaired in the event of an Emergency, Accident, or Similar Incident

The Reorganized Debtors' reputation and business could be materially and adversely affected in the event of an emergency, accident, or similar incident involving its aircraft.  The Reorganized Debtors could potentially be exposed to significant losses if any of their aircraft is subject to an emergency, accident, terrorist incident, or other similar incident, and significant costs related to passenger claims, repairs, or replacement of a damaged aircraft and its temporary or permanent loss from service.  There can be no assurance that the Reorganized Debtors will not be affected by such events or that the amount of their insurance coverage will be adequate in the event such circumstances arise and any such event could cause a substantial increase in the Company's insurance premiums.

## ARTICLE VII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**A.      General**

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Reorganized Debtors, and certain Holders.  The following does not address the U.S. federal income tax consequences to Holders not entitled to vote to accept or reject the Plan.  Thus, the following summary applies only to certain Holders of Senior Secured Notes and Convertible Notes (collectively, the "**Notes Claims**").

The following summary is based on the Tax Code, existing and proposed Treasury Regulations, judicial decisions and authorities, published administrative rules and pronouncements of the IRS, and other applicable authorities, all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly on a retroactive basis.  Any such change could significantly affect the U.S. federal income tax consequences described below.  Due to the lack of definitive judicial and administrative authority in several areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  The Debtors have not requested, and do not intend to seek, an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan discussed below.  The discussion below is not binding on the IRS or the courts and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed below.

The following discussion does not address foreign, state, local, or territory tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (including, for example, foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts,

mutual funds, banks, and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold Notes Claims through, S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, U.S. expatriates, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on unearned income, persons who use the accrual method of accounting and report income on an "applicable financial statement" (as defined in Section 451 of the Tax Code) and persons holding Notes Claims that are part of a straddle, hedging, constructive sale, or conversion transaction).  The following summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity different than any other Holder of a Notes Claim of the same Class, and the tax consequences may differ materially from that described below.  In addition, the following discussion does not address U.S. federal taxes other than income taxes.

For purposes of this Disclosure Statement, a "**U.S. Holder**" means a beneficial owner of Notes Claims that is, for U.S. federal income tax purposes:  (1) a citizen or resident of the United States; (2) a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States or any state therein or the District of Columbia; or (3) an estate or trust, the income of which is subject to U.S. federal income taxation regardless of its source.  If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

For purposes of this Disclosure Statement, a "**Non-U.S. Holder**" means a beneficial owner of Notes Claims that is, for U.S. federal income tax purposes, an individual, corporation (or other entity taxable as a corporation for U.S. federal income tax purposes), estate or trust that is not a U.S. Holder. In addition, for purposes of this discussion, a "Holder" means a U.S. Holder or a Non-U.S. Holder, as applicable.

The following discussion assumes that the Holder has not claimed a bad debt deduction with respect to a Notes Claim (or any portion thereof) in the current or any prior year and such Notes Claim did not become completely or partially worthless in a prior taxable year.  Additionally, the following discussion assumes that (1) the various debt and other arrangements to which any of the Debtors is or will be a party will be respected for U.S. federal income tax purposes in accordance with their form and (2) the Notes Claims are held as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the Tax Code.  The U.S. federal income tax consequences resulting from the implementation of the Plan to the Debtors, Reorganized Debtors, and U.S. Holders may vary from those consequences described below depending on the manner in which the transactions described hereunder are structured.

**ACCORDINGLY, THE FOLLOWING DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR**

**FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A NOTES CLAIM. EACH HOLDER OF A NOTES CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, TERRITORY, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN**

**B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors**

1.      <u>Entity Classification of the Debtors</u>

Spirit Airlines, Inc. ("**Debtor Parent**") is a corporation for U.S. federal income tax purposes. Spirit Finance Cayman 1 Ltd., Spirit Finance Cayman 2 Ltd., Spirit IP Cayman Ltd., and Spirit Loyalty Cayman Ltd. (collectively, the "**Disregarded Entities**") are wholly owned Cayman subsidiaries of Debtor Parent. The Disregarded Entities have made an election to be classified, for U.S. federal tax purposes, as entities that are disregarded as separate from Debtor Parent. Accordingly, for U.S. federal tax purposes, Debtor Parent is treated as the issuer of the Senior Secured Notes and the Convertible Notes, and the remainder of this discussion assumes that the Disregarded Entities will not be treated as entities separate from Debtor Parent for U.S. federal income tax purposes.

2.      <u>Implementation of the Transactions Contemplated by the Plan</u>

The tax consequences of the implementation of the Plan to the Debtors will differ depending on whether the transactions contemplated hereby are structured as a taxable sale of the assets of any Debtor and/or stock of Parent Debtor (a "**Sale Transaction**") or as a reorganization of the debt and equity capital of the Debtors (a "**Reorganization in Place**"). It has not yet been determined how such transactions will be structured, which will depend on, among other things, valuation matters, the ability to offset taxable income arising from a Sale Transaction with tax attributes available to the Debtors, any anticipated tax liabilities associated with a Sale Transaction, and any future tax benefits associated with a step-up in the tax basis of the assets sold pursuant to a Sale Transaction. In light of these various considerations, whether the transactions contemplated hereby will be consummated as a Sale Transaction or a Reorganization in Place is unlikely to be determined until a short time before consummation and, accordingly, Holders should assume that either option is possible.

If the transactions undertaken pursuant to the Plan are structured in whole or in part as a Sale Transaction involving the transfer (or deemed transfer) of the Debtors' assets, the Debtors generally are expected to realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (which generally is expected to equal the fair market value of the assets transferred (or deemed to be transferred) by the Debtors) and the Debtors' tax basis in such assets. Realized gains, if any, may be offset by current-year losses and deductions, which may include interest deductions that may be (or may become) available under Section 163(j) of the Tax Code and by any other available NOLs or other tax attributes, subject to applicable limitations. As of December 31, 2023, the Parent Debtor had a net operating loss ("**NOL**") carryforward for U.S. federal income tax purposes of approximately $1.4 billion (relating to losses incurred after 2017), approximately $234.4 million of interest expense deductions that have been deferred under Section 163(j) of the Tax Code (the "**163(j) Deductions**"), foreign tax

credits of approximately $1 million and general business tax credits of approximately $1.4 million. Because Parent Debtor's NOL carryforwards arose after 2017, they may not be applied to offset more than 80% of its taxable income (with certain adjustments and subject to applicable limitations) for any taxable year, and Parent Debtor may not have sufficient deductions, losses, or other attributes for U.S. federal income tax purposes to fully offset income recognized in a Sale Transaction.

Any taxable gain remaining after such offsets would result in a cash tax obligation. If the Reorganized Debtors purchase (or are deemed to purchase) assets or stock of any Debtor pursuant to a Sale Transaction, such Reorganized Debtors will take a fair market value basis in the transferred assets. If the Sale Transaction is, or is treated as, a purchase of the Parent Debtor's assets, the Parent Debtors' tax attributes will not carry over to, or otherwise be available for utilization by, the Reorganized Debtors.

If the transactions undertaken pursuant to the Plan are structured as a Reorganization in Place, then (i) it is not expected that the Debtors will recognize gain or loss as a result thereof, other than as a result of cancellation of indebtedness income ("**CODI**") (as described immediately below) and (ii) Parent Debtor's tax attributes will, subject to the rules discussed below regarding CODI and Sections 382 and 383 of the Tax Code, survive the restructuring process and carry over to the Reorganized Debtors.

3.    Cancellation of Debt Income

In general, absent an exception, a taxpayer will realize and recognize CODI upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of CODI, in general, is the excess of (a) the adjusted issue price (within the meaning of applicable Treasury Regulations) of the indebtedness satisfied over (b) the sum of the amount of any Cash and the fair market value of any other consideration (including stock of the taxpayer or a party related to the taxpayer) given in satisfaction of such indebtedness. Under Section 108 of the Tax Code, a taxpayer is not required to include CODI in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt is granted by the court or is pursuant to a plan approved by the court. Instead, as a consequence of such exclusion, the taxpayer must reduce certain of its tax attributes by the amount of CODI that it excluded from gross income. In general, tax attributes will be reduced in the following order: (1) NOLs; (2) general business credits; (3) minimum tax credits; (4) capital loss carryovers; (5) tax basis in assets, which includes the stock in subsidiaries (but not below the amount of liabilities to which the debtor remains subject immediately after the discharge); (6) passive activity loss and credit carryovers; and (7) foreign tax credits (collectively, the "**Tax Attributes**"). Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the Tax Code, in which case the limitation described in the immediately preceding sentence does not apply. In general, any reduction in Tax Attributes under the CODI rules does not occur until after the tax for the year of the discharge has been determined. 163(j) Deductions are not subject to reduction under these rules. Any excess CODI over the amount of any such Tax Attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

As discussed above, the Disregarded Entities are entities that are disregarded as separate from Parent Debtor for U.S. federal income tax purposes. Therefore, to the extent that the transactions pursuant to the Plan give rise to CODI, such CODI will be recognized by Parent Debtor for such purposes. Because Parent Debtor is a debtor in bankruptcy, the CODI will be excluded from income by reason of the bankruptcy exception, and Parent Debtor may be required to reduce its Tax Attributes accordingly, as discussed above. Parent Debtor may realize CODI in connection with the transactions contemplated hereby, with an attendant reduction in Tax Attributes (but in the case of tax basis where no election is made to reduce the basis of depreciable assets as described above, only to the extent such tax basis exceeds the amount of the Parent Debtor's liabilities, as determined for these purposes, immediately after the Effective Date). The exact amount of any CODI that will be realized by Parent Debtor will not be determinable until the Consummation of the Plan because the amount of CODI will depend, in part, on the value of the equity interests in the Reorganized Debtors issued in connection with the Plan and the value of other non-Cash consideration, neither of which can be determined until after Consummation. Therefore, the total amount of the reduction of the Tax Attributes as a result of the Plan cannot be determined until after the Effective Date. Depending on the amount of CODI, if the transactions contemplated hereby are structured as a Reorganization in Place, some of the Parent Debtor's tax basis in the Reorganized Debtors' assets may be reduced by CODI that is not absorbed by the NOLs and other Tax Attributes. As a general matter, CODI is not expected to be relevant to the Reorganized Debtors in the event the transactions contemplated hereby are consummated as a Sale Transaction.

4.    <u>Other Income</u>

As discussed above, the Disregarded Entities are entities that are disregarded as separate from Parent Debtor for U.S. federal income tax purposes. Therefore, to the extent that the transactions pursuant to this Plan give rise to any income other than CODI, such other income will be recognized by Parent Debtor. Parent Debtor may incur other income for U.S. federal income tax purposes in connection with the Plan that, unlike CODI, generally will not be excluded from Parent Debtor's U.S. federal taxable income. For example, if appreciated assets are transferred in satisfaction of a Notes Claim or pursuant to a Sale Transaction, Parent Debtor would recognize gain in connection with such transfer and may incur cash tax liability as a result, although such tax liability may be significantly offset by Parent Debtor's Tax Attributes and 163(j) Deductions.

In addition, the U.S. federal income tax considerations relating to the Plan are complex and subject to uncertainties. No assurance can be given that the IRS will agree with Parent Debtor's interpretations of the tax rules applicable to, or tax positions taken with respect to, the transactions undertaken to effect the Plan. If the IRS were to successfully challenge any such interpretation or position, Parent Debtor may recognize additional taxable income for U.S. federal income tax purposes.

5.    <u>Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes</u>

After giving effect to the reduction in Tax Attributes pursuant to excluded CODI and to the offset of any other income, the ability of the Reorganized Debtors in a Reorganization in Place to use any remaining Tax Attributes and certain other attributes post-Consummation may be subject to certain limitations under Sections 382 and 383 of the Tax Code as a result of an "ownership

change" of the Reorganized Debtors by reason of the transactions consummated pursuant to the Plan. As noted above, in a Sale Transaction, the Parent Debtor's Tax Attributes and other attributes generally will not carry over to or otherwise be available for utilization by the Reorganized Debtors.

Under Sections 382 and 383 of the Tax Code, if Parent Debtor undergoes an "ownership change" as defined under Section 382 of the Tax Code, the amount of any remaining NOL carryforwards, tax credit carryforwards, 163(j) Deductions, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change and cost recovery deductions) of Parent Debtor allocable to periods prior to the Effective Date (collectively, the "**Pre-Change Losses**") that may be utilized to offset future taxable income generally are subject to an annual limitation. In general, the amount of the annual limitation to which a corporation that undergoes an ownership change would be subject (the "**Section 382 Limitation**") is equal to the product of (a) the fair market value of the stock of the corporation immediately before the ownership change(with certain adjustments), multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the three-calendar-month period ending with the calendar month in which the ownership change occurs, currently 3.31% for November 2024). For this purpose, if a corporation has a "net unrealized built-in loss" at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then, generally, built-in losses (including depletion, amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. While proposed Treasury Regulations could significantly modify the calculation and treatment of net unrealized built-in gains and losses, those regulations are not expected to apply to the Reorganized Debtors, and the remainder of this discussion assumes they will not apply.

The Debtors expect that the issuance of the Consideration pursuant to the terms of the Plan will give rise to an ownership change for this purpose and that the Reorganized Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of Section 382 of the Tax Code applies.

Special rules may apply in the case of a corporation that experiences an ownership change as a result of a bankruptcy proceeding. An exception to the Section 382 Limitation generally applies in bankruptcy if the corporation's pre-bankruptcy shareholders and certain holders of debt receive, in respect of their interests and claims, at least 50% of the stock of the reorganized corporation (or of a controlling corporation if such corporation also is in bankruptcy) pursuant to a confirmed plan of reorganization (the "**Section 382(l)(5) Exception**"). If a corporation qualifies for the Section 382(l)(5) Exception, the annual Section 382 Limitation will not apply to the corporation's Pre-Change Losses. Instead, the corporation's Pre-Change Losses are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of any ownership change, and the portion of the current taxable year ending on the date of the ownership change, in respect of all debt converted into stock pursuant to the bankruptcy reorganization. Additionally, if the Section 382(l)(5) Exception applies and

42

the reorganized corporation undergoes another ownership change within two years after consummation of the plan of reorganization, then the reorganized corporation would be presumed to have an annual Section 382 Limitation of zero beginning with any taxable year ending after the subsequent ownership change. A corporation may elect not to apply the Section 382(l)(5) Exception.

If the Debtors do not qualify for, or elect not to apply, the Section 382(l)(5) Exception described above, the provisions of Section 382(l)(6) of the Tax Code applicable to corporations under the jurisdiction of a bankruptcy court would generally apply in calculating the annual Section 382 Limitation (the "**Section 382(l)(6) Rule**"). Under the Section 382(l)(6) Rule, a corporation in bankruptcy that undergoes an ownership change pursuant to a plan of reorganization values its stock to be used in computing the Section 382 Limitation after taking into account any increase in value resulting from the discharge of creditors' claims in the reorganization (rather than the value without taking into account such increases, as is the case under the general rule for non-bankruptcy ownership changes).

The Debtors have not determined whether they will be eligible for the Section 382(l)(5) Exception or whether they will affirmatively elect out of the Section 382(l)(5) Exception, if available.

## C.      Certain U.S. Federal Income Tax Consequences of the Plan to Certain U.S. Holders of Notes Claims

### 1.      Consequences Relating to Receipt of the Consideration

Pursuant to the Plan, each U.S. Holder of a Notes Claim will receive in satisfaction thereof Exit Secured Notes, New Equity Interests and Subscription Rights (or, in the case of an Ineligible Convertible Noteholder, Exit Secured Notes only), (collectively, the "**Consideration**"). Additionally, Holders may receive Cash payments (i) as "adequate protection" for interest accrued on the Notes Claims during the pendency of the bankruptcy proceedings or (ii) without duplication, upon consummation of the Plan for any accrued and unpaid interest on the Notes Claims at that time. Although the matter is unclear, the Debtors expect that any such Cash payments will be treated in the same manner as Consideration received in respect of accrued but unpaid interest described below in "— *Accrued Interest*."

#### (a) Uncertain Treatment of Subscription Rights

The characterization of the issuance of the Subscription Rights and their subsequent exercise for U.S. federal income tax purposes – as the issuance and exercise of options to acquire a portion of the Equity Rights Offering Shares or, alternatively, as an integrated transaction pursuant to which the Equity Rights Offering Shares are acquired directly in partial satisfaction of a U.S. Holder's Notes Claim – is uncertain. Although the question is not free from doubt, the Debtors intend to treat the issuance of the Subscription Rights and their subsequent exercise for U.S. federal income tax purposes as an issuance and exercise of options to acquire a portion of the Equity Rights Offering Shares for U.S. federal income tax purposes. Except as expressly provided below, the discussion herein generally assumes that the issuance of Subscription Rights and their

subsequent exercise is treated as an issuance and exercise of options to acquire a portion of the Equity Rights Offering Shares.

*(b) Treatment of the Exchange of Notes Claims for the Consideration*

It is expected that the exchange of the Notes Claims for the Consideration pursuant to the Plan will be treated as a realization event under Section 1001 of the Tax Code.

The U.S. federal income tax consequences to a U.S. Holder of a Notes Claim will depend, in part, on whether (i) for U.S. federal income tax purposes (a) the Notes Claim surrendered by such U.S. Holder constitutes a "security" of Parent Debtor and (b) the Consideration received by such U.S. Holder includes stock in, or a "security" issued by, Reorganized Parent and (ii) the transactions contemplated hereby are structured as a Reorganization in Place or a Sale Transaction. Neither the Tax Code nor the Treasury Regulations define the term "security."

Whether a debt instrument constitutes a security is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including, among others, whether the debt instrument is secured, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. Moreover, in published guidance, the IRS has indicated that newly issued debt instruments that would not qualify as securities when viewed in isolation may, in some circumstances, nonetheless qualify as securities if issued in exchange for existing securities.

The Senior Secured Notes that were issued in 2020 (the "**Original Senior Secured Notes**") and the Convertible Notes had terms of slightly more than five complete years. However, the Senior Secured Notes that were issued in 2022 (the "**Incremental Senior Secured Notes**") had a term of less than three complete years. Therefore, while it is not clear whether the Original Senior Secured Notes or the Convertible Notes will be treated as securities, the Incremental Senior Secured Notes likely will not be treated as securities for this purpose. Thus, although a U.S. Holder (other than an Ineligible Convertible Noteholder) will receive Subscription Rights (which, subject to the discussion above regarding the uncertain characterization of Subscription Rights for U.S. federal income tax purposes, are expected to be treated as zero principal amount securities for this purpose) and New Equity Interests in exchange for the U.S. Holder's Notes Claims, the exchange of Incremental Senior Secured Notes for the Consideration likely will not be treated as a recapitalization, and it is unclear whether the exchange of Original Senior Secured Notes or Convertible Notes for the Consideration will be treated as a recapitalization. It is also unclear whether the Exit Secured Notes will be treated as "securities" for this purpose. If the Exit Secured Notes are not treated as "securities" for this purpose, an Ineligible Convertible Noteholder's exchange pursuant to the Plan will not be treated as a recapitalization. Holders of Notes Claims

should consult their tax advisors as to whether such Notes Claims or the Exit Secured Notes are properly treated as "securities" and whether the exchange qualifies for recapitalization treatment.

If the exchange of the Original Senior Secured Notes or the Convertible Notes for the Consideration is treated as a recapitalization, a U.S. Holder will not recognize loss on such exchange but, if the Exit Secured Notes do not constitute "securities" for this purpose (*i.e.*, if the Exit Secured Notes are "boot" received in the recapitalization), will recognize any gain realized on the exchange to the extent of the fair market value of the Exit Secured Notes received.  In that case, the U.S. Holder's tax basis in any stock or securities included in the Consideration would be equal to its tax basis for the Original Senior Secured Notes or the Convertible Notes, as applicable, increased by the amount of any gain recognized on the exchange and decreased by the fair market value of any "boot" received in the exchange, and the U.S. Holder's holding period for any such stock and securities would include the holding period for the Original Senior Secured Notes or the Convertible Notes, as applicable. The U.S. Holder's tax basis in any "boot" received in the exchange would equal its fair market value, and the U.S. Holder's holding period in the "boot" would begin on the day following the exchange. U.S. Holders should consult their tax advisors with regard to the potential qualification of the exchange as a recapitalization for U.S. federal income tax purposes and the U.S. federal income tax consequences thereof.

If the exchange of the Original Senior Secured Notes or the Convertible Notes for the Consideration is not treated as a recapitalization, a U.S. Holder generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the "issue price" of the Exit Secured Notes (discussed below) and the fair market value of the New Equity Interests and Subscription Rights (in each case, excluding any amount allocable to accrued and unpaid interest on the Notes Claims, discussed in *"Accrued Interest"* below) and (ii) the U.S. Holder's "adjusted tax basis" in the Notes Claim exchanged therefor.  A U.S. Holder's adjusted tax basis in the Notes Claim generally will equal the cost paid (or deemed paid, if acquired as a result of a prior "significant modification" of the Notes Claim) for such Notes Claim, increased by any acquisition discount, market discount or "original issue discount" ("**OID**") previously included in income, and reduced (but not below zero) by any amortizable bond premium previously amortized with respect to the Notes Claim. Subject to the rules for market discount discussed below, gain or loss generally will be capital gain or loss and generally will be long-term capital gain or loss if the U.S. Holder has a holding period in the Notes Claim of more than one year as of the Effective Date.  Long-term capital gains recognized by non-corporate U.S. Holders, including individuals, generally will be taxable at a reduced rate.  The deductibility of capital losses is subject to certain limitations.

If the exchange of the Original Senior Secured Notes or the Convertible Notes for the Consideration is not treated as a recapitalization, a U.S. Holder's tax basis in the Exit Secured Notes generally will be equal to the issue price of such Exit Secured Notes, and its holding period in the Exit Secured Notes will begin on the day after the Effective Date.  A U.S. Holder's tax basis in the New Equity Interests and the Subscription Rights generally will be equal to their respective fair market values, and its holding period in the New Equity Interests and the Subscription Rights will begin on the day after the Effective Date.  Please see *"Accrued Interest"* below for a discussion of accrued but unpaid interest on the Notes Claims.

### (c) Accrued Interest

To the extent that any amount (including Cash) received by a U.S. Holder of a Notes Claim is attributable to accrued but unpaid interest, accrued acquisition discount or OID on the Notes Claim, the receipt of such amount is generally expected to be taxable to the U.S. Holder as ordinary interest income (to the extent not already included in income by the U.S. Holder).  Conversely, a U.S. Holder may be entitled to recognize a deductible loss to the extent that any accrued interest, discount or OID previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.  The tax basis of the Consideration treated as received in satisfaction of accrued but unpaid interest, discount or OID generally is expected to equal the amount of such accrued but unpaid interest, discount or OID.  The holding period for such Consideration generally is expected to begin on the day following the receipt of such consideration.

If the fair market value of the Consideration received by a U.S. Holder is not sufficient to fully satisfy all principal and interest on a Notes Claim, the extent to which such consideration will be attributable to accrued interest, discount or OID is unclear.   Under the Plan, the aggregate Consideration received in respect of a Notes Claim will be allocated first to the principal amount of such Notes Claim, with any excess allocated to unpaid interest, if any, that accrued on such Notes Claim before the Petition Date.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments under a debt instrument as allocated first to any accrued but unpaid interest.  The IRS could take the position that the Consideration received by a U.S. Holder should be allocated in some way other than as provided in the Plan.  U.S. Holders of Notes Claims should consult their own tax advisors regarding the proper allocation of the Consideration received by them under the Plan.

### (d) Market Discount

U.S. Holders of Notes Claims may be affected by the market discount provisions of Sections 1276 through 1278 of the Tax Code.  Under these rules, some or all of any gain realized by a U.S. Holder may be treated as ordinary income (instead of capital gain) to the extent of the amount of market discount on such Notes Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with market discount as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price, in the case of a debt obligation issued with OID) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition.  However, a debt obligation will not be a market discount obligation if such excess is less than a statutory *de minimis* amount (equal to 0.25% of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with OID, multiplied by the number of complete years remaining to maturity as of the time the holder acquired the debt obligation).

Any gain recognized by a U.S. Holder on the taxable disposition of a Notes Claim (determined as described above) that was acquired with market discount generally is expected to

be treated as ordinary income to the extent of the market discount that accrued thereon while the Notes Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  If a Notes Claim that was acquired with market discount is exchanged in a recapitalization for the Consideration, any market discount that accrued on the Notes Claim (*i.e.*, up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the Exit Secured Notes received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such Exit Secured Note is treated as ordinary income to the extent of such accrued market discount.

    2.    <u>Consequences Relating to Ownership and Disposition of the Consideration</u>

    *(a)*    *Exit Secured Notes*

    (i)    Issue Price

The issue price of the Exit Secured Notes will depend on whether the Exit Secured Notes or the Notes Claims are publicly traded (as defined below).

The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered "traded on an established market" ("**publicly traded**").  If the Exit Secured Notes are treated as "publicly traded" for U.S. federal income tax purposes, the "issue price" of the Exit Secured Notes will be the fair market value of the Exit Secured Notes as of their issue date.  If any of the Notes Claims are, but the Exit Secured Notes are not, treated as publicly traded for U.S. federal income tax purposes, then the issue price of an Exit Secured Note received in exchange for a Notes Claim will be based on the trading price of the publicly traded Notes Claims as determined on the issue date of the Exit Secured Notes. There is some uncertainty as to how these rules will apply if some classes of Notes Claims are publicly traded but others are not, or if Senior Secured Notes and Convertible Notes are trading at prices that would not imply the same issue price. If neither the Notes Claims nor the Exit Secured Notes are treated as publicly traded, then the issue price of the Exit Secured Notes issued in exchange for the Notes Claims will be the principal amount of such Exit Secured Notes.

Debt instruments are considered to be publicly traded if, at any time during the 31-day period ending fifteen days after their issue date, the debt instruments are traded on an "established market."  Debt instruments will be considered to trade on an established market if (i) there is a price for an executed purchase or sale of the debt instruments that is reasonably available within a reasonable period of time after the sale, (ii) there is at least one price quote for the debt instruments from at least one reasonably identifiable broker, dealer or pricing service, which price quote is substantially the same as the price for which the person receiving the quoted price could purchase or sell the debt instruments (a "**firm quote**"), or (iii) there is at least one price quote for the debt instruments other than a firm quote, available from at least one such broker, dealer, or pricing service.  Debt instruments will be considered publicly traded for this purpose if they meet any of the prongs described above during the same period.

Under the applicable Treasury Regulations, the Debtors may be required to make a determination as to whether the Notes Claims or Exit Secured Notes are publicly traded and their "issue price," and to make such determinations available to U.S. Holders in a commercially reasonable fashion, including by electronic publication, within 90 days of the issue date of the Exit

Secured Notes.  These Treasury Regulations provide that each of these determinations is binding on a U.S. Holder unless the U.S. Holder satisfies certain conditions.

Because the relevant trading period for determining whether the Notes Claims and the Exit Secured Notes are publicly traded and the issue price of the Exit Secured Notes has not yet occurred, the Debtors are unable to determine the issue price of the Exit Secured Notes at this time.

(ii)    Interest and OID

Payments or accruals of "qualified stated interest" on the Exit Secured Notes generally will be includible in a U.S. Holder's gross income as ordinary interest income and taxable at the time such interest is received or accrued, in accordance with such U.S. Holder's method of tax accounting for U.S. federal income tax purposes.  The term "qualified stated interest" generally means stated interest that is unconditionally payable in Cash or in property (other than debt instruments of the issuer such as any interest payments that are payments in kind ("**PIK Interest**")) at least annually at a single fixed rate or a single qualified floating rate.  Because the Reorganized Debtors have an option to pay PIK Interest on the Exit Secured Notes, only 8% of the stated interest payments on the Exit Secured Notes will be qualified stated interest.

The amount of OID on an Exit Secured Note will be equal to the excess of the stated redemption price at maturity over the issue price (determined as discussed above).  The "stated redemption price at maturity" of an Exit Secured Note generally will equal the sum of all payments required under the Exit Secured Note other than qualified stated interest.

A U.S. Holder will be required to include such OID in income as it accrues, in accordance with a constant-yield method based on a compounding of interest, before the receipt of Cash attributable to this income, regardless of its method of tax accounting.  Under this method, a U.S. Holder will be required to include in ordinary income the sum of the "daily portions" of OID for all days during the taxable year that it owns the Exit Secured Note.  The daily portions of OID are determined by allocating to each day in any accrual period a ratable portion of the OID on the Exit Secured Note that is allocable to that period.  Accrual periods may be any length and may vary in length over the term of an Exit Secured Note, so long as no accrual period is longer than one year.  The amount of OID allocable to each accrual period is determined by multiplying the "adjusted issue price" of the Exit Secured Note at the beginning of the accrual period by the yield to maturity of the Exit Secured Note, adjusted to take account of the length of the accrual period.  The "adjusted issue price" of the Exit Secured Note at the beginning of any accrual period will generally be the sum of its issue price and the amount of OID allocable to all prior accrual periods.  The "yield to maturity" of an Exit Secured Note is the discount rate that causes the present value on the issue date of all payments on the Note other than qualified stated interest to equal the issue price.

Determining the "yield to maturity" of a note (such as the Exit Secured Notes) that provides for alternative interest rates (depending on whether the Reorganized Debtor chooses to pay the interest in all Cash or in a mixture of Cash and PIK Interest) is complex and will depend on certain assumptions as to what interest rate should be used.

(iii)    Sale, Retirement, Redemption, or Other Taxable Disposition

A U.S. Holder of Exit Secured Notes generally will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of the Exit Secured Notes equal to the difference, if any, between (i) the amount realized upon the disposition (less a portion allocable to any accrued interest that has not yet been included in income by the U.S. Holder, which generally will be taxable as ordinary interest income) and (ii) the U.S. Holder's adjusted tax basis in the Exit Secured Notes. In general, a U.S. Holder's adjusted tax basis in Exit Secured Notes generally will be its initial tax basis in the Exit Secured Notes, increased by any accrued OID previously included in the U.S. Holder's gross income with respect to the Exit Secured Notes and reduced by any payments other than qualified stated interests. Any gain or loss on the sale, redemption, retirement, or other taxable disposition of the Exit Secured Notes generally will be capital gain or loss, and generally will be long-term capital gain or loss if the U.S. Holder has held the Exit Secured Notes for more than one year as of the date of disposition. The deductibility of capital losses is subject to certain limitations.

The tax consequences to a U.S. Holder who received Exit Secured Notes in a recapitalization (as described above in "*Treatment of the Exchange of Notes Claims for the Consideration*") may have different consequences upon a sale, redemption, retirement, or other taxable disposition of their Exit Secured Notes, including if the U.S. Holder is treated as having acquired the Exit Secured Notes with market discount or amortizable bond premium. U.S. Holders who receive Exit Secured Notes in a recapitalization should consult with their tax advisors as to the tax consequences of a taxable disposition of their Exit Secured Notes.

(b)    *New Equity Interests*

(i)    Distributions

The gross amount of any distribution made on account of New Equity Interests that is made out of Reorganized Parent's current or accumulated earnings and profits (as determined for U.S. federal income tax purposes) generally is expected to be taxable to a U.S. Holder as ordinary dividend income on the date such distribution is actually or constructively received. Any such dividends generally would be expected to be eligible for the dividends received deduction allowed to corporations in respect of dividends received from U.S. corporations. To the extent that the amount of the distribution exceeds Reorganized Parent's current and accumulated earnings and profits (as determined under U.S. federal income tax principles), such excess amount is generally expected to be treated first as a non-taxable return of capital to the extent of the U.S. Holder's tax basis in its New Equity Interests, and thereafter as capital gain recognized on a sale or exchange. U.S. Holders should consult their own tax advisors with respect to the appropriate U.S. federal income tax treatment of any distribution received from Reorganized Parent.

Dividends paid by Reorganized Parent to non-corporate U.S. Holders who meet certain requirements are generally expected to be eligible to be treated as "qualified dividend income" and therefore taxable at rates applicable to long-term capital gains. U.S. Holders should consult their own tax advisors regarding the availability of these favorable tax rates on dividends in their particular circumstances.

(ii)      Sale, Exchange, or Other Taxable Disposition

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, exchange, or other taxable disposition (other than certain redemptions) of the New Equity Interests.  Such capital gain generally will be long-term capital gain if at the time of the sale, exchange, or other taxable disposition (other than certain redemptions), the U.S. Holder has a holding period in the New Equity Interests of more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described above.  Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Equity Interests as ordinary income if the U.S. Holder claimed a bad debt deduction with respect to its Notes Claims or recognized an ordinary loss on the exchange of its Notes Claims for New Equity Interests.  U.S. Holders should consult with their tax advisors regarding the tax consequences of a redemption of their New Equity Interests, including the possibility that a redemption could be treated as a dividend for U.S. federal income tax purposes.

As discussed above under "— *Exit Secured Notes— Sale, Retirement, Redemption or Other Taxable Disposition*," additional tax considerations may apply to U.S. Holders who received their New Equity Interests in a recapitalization described above under "*Consequences to U.S. Holders of Notes Claims of Receiving the Consideration— Treatment of the Exchange of Notes Claims for the Consideration*."

(c)      *Subscription Rights*

(i)      Exercise

A U.S. Holder that elects to exercise its Subscription Rights generally will be treated as purchasing, in exchange for its Subscription Rights and the amount of Cash funded by the U.S. Holder to exercise the Subscription Rights, the Equity Rights Offering Shares it is entitled to purchase pursuant to the Subscription Rights. In each case, such purchase generally will be treated as the exercise of an option under general tax principles, and the U.S. Holder therefore should not recognize income, gain or loss for U.S. federal income tax purposes. A U.S. Holder's aggregate tax basis in the Equity Rights Offering Shares received upon exercise of the Subscription Rights generally will equal the sum of (a) the amount of Cash paid by the U.S. Holder to exercise its Exit Rights plus (b) such U.S. Holder's tax basis in its Subscription Rights immediately before such Subscription Rights are exercised. A U.S. Holder's holding period in the Equity Rights Offering Shares will begin on the day after the exercise date of the Subscription Rights. A U.S. Holder that elects not to exercise its Subscription Rights and instead allows the Subscription Rights to lapse may be entitled to claim a capital loss upon expiration of the Subscription Rights in an amount equal to the amount of tax basis allocated to the Subscription Rights, subject to any limitations on such U.S. Holder's ability to utilize capital losses. U.S. Holders are urged to consult their own tax advisors as to the tax consequences of either electing to exercise or electing not to exercise the Subscription Rights.

If, contrary to the Debtors' intended treatment, the issuance of the Subscription Rights and their subsequent exercise is treated as an integrated transaction for U.S. federal income tax purposes pursuant to which the Equity Rights Offering Shares are acquired directly in partial

satisfaction of a U.S. Holder's Notes Claim and not as an option to acquire a portion of the Equity Rights Offering Shares, then a U.S. Holder's aggregate tax basis in the Equity Rights Offering Shares received upon exercise of Subscription Rights should be equal to the sum of (i) the amount paid for the Equity Rights Offering Shares and (ii) the U.S. Holder's tax basis, if any, in the portion of such Holder's Notes Claims attributed to the Equity Rights Offering Shares received pursuant to the exercise of Subscription Rights. In that case, the U.S. Holder's holding period in the Equity Rights Offering Shares treated as having been acquired in satisfaction of its Notes Claims would be determined as described above in"—Treatment of the Exchange of Notes Claims for the Consideration," and the Holder's holding period in the Equity Rights Offering Shares treated as having been acquired for Cash would begin on the day after their acquisition.

U.S. Holders should consult their own tax advisors regarding the proper characterization of the Subscription Rights for U.S. federal income tax purposes and the consequences to it of such treatment given its particular circumstances.

## D.   Certain U.S. Federal Income Tax Consequences of the Plan to Certain Non-U.S. Holders of Notes Claims

### 1.   Consequences Relating to Receipt of the Consideration

#### (a)   *Treatment of the Exchange of Notes Claims for the Consideration*

Whether a Non-U.S. Holder recognizes gain or loss on the exchange of the Notes Claims for the Consideration and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders. As discussed above in "—*Treatment of the Exchange of Notes Claims for the Consideration,*" it is expected that the exchange of the Notes Claims for the Consideration pursuant to the Plan will be treated as a realization event under Section 1001 of the Tax Code. Subject to the rules discussed below in "— *Accrued Interest*", "—*FATCA*" and "—*Backup Withholding on Distributions and Information Reporting,*" any gain recognized by a Non-U.S. Holder on the exchange of its Notes Claims for the Consideration generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is a non-resident alien individual who was present in the United States for 183 days or more during the taxable year in which the exchange of the Notes Claims for the Consideration occurs and certain other conditions are met, (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States), or (iii) solely with respect to the Convertible Notes, Non-U.S. Holders of Convertible Notes that are treated as holding more than five (5) percent of the Debtor's stock within the meaning of Section 897(c)(3) of the Tax Code, Parent Debtor is or has been during the Non-US Holder's holding period for the Convertible Notes, a United States real property holding corporation as defined in the Code ("**USRPHC**") for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or lower applicable income tax treaty rate) on any gain recognized, which may be offset by certain U.S. source capital losses. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax in the manner described below in "—*Income or Gain Effectively Connected with a U.S. Trade or Business.*" With respect

to the third exception, Parent Debtor believes that it is not, and has not been at any time since the Convertible Notes were issued, a USRPHC.

### (b)    Accrued Interest

Subject to the rules discussed below in "—*FATCA*" and "—*Backup Withholding on Distributions and Information Reporting*," payments (including any Cash) attributable to accrued but unpaid interest on a Notes Claim or Exit Secured Notes to a Non-U.S. Holder generally will not be subject to U.S. federal income tax and will be exempt from withholding under the "portfolio interest" exemption if the Non-U.S. Holder properly certifies to its foreign status (generally, by providing the Reorganized Debtor or its agent IRS Form W-8BEN or W-8BEN-E prior to payment), and:

(i)    the Non-U.S. Holder does not own, actually or constructively, 10% or more of the total combined voting power of all classes of voting stock of Parent Debtor (with respect to payments of interest on the Convertible Notes) or Reorganized Debtor (with respect to payments of interest on the Exit Secured Notes);

(ii)    the Non-U.S. Holder is not a "controlled foreign corporation" that is a "related person" with respect to Parent Debtor (with respect to payments of interest on the Convertible Notes) or Reorganized Debtor (with respect to payments of interest on the Exit Secured Notes);

(iii)    the Non-U.S. Holder is not a bank whose receipt of interest is in connection with an extension of credit made pursuant to a loan agreement entered into in the ordinary course of the Non-U.S. Holder's trade or business; and

(iv)    such interest is not effectively connected with the Non-U.S. Holder's conduct of a U.S. trade or business.

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but unpaid interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or lower applicable income tax treaty rate) on payments that are attributable to accrued but unpaid interest.  For purposes of providing a properly executed IRS Form W-8BEN or W-BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

If any accrued but unpaid interest is effectively connected income, the Non-U.S. Holder generally will be subject to U.S. federal income tax in the manner described below in "— *Income or Gain Effectively Connected with a U.S. Trade or Business.*"

### (c)    Income or Gain Effectively Connected with a U.S. Trade or Business

If any income or gain realized by a Non-U.S. Holder (including any income attributable to accrued but unpaid interest) on the exchange of its Notes Claim for the Consideration is effectively connected with such Non-U.S. Holder's conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, the Holder maintains a permanent establishment in

the United States to which such interest, gain or dividends is attributable), then the income or gain will be subject to U.S. federal income tax at regular graduated income tax rates generally in the same manner as if such Non-U.S. Holder were a U.S. Holder.  Effectively connected income will not be subject to U.S. federal withholding tax if the Non-U.S. Holder satisfies certain certification requirements by providing to the Reorganized Debtor or its agent a properly executed IRS Form W-8ECI (or successor form).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or lower applicable income tax treaty rate) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.    Consequences Relating to Ownership and Disposition of the Consideration.

(a)    *Exit Secured Notes.*

(i)    Interest.

Non-U.S. Holder's consequences relating to relating to interest payments on the Exit Secured Notes are determined in the same manner as set forth above under "—*Accrued Interest*".

(ii)    Sale, Retirement, Redemption or Other Taxable Disposition.

A Non-U.S. Holder's consequences relating to the sale, redemption or other taxable disposition of the Exit Secured Notes are determined in the same manner as set forth above in "—*Treatment of the Exchange of Notes Claims for the Consideration*" with respect to the exchange of Original Senior Secured Notes.

(b)    *New Equity Interests*

(i)    Distributions

As discussed above in "— *Distributions,*" the gross amount of any distribution made on account of New Equity Interests that is made out of Reorganized Parent's current or accumulated earnings and profits (as determined for U.S. federal income tax purposes) generally is expected to be treated as dividend income on the date such distribution is actually or constructively received.

Subject to the rules discussed above in "—*Income or Gain Effectively Connected with a U.S. Trade or Business,*" and below in "—*FATCA,*" dividends paid to a Non-U.S. Holder on the New Equity Interests generally will be subject to U.S. federal withholding tax at a rate of 30% of the gross amount of the dividend unless an applicable income tax treaty provides for a lower rate. To receive the benefit of a reduced treaty rate, a Non-U.S. Holder must provide the Reorganized Debtor or its agent with an IRS Form W-8BEN or IRS Form W-8BEN-E (or other applicable or successor form) certifying qualification for the reduced rate. To the extent that the amount of the distribution exceeds Reorganized Parent's current and accumulated earnings and profits (as determined under U.S. federal income tax principles), such excess amount is generally expected to be treated first as a non-taxable return of capital to the extent of the Non- U.S. Holder's tax basis in its New Equity Interests, and thereafter as capital gain recognized on a sale or exchange. Non-U.S. Holders should consult their own tax advisors with respect to the appropriate U.S. federal income tax treatment of any distribution received from Reorganized Parent

(ii)       Sale, Exchange, or Other Taxable Disposition

Upon a sale or other taxable disposition (other than certain redemptions) of their New Equity Interests, Non-U.S. Holders generally will be treated in the same manner as described above under "—*Treatment of the Exchange of Notes Claims for the Consideration.*" In addition to the consideration described above, in the event that the Reorganized Debtor is or has been a USRPHC during the shorter of the Non-U.S. Holder's holding period in the New Equity Interests or the five (5) year period ending on the date of the disposition of the New Equity Interests, different rules may apply. Parent Debtor does not believe it is or has been in the proceeding five (5) years, and does not expect to become, a USRPHC. Non-U.S. Holders should consult with their tax advisors regarding the tax consequences of a redemption of their New Equity Interests, including the possibility that the redemption could be treated as a dividend for U.S. federal income tax purposes and subject to potential U.S. federal withholding tax under the rules discussed above under "—Distributions."

(c)       *Subscription Rights*

As described above in "—*Issuance and Exercise*", the Debtors intend to treat the issuance of the Subscription Rights and their subsequent exercise as an issuance and exercise of options to acquire a portion of the Equity Rights Offering Shares for U.S. federal income tax purposes. Accordingly, a Non-U.S. Holder generally should not recognize gain or loss upon the exercise of the Subscription Rights.

If, contrary to the Debtors' intended treatment, the issuance of the Subscription Rights and their subsequent exercise is treated as an integrated transaction for U.S. federal income tax purposes pursuant to which the Equity Rights Offering Shares are acquired directly in partial satisfaction of a U.S. Holder's Notes Claim and not as an option to acquire a portion of the Equity Rights Offering Shares, a Non-U.S. Holder will be treated in the same manner as described above in "— *Treatment of the Exchange of Notes Claims for the Consideration."*

(d)       *FATCA*

Sections 1471 through 1474 of the Tax Code and the Treasury Regulations and administrative guidance issued thereunder ("FATCA") imposes a 30% withholding tax on "withholdable payments" (as defined in the Tax Code, including payments of interest on a Notes Claim and an Exit Secured Note and dividends on a New Equity Interest) if paid to a "foreign financial institution" or a "non-financial entity" (each as defined in the Tax Code) (including in some cases, when such foreign financial institution or non-financial foreign entity is acting as an intermediary), unless (i) in the case of a foreign financial institution, such institution enters into an agreement with the U.S. government to withhold on certain payments, and to collect and provide to the U.S. tax authorities substantial information regarding U.S. account holders of such institution (which includes certain equity and debt holders of such institution, as well as certain account holders that are non-U.S. entities with U.S. owners), (ii) in the case of a non-financial foreign entity, such entity certifies that it does not have any "substantial United States owners" (as defined in the Tax Code) or provides the Reorganized Debtor or its agent with a certification identifying the direct and indirect substantial United States owners of the entity (in either case, generally on an IRS Form W-8BEN-E), or (iii) the foreign financial institution or non-financial

54

foreign entity otherwise qualifies for an exemption from these rules and provides appropriate documentation (such as an IRS Form W-8BEN-E). While withholdable payments would have originally included payments of gross proceeds from the sale or other disposition of a note or stock which can produce U.S. source interest or dividends, proposed Treasury Regulations provide that such payments of gross proceeds (other than amounts treated as interest) do not constitute withholdable payments. Taxpayers may rely generally on these proposed Treasury Regulations until they are revoked or final Treasury Regulations are issued. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing these rules may be subject to different rules. Under certain circumstances, a Holder might be eligible for refunds or credits of such taxes.

**NON-U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH NON-U.S. HOLDER'S U.S. FEDERAL INCOME TAX CONSEQUENCES PURSUANT TO THE PLAN.**

**E.    Backup Withholding on Distributions and Information Reporting.**

Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable withholding rate (currently at a rate of 24%). Under the backup withholding rules, a Holder may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; (b) in the case of a U.S. Holder, timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9); and (c) in the case of a Non-U.S. Holder, complies with certification procedures to establish that the Holder is not a United States person (generally in the form of a properly executed applicable IRS Form W-8). Backup withholding is not an additional tax but merely an advance payment and may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holder's tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR**

**OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY NON-U.S. OR U.S. STATE, LOCAL OR TERRITORY TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAW**.

## ARTICLE VIII.
## CERTAIN SECURITIES LAW MATTERS

The following discussion summarizes certain matters related to securities laws that may affect those that receive certain Plan Distributions pursuant hereto.  Given the complex or subjective nature of such matters, including the factual question of whether a particular Holder may be an underwriter, the Debtors make no representation concerning the right of any person to trade in the New Equity Interests, the Exit Secured Notes Financing, or any other Securities.  The Debtors recommend that potential recipients of the New Equity Interests or any other Securities consult their own counsel concerning whether they may freely trade such Securities without registration under, or exemption from registration under, the Securities Act, the Securities Exchange Act, or similar state, federal, or foreign laws.

The ownership of the New Equity Interests and the Exit Secured Notes Financing is expected to be through the facilities of DTC. The Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Equity Interests and/or the Exit Secured Notes Financing under applicable securities laws. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Equity Interests and/or the Exit Secured Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.  DTC and any transfer agent shall be required to accept and conclusively rely upon the Confirmation Order in lieu of a legal opinion regarding whether the New Equity Interests and/or the Exit Secured Notes are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

A.    **New Equity Interests**

1.    Offering and Issuance of New Equity Interests

The Plan provides for the offering, issuance, and distribution of the New Equity Interests, which are "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

The Debtors will rely on (a) section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution, if applicable, of New Equity Interests (other than the Equity Rights Offering Holdback Shares, the Backstop Shares, and the Backstop Premium Shares), and to the extent such exemption is not available, then such New Equity Interests will be offered, issued, and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws and (b) Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act, and similar Blue-Sky Laws provisions,

to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution, if applicable, of the Equity Rights Offering Holdback Shares, the Backstop Shares, and the Backstop Premium Shares to certain Holders of Allowed Senior Secured Notes Claims and certain eligible Holders of Allowed Convertible Notes Claims.

Section 1145(a)(1) of the Bankruptcy Code exempts the issuance, offer, sale, and distribution of Securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local Securities laws if the following three principal requirements are satisfied: (a) the Securities must be offered and sold under a plan of reorganization and must be Securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the Securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the Securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property. *See* 11 U.S.C. § 1145(a)(1).

The issuance and distribution of the New Equity Interests (other than the Equity Rights Offering Holdback Shares, the Backstop Shares, and the Backstop Premium Shares) satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such offering, issuance, and distribution are exempt from registration under the Securities Act and any state or local law requiring registration. To the extent any "offer or sale" of New Equity Interests may be deemed to have occurred, such offer or sale is made under the Plan and in exchange for Claims against one or more of the Debtors, or principally in exchange for such Claims and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code. The availability of the exemptions under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to occurrence of the Effective Date of the Plan.

2.  Private Placement Securities

To the degree that section 1145 of the Bankruptcy Code is not available for the issuance and distribution of the New Equity Interests, (a) Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under the Securities Act and (b) Regulation S provides that the offering or issuance of securities to persons that, at the time of the issuance, were outside of the United States and were not "U.S. persons" (and were not purchasing for the account or benefit of a "U.S. person") within the meaning of Regulation S is exempt from registration under Section 5 of the Securities Act.

The Debtors believe that the Equity Rights Offering Holdback Shares, the Backstop Shares, and the Backstop Premium Shares are issuable without registration under the Securities Act in reliance upon the exemption from registration provided under Section 4(a)(2) of the Securities Act (including, potentially, pursuant to the safe harbor provided by Regulation D promulgated under the Securities Act), Regulation S under the Securities Act or other applicable exemptions.

The Equity Rights Offering Holdback Shares, the Backstop Shares, and the Backstop Premium Shares will be subject to resale restrictions and may be resold, exchanged, assigned, or

otherwise transferred only pursuant to registration, or an applicable exemption from registration (such as Rule 144), under the Securities Act and other applicable law, including as described below.

In addition, in connection with resales of any New Equity Interests offered, issued, and distributed pursuant to Regulation S under the Securities Act: (i) the offer or sale, if made prior to the expiration of the one-year distribution compliance period (six months for a reporting issuer), may not be made to a U.S. person or for the account or benefit of a U.S. person (other than a distributor); and (ii) the offer or sale, if made prior to the expiration of the applicable one-year or six-month distribution compliance period, is made pursuant to the following conditions: (a) the purchaser (other than a distributor) certifies that it is not a U.S. person and is not acquiring the securities for the account or benefit of any U.S. person or is a U.S. person who purchased securities in a transaction that did not require registration under the Securities Act; and (b) the purchaser agrees to resell such securities only in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

The Equity Rights Offering Holdback Shares, the Backstop Shares, and the Backstop Premium Shares will be deemed "restricted securities" (as defined by Rule 144 of the Securities Act), will bear customary legends and transfer restrictions, and may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act (such as Rule 144) is available, in each case, subject to the limitations in the applicable New Organizational Documents." Although the Reorganized Debtors expect to register the Equity Rights Offering Holdback Shares, the Backstop Shares, and the Backstop Premium Shares for resale on or as soon as reasonably practicable after the Effective Date, such registration requires review of a registration statement by the SEC staff and may take a substantial amount of time. Any persons receiving restricted securities under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

3.    Subsequent Transfers of New Equity Interests

Subject to any limitations in the New Organizational Documents, the New Equity Interests (other than the Equity Rights Offering Holdback Shares, the Backstop Shares, and the Backstop Premium Shares) issued and distributed under the Plan in reliance on section 1145(a)(1) of the Bankruptcy Code may be freely transferred by recipients following the initial issuance under the Plan without registration unless, as more fully described below, the holder is an "underwriter" with respect to such securities.

Generally, an "underwriter" (for purposes of section 1145 of the Bankruptcy Code) is any person who:

    (a)    purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security

received or to be received in exchange for such a claim or interest;

(b)    offers to sell securities offered or sold under the plan for the holders of such securities;

(c)    offers to buy securities offered or sold under the plan from the holders of such securities, if such offer to buy is—

(i)    with a view to distribution of such securities; and

(ii)    under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or

(d)    is an issuer, as [defined in section 2(a)(11) of the Securities Act], with respect to such securities.

11 U.S.C. § 1145(b)(1).  Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

To the extent that any Entities who receive New Equity Interests pursuant to the Plan are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, resales of such New Equity Interests by such Entities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  However, resales of New Equity Interests satisfying the applicable requirements of Rule 144 of the Securities Act with respect to "control securities" (or another available exemption under the Securities Act) may be permitted.  Rule 144 permits the public resale of Securities received by such persons if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met. Although the Reorganized Debtors expect to register the New Equity Interests that constitute "control securities" for resale on or as soon as reasonably practicable after the Effective Date (which registration would allow resales that are not subject to the conditions set forth in Rule 144), such registration requires review of a registration statement by the SEC staff and may take a substantial amount of time.

Whether or not any particular person may be deemed to be an "underwriter" with respect to the New Equity Interests or any other Security issued pursuant to the Plan depends upon various facts and circumstances applicable to that Entity.  Accordingly, the Debtors express no view as to whether any particular Entity receiving New Equity Interests or other Securities hereunder may be an "underwriter" with respect to such New Equity Interests or other Securities.

B.      **Equity Rights Offering**

The Plan provides that the Equity Rights Offering Amount will be raised through the Equity Rights Offering. On the Effective Date, the Debtors shall consummate the Equity Rights Offering, subject to the terms and conditions set forth in the Backstop Commitment Agreement, the Equity Rights Offering Documents, and the Plan.

Upon exercise of the Subscription Rights by the Equity Rights Offering Participants pursuant to the terms of the Backstop Commitment Agreement, the Equity Rights Offering Procedures, the Plan, and the other Equity Rights Offering Documents, the Reorganized Debtors shall be authorized to issue the Equity Rights Offering Shares (including the Equity Rights Offering Holdback Shares) issuable pursuant to the exercise of Subscription Rights in accordance with the Plan, the Backstop Commitment Agreement, the Equity Rights Offering Procedures, and the other Equity Rights Offering Documents.

The Equity Rights Offering Amount will be 100% backstopped by the Backstop Commitment Parties, and the Backstop Commitment Parties shall be obligated on a several, but not joint and several, basis to purchase the Unsubscribed Equity in accordance with and subject to the terms and conditions of the Backstop Commitment Agreement.

Subject to, and in accordance with the Backstop Commitment Agreement, as consideration for the Rights Offering Backstop Commitment, on the Effective Date the Backstop Commitment Parties shall receive the Backstop Premium Shares, which will be payable on, and as a condition to, the Effective Date in New Equity Interests in accordance with and subject to the terms of the Backstop Commitment Agreement, subject to dilution on account of the MIP Interests, and shall have been fully earned as of the effective date of the Backstop Support Agreement.

For the avoidance of doubt, the Equity Rights Offering Holdback Shares, the Backstop Shares, and the Backstop Premium Shares shall be solely on account of the new money provided through the Equity Rights Offering Holdback and the Rights Offering Backstop Commitments and not on account of any Holder's Senior Secured Notes Claims or Convertible Notes Claims.

Notwithstanding any other provision of this Plan, any Backstop Commitment Party that will hold, on a pro forma basis, 5.00% or more of the New Equity Interests may elect at any time prior to the Closing Date to receive, in lieu of all or a portion of the New Equity Interests that would otherwise be issuable to it, pre-funded warrants to acquire such New Equity Interests exercisable for an exercise price equal to the par value of the New Equity Interests (the "Pre-Funded Warrants"). The Pre-Funded Warrants will include customary beneficial ownership limitation provisions prohibiting the exercise of the Pre-Funded Warrants to the extent that, after giving effect to an exercise of the Pre-Funded Warrants, the Backstop Commitment Party, together with any affiliates and any members of a Section 13(d) group with the Backstop Commitment Party and/or its affiliates, would beneficially own (as such term is defined under Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in excess either 4.99% or 9.99% of the outstanding New Equity Interests (which threshold shall be specified by the applicable Backstop Commitment Party).

As discussed in Section A above, to the degree that Section 1145 of the Bankruptcy Code is not available for the issuance and distribution of the securities in connection with the Rights Offering, then such securities will be offered, issued, and distributed under the Plan pursuant to the exemption from registration provided under Section 4(a)(2) of the Securities Act (including, potentially, pursuant to the safe harbor provided by Regulation D promulgated under the Securities Act), Regulation S under the Securities Act or other applicable exemptions.

## C.    Exit Secured Notes Financing

### 1.    Offering and Issuance of the Exit Secured Notes Financing

In connection with the Exit Secured Notes Financing, the Plan provides for the offering, issuance, and distribution of the Exit Secured Notes, which are "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

The Debtors are relying on Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act, and similar Blue-Sky Laws provisions, to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution under the Plan of the Exit Secured Notes to Holders of Allowed Senior Secured Notes Claims and certain eligible Holders of Allowed Convertible Notes Claims of the Exit Secured Notes, including in connection with the Solicitation.

Section 4(a)(2) of the Securities Act provides that the offering or issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under Section 5 of the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under the Securities Act. Regulation S provides that the offering or issuance of securities to persons that, at the time of the issuance, were outside of the United States and were not "U.S. persons" (and were not purchasing for the account or benefit of a "U.S. person") within the meaning of Regulation S is exempt from registration under Section 5 of the Securities Act.

The Debtors believe that the Exit Secured Notes may be offered and issued without registration under the Securities Act in reliance upon the exemption from registration provided under Section 4(a)(2) of the Securities Act (including, potentially, pursuant to the safe harbor provided by Regulation D promulgated under the Securities Act) and/or Regulation S or other applicable exemptions. Each Holder of a Senior Secured Notes Claim is a "qualified institutional buyer" (as defined under Rule 144A of the Securities Act) or a "non-U.S. person" within the meaning of Regulation S of the Securities Act. Each Holder of an Allowed Convertible Notes Claim that will receive the Exit Secured Notes is required to represent that it is an Institutional Accredited Investor, a "qualified institutional buyer" (as defined under Rule 144A of the Securities Act) or a "non-U.S. person" within the meaning of Regulation S of the Securities Act.

The Exit Secured Notes will be deemed "restricted securities" (as defined by Rule 144 under the Securities Act) that may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act (such as Rule 144A or Regulation S) is available, and in compliance with any applicable state or foreign securities laws. Any and all of the Exit Secured Notes offered,

issued, or distributed under the Plan pursuant to Regulation S under the Securities Act shall be subject to any applicable restrictions on transfer set forth in Regulation S and may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act (such as Rule 144A or Regulation S) is available, and in compliance with any applicable state or foreign securities laws.

In addition, in connection with resales of any Exit Secured Notes offered, issued, and distributed pursuant to Regulation S under the Securities Act: (i) the offer or sale, if made prior to the expiration of the 40-day distribution compliance period, may not be made to a U.S. person or for the account or benefit of a U.S. person (other than a distributor); and (ii) the offer or sale, if made prior to the expiration of the 40-day distribution compliance period, is made pursuant to the following conditions: (a) the purchaser (other than a distributor) certifies that it is not a U.S. person and is not acquiring the securities for the account or benefit of any U.S. person or is a U.S. person who purchased securities in a transaction that did not require registration under the Securities Act; and (b) the purchaser agrees to resell such securities only in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

Any persons receiving restricted securities under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

## CONCLUSION AND RECOMMENDATION

The Debtors and the Consenting Stakeholders believe that Confirmation and Consummation of the Plan are in the best interests of the Debtors, their Estates, and their creditors. The Plan contemplates a restructuring that will be beneficial to the Company and provides for an equitable distribution of distributable value to Holders of Claims. The Debtors believe that any alternative to Plan Confirmation could result in significant delay, litigation, and additional costs, as well as a reduction in the distributions to Holders of Claims in certain Classes. **Consequently, the Debtors and the Consenting Stakeholders urge all eligible Holders of Claims eligible to vote on the Plan to vote to ACCEPT the Plan and to complete and submit their Ballots so that they are RECEIVED by the Claims and Solicitation Agent on or before the Voting Deadline.**

Spirit Airlines, Inc.
on behalf of itself and each of its Debtor affiliates

December [●], 2024

_____

Fred Cromer
Chief Financial Officer

## Exhibit A

**Organizational Chart**

# Corporate Structure Chart





*Spirit Airlines, Inc. directly or indirectly owns 100% of each of Spirit Finance Cayman 1 Ltd., Spirit Finance Cayman 2 Ltd., Spirit IP Cayman Ltd., and Spirit Loyalty Cayman Ltd., other than with respect to a special share, representing 0.1% of authorized share capital, issued by each entity to Walkers Fiduciary Limited.*

**Exhibit B**

**Financial Projections**

[to come]

## Exhibit C

**Valuation Analysis**

[to come]

**<u>Exhibit D</u>**

**Liquidation Analysis**

[to come]

**<u>Exhibit E</u>**

**Schedule of Retained Causes of Action**

This Schedule of Retained Causes of Action (the "**Schedule**") represents the most current list of the Retained Causes of Action in connection with the Plan (subject to the terms thereof).[1] The Debtors expressly reserve the right to alter, amend, remove, augment, supplement, or otherwise modify this Schedule at any time in accordance with the terms of the Plan.

As set forth in Article VIII.I of the Plan, except as expressly waived, relinquished, exculpated, released, discharged, compromised, or settled in or pursuant to the Plan, the Confirmation Order, or a Final Order, the (Reorganized) Debtors and their Estates expressly retain all rights and Causes of Action that they may have or choose to assert on behalf of their respective stakeholders, including under any provision of the Bankruptcy Code or any applicable analogous statute or non-bankruptcy law, whether arising before or after the Petition Date.

In accordance with sections 1141(b)–(c) of the Bankruptcy Code, upon the Effective Date, the Retained Causes of Action shall vest in the Reorganized Debtors, free and clear of all Claims, Liens, charges, and other encumbrances and interests in accordance with Article IV of the Plan. Upon Consummation, (a) the Reorganized Debtors shall have, retain, reserve, and be entitled to commence, assert, and pursue all Retained Causes of Action as if the Chapter 11 Cases had not been commenced.

To the fullest extent permitted by applicable law, the Debtors' inclusion or failure to include or describe with sufficient specificity any Retained Cause of Action in the Plan, Disclosure Statement (including this Schedule), or Confirmation Order shall not be deemed an admission, denial, or waiver of any Retained Cause of Action that the (Reorganized) Debtors or their Estates, hold or may hold.  No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation, including any argument of waiver on account of the failure to include or describe with sufficient specificity any Retained Cause of Action.  For the avoidance of doubt, in no instance shall "Retained Causes of Action" include any claim or Cause of Action with respect to, or against, a Released Party that was released pursuant to the Plan.

**No Entity may rely on the absence of a specific reference in the Plan, Disclosure Statement (including this Schedule), or Confirmation Order to any Cause of Action against them as any indication that the (Reorganized) Debtors will not pursue any and all available Causes of Action against them.**

<u>CERTAIN CATEGORIES OF CAUSES OF ACTION</u>

The following is an indicative, but in no way an exhaustive or exclusive, list of "Retained Causes of Action."

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them elsewhere in this Disclosure Statement.  For the avoidance of doubt, the rules of interpretation set forth in Article I.B of the Plan shall apply hereto.

**I.    Claims Related to Third-Party Indemnifications**

All Causes of Action arising under or relating to the Debtors' contractual or legal rights of indemnification or contribution.

**II.    Claims Related to Insurance Contracts**

All Causes of Action based in whole or in part upon any and all insurance contracts issued to or for the benefit of any of the Debtors (or any of their predecessors), to which any of the (Reorganized) Debtors is a party, or pursuant to which any of the (Reorganized) Debtors (or any of their predecessors) or their Estates has any rights whatsoever, including Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matter.  Without limiting the generality of the foregoing, the (Reorganized) Debtors expressly reserve all Causes of Action against the Entities identified on **Annex A** hereto.

**III.    Claims Related to Tax Obligations**

All Causes of Action based in whole or in part upon any and all tax obligations (including any asserted fees, tariffs, charges, penalties, or other amounts associated with or related to any tax obligation) to which any of the (Reorganized) Debtors (or any of their predecessors) is a party or pursuant to which any of the (Reorganized) Debtors (or any of their predecessors) or their Estates has any rights whatsoever, including against or related to all Entities that owe or that may in the future owe money related to tax refunds to them.  Without limiting the generality of the foregoing, the (Reorganized) Debtors expressly reserve all Causes of Action against the Entities identified on **Annex B** hereto.

**IV.    Claims, Defenses, Crossclaims, and Counterclaims Related to Litigation and Possible Litigation**

All Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, or judicial or non-judicial.

**V.    Claims Related to Contracts and Leases**

All Causes of Action based in whole or in part upon any and all contracts and leases to which any of the (Reorganized) Debtors (or any of their predecessors) is a party or pursuant to which any of the (Reorganized) Debtors (or any of their predecessors) or their Estates has any rights whatsoever, including all contracts and leases that are assumed pursuant to the Plan or were previously or will be assumed or assumed and assigned by the Debtors in the Chapter 11 Cases, including Causes of Action against vendors, suppliers of goods and services, or any other parties for, among other things, the following:  (a) overpayments, back charges, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, contribution, recoupment, or setoff; (b) termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) failure to fully perform or to condition performance on additional requirements under contracts or leases with any one or more of the Debtors before the assumption or rejection, if applicable, of

2

such contracts or leases; (d) payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) any liens, including mechanics', artisans', materialmens', possessory, or statutory liens, held by any of the Debtors; (f) claims arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies, suppliers of environmental services or goods, or any other Entities; (g) counterclaims and defenses related to any contractual obligations; (h) any turnover actions arising under sections 542 or 543 of the Bankruptcy Code; and (i) unfair competition, licensing or licensing agreements, interference with contract or potential business advantage, conversion, breach of contract, breach of duty (whether in law, in equity, or otherwise), infringement of intellectual property, or other business tort claims.

## VI.    Claims Related to Accounts Receivable and Accounts Payable

All Causes of Action against or related to all Entities that owe or that may in the future owe money to the (Reorganized) Debtors or their Estates. Furthermore, the Reorganized Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the (Reorganized) Debtors or their Estates owe money to them.

## VII.   Avoidance Actions

All Avoidance Actions (*i.e.*, all actual or potential avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors, their Estates, or other authorized parties in interest to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code or under similar or related state, federal, or non-U.S. statutes and common law, including fraudulent transfer laws or fraudulent conveyance laws).

## VIII.  Claims Related to Deposits/Prepayments, Adequate Assurance Postings, and Other Collateral Postings

All Causes of Action based in whole or in part upon any postings of a security deposit, letter of credit, adequate assurance payment, or any other type of deposit, prepayment, or collateral.

## IX.    Other Causes of Action

1.  Causes of Action in connection with asserting or exercising the right to object to Claims or Interests.

2.  Causes of Action in connection with asserting or exercising claims and rights pursuant to the Bankruptcy Code.

3.  Causes of Action in connection with asserting or exercising claims or defenses, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

4.  Causes of Action in connection with asserting or exercising claims, causes of action, proceedings, controversies, demands, rights, actions, Liens, indemnities, guaranties, suits, obligations, liabilities, interests, debts, damages, judgments,

accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, direct or indirect, secured or unsecured, assertable directly or derivatively, choate or inchoate, reduced to judgment or otherwise, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or any other theory of law.

5.      Causes of Action arising from, relating to, or in connection with any matter arising out of, or relating to, the Chapter 11 Cases and the Plan including those matters listed in <u>Article XI</u> of the Plan, for which the Bankruptcy Court retains exclusive jurisdiction under the Plan.

***

### Annex A

ACE American Insurance Company
ACE Fire Underwriters Insurance Company
AIG - American Home Assurance Co.
AIG - National Union Fire Insurance Company
AIG - WorldSource
AIG Specialty Ins Co. (Primary)
Allianz Global Risk US Ins Co.
Allianz Global Risks US Insurance Company
ARCH Specialty Ins Co.
Arch Specialty Insurance Co.
Argonaut Insurance Company
Ascot Specialty Insurance Company
Atlantic Specialty Insurance Company
AXA XL
AXA XL - Indian Harbor Insurance Company
AXA XL (XL Specialty Insurance Company)
Axis Excess Insurance Policy
Axis Ins. Co.
Beazley Group
Berkley
Berkley Colombia Seguros
Berkley Insurance Company
Berkshire Hathaway
Brit (Lloyds of London)
Charles F. Engel And Associates LLC.
CNA; Continental Casualty Company
Convex Insurance UK Limited
Crum & Forster Specialty
Freedom Specialty Insurance
Great American Insurance
Grupo Mexicano De Seguros
Hartford
HDI Global Insurance Company (Falcon)
HDI Global Specialty

Hiscox / "A  XV"/Stable
Indemnity Insurance Company of North America (Chubb)
Instituto Nacional De Seguros
Jmalucelli Travelers Seguros S.A.
Landmark American Insurance Co
Liberty Surplus Insurance Corporation
Lloyd's of London
Lloyd's of London and other Licensed Companies per One Global
Mapfre-La Centro Americana
Member Companies of La Reunion Aerienne
Nautilus Insurance Company (Berkley
Old Republic Insurance Company
RLI Insurance Company
Seguros America
Seguros Bolívar
Seguros Del Estado
Seguros Equinoccial
Seguros Mundial
Selective Insurance Company of SE
Sirius International Insurance Corporation
Sompo (Endurance Assurance Corp)
Southern Insurance Company
Starr Surplus Lines Insurance Company per Starr Aviation Agency, Inc.
Starstone Specialty Insurance Company
Sweaden Compania de Seguros S.A.
The Hartford Premier Excess Policy
Underwriters at Lloyd's of London and other Licensed Companies per OneGlobal Broking, Ltd.
Westfield Insurance Company
Zurich

**Annex B**

Aeris
Aero Lauderdale, Llc
Aerocali S.A.
Aeropuerto De Cancun S.A. De  C.V
Aeropuerto De Puerto Vallarta, S.A.
Aeropuerto International Del Cibao
Aeropuerto Internl De Monterrey
Aeropuerto San Jose Del Cabo
Aeropuertos Dominicanos Siglo XXI SA
Aerostar Airports Holdings
Aerostar Airports Pfc
Aerotel-Jamaica
Air Navigation Services Aruba
Airplan
Airport Revenue Fund
Alameda County Tax Collector
Alaska Department of Revenue
Alcaldia De Managua
Alcaldia Mayor De Bogota
Alcaldia Mayor De Cartagena De Indi
Alcaldia Municipal De Comayagua
Alcaldia Municipal De Palmira
Alcaldia Municipal De San Luis
Alcaldia Municipal De San Salvador
Aldine Isd Tax Office
Allied Universal
Ann Harris Bennett-Tax Assessor
Arizona Department of Revenue
Aruba Airport Authority N.V
Atlanta Airlines Terminal Corp
Atlanta Dept of Aviation (Pfc)
Autoridad Aeronautica Civil
Autorite Aeroportuaire Nationale
Avenger Flight Group Llc
Aviam
B & Co Legal
Ballard & Ballard
Banco De La Nacion / Sunat
Bancredito
Bernalillo County Treasurer
Birmingham Airport Authority Pfc
Boise Air Terminal
Broward County Aviation Dept./Usa Parking Assoc.
Broward County Tax Collector
Broward Cty Aviation Dept
Broward Cty Aviation Pfc
Buncombe County Tax Collector
California Franchise Tax Board
California State Conrtollers Office
Capital Region Airport Commission
Central West Virginia Regional - Pf
Charleston County Aviation Authorit

Charlotte Douglas Int'L Airport
Chicas, Vilchez & Ruiz
City And County of Denver
City Of Albuquerque Aviation Dept
City Of Atlanta Department Of Aviat
City Of Austin
City of Austin Dept of Aviation Pfc
City Of Boston
City Of Charlotte
City Of Chicago Dept. Of Aviation
City of Chicago Pfc
City of Doral
City of Henderson
City of Kansas City - Pfc
City Of Kansas City Aviation Depart
City of Kenner
City Of Los Angeles
City of Los Angeles Pfc
City Of Manchester, Nh
City of Manchester, Nh Pfc
City Of Miramar
City of Oakland
City Of Pensacola
City of Pensacola-Pfc
Gtr Orlando Aviation Authority
Louis Armstrong New Orleans Intl Airport
New Orleans Aviation - Pfc
City of Portland
City of Romulus
City of San Antonio Texas
Allegheny / Pittsburgh Intl. Airp.
City Of San Jose
City of San Jose Pfc
City of St. Louis - Pfc
City Of Tampa
Clark County Dept Of Aviation
Clayton Cty Tax Commissioner
Cleveland Airport System
Cleveland Airport System - Pfc
Cleveland Terminal & Equipment Cons
Cocesna - Coporacion Centroameric
Collector Of Customs - Jam
Collector of Revenue-St. Louis Coun
Colorado Department of Revenue
Colorado Dept of Agriculture
Columbus Regional Airport
Comision Ejecutiva Portuaria Autono
Commissioner of Taxation & Finance
Commissioner of Taxation And Financ
Commonwealth of Massachusetts
Commonwealth of Virginia
Comptroller of Maryland

Connecticut Airport Authority
Connecticut Airport Authority - Pfc
Corpac, S.A
County of Henrico, Virginia
Dallas Fort Worth Intnl - Pfc
Dallas/Fort Worth Int. Airport
Dc Office of Finance & Treasury
Denver Port Authority - Pfc
Dept Of Lic & Consumer St Thomas
Detroit Airlines North
Detroit Metropolitan - Pfc
Dian / Direccion De Impuestos Y
Direccion General De Aeronautica Ci
Direccion General De Aviacion Civil
Direccion General De Ingresos
Direccion General De Tesoreria - Sa
Direccion/Colector De Impuestos Int
Direction Generale Des Impots
Division of Alcoholic
Eaai/Empresa Administradora De  Aer
Earl K. Wood, Tax Collector
Escambia County Tax Collector
Eurocontrol
Federal Aviation Administration
Fideicomiso Opain Sa
Fideicomisos Sociedad Fiduciaria De
Fiduagraria Fedeicomiso Proturismo
Fiduciaria De Ocidente Regulados
Fl Department of Financial Services
Florida Department of Revenue
Florida Department of State
General Mitchell Intl
Georgia Department of Revenue
Georgia Department of Revenue
Grapevine-Colleyville Tax Office
St. Louis Lambert International Air
Guilford County Tax Department
Hennepin County Treasurer
Hillsborough County Aviation Authority
Hillsborough County Pfc
Hillsborough County Tax Collector
Horry County Treasurer
Houston Airport System
Iah/George Bush Intercontinental -
Iata - Princess Juliana Int. Airp.
Iata Empresa Hondurena De Infraestr
Iata/Palmerola Internatnl Arprt,
Ice/Instituto Costarricense De Turi
Idaho State Tax Commission
Illinois Department of Revenue
Illinois Secretary of State
Illinois State Treasurer
Indiana Department of Revenue
Transportation Security Admin
City Of Phoenix
Inguat/Instituto Guatemalteco De Tu

Instituto Dominicano De Aviacion Ci
International Air Transport Association
Intur/Instituto Nicaraguense De Tur
Jamaica Civil Aviation Authority
Jamaican Government Treasury
Jefferson County Sheriffs Office
Jefferson Parish - Revenue & Tax
John B. Mcckuskey Wv State Auditor
John Wayne Airport County of Orange
Kentucky Deparmtnet of Agriculture
Kentucky Department of Revenue
King County Treasury
Las Vegas Dept of Aviation-Pfc
Lee County Port Auth Pfc
Lee County Tax Collector
Lima Airport Partners S.R.L
Los Angeles Cnty Tax Collector
Louisiana Dept of Revenue
Louisville Regional Airport Authori
Maryland Aviation Admin - Pfc
Maryland Aviation Administration
Maryland Department of Revenue
Maryland Dept Of Agriculture
City of Philadelphia
Mecklenburg County Tax Collector
Memphis International Airport
Memphis-Shelby County Airport Authority
Metro Airport Commission (Msp)
Metropolitan Arprt Comm Pfc
Miami Dade Aviation Department
Metropolitan Trustee Real Property
Miami-Dade Tax Collector
Michigan Chamber of Commerce
Michigan Dept. of Treasury
Ministere De L'Interieur Et Des Col
Ministerio De Comercio
South Jersey Transportation
Ministerio/Direccion Gnrl De Migrac
Minnesota Department of Commerce
Minnesota Revenue
Port Of Oakland
Municipalidad De Alajuela
Municipalidad De San Pedro Sula
Municipio De Armenia
Municipio De Lebrija
Municipio De Rionegro
Municipio De Soledad
Myrtle Beach Int'L A/P ( Pfc )
Myrtle Beach/Horry Dept of Airport
Nassar Abogados Costa Rica, S.A.
Nats (Services) Limited
Nav Canada
Nevada Department of Taxation
Nevada Unclaimed Property
New Jersey Department of Treasury
New Mexico Taxation & Revenue Dept

New York City Tax
Nm Taxation And Revenue Department
Norfolk Airport Authority
North Carolina Dept of Revenue
Nyc Department of Finance
Nys Dept of Taxation & Finance
Office National De L'Aviation  Civi
Ohio Department of Commerce
Ohio Department of Taxation
Orange County Tax Collector
Oregon Department of Revenue
Oregon Department of State Lands
P.A. Aeropuerto Ernesto Cortissoz
Pac Kingston Airport Limited
Palm Beach International  Airport
Pennsylvania Dept of Revenue
Pfc Charleston County Aviation
Pfc City of Albuquerque Aviation
Puerto Rico Ports Authority
Pfc Monroe County Airport Authority
Pfc-Burbank-Glendale-Pasadena Airp
Pfc-Charlotte Douglas Int'L Airport
Pfc-Sacramento Cty Dept of Airports
Philadelphia Terminal & Equipment C
Port Of Portland
Platte County Collector
Port Authority ( Pfc Only )
Port Authority (Ewr Pfc Only)
Port Authority Of Ny & Nj
Indianapolis Airport Authority
Ministerio De Turismo
Port Of Seattle
Servicio De Rentas Internas
Pr Ports Authority Pse Pfc
Massachusetts Port Authority
Raleigh-Durham Airport Authority
Reno-Tahoe Airport Authority
Rhode Island Dept of The Gen Treasu
Sacramento County Airport System
Sacramento County Dept of Finance
Sacsa / Sociedad Aeroportuaria
Salt Lake City Dept Of Airports
Salt Lake County Treasurer
San Diego County Treasurer
Sar - Servicio De Administracion De
Scis Air Sercurity Corp.
Secretary of The Treasury (Pr)
Seneam/Servicio De Adm Tribut
San Diego County Regional Arprt Aut
Shelby County Trustee
Sheltair Aviation Center, Llc
South Carolina Dept of Revenue

South Carolina State Treasurer
Missouri Dept of Revenue
Metropolitan Nashville Airport
State of Alabama Treasurer
State of Connecticut
State of Maryland Dept of Tax
State of Michigan
State  Of  Michigan  Dept  Of  Labor  &  Economic
Opportunit
State of New Jersey
State of New Jersey - Ppt
State of South Carolina
State of Utah
State of Washington Dept of Revenue
State of Washington Dept of Revenue
State of Wyoming
Subdirección Zonal Del Litoral
Superintendencia De Administracion
Superintendencia De Puertos
Tagsa - Terminal Aeroportuar
Tarrant Cnty Tax Assessor - Col
Tax Collector, Multnomah County
Tbi Airport Management, Inc.
Tbitec
Tennessee Department of Revenue
Tesoreria General De La Republica -
Tesoro Nacional - Aerocivil Aeronau
Texas Comptroller of Public Acct.
The City of Boston
Tourism Enhancement Fund
Town of Windsor Locks Tax Collector
Travis County Tax Collector
Treas Nyc
Treasurer, City of Memphis
Tresor Publique/Redevances
United States Treasury
Us Customs And Border Protection
Usda, Aphis, Rot
Usvi-Office of Lieutenant Governor
Utah State Tax Commission
Virgin Islands Port Authority
Virginia Department of Taxation
Wake County Tax Administration
Wayne County Dept. Of Airports
West Virginia Dept of Revenue
Westmoreland County Airport
Westmoreland County -Pfc
Wisconsin Department of Revenue
Workers' Compensation Admin Trust F
World Fuel Services, Inc.
World Fuel/Spire Flight Solutions

**<u>Exhibit F</u>**

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules attached to this agreement in accordance with Section 12.02, as amended, restated, supplemented or modified from time to time in accordance with the terms hereof, this "**Agreement**") is made and entered into as of November 18, 2024, by and among the following parties (each of the following described in sub-clauses (i) through (iii) of this preamble, individually, a "**Party**" and, collectively, the "**Parties**"):[1]

(i)     Spirit Airlines, Inc., a corporation incorporated under the laws of Delaware (the "**Company**"), and each of its direct or indirect subsidiaries that executes and delivers a Company Acknowledgment after the date hereof in accordance with this Agreement (together with the Company, each a "**Company Party**," and collectively, the "**Company Parties**");

(ii)    the undersigned beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts or funds that beneficially hold, Senior Secured Notes Claims (as defined below) that have executed and delivered counterpart signature pages to this Agreement (in each case solely in their capacity as such, together with each Senior Secured Noteholder (as defined below) that executes and delivers a Joinder from time to time after the date hereof, the "**Consenting Senior Secured Noteholders**") to counsel to the Company Parties and counsel to the Consenting Senior Secured Noteholders; and

(iii)   the undersigned beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts or funds that beneficially hold, Convertible Notes Claims (as defined below) that have executed and delivered counterpart signature pages to this Agreement (in each case solely in their capacity as such, together with each Convertible Noteholder (as defined below) that executes and delivers a Joinder from time to time and after the date hereof, the "**Consenting Convertible Noteholders**" and, together with the Consenting Senior Secured Noteholders, the "**Consenting Stakeholders**").

---

[1] Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

### *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arm's length negotiated and agreed upon the material terms of a comprehensive restructuring with respect to the Company Parties' capital structure (the "**Restructuring Transactions**") in accordance with and subject to the terms and conditions set forth in this Agreement and the terms set forth in the chapter 11 plan of reorganization attached hereto as **Exhibit A** (together with the exhibits and appendices annexed thereto, the "**Plan**");

**WHEREAS**, the Restructuring Transactions shall be implemented through the commencement by the Company and its subsidiaries of voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, as of the date hereof, (a) the Consenting Senior Secured Noteholders hold, in the aggregate, 78.6% of the aggregate principal amount of the Senior Secured Notes Claims (including Loaned Claims), and (b) the Consenting Convertible Noteholders hold, in the aggregate, 84.1% of the aggregate principal amount of Convertible Notes Claims;

**WHEREAS**, the Parties have agreed to express their mutual support and take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement; and

**NOW, THEREFORE**, in consideration of the covenants and agreements contained in this Agreement, and for other valuable consideration, the receipt and sufficiency of which are acknowledged, each Party, severally, and not jointly and severally, intending to be legally bound by this Agreement, agrees as follows:

### *AGREEMENT*

**Section 1.**    ***Definitions and Interpretation.***

1.01.    <u>Definitions</u>. The following terms shall have the following definitions:

"**2025 Convertible Notes**" means the Company's 4.75% Convertible Senior Notes due 2025, issued under the 2025 Convertible Notes Indenture.

"**2025 Convertible Notes Claims**" means any Claim on account of the 2025 Convertible Notes.

"**2025 Convertible Notes Indenture**" means that certain Indenture, dated as of May 12, 2020, between the Company and Wilmington Trust, National Association, as trustee, as supplemented by that certain First Supplemental Indenture, dated as of May 12, 2020, between the Company and Wilmington Trust, National Association, as trustee, as amended or supplemented to the date of this Agreement.

2

"**2025 Convertible Notes Trustee**" means Wilmington Trust, National Association, in its capacity as trustee under the 2025 Convertible Notes Indenture, and any successor trustee appointed pursuant to the terms thereof.

"**2026 Convertible Notes**" means the Company's 1.00% Convertible Senior Notes due 2026, issued under the 2026 Convertible Notes Indenture.

"**2026 Convertible Notes Claims**" means any Claim on account of the 2026 Convertible Notes.

"**2026 Convertible Notes Indenture**" means that certain Indenture, dated as of May 12, 2020, between the Company and Wilmington Trust, National Association, as trustee, as supplemented by that certain Second Supplemental Indenture, dated as of April 30, 2021, between the Company and Wilmington Trust, National Association, as trustee, as amended or supplemented to the date of this Agreement.

"**2026 Convertible Notes Trustee**" means Wilmington Trust, National Association, in its capacity as trustee under the 2026 Convertible Notes Indenture, and any successor trustee appointed pursuant to the terms thereof.

"**Ad Hoc Group of Convertible Noteholders**" means that certain ad hoc group of Convertible Noteholders represented by the Ad Hoc Group of Convertible Noteholders Advisors.

"**Ad Hoc Group of Convertible Noteholders Advisors**" means (i) Paul Hastings LLP, (ii) Ducera Partners LLC, (iii) one commercial aviation counsel to the Ad Hoc Group of Convertible Noteholders with prior written consent of the Company Parties (such consent not to be unreasonably withheld), and (iv) one Cayman Islands local counsel to the Ad Hoc Group of Convertible Noteholders.

"**Ad Hoc Group of Senior Secured Noteholders**" means that certain ad hoc group of Senior Secured Noteholders represented by the Ad Hoc Group of Senior Secured Noteholders Advisors.

"**Ad Hoc Group of Senior Secured Noteholders Advisors**" means (i) Akin Gump Strauss Hauer & Feld LLP, (ii) Evercore Group L.L.C., (iii) one Cayman Islands local counsel to the Ad Hoc Group of Senior Secured Noteholders, (iv) one commercial aviation counsel to the Ad Hoc Group of Senior Secured Noteholders, and (v) any consultants or other professionals retained by the Consenting Senior Secured Noteholders in connection with the Restructuring Transactions, with prior written consent of the Company Parties (such consent not to be unreasonably withheld).

"**Adequate Protection Order**" means an interim order of the Bankruptcy Court authorizing the Debtors' use of the Cash Collateral (if any) and providing adequate protection for the Senior Secured Noteholders, the Secured Notes Trustee and the agent or lenders under the Company's prepetition revolving credit facility.

"**Affiliate**" means, with respect to any specified Entity, any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such

3

specified Entity. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement, or otherwise.  A Related Fund of any Person shall be deemed to be the Affiliate of such Person.

"**Agreement**" has the meaning set forth in the preamble hereto and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules attached hereto in accordance with Section 12.02.

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date (or, in the case of any Company Party or Consenting Stakeholder that becomes a party hereto after the Agreement Effective Date, as of the date and time such Company Party or Consenting Stakeholder executes and delivers a Company Acknowledgment or Joinder, as applicable, in accordance with the terms hereof) to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any written or verbal inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, financing (debt or equity), joint venture, partnership, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving the Company or any of its direct or indirect subsidiaries or the debt, equity, or other interests in the Company or any of its direct or indirect subsidiaries that in each case is an alternative to, or is inconsistent with, the Restructuring Transactions, but in each case excluding any debtor in possession financing facility.

"**Backstop Commitment**" has the meaning set forth in the Backstop Commitment Agreement.

"**Backstop Commitment Agreement**" means the backstop commitment agreement (including all exhibits, annexes, and schedules thereto and as amended, supplemented, or modified pursuant to the terms thereof), substantially in the form attached hereto as **Exhibit C**.

"**Backstop Commitment Parties**" has the meaning set forth in the Backstop Commitment Agreement.

"**Backstop Motion**" means the motion seeking entry of the Backstop Order.

"**Backstop Order**" means the order entered by the Bankruptcy Court approving and authorizing the Debtors' assumption of the Backstop Commitment Agreement and the Debtors' performance thereunder.

4

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cash Collateral**" has the meaning set forth in section 363(a) of the Bankruptcy Code.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Closing Date**" means, the effective date of the Restructuring Transactions pursuant to the Plan.

"**Company Acknowledgment**" means an acknowledgment and joinder to this Agreement substantially in the form attached to this Agreement as **Exhibit D**.

"**Company Claims**" means any Claim against the Company or any direct or indirect subsidiary thereof including, without limitation, the Senior Secured Notes Claims and the Convertible Notes Claims. Solely for the purpose of Sections 7, 8(a), 8(b), and 8(c) hereof, Company Claims shall exclude all debt financing claims secured by aircraft.

"**Company Claims/Interests**" means, collectively, any Company Claims and Company Interests.

"**Company Interests**" means any Equity Interests in the Company or any direct or indirect subsidiary thereof.

"**Company Termination Notice**" has the meaning set forth in Section 10.03.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including, but not limited to, with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information in connection with or related to any potential restructuring.

"**Confirmation Order**" means, the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code, which Confirmation Order shall be consistent with this Agreement.

"**Consent Solicitation**" has the meaning set forth in Section 4(c).

"**Consent Solicitation Date**" has the meaning set forth in Section 4.

"**Consenting Convertible Noteholders**" has the meaning set forth in the preamble to this Agreement.

5

"**<u>Consenting Convertible Noteholder Termination Notice</u>**" has the meaning set forth in Section 10.02.

"**<u>Consenting Senior Secured Noteholders</u>**" has the meaning set forth in the preamble to this Agreement.

"**<u>Consenting Senior Secured Noteholder Termination Notice</u>**" has the meaning set forth in Section 10.01.

"**<u>Consenting Stakeholder Fees and Expenses</u>**" has the meaning set forth in Section 12.18.

"**<u>Consenting Stakeholders</u>**" has the meaning set forth in the preamble to this Agreement.

"**<u>Convertible Notes Claims</u>**" 2025 Convertible Notes Claims and 2026 Convertible Notes Claims.

"**<u>Convertible Noteholder</u>**" means, collectively, a "Holder" as defined in the 2025 Convertible Notes Indenture or the 2026 Convertible Notes Indenture.

"**<u>Debtors</u>**" means, collectively, the Company and its direct or indirect subsidiaries that file the Chapter 11 Cases.

"**<u>Definitive Documents</u>**" means the definitive documents listed in Section 3.01.

"**<u>DIP Credit Agreement</u>**" means the Credit Agreement with respect to the DIP Facility.

"**<u>DIP Facility</u>**" means the post-petition senior secured credit facility to be provided pursuant to, and subject to the terms and conditions of, the DIP Financing Documents.

"**<u>DIP Financing Documents</u>**" means the documentation governing the DIP Facility, including any DIP Order, Adequate Protection Order, the DIP Term Sheet, the DIP Credit Agreement, and any related credit agreement, security agreement or similar documents, as may be amended, modified, or supplemented from time to time, in accordance with the terms and conditions set forth therein.

"**<u>DIP Order</u>**" means, as applicable, the interim and final orders of the Bankruptcy Court approving the DIP Facility and granting the Debtors authority to use Cash Collateral in the Chapter 11 Cases.

"**<u>DIP Term Sheet</u>**" means the term sheet setting forth the terms of the DIP Facility attached hereto as **<u>Exhibit E</u>**.

"**<u>Disclosure Statement</u>**" means, the disclosure statement with respect to the Plan.

"**<u>Entity</u>**" shall have the meaning set forth in Section 101(15) of the Bankruptcy Code.

"**<u>Equity Interests</u>**" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests,

6

unit, or share in a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

"**Equity Rights Offering**" means the equity rights offering to be conducted in connection with the Plan and consummated on the Plan Effective Date in accordance with the Equity Rights Offering Documents.

"**Equity Rights Offering Documents**" means the Backstop Commitment Agreement, the Backstop Motion, the Backstop Order, and any and all other agreements, documents, and instruments delivered or entered into in connection with, or otherwise governing, the Equity Rights Offering, including the Equity Rights Offering procedures, subscription forms, and any other materials distributed in connection with the Equity Rights Offering.

"**Event**" means any event, development, occurrence, circumstance, effect, condition, result, state of facts or change.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Exit Financing Facilities**" means, collectively, the Exit Secured Notes Facility and Exit Revolving Credit Facility.

"**Exit Financing Facilities Documents**" means, collectively, the Exit Secured Notes Documents and Exit RCF Documents.

"**Exit RCF Documents**" means all documentation effectuating the incurrence of the Exit Revolving Credit Facility.

"**Exit Revolving Credit Facility**" means a senior secured revolving credit facility to be entered into by one or more Reorganized Company Parties in accordance with the Exit RCF Documents.

"**Exit Secured Notes Documents**" means all documentation effectuating the incurrence of the Exit Secured Notes Facility.

"**Exit Secured Notes Facility**" means $840 million of senior secured notes to be issued by the Reorganized Company Parties in accordance with the Exit Secured Notes Facility Term Sheet and the Exit Secured Notes Documents.

"**Exit Secured Notes Facility Term Sheet**" means the term sheet setting forth the material terms of the Exit Secured Notes Facility attached hereto as **Exhibit G**.

"**First Day Pleadings**" means, the first-day pleadings that the Company determines are necessary or desirable to file with the Bankruptcy Court.

"**Governance Term Sheet**" means the term sheet setting forth the material governance terms of the Reorganized Company Parties, substantially in the form attached hereto as **Exhibit H**.

"**Governing Body**" means the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of an Entity.

"**Governmental Authority**" means any applicable federal, state, local or foreign government or any agency, bureau, board, commission, court or arbitral body, department, political subdivision, regulatory or administrative authority, tribunal or other instrumentality thereof, or any self-regulatory organization.

"**Intercompany Claim**" means any Claim on account of the Intercompany Note.

"**Intercompany Note**" means that certain Loyalty Program Intercompany Note originally dated as of September 17, 2020, by and among Spirit Airlines, Inc., as Payor, and Spirit IP Cayman Ltd. and Spirit Loyalty Cayman Ltd., each as Payee, as amended by that certain Amended and Restated Loyalty Program Intercompany Note, dated as of November 17, 2022, as further amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Joinder**" means a joinder to this Agreement substantially in the form attached to this Agreement as **Exhibit I**.

"**Joint Administration Motion**" means the motion seeking joint administration of the Chapter 11 Cases of the Company Parties.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Authority of competent jurisdiction (including the Bankruptcy Court).

"**Loaned Claims**" has the meaning set forth in Section 8(a).

"**Milestones**" means the milestones set forth in Section 4, as any such milestone may be extended or waived in writing (including via email in accordance with Section 12.17) in accordance with the terms of Section 4.

"**New Common Equity**" means the equity interests in the Reorganized Company.

"**New Organizational Documents**" means, on or after the Closing Date, the organizational and governance documents for the Reorganized Company Parties, including, without limitation, certificates of incorporation (including any certificate of designations), certificates of formation or certificates of limited partnership (or equivalent organizational documents), certificates of designation, bylaws, limited liability company agreements, shareholders' agreements, and limited partnership agreements (or equivalent governing documents), as applicable, in each case, consistent with the terms and conditions set forth in this Agreement, including the Governance Term Sheet.

8

"**Offshore Documents**" means:

(i) the Amended and Restated Declaration of Trust in respect of the special share in Spirit Loyalty Cayman Ltd. to be made by Walkers Fiduciary Limited as trustee;

(ii) the Amended and Restated Declaration of Trust in respect of the special share in Spirit Finance Cayman 2 Ltd. to be made by Walkers Fiduciary Limited as trustee;

(iii) the Amended and Restated Declaration of Trust in respect of the special share in Spirit Finance Cayman 1 Ltd. to be made by Walkers Fiduciary Limited as trustee;

(iv) the Amended and Restated Declaration of Trust in respect of the special share in Spirit IP Cayman Ltd. to be made by Walkers Fiduciary Limited as trustee;

(v) the Amended and Restated Administration Agreement in respect of Spirit Loyalty Cayman Ltd. to be entered into among Walkers Fiduciary Limited as shareholder, Walkers Fiduciary Limited as administrator, Spirit Loyalty Cayman Ltd. and the Company as obligor;

(vi) the Amended and Restated Administration Agreement in respect of Spirit Finance Cayman 2 Ltd. to be entered into among Walkers Fiduciary Limited as shareholder, Walkers Fiduciary Limited as administrator, Spirit Finance Cayman 2 Ltd. and the Company as obligor;

(vii) the Amended and Restated Administration Agreement in respect of Spirit Finance Cayman 1 Ltd. to be entered into among Walkers Fiduciary Limited as shareholder, Walkers Fiduciary Limited as administrator, Spirit Finance Cayman 1 Ltd. and the Company as obligor;

(viii) the Amended and Restated Administration Agreement in respect of Spirit IP Cayman Ltd. to be entered into among Walkers Fiduciary Limited as shareholder, Walkers Fiduciary Limited as administrator, Spirit IP Cayman Ltd. and the Company as obligor;

(ix) the Amended and Restated Deed of Undertaking in respect of Spirit Loyalty Cayman Ltd. to be entered into among Spirit Loyalty Cayman Ltd., Spirit Finance Cayman 2 Ltd. as shareholder, Walkers Fiduciary Limited as special shareholder and Wilmington Trust, National Association as collateral agent;

(x) the Amended and Restated Deed of Undertaking in respect of Spirit Finance Cayman 2 Ltd. to be entered into among Spirit Finance Cayman 2 Ltd., Spirit Finance Cayman 1 Ltd. as shareholder, Walkers Fiduciary Limited as special shareholder and Wilmington Trust, National Association as collateral agent;

(xi) the Amended and Restated Deed of Undertaking in respect of Spirit Finance Cayman 1 Ltd. to be entered into among Spirit Finance Cayman 1 Ltd., the Company as shareholder, Walkers Fiduciary Limited as special shareholder and Wilmington Trust, National Association as collateral agent;

(xii) the Amended and Restated Deed of Undertaking in respect of Spirit IP Cayman Ltd. to be entered into among Spirit IP Cayman Ltd., Spirit Finance Cayman 2 Ltd. as shareholder,

9

Walkers Fiduciary Limited as special shareholder and Wilmington Trust, National Association as collateral agent;

(xiii) the shareholder resolutions of Spirit Loyalty Cayman Ltd., together with the second amended and restated memorandum and articles of association of Spirit Loyalty Cayman Ltd. annexed thereto;

(xiv) the shareholder resolutions of Spirit Finance Cayman 2 Ltd., together with the second amended and restated memorandum and articles of association of Spirit Finance Cayman 2 Ltd. annexed thereto;

(xv) the shareholder resolutions of Spirit Finance Cayman 1 Ltd., together with the second amended and restated memorandum and articles of association of Spirit Finance Cayman 1 Ltd. annexed thereto;

(xvi) the shareholder resolutions of Spirit IP Cayman Ltd., together with the second amended and restated memorandum and articles of association of Spirit IP Cayman Ltd. annexed thereto;

(xvii) the consent in respect of Spirit Loyalty Cayman Ltd. to be granted by Wilmington Trust, National Association as collateral agent and controlling beneficiary;

(xviii) the consent in respect of Spirit Finance Cayman 2 Ltd. to be granted by Wilmington Trust, National Association as collateral agent and controlling beneficiary;

(xix) the consent in respect of Spirit Finance Cayman 1 Ltd. to be granted by Wilmington Trust, National Association as collateral agent and controlling beneficiary; and

(xx) the consent in respect of Spirit IP Cayman Ltd. to be granted by Wilmington Trust, National Association as collateral agent and controlling beneficiary.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each Transferee of any Company Claim/Interest that meets the requirements of Section 7.02.

"**Person**" means any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any Governmental Authority.

"**Petition Date**" means the date on which the Chapter 11 Cases are commenced.

"**Plan Effective Date**" means the date upon which all conditions precedent to the effectiveness of the Plan have been satisfied or are waived in accordance with the terms of this Agreement and the Plan, and on which the Restructuring Transactions become effective or are consummated.

"**Plan Supplement**" means, the compilation of certain documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court prior to the hearing held by the Bankruptcy Court to consider confirmation of the Plan, each of which shall be consistent with this Agreement.

"**Proposed Amendments**" has the meaning set forth in Section 4(c).

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the market as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Registration Rights Agreement**" has the meaning set forth in the Governance Term Sheet.

"**Related Fund**" means, with respect to any Person, any fund, account, or investment vehicle that is controlled or managed by (i) such Person, (ii) an Affiliate of such Person, or (iii) the same investment manager, advisor or subadvisor as such Person or an Affiliate of such investment manager, advisor or subadvisor.

"**Reorganized Company Parties**" means, the Company Parties, as reorganized pursuant to the Plan, or any successor thereto or assignee thereof, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, immediately after the Closing Date.

"**Required Backstop Commitment Parties**" shall have the meaning as provided in the Backstop Commitment Agreement.

"**Required Consenting Convertible Noteholders**" means, as of the relevant date, those holders of Convertible Notes Claims that are party to this Agreement holding greater than 50% of the aggregate outstanding principal amount of the Convertible Notes Claims that are held by all such holders in the aggregate.

"**Required Consenting Senior Secured Noteholders**" means, as of the relevant date, those holders of Senior Secured Notes Claims that are party to this Agreement holding greater than 50% of the aggregate outstanding principal amount of the Senior Secured Notes Claims that are held by all such holders in the aggregate.

"**Required Consenting Stakeholders**" means, collectively, the Required Consenting Senior Secured Noteholders and the Required Consenting Convertible Noteholders.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), (7), (8), (9), (12), and (13) under the Securities Act.

11

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Senior Secured Notes**" means the 8.00% Senior Secured Notes due 2025 issued by Spirit IP Cayman Ltd. and Spirit Loyalty Cayman Ltd. under the Senior Secured Notes Indenture.

"**Senior Secured Notes Claims**" means any Claim on account of the Senior Secured Notes.

"**Senior Secured Notes Indenture**" means that certain Indenture originally dated as of September 17, 2020, by and among Spirit IP Cayman Ltd. and Spirit Loyalty Cayman Ltd., each as co-issuers, the Company, as parent guarantor, the other guarantors from time to time party thereto and Wilmington Trust, National Association, as trustee and collateral custodian, as amended by that certain First Supplemental Indenture, dated as of November 17, 2022, as further amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Senior Secured Noteholder**" means a "Holder" as defined in the Senior Secured Notes Indenture.

"**Senior Secured Notes Trustee**" means Wilmington Trust, National Association, in its capacity as trustee under the Senior Secured Notes Indenture, and any successor trustee appointed pursuant to the terms thereof.

"**Solicitation**" means the solicitation of votes with respect to the Plan.

"**Solicitation Materials**" means the Disclosure Statement, ballots, documents, forms, and all other materials provided in connection with the solicitation of the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code, which shall be consistent with this Agreement.

"**Solicitation Procedures Motion**" means the motion seeking final approval of the Disclosure Statement and approval of the Solicitation Procedures Order.

"**Solicitation Procedures Order**" means the order of the Bankruptcy Court approving the Solicitation procedures, the Equity Rights Offering procedures, subscription forms and other materials to be distributed in connection with Equity Rights Offering, granting approval of the adequacy of the Disclosure Statement, and scheduling a hearing for final approval of the Plan.

"**Termination Date**" means, with respect to a Party to this Agreement, the date on which termination of this Agreement as to such Party is effective in accordance with Section 10.

"**Transaction Documentation**" means all documents or agreements memorializing the Restructuring Transactions.

"**Transfer**" means to, directly or indirectly, sell, assign, grant, transfer, convey, pledge, hypothecate, or otherwise dispose of, but in each case only upon the date of settlement of the Transfer and excluding any pledge or assignment of security interest to secure obligations of a party to a Federal Reserve Bank or any other central bank.

"**Transferee**" means the recipient of a Transfer.

12

"**Trustee**" means, as applicable, the 2025 Convertible Notes Trustee, 2026 Convertible Notes Trustee or Senior Secured Notes Trustee.

1.02.    <u>Interpretation</u>.  For purposes of this Agreement:

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender shall include the masculine, feminine, and the neutral gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning;

(c)      unless otherwise specified, any reference in this Agreement to a contract, lease, instrument, release, indenture, or other agreement or document (other than a Definitive Document) being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, provided that references in this Agreement to any Definitive Document shall mean such Definitive Document in form and substance as required pursuant to Section 3.02;

(d)      unless otherwise specified, any reference in this Agreement to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; notwithstanding the foregoing, any capitalized terms in this Agreement that are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date of this Agreement;

(e)      unless otherwise specified, all references in this Agreement to "Sections" are references to Sections of this Agreement;"

(f)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not; and

(j)      the word "or" shall not be exclusive.

13

**Section 2.**    *Effectiveness of this Agreement.* This Agreement shall become effective and binding upon each of the Parties on the date and time by which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)    the Company shall have executed and delivered counterpart signature pages of this Agreement (which signature pages may be delivered by counsel and in electronic form) to counsel to the Consenting Stakeholders;

(b)    the following shall have executed and delivered counterpart signature pages of this Agreement (which signature pages may be delivered by counsel and in electronic form) to the Company:

(i)    holders of more than 66 2/3% of the aggregate outstanding principal amount of the Senior Secured Notes Claims; and

(ii)    holders of more than 66 2/3% of the aggregate outstanding principal amount of the Convertible Notes Claims.

(c)    the Company shall have paid in full the Consenting Stakeholder Fees and Expenses for which an invoice has been received by the Company on or before two (2) Business Days prior to the Agreement Effective Date.

With respect to any Company Party that becomes a party to this Agreement after the Agreement Effective Date, this Agreement shall become effective as to and fully binding upon such Company Party at the time it executes and delivers a Company Acknowledgment in accordance with the terms hereof, and such Company Party, as of such time and without further action, shall be deemed to have made to the other Parties all representations and warranties in Section 9 of the Agreement. Prior to the date that the Company Parties set forth on **Exhibit F** become a party to this Agreement, references to "Company Parties" in this Agreement shall be deemed to be a reference to the Company.

With respect to any Consenting Stakeholder that becomes a party to this Agreement pursuant to Section 7 hereof, this Agreement shall become effective as to such Consenting Stakeholder at the time it executes and delivers a Joinder in accordance with the terms hereof.

**Section 3.**    *Definitive Documents.*

3.01.    The definitive documents shall consist of the following (the "**Definitive Documents**"):

(i)    the Plan;

(ii)    the Confirmation Order;

(iii)    the Disclosure Statement and all other Solicitation Materials;

(iv)    the Solicitation Procedures Order;

14

(v)      the First Day Pleadings and all orders sought pursuant thereto;

(vi)      the Plan Supplement;

(vii)      the DIP Financing Documents;

(viii)      the Exit Financing Facilities Documents;

(ix)      the Equity Rights Offering Documents;

(x)      the Registration Rights Agreement;

(xi)      the New Organizational Documents;

(xii)      the Offshore Documents;

(xiii)      the Adequate Protection Order;

(xiv) the documents relating to the Consent Solicitation, including the supplemental indentures, collateral agreement amendments, consent solicitation statements and other documentation necessary to consummate the Consent Solicitation;

(xv)      such other motions, orders, agreements, and documentation necessary or desirable to consummate and document the transactions contemplated by this Agreement, including any plan prepared pursuant to Section 382 of the Internal Revenue Code;

(xvi)      to the extent not included above, all financing documents needed to effectuate the Restructuring; and

(xvii) all other material customary filings, deeds, agreements, notifications, certificates or other documents delivered in connection with transactions of this type (including, without limitation, any and all other documents implementing, achieving, contemplated by or relating to the Restructuring Transactions).

3.02.   The Definitive Documents that are not executed or in a form attached to this Agreement as of the Agreement Effective Date remain subject to good faith negotiation, agreement and completion. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with this Agreement. The Definitive Documents that are not executed or in a form attached to this Agreement as of the Effective Date, and any amendments, modifications, or supplements to any Definitive Documents, shall be consistent with this Agreement and otherwise shall be in form and substance reasonably acceptable to the Company, the Required Consenting Senior Secured Noteholders, and the Required Consenting Convertible Noteholders.

Notwithstanding anything herein to the contrary, (i) the DIP Financing Documents shall further be required to be reasonably acceptable in form and substance to the Required DIP Lenders (as

15

defined in the DIP Financing Documents); (ii) the Backstop Commitment Agreement shall further be required to be reasonably acceptable in form and substance to the Required Backstop Commitment Parties and (iii) the Adequate Protection Order shall be in form and substance acceptable to the Required Consenting Senior Secured Noteholders only (provided that any modifications that increase the amount of any payments on account of the adequate protection provided for the benefit of the Senior Secured Noteholders shall require the reasonable consent of the Required Consenting Convertible Noteholders).

**Section 4.** *Milestones.* The following milestones (collectively, the "**Milestones**") shall apply to this Agreement (unless extended or waived in writing (including via email in accordance with Section 12.17) with the consent (not to be unreasonably withheld) of the Company Parties, the Required Consenting Senior Secured Noteholders, and, with respect to Milestones other than those set forth in clauses (d) and (g)(ii), the Required Consenting Convertible Noteholders):

(a)     no later than November 18, 2024, the Company shall file a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the date of filing of such voluntary petition, the "**Petition Date**");

(b)     no later than November 18, 2024 the Company shall file with the Bankruptcy Court a motion seeking entry of the Adequate Protection Order and DIP Order;

(c)     no later than November 19, 2024, the Debtors shall launch a consent solicitation (the "**Consent Solicitation**" and such date, the "**Consent Solicitation Date**") seeking consent to certain amendments to the Senior Secured Notes Indenture and as set out in the Offshore Documents (collectively, the "**Proposed Amendments**") in order to facilitate the commencement of Chapter 11 Cases for the Company Parties identified on Exhibit F hereto;

(d)     no later than November 20, 2024, the Bankruptcy Court shall have entered the Adequate Protection Order;

(e)     no later than November 27, 2024, the Company shall file the Backstop Moton with the Bankruptcy Court;

(f)     no later than November 29, 2024, the Company Parties identified on Exhibit F shall have (i) executed and delivered the Company Acknowledgment to counsel to the Consenting Stakeholders, (ii) filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (iii) filed a Joint Administration Motion;

(g)     no later than December 2, 2024, the Bankruptcy Court shall have entered (i) an order granting the Joint Administration Motion, (ii) an order deeming the Adequate Protection Order applicable and binding with respect to all Company Parties, and (iii) an order deeming all other applicable orders applicable and binding with respect to all Company Parties;

(h)     no later than December 2, 2024, the Company shall file with the Bankruptcy Court the Plan, the Disclosure Statement, the Solicitation Procedures Motion;

16

(i)      no later than December 23, 2024, the Bankruptcy Court shall have entered (i) the final DIP Order and (ii) the Backstop Order;

(j)      no later than January 13, 2025, the Bankruptcy Court shall have entered the Solicitation Procedures Order;

(k)      no later than February 17, 2025, the Bankruptcy Court shall have entered the Confirmation Order;

(l)      the Plan shall have become effective in accordance with its terms no later than March 4, 2025; *provided, however,* such date may be automatically extended by up to forty-five (45) days to the extent regulatory approvals are the only outstanding conditions to effectiveness of the Plan.

**Section 5.       *Commitments of the Consenting Stakeholders.***

5.01.   <u>Affirmative Commitments</u>.   During the Agreement Effective Period, each Consenting Stakeholder severally, and not jointly and severally, agrees in respect of all of its Company Claims/Interests (subject to Section 5.04) to:

(a)      support and consummate the Plan in accordance with the terms and conditions set forth in this Agreement, and timely take all actions contemplated thereby and as necessary to support and achieve consummation of the Restructuring Transactions, including with respect to providing information as may be reasonably requested and necessary to obtain any necessary regulatory approvals to consummate the Restructuring Transactions;

(b)      act in good faith and support the Restructuring Transactions, subject to finalization of the Definitive Documents in accordance with the terms and conditions set forth in this Agreement, including to vote and exercise any powers or rights available to it (including in any creditors' meeting or in any process requiring voting or approval to which such Consenting Stakeholder is legally entitled to participate), in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions and within the timeframe outlined herein and in the Definitive Documents and not change or withdraw (or cause to be changed or withdrawn) any such vote;

(c)      with respect to the Consenting Senior Secured Noteholders, provide consent in accordance with the Consent Solicitation in order to effectuate the Proposed Amendments;

(d)      use commercially reasonable efforts to cooperate with and assist the Company, as may be reasonably requested by the Company in obtaining additional support for the Restructuring Transactions from the Company Party's other stakeholders;

(e)      use commercially reasonable efforts to give any notice, order, instruction, or direction to any applicable agent reasonably necessary to give effect to the Restructuring Transactions (including, for the avoidance of doubt, any notice, order, instruction, or direction required in connection with the execution and delivery of the Definitive Documents), on the terms and subject to the conditions of this Agreement; *provided* that no Consenting Stakeholder shall be

17

required to provide an indemnity or incur any potential expense or liability in connection therewith, other than expenses that the Company parties have agreed in writing to reimburse or indemnify on terms satisfactory to such Consenting Stakeholder;

(f)     negotiate in good faith and use commercially reasonable efforts to finalize, execute and deliver the Definitive Documents to which it is required to be a party or to which it has a consent right pursuant to Section 3.02;

(g)     consider in good faith any appropriate additional or alternative provisions or agreement necessary to address any legal, financial, or structural impediment that may arise that would prevent, hinder, impede, delay or are necessary to effectuate the consummation of the Restructuring Transactions in accordance with this Agreement.

5.02.   <u>Negative Commitments</u>.   During the Agreement Effective Period, except as otherwise provided in Section 5.04, each Consenting Stakeholder, as applicable, severally, and not jointly and severally, agrees in respect of all of its Company Claims/Interests (subject to Section 5.04) that it shall not, directly or indirectly, and shall not direct any Trustee or other Entity to:

(a)     take any action that is inconsistent with this Agreement or the Restructuring Transactions or that would reasonably be expected to interfere with, delay, or impede the solicitation and approval of the Disclosure Statement or the confirmation and consummation of the Plan and the Restructuring Transactions;

(b)     directly or indirectly, through any Person, seek, solicit, propose, support, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring Proposal;

(c)     file any motion, objection, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is inconsistent with this Agreement, the Plan or the Restructuring Transactions;

(d)     take (directly or indirectly), or direct the applicable Trustee to take, any action to enforce or exercise any right or remedy for the enforcement, collection, or recovery of any of the Company Claims/Interests, including rights or remedies arising from or asserting or bringing any claims under or with respect to the Senior Secured Notes Indenture and any Transaction Document (as defined in the Senior Secured Notes Indenture), the 2025 Convertible Notes Indenture or the 2026 Convertible Notes Indenture, as applicable, to the extent inconsistent with this Agreement;

(e)     enter into any cooperation agreement or similar agreement or arrangement with any other holder of Company Claims/Interests that both (i) relates to the holding, voting or disposition of any instrument, security or notes in connection with the Company Parties or the Reorganized Company Parties, or any entitlement to distributions, sharing of recoveries, opportunities to participate in future transactions in relation to such instrument, security or notes, and (ii) by its terms remains in effect after the Closing Date;

(f)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind (including a derivative action), including, without limitation, with respect to this Agreement, the

Restructuring Transactions, or the Chapter 11 Cases, against the Company or any of its direct or indirect subsidiaries or the other Parties (other than to enforce this Agreement or any Definitive Document or as otherwise consistent with this Agreement);

(g)     object to, delay, impede, or take any other action to interfere with the Company's or its direct or indirect subsidiaries' ownership and possession of its or their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code in the Chapter 11 Cases.

5.03.   <u>Commitments with Respect to Chapter 11 Cases</u>.   Subject to Section 5.04, each Consenting Stakeholder agrees, severally, and not jointly and severally, during the Agreement Effective Period, that it shall:

(a)     timely vote each of its Company Claims/Interests it is entitled to vote to accept the Plan by timely delivering its duly executed and completed ballot(s) accepting the Plan following the date of the Solicitation and its actual receipt of the Solicitation Materials and the ballot;

(b)     (i) to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of such releases and (ii) to the extent it is permitted to elect whether to opt in to the releases set forth in the Plan, elect to opt in to such releases, in each case by delivering its duly executed and completed ballot(s) indicating such election prior to the deadline for such delivery; and

(c)     not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clause (a) or (b) above; provided, however, that nothing in this Agreement shall prevent any Consenting Stakeholder from withholding, amending, or revoking (or causing the same) its timely consent or vote with respect to the Plan if this Agreement has been terminated in accordance with its terms with respect to such Consenting Stakeholder.

5.04.   <u>Additional Provisions Regarding the Consenting Stakeholders' Commitments</u>. Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement shall:

(a)     be construed to impair the rights of any Consenting Stakeholder from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of delaying, interfering, impeding, or taking any other action to delay, interfere or impede, directly or indirectly, the Restructuring Transactions;

(b)     affect the ability of any Consenting Stakeholder, to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee);

(c)     prevent any Consenting Stakeholder, from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement;

(d)     require any Consenting Stakeholder, to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Consenting Stakeholder other than as expressly described in this Agreement, other than expenses that the Company Parties have agreed in writing to reimburse or indemnify on terms satisfactory to such Consenting Stakeholder;

(e)     prevent any Consenting Stakeholder, from protecting and preserving its rights, remedies, and interests, including its Claims against, or Interests in, the Company Parties to the extent not inconsistent with this Agreement;

(f)     impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(g)     require any Consenting Stakeholder to (i) take any action, or omit to take any action, not reasonably within its control or which would directly or indirectly breach or cause a breach of any legal or regulatory requirement or any order or direction of any relevant court or Governmental Authority or (ii) take part or be involved in any litigation or court or regulatory proceedings, except as expressly contemplated by this Agreement;

(h)     other than as expressly set forth herein, limit the rights or obligations of any Consenting Stakeholder under, or constitute a waiver or amendment of any term or provision of any of, the Senior Secured Notes Indenture, the 2025 Convertible Notes Indenture or the 2026 Convertible Notes Indenture;

(i)     constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company or any of its direct or indirect subsidiaries that secure the obligations under any of the Senior Secured Notes Indenture, the 2025 Convertible Notes Indenture or the 2026 Convertible Notes Indenture; or

(j)     prevent any Consenting Stakeholder from taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence, or priority of its Company Claims/Interests (including, without limitation, the filing of a proof of claim against any Debtor).

**Section 6.**     ***Commitments of the Company Parties.***

6.01.   <u>Affirmative Commitments</u>.   Subject to Section 6.03, during the Agreement Effective Period, the Company Parties, jointly and severally, agree to:

(a)     support, act in good faith, and take all actions reasonably necessary and desirable to implement and consummate the Restructuring Transactions in accordance with this Agreement, and the applicable Milestones unless waived or modified in accordance with the terms hereof;

(b)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated in this Agreement, negotiate in good faith with the Required Consenting Stakeholders appropriate additional or

alternative provisions or alternative implementation mechanics to address any such impediment, and support and take all steps reasonably necessary and desirable to address any such impediment;

(c)     use commercially reasonable efforts to obtain any required regulatory and/or third-party approvals and consents for the consummation and implementation of the Restructuring Transactions;

(d)     negotiate in good faith and use commercially reasonable efforts to finalize, execute and implement the Definitive Documents, any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)     at least three (3) days prior to the filing (or such shorter period as may be necessary or practicable), provide concurrently to the respective counsels for the Consenting Stakeholders draft copies of all material pleadings, motions, and proposed orders (including without limitation the Plan, the Disclosure Statement, the First Day Pleadings, and all "second day motions and proposed orders); that affect the Consenting Stakeholders;

(f)     actively and timely oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the filing of timely filed objections or written responses) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions;

(g)     consult and negotiate in good faith with the Consenting Stakeholders and their advisors regarding the implementation of the Restructuring Transactions, and the execution of the Definitive Documents to which such Consenting Stakeholder is required to be a party or to which it has a consent right pursuant to Section 3.02;

(h)     inform counsel to the Consenting Stakeholders in writing (email being sufficient) as soon as reasonably practicable after becoming aware of: (i) any matter or circumstance which it knows, or believes to be a material impediment to the implementation or consummation of the Restructuring Transactions; (ii) any notice of any commencement of any material involuntary insolvency proceedings, legal suit for payment of debt or securement of security from or by any person in respect the Company or any of its direct or indirect subsidiaries; (iii) any material breach of any of the terms, conditions, representations, warranties or covenants set forth in this Agreement (including a breach by the Company Parties); or (iv) any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been incorrect or misleading in any material respect when made or deemed to be made;

(i)     if the Company Parties receive any bona fide proposal or offer to effect an Alternative Restructuring Proposal, the Company shall (i) inform counsel to each of the Consenting Stakeholders in writing (email being sufficient) within one (1) Business Day of receiving such proposal, with such notice to include the material terms thereof, including the identity of the Person(s) involved, and the action taken or proposed to be taken by the Company in response thereto, (ii) provide counsel and advisors to each of the Consenting Stakeholders with regular updates as to the status and progress of such Alternative Restructuring Proposal, and (iii)

21

respond promptly to reasonable information requests and questions from counsel to the Consenting Stakeholders relating to such Alternative Restructuring Proposal;

(j)     from the date hereof until the Plan Effective Date, other than (a) as required by contracts existing on the date hereof or applicable Law, (b) with the consent of the Consenting Senior Secured Noteholders (not to be unreasonably withheld, conditioned, or delayed) and in consultation with the Consenting Convertible Noteholders, or (c) except as expressly contemplated, allowed, or required by the Plan or this Agreement, (i) operate their business in the ordinary course consistent with past practices; (ii) use commercially reasonable efforts (x) to preserve intact the Company Parties' business organization and relationships with third parties and employees, taking into account the Restructuring Transactions; and (y) maintain good standing (or equivalent status under the Laws of its incorporation or organization) under the Laws of the jurisdiction in which the Company Parties are incorporated or organized, taking into account the Restructuring Transactions; (iii) consult in good faith with counsel for the Consenting Stakeholders prior to the Company Parties' entry into, termination of, or modification of any material operational contracts, leases, or other binding agreements, other than in the ordinary course of business; (iv) refrain from increasing the compensation payable to any "Insiders" (as defined in the Bankruptcy Code) of the Company Parties, except, with advance notice to the Consenting Stakeholders, annual base salary compensation increases and merit-based adjustments in the ordinary course of business and consistent with past practice or as required by the terms of and in accordance with any written employment or engagement agreement currently in effect between the Company Parties and such person; (v) refrain from granting any long term cash incentive awards payable to any "Insiders" (as defined in the Bankruptcy Code) of the Company Parties not existing as of the date of this Agreement or implementing a short term incentive plan for 2025 payable to any "Insiders" (as defined in the Bankruptcy Code) of the Company Parties; and (vi) refrain from entry into any binding transaction involving the direct or indirect sale, purchase, transfer, or other disposition of a material portion of the Company Parties' assets;

(k)     use commercially reasonable efforts to provide the advisors to the Consenting Stakeholders with (i) reasonable access to, during regular business hours, the non-privileged, non-confidential books, work papers, records and materials of any Company Party, (ii) reasonable access to, during regular business hours, the personnel and applicable advisors of any Company Party to discuss the status and progress of the Restructuring Transactions, and (iii) timely responses to all reasonable diligence requests provided by any such advisors; it being understood that the foregoing cannot, and should not be construed to, (A) require the disclosure of any workpapers, materials, reports, statements, or other information intended to be subject to attorney-client or work-product privilege or any other applicable privilege doctrines available under applicable law, or (B) override any existing confidentiality or other applicable obligations owed with respect to any such information. In addition, the Company Parties shall cooperate with reasonable requests from any Consenting Stakeholder for information or documentation relating to compliance with Anti-Corruption Laws, Anti-Money Laundering Laws, Sanctions and Ex-Im Laws (as such terms are defined in the Backstop Commitment Agreement) and the Company Parties' associated policies and procedures.

(l)     use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent; and

22

(m)     in the event that any information to be provided pursuant to this Agreement contains material non-public information, deliver such information to the Ad Hoc Group of Convertible Noteholders Advisors or Ad Hoc Group of Senior Secured Noteholders Advisors, as applicable, on a professional-eyes only basis, instead of delivering such information to the Consenting Stakeholders, unless and until such Consenting Stakeholder has entered into a Confidentiality Agreement in form and substance acceptable to such Consenting Stakeholder.

6.02.   <u>Negative Commitments</u>.  Except as set forth in Section 6.03, during the Agreement Effective Period, the Company Parties shall not, without the prior written consent (including via email in accordance with Section 12.17) of the Required Consenting Stakeholders, directly or indirectly:

(a)     take any action that is inconsistent with this Agreement, the Definitive Documents or the Restructuring Transactions or take any other action that would reasonably be expected to interfere with, delay, or impede solicitation, implementation, or consummation of, the Restructuring Transactions;

(b)     modify the Plan, in whole or in part, in a manner that is inconsistent with this Agreement;

(c)     file any motion, pleading, order or any Definitive Documents with the Bankruptcy Court or any other court (including any modification or amendment thereof) that in whole or in part, is inconsistent with this Agreement, the Plan or the Definitive Documents;

(d)     except as contemplated under the Restructuring Transactions, amend or change, or propose to amend or change any of the Company Parties' organizational documents;

(e)     except to the extent permitted by Section 6.03(c) hereof, seek, solicit, support, initiate, encourage, propose, negotiate, discuss assist, consent to, vote for or enter into any agreement regarding (in each case, directly or indirectly) any Alternative Restructuring Proposal.

(f)     (i) seek discovery in connection with, prepare, or commence an avoidance action or other legal proceeding that challenges (A) the amount, validity, allowance, character, enforceability, or priority of the Senior Secured Notes Claims, the Convertible Notes Claims, or the Intercompany Claim, or (B) as applicable, the validity, enforceability, or perfection of any lien or other encumbrance securing any such Claims, or (ii) support any third party in connection with any of the acts described in clause (i) of this Section 6.02(f).

6.03.   <u>Additional Provisions Regarding the Company Parties' Commitments.</u>

(a)     Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Company Parties or the Governing Body of the Company Parties, to take or refrain from taking any action with respect to the Restructuring Transactions (including terminating this Agreement under Section 10) to the extent the Governing Body of the Company Parties determines in good faith, based on the advice of counsel, that taking or refraining from taking such action, as applicable, would be inconsistent with its or their fiduciary obligations under applicable Law or a violation of applicable Law.  Any such action or inaction pursuant to this

23

Section 6.03 shall not be deemed to constitute a breach of this Agreement. The Company Parties shall provide prompt written notice (within one (1) Business Day) to counsel to the Required Consenting Stakeholders of any such determination in accordance with this Section 6.03 to take or refrain from taking any action. This Section 6.03 shall not impede the Consenting Stakeholders' right to terminate this Agreement pursuant to Section 10 of this Agreement.

(b)      Notwithstanding anything to the contrary in this Agreement but subject to Section 6.01(i), upon receipt of an unsolicited Alternative Restructuring Proposal, the Company Parties and its directors, managers, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives (including any Governing Body members) shall have the rights to: (i) consider and respond to such Alternative Restructuring Proposal; (ii) provide access to non-public information concerning the Company and any of its direct or indirect subsidiaries to any Entity making such proposal that requests such information and enters into Confidentiality Agreements or nondisclosure agreements with the Company in connection with such proposal; (iii) receive, maintain, facilitate, participate in or continue discussions or negotiations with respect to such Alternative Restructuring Proposal if the Governing Body of the Company Parties entity determines, in good faith upon the advice of counsel, that failure to take such action would be inconsistent with their fiduciary duties or applicable Law or in violation of applicable Law; and (iv) enter into or continue discussions or negotiations with holders of Company Claims/Interests (including the Consenting Stakeholders) regarding such Alternative Restructuring Proposal.

(c)      Nothing in this Agreement shall: (i) impair or waive the rights of the Company Parties to assert or raise any objection permitted under this Agreement in connection with the implementation of the Restructuring Transactions; (ii) affect the ability of the Company Parties to consult with any Consenting Stakeholder or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee) so long as doing so is not inconsistent with the terms hereof; or (iii) prevent the Company Parties from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 7.      *Transfer of Company Claims/Interests and Joinders.***

7.01.   Except solely to the extent provided in Section 7.02 or 7.04 of this Agreement, this Agreement shall not limit, restrict, or otherwise affect in any way a Party's right, authority, or power to purchase or Transfer any Company Claims/Interests, including any right, title, or interest in a Company Claim/Interest.

7.02.   <u>Transfer Restrictions.</u>   During the Agreement Effective Period, and subject to the terms and conditions of this Agreement, each Party agrees, solely with respect to itself, as expressly identified and limited on its signature page or Joinder, and not in any other manner or with respect to any Affiliates, not to Transfer any right, title, or interest in a Company Claim, unless (a) the Transferee is a Party to this Agreement, or (b) if the Transferee is not already a Party to this Agreement, (i) the Transferee is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, or (3) an institutional accredited investor (as defined in the Rules), and

(ii) the Transferee agrees in writing to be bound by the terms of this Agreement by executing a Joinder in the form attached to this Agreement and delivering an executed copy thereof to counsel to the Company.  Upon compliance with the requirements of Section 7.02 of this Agreement, including delivery of the Joinder, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims.  Any Transfer in violation of this Section 7.02 or 7.04 shall be void *ab initio* and the Company Parties and each other Consenting Stakeholder shall have the right to enforce the voiding of such transfer.

7.03.   <u>General Exception</u>.  Notwithstanding anything in this Agreement to the contrary, this Section 7 shall not apply to the grant of any lien or encumbrance on any right, title, or interest in any Company Claims in favor of a bank, broker-dealer or other custodial institution holding custody of any such right, title, or interest in the Company Claims in the ordinary course of business that is released upon the Transfer of any such right, title, or interest in a Company Claim.

7.04.   <u>Qualified Marketmaker Exceptions</u>.

(a)   Notwithstanding Section 7.02, a Consenting Stakeholder may Transfer any right, title, or interest in its Company Claims to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker execute a Joinder or be a Party to this Agreement, on the condition that (i) such Qualified Marketmaker subsequently Transfers such Company Claims (by purchase, sale, assignment, participation or otherwise) by no later than five (5) Business Days of its acquisition thereof, (ii) such Consenting Stakeholder provides prompt notice of any such Transfer no later than the date of such Transfer to counsel to the Company Parties and counsel to the Consenting Stakeholder in accordance with Section 12.10, (iii) any subsequent Transfer by such Qualified Marketmaker of the right, title or interest in such Company Claims is to a Permitted Transferee, and (iv) the Transferee is unaffiliated with such Qualified Marketmaker (and the Transfer documentation between the transferor Consenting Stakeholder and such Qualified Marketmaker shall contain a requirement that provides as such); *provided*, that, if the foregoing items (i) through (iv) are not satisfied, the Qualified Marketmaker will be required to executed and deliver a Joinder.

(b)   Notwithstanding Section 7.02, to the extent that a Party to this Agreement is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interest in any Company Claims/Interests that it acquires from a holder of such Company Claims/Interests that is not a Party to this Agreement without the requirement that the transferee execute a Joinder or be a Party hereto.

7.05.   <u>Effect of Delivery of Joinder</u>.  By executing and delivering a Joinder as provided under Section 7.02 or 7.04, a Transferee:

(a)   becomes and shall be treated for all purposes under this Agreement as a Party to this Agreement with respect to the Transferred Company Claims/Interests and with respect to all other Company Claims/Interests that the Transferee holds and subsequently acquires, subject to Section 7.03 and Section 7.04(c);

(b)   agrees to be bound by all of the terms of this Agreement (as such terms may be

25

amended from time to time in accordance with the terms hereof); and

(c)     is deemed, without further action, to make to the other Parties hereto the representations and warranties that the Parties to this Agreement make in Section 8 of this Agreement, in each case as of the date of the Joinder.

7.06.   Effect of Transfer.   A Party to this Agreement that Transfers any right, title, or interest in any Company Claims in accordance with the terms of this Section 7 shall, subject to delivery of a Joinder with respect to any transferred Company Claims, be deemed to relinquish its rights and be released from its obligations under this Agreement solely to the extent of such Transferred Company Claims; *provided, however,* that in no event shall such Transfer relieve any Party from liability for its breach or non-performance of its obligations under this Agreement prior to such Transfer.

7.07.   Additional Claims.   This Agreement shall not limit, restrict, or otherwise affect in any way a Party's right, authority, or power to acquire any Company Claims in addition to the Party's Company Claims and such acquired Company Claims shall automatically and immediately upon acquisition by a Party be deemed to be subject to the terms of this Agreement, except as set forth in Section 7.04 above.   During the Agreement Effective Period, to the extent any Party to this Agreement acquires additional Company Claims from an entity that is not a Party to this Agreement, such Party shall promptly provide notice of any such acquisition and (including the amount and type of Company Claim acquired) and deliver a current list of its Company Claims to counsel to the Company Parties, counsel to the Consenting Senior Secured Noteholders and counsel to the Consenting Convertible Noteholders within 3 Business Days after such acquisition.

7.08.   No Obligation.   This Section 7 shall not by its terms impose any obligation on the Company Parties to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests. Notwithstanding anything to the contrary in this Agreement, if the Company Parties and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations of the Company Parties otherwise arising under such Confidentiality Agreements.

**Section 8.     *Representations and Warranties of Consenting Stakeholders.*** Each Consenting Stakeholder severally, and not jointly and severally, represents and warrants that as of the Agreement Effective Date (or, in the case of a Consenting Stakeholder that becomes a party hereto after the Agreement Effective Date, as of the date such Consenting Stakeholder becomes a Party to this Agreement by executing and delivering a Joinder) and as of the Closing Date:

(a)     it is the beneficial or record owner of the aggregate principal amount of the Company Claims or is the nominee, investment manager, advisor or sub-advisor for beneficial holders of the Company Claims reflected in (or, to the extent it has loaned or transferred any Company Claims to any third-party on a temporary basis pursuant to any loan or repurchase agreement (any such Company Claims, the "**Loaned Claims**"), it has recalled any Loaned Claims to the extent possible, and will use commercially reasonable efforts to beneficially own any such

Loaned Claims as soon as reasonably practicable), and, having made reasonable inquiry, is not the beneficial or record owner or the nominee, investment manager, advisor or sub-advisor for a beneficial or record owner of any Company Claims other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Joinder, as applicable (as may be updated pursuant to Section 7);

(b)    it has (or upon the return of any Loaned Claims, will have) the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims;

(c)    such Company Claims are (or upon the return of any Loaned Claims, will be) free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)    (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act) or (C) an institutional accredited investor (as defined in the Rules) and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribute or resale in violation of the Securities Act; and

(e)    it is not party to any cooperation agreement or similar agreement or arrangement with any other holder of Company Claims/Interests that both (i) relates to the holding, voting or disposition of any instrument, security or notes in connection with the Company Parties or the Reorganized Company Parties, or any entitlement to distributions, sharing of recoveries, opportunities to participate in future transactions in relation to such instrument, security or notes, and (ii) by its terms remains in effect after the Closing Date.

For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, any Consenting Stakeholder's inability to vote, consent, or take any other action with respect to Loaned Claims shall not be a breach or default of such Consenting Stakeholder's obligations under this Agreement or any Definitive Document.

**Section 9.    *Mutual Representations, Warranties, and Covenants*.**    Each of the Parties, severally, and not jointly and severally, represents, warrants and covenants to each other Party that, as of the Agreement Effective Date (or, in the case of each Company Party and Consenting Stakeholder that becomes a party hereto after the Agreement Effective Date, as of the date such Company Party or Consenting Stakeholder becomes a Party to this Agreement by executing and delivering a Company Acknowledgment or Joinder, as applicable) and as of the Closing Date:

(a)    it is validly existing and in good standing under the Laws of the state or jurisdiction of its organization, incorporation or formation, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan or the Bankruptcy Code, if applicable, no consent or approval is required by any other Entity or Person in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance of, the transactions contemplated by this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association, or other constitutional documents;

(d)      it has all requisite corporate or similar power and authority to enter into, execute, and deliver this Agreement and it has (or will have, at the relevant time) all requisite corporate, partnership or similar power and authority to effectuate the Restructuring Transactions and carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(e)      it has not assigned, conveyed, sold, hypothecated or otherwise transferred all, any part of or any interest in any claim or cause of action that would be released pursuant to the releases set forth in the Plan; and

(f)      it is not a party to any Alternative Restructuring Proposal, restructuring, or similar agreement with other Parties to this Agreement that relates to the Company or any of its direct or indirect subsidiaries that has not been disclosed to all Parties to this Agreement.

**Section 10.**    *Termination Events.*

10.01.  <u>Consenting Senior Secured Noteholder Termination Events</u>.  This Agreement may be terminated with respect to the Consenting Senior Secured Noteholders by the Required Consenting Senior Secured Noteholders by the delivery to the Company Parties' counsel of written notice (a "**Consenting Senior Secured Noteholder Termination Notice**") in accordance with Section 12.10 of this Agreement upon the occurrence of any of the following events (unless waived in writing by the Required Consenting Senior Secured Noteholders in their sole discretion):

(a)      the breach by the Company Parties of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that would have, or could reasonably be expected to have, a material adverse effect on the Restructuring Transactions, which breach remains uncured (to the extent curable) for five (5) Business Days after delivery of the Consenting Senior Secured Noteholder Termination Notice detailing any such breach;

(b)      the breach in any material respect by one or more of the Consenting Convertible Noteholders of any of such Consenting Convertible Noteholder's representations, warranties, covenants or obligations set forth in this Agreement that (i) would result in the non-breaching Consenting Convertible Noteholders owning or controlling less than 66-2/3% in aggregate principal amount of all outstanding Convertible Notes Claims and (ii) remains uncured for a period of five (5) Business Days after the receipt of a Consenting Senior Secured Noteholder Termination Notice specifying such breach;

(c)      the Company Parties (i) file any motion seeking to avoid, disallow, subordinate, or recharacterize any Company Claims/Interests or security interest held by or for the benefit of any Consenting Senior Secured Noteholder or (ii) shall have supported any application, adversary proceeding, or cause of action referred to in the immediately preceding clause (i) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or cause of action;

(d)      the Company Parties (i) file any motion seeking to avoid, disallow, subordinate, or recharacterize the Intercompany Claim or (ii) shall have supported any application, adversary proceeding, or cause of action referred to in the immediately preceding clause (i) filed by a third party, or consent to the standing of any such third party to bring such application, adversary proceeding, or cause of action;

(e)      the Bankruptcy Court enters an order providing for the relief specified in Section 10.01(c) or 10.01(d);

(f)      the issuance, promulgation, or enactment by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) either (1) such ruling, judgment or order has been issued at the request of the Company Parties in contravention of any obligations set forth in this Agreement or (2) such ruling, judgment or order remains in effect for ten (10) Business Days after delivery of a Consenting Senior Secured Noteholder Termination Notice identifying any such issuance; notwithstanding the foregoing, this termination right may not be exercised by any Party that sought or requested such ruling, judgment or order in contravention of any obligation set forth in this Agreement;

(g)      the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for ten (10) Business Days after the entry of such order; *provided*, that no Consenting Senior Secured Noteholder shall have the right to terminate this Agreement pursuant to this Section 10.01(g) if the Bankruptcy Court denies confirmation of the Plan subject only to the making of ministerial, administrative, or immaterial modifications to the Plan;

(h)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by the Company Parties seeking an order (without the prior written reasonable consent of the Required Consenting Senior Secured Noteholders), (i) converting any Chapter 11 Case to cases under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in the Chapter 11 Cases, (iii) dismissing the Chapter 11 Cases, or (iv) rejecting this Agreement;

(i)      any Company Party fails to timely file a formal objection, after consultation in good faith with the Consenting Senior Secured Noteholders, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee, (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Chapter 11 Cases;

(j)      any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, receivership, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect, except as contemplated by this Agreement, (ii) is the subject of an involuntary case under the Bankruptcy Code that is not dismissed or withdrawn within 30 days of the commencement of such proceeding, or any Company Party consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the preceding subsection (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official with respect to any Company Party or for a substantial part of any Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(k)      the failure of the Company Parties to meet a Milestone, which has not been waived, modified or extended in accordance with this Agreement, unless (i) such failure is the result of any act, omission, or delay on the part of the terminating Consenting Senior Secured Noteholder in violation of its obligations under this Agreement or (ii) such failure is due solely to the unavailability of the Bankruptcy Court;

(l)      any Company Party (i) withdraws from the Plan or Disclosure Statement, if applicable, or (ii) files or otherwise makes public any of the Definitive Documents (including any modification or amendments thereto) (x) in a form that is inconsistent (other than in an immaterial manner) with this Agreement and (y) without the consent of the Required Consenting Senior Secured Noteholders in accordance with this Agreement, which occurrence remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Senior Secured Noteholder transmits a written notice in accordance with Section 12.10;

(m)      any order approving the Plan or the Disclosure Statement is appealed, reversed, stayed, dismissed, vacated, reconsidered, or modified without the prior written consent of the Required Consenting Senior Secured Noteholders, and such order remains in effect for ten (10) Business Days after entry thereof;

(n)      the acceleration of any obligations or termination of commitments under the DIP Facility or the DIP Financing Documents;

(o)      any Company Party fails to comply with any of its obligations to the Senior Secured Notes Trustee or the Senior Secured Noteholders under the Adequate Protection Order;

(p)      the Backstop Agreement is terminated as to all parties thereto in accordance with its terms;

(q)      this Agreement is terminated as to the Consenting Convertible Noteholders;

(r)      the Bankruptcy Court enters an order terminating a Debtor's exclusive right to file or solicit acceptances of a plan of reorganization;

30

(s)    any Company Party publicly announces that it (i) intends to not support the Restructuring Transactions, or (ii) intends to accept an Alternative Restructuring Proposal or executes a definitive written agreement with respect to an Alternative Restructuring Proposal;

(t)    the Company Parties fail to pay the Consenting Stakeholder Fees and Expenses of the Ad Hoc Group of Senior Secured Noteholders Advisors in accordance with Section 12.18 hereof; or

(u)    the Company Parties' execution, delivery, amendment, modification, withdrawal, or filing of a pleading seeking approval of, or authority to amend or modify, any Definitive Document that, in any such case, is not consistent with this Agreement or otherwise not reasonably acceptable to the Required Consenting Senior Secured Noteholders.

10.02.    <u>Consenting Convertible Noteholder Termination Events</u>.  This Agreement may be terminated with respect to the Consenting Convertible Noteholders by the Required Consenting Convertible Noteholders by the delivery to the Company Parties' counsel a written notice (a "**Consenting Convertible Noteholder Termination Notice**") in accordance with Section 12.10 of this Agreement upon the occurrence of any of the following events (unless waived in writing by the Required Consenting Convertible Noteholders in their sole discretion):

(a)    the breach by the Company Parties of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that would have, or could reasonably be expected to have, a material adverse effect on the Restructuring Transactions, which breach remains uncured (to the extent curable) for five (5) Business Days after delivery of the Consenting Convertible Noteholder Termination Notice detailing any such breach;

(b)    the breach in any material respect by one or more of the Consenting Senior Secured Noteholders of any of such Consenting Senior Secured Noteholder's representations, warranties, covenants or obligations set forth in this Agreement that (i) would result in the non-breaching Consenting Senior Secured Noteholders owning or controlling less than 66-2/3% in aggregate principal amount of all outstanding Senior Secured Notes Claims and (ii) remains uncured for a period of five (5) Business Days after the receipt of a Consenting Convertible Noteholder Termination Notice specifying such breach;

(c)    any Company Party (i) files any motion seeking to avoid, disallow, subordinate, or recharacterize any Company Claims/Interests held by any Consenting Convertible Noteholder or (ii) shall have supported any application, adversary proceeding, or cause of action referred to in the immediately preceding clause (i) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or cause of action;

(d)    the Bankruptcy Court enters an order providing for the relief specified in Section 10.02(c);

(e)    the issuance, promulgation, or enactment by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) either (1) such ruling, judgment or order has been issued at the

31

request of the Company Parties in contravention of any obligations set forth in this Agreement or (2) such ruling, judgment or order remains in effect for 10 Business Days after delivery of a Consenting Convertible Noteholder Termination Notice identifying any such issuance; notwithstanding the foregoing, this termination right may not be exercised by any Party that sought or requested such ruling, judgment or order in contravention of any obligation set forth in this Agreement;

(f)    the Bankruptcy Court enters an order (i) denying confirmation of the Plan, and such order remains in effect for ten (10) Business Days after the entry of such order; *provided*, that no Consenting Convertible Noteholder shall have the right to terminate this Agreement pursuant to this Section 10.02(f) if the Bankruptcy Court denies confirmation of the Plan subject only to the making of ministerial, administrative, or immaterial modifications to the Plan;

(g)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by the Company Parties seeking an order (without the prior written reasonable consent of the Required Consenting Convertible Noteholders), (i) converting any Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in the Chapter 11 Cases, (iii) dismissing the Chapter 11 Cases or (iv) rejecting this Agreement;

(h)    any Company Party fails to timely file a formal objection, after consultation in good faith with the Consenting Convertible Noteholders, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee, (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Chapter 11 Cases;

(i)    any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, receivership, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect, except as contemplated by this Agreement, (ii) is the subject of an involuntary case under the Bankruptcy Code that is not dismissed or withdrawn within 30 days of the commencement of such proceeding, or any Company Party consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the preceding subsection (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official with respect to any Company Party or for a substantial part of any Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(j)    the failure of the Company Parties to meet a Milestone, which has not been waived, modified, or extended in accordance with this Agreement, unless (i) such failure is the result of any act, omission, or delay on the part of the terminating Consenting Convertible Noteholder in violation of its obligations under this Agreement, or (ii) such failure is due solely to the unavailability of the Bankruptcy Court;

32

(k)       any Company Party (i) withdraws from the Plan or Disclosure Statement, if applicable, or (ii) files or otherwise makes public any of the Definitive Documents (including any modification or amendments thereto) (x) in a form that is inconsistent (other than in an immaterial manner) with this Agreement and (y) without the consent of the Required Consenting Convertible Noteholders (in accordance with this Agreement), which occurrence remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Convertible Noteholder transmits a written notice in accordance with Section 12.10;

(l)       any order approving the Plan or the Disclosure Statement is appealed, reversed, stayed, dismissed, vacated, reconsidered or modified without the prior written consent of the Required Consenting Convertible Noteholders, and such order remains in effect for ten (10) Business Days after entry thereof;

(m)      the Backstop Agreement is terminated as to all parties thereto in accordance with its terms;

(n)       this Agreement is terminated as to the Consenting Senior Secured Noteholders;

(o)       the Bankruptcy Court enters an order terminating a Debtor's exclusive right to file or solicit acceptances of a plan of reorganization;

(p)       any Company Party publicly announces that it (i) intends to not support the Restructuring Transactions, or (ii) intends to accept an Alternative Restructuring Proposal or executes a definitive written agreement with respect to an Alternative Restructuring Proposal;

(q)       the Company Parties fail to pay the Consenting Stakeholder Fees and Expenses of the Ad Hoc Group of Convertible Noteholders Advisors in accordance with Section 12.18 hereof, unless the payment of such fees and expenses has not been authorized by an order of the Bankruptcy Court;

(r)       the Company Parties' execution, delivery, amendment, withdrawal, modification, or filing of a pleading seeking approval of, or authority to amend or modify, any Definitive Document that, in any such case, is not consistent in all respects with this Agreement or does not comport with the consent rights of the Required Consenting Convertible Noteholders as set forth in Section 3.02 of this Agreement.

10.03.  Company Parties Termination Events.  The Company Parties may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 12.10 of this Agreement (each, a "**Company Termination Notice**") upon the occurrence of any of the following events:

(a)       the breach by (1) one or more of the Consenting Senior Secured Noteholders of any of any provision set forth in this Agreement that would result in the non-breaching Consenting Senior Secured Noteholders owning or controlling less than 66-2/3% in aggregate principal amount of all outstanding Senior Secured Notes Claims, or (2) one or more of the Consenting Convertible Noteholders of any of any provision set forth in this Agreement that would result in the non-breaching Consenting Convertible Noteholders owning or controlling less than 66-2/3%

33

in aggregate principal amount of all outstanding Convertible Notes Claims, in each case that remains uncured for a period of five (5) Business Days after the receipt of a Company Termination Notice specifying such breach;

(b)    in accordance with Section 6.03, the Governing Body of any Company Party determines in good faith, based upon advice of counsel (which may be outside counsel), that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law;

(c)    the issuance, promulgation, or enactment by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for 10 Business Days after such delivery of a Company Termination Notice specifying any such issuance; notwithstanding the foregoing, this termination right shall not apply to or be exercised by the Company Parties if the Company Parties sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement;

(d)    the Required Consenting Senior Secured Noteholders or the Required Consenting Convertible Noteholders terminate this Agreement with respect to the Consenting Senior Secured Noteholders or the Consenting Convertible Noteholders, as applicable, in accordance with Section 10.01 or 10.02;

(e)    the acceleration of any obligations under the DIP Facility or the DIP Financing Documents;

(f)    the Backstop Agreement is terminated as to all parties thereto in accordance with its terms; or

(g)    this Agreement is terminated as to either the Consenting Senior Secured Noteholders or the Consenting Convertible Noteholders.

10.04.   Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Company Parties, (b) the Required Consenting Senior Secured Noteholders, and (c) the Required Consenting Convertible Noteholders.

10.05.   Automatic Termination.  This Agreement shall terminate automatically as to all Parties without any further required action or notice immediately upon the Closing Date.

10.06.   Effect of Termination.  After the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination, except as otherwise expressly provided in this Agreement, shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with

34

respect to any and all Company Claims/Interests held by such Party; *provided, however,* that in no event shall such termination relieve any Party from (i) liability for its breach or non-performance of its obligations under this Agreement prior to the Termination Date, or (ii) obligations under this Agreement which by their terms expressly survive termination of this Agreement. Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by the Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before such Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise.  Nothing in this Agreement shall be construed as prohibiting the Company Parties or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with the terms hereof or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing in this Agreement is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of the Company Parties or the ability of the Company Parties to protect and preserve their rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its Claims against the Company Parties, or any Consenting Stakeholder, as applicable. No purported termination of this Agreement shall be effective under this Section 10.06 or otherwise if the Party seeking to terminate this Agreement is in breach of this Agreement, except a termination pursuant to Section 10.03(b).  Nothing in this Section 10.06 shall restrict the Company Parties' right to terminate this Agreement in accordance with Section 10.03(b).

**Section 11.    *Amendments and Waivers*.**

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 11.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by (i) the Company Parties, (ii) the Required Consenting Senior Secured Noteholders, and (iii) the Required Consenting Convertible Noteholders; *provided* that (w) any modification or amendment to the definition of Required Consenting Senior Secured Noteholders shall require the written consent of each Consenting Senior Secured Noteholder, (x) any modification or amendment to the definition of Required Consenting Convertible Noteholders shall require the written consent of each Consenting Convertible Noteholder, (y) any modification, amendment, supplement or waiver which materially, adversely and disproportionately affects the Senior Secured Notes Claims held by any Consenting Senior Secured Noteholder as compared to any other Consenting Senior Secured Noteholder shall require the written consent of such Consenting Senior Secured Noteholder; and (z) any modification, amendment, supplement or waiver which materially, adversely and disproportionately affects the Convertible Notes Claims held by any Consenting Convertible Noteholder as compared to any other Consenting Convertible Noteholder shall require the written consent of such Consenting Convertible Noteholder; *provided*, *further,* that any modification, amendment, supplement or waiver to any Definitive Document that is an exhibit hereto shall be

35

subject to the consent rights of the respective Parties set forth in Section 3.02 of this Agreement; *provided*, *further*, that any modification or amendment to this Section shall require the consent of each Consenting Stakeholder. For the avoidance of doubt, in the event of any modification, amendment or supplement of the type set forth in clauses (y) and (z) above, the affected Consenting Senior Secured Noteholder or Consenting Convertible Noteholder, as applicable, shall have the right to terminate this Agreement as to itself.

(c)     Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 11 shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as (i) a further or continuing waiver of such breach, (ii) a waiver of any other or subsequent breach, or (iii) a waiver of any provision of this Agreement by another Party. No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

## Section 12.    *Miscellaneous.*

12.01.  <u>Acknowledgment</u>.  Notwithstanding any other provision of this Agreement, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

12.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached to this Agreement (together with any exhibits, annexes or schedules thereto) is expressly incorporated and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules (it being understood and agreed that any actions and obligations required to be taken by any Party that are included in the exhibits attached to this Agreement, but not in this Agreement are to be considered "covenants" of such Party and therefore covenants of this Agreement, notwithstanding the failure of any specific provision in any of the exhibits to be re-copied into this Agreement). In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules attached to this Agreement) and the exhibits, annexes, and schedules attached to this Agreement, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern, *provided*, that in the event of any inconsistency between this Agreement and the Plan, the terms and conditions set forth in the Plan shall govern.

12.03.  <u>Further Assurances</u>. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters specified in this Agreement, as may be reasonably appropriate or necessary from time to time, to

effectuate the Restructuring Transactions, as applicable, provided that such additional documents are consistent with the terms hereof and do not include any additional liabilities or obligations of the Consenting Stakeholder without each impacted Consulting Stakeholder's prior written consent.

12.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided in this Agreement, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter of this Agreement and supersedes all prior negotiations, understandings, and agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement. The Parties acknowledge and agree that they are not relying on any representations or warranties other than as set forth in this Agreement.

12.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE CHOSEN STATE, WITHOUT GIVING EFFECT TO ITS CONFLICT OF LAWS PRINCIPLES. Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party to this Agreement.

12.06.  <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY TO THIS AGREEMENT IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

12.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each Person executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

12.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation of this Agreement, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion of this Agreement, shall not be effective in regard to the interpretation of this Agreement. The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

12.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as

applicable.  There are no third-party beneficiaries under this Agreement, and, except as set forth in Section 7, the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Entity.

12.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    if to the Company Parties, to:

Spirit Airlines, Inc.
2800 Executive Way
Miramar, FL 33025
Attn:  Thomas Canfield
Email: thomas.canfield@Spirit.com

with a copy to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attn:  Marshall Huebner
        Darren Klein
        Christopher Robertson
Email: marshall.huebner@davispolk.com
        darren.klein@davispolk.com
        christopher.robertson@davispolk.com

(b)    if to a Senior Secured Noteholder, the address or e-mail address set forth on such Party's signature page to this Agreement (or in the signature page to a Joinder, as applicable), with a copy to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn:  Michael Stamer
        Jason P. Rubin
        Stephen B. Kuhn
Email: mstamer@akingump.com
        jrubin@akingump.com
        skuhn@akingump.com

(c)    if to a Consenting Convertible Noteholder, the address or e-mail address set forth on such Consenting Convertible Noteholder's signature page to this Agreement (or in the signature page to a Joinder, as applicable), with a copy to:

38

Paul Hastings LLP
71 S. Wacker Drive
Chicago, IL 60606
Attn:   Matthew L. Warren
          Geoffrey M. King
Email: mattwarren@paulhastings.com
          geoffking@paulhastings.com

and

Paul Hastings LLP
1170 Peachtree Street N.E.
Suite 100
Atlanta, GA 30309
Attn:   Zach Cochran
Email: zachcochran@paulhastings.com

(d)      Any notice given by delivery, mail, or courier shall be effective when received.

12.11.   <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties. Each Consenting Stakeholder acknowledges and agrees that it is not relying on any representations or warranties other than as set forth in this Agreement or any other Definitive Document.

12.12.   <u>Admissibility and Waiver.</u>  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating to this Agreement shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages or any other remedy to which a Party may be entitled under this Agreement.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties fully reserve any and all of their rights.

12.13.   <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

12.14.   <u>Several, Not Joint and Several, Claims</u>.  The agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several, and not joint and several.

39

12.15.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

12.16.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

12.17.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3, Section 4, Section 11, or otherwise, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

12.18.  <u>Fees and Expenses</u>. To the extent not previously paid, and regardless of whether the Restructuring Transactions are consummated, the Company Parties shall promptly pay in cash all fees and expenses of the Ad Hoc Group of Senior Secured Noteholders Advisors and the Ad Hoc Group of Convertible Noteholders Advisors, in each case, in accordance with any engagement letters (if any) of such professional, including, without limitation, any success fees contemplated therein (collectively, the "**Consenting Stakeholder Fees and Expenses**").

12.19.  <u>Survival</u>.  Notwithstanding (a) any Transfer of any Company Claims in accordance with Section 7 or (b) the termination of this Agreement pursuant to Section 10, the agreements and obligations of the Parties in Sections 10.06, Sections 12.01-12.19, Sections 12.20-12.21, Section 12.23  any defined terms used in any of the foregoing Sections (solely to the extent used therein) and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect in accordance with the terms hereof and thereof.

12.20.  <u>Enforceability of Agreement</u>.  If the Chapter 11 Cases are commenced, each of the Parties waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement to the extent the Bankruptcy Court determines that such relief is required.

12.21.  <u>Relationship Among Parties</u>.  Notwithstanding anything to the contrary herein, the duties and obligations of the Consenting Stakeholders under this Agreement shall be several, not joint and several. None of the Consenting Stakeholders shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any Consenting Stakeholder, any Company Party, or any of the Company Party's respective creditors or other stakeholders, and there are no commitments among or between the Consenting Stakeholders, in each case except as expressly set forth in this Agreement or any other Definitive Document. It is understood and agreed that any Consenting Stakeholders may trade in any debt or equity securities

of any Company Party without the consent of the Company Parties, subject to applicable securities laws and this Agreement. No prior history, pattern or practice of sharing confidences among or between any of the Consenting Stakeholders, and/or the Company Parties shall in any way affect or negate this understanding and agreement. The Parties have no agreement, arrangement or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any equity securities of any of the Company Parties and do not constitute a "group" within the meaning of Section 13(d)(3) of the Exchange Act or Rule 13d-5 promulgated thereunder. For the avoidance of doubt: (a) each Consenting Stakeholder is entering into this Agreement directly with the Company Parties and not with any other Consenting Stakeholder; (b) subject to Section 7.02, no other Consenting Stakeholder shall have any right to bring any action against any other Consenting Stakeholder with respect this Agreement (or any breach thereof); and (c) no Consenting Stakeholder shall, nor shall any action taken by a Consenting Stakeholder pursuant to this Agreement, be deemed to be acting in concert or as any group with any other Consenting Stakeholder with respect to the obligations under this Agreement nor shall this Agreement create a presumption that the Consenting Stakeholders are in any way acting as a group. All rights under this Agreement are separately granted to each Consenting Stakeholder by the Company Parties and vice versa, and the use of a single document is for the convenience of the Company Parties. The decision to commit to enter into the Restructuring Transactions contemplated by this Agreement has been made independently. For the avoidance of doubt, the Consenting Stakeholders are not insiders of the Company or its subsidiaries.

12.22. <u>Publicity</u>. The Company Parties shall submit drafts to counsel to the Consenting Stakeholders, respectively, of any press releases or other public statements that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) Business Days prior to making any such disclosure (*provided, however,* that if delivery of such document at least two (2) Business Days in advance of such disclosure is impossible or impracticable under the circumstances, such document shall be delivered as soon as otherwise practicable), and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith. Except as required by Law or otherwise permitted under the terms of any other agreement between the Company Parties and any Consenting Stakeholder, no Party or its advisors shall (a) use the name of any Consenting Stakeholder in any public manner (including in any press release) with respect to this Agreement, the Restructuring or any of the Definitive Documents or (b) disclose to any Person (including, for the avoidance of doubt, any other Party), other than advisors to the Company Parties, the principal amount or percentage of any Company Claims/Interests held by any individual Consenting Stakeholder, in each case, without such Consenting Stakeholder's prior written consent (it being understood and agreed that each Consenting Stakeholder's signature page to this Agreement shall be redacted to remove the name of such Consenting Stakeholder and the amount and/or percentage of Company Claims/Interests held by such Consenting Stakeholder); *provided, however*, that (i) if such disclosure is required by Law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Stakeholder a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure, and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Company Claims/Interests held by all the Consenting Stakeholders, collectively, on a facility by facility basis. Notwithstanding the provisions in this Section 12.22, (x) any Party may disclose the

identities of the other parties in any action to enforce this Agreement or in any action for damages as a result of any breaches hereof, and (y) any Party may disclose, to the extent expressly consented to in writing by a Consenting Stakeholder, such Consenting Stakeholder's identity and individual holdings.

12.23. <u>No Recourse</u>.  This Agreement may only be enforced against the named parties hereto (and then only to the extent of the specific obligations undertaken by such parties in this Agreement). All claims or causes of action (whether in contract, tort, equity or any other theory) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement, may be made only against the Persons that are expressly identified as parties hereto (and then only to the extent of the specific obligations undertaken by such parties herein). No past, present or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, affiliate, controlling person, investment manager or advisor (or such investment manager's or advisor's employees, managers or partners), agent, attorney or other representative of any party hereto (including any person negotiating or executing this Agreement on behalf of a party hereto), nor any past, present or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, affiliate, controlling person, investment manager or advisor (or such investment manager's or advisor's employees, managers or partners), agent, attorney or other representative of any of the foregoing (other than any of the foregoing that is a party hereto) (any such Person, a "**<u>No Recourse Party</u>**"), shall have any liability with respect to this Agreement or with respect to any proceeding (whether in contract, tort, equity or any other theory that seeks to "pierce the corporate veil" or impose liability of an entity against its owners or affiliates or otherwise) that may arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement.

12.24. <u>Specific Execution</u>

(a)      The Parties understand that the Consenting Stakeholders are engaged in a wide range of financial services and businesses. In furtherance of the foregoing, the Parties acknowledge and agree that, to the extent a Consenting Stakeholder expressly indicates on its signature page hereto that it is executing this Agreement on behalf of specific trading desk(s) and/or business group(s) of the Consenting Stakeholder, the obligations set forth in this Agreement shall only apply to such trading desk(s) and/or business group(s) and shall not apply to any other trading desk or business group of the Consenting Stakeholder so long as they are not acting at the direction or for the benefit of such Consenting Stakeholder or such Consenting Stakeholder's investment in the Company Parties; provided, that the foregoing shall not diminish or otherwise affect the obligations and liability therefor of any legal entity that (i) executes this Agreement or (ii) on whose behalf this Agreement is executed by a Consenting Stakeholder. The Company acknowledges that one or more Consenting Stakeholders may have engaged an investment manager or advisor which acts as (i) the sole investment manager or advisor for certain single-manager accounts, and (ii) investment manager or adviser solely to a designated pool of assets of certain multi-manager accounts. In respect of the multi-manager accounts, to the extent a Consenting Stakeholder expressly indicates on its signature page hereto that such investment advisor or manager (A) is its discretionary advisor with respect to the accounts of the Consenting Stakeholder or (B) has executed the Agreement on Consenting Stakeholder's behalf ("**<u>Investment</u>**

**Advisor**"), the Investment Advisor has no visibility, control or oversight in respect of the trading of other investment managers or advisers to such multi-manager accounts of the Consenting Stakeholder. As such, notwithstanding anything to the contrary herein, all agreements, covenants, representations or warranties herein that relate to any Consenting Stakeholder shall, with respect to any multi-manager accounts, solely apply to the portion of the account over which such Investment Advisor has discretion and not the Consenting Stakeholder as a whole.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

**SPIRIT AIRLINES, INC.**

By: _____
Name: Fred Cromer
Authorized Signatory

[*Signature Page to Restructuring Support Agreement*]

[Consenting Stakeholder Signature Pages on File with the Company]

## EXHIBIT A

**Plan**

**[Attached to the Disclosure Statement as Exhibit G]**

**<u>EXHIBIT B</u>**

**[Reserved]**

## **<u>EXHIBIT C</u>**

**Backstop Commitment Agreement**

*EXECUTION VERSION*

**BACKSTOP COMMITMENT AGREEMENT**

**BY AND AMONG**

**SPIRIT AIRLINES INC.**

**THE OTHER DEBTORS PARTY HERETO**

**AND**

**THE BACKSTOP COMMITMENT PARTIES PARTY HERETO**

Dated as of November 18, 2024

# TABLE OF CONTENTS

**Page**

**ARTICLE I      DEFINITIONS** .................................................................................**2**
    Section 1.1      Definitions ...................................................................2
    Section 1.2      Construction .................................................................22
    Section 1.3      Consent Rights under the Restructuring Support Agreement ................23

**ARTICLE II      RIGHTS OFFERING BACKSTOP COMMITMENT** ..............................**23**
    Section 2.1      The Direct Allocation; The Rights Offering; Rights Offering Shares. ..............................................................23
    Section 2.2      The Rights Offering Backstop Commitment. .............................24
    Section 2.3      Assignment & Designation of Commitment Rights .....................25
    Section 2.4      Escrow Account Funding ................................................27
    Section 2.5      Senior Secured Commitment Party Default; Replacement of Defaulting Senior Secured Backstop Commitment Parties ..............29
    Section 2.6      Convertible Commitment Party Default; Replacement of Defaulting Convertible Backstop Commitment Parties ....................30
    Section 2.7      Closing ......................................................................32
    Section 2.8      Withholding .................................................................33

**ARTICLE III      BACKSTOP COMMITMENT CONSIDERATION AND EXPENSE REIMBURSEMENT** ....................................**34**
    Section 3.1      Backstop Premium Payable by the Debtors ..............................34
    Section 3.2      Expense Reimbursement ..................................................36
    Section 3.3      Tax Treatment of Backstop Premium .....................................36

**ARTICLE IV      REPRESENTATIONS AND WARRANTIES OF THE DEBTORS** ........**37**
    Section 4.1      Organization and Qualification ...........................................37
    Section 4.2      Corporate Power and Authority ..........................................37
    Section 4.3      Execution and Delivery; Enforceability ..................................38
    Section 4.4      Authorized and Issued Interests ..........................................38
    Section 4.5      Issuance .....................................................................39
    Section 4.6      No Conflict ..................................................................39
    Section 4.7      Consents and Approvals ...................................................40
    Section 4.8      Arm's-Length ...............................................................40
    Section 4.9      Financial Statements .......................................................40
    Section 4.10     Absence of Certain Changes ..............................................41
    Section 4.11     No Violation; Compliance with Laws ....................................41
    Section 4.12     Legal Proceedings ..........................................................41
    Section 4.13     Labor Relations .............................................................41
    Section 4.14     Intellectual Property .......................................................42
    Section 4.15     Privacy and Data Protection ..............................................44
    Section 4.16     Certain Aircraft Matters ...................................................44
    Section 4.17     Real and Personal Property ...............................................45
    Section 4.18     Licenses and Permits ......................................................46
    Section 4.19     Environmental ..............................................................46
    Section 4.20     Taxes ........................................................................47

TABLE OF CONTENTS (cont'd)

| | | |
|---|---|---|
| Section 4.21 | Employee Benefit Plans | 48 |
| Section 4.22 | Internal Control Over Financial Reporting | 49 |
| Section 4.23 | Material Contracts | 50 |
| Section 4.24 | No Unlawful Payments | 50 |
| Section 4.25 | Compliance with Money Laundering, Ex-Im Laws and Sanctions Laws | 50 |
| Section 4.26 | No Broker's Fees | 51 |
| Section 4.27 | Investment Company Act | 52 |
| Section 4.28 | Insurance | 52 |
| Section 4.29 | Disclosure, Company SEC Documents and Disclosure Statement | 52 |
| Section 4.30 | Securities Registration Exemption; No Integration; No General Solicitation | 52 |
| Section 4.31 | Aircraft | 53 |
| Section 4.32 | Company Slots and Operating Authorizations | 54 |
| Section 4.33 | Company Airports | 55 |
| Section 4.34 | U.S. Citizen; Air Carrier | 55 |
| Section 4.35 | No Other Representations or Warranties. | 55 |

**ARTICLE V   REPRESENTATIONS AND WARRANTIES OF THE BACKSTOP COMMITMENT PARTIES ................ 56**

| | | |
|---|---|---|
| Section 5.1 | Organization | 56 |
| Section 5.2 | Organizational Power and Authority | 56 |
| Section 5.3 | Execution and Delivery; Enforceability | 56 |
| Section 5.4 | No Conflict | 56 |
| Section 5.5 | Consents and Approvals | 57 |
| Section 5.6 | No Registration | 57 |
| Section 5.7 | Purchasing Intent | 57 |
| Section 5.8 | Sophistication; Investigation | 58 |
| Section 5.9 | No Broker's Fees | 58 |
| Section 5.10 | Sufficient Funds | 59 |
| Section 5.11 | Additional Securities Law Matters | 59 |
| Section 5.12 | Legal Proceedings | 61 |
| Section 5.13 | Arm's Length | 61 |
| Section 5.14 | No Other Representations or Warranties | 61 |

**ARTICLE VI   ADDITIONAL COVENANTS ................ 61**

| | | |
|---|---|---|
| Section 6.1 | Orders Generally | 61 |
| Section 6.2 | Conduct of Business | 61 |
| Section 6.3 | Access to Information; Confidentiality | 64 |
| Section 6.4 | Financial Information | 66 |
| Section 6.5 | Commercially Reasonable Efforts | 66 |
| Section 6.6 | Registration Rights Agreement; Company Organizational Documents | 67 |
| Section 6.7 | Blue Sky | 67 |
| Section 6.8 | Use of Proceeds | 67 |
| Section 6.9 | Share Legend | 67 |

TABLE OF CONTENTS (cont'd)

Section 6.10    Antitrust Approval ...................................................................68
Section 6.11    Alternative Restructuring Proposal...........................................69
Section 6.12    Rule 144A Transferability ........................................................69
Section 6.13    Anti-Corruption Laws, Money Laundering Laws, Ex-Im Laws and
                Sanctions. ................................................................................69
Section 6.14    DTC Eligibility .......................................................................70

**ARTICLE VII    CONDITIONS TO THE OBLIGATIONS OF THE PARTIES................70**
Section 7.1     Conditions to the Obligations of the Backstop Commitment Parties ........70
Section 7.2     Waiver of Conditions to Obligations of Backstop Commitment
                Parties.......................................................................................73
Section 7.3     Conditions to the Obligations of the Debtors ............................74

**ARTICLE VIII    INDEMNIFICATION AND CONTRIBUTION .........................................75**
Section 8.1     Indemnification Obligations .....................................................75
Section 8.2     Indemnification Procedure........................................................76
Section 8.3     Settlement of Indemnified Claims .............................................77
Section 8.4     Contribution .............................................................................77
Section 8.5     Treatment of Indemnification Payments.....................................77
Section 8.6     No Survival ..............................................................................78

**ARTICLE IX    TERMINATION ...............................................................................78**
Section 9.1     Consensual Termination ...........................................................78
Section 9.2     Automatic Termination; Termination by the Backstop
                Commitment Parties...................................................................78
Section 9.3     Termination by the Debtors ......................................................80
Section 9.4     Effect of Termination ...............................................................81

**ARTICLE X    GENERAL PROVISIONS ...................................................................82**
Section 10.1    Notices .....................................................................................82
Section 10.2    Assignment; Third Party Beneficiaries......................................84
Section 10.3    Prior Negotiations; Entire Agreement .......................................84
Section 10.4    Governing Law; Venue..............................................................85
Section 10.5    Binding Agreement ...................................................................85
Section 10.6    Waiver of Jury Trial ..................................................................85
Section 10.7    Counterparts..............................................................................85
Section 10.8    Waivers and Amendments; Rights Cumulative; Consent................85
Section 10.9    Headings ...................................................................................86
Section 10.10   Specific Performance ................................................................86
Section 10.11   Damages....................................................................................86
Section 10.12   No Reliance ...............................................................................87
Section 10.13   Publicity ....................................................................................87
Section 10.14   Settlement Discussions..............................................................88
Section 10.15   No Recourse ..............................................................................88
Section 10.16   Specific Execution ....................................................................88

TABLE OF CONTENTS (cont'd)

<u>Page</u>

## SCHEDULES

Schedule 1    Senior Secured Commitment Schedule
Schedule 2    Convertible Commitment Schedule
Company Disclosure Schedules

## EXHIBITS

Exhibit A    Form of BCA Joinder
Exhibit B    Form of Commitment Party Transfer Form
Exhibit C    Form of Company Acknowledgement
Exhibit D    Debtors to Sign Company Acknowledgement

**BACKSTOP COMMITMENT AGREEMENT**

THIS BACKSTOP COMMITMENT AGREEMENT (this "**Agreement**"), dated as of November 18, 2024, is made by and among Spirit Airlines Inc. a Delaware corporation (the "**Company**"), and each of its direct or indirect subsidiaries that executes and delivers a acknowledgment and joinder to this Agreement substantially in the form attached to this Agreement as Exhibit C ("Company Acknowledgment") after the date hereof in accordance with this Agreement, and that become thereafter debtors and debtors-in-possession that file chapter 11 cases under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as it may be amended from time to time, the "**Bankruptcy Code**") in the Bankruptcy Court (as defined below) (together with the Company, each, a "**Debtor**" and collectively, the "**Debtors**"), each Convertible Noteholder party hereto (collectively, the "**Convertible Backstop Commitment Parties**"), and each Senior Secured Noteholder party hereto (collectively, the "**Senior Secured Backstop Commitment Parties**" and, together with the Convertible Backstop Commitment Parties, the "**Backstop Commitment Parties**"). The Company, the other Debtors and each Backstop Commitment Party are referred to herein, collectively, as the "**Parties**," and each, individually, a "**Party**." Capitalized terms that are used but not otherwise defined in this Agreement shall have the respective meanings given to them in Section 1.1 hereof or, if not defined therein, shall have the meanings given to them in the Restructuring Support Agreement (as defined below).

**RECITALS**

WHEREAS, the Company has entered into a restructuring support agreement (including the terms and conditions set forth in the Plan attached as Exhibit A thereto) dated as of November 18, 2024, by and among the Debtors and the Consenting Stakeholders party thereto (together with all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time, the "**Restructuring Support Agreement**"), which provides for the restructuring of the Debtors' capital structure and financial obligations pursuant to a joint plan of reorganization to be filed in bankruptcy cases voluntarily commenced under the Bankruptcy Code on November 18, 2024 in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**," and such cases, the "**Chapter 11 Cases**"), implementing the terms and conditions of the Restructuring Transactions;

WHEREAS, pursuant to the Restructuring Support Agreement and the Plan, the Company intends to issue New Common Equity for an aggregate purchase price of $350 million (such New Common Equity, the "**Offering Shares**"), of which (i) Offering Shares (the "**Senior Secured Direct Allocation Shares**") representing an aggregate purchase price equal to the Senior Secured Holdback Amount (as defined below) shall be allocated to the Senior Secured Backstop Commitment Parties (the "**Senior Secured Direct Allocation**"), (ii) Offering Shares (the "**Convertible Direct Allocation Shares**") representing an aggregate purchase price equal to the Convertible Holdback Amount (as defined below) shall be allocated to the Convertible Backstop Commitment Parties (the "**Convertible Direct Allocation**" and, together with the Senior Secured Direct Allocation, the "**Direct Allocation**"), (iii) Offering Shares will be offered in a rights offering (the "**Rights Offering**") to Eligible Participants (as defined below) pursuant to which (A) Offering Shares representing an aggregate purchase price equal to the Senior Secured Rights Offering Amount (as defined below) will be offered to Senior Secured Noteholders on a ratable basis based on such holder's amount of Senior Secured Notes Claims (the "**Senior Secured Rights**

1

**Offering Shares**"), and (B) Offering Shares representing an aggregate purchase price equal to the Convertible Rights Offering Amount will be offered to Convertible Noteholders on a ratable basis based on such holder's amount of Convertible Notes Claims (the "**Convertible Rights Offering Shares**" and, together with Senior Secured Rights Offering Shares, the "**Rights Offering Shares**"), in each case on, and subject to, the terms and conditions set forth herein and subject to such procedures, terms, conditions and documentation acceptable to the Company and the Required Backstop Commitment Parties;

WHEREAS, subject to the terms and conditions contained in this Agreement, each Backstop Commitment Party has agreed severally, and not jointly and severally, to fund its respective Direct Allocation Commitment (as defined below) and Rights Offering Backstop Commitment (as defined below), if any, based on its respective Commitment Percentage (as defined below) and each Backstop Commitment Party will be entitled to receive its respective Direct Allocation Shares (as defined below), Backstop Shares (as defined below) and Backstop Premium Shares (as defined below) in amounts as described herein and subject to the terms and conditions hereof and thereof; and

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    <u>Definitions</u>.  Except as otherwise expressly provided in this Agreement, whenever used in this Agreement (including any Schedules hereto), the following terms shall have the respective meanings specified therefor below or in the Restructuring Support Agreement, as applicable:

"**Ad Hoc Group of Convertible Noteholders Advisors**" has the meaning set forth in the Restructuring Support Agreement.

"**Ad Hoc Group of Senior Secured Noteholders Advisors**" has the meaning set forth in the Restructuring Support Agreement.

"**Advisor Fees**" has the meaning set forth in <u>Section 3.2(a)</u>.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly, Controls or is Controlled by or is under common Control with such Person, and shall include the meaning of "affiliate" set forth in section 101(2) of the Bankruptcy Code as if such person were a debtor.  "**Affiliated**" has a correlative meaning.

"**Affiliated Fund**" means which respect to any Backstop Commitment Party, (a) any Affiliates (including at the institutional level) of such Backstop Commitment Party or any fund, account (including any separately managed accounts) or investment vehicle that is controlled, managed, advised or sub-advised by such Backstop Commitment Party, an Affiliate of such Backstop Commitment Party or by the same investment manager, advisor or subadvisor as such Backstop Commitment Party or an Affiliate of such Backstop Commitment Party or any fund,

2

account (including any separately managed accounts) or investment vehicle which is controlled, managed, advised or sub-advised by an Affiliate of a Backstop Commitment Party's investment manager, advisor or sub-advisor, (b) one or more special purpose vehicles that are wholly owned by such Backstop Commitment Party and its Affiliates, created for the purpose of holding the Direct Allocation Amount and/or the Rights Offering Backstop Commitment or (c) any Person, or any of its Affiliates, that is party to a derivative or participation transaction with such Backstop Commitment Party pursuant to which there is a transfer of the economics of ownership of Senior Secured Notes Claims, Convertible Notes Claims or any securities to or from such Person.

"**Agreement**" has the meaning set forth in the preamble.

"**Alternative Restructuring Proposal**" has the meaning set forth in the Restructuring Support Agreement.

"**Anti-Corruption Laws**" has the meaning set forth in Section 4.24.

"**Antitrust Authorities**" means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States, and any other Governmental Entity, whether domestic, foreign or supranational, having jurisdiction pursuant to, or enforcing, the Antitrust Laws, and "**Antitrust Authority**" means any of them.

"**Antitrust Laws**" means the Sherman Antitrust Act of 1890, as amended, the Clayton Antitrust Act of 1914, as amended, the HSR Act, the Federal Trade Commission Act of 1914, as amended, and any other Law, whether domestic or foreign, governing agreements in restraint of trade, monopolization, pre-merger notification, the lessening of competition through merger or acquisition or anticompetitive conduct, and any foreign investment Laws.

"**Applicable Consent**" has the meaning set forth in Section 4.7.

"**Backstop Cash Premium**" means $35,000,000.

"**Backstop Commitment Parties**" has the meaning set forth in the preamble.

"**Backstop Order**" has the meaning set forth in the Restructuring Support Agreement.

"**Backstop Premium**" means the Senior Secured Backstop Premium and the Convertible Backstop Premium.

"**Backstop Premium Shares**" means the Senior Secured Backstop Premium Shares and the Convertible Backstop Premium Shares.

"**Backstop Shares**" means the Senior Secured Backstop Shares and the Convertible Backstop Shares.

"**Bankruptcy Code**" has the meaning set forth in the preamble.

3

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated under section 2075 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, each as amended from time to time.

"**BCA Approval Obligations**" means, subject to the Backstop Order, the obligations of Company and the other Debtors under this Agreement and the Backstop Order.

"**BCA Joinder**" means the form of joinder agreement attached hereto as Exhibit A.

"**Breaching Consenting Stakeholder**" has the meaning set forth in Section 9.4(b).

"**Business Day**" means any day, other than a Saturday, Sunday or legal holiday, as defined in Bankruptcy Rule 9006(a).

"**Chapter 11 Cases**" has the meaning set forth in the Recitals.

"**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 2.7(a).

"**Closing Date**" has the meaning set forth in Section 2.7(a).

"**Collective Bargaining Agreement**" has the meaning set forth in Section 4.13(a).

"**Commitment Amount**" means a Senior Secured Commitment Amount or a Convertible Commitment Amount, as applicable.

"**Commitment Party Default**" means either a Senior Secured Commitment Party Default or a Convertible Commitment Party Default, as applicable.

"**Commitment Party Replacement**" means a Senior Secured Commitment Party Replacement or a Convertible Commitment Party Replacement, as applicable.

"**Commitment Party Subscription Deadline**" means the Subscription Tender Deadline as set forth and defined in the Subscription Form.

"**Commitment Party Transfer Form**" means that certain form attached hereto as Exhibit B.

"**Commitment Percentage**" means a Senior Secured Commitment Percentage or a Convertible Commitment Percentage, as applicable.

"**Company**" has the meaning set forth in the preamble.

"**Company Acknowledgement**" has the meaning set forth in the preamble.

4

"**Company Aircraft**" has the meaning set forth in Section 4.31(a).

"**Company Aircraft Finance Contract**" has the meaning set forth in Section 4.31(e).

"**Company Aircraft Purchase Contract**" has the meaning set forth in Section 4.31(d).

"**Company Airport**" has the meaning set forth in Section 4.33.

"**Company Benefit Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), whether or not subject to ERISA, and any other compensation or benefits plan, policy, program, arrangement or payroll practice, and each other stock or equity purchase, stock or equity option, or other equity or equity based award, severance, retention, employment, consulting, change of control, bonus, incentive, deferred compensation, employee loan, retirement, fringe benefit and other benefit plan, agreement, program, policy, legally binding commitment or other arrangement, other than a Foreign Plan or a Multiemployer Plan, in each case, established, sponsored, maintained or contributed to or required to be contributed to by any Debtor or any Debtor Subsidiary.

"**Company Claims/Interests**" has the meaning set forth in the Restructuring Support Agreement.

"**Company Disclosure Schedules**" means the disclosure schedules delivered by the Company to the Backstop Commitment Parties on the date of this Agreement.

"**Company Organizational Documents**" means collectively, the organizational documents of the Company, including any certificate of formation, articles of incorporation, limited liability company agreement, bylaws or any similar documents, as applicable.

"**Company Permits**" means all authorizations, permits, certificates, exemptions, waivers, approvals, orders, consents, franchises, variances, deviations, registrations, licenses and clearances of any Governmental Entity applicable to the Debtors and necessary for them to own, lease and operate their assets and properties and to operate the Debtors' business as currently conducted.

"**Company SEC Documents**" means all of the reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) filed with or furnished to the SEC by the Company.

"**Company Slots**" has the meaning set forth in Section 4.33(a).

"**Confirmation Order**" has the meaning set forth in the Restructuring Support Agreement.

"**Consenting Stakeholders**" has the meaning set forth in the Restructuring Support Agreement.

5

"**Contract**" means any agreement, contract or instrument, including any loan, note, bond, mortgage, indenture, guarantee, deed of trust, license, sublicense, settlement agreement, franchise, commitment, lease, franchise agreement, letter of intent, memorandum of understanding or other obligation, and any amendments thereto, whether written or oral, but excluding the Plan.

"**Control**" means, with respect to any Person, the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement, or otherwise.

"**Convertible Available Shares**" means the Direct Allocation Shares, Rights Offering Shares and Backstop Shares that a Defaulting Convertible Backstop Commitment Party has failed to fund as a result of a Convertible Commitment Party Default.

"**Convertible Backstop Commitment Parties**" has the meaning set forth in the preamble.

"**Convertible Backstop Funding Notice**" has the meaning set forth in Section 2.4(b).

"**Convertible Backstop Premium**" has the meaning set forth in Section 3.1(b)(i).

"**Convertible Backstop Premium Shares**" has the meaning set forth in Section 3.1(b)(i).

"**Convertible Backstop Shares**" has the meaning set forth in Section 2.2(b).

"**Convertible Commitment Amount**" has the meaning set forth in Section 2.2(b).

"**Convertible Commitment Party Default**" means the failure by any Convertible Backstop Commitment Party or its Related Purchasers (as applicable) to deliver and pay any portion of its respective Funding Amount by the Escrow Account Funding Date in accordance with Section 2.4(e).

"**Convertible Commitment Party Replacement**" has the meaning set forth in Section 2.6(a).

"**Convertible Commitment Party Replacement Period**" has the meaning set forth in Section 2.6(a).

"**Convertible Commitment Percentage**" means, with respect to each Convertible Backstop Commitment Party, the percentage set forth opposite such Convertible Backstop Commitment Party's name on the Convertible Commitment Schedule.

"**Convertible Commitment Schedule**" means Schedule 2 hereto.

"**Convertible Direct Allocation**" has the meaning set forth in the Recitals.

6

"**Convertible Direct Allocation Amount**" has the meaning set forth in the <u>Section 2.1(a)</u>.

"**Convertible Direct Allocation Commitments**" has the meaning set forth in the <u>Section 2.1(a)</u>.

"**Convertible Direct Allocation Shares**" has the meaning set forth in the Recitals.

"**Convertible Funding Amount**" has the meaning set forth in Section 2.4(b).

"**Convertible Holdback Amount**" means (i) if the Convertible Notes RSA Condition has not been met, $37,187,500 and (ii) if the Convertible Notes RSA Condition has been met, $7,437,500.

"**Convertible Noteholders**" has the meaning set forth in the Restructuring Support Agreement.

"**Convertible Notes Claims**" has the meaning set forth in the Restructuring Support Agreement.

"**Convertible Notes RSA Condition**" means that, no later than 11:59 p.m., New York City time, on November 25, 2024, as such time may be extended with the consent of the Required Convertible Backstop Commitment Parties, Convertible Noteholders (as such term is defined in the Restructuring Support Agreement) holding, in the aggregate, at least 90.00% of the aggregate principal amount of the Convertible Notes Claims shall have executed the Restructuring Support Agreement.

"**Convertible Replacing Commitment Parties**" has the meaning set forth in Section 2.6(a).

"**Convertible Rights Offering Amount**" means (i) if the Convertible Notes RSA Condition has not been met, $37,187,500 and (ii) if the Convertible Notes RSA Condition has been met, $66,937,500.

"**Convertible Rights Offering Backstop Commitment**" has the meaning set forth in <u>Section 2.2(b)</u>.

"**Convertible Rights Offering Shares**" has the meaning set forth in the Recitals.

"**Convertible Unsubscribed Shares**" has the meaning set forth in <u>Section 2.2(b)</u>.

"**Data Protection Laws**" means all Laws pertaining to the protection, privacy, security, breach notification, and cross-border transfer of Personal Data.

"**Debtors**" has the meaning set forth in the preamble.

"**Defaulting Commitment Party**" means, in respect of a Senior Secured Commitment Party Default or Convertible Commitment Party Default, as applicable, in each case,

that is continuing, the applicable Defaulting Senior Secured Backstop Commitment Party or Defaulting Convertible Backstop Commitment Party.

"**Defaulting Convertible Backstop Commitment Party**" means, in respect of a Convertible Commitment Party Default that is continuing, the applicable defaulting Convertible Backstop Commitment Party.

"**Defaulting Senior Secured Backstop Commitment Party**" means, in respect of a Senior Secured Commitment Party Default that is continuing, the applicable defaulting Senior Secured Backstop Commitment Party.

"**Deferred Compensation Liability**" means the amount, as of immediately prior to the date hereof and on and as of the Closing Date, of all distributions that may become payable in respect of any non-qualified deferred compensation plan established, maintained, sponsored, or contributed, or required to be contributed, by a Debtor or any of its Subsidiaries, including any supplemental retirement plan, and account balances thereunder.

"**Defined Benefit Pension Plan**" means any plan that is subject to Section 412 of the Tax Code, Section 302 of ERISA or Title IV of ERISA (including a Multiemployer Plan) maintained, sponsored or contributed to, or for which there is an obligation to contribute to, by any of the Debtors or any ERISA Affiliate at any time during the preceding six (6) plan years.

"**Definitive Documents**" has the meaning set forth in the Restructuring Support Agreement.

"**DIP Claim**" means a claim under the DIP Facility.

"**DIP Facility**" has the meaning set forth in the Restructuring Support Agreement.

"**DIP Orders**" has the meaning set forth in the Restructuring Support Agreement.

"**Direct Allocation**" has the meaning set forth in the Recitals.

"**Direct Allocation Amount**" means (i) for each Senior Secured Backstop Commitment Party such Senior Secured Backstop Commitment Party's Senior Secured Direct Allocation Amount and (ii) for each Convertible Backstop Commitment Party such Convertible Backstop Commitment Party's Convertible Direct Allocation Amount.

"**Direct Allocation Commitment**" means a Senior Secured Direct Allocation Commitment or a Convertible Direct Allocation Commitment, as applicable.

"**Direct Allocation Shares**" means the Senior Secured Direct Allocation Shares or the Convertible Direct Allocation Shares, as applicable.

"**Disclosure Statement**" has the meaning set forth in the Restructuring Support Agreement.

8

"**Disclosure Statement Order**" means the Solicitation Procedures Order, as such term is defined in the Restructuring Support Agreement.

"**DTC**" means The Depository Trust Company.

"**Eligible Participant**" means a Convertible Noteholder or a Senior Secured Noteholder, as applicable.

"**Environmental Laws**" means all applicable Laws and Orders relating in any way to the protection of the environment, preservation of natural resources, health and safety matters (to the extent relating to exposure to Hazardous Materials), or pollution, including such Laws relating to the presence, use, manufacturing, production, generation, handling, management, transportation, treatment, recycling, storage, importing, Release or threatened Release, or cleanup of Hazardous Materials.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder, in each case, as in effect from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with any of the Debtors or any of its subsidiaries, is, or at any relevant time during the past six (6) years was, treated as a single employer or under common control under or within the meaning of Section 414 of the Tax Code or Section 4001 of ERISA.

"**Escrow Account**" has the meaning set forth in Section 2.4(a).

"**Escrow Account Funding Date**" has the meaning set forth in Section 2.4(e).

"**EU/UK Qualified Investor**" has the meaning set forth in Article 2(e) of the Prospectus Regulation.

"**Event**" means any event, development, occurrence, circumstance, effect, condition, result, state of facts or change.

"**Ex-Im Laws**" means, (a) applicable Laws related to export controls, including the U.S. Export Administration Regulations administered by the U.S. Department of Commerce; and (b) applicable Laws related to the importation of goods, including those administered by U.S. Customs and Border Protection.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and including any rule or regulation promulgated thereunder.

"**Exit Financing Facility**" has the meaning set forth in the Restructuring Support Agreement.

"**Expense Reimbursement**" has the meaning set forth in Section 3.2(a).

"**FAA**" means the Federal Aviation Administration.

9

"**Federal Aviation Act**" means Subtitle VII of Title 49 of the U.S. Code.

"**Filing Party**" has the meaning set forth in Section 6.10(b).

"**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, vacated, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing thereof has been timely sought, or if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

"**Financial Reports**" has the meaning set forth in Section 6.4.

"**Financial Statements**" has the meaning set forth in Section 4.9.

"**Foreign Plan**" means any employee benefit plan, program, policy, arrangement, scheme or agreement established, sponsored, maintained or contributed to or required to be contributed to by any Debtor or any Debtor Subsidiary or with respect to which any Debtor or Debtor Subsidiary has or could reasonably be expected to have liability, contingent or otherwise, in each case, primarily for the benefit of employees or service providers employed outside the United States.

"**Funding Amount**" means the Senior Secured Funding Amount or Convertible Funding Amount, as applicable.

"**Funding Notice**" means the Senior Secured Backstop Funding Notice or Convertible Backstop Funding Notice, as applicable.

"**GAAP**" means the generally accepted accounting principles in the United States of America set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board.

"**Governmental Entity**" means any "governmental unit" set forth in section 101(27) of the Bankruptcy Code and foreign governmental authorities.

"**Hazardous Materials**" means all pollutants, contaminants, wastes, chemicals, materials, substances and constituents which are regulated by Environmental Law or which can give rise to liability under any Environmental Law due to their dangerous or deleterious properties

10

or characteristics, including explosive or radioactive substances or petroleum or any fraction thereof, petroleum distillates, petroleum products, natural gas, asbestos or asbestos containing materials, per- or polyfluoroalkyl substances, polychlorinated biphenyls, toxic mold or radon gas.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended from time to time.

"**Immediate Family Member**" means, with respect to any Person, any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law of such Person, and any person (other than a tenant or employee) sharing the household of such Person.

"**Indemnified Claim**" has the meaning set forth in Section 8.2.

"**Indemnified Person**" has the meaning set forth in Section 8.1.

"**Indemnifying Party**" has the meaning set forth in Section 8.1.

"**Intellectual Property Rights**" means all right, title, and interest in and to the following worldwide: (i) patents, patent applications, patent disclosures and inventions and all improvements thereto (whether or not patentable or reduced to practice), and any reissue, continuation, continuation-in-part, renewals, renewal applications, revision, divisional, extension or reexamination thereof; (ii) trademarks, service marks, and trade dress, trade names, corporate names, certification marks, collective marks, d/b/a's, logos, slogans, and other indicia of origin and all registrations, applications, and renewals in connection therewith (and all goodwill associated therewith); (iii) domain names and social media handles, and all registrations therefor; (iv) rights in all works of authorship (whether copyrightable or not), copyrights and all registrations, applications, and renewals thereof, and all derivative works, and moral rights; (v) trade secrets, know-how, technologies, algorithms, processes, techniques, protocols, methods, layouts, templates, tools, designs, customer lists and supplier lists, and specifications ("Trade Secrets"); and (vi) intellectual property rights in Software.

"**Intended Tax Treatment**" has the meaning set forth in Section 3.3.

"**Equity Interests**" has the meaning set forth in the Restructuring Support Agreement.

"**Investment Company Act**" has the meaning set forth in Section 4.27.

"**IP Contracts**" means all written Contracts pursuant to which the Debtors or any of their Subsidiaries (i) grant any license, sublicense, covenant not to assert, release, agreement not to enforce or prosecute, or other immunity to any Person, other than to the Debtors or any of their Subsidiaries, under or to any Intellectual Property Rights (except Ordinary Course Licenses) or (ii) are granted a license, sublicense, covenant not to assert, release, agreement not to enforce or prosecute, or immunity to or under any Person's Intellectual Property Rights (other than Ordinary Course Licenses or licenses for non-customized, off-the-shelf software), in the case of both clauses (i) or (ii), that are material to the conduct of the business of the Debtors and their Subsidiaries, taken as a whole.

"**IRS**" means the United States Internal Revenue Service.

"**Knowledge of the Company**" means the actual knowledge, after reasonable inquiry of their direct reports as such individuals would normally conduct in the ordinary course of their business, of the President and Chief Executive Officer and Class III Director (Ted Christie III), the Executive Vice President and Chief Operating Officer (John Bendoraitis), the Executive Vice President and Chief Financial Officer (Fred Cromer), Executive Vice President and Chief Commercial Officer (Matthew H. Klein), Senior Vice President, General Counsel and Secretary (Thomas C. Canfield) of the Company.

"**Law**" has the meaning set forth in the Restructuring Support Agreement.

"**Leased Real Property**" means any and all parcels of or interests in real property leased, subleased or licensed by, or for which a right to use or occupy has been granted to, any of the Debtors or their respective Subsidiaries, as of the date of this Agreement and the Closing Date, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures incidental to the lease, license or occupancy right thereof, which is used or intended to be used in the business of any of the Debtors or their respective Subsidiaries.

"**Legal Proceedings**" has the meaning set forth in Section 4.12.

"**Legend**" has the meaning set forth in Section 6.9.

"**Lien**" means any lien, adverse claim, charge, option, warrant, right of first refusal or first offer, escrow, servitude, security interest, mortgage, pledge, reservation, equitable interest, deed of trust, indenture, easement, encumbrance, restriction on transfer, conditional sale or other title retention agreement, lease, sublease, license, preemptive right, community property interest, collateral assignment, hypothecation, right of way, defect in title, lien or judicial lien as defined in sections 101(36) and (37) of the Bankruptcy Code, or other restrictions or encumbrances of any kind.

"**Lookback Date**" means January 1, 2022.

"**Losses**" has the meaning set forth in Section 8.1.

"**Management Incentive Plan**" means any post-Plan Effective Date incentive plan providing for the issuance of equity and equity-based awards with respect to New Common Equity, as approved by the board of directors of the Company, in accordance with and subject to the terms and conditions of the Plan and the Restructuring Support Agreement.

"**Material Adverse Effect**" means any Event occurring after the date hereof that individually, or together with all other Events, has had a material and adverse effect on (a) the business, assets, liabilities, finances, properties, prospects, results of operations or condition (financial or otherwise) of the Debtors and their Subsidiaries, taken as a whole, or (b) the ability of the Debtors and their Subsidiaries, taken as a whole, to perform their obligations under, or to consummate the transactions contemplated by, the Transaction Agreements, including the Rights Offering; provided, that in the case of clause (a), except to the extent such Event results from,

12

arises out of, or is attributable to, the following (either alone or in combination): (i) any change after the date hereof in global, national or regional political conditions (including hostilities, acts of war, sabotage, terrorism or military actions, or any escalation or material worsening of any such hostilities, acts of war, sabotage, terrorism or military actions existing or underway) or in the general business, market, financial or economic conditions affecting the industries, regions and markets in which the Debtors or their Subsidiaries operate, including any change in the United States or applicable foreign economies or securities, commodities or financial markets, or force majeure events or "acts of God"; (ii) any changes after the date hereof in applicable Law or GAAP, or in the interpretation or enforcement thereof; (iii) the negotiation, execution, announcement or performance of this Agreement or the other Transaction Agreements or the transactions contemplated hereby or thereby; (iv) changes in the market price or trading volume of the claims or equity or debt securities of the Debtors or their Subsidiaries (but not the underlying facts giving rise to such changes unless such facts are otherwise excluded pursuant to the clauses contained in this definition); (v) the filing of the Chapter 11 Cases or actions taken in connection with the Chapter 11 Cases that are directed by the Bankruptcy Court and made in compliance with the Bankruptcy Code and the Transaction Agreements; (vi) declarations of national emergencies in the United States or natural disasters in the United States; (vii) the Events leading up to the filing of the Chapter 11 Cases that were publicly disclosed prior to the date hereof; (viii) the occurrence of a Commitment Party Default and any Events that directly arise out of such Commitment Party Default; (ix) any epidemic, pandemic or disease outbreak (including the COVID-19 pandemic, its variants or any other similar pandemic), or any Law, regulation, statute, directive, pronouncement or guideline issued by a Governmental Entity, the Centers for Disease Control and Prevention, the World Health Organization or industry group providing for business closures, "sheltering-in-place" or other restrictions that relate to, or arise out of, an epidemic, pandemic or disease outbreak (including the COVID-19 pandemic) or any change in such Law, regulation, statute, directive, pronouncement or guideline or interpretation thereof following the date of this Agreement; (x) any actions taken by the Debtors and their Subsidiaries that are directed or instructed by the FAA, and (xi) any Event disclosed or described in the Company Disclosure Schedules; provided, that the exceptions set forth in clauses (i), (ii), (vi), (ix) and (x) shall not apply to the extent that such Event is disproportionately adverse to the Debtors and their Subsidiaries, taken as a whole, as compared to other companies in the industries in which the Debtors or their Subsidiaries operate.

"**Material Contracts**" means all "plans of acquisition, reorganization, arrangement, liquidation or succession" and "material contracts" (as such terms are defined in Items 601(b)(2) and 601(b)(10) of Regulation S-K under the Exchange Act) to which any of the Debtors is a party.  For the avoidance of doubt, the term "Material Contracts" shall include any Contract containing any indemnification, warranty, support, maintenance or service obligation on the part of the Debtors, other than any such Contract entered in the ordinary course of the business of the Debtors.

"**Money Laundering Laws**" has the meaning set forth in Section 4.25(a).

"**Multiemployer Plan**" means a multiemployer plan as defined in Sections 4001(a)(3) and (3)(37) of ERISA to which any of the Debtors or any of their Subsidiaries or any respective ERISA Affiliate is making or accruing an obligation to make contributions, has within any of the preceding six (6) plan years made or accrued an obligation to make contributions, or

13

each such plan with respect to which any such entity has any actual or contingent liability or obligation.

"**New Common Equity**" has the meaning set forth in the Restructuring Support Agreement.

"**Offering Shares**" has the meaning set forth in the Recitals.

"**Order**" means any judgment, order, award, injunction, writ, permit, license or decree of any Governmental Entity or arbitrator of applicable jurisdiction.

"**Ordinary Course License**" means any of the following agreements of the Company or any other Debtor: (i) any license contained in a customer subscription, license or service agreement, (ii) any standard confidentiality or non-disclosure agreement, or (iii) any other license with respect to Intellectual Property Rights that is non-exclusive and entered into in the ordinary course of business, consistent with past practice.

"**Outside Date**" means the date set forth in Section 4(l) of the Restructuring Support Agreement, as such date may be extended pursuant to the terms of the Restructuring Support Agreement.

"**Owned Real Property**" means, collectively, all real property owned in fee by any of the Debtors or their respective Subsidiaries, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures incidental to the ownership or lease thereof.

"**Party**" has the meaning set forth in the preamble.

"**PCI DSS**" means the Payment Card Industry Data Security Standard, issued by the Payment Card Industry Security Standards Council, as may be revised from time to time.

"**Per Share Subscription Price**" means (i) the product of (a) 70% and (b) Plan Equity Value, divided by (ii) Total Shares Outstanding.

"**Permitted Investor**" means that such Person is either (i) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act, (ii) a non-U.S. person as defined under Regulation S under the Securities Act, or (iii) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3), (7), (8), (9), (12) or (13) under the Securities Act; or if the Person is resident, located or has a registered office in any member state of the European Economic Area or the United Kingdom, such Person must be an EU/UK Qualified Investor.

"**Permitted Liens**" means (a) with respect to assets or property constituting Prepetition RCF Collateral, Liens permitted by clauses (3), (4), (5), (7), (8), (9), (10), (11) and/or (13) of the definition of "Permitted Liens" in the Prepetition RCF, (b) with respect to assets or property constituting Prepetition Senior Secured Notes Collateral, Liens permitted by clauses (3), (4), (5), (6), (7), (8), (9), (10), (11), (12), (14), (15) and/or (16) of the definition of "Permitted Liens" in the Senior Secured Notes Indenture, (c) with respect to assets or property not constituting Prepetition RCF Collateral or Prepetition Senior Secured Notes Collateral, (i) statutory Liens for

14

current Taxes that (x) are not delinquent, (y) are being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto in accordance with GAAP and reflected in the Financial Statements, or (z) for U.S. Taxes only, the nonpayment of which is permitted or required by the Bankruptcy Code or the Bankruptcy Court, (ii) statutory Liens of the landlords, if any, under the Real Property Leases, and operator's, vendors', carriers', warehousemen's, mechanics', materialmen's, repairmen's and other similar statutory Liens for labor, materials or supplies, provided any such Lien is incurred in the ordinary course of business consistent with past practice and as otherwise not prohibited under this Agreement, for amounts that are not delinquent and that do not materially detract from the value of, or materially impair the use of, any of the Real Property or personal property of any of the Debtors, (iii) zoning, building codes and other similar land use Laws regulating the use or occupancy of any Real Property or the activities conducted thereon that are imposed by any Governmental Entity having jurisdiction over such Real Property; _provided_, that no such zoning, building codes and other land use Laws individually or in the aggregate, materially and adversely affect, impair or interfere with the use, occupancy, ownership, value and/or maintenance of or the access to such Real Property or any property affected thereby or, the operation of the business of the Company, the other Debtors and/or their respective subsidiaries as presently conducted, (iv) easements, covenants, conditions, restrictions of record, and other similar recorded matters affecting title to any Real Property that do not, individually or in the aggregate, materially interfere with the use, occupancy, ownership, value and/or maintenance of or the access to the property burdened thereby or the conduct of the business of the Company, the other Debtors, and/or their respective subsidiaries as presently conducted or as presently planned to be conducted or their use of any of their respective assets, (v) matters that would be disclosed by an accurate survey or inspection of the Real Property, (vi) any Ordinary Course License, and (vii) Liens listed on Section 1.1 of the Company Disclosure Schedules, (d) Liens that, pursuant to the Confirmation Order, will not survive beyond the Plan Effective Date and (e) Liens securing the DIP Facility.

"**Permitted Transfer**" has the meaning set forth in Section 2.3(b).

"**Permitted Transferees**" has the meaning set forth in Section 2.3(c).

"**Person**" means any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any governmental authority.

"**Personal Data**" means any and all information that can reasonably be used to identify an individual natural person, household or device, including name, physical address, telephone number, email address, financial account number, password or PIN, device identifier or unique identification number, government-issued identifier (including Social Security Number and driver's license number), medical, health or insurance information, gender, data of birth, educational or employment information, religious or political view or affiliation and marital or other status (to the extent any of these data elements can reasonably be associated with an individual natural person or is linked to any such data element that can reasonably be associated with an individual natural person, household or device). Personal Data also includes any information not listed above if such information is defined as "personal data," "personally

15

identifiable information," "individually identifiable health information," "protected health information," or "personal information" under any Data Protection Laws.

"**Petition Date**" has the meaning set forth in the Restructuring Support Agreement.

"**Plan**" has the meaning set forth in the Restructuring Support Agreement.

"**Plan Effective Date**" has the meaning set forth in the Restructuring Support Agreement.

"**Plan Equity Value**" means $806,451,613.

"**Plan Supplement**" has the meaning set forth in the Restructuring Support Agreement.

"**Pre-Closing Period**" has the meaning set forth in Section 6.2(a).

"**Prepetition RCF**" has the meaning set forth in the DIP Orders.

"**Prepetition RCF Collateral**" has the meaning set forth in the DIP Orders.

"**Prepetition Senior Secured Notes Collateral**" has the meaning set forth in the DIP Orders.

"**Privacy Statements**" means, collectively, all of the Debtors' and their Subsidiaries' external privacy policies or privacy statements made to customers and publicly posted privacy policies regarding the collection, use, disclosure, transfer, storage, maintenance, retention, deletion, disposal, modification or other processing of data protected under Data Protection Laws .

"**Pro Rata Share**" means (i) with respect to the Senior Secured Notes Claims, a fraction (expressed as a percentage), the numerator of which is the principal amount of Senior Secured Notes Claims held by the applicable Senior Secured Noteholder and the denominator of which is the aggregate principal amount of all Senior Secured Notes Claims, and (ii) with respect to the Convertible Notes Claims, a fraction (expressed as a percentage), the numerator of which is the principal amount of the Convertible Notes Claims held by the applicable Convertible Noteholder and the denominator of which is the aggregate principal amount of all Convertible Notes Claims.

"**Prospectus Regulation**" means Regulation (EU) No 2017/1129 of the European Parliament and of the European Council of 14 June 2017, and as such regulation forms part of United Kingdom domestic law pursuant to the European Union (Withdrawal) Act 2018, or such other successor rule, regulation or legislation as may apply in the European Economic Area or the United Kingdom.

"**Real Property**" means, collectively any and all Owned Real Property and Leased Real Property.

"**Real Property Lease**" and "**Real Property Leases**" have the meanings set forth in Section 4.17(b).

"**Registration Rights Agreement**" has the meaning set forth in Section 6.6(a).

"**Regulation S**" has the meaning set forth in Section 5.11(b).

"**Related Party**" has the meaning given to "related person" in Item 404 of Regulation S-K.

"**Related Party Transaction**" has the meaning set forth in Section 6.2(b)(iii).

"**Related Purchaser**" means, with respect to any Backstop Commitment Party, any reasonably creditworthy Affiliate or Affiliated Fund of such Backstop Commitment Party (other than any portfolio company of such Backstop Commitment Party or its Affiliates).

"**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or migrating in, into, onto or through the environment.  "**Released**" has a correlative meaning.

"**Replacement Funding Notice**" has the meaning set forth in Section 2.5(a).

"**Replacing Commitment Parties**" means either the Senior Secured Replacing Commitment Parties or the Convertible Replacing Commitment Parties, as applicable.

"**Representatives**" means, with respect to any Person, such Person's directors, officers, members, partners, managers, employees, agents, investment bankers, attorneys, accountants, advisors, consultants and other representatives.

"**Required Backstop Commitment Parties**" means, collectively, the Required Senior Secured Backstop Commitment Parties and the Required Convertible Backstop Commitment Parties.

"**Required Convertible Backstop Commitment Parties**" means, at any time, Convertible Backstop Commitment Parties holding Commitment Percentages representing commitments to purchase at least 50.1% of the Convertible Backstop Shares.

"**Required Senior Secured Backstop Commitment Parties**" means, at any time, Senior Secured Backstop Commitment Parties holding Commitment Percentages representing commitments to purchase at least 50.1% of the Senior Secured Backstop Shares.

"**Required Consenting Convertible Noteholders**" has the meaning set forth in the Restructuring Support Agreement.

"**Required Consenting Senior Secured Noteholders**" has the meaning set forth in the Restructuring Support Agreement.

"**Restricted Period**" has the meaning set forth in Section 5.11(d).

17

"**Restructuring Support Agreement**" has the meaning set forth in the Recitals.

"**Restructuring Transactions**" has the meaning set forth in the Restructuring Support Agreement.

"**Rights Offering**" has the meaning set forth in the Recitals.

"**Rights Offering Backstop Commitment**" means a Senior Secured Rights Offering Backstop Commitment or a Convertible Rights Offering Backstop Commitment, as applicable.

"**Rights Offering Procedures**" means the procedures with respect to the Rights Offering, including any modifications thereto, that are approved by the Bankruptcy Court pursuant to the Disclosure Statement Order, which procedures shall be in form and substance satisfactory to the Required Backstop Commitment Parties and the Company.

"**Rights Offering Shares**" has the meaning set forth in the Recitals.

"**Rights Offering Subscription Agent**" means Epiq Corporate Restructuring, LLC , or another subscription agent appointed by the Company and satisfactory to the Required Backstop Commitment Parties.

"**RSA Joinder**" means a joinder to the Restructuring Support Agreement in the form of Exhibit C thereto.

"**Rule 144A**" has the meaning set forth in Section 5.11(b).

"**Sanctioned Country**" means any country or territory that is itself the target of comprehensive Sanctions (as of the execution of the Agreement, Crimea, Cuba, Iran, North Korea, Syria, and those portions of the Donetsk People's Republic or Luhansk People's Republic regions and such other regions of Ukraine over which any Sanctions authority imposes comprehensive Sanctions).

"**Sanctioned Person**" means any Person that is (a) the target of Sanctions, including any Person identified on U.S. Department of the Treasury's Office of Foreign Assets Control's Specially Designated Nationals and Blocked Persons List, Sectoral Sanctions Identifications List, or any other Sanctions-related list maintained by a Sanctions authority; (b) a Person that is organized, located, resident, or primarily doing business in a Sanctioned Country; or (c ) any Person owned or controlled by any Person(s) described in clause(s) (a) and/or (b) to the extent such owned or controlled Person is subject to the same restrictions or prohibitions as the Person(s) described in clause(s) (a) and/or (b).

"**Sanctions**" means any economic, financial and trade sanctions administered or enforced by the U.S. government (including without limitation, the U.S. Department of the Treasury's Office of Foreign Assets Control, the U.S. Department of State and the U.S. Department of Commerce), the United Nations Security Council, the European Union and each member state thereof, the Cayman Islands or the United Kingdom (including His Majesty's Treasury).

18

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended, and including any rule or regulation promulgated thereunder.

"**Security Incident**" means any unauthorized or unlawful access, acquisition, exfiltration, manipulation, erasure, loss, use, or disclosure that compromises the confidentiality, integrity, availability or security of Personal Data, or that triggers any reporting requirement under any breach notification Law or contractual provision.

"**Senior Secured Available Shares**" means the Direct Allocation Shares, Rights Offering Shares and Backstop Shares that a Defaulting Senior Secured Backstop Commitment Party has failed to fund as a result of a Senior Secured Commitment Party Default.

"**Senior Secured Backstop Commitment Parties**" has the meaning set forth in the preamble.

"**Senior Secured Backstop Funding Notice**" has the meaning set forth in Section 2.4(a).

"**Senior Secured Backstop Premium**" has the meaning set forth in Section 3.1(a)(i).

"**Senior Secured Backstop Premium Shares**" has the meaning set forth in Section 3.1(a)(i).

"**Senior Secured Backstop Shares**" has the meaning set forth in Section 2.2(a).

"**Senior Secured Commitment Amount**" has the meaning set forth in Section 2.2(a).

"**Senior Secured Commitment Party Default**" means the failure by any Senior Secured Backstop Commitment Party or its Related Purchasers (as applicable) to deliver and pay any portion of its respective Funding Amount by the Escrow Account Funding Date in accordance with Section 2.4(e).

"**Senior Secured Commitment Party Replacement**" has the meaning set forth in Section 2.5(a).

"**Senior Secured Commitment Party Replacement Period**" has the meaning set forth in Section 2.5(a).

"**Senior Secured Commitment Percentage**" means, with respect to each Senior Secured Backstop Commitment Party, the percentage set forth opposite such Senior Secured Backstop Commitment Party's name on the Senior Secured Commitment Schedule.

"**Senior Secured Commitment Schedule**" means Schedule 1 hereto.

19

"**Senior Secured Direct Allocation**" has the meaning set forth in the Recitals.

"**Senior Secured Direct Allocation Amount**" has the meaning set forth in the Section 2.1(a).

"**Senior Secured Direct Allocation Commitment**" has the meaning set forth in the Section 2.1(a).

"**Senior Secured Direct Allocation Shares**" has the meaning set forth in the Recitals.

"**Senior Secured Funding Amount**" has the meaning set forth in the Section 2.4(a).

"**Senior Secured Holdback Amount**" means (i) if the Senior Secured Notes RSA Condition has not been met, $137,812,500 and (ii) if the Senior Secured Notes RSA Condition has been met, $27,562,500.

"**Senior Secured Noteholders**" has the meaning set forth in the Restructuring Support Agreement.

"**Senior Secured Notes Claims**" has the meaning set forth in the Restructuring Support Agreement.

"**Senior Secured Notes Indenture**" has the meaning set forth in the Restructuring Support Agreement.

"**Senior Secured Notes RSA Condition**" means that, no later than 11:59 p.m., New York City time, on November 25, 2024, as such time may be extended with the consent of the Required Senior Secured Backstop Commitment Parties, Senior Secured Noteholders (as such term is defined in the Restructuring Support Agreement) holding, in the aggregate, at least 90.00% of the aggregate principal amount of the Senior Secured Notes Claims shall have executed the Restructuring Support Agreement.

"**Senior Secured Replacing Commitment Parties**" has the meaning set forth in Section 2.5(a).

"**Senior Secured Rights Offering Backstop Commitment**" has the meaning set forth in Section 2.2(a).

"**Senior Secured Rights Offering Amount**" means (i) if the Senior Secured Notes RSA Condition has not been met, $137,812,500 and (ii) if the Senior Secured Notes RSA Condition has been met, $248,062,500.

"**Senior Secured Rights Offering Shares**" has the meaning set forth in the Recitals.

20

"**Senior Secured Unsubscribed Shares**" has the meaning set forth in <u>Section 2.2(a)</u>.

"**Software**" means any and all (a) computer programs and applications, architectures, libraries, codes, firmware and middleware, including any and all software implementations of algorithms, analytics, models and methodologies, whether in Source Code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (d) all programmer and user documentation, including user manuals and training materials, relating to any of the foregoing and (e) any of the foregoing used or included in software or application for wireless mobile communication devices.

"**Source Code**" means computer software and code, in form other than object code or machine readable form, including related programmer comments and annotations, help text, data and data structures, instructions and procedural, object-oriented and other code, which may be printed out or displayed in human readable form.

"**SOX**" has the meaning set forth in <u>Section 4.29</u>.

"**Subscription Form**" means that certain Convertible Notes Subscription Form and/or certain Senior Secured Notes Subscription Form (each as defined in the Rights Offering Procedures), as applicable, to be used by any Eligible Participant electing to purchase Rights Offering Shares in the Rights Offering.

"**Subscription Rights**" means the subscription rights to fund and purchase the Rights Offering Shares.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture or other legal entity as to which such Person (either alone or through or together with any other subsidiary), (a) owns, directly or indirectly, more than fifty percent (50%) of the stock or other Equity Interests, (b) has the power to elect a majority of the board of directors or similar governing body, or (c) has the power to direct the business and policies.  For the avoidance of doubt, a "Subsidiary" of the Company includes any non-Debtor subsidiary.

"**Systems**" means the operational technology systems, information technology and related infrastructure used, owned, leased or licensed by or for the business of the Debtors and their Subsidiaries, including industrial control systems, firmware, hardware, networks, interfaces, platforms and related systems.

"**Tax**" or "**Taxes**" means all taxes, assessments, duties, levies or other mandatory governmental charges paid to a Governmental Entity, including all U.S. federal, state, local, and non-U.S. and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, excise, severance, windfall profits, stamp, payroll, social security, withholding and other taxes, assessments, duties, levies or other mandatory governmental charges in the nature of a tax paid to a Governmental Entity (whether payable directly or by withholding and whether or not requiring the filing of a return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest thereon and shall include any

21

liability for such amounts as a result of being a member of a combined, consolidated, unitary or affiliated group, as successor, or by contract.

"**Tax Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Tax Return**" means any return, declaration, report, election, estimates, claim for refund, information return or other documents (including any related or supporting schedules or statements, and including any attachment thereto or amendment thereof) filed or required to be filed with any Governmental Entity in connection with the determination, assessment or collection of any Taxes, or the administration of any Laws.

"**Total Shares Outstanding**" means the total number of shares of New Common Equity outstanding on the Plan Effective Date after giving effect to the consummation of the transactions contemplated by the Plan and this Agreement, including, for the avoidance of doubt, the Offering Shares and the Backstop Premium Shares, but without giving effect to any New Common Equity issued or reserved for issuance pursuant to the Management Incentive Plan.

"**Transaction Agreements**" has the meaning set forth in <u>Section 4.2</u>.

"**Transfer**" means to sell, resell, reallocate, transfer, assign, pledge, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).  "**Transfer**" used as a noun has a correlative meaning.

"**Treasury Regulations**" means the regulations promulgated under the Tax Code.

"**Union**" has the meaning set forth in <u>Section 4.13(a)</u>.

"**WARN Act**" has the meaning set forth in <u>Section 4.13(b)</u>.

"**Willful or intentional breach**" has the meaning set forth in <u>Section 9.4(a)</u>.

Section 1.2    <u>Construction</u>.    In this Agreement, unless the context otherwise requires:

(a)    references to Articles, Sections and Schedules are references to the articles and sections or subsections of, and the schedules attached to, this Agreement;

(b)    references in this Agreement to "writing" or comparable expressions include a reference to a written document transmitted by means of electronic mail in portable document format (pdf), facsimile transmission or comparable means of communication;

(c)    words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(d)     the words "hereof," "herein," "hereto," "hereunder," and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole, including all Schedules and Exhibits attached to this Agreement, and not to any provision of this Agreement;

(e)     the term "this Agreement" shall be construed as a reference to this Agreement as the same may have been, or may from time to time be, amended, modified, varied, novated, or supplemented;

(f)     "include," "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words;

(g)     references to "day" or "days" are to calendar days;

(h)     references to "the date hereof" means the date of this Agreement;

(i)     unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder in effect from time to time; and

(j)     references to "dollars" or "$" refer to currency of the United States of America, unless otherwise expressly provided.

Section 1.3     Consent Rights under the Restructuring Support Agreement.

For the avoidance of doubt, nothing in this Agreement shall be interpreted in any way to limit in any manner any consent right of the Consenting Stakeholders or any other party under the Restructuring Support Agreement.

## ARTICLE II

## RIGHTS OFFERING BACKSTOP COMMITMENT

Section 2.1     The Direct Allocation; The Rights Offering; Rights Offering Shares. On and subject to the terms and conditions hereof, the Company shall conduct the Direct Allocation pursuant to which, at the Closing, (i)(A) the Company shall issue and sell to each Senior Secured Backstop Commitment Party, and (B) each Senior Secured Backstop Commitment Party hereby agrees, severally, and not jointly and severally, to purchase from the Company, a number of Offering Shares equal to its Senior Secured Commitment Percentage of the Senior Secured Direct Allocation Shares at the Per Share Subscription Price (such Senior Secured Backstop Commitment Party's "**Senior Secured Direct Allocation Amount**" and such obligations to purchase the Senior Secured Direct Allocation Shares, the "**Senior Secured Direct Allocation Commitments**"), and (ii)(A) the Company shall issue and sell to each Convertible Backstop Commitment Party, and (B) each Convertible Backstop Commitment Party hereby agrees, severally, and not jointly and severally, to purchase from the Company, a number of Offering Shares equal to its Convertible Commitment Percentage of the Convertible Direct Allocation Shares at the Per Share Subscription Price (such

23

Convertible Backstop Commitment Party's "**Convertible Direct Allocation Amount**" and such obligations to purchase the Convertible Direct Allocation Shares, the "**Convertible Direct Allocation Commitments**").

(b)      On and subject to the terms and conditions hereof, the Company shall conduct the Rights Offering pursuant to and in accordance with the Rights Offering Procedures, this Agreement, the Restructuring Support Agreement, the Disclosure Statement Order and the Backstop Order, as applicable, in all material respects.

(c)      (i) Each Eligible Participant that exercises its Subscription Rights to fund Rights Offering Shares, shall be entitled to elect to receive up to its Pro Rata Share of the Rights Offering Shares, (ii) each Senior Secured Backstop Commitment Party shall exercise its Subscription Rights to purchase its Pro Rata Share of the Senior Secured Rights Offering Shares, and (iii) each Convertible Backstop Commitment Party shall exercise its Subscription Rights to purchase its Pro Rata Share of the Convertible Rights Offering Shares.

(d)      No later than the Commitment Party Subscription Deadline, each Backstop Commitment Party shall arrange to tender its Senior Secured Notes and/or Convertible Notes, as applicable, in accordance with the Rights Offering Procedures.

(e)      The Rights Offering will be conducted and the Rights Offering Shares will be offered, issued and distributed, in each case under the Plan without registration under the Securities Act or any similar federal or local Law in reliance on Bankruptcy Code section 1145(a), to the extent permitted.  The Direct Allocation Shares, the Backstop Shares and the Backstop Premium Shares issued to the Backstop Commitment Parties pursuant to this Agreement, will be exempt from the registration requirements of the Securities Act pursuant to Rule 506(b) of Regulation D promulgated under the Securities Act or Section 4(a)(2) of the Securities Act, Regulation S under the Securities Act or another available exemption under the Securities Act.

Section 2.2      The Rights Offering Backstop Commitment.

(a)      Senior Secured Backstop Commitment Parties.  On and subject to the terms and conditions hereof, including entry of the Backstop Order, each Senior Secured Backstop Commitment Party agrees, severally, and not jointly and severally, to purchase, and the Company agrees to issue to such Senior Secured Backstop Commitment Party, on the Closing Date at the Per Share Subscription Price, an aggregate number of Senior Secured Rights Offering Shares equal to (i) such Senior Secured Backstop Commitment Party's Senior Secured Commitment Percentage multiplied by (ii) the aggregate number of Senior Secured Rights Offering Shares that Senior Secured Noteholders did not elect to purchase in the Rights Offering (the "**Senior Secured Unsubscribed Shares**") as set forth on such Senior Secured Backstop Commitment Party's Funding Notice delivered pursuant to Section 2.4 (the aggregate purchase price of such Senior Secured Backstop Commitment Party's Senior Secured Unsubscribed Shares, its "**Senior Secured Commitment Amount**" and such Senior Secured Unsubscribed Shares, such Senior Secured Backstop Commitment Party's "**Senior Secured Backstop Shares**" and such obligation to purchase Senior Secured Backstop Shares, such Senior Secured Backstop Commitment Party's "**Senior Secured Rights Offering Backstop Commitment**").

24

(b)    <u>Convertible Backstop Commitment Parties</u>.  On and subject to the terms and conditions hereof, including entry of the Backstop Order, each Convertible Backstop Commitment Party agrees, severally, and not jointly and severally, to purchase, and the Company agrees to issue to such Convertible Backstop Commitment Party, on the Closing Date at the Per Share Subscription Price, an aggregate number of Convertible Rights Offering Shares equal to (i) such Convertible Backstop Commitment Party's Convertible Commitment Percentage multiplied by (ii) the aggregate number of Convertible Rights Offering Shares that  Convertible Noteholders did not elect to purchase in the Rights Offering (the "**Convertible Unsubscribed Shares**") as set forth on such Convertible Backstop Commitment Party's Funding Notice pursuant to <u>Section 2.4</u> (the aggregate purchase price of such Convertible Backstop Commitment Party's Convertible Unsubscribed Shares, its "**Convertible Commitment Amount**" and such Convertible Unsubscribed Shares, such Convertible Backstop Commitment Party's "**Convertible Backstop Shares**" and, such obligation to purchase Convertible Backstop Shares, such Convertible Backstop Commitment Party's "**Convertible Rights Offering Backstop Commitment**").

Section 2.3    <u>Assignment & Designation of Commitment Rights</u>.

(a)    From the date hereof until the Commitment Party Subscription Deadline, each Backstop Commitment Party shall have the right to:

(i)    by written notice to the Company and the Rights Offering Subscription Agent, require that all or any portion of its (1) Direct Allocation Shares, (2) Rights Offering Shares, (3) Backstop Shares, and/or (4) Backstop Premium Shares, in each case, at the Closing Date, be issued in the name(s) of, and delivered to one or more of, its Related Purchasers without the need for such Backstop Commitment Party to Transfer any portion of its Direct Allocation Commitment, Rights Offering Backstop Commitment, Senior Secured Notes Claims, Convertible Notes Claims and/or Subscription Rights to such Related Purchaser(s) which notice of designation by the applicable Backstop Commitment Party, shall (i) specify the amount of such Direct Allocation Shares, Rights Offering Shares, Backstop Shares, and/or Backstop Premium Shares, as applicable, to be delivered to or issued in the name of each such Related Purchaser at the Closing Date; and (ii) contain a confirmation (as set forth in the Subscription Form) by each such Related Purchaser of the accuracy of the representations and warranties made by each Backstop Commitment Party under this Agreement or the Rights Offering Procedures as applied to such Related Purchaser; <u>provided</u>, that no such designation shall relieve such Backstop Commitment Party from any of its obligations under this Agreement; and

(ii)    by written notice to the Company and the Rights Offering Subscription Agent elect to have one or more of its Related Purchasers or other Affiliates or Affiliated Funds fund all or any portion of its Funding Amount at the Closing Date, without the need for such Backstop Commitment Party to transfer any portion of its Direct Allocation Commitment, Rights Offering Backstop Commitment, Senior Secured Notes Claims, Convertible Notes Claims and/or Subscription Rights to such Related Purchaser(s) or other Affiliate(s) or Affiliated Fund(s), which notice shall (i) specify the applicable Funding Amount to be

25

delivered by each such Related Purchaser or other Affiliate or Affiliated Fund on behalf of its respective Backstop Commitment Party at the Closing Date; and (ii) contain a confirmation by each such Related Purchaser or other Affiliate or Affiliated Fund of the accuracy of the representations and warranties made by each Backstop Commitment Party under this Agreement or the Rights Offering Procedures as applied to such Related Purchaser or other Affiliate or Affiliated Fund; provided, that no such designation shall relieve such Backstop Commitment Party from any of its obligations under this Agreement.

(b)    From the date hereof until the Commitment Party Subscription Deadline, each Backstop Commitment Party may Transfer (each, a "**Permitted Transfer**") (A) the rights and obligations of such Backstop Commitment Party to participate in the Direct Allocation and purchase the Direct Allocation Shares and (B) the rights and obligations of such Backstop Commitment Party to provide the Rights Offering Backstop Commitment and to purchase any Backstop Shares and receive Backstop Premium Shares, provided, that, any transfer of any of the foregoing must comply with the requirements of this Section 2.3.

(c)    Any Permitted Transfer pursuant to Section 2.3(b) must be to any other Backstop Commitment Party or its Related Purchasers (provided, that such Related Purchaser is also a Permitted Investor) (collectively, the "**Permitted Transferees**").  Each such Permitted Transferee must execute and provide to the Rights Offering Subscription Agent, the Company, the Ad Hoc Group of Senior Secured Noteholders Advisors and the Ad Hoc Group of Convertible Noteholders Advisors promptly (no later than two (2) Business Days after any Permitted Transfer) a BCA Joinder (unless already party to this Agreement), and an RSA Joinder (unless already party to the Restructuring Support Agreement).  Each transferring Backstop Commitment Party and Permitted Transferee must provide to the Rights Offering Subscription Agent, the Company, the Ad Hoc Group of Senior Secured Noteholders Advisors and the Ad Hoc Group of Convertible Noteholders Advisors promptly (no later than two (2) Business Days after any Permitted Transfer) a Commitment Party Transfer Form with such Permitted Transferee being deemed a Backstop Commitment Party.  Upon the receipt of a Commitment Party Transfer Form, including, as set forth therein, an executed BCA Joinder and an executed RSA Joinder (if applicable), which shall constitute notice of such Permitted Transfer, the Rights Offering Subscription Agent shall note such Permitted Transfer in the respective records maintained by the Rights Offering Subscription Agent pursuant to Section 2.3(f) promptly but no later than three (3) Business Days following receipt of such notice of Transfer.  If a Funding Notice has been issued to any such transferring Backstop Commitment Party, the Rights Offering Subscription Agent shall issue updated Funding Notices to such transferring Backstop Commitment Party and Permitted Transferee, as applicable, and the Permitted Transferee will be required to deliver and pay an amount equal to its respective Funding Amount by wire transfer of immediately available funds in U.S. dollars into the Escrow Account no later than three (3) Business Days prior to the Closing Date.

(d)    Any Transfer in violation of this Section 2.3 shall be void *ab initio*.

(e)    In the event a Backstop Commitment Party acquires any additional Senior Secured Notes Claims or Convertible Notes Claims after the date hereof, such acquisition shall not increase such Backstop Commitment Party's Commitment Percentage, provided, that, this Section

2.3(e) shall not in any way limit the right of any Backstop Commitment Party to complete Permitted Transfers in accordance with Section 2.3(b).

(f)     Upon request of the Ad Hoc Group of Senior Secured Noteholders Advisors or the Ad Hoc Group of Convertible Noteholders Advisors, the Company shall direct the Rights Offering Subscription Agent to provide, to the extent such information has been provided to the Rights Offering Subscription Agent or is in its possession, as soon as commercially reasonably practicable but in no event later than five (5) Business Days following receipt of such request, the Ad Hoc Group of Senior Secured Noteholders Advisors or Ad Hoc Group of Convertible Noteholders Advisors, as applicable, with copies of the records (which may be in electronic format) identifying, as of the close of business on the date of such request, the names of the Persons who are recorded to receive and the amounts (to the extent calculable as of the date of such request) that such Persons are recorded to receive on the Closing Date of the Direct Allocation Shares, the Rights Offering Shares, the Backstop Shares, and the Backstop Premium Shares.  For the avoidance of doubt, the Company shall direct the Rights Offering Subscription Agent to maintain records of each of the foregoing (to the extent such information has been provided to the Rights Offering Subscription Agent or is in its possession) and for purposes of determining whether any consent threshold set forth herein has been met, and the Parties agree to rely on such records.

Section 2.4    Escrow Account Funding.

(a)     Senior Secured Backstop Funding Notice.  No later than the fifth (5th) calendar day following the Commitment Party Subscription Deadline, upon instruction and on behalf of the Company and subject to the prior written consent (with delivery by electronic mail being sufficient) of the Required Consenting Senior Secured Noteholders (which consent shall not be unreasonably withheld, delayed or conditioned) the Rights Offering Subscription Agent shall deliver to each Senior Secured Backstop Commitment Party a written notice (each, a "**Senior Secured Backstop Funding Notice**,") setting forth (i) the aggregate amount of Senior Secured Unsubscribed Shares; (ii) such Senior Secured Backstop Commitment Party's aggregate number of Senior Secured Rights Offering Shares subscribed for in the Rights Offering; (iii) such Senior Secured Backstop Commitment Party's Senior Secured Commitment Amount; (iv) such Senior Secured Backstop Commitment Party's Senior Secured Direct Allocation Amount; (v) the aggregate purchase price for such Senior Secured Backstop Commitment Party's Senior Secured Rights Offering Shares subscribed for in the Rights Offering; (vi) the sum of clauses (iii), (iv), and (v) (such sum, such Senior Secured Backstop Commitment Party's "**Senior Secured Funding Amount**"); and (vii) subject to the last sentence of Section 2.4(e), the non-interest bearing escrow account (the "**Escrow Account**") designated in an escrow agreement acceptable to the Company and the Required Backstop Commitment Parties (the "**Escrow Agreement**") and corresponding wire instructions, to which such Backstop Commitment Party (other than those that are registered investment companies under the Investment Company Act or whose investment management arrangements otherwise preclude funding into escrow ("**Investment Companies**"), unless such Backstop Commitment Party shall so choose) shall deliver and pay its Senior Secured Funding Amount. On the Plan Effective Date, each Senior Secured Backstop Commitment Party that is an Investment Company shall, at its option, deliver and pay its respective Senior Secured Funding Amount by wire transfer of immediately available funds in U.S. dollars to a segregated bank account of the Rights Offering Subscription Agent designated by the Rights Offering Subscription Agent in the Senior Secured Backstop Funding Notice, or make other arrangements that are

27

acceptable to the applicable Investment Company and the Debtors, in satisfaction of such Senior Secured Backstop Commitment Party's Senior Secured Commitment Amount and its obligations to fully exercise the Subscription Rights.

(b)    Convertible Backstop Funding Notice.  No later than fifth (5th) calendar day following the Commitment Party Subscription Deadline, upon instruction and on behalf of the Company and subject to the prior written consent (with delivery by electronic mail being sufficient) of the Required Consenting Convertible Noteholders (which consent shall not be unreasonably withheld, delayed or conditioned) the Rights Offering Subscription Agent shall, on behalf of the Company, deliver to each Convertible Backstop Commitment Party a written notice (each, a "**Convertible Backstop Funding Notice**") setting forth (i) the aggregate amount of Convertible Unsubscribed Shares; (ii) such Convertible Backstop Commitment Party's aggregate number of Convertible Rights Offering Shares subscribed for in the Rights Offering; (iii) such Convertible Backstop Commitment Party's Convertible Commitment Amount; (iv) such Convertible Backstop Commitment Party's Convertible Direct Allocation Amount; (v) the aggregate purchase price for such Convertible Backstop Commitment Party's Convertible Rights Offering Shares subscribed for in the Rights Offering; (vi) the sum of clauses (iii), (iv), and (v) (such sum, such Convertible Backstop Commitment Party's "**Convertible Funding Amount**"); and (vii) subject to the last sentence of Section 2.4(e), the Escrow Account designated in the Escrow Agreement and corresponding wire instructions, to which such Convertible Backstop Commitment Party (other than those that are Investment Companies, unless such Backstop Commitment Party shall so choose) shall deliver and pay its Convertible Funding Amount.  On the Plan Effective Date, each Convertible Backstop Commitment Party that is an Investment Company shall, at its option, deliver and pay its respective Convertible Funding Amount by wire transfer of immediately available funds in U.S. dollars to a segregated bank account of the Rights Offering Subscription Agent designated by the Rights Offering Subscription Agent in the Convertible Backstop Funding Notice, or make other arrangements that are acceptable to the applicable Investment Company and the Debtors, in satisfaction of such Convertible Backstop Commitment Party's Convertible Commitment Amount and its obligations to fully exercise the Subscription Rights.

(c)    Funding Notice Information. The Company shall promptly direct the Rights Offering Subscription Agent to provide any written backup, information and documentation in its possession relating to the information contained in any applicable Funding Notice as any Backstop Commitment Party may reasonably request.

(d)    [Reserved].

(e)    Escrow Account Funding. Subject to the Escrow Agreement but no later than three (3) Business Days following receipt of the Funding Notice (as such date may be extended with the consent of the Company and the Required Backstop Commitment Parties, but in no event later than two (2) Business Days before the Plan Effective Date, the "**Escrow Account Funding Date**"), each Backstop Commitment Party shall deliver and pay an amount equal to its respective Funding Amount, by wire transfer of immediately available funds in U.S. dollars into the Escrow Account in satisfaction of such Backstop Commitment Party's Direct Allocation Amount, Rights Offering Backstop Commitment and the Subscription Rights that such Backstop Commitment Party exercised.  If the Closing does not occur within ten (10) Business Days

28

following the Escrow Account Funding Date, all amounts deposited by the Backstop Commitment Parties in the Escrow Account shall be returned to the Backstop Commitment Parties in accordance with the terms and conditions of the Escrow Agreement.

Section 2.5    Senior Secured Commitment Party Default; Replacement of Defaulting Senior Secured Backstop Commitment Parties.

(a)    Upon the occurrence of a Senior Secured Commitment Party Default, the other Senior Secured Backstop Commitment Parties and their respective Related Purchasers (other than any Defaulting Senior Secured Backstop Commitment Party) shall have the right and opportunity (but not the obligation), within three (3) Business Days (or such longer period as may be provided by the Company with the consent of the Required Backstop Commitment Parties (which shall not be unreasonably withheld)) after receipt of written notice from the Company to all Senior Secured Backstop Commitment Parties of such Senior Secured Commitment Party Default, which notice shall be given promptly following the occurrence of such Senior Secured Commitment Party Default and to all Senior Secured Backstop Commitment Parties substantially concurrently (such period, the "**Senior Secured Commitment Party Replacement Period**"), to make arrangements for one or more of the Senior Secured Backstop Commitment Parties and their respective Related Purchasers (other than the Defaulting Senior Secured Backstop Commitment Party) to fund all or any portion of the Senior Secured Available Shares (such funding, a "**Senior Secured Commitment Party Replacement**") on the terms and subject to the conditions set forth in this Agreement and in such amounts as may be agreed upon by all of the Senior Secured Backstop Commitment Parties electing to fund all or any portion of the Senior Secured Available Shares, or, if no such arrangements are made, based upon the relative applicable Commitment Amounts of any such Senior Secured Backstop Commitment Parties (other than any Defaulting Commitment Party) and their respective Related Purchasers (such Senior Secured Backstop Commitment Parties, the "**Senior Secured Replacing Commitment Parties**"). Following the expiration of the Senior Secured Commitment Party Replacement Period, the Company shall promptly, but no later than one (1) Business Day provide each Senior Secured Replacing Commitment Party with a revised Funding Notice (the "**Replacement Funding Notice**") that reflects the updated Funding Amount of such Senior Secured Replacing Commitment Party and the amount that each Senior Secured Replacing Commitment Party is required to fund pursuant to Section 2.7(c) after taking into consideration the Senior Secured Commitment Party Replacement. Within two (2) Business Days following receipt of the Replacement Funding Notice, each Senior Secured Replacing Commitment Party shall fund any unfunded Funding Amount to the Escrow Account. Any Senior Secured Available Shares funded by a Senior Secured Replacing Commitment Party shall be included, among other things, in the determination of (i) the Senior Secured Backstop Shares (and the corresponding right to receive Senior Secured Backstop Shares) of such Senior Secured Replacing Commitment Party for all purposes hereunder, (ii) the Senior Secured Direct Allocation Amount and/or the Senior Secured Commitment Amount of such Senior Secured Replacing Commitment Party for purposes of Section 2.5(d), Section 2.4(e), Section 2.7(c), Section 3.1 (as applicable) and Section 3.2 (as applicable), and (iii) the Senior Secured Commitment Amount of such Senior Secured Replacing Commitment Party for purposes of the definition of "Required Backstop Commitment Parties". If a Senior Secured Commitment Party Default occurs, the Outside Date shall be extended to the extent necessary to allow for the Senior Secured Commitment Party Replacement and the Closing Date to be completed and occur prior to the Outside Date.

29

(b)      The Convertible Backstop Commitment Parties shall have the right (but not the obligation) to make arrangements for one or more of the Convertible Backstop Commitment Parties to fund any portion of the Senior Secured Available Shares not otherwise funded by any Senior Secured Replacing Commitment Parties (in such case, each such funding Convertible Backstop Commitment Party shall constitute a Senior Secured Replacing Commitment Party and shall be bound by the funding period as set forth under above Section 2.5(a)).

(c)      Notwithstanding anything in this Agreement to the contrary, if a Senior Secured Backstop Commitment Party is a Defaulting Senior Secured Backstop Commitment Party, or if this Agreement is terminated with respect to such Senior Secured Backstop Commitment Party as a result of its default hereunder, such Defaulting Senior Secured Backstop Commitment Party shall not be entitled to any of the Senior Secured Direct Allocation Shares, Backstop Shares, Backstop Premium Shares, or expense reimbursement (including the Expense Reimbursement other than the Advisor Fees) or indemnification provided, or to be provided, under or in connection with this Agreement or any other Transaction Agreement.

(d)      Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall be deemed to require a Senior Secured Backstop Commitment Party to pay more than its Senior Secured Direct Allocation Amount for its Senior Secured Direct Allocation Shares, its Senior Secured Commitment Amount for its Senior Secured Backstop Shares, or the aggregate purchase price calculated based on the Per Share Subscription Price for its Pro Rata Share of the Senior Secured Rights Offering Shares, as applicable.

(e)      For the avoidance of doubt, notwithstanding anything to the contrary set forth in Section 9.4, but subject to Section 10.11, no provision of this Agreement shall relieve any Defaulting Senior Secured Backstop Commitment Party from liability hereunder, or limit the availability of the remedies set forth in Section 10.10 or any other remedy available under applicable Laws, in connection with any such Defaulting Senior Secured Backstop Commitment Party's Senior Secured Commitment Party Default, and the Parties hereto may enforce rights of money damages and/or specific performance upon such Senior Secured Commitment Party Default. Any Defaulting Senior Secured Backstop Commitment Party shall be liable to each other Senior Secured Backstop Commitment Party that is not a Defaulting Senior Secured Backstop Commitment Party, and to the Company, as a result of any breach of its obligations hereunder. For the avoidance of doubt, nothing in this provision shall require the Company to issue any New Common Equity (including any Senior Secured Backstop Premium Shares) to any Defaulting Senior Secured Backstop Commitment Party.

Section 2.6      Convertible Commitment Party Default; Replacement of Defaulting Convertible Backstop Commitment Parties.

(a)      Upon the occurrence of a Convertible Commitment Party Default, the other Convertible Backstop Commitment Parties and their respective Related Purchasers (other than any Defaulting Convertible Backstop Commitment Party) shall have the right and opportunity (but not the obligation), within three (3) Business Days (or such longer period as may be provided by the Company with the consent of the Required Backstop Commitment Parties (which shall not be unreasonably withheld)) after receipt of written notice from the Company to all Convertible Backstop Commitment Parties of such Convertible Commitment Party Default, which notice shall

30

be given promptly following the occurrence of such Convertible Commitment Party Default and to all Convertible Backstop Commitment Parties substantially concurrently (such period, the "**Convertible Commitment Party Replacement Period**"), to make arrangements for one or more of the Convertible Backstop Commitment Parties and their respective Related Purchasers (other than the Defaulting Convertible Backstop Commitment Party) to fund all or any portion of the Convertible Available Shares (such funding, a "**Convertible Commitment Party Replacement**") on the terms and subject to the conditions set forth in this Agreement and in such amounts as may be agreed upon by all of the Convertible Backstop Commitment Parties electing to fund all or any portion of the Convertible Available Shares, or, if no such arrangements are made, based upon the relative applicable Commitment Amounts of any such Convertible Backstop Commitment Parties (other than any Defaulting Commitment Party) and their respective Related Purchasers (such Convertible Backstop Commitment Parties the "**Convertible Replacing Commitment Parties**"). Following the expiration of the Convertible Commitment Party Replacement Period, the Company shall promptly, but no later than one (1) Business Day, provide each Convertible Replacing Commitment Party with a Replacement Funding Notice that reflects the updated Funding Amount of such Convertible Replacing Commitment Party and the amount that each Convertible Replacing Commitment Party is required to fund pursuant to Section 2.7(c) after taking into consideration the Convertible Commitment Party Replacement.  Within two (2) Business Days following receipt of the Replacement Funding Notice, each Convertible Replacing Commitment Party shall fund any unfunded Funding Amount to the Escrow Account.  Any Convertible Available Shares funded by a Convertible Replacing Commitment Party shall be included, among other things, in the determination of (i) the Convertible Backstop Shares (and the corresponding right to receive Convertible Backstop Shares) of such Convertible Replacing Commitment Party for all purposes hereunder, (ii) the Convertible Direct Allocation Amount and/or the Convertible Commitment Amount of such Convertible Replacing Commitment Party for purposes of Section 2.5(d), Section 2.4(e), Section 2.7(c), Section 3.1 (as applicable) and Section 3.2 (as applicable), and (iii) the Convertible Commitment Amount of such Convertible Replacing Commitment Party for purposes of the definition of "Required Backstop Commitment Parties".  If a Convertible Commitment Party Default occurs, the Outside Date shall be extended to the extent necessary to allow for the Convertible Commitment Party Replacement and the Closing Date to be completed and occur prior to the Outside Date.

(b)     The Senior Secured Backstop Commitment Parties shall have the right (but not the obligation) to make arrangements for one or more of the Senior Secured Backstop Commitment Parties to fund any portion of the Convertible Available Shares not otherwise funded by any Convertible Replacing Commitment Parties (in such case, each such funding Senior Secured Backstop Commitment Party shall constitute a Convertible Replacing Commitment Party and shall be bound by the funding period as set forth under above Section 2.6(a)).

(c)     Notwithstanding anything in this Agreement to the contrary, if a Convertible Backstop Commitment Party is a Defaulting Convertible Backstop Commitment Party, or if this Agreement is terminated with respect to such Convertible Backstop Commitment Party as a result of its default hereunder, such Defaulting Convertible Backstop Commitment Party shall not be entitled to any of the Convertible Direct Allocation Shares, Backstop Shares, Backstop Premium Shares, or expense reimbursement (including the Expense Reimbursement other than the Advisor Fees) or indemnification provided, or to be provided, under or in connection with this Agreement or any other Transaction Agreement.

(d)      Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall be deemed to require a Convertible Backstop Commitment Party to pay more than its Convertible Direct Allocation Amount for its Convertible Direct Allocation Shares, its Convertible Commitment Amount for its Convertible Backstop Shares, or the aggregate purchase price calculated based on the Per Share Subscription Price for its Pro Rata Share of the Convertible Rights Offering Shares, as applicable.

(e)      For the avoidance of doubt, notwithstanding anything to the contrary set forth in Section 9.4, but subject to Section 10.11, no provision of this Agreement shall relieve any Defaulting Convertible Backstop Commitment Party from liability hereunder, or limit the availability of the remedies set forth in Section 10.10 or any other remedy available under applicable Laws, in connection with any such Defaulting Convertible Backstop Commitment Party's Convertible Commitment Party Default, and the Parties hereto may enforce rights of money damages and/or specific performance upon such Convertible Commitment Party Default. Any Defaulting Convertible Backstop Commitment Party shall be liable to each other Convertible Backstop Commitment Party that is not a Defaulting Convertible Backstop Commitment Party, and to the Company, as a result of any breach of its obligations hereunder. For the avoidance of doubt, nothing in this provision shall require the Company to issue any New Common Equity (including any Convertible Backstop Premium Shares) to any Defaulting Convertible Backstop Commitment Party.

Section 2.7      Closing.

(a)      Subject to Article VII, and Article IX, and unless otherwise mutually agreed in writing between the Debtors and the Required Backstop Commitment Parties, the closing of the Rights Offering and the Direct Allocation (the "**Closing**") shall take place electronically on the date on which all of the conditions set forth in Article VII shall have been satisfied or waived in accordance with this Agreement (other than conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions). The date on which the Closing actually occurs shall be referred to herein as the "**Closing Date**."

(b)      On the Closing Date, the Company will issue:

(i)      to each Senior Secured Backstop Commitment Party, such Senior Secured Backstop Commitment Party's Direct Allocation Shares, the Senior Secured Rights Offering Shares, the Senior Secured Backstop Shares and the Senior Secured Backstop Premium Shares.

(ii)      to each Convertible Backstop Commitment Party, such Convertible Backstop Commitment Party's Direct Allocation Shares, the Convertible Rights Offering Shares, the Convertible Backstop Shares and the Convertible Backstop Premium Shares.

(c)      On the Closing Date, the Debtors will deliver to the Backstop Commitment Parties, to the satisfaction of the Required Backstop Commitment Parties:

(i)     a certificate of the chief financial officer or chief accounting officer of the Company with respect to solvency matters, in form and substance acceptable to the Required Backstop Commitment Parties; and

(ii)    any documentation and other information reasonably requested in connection with Sanctions or Money Laundering Laws, including, without limitation, "know-your-customer" rules and regulations.

(d)     Subject to <u>Section 2.7(b)</u>, at the Closing, the funds held in the Escrow Account (and any amounts paid to a Rights Offering Subscription Agent bank account pursuant to the Rights Offering Procedures) shall, as applicable, be released and utilized in accordance with the Plan or Confirmation Order, as applicable.

(e)     Subject to <u>Article VII</u>, at the Closing, issuance of the Direct Allocation Shares, Rights Offering Shares, Backstop Shares and Backstop Premium Shares will be made by the Company to each Backstop Commitment Party (or its designee in accordance with <u>Section 2.3</u>, as applicable) against payment for such shares (or, in the case of the Backstop Premium Shares, as consideration for each Backstop Commitment Party's obligations hereunder) to be funded by such Backstop Commitment Party, in satisfaction of such Backstop Commitment Party's obligations under this Agreement.

Section 2.8     <u>Withholding</u>.  The Company and each of its designees and Affiliates shall be entitled to deduct or withhold any Taxes or other amounts with respect to any amounts payable pursuant to this Agreement that are required to be deducted or withheld under applicable Law. The Company shall cooperate in good faith with the Backstop Commitment Parties to reduce or eliminate, to the extent reasonably possible and permitted by applicable Law, any such amounts required to be deducted or withheld. The Company and each of its designees and Affiliates will be authorized to take any actions that may be reasonably necessary or appropriate to comply with such deduction or withholding requirements, including to request any reasonably necessary Tax forms, including IRS form W-9 or the appropriate series of IRS form W-8, as applicable, or any similar information for the purpose of determining whether any such withholding is required.  Any such deducted or withheld amounts shall be treated as paid to the Person to whom such amounts would otherwise have been paid for purposes of this Agreement.

Section 2.9 <u>Pre-funded Warrants</u>. Notwithstanding any other provision of this Agreement, a Backstop Commitment Party may elect at any time prior to the Closing Date to receive, in lieu of all or a portion of the Backstop Shares, Backstop Premium Shares or Direct Allocation Shares that would otherwise be issuable to it, pre-funded warrants to acquire such Backstop Shares, Backstop Premium Shares or Direct Allocation Shares exercisable for an exercise price equal to the par value of the New Common Equity (the "**Pre-Funded Warrants**"). The Pre-Funded Warrants will include customary beneficial ownership limitation provisions prohibiting the exercise of the Pre-Funded Warrants to the extent that, after giving effect to an exercise of the Pre-Funded Warrants, the Backstop Commitment Party, together with any affiliates and any members of a Section 13(d) group with the Backstop Commitment Party and/or its affiliates, would beneficially own (as such term is defined under Rule 13d-3 under the Exchange Act) in

33

excess of either 4.99% or 9.99% of the outstanding New Common Equity (which threshold shall be specified by the applicable Backstop Commitment Party).

## ARTICLE III

## BACKSTOP COMMITMENT CONSIDERATION AND EXPENSE REIMBURSEMENT

Section 3.1    <u>Backstop Premium Payable by the Debtors</u>.

(a)    <u>Senior Secured Backstop Commitment Parties</u>.

(i)    Subject to <u>Section 3.2</u>, in consideration for the Senior Secured Direct Allocation Commitments and the Senior Secured Rights Offering Backstop Commitments and the other agreements and undertakings of the Senior Secured Backstop Commitment Parties in respect of the Rights Offering and the Senior Secured Direct Allocation under this Agreement, and pursuant to and in accordance with the Rights Offering Procedures, this Agreement, the Restructuring Support Agreement, the Disclosure Statement Order and the Backstop Order, the Debtors shall pay or cause to be paid to each Senior Secured Backstop Commitment Party (including any Senior Secured Replacing Commitment Party, but excluding any Defaulting Senior Secured Backstop Commitment Party) or such Senior Secured Backstop Commitment Party's designee(s), as applicable, a non-refundable premium (the "**Senior Secured Backstop Premium**") equal to a number of shares of New Common Equity equal to the product of (i) such Senior Secured Backstop Commitment Party's Senior Secured Commitment Percentage and (ii) 4.8825% of the Total Shares Outstanding (the "**Senior Secured Backstop Premium Shares**") to the Senior Secured Backstop Commitment Parties; provided, that if the Closing does not occur, the Senior Secured Backstop Premium shall be payable only in cash and only to the extent provided in (and in accordance with) <u>Section 9.4(b)</u>.

(ii)    The provisions for the payment of the Senior Secured Backstop Premium, the Expense Reimbursement and the indemnification provided herein, are an integral part of the transactions contemplated by this Agreement and without these provisions the Senior Secured Backstop Commitment Parties would not have entered into this Agreement.

(iii)    Subject to <u>Section 9.4(b)</u>, the Company shall cause the Senior Secured Backstop Premium to be paid to the applicable Senior Secured Backstop Commitment Parties on (and as a condition to) the Plan Effective Date.

(iv)    The Senior Secured Backstop Premium and the Expense Reimbursement shall, pursuant to the Backstop Order, constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code and shall not be subject to set-off, recharacterization, avoidance or disallowance.

(v)     The Senior Secured Backstop Premium (including the applicable portion of the Backstop Cash Premium (in satisfaction of the Backstop Premium pursuant to <u>Section 9.4(b))</u> shall be fully earned, non-refundable and non-avoidable upon the execution of this Agreement, and, subject to Section 9.4(b), shall be paid by the Debtors on the Closing Date as set forth above.

(b)     <u>Convertible Backstop Commitment Parties</u>.

(i)     Subject to <u>Section 3.2</u>, in consideration for the Convertible Direct Allocation Commitments and the Convertible Rights Offering Backstop Commitments and the other agreements and undertakings of the Convertible Backstop Commitment Parties in respect of the Rights Offering and the Convertible Direct Allocation under this Agreement, and pursuant to and in accordance with the Rights Offering Procedures, this Agreement, the Restructuring Support Agreement, the Disclosure Statement Order and the Backstop Order, the Debtors shall pay or cause to be paid to each Convertible Backstop Commitment Party (including any Convertible Replacing Commitment Party, but excluding any Defaulting Convertible Backstop Commitment Party) or such Convertible Backstop Commitment Party's designee(s), as applicable, a non-refundable premium (the "**Convertible Backstop Premium**") equal to a number of shares of New Common Equity equal to the product of (i) such Convertible Backstop Commitment Party's Convertible Commitment Percentage and (ii) of 1.3175% of the Total Shares Outstanding (the "**Convertible Backstop Premium Shares**") to the Convertible Backstop Commitment Parties; provided that if the Closing does not occur, the Convertible Backstop Premium shall be payable only in cash and only to the extent provided in (and in accordance with) <u>Section 9.4(b)</u>.

(ii)     The provisions for the payment of the Convertible Backstop Premium, the Expense Reimbursement and the indemnification provided herein, are an integral part of the transactions contemplated by this Agreement and without these provisions the Convertible Backstop Commitment Parties would not have entered into this Agreement.

(iii)     Subject to <u>Section 9.4(b)</u>, the Company shall cause the Convertible Backstop Premium to be paid to the applicable Convertible Backstop Commitment Party on (and as a condition to) the Plan Effective Date.

(iv)     The Convertible Backstop Premium and the Expense Reimbursement shall, pursuant to the Backstop Order, constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code and shall not be subject to set-off, recharacterization, avoidance or disallowance.

(v)     The Convertible Backstop Premium (including the applicable portion of the Backstop Cash Premium (in satisfaction of the Backstop Premium pursuant to <u>Section 9.4(b))</u>, shall be fully earned, non-refundable and non-

35

avoidable upon the execution of this Agreement and, subject to Section 9.4(b), shall be paid by the Debtors on the Closing Date as set forth above.

Section 3.2     Expense Reimbursement.

(a)     Whether or not the transactions contemplated hereunder are consummated, in accordance with and subject to the Backstop Order, the Debtors agree to pay, in accordance with Section 3.2(b) below, and to the extent such fees and expenses remain unpaid, (i) all reasonable and documented out-of-pocket fees and expenses (other than Taxes but including travel costs and expenses) of the Backstop Commitment Parties and the Ad Hoc Group of Senior Secured Noteholders Advisors and Ad Hoc Group of Convertible Noteholders Advisors incurred on behalf of the Backstop Commitment Parties in connection with the Chapter 11 Cases and/or the Restructuring Transactions (whether incurred before or after the Petition Date), including the negotiation, preparation and implementation of the Transaction Agreements and the other agreements and transactions contemplated hereby and thereby (the "**Advisor Fees**") and (ii) any applicable filing or other similar fees required to be paid by the Backstop Commitment Parties in all applicable jurisdictions (such payment obligations, the "**Expense Reimbursement**").  The Expense Reimbursement shall, pursuant to the Backstop Order, constitute allowed administrative expenses against each of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code and shall not be subject to set-off, recharacterization, avoidance or disallowance.  For the avoidance of doubt, the amount payable pursuant to this Section 3.2 shall be determined without duplication of recovery under the Restructuring Support Agreement or other Transaction Agreements.

(b)     The Expense Reimbursement accrued through the date on which the Backstop Order is entered shall be paid in accordance with the Backstop Order as promptly as reasonably practicable after the date of entry of the Backstop Order.  The Expense Reimbursement shall thereafter be payable in accordance with the procedures set forth in the Backstop Order; provided, that the Debtors' final payment shall be made contemporaneously with the Closing or the earlier termination of this Agreement pursuant to Article IX.

Section 3.3     Tax Treatment of Backstop Premium.  The Backstop Commitment Parties and the Debtors agree that for U.S. federal and applicable U.S. state, local and territory income Tax purposes, (a) the entering into of the Rights Offering Backstop Commitments pursuant to this Agreement shall be treated as the sale of put options by the Backstop Commitment Parties to the Debtors and (b) the Backstop Premium shall be treated as "put premium" in respect of such options and shall not be treated as a fee (collectively, the "**Intended Tax Treatment**").  Each Debtor and Backstop Commitment Party shall prepare its respective U.S. federal, and applicable U.S. state, local and territory income Tax Returns in a manner consistent with the Intended Tax Treatment, and none of the Backstop Commitment Parties or any Debtor shall take any position or action with respect to U.S. Taxes (whether in audits, Tax Returns or otherwise) inconsistent with the Intended Tax Treatment, except as otherwise required by a "determination" within the meaning of Section 1313(a) of the Tax Code. The Parties agree that, as of the date hereof, no deduction or withholding of Tax is required by Law with respect to the payment of the Backstop Premium under this Agreement.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE DEBTORS

Except (a) as set forth in the corresponding section of the Company Disclosure Schedules (it being understood that any information, item or matter set forth in one section or subsection of the Company Disclosure Schedules shall be deemed a disclosure with respect to, and shall be deemed to apply to and qualify, the section or subsection of this Agreement to which it corresponds in number and each other section or subsection of this Agreement (i) to which there is an explicit cross-reference to such information, item or matter or (ii) to the extent that it is reasonably apparent based upon the content of such disclosure that such information, item or matter is relevant to such other section or subsection) or (b) as disclosed in the Company SEC Documents filed with (or furnished to) the SEC on or after December 31, 2021 and no later than two (2) Business Days prior to the date hereof (excluding any cautionary, predictive or forward-looking disclosures contained in the "Forward-Looking Statements" or "Risk Factors" sections thereof), the Company (or, in the case of each Debtor that becomes a party hereto after the date of this Agreement, as of the date such Debtor becomes a Party to this Agreement by executing and delivering a Company Acknowledgement) hereby represents and warrants to the Backstop Commitment Parties as of the date of this Agreement, as set forth below.

Section 4.1    <u>Organization and Qualification</u>.  Each of the Debtors and each of their Subsidiaries (a) is a duly organized and validly existing corporation, limited liability company, or limited partnership, as the case may be, and, if applicable, in good standing (or the equivalent thereof to the extent such concept is recognized in the applicable jurisdiction) under the Laws of the jurisdiction of its incorporation or organization, (b) has the corporate, limited liability company or other applicable power and authority to own its property and assets and to transact the business in which it is currently engaged and presently proposes to engage and (c) except where the failure to have such authority or qualification would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the conduct of its business as currently conducted requires such qualifications.

Section 4.2    <u>Corporate Power and Authority</u>.  Each of the Debtors has the requisite corporate, limited liability company or other applicable power and authority (a) (i) subject to entry of the Backstop Order and the Confirmation Order, to enter into, execute and deliver this Agreement and to perform the BCA Approval Obligations and (ii) subject to entry of the Backstop Order and the Confirmation Order, to perform each of its other obligations hereunder and (b) subject to entry of the Backstop Order, the Disclosure Statement Order, and the Confirmation Order, to consummate the transactions contemplated herein and in the Plan, to enter into, execute and deliver all agreements to which it will be a party as contemplated by this Agreement and the Plan (including the Definitive Documents, the Restructuring Support Agreement and this Agreement, collectively, the "**<u>Transaction Agreements</u>**") and to perform its obligations under each of the Transaction Agreements (other than this Agreement).  Subject to the receipt of the foregoing Orders, as applicable, the execution and delivery of this Agreement and each of the other Transaction Agreements and the consummation of the transactions contemplated

37

hereby and thereby have been or will be duly authorized by all requisite corporate action on behalf of the Company and the Debtors and no other corporate proceedings on the part of the Company or the Debtors are or will be necessary to authorize this Agreement or any of the other Transaction Agreements or to consummate the transactions contemplated hereby or thereby.

Section 4.3    <u>Execution and Delivery; Enforceability</u>.  This Agreement has been duly executed and delivered by each of the Company and the other Debtors. Subject to entry of the Backstop Order, the Disclosure Statement Order, and the Confirmation Order, as applicable, each other Transaction Agreement will be, duly executed and delivered by the Company and the other Debtors party thereto.  Upon entry of the Backstop Order and assuming due authorization and valid execution and delivery hereof by the Backstop Commitment Parties, the BCA Approval Obligations will constitute the valid and legally binding obligations of the Company and, to the extent applicable, the other Debtors, enforceable against the Company and, to the extent applicable, the other Debtors, in accordance with their respective terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.  Upon entry of the Backstop Order and assuming due authorization and valid execution and delivery of this Agreement and the other Transaction Agreements by the Backstop Commitment Parties and, to the extent applicable, any other parties hereof and thereof, each of the obligations of the Company and, to the extent applicable, the other Debtors hereunder and thereunder will constitute the valid and legally binding obligations of the Company and, to the extent applicable, the other Debtors, enforceable against the Company and, to the extent applicable, the other Debtors, in accordance with their respective terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws now or hereafter in effect relating to creditor's rights generally and subject to general principles of equity.

Section 4.4    <u>Authorized and Issued Interests</u>.

(a)    On the Closing Date, (i) the total issued Equity Interests of the Company will consist solely of the New Common Equity issued pursuant to the Plan, the New Common Equity issued as Rights Offering Shares under the Rights Offering, the New Common Equity issued as Direct Allocation Shares under the Direct Allocation, the New Common Equity issued as Backstop Shares pursuant to <u>Article II</u> and the New Common Equity issued as Backstop Premium Shares pursuant to <u>Article III</u>, (ii) no Equity Interests will be held by the Company in its treasury, (iii) no Equity Interests of the Company will be reserved for issuance upon exercise of stock options and other rights to purchase or acquire Equity Interests of the Company granted in connection with any employment arrangement entered into in accordance with <u>Section 6.3</u>, except as reserved in respect of the Management Incentive Plan, and (iv) no warrants to purchase Equity Interests of the Company will be issued and outstanding.  Except as set forth in the prior sentence, as of the Closing Date, no units or shares of capital stock or other equity securities or voting interest in the Company or any securities convertible into or exchangeable or exercisable for securities or other equity securities of the Company or any of its Subsidiaries will have been issued, reserved for issuance or outstanding.

38

(b)    Except as described in this <u>Section 4.4</u> and except as set forth in the Registration Rights Agreement, the Company Organizational Documents, this Agreement, the Restructuring Support Agreement or as required under the Plan as of the Closing Date, none of the Debtors or any of their respective Subsidiaries will be party to or otherwise bound by or subject to any outstanding option, warrant, call, right, security, commitment, Contract, arrangement, or undertaking (including any preemptive right) that (i) obligates the Debtors or their respective Subsidiaries to issue, deliver, sell or transfer, or repurchase, redeem, or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed, or otherwise acquired, any units or shares of the capital stock of, or other equity or voting interests in, any of the Debtors or their respective Subsidiaries or any security convertible or exercisable for or exchangeable into any units or capital stock of, or other equity or voting interest in, any of the Debtors or their respective Subsidiaries, (ii) obligates any of the Debtors or their respective Subsidiaries to issue, grant, extend, or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement, or undertaking, (iii) restricts the transfer of any units or shares of capital stock of any of the Debtors or their respective Subsidiaries (other than any restrictions included in the Exit Financing Facility or any corresponding pledge agreement), or (iv) relates to the voting of any Equity Interests in any of the Debtors or their respective Subsidiaries, except as to voting rights attendant to any such Equity Interests or as set forth in the organizational documents thereof.

Section 4.5    <u>Issuance</u>.  The New Common Equity to be issued pursuant to the Plan by the Company on the Closing Date, the Direct Allocation Shares to be issued in the Direct Allocation, the Rights Offering Shares to be issued in connection with the consumation of the Rights Offering and the Backstop Shares and Backstop Premium Shares to be issued pursuant to the terms hereof, will, when issued and delivered on the Closing Date, be duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, Liens (other than transfer restrictions imposed hereunder or under the Company Organizational Documents or by applicable Law), preemptive rights, rights of first refusal, subscription and similar rights (other than any rights set forth in the Company Organizational Documents and the Registration Rights Agreement).

Section 4.6    <u>No Conflict</u>.    Assuming the consents described in clauses (a) through (h) of <u>Section 4.7</u> are obtained, the execution and delivery by the Company and, if applicable, any Debtor, of this Agreement, the Plan and the other Transaction Agreements, the compliance by the Company and, if applicable, any other Debtor, with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein will not (i) conflict with, or result in a breach, modification or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent specified in the Plan, in the acceleration of, or the creation of any Lien under, or cause any payment or consent to be required under any Contract to which the Company or any Debtor will be bound as of the Closing Date after giving effect to the Plan or to which any of the property or assets of the Company or any Debtor will be subject as of the Closing Date after giving effect to the Plan, (ii) result in any violation of the provisions of any of the Company's or the Debtors' organizational documents (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases or the Company's or any Debtor's undertaking to implement the Restructuring Transactions through the Chapter 11 Cases), or (iii) result in any violation of any Law or Order applicable to the

39

Company or any Debtor or any of their properties, except in each of the cases described in clauses (i) and (iii) for any conflict, breach, modification, violation, default or acceleration which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.7    Consents and Approvals.    No consent, approval, authorization, Order, registration, or qualification of or with any Governmental Entity having jurisdiction over the Company or any of the other Debtors or any of their properties (each, an "**Applicable Consent**") is required for the execution and delivery by the Company and, to the extent relevant, the other Debtors, of this Agreement, the Plan and the other Transaction Agreements, the compliance by the Company and, to the extent relevant, the Debtors, with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except for (a) entry of the Backstop Order authorizing the Company and the Debtors to enter into this Agreement and perform the BCA Approval Obligations, (b) entry of the Disclosure Statement Order, (c) entry by the Bankruptcy Court, or any other court of competent jurisdiction, of Orders as may be necessary in the Chapter 11 Cases from time-to-time, (d) entry of the Confirmation Order, (e) filings, notifications, authorizations, approvals, consents, or clearances from the FAA, (f) filings, notifications, authorizations, approvals, consents, clearances or termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement, (g) such consents, approvals, authorizations, registrations or qualifications as may be required under local or state securities or "Blue Sky" Laws in connection with the issuance of the Subscription Rights, the issuance of the Rights Offering Shares pursuant to the exercise of the Subscription Rights or the issuance of the Backstop Shares or Backstop Premium Shares, and (h) any Applicable Consents that, if not made or obtained, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.8    Arm's-Length.    The Company and the Debtors acknowledge and agree that (a) each of the Backstop Commitment Parties is acting solely in the capacity of an arm's-length contractual counterparty to the Company and the Debtors with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering) and not as a financial advisor or a fiduciary to, or an agent of, the Company or any of its Subsidiaries and (b) no Backstop Commitment Party is advising the Company or any of its Subsidiaries as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.

Section 4.9    Financial Statements.    (i) The audited consolidated balance sheet of the Company and its Subsidiaries as of December 31, 2023 and the related audited consolidated statements of income, cash flows and shareholders' equity of the Company and its Subsidiaries for such fiscal year then ended, and (ii) the unaudited consolidated balance sheets of the Company and its Subsidiaries as of June 30, 2024 and the related consolidated statements of income, cash flows and shareholders' equity of the Company and its Subsidiaries for such quarter then ended, were prepared, in all material respects, in accordance with GAAP (except as disclosed therein), and represent a true and fair view, in all material respects, of the consolidated financial condition, financial position and results of operations and cash flows of the Company and its consolidated Subsidiaries as

40

of the dates thereof and for such period covered thereby (collectively, the "**Financial Statements**").  All such Financial Statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP, as applicable, consistently throughout the periods involved (except as disclosed therein).

Section 4.10    Absence of Certain Changes.  Except as set forth in Section 4.10 of the Company Disclosure Schedules, since the Lookback Date until the date of this Agreement, no Event has occurred or exists that has had or would be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.11    No Violation; Compliance with Laws.  (a) The Company is not in violation of its certificate of incorporation or bylaws and (b) no other Debtor or any of its respective Subsidiaries is in violation of its respective charter and bylaws, certificate of formation and limited liability company operating agreement or similar organizational document, as applicable.  None of the Debtors or their Subsidiaries is or has been at any time since the Lookback Date in violation of any Law or Order, except for any such violations that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.12    Legal Proceedings.  Other than as set forth in Section 4.12 of the Company Disclosure Schedules, the anticipated Chapter 11 Cases and any adversary proceedings or contested motions commenced in connection therewith, (a) there are no material legal, governmental, administrative, judicial or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters, claims, notices of noncompliance or violations, or proceedings ("**Legal Proceedings**") pending or, to the Knowledge of the Company, threatened to which any of the Debtors or their Subsidiaries is a party or to which any property of any of the Debtors or their Subsidiaries is the subject which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (b) no Event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Legal Proceeding, in each case that in any manner draws into question the validity or enforceability of this Agreement, the Plan or the other Transaction Agreements or that would reasonably be expected to have, in the aggregate, a Material Adverse Effect.

Section 4.13    Labor Relations.

(a)    Except as set forth in Section 4.13(a)(i) of the Company Disclosure Schedules, as of the date of this Agreement, none of the Debtors or their respective Subsidiaries is a party or subject to any collective bargaining agreements, works council agreements, labor union Contracts, trade union agreements, and other similar agreements (each a "**Collective Bargaining Agreement**") with any union, works council, or labor organization (each a "**Union**" and collectively "**Unions**").  Except as set forth in Section 4.13(a)(ii) of the Company Disclosure Schedules, (i) since the Lookback Date, to the Knowledge of the Debtors, no Union or group of employees of any of the Debtors or their respective Subsidiaries has made a written demand for recognition or certification as the bargaining representative of the Debtors' or their respective Subsidiaries' employees, or filed a petition for recognition as the bargaining representative of the Debtors' or their respective Subsidiaries' employees with any Governmental Entity; (ii) as of the

41

date of this Agreement, no Collective Bargaining Agreement is being negotiated by any of the Debtors or their respective Subsidiaries; and (iii) since the Lookback Date, there have been no actual or, to the Knowledge of the Company, threatened strikes, lockouts, slowdowns, work stoppages, boycotts, handbilling, picketing, walkouts, labor demonstrations, leafleting, sit-ins, sick-outs, or other forms of organized labor with respect to any of the Debtors or their respective Subsidiaries that are material to the Debtors, taken as a whole. The consummation of the transactions contemplated by the Transaction Agreements will not give rise to a right of termination or right of renegotiation on the part of any Union under any Collective Bargaining Agreement to which any of the Debtors (or any predecessor) or any of their respective Subsidiaries is a party or otherwise bound.

(b)     Except as set forth in Section 4.13(b) of the Company Disclosure Schedules since the Lookback Date, the Debtors or their respective Subsidiaries have been in material compliance with all applicable Laws relating to labor and employment, including but not limited to all Laws relating to employment practices; the hiring, promotion, assignment, and termination of employees; plant closures, layoffs, and furloughs (including the Worker Adjustment and Retraining Notification Act of 1988 and any similar state, local or foreign Laws (the "**WARN Act**")); discrimination; harassment (including sexual harassment); retaliation; equal employment opportunities; automated employment decision tools and other artificial intelligence; employee trainings and notices; disability; labor relations; wages and hours; the Fair Labor Standards Act; classification of independent contractors; hours of work; payment of wages; restrictive covenants; immigration; workers' compensation; employee benefits; background and credit checks; working conditions; occupational safety and health; and family and medical leave.

Section 4.14    Intellectual Property.

(a)     Except as set forth in Section 4.14(a) of the Company Disclosure Schedules, the Debtors or their respective Subsidiaries or Affiliates exclusively own, or have the enforceable right under written licenses to use, all the Intellectual Property Rights that are material to and necessary for the operation of their respective businesses as currently conducted ("**Material Intellectual Property Rights**").

(b)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) the Material Intellectual Property Rights owned by the Debtors are owned free and clear of all Liens, other than Permitted Liens, and all registrations and applications included in such Material Intellectual Property Rights are, as applicable, subsisting and have not expired (except subject to applicable statutory terms), been canceled, or been abandoned, (ii) to the Knowledge of the Company, each item of the Material Intellectual Property Rights is valid and enforceable and (iii) no Legal Proceeding (other than office actions issued by the applicable Governmental Entity in connection with the prosecution of applications) is pending or, to the Knowledge of the Company, threatened by or before any Governmental Entity, that challenges the legality, validity, enforceability, registration, use or ownership of any item of such Material Intellectual Property Rights.

(c)     Except as set forth in Section 4.14(c) of the Company Disclosure Schedules or as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, neither the Debtors nor their respective Subsidiaries have granted, conveyed or

42

transferred (or is obligated to grant, convey or transfer) to any Person or has permitted (or is obligated to permit) any Person to retain any ownership interest, including any joint or partial ownership interest, or any exclusive licensed rights, in any of the Material Intellectual Property Rights.

(d)     Except as set forth in Section 4.14(d) of the Company Disclosure Schedules or as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, as of the date hereof, no Legal Proceedings are pending or, to the Knowledge of the Company, are threatened against the Debtors or any of their Subsidiaries, alleging that any of the Material Intellectual Property Rights or the operation of the businesses of the Debtors or any of their Subsidiaries (i) have or are infringing, misappropriating, diluting or otherwise violating the Intellectual Property Rights of any Person or (ii) constituted unfair competition or unfair trade practices.

(e)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, to the Knowledge of the Company, (i) no Person is infringing, misappropriating, diluting, or otherwise violating any Material Intellectual Property Rights owned by the Debtors or any of their Subsidiaries, and (ii) neither the Debtors nor any of their Subsidiaries has instituted or threatened to institute any Legal Proceeding against any Person alleging such Person is infringing, misappropriating, diluting, using in an unauthorized manner or otherwise violating any Material Intellectual Property Rights owned by the Debtors or any of their Subsidiaries.

(f)     Since the Lookback Date, and except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) the Debtors and each of their Subsidiaries have taken commercially reasonable actions, at least consistent with industry standards, to maintain and protect (A) all confidential information of the Debtors and each of their Subsidiaries that derives independent economic value, actual or potential, from not being known to other Persons, and (B) all Trade Secrets of the Debtors and each of their Subsidiaries; (ii) to the Knowledge of the Company, there has been no unauthorized disclosure, access, or theft of the Trade Secrets of the Debtors or any of their Subsidiaries, or unauthorized disclosure by the Debtors or any of their Subsidiaries of any third party information that has been supplied to the Debtors or any of their Subsidiaries in confidence; and (iii) neither the Debtors nor any of their Subsidiaries has disclosed, delivered, or licensed to any Person, agreed to disclose, deliver, or license to any Person, or deposited or agreed to deposit with any Person, any owned Source Code or any other Trade Secrets of the Debtors or any of their Subsidiaries, other than to Persons and third parties bound by confidentiality obligations.

(g)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will result in a material breach, violation, modification, cancellation, termination, or suspension of any IP Contract, (ii) all IP Contracts shall remain in full force and effect immediately following the Closing in accordance with their terms, and, as of immediately after the Closing, the Debtors will be entitled to exercise all of their respective rights under all IP Contracts to the same extent as prior to the Closing and (iii) the consummation of the transactions contemplated hereby shall not require any consents, approvals, or other authorization by any third party concerning any IP Contracts.

43

Section 4.15    <u>Privacy and Data Protection</u>.

(a)    Since the Lookback Date and except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) the Debtors and their Subsidiaries are and have been in compliance with all applicable Data Protection Laws, the Privacy Statements, PCI DSS and the obligations under their Contracts; (ii) the Debtors and their Subsidiaries have (A) taken appropriate steps reasonably designed to implement and maintain such policies, procedures, and practices governing Personal Data as are required to comply with all applicable Data Protection Laws, the Privacy Statements, PCI DSS and the obligations under their Contracts, and (B) followed such policies, procedures, and practices in the conduct of the business of the Debtors and their Subsidiaries.

(b)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Debtors and their Subsidiaries have adopted commercially reasonable information security and privacy programs, including reasonable and appropriate administrative, physical, and technical safeguards, to protect the confidentiality, integrity, availability and security of Personal Data against unauthorized access, use, modification, disclosure or other misuse.

(c)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Debtors and their Subsidiaries have used commercially reasonable efforts to prevent the introduction into the Systems , and, to the Knowledge of the Company, such Systems do not contain, any ransomware, disabling codes or instructions, spyware, Trojan horses, worms, viruses or other software routines that permit or cause unauthorized access to, or disruption, impairment, disablement, or destruction of, Software, data or other materials. Since the Lookback Date, the Systems (i) have not suffered any unplanned or critical failures, continued substandard performance, errors, breakdowns or other adverse Events that have caused any disruption or interruption in the operation of the business of the Debtors and their Subsidiaries; (ii) have been in good working order; (iii) have functioned in accordance with all specifications and any other descriptions under which they were supplied; (iv) to the Knowledge of the Company, have been substantially free of any defects, bugs and errors; and (v) have been sufficient for the needs of the business of the Debtors and their Subsidiaries, except, for each of (i)-(v), as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(d)    Since the Lookback Date, (i) the Debtors and their Subsidiaries have not suffered any Security Incident, and to the Knowledge of the Company, no service provider (in the course of providing services for or on behalf of the Debtors or any of their Subsidiaries) has suffered any Security Incident, except, for each of (i) and (ii), as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. To the Knowledge of the Company, there are no pending complaints, actions, fines, or other penalties facing the Debtors or their Subsidiaries in connection with any such Security Incident or other adverse Events relating to Personal Data, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.16    <u>Certain Aircraft Matters</u>.    The Debtors and their Subsidiaries hold all material air operator's certificates (or such similar document as is

44

applicable in the relevant jurisdiction) sufficient in all material respects to operate aircraft in the manner and jurisdiction in which its aircraft are currently operated.

Section 4.17    Real and Personal Property.

(a)    Except as has not had, and would not reasonably be expected to have, a Material Adverse Effect, the applicable Debtor, or the applicable Subsidiary of the Debtors, has good, marketable and exclusive fee simple title to, and the valid and enforceable power and unqualified right to use and sell, transfer, convey or assign each parcel of Owned Real Property, free and clear of all Liens other than Permitted Liens.  The Debtors or their respective Subsidiaries have not leased, licensed or otherwise granted any Person the right to use or occupy the Owned Real Property, which lease, license or grant is currently in effect.

(b)    Except as has not had, and would not reasonably be expected to have, a Material Adverse Effect, the applicable Debtor, or the applicable Subsidiary of the Debtors, has a valid, binding and enforceable leasehold interest under each lease, sublease, license or other similar document or instrument under which such Leased Real Property is occupied or used (individually, a "**Real Property Lease**" and collectively, the "**Real Property Leases**"), free and clear of all Liens other than Permitted Liens, subject to applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws affecting creditor's rights generally or general principles of equity, including the Chapter 11 Cases and any limitations of the Chapter 11 Cases as may be applied under non-U.S. law.  Except as has not had, or would not reasonably be expected to have, a Material Adverse Effect, each Real Property Lease is in full force and effect and is the valid, binding and enforceable obligation of each party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws affecting creditor's rights generally or general principles of equity, including the Chapter 11 Cases.  None of the Debtors or their Subsidiaries has received written notice of any good faith claim asserting that such leases are not in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    There are no outstanding agreements, options, rights of first offer or rights of first refusal, or other contractual (or other) right or obligation on the part of any party to purchase, sell, assign or dispose any Real Property.  There are not pending or, to the Knowledge of the Company, threatened any condemnation proceedings with respect to any Real Property.  The Real Property constitutes all interests in real property (i) currently used, occupied or held for use in connection with the business of the Debtors and their respective Subsidiaries, as presently conducted, and (ii) necessary for the continued operation of the business of the Debtors and their respective Subsidiaries, as presently conducted.

(d)    Each of the Debtors and each of their respective Subsidiaries has valid title to all of its respective personal property and assets, except for Permitted Liens, and except where the failure (or failures) to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  To the Knowledge of the Company, all such personal property and assets are free and clear of Liens, other than Permitted Liens.  Other than as a consequence of the Chapter 11 Cases, each of the Debtors and each of their respective Subsidiaries owns or possesses the right to use all of its personal property,  and all licenses and

45

rights with respect to any of the foregoing used in the conduct of their businesses, without any conflict (of which any of the Debtors and any of their Subsidiaries has been notified in writing) with the rights of others, and free from any burdensome restrictions on the present conduct of the Debtors or their respective Subsidiaries, as the case maybe, except where such conflicts and restrictions would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.18   <u>Licenses and Permits</u>.   The Debtors or their Subsidiaries possess all licenses, certificates, permits and other authorizations issued by, have made all declarations and filings with and have maintained all financial assurances required by, the appropriate Governmental Entities that are necessary for the ownership or lease of their respective properties and the conduct of the business, except where the failure to possess, make or give the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.   None of the Debtors or their Subsidiaries (a) has received notice of any revocation or modification of any such license, certificate, permit or authorization or (b) has any reason to believe that any such license, certificate, permit, or authorization will not be renewed in the ordinary course, except to the extent that any of the foregoing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.   The execution, delivery and consummation, as applicable, by the Company and, if applicable, any other Debtor, of this Agreement, the Plan and the other Transaction Agreements, the compliance by the Company and, if applicable, any other Debtor, with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein will not give rise to (a) any obligations to obtain the consent of any Governmental Entity or (b) any action to revoke, terminate, withdraw, cancel, limit, condition, appeal or otherwise review, or any other adverse effect on, any license, certificate, permit or other authorization required by the Debtors or their Subsidiaries to conduct their respective business and occupy each of their properties, in each case, which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.19   <u>Environmental</u>.   Except as set forth in Section 4.19 of the Company Disclosure Schedules or as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) no unresolved written notice, claim, demand, request for information, Order, complaint or penalty has been received by any of the Debtors or their Subsidiaries, and there are no Legal Proceedings pending or, to the Knowledge of the Company, threatened, in each case, which allege a violation of or liability under any Environmental Laws (including with respect to exposure to Hazardous Materials), in each case relating to any of the Debtors or their Subsidiaries, (b) each Debtor and each of their respective Subsidiaries has received and maintained in full force and effect all environmental permits, licenses and other approvals, and has maintained all financial assurances, in each case to the extent necessary for its operations to comply with all applicable Environmental Laws and is, and since the Lookback Date, has been, in compliance with the terms of such permits, licenses and other approvals and with all applicable Environmental Laws, (c) none of the Debtors or their Subsidiaries are subject to any Order applicable to it or with respect to its assets arising under Environmental Law, (d) to the Knowledge of the Company, no Hazardous Material is located at, on or under any property currently or formerly owned, operated or leased by

46

any of the Debtors or their Subsidiaries that has given rise or would reasonably be expected to give rise to any cost, liability or obligation of any of the Debtors or their Subsidiaries under any Environmental Laws, (e) no Hazardous Material has been Released, generated, treated, stored, transported or handled by any of the Debtors or their Subsidiaries, and none of the Debtors or their Subsidiaries has arranged for or permitted the disposal of Hazardous Material at any location, in each case, in a manner that has given rise or would reasonably be expected to give rise to any cost, liability or obligation of any of the Debtors or their Subsidiaries has under any Environmental Laws, and (f) none of Debtors or their Subsidiaries has, either expressly or by operation of Law, assumed any liabilities or obligations of any other Person arising under or relating to Environmental Laws that remains unresolved.

Section 4.20    Taxes.  Except as set forth on Section 4.20 of the Company Disclosure Schedules and in each case, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)    Each of the Debtors and their Subsidiaries have filed or caused to be filed all U.S. federal, state, and local and non-U.S. Tax Returns required to have been filed by it under applicable Laws (taking into account extensions) and each such Tax Return is true and correct and was prepared in compliance with all applicable Laws.

(b)    Each of the Debtors and their Subsidiaries has timely paid or caused to be timely paid (taking into account extensions) all Taxes due and payable by it (whether or not shown as due on the Tax Returns referred to in clause (a)) (or made adequate provision (in accordance with GAAP) for the payment of all Taxes due) with respect to all periods or portions thereof ending on or before the date hereof, excluding Taxes (i) being contested in good faith by appropriate proceedings and for which the Debtors or their Subsidiaries have set aside on their books adequate reserves in accordance with GAAP or (ii) the nonpayment of which is permitted or required by the Bankruptcy Code.

(c)    As of the date hereof, with respect to the Debtors, other than in connection with the Chapter 11 Cases and other than Taxes or assessments that are being contested in good faith by appropriate proceedings and for which the Debtors or their Subsidiaries have set aside on their books adequate reserves in accordance with GAAP, (i) no claims have been asserted in writing with respect to any Taxes that have not be fully paid, settled or otherwise resolved, (ii) no presently effective waivers or extensions of statutes of limitation with respect to Taxes have been given or requested (other than any waivers or extensions obtained in the ordinary course of business) and (iii) no Tax Returns are currently being examined by, and no written notification of intention to examine any such Tax Returns has been received from, the IRS or any other Governmental Entity.

(d)    The Debtors and each Subsidiary have, within the time and in the manner prescribed by Law, withheld all amounts required to be withheld from all payments made (or treated as made) by the Debtors and each Subsidiary to employees, independent contractors, creditors, and other third parties; to the extent required by applicable Law, paid such withheld amounts to the proper Governmental Entity; and complied with all information reporting requirements related thereto in all material respects.

47

(e)      There are no Liens for Taxes (other than statutory liens for Taxes not yet due and payable that constitute Permitted Liens) upon any of the assets of the Debtors or their Subsidiaries.

(f)      No claim has ever been made in writing by any Tax authority or other Governmental Entity in a jurisdiction where any of the Debtors or Subsidiaries has not filed a Tax Return that it is or may be required to file a Tax Return or may be subject to Tax by such jurisdiction that has not been settled or otherwise resolved.

(g)      None of the Debtors nor any Subsidiary has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed by Section 355 or Section 361 of the Tax Code within the three (3) years preceding the date of this Agreement.

(h)      None of the Debtors nor their Subsidiaries is party to any Tax sharing, allocation, indemnity or similar agreement or arrangement that is currently in effect, other than any such agreement as to which only the Debtors, the Company or any of their Subsidiaries are parties or that was entered into the ordinary course of business and the principal purpose is not related to Taxes.

(i)      None of the Debtors nor their Subsidiaries (i) has  in the last ten (10) years, (and, to the Company's knowledge, ever) been a member of an "affiliated group" within the meaning of Section 1504(a) of the Tax Code filing a consolidated U.S. federal income Tax return (other than the "affiliated group" the common parent of which is or was any of the Debtors) or (ii) has any liability for Taxes of any Person (other than any of the Debtors or any of their Subsidiaries) (A) under Treasury Regulations Section 1.1502-6 (or any similar provision of U.S. state, local or non-U.S. Law) or (B) as a Transferee or successor, or by Contract (other than any such agreement as to which only the Debtors, the Company or any of their Subsidiaries are parties or that was entered into the ordinary course of business and the principal purpose is not related to Taxes).

(j)      No Debtor nor any Subsidiary is or has been a party to any "listed transaction," as defined in Section 6707A of the Tax Code and Treasury Regulations Section 1.6011-4 or any similar transaction requiring disclosure to a Tax authority under any similar provision of Law.

Section 4.21    Employee Benefit Plans.

(a)      Except as set forth in Section 4.21(a)(i) of the Company Disclosure Schedules, none of the Debtors or their respective Subsidiaries nor any of their respective ERISA Affiliates sponsor, maintain, contribute to, or has an obligation to contribute to, or has any outstanding liability (contingent or otherwise) to any (x) Multiemployer Plan, (y) Defined Benefit Pension Plan or (z) non-qualified deferred compensation plan subject to Section 409A of the Code and in which employees subject to U.S. federal income taxes participate, in each case that are material to the Debtors, taken as a whole.  Except as set forth in Section 4.21(a)(ii) of the Company Disclosure Schedules, none of the Company Benefit Plans or any Multiemployer Plans set forth in Section 4.21(a)(i) could reasonably be expected to result, individually or in the aggregate, in a material liability.  No conditions exist that could reasonably be expected to result in any material

48

liability or obligation (contingent or otherwise) to the Debtors or their respective Subsidiaries under Title IV of ERISA. Within the past six (6) years, none of the Debtors nor any of their ERISA Affiliates has incurred any withdrawal liability with respect to a Multiemployer Plan under Subtitle E of Title IV of ERISA that has not been satisfied in full, and, to the Knowledge of the Company, no condition or circumstance exists that presents a reasonable risk of the occurrence of any other withdrawal from or the partition, termination or insolvency of any such Multiemployer Plan that are material to the Debtors, taken as a whole.

(b)     Except as would not reasonably be expected to result, individually or in the aggregate, in material liability to Debtors, no employee pension benefit plan or any other material employee benefit, plan, program, practice, policy, agreement or arrangement governed by or subject to the Laws of a jurisdiction other than the United States of America to which Debtors have an obligation.

(c)     Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, each Foreign Plan complies with all applicable local laws and regulations thereto and there are no pending, or to the Knowledge of the Company, threatened in writing claims, sanctions, actions or lawsuits, asserted or instituted against any Company Benefit Plan or Foreign Plan in each case other than claims for benefits in the normal course.

(d)     Except as would not reasonably be expected to have, individually or in the aggregate, in material liability to Debtors, none of the Company Benefit Plans or Foreign Plans obligates any Debtor or any of their Subsidiaries to provide, nor has any Debtor or any of their Subsidiaries promised or agreed to provide or otherwise has any liability (contingent or otherwise) with respect to, retiree or post-employment health, welfare or life insurance or benefits, other than as required under Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code or any similar Law.

(e)     Except as set forth on Section 4.21(e)(i) of the Company Disclosure Schedules or as would not reasonably be expected to result, individually or in the aggregate, in a material liability, (A) all compensation and benefit arrangements of the Debtors and their respective Subsidiaries and all Company Benefits Plans comply and have complied in both form and operation with their terms and all applicable Laws and legal requirements, in all material respects, and (B) none of the Debtors has any obligation to provide any individual with a "gross up" or similar payment in respect of any Taxes that may become payable under Section 409A or 4999 of the Code. Except as set forth on Section 4.21(e)(ii) of the Company Disclosure Schedules, no Company Benefit Plan or compensation or benefit plan, practice, program, policy, agreement or arrangement exists that, as a result of the Chapter 11 Cases or any transactions related thereto, including the transactions contemplated by this Agreement, could reasonably be expected to (A) result in the acceleration of the time of payment or vesting of or (B) a material increase in the amount of compensation or benefits due to, in each case, any employee, director or other individual service provider of any of the Debtors or any of their Subsidiaries.

Section 4.22   Internal Control Over Financial Reporting.   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Company has established and maintains a system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) promulgated under

the Exchange Act) that complies with the requirements of the Exchange Act and has been designed to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP and to the Knowledge of the Company, there are no weaknesses in the Company's internal control over financial reporting as of the date hereof.

Section 4.23    <u>Material Contracts</u>.    Other than as a result of a rejection motion filed by any of the Debtors in the Chapter 11 Cases, all Material Contracts are valid, binding and enforceable by and against the Debtor party thereto (except for where the failure to be valid, binding or enforceable would reasonably be expected to be material to the Debtors, taken as a whole), and, to the Knowledge of the Company, each other party thereto, and no written notice to terminate, in whole or part, any Material Contract has been delivered to any of the Debtors (except where such termination would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect).    Other than as a result of the filing of the Chapter 11 Cases or any rejection motion filed by any of the Debtors in the Chapter 11 Cases, none of the Debtors nor, to the Knowledge of the Company, any other party to any Material Contract, is in material default or breach under the terms thereof, in each case, except for such instances of material default or breach that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.24    <u>No Unlawful Payments</u>.    Except as set forth in Section 4.24 of the Company Disclosure Schedules, during the past five years, none of the Debtors or their respective Subsidiaries nor any of their respective directors, officers, or employees, or to the Knowledge of the Company, any of their agents or Representatives authorized to act on behalf of any Debtor or its Subsidiary, in each case in their capacity as such, has: (a) used any funds of any of the Debtors or their respective Subsidiaries for any unlawful contribution, gift, entertainment or other unlawful expense, in each case relating to political activity; (b) made any direct or indirect unlawful payment to any foreign or domestic government official or employee; (c) otherwise violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder, the UK Bribery Act 2010, or any other applicable laws, rules and regulations related to corruption or bribery ("**<u>Anti-Corruption Laws</u>**"); or (d) made any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment, in each case of (a) – (d) in violation of any Anti-Corruption Law.    No Legal Proceeding by or before any Governmental Entity or any arbitrator involving any of the Debtors or their respective Subsidiaries with respect to the Anti-Corruption Laws is pending or, to the Knowledge of the Company, threatened, and no Event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Legal Proceeding.    The Company, the Debtors and their respective Subsidiaries have implemented and maintain in effect policies and procedures reasonably designed to ensure compliance by the Debtors and their Subsidiaries and their respective Representatives with Anti-Corruption Laws.

Section 4.25    <u>Compliance with Money Laundering, Ex-Im Laws and Sanctions Laws</u>.

50

(a)      Debtors and their respective Subsidiaries, and their respective directors, officers, employees and, to the Knowledge of the Company, agents and Representatives authorized to act on behalf of any Debtor or Subsidiary, in each case in their capacity as such, are and, during the past five years have been, in compliance in all respects with the U.S. Currency and Foreign Transactions Reporting Act of 1970, the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001), the Money Laundering Control Act of 1986, the UK Proceeds of Crime Act 2022, the UK Terrorism Act 2000, and all other applicable Laws, rules and regulations of any jurisdiction related to terrorist financing or money laundering, including "know-your-customer" and financial recordkeeping and reporting requirements (collectively, the "**Money Laundering Laws**").  No Legal Proceeding by or before any Governmental Entity or any arbitrator involving any of the Debtors or their respective Subsidiaries with respect to Money Laundering Laws is pending or to the Knowledge of the Company threatened and no Event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Legal Proceeding.  The Debtors and their respective Subsidiaries have implemented and maintain in effect policies and procedures reasonably designed to ensure compliance by the Debtors and their Subsidiaries and their respective  Representatives with Money Laundering Laws.

(b)      None of the Debtors or their Subsidiaries nor any of their respective directors, officers, or employees, or to the Knowledge of the Company, any agents or Representatives authorized to act on behalf of any Debtor or its Subsidiary, is currently or has been during the past six (6) years a Sanctioned Person.  Each Debtor and each of its Subsidiaries have for the past six (6) years complied and are in compliance with Ex-Im Laws. Each Debtor and each of its Subsidiaries have for the past six (6) years complied and are in compliance with Sanctions. None of the Debtors or their respective Subsidiaries has had during the past six (6) years or currently has assets located in any Sanctioned Country in violation of Sanctions, or otherwise directly or indirectly derives or has derived within the past six (6) years revenues, or is engaged or has engaged within the past six (6) years in any transaction(s), investments, dealings or activities (i) in or with, any Sanctioned Country or Sanctioned Person in each case in violation of Sanctions or (ii) in any manner which would result in a material violation of Sanctions.  The Debtors will not, and will not permit any of their respective Subsidiaries to, directly or knowingly indirectly, use the proceeds of the Rights Offering, or lend, contribute or otherwise make available such proceeds to any other Debtor, its Subsidiaries, joint venture or other Person, (i) for the purpose of financing the transactions, investments, dealings or activities involving any Sanctioned Country or Sanctioned Person; or (ii) in any manner in violation of Sanctions, Ex-Im Laws, Anti-Corruption Laws or Money Laundering Laws by any Person (including any agent, Backstop Commitment Parties, arranger, advisor or other individual or entity participating in a transaction).  No Legal Proceeding by or before any Governmental Entity or any arbitrator involving any of the Debtors or their respective Subsidiaries with respect to Sanctions or Ex-Im Laws is pending or, to the Knowledge of the Company, threatened, and no Event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Legal Proceeding. The Company, the Debtors and their respective Subsidiaries have implemented and maintain in effect policies and procedures reasonably designed to ensure compliance by the Debtors and their Subsidiaries Sanctions and Ex-Im Laws.

Section 4.26   <u>No Broker's Fees</u>.  None of the Debtors or any of their respective Subsidiaries is a party to any Contract with any Person (other than this Agreement) that would give rise to a valid claim against the Backstop Commitment Parties

51

for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the transactions contemplated by this Agreement.

Section 4.27    Investment Company Act.  None of the Debtors or any of their respective Subsidiaries is, or immediately after giving effect to the consummation of the Restructuring Transactions and the application of proceeds thereof will be, an "investment company" required to register as such under the Investment Company Act of 1940, as amended (the "**Investment Company Act**"), and this conclusion is based on one or more bases or exclusions other than Sections 3(c)(1) and 3(c)(7) of the Investment Company Act.

Section 4.28    Insurance.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) the Debtors and their respective Subsidiaries have insured their properties and assets against such risks and in such amounts as are customary for companies engaged in similar businesses in similar geographies; (b) all premiums due and payable in respect of insurance policies maintained by the Debtors and their respective Subsidiaries have been paid; (c) the Company reasonably believes that the insurance maintained by or on behalf of the Debtors and their respective Subsidiaries is adequate in all material respects; and (d) as of the date hereof, to the Knowledge of the Company, none of the Debtors and their respective Subsidiaries has received notice from any insurer or agent of such insurer with respect to any insurance policies of the Debtors and their respective Subsidiaries of any cancellation or termination of such policies, other than such notices which are received in the ordinary course of business or for policies that have expired in accordance with their terms.

Section 4.29    Disclosure, Company SEC Documents and Disclosure Statement.  Other than as set forth in Section 4.29 of the Company Disclosure Schedules, the Company has filed with or furnished to the SEC all reports, schedules, forms, statements, and other documents (including exhibits and other information incorporated therein) required to be filed or furnished by the Company since the Lookback Date under the Exchange Act or the Securities Act. As of their respective dates, and, if amended, as of the date of the last such amendment, each of the Company SEC Documents, (including exhibits and other information incorporated therein) including any financial statements or schedules included therein, (a) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated in such Company SEC Document or necessary in order to make the statements in such Company SEC Document, in light of the circumstances under which they were made, not misleading and (b) complied in all material respects with the applicable requirements of the Exchange Act, the Securities Act and the Sarbanes-Oxley Act of 2002 ("**SOX**"), as the case may be, and the applicable rules and regulations of the SEC under the Exchange Act, the Securities Act and SOX, as the case may be.

Section 4.30    Securities Registration Exemption; No Integration; No General Solicitation.  Assuming the truth and accuracy of the representations of each Backstop Commitment Party set forth in Article V, the offer, sale and delivery of the Direct Allocation Shares, the Backstop Shares and any Backstop Premium Shares to the Backstop Commitment Parties in the manner contemplated by this Agreement and the

Plan shall be exempt from registration under Rule 506(b) of Regulation D promulgated under the Securities Act or Section 4(a)(2) of the Securities Act, Regulation S under the Securities Act or another available exemption under the Securities Act. The offer, sale and delivery of the Rights Offering Shares in the manner contemplated by this Agreement and the Plan shall be exempt from registration under Section 1145(a) of the Bankruptcy Code. The Company and the Debtors have not and will not, directly or through any agent, sell, offer for sale, solicit offers to buy or otherwise negotiate in respect of, any security (as defined in the Securities Act), that is or will be integrated with the Rights Offering and this Agreement in a manner that would require registration of the Direct Allocation Shares, Backstop Shares or Backstop Premium Shares to be issued on the Plan Effective Date under the Securities Act. Neither the Company, Debtors nor any other Person acting on their behalf have or will solicit offers for, or offer or sell, any Direct Allocation Shares, Backstop Shares or Backstop Premium Shares by means of any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D promulgated under the Securities Act or directed selling efforts within the meaning of Regulation S under the Securities Act, or in any manner involving a public offering within the meaning of Section 4(a)(2) of the Securities Act, and all such persons have complied and will comply with the offering restrictions of Regulation S.

Section 4.31    Aircraft.

(a)    Section 4.31(a) of the Company Disclosure Schedules set forth, as of the date of this Agreement, a true and complete list of (i) all aircraft operated under the operating certificate of any Debtor and (ii) all aircraft owned or leased by any Debtor, (collectively, the "**Company Aircraft**"), including, for each Company Aircraft, a description of the type, manufacturer's model name, manufacturer's serial number, FAA registration number, the delivery date, the manufacture date or age, and whether it is owned or leased and by which Debtor.

(b)    As of the date of this Agreement, all Company Aircraft are properly registered on the FAA aircraft registry, in airworthy condition (except for any Company Aircraft undergoing maintenance or in storage), and have validly issued and current FAA certificates of airworthiness that are in full force and effect (except for the period of time any Company Aircraft may be out of service and such certificate is suspended in connection therewith).

(c)    As of the date of this Agreement, all Company Aircraft have been and are being maintained in all material respects according to applicable Laws, applicable FAA regulatory standards and FAA-approved maintenance programs of the Debtors. The Debtors have implemented maintenance schedules with respect to Company Aircraft and engines that, if complied with, result in the satisfaction of all requirements under all applicable airworthiness directives of the FAA and Federal Aviation Regulations required to be complied with and which are in accordance with the FAA-approved maintenance program of the Debtors, and the Debtors, as of the date of this Agreement, are in compliance with such maintenance schedules in all material respects (except with respect to Company Aircraft in storage as identified on Section 4.31(c) of the Company Disclosure Schedules), and the Debtors, as of the date of this Agreement, have no reason to believe that the Debtors will not satisfy in any material respect any component of such maintenance schedules on or prior to the dates specified in such maintenance schedules (except with respect to Company Aircraft in storage). As of the date of this Agreement, each Company

Aircraft's structure, Systems and components are functioning in all material respects in accordance with their intended use, except for Company Aircraft that are undergoing maintenance and temporarily deferred maintenance items that are permitted by the Debtors' maintenance programs. All deferred maintenance items and temporary repairs with respect to each such Company Aircraft, as of the date of this Agreement, have been or will be made in all material respects in accordance with the Debtors' maintenance programs.

(d)    Section 4.31(d) of the Company Disclosure Schedules set forth, as of the date of this Agreement, a true and complete list of all Contracts (other than Contracts that may be terminated or cancelled by any Debtor without incurring any material penalty) pursuant to which the Debtors have a binding obligation following the date hereof to purchase or lease aircraft, engines or simulators where the reasonably expected expenditures under any such Contract exceed $5,000,000 per annum (together with all amendments, modifications and supplements thereto, each, a "**Company Aircraft Purchase Contract**"), including the manufacturer and model of all aircraft, engines or simulators subject to each Contract, the nature of the purchase or lease obligation (i.e., firm commitment, subject to reconfirmation or otherwise) and the anticipated year of delivery of the aircraft, engines or simulators subject to such Contract.

(e)    Section 4.31(e) of the Company Disclosure Schedules set forth, as of the date of this Agreement, a true and complete list of all Contracts pursuant to which the Debtors have financed, or have commitments to finance, Company Aircraft (including leases, mortgages and deferred or conditional sales agreements) involving amounts in excess of $5,000,000 (together with all amendments, modifications and supplements thereto, each, a "**Company Aircraft Finance Contract**").

(f)    [Reserved].

(g)    As of the date of this Agreement, no Debtor is a party to any interchange or pooling agreements with respect to the Company Aircraft, other than pooling agreements in the ordinary course of business.

(h)    As of the date of this Agreement, all Company Aircraft are insured (i) as required by Law, (ii) for "Hull All Risks", "All Risks" and "Hull War and Allied Perils" insurance of loss or damage whilst flying and on the ground on an agreed value basis for an amount at least equal to the market value of such Company Aircraft, and for liability insurances, in each case in extent and value as expected for a reputable large airline operating in the U.S., and (iii) as required by any financing or leasing documents in respect of such Company Aircraft.

Section 4.32    Company Slots and Operating Authorizations.

(a)    Section 4.32(a) of the Company Disclosure Schedules set forth a true and complete list as of the date of this Agreement of all takeoff and landing slots, slot exemptions, and operating authorizations from the FAA or any other Governmental Entity and other similar designated takeoff and landing rights used or held by any Debtor (the "**Company Slots**") at any domestic or international airport and such list indicates (i) any Company Slots that have been permanently allocated to the Debtors from another air carrier and (ii) any Contracts concerning specific Company Slots.

54

(b)      Since the Lookback Date, the Debtors have complied in all material respects and is in compliance in all material respects with all regulations issued under the Federal Aviation Act and any other Laws (including any waivers or exemptions therefrom) promulgated in the United States or in any country in which the Debtors operate by either a civil aviation authority, airport authority or slot coordinator with respect to the Company Slots.  The Company has not (a) received any written notice of any proposed withdrawal of any Company Slot by the FAA, any other Governmental Entity or any slot coordinator, or (b) agreed to any future slide, trade, purchase, sale, exchange, lease, or transfer of any of the Company Slots (except, in each case, for seasonal swaps and temporary returns to the FAA).  The Company Slots have not been designated for the provision of essential air service under the regulations of the FAA, were not acquired pursuant to 14 C.F.R. Section 93.219, and have not been designated for international operations, as more fully detailed in 14 C.F.R. Section 93.217. To the extent covered by 14 C.F.R. Section 93.227 or any Order, notice, or requirement of the FAA, any other Governmental Entity or any slot coordinator, the Debtors have used the Company Slots (or the Company Slots have been used by other operators) either at least 80% of the maximum amount that each Company Slot could have been used during each full reporting period (as described in 14 C.F.R. Section 93.227(i) or any such Order, notice, or requirement) or such greater or lesser amount of minimum usage as may have been required to protect such Company Slots from termination or withdrawal under regulations or waivers established by the FAA, any other Governmental Entity, or any slot coordinator.  All material reports required by the FAA, any other Governmental Entity or any slot coordinator relating to the Company Slots have been filed in a timely manner.

Section 4.33   Company Airports.  As of the date of this Agreement, no airport authority at any airport at which the Debtors operate more than five (5) departures per day (each such airport, a "**Company Airport**") has taken any action, nor, to the Knowledge of the Company, is any such action threatened, that would reasonably be expected to materially interfere with the ability of any Debtor to conduct its respective operations at any Company Airport in substantially the manner as currently conducted.

Section 4.34   U.S. Citizen; Air Carrier.  The Company is a "citizen of the United States" as defined in 49 U.S.C. § 40102(a)(15) of the Federal Aviation Act and as interpreted by DOT, and the Company is fully authorized and qualified to operate as an "air carrier" within the meaning of the Federal Aviation Act operating under certificates and exemptions issued pursuant to the Federal Aviation Act (49 U.S.C. §§ 40102(a)(2), 40109, and 41101-41112).

Section 4.35   No Other Representations or Warranties. Except for the representations and warranties of the Company and where applicable, its Subsidiaries expressly contained in this Article IV (including the related portions of the Company Disclosure Schedules, the Restructuring Support Agreement, the Plan and the Definitive Documents), neither the Company, nor any other Person makes any express or implied representations or warranties regarding the Company, the Debtors or their Subsidiaries, and the Company and each Debtor hereby disclaims any such representation or warranty with respect to the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement, including any representation or warranty as to the accuracy or completeness of any information regarding the Debtors or their Subsidiaries furnished or made available to the Backstop Commitment Parties and their

55

Affiliates or as to the future revenue, profitability or success of the Company, the Debtors or their Subsidiaries, or any representation or warranty arising from statute or otherwise in Law.

# ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE BACKSTOP COMMITMENT

## PARTIES

Each Backstop Commitment Party, severally, and not jointly and severally, represents and warrants as to itself only (unless otherwise set forth herein, as of the date of this Agreement) as set forth below.

Section 5.1    Organization.  Such Backstop Commitment Party is a legal entity duly organized, validly existing and, if applicable, in good standing (or the equivalent thereof) under the Laws of its jurisdiction of incorporation or organization.

Section 5.2    Organizational Power and Authority.    Such Backstop Commitment Party has the requisite power and authority (corporate, partnership or otherwise) to enter into, execute and deliver this Agreement and each other Transaction Agreement to which such Backstop Commitment Party is a party and to perform its obligations hereunder and thereunder and has taken all necessary action (corporate or otherwise) required for the due authorization, execution, delivery and performance by it of this Agreement and the other Transaction Agreements.

Section 5.3    Execution and Delivery; Enforceability.  This Agreement and each other Transaction Agreement to which such Backstop Commitment Party is a party (a) has been, or prior to its execution and delivery will be, duly and validly executed and delivered by such Backstop Commitment Party and (b) upon entry of the Backstop Order and assuming due and valid execution and delivery hereof and thereof by the Company and the other Debtors (as applicable), will constitute valid and legally binding obligations of such Backstop Commitment Party, enforceable against such Backstop Commitment Party in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar Laws limiting creditors' rights generally or by equitable principles relating to enforceability.

Section 5.4    No Conflict.  Assuming that the consents referred to in clauses (a) and (b) of Section 5.5 are obtained, the execution and delivery by such Backstop Commitment Party of this Agreement and each other Transaction Agreement to which such Backstop Commitment Party is a party, the compliance by such Backstop Commitment Party with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (a) will not conflict with, or result in breach, modification, termination or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time or both), or result in the acceleration of, or the creation of any Lien under, any Contract to which such Backstop Commitment Party is party or is bound or to which any of the property or assets or such

56

Backstop Commitment Party are subject, (b) will not result in any violation of the provisions of the certificate of incorporation or bylaws (or comparable constituent documents) of such Backstop Commitment Party and (c) will not result in any material violation of any Law or Order applicable to such Backstop Commitment Party or any of its properties, except in each of the cases described in clauses (a) or (c), for any conflict, breach, modification, termination, violation, default, acceleration or Lien which would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay, or materially and adversely impact such Backstop Commitment Party's performance of its obligations under this Agreement.

Section 5.5    <u>Consents and Approvals</u>.    No consent, approval, authorization, Order, registration or qualification of or with any Governmental Entity having jurisdiction over such Backstop Commitment Party or any of its properties is required for the execution and delivery by such Backstop Commitment Party of this Agreement and each other Transaction Agreement to which such Backstop Commitment Party is a party, the compliance by such Backstop Commitment Party with the provisions hereof and thereof and the consummation of the transactions (including the funding by such Backstop Commitment Party of its Direct Allocation Amount and Commitment Amount of the Backstop Shares) contemplated herein and therein, except (a) any consent, approval, authorization, Order, registration or qualification which, if not made or obtained, would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay, or materially and adversely impact such Backstop Commitment Party's performance of its obligations under this Agreement and each other Transaction Agreement to which such Backstop Commitment Party is a party and (b) filings, notifications, authorizations, approvals, consents, clearances or termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement.

Section 5.6    <u>No Registration</u>.    Such Backstop Commitment Party understands that (a) the Rights Offering Shares, Direct Allocation Shares, Backstop Shares and the Backstop Premium Shares have not been registered under the Securities Act or any state or foreign securities or "Blue Sky" laws and no prospectus has been prepared in accordance with the requirements of the Prospectus Regulation by reason of a specific exemption from the registration provisions of the Securities Act and the Prospectus Regulation, the availability of which depends on, among other things, the bona fide nature of the investment intent and the accuracy of such Backstop Commitment Party's representations as expressed herein or otherwise made pursuant hereto, and (b) the Rights Offering Shares, Direct Allocation Shares, Backstop Shares and Backstop Premium Shares cannot be sold unless subsequently registered under the Securities Act or an exemption from registration or an exemption from the requirement to publish a prospectus under the Prospectus Regulation is available.

Section 5.7    <u>Purchasing Intent</u>.    Such Backstop Commitment Party is acquiring the Rights Offering Shares, Direct Allocation Shares, Backstop Shares and Backstop Premium Shares for its own account or accounts or funds over which it holds voting discretion, not otherwise as a nominee or agent, and not otherwise with the view to, or for resale in connection with, any distribution thereof not in compliance with the

Securities Act, any applicable securities or "Blue Sky" laws of any state of the United States or other applicable securities Laws, and such Backstop Commitment Party has no present intention of selling, granting any other participation in, or otherwise distributing the same, except in compliance with the Securities Act, any applicable securities or "Blue Sky" laws of any state of the United States and any applicable securities Laws. Such Backstop Commitment Party has not engaged in any short selling of or any hedging transaction with respect to the Backstop Shares or Backstop Premium Shares in violation of the Securities Act.

Section 5.8    <u>Sophistication; Investigation</u>.  Such Backstop Commitment Party has such knowledge and experience in financial and business matters such that it is capable of evaluating the merits and risks of its investment in the Rights Offering Shares, Direct Allocation Shares, Backstop Shares and Backstop Premium Shares.  Such Backstop Commitment Party understands and accepts that its investment in the Rights Offering Shares, Direct Allocation Shares, Backstop Shares and Backstop Premium Shares involve risks.  Such Backstop Commitment Party has received such documentation as it has deemed necessary to make an informed investment decision in connection with its investment in the Rights Offering Shares, Direct Allocation Shares, Backstop Shares and the Backstop Premium Shares has had adequate time to review such documents prior to making its decision to invest, has had a full opportunity to ask questions of and receive answers from the Company or any person or persons acting on behalf of the Company concerning the terms and conditions of an investment in the Company and has made an independent decision to invest in the Rights Offering Shares, Direct Allocation Shares, Backstop Shares and Backstop Premium Shares based upon the foregoing and other information available to it, which it has deemed adequate for this purpose.  With the assistance of each Backstop Commitment Party's own professional advisors, to the extent that such Backstop Commitment Party has deemed appropriate, such Backstop Commitment Party has made its own legal, tax, accounting and financial evaluation of the merits and risks of an investment in the Rights Offering Shares, Direct Allocation Shares, Backstop Shares and any New Common Equity (including Backstop Shares and Backstop Premium Shares).  Such Backstop Commitment Party understands and is able to bear any economic risks associated with such investment (including the necessity of holding such shares for an indefinite period of time).  Except for the representations and warranties expressly set forth in this Agreement (including the related portions of the Company Disclosure Schedules), any other Transaction Agreement or Plan, such Backstop Commitment Party has independently evaluated the merits and risks of its decision to enter into this Agreement and disclaims reliance on any representations or warranties, either express or implied, by or on behalf of any of the Debtors.

Section 5.9    <u>No Broker's Fees</u>.  Such Backstop Commitment Party is not a party to any Contract with any Person (other than the Transaction Agreements, the Ad Hoc Group of Senior Secured Noteholders Advisors and Ad Hoc Group of Convertible Noteholders Advisors and any Contract giving rise to the Expense Reimbursement hereunder) that would give rise to a valid claim against any of the Debtors for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Backstop Shares and issuance of the Backstop Shares and Backstop Premium Shares.

58

Section 5.10   <u>Sufficient Funds</u>.  Such Backstop Commitment Party has, or has ready access to, sufficient assets and the financial capacity to perform all of its obligations under this Agreement, including, to the extent applicable, the ability (or ability to cause its Related Purchasers) to fully exercise all Subscription Rights that are issued to it pursuant to the Rights Offering, fund such Backstop Commitment Party's Rights Offering Backstop Commitment and purchase the Direct Allocation Shares.

Section 5.11   <u>Additional Securities Law Matters</u>.

(a)   Such Backstop Commitment Party has been advised by the Company that the Direct Allocation Shares, Backstop Shares and Backstop Premium Shares are characterized as "restricted securities" under the Securities Act inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that such Backstop Commitment Party must continue to bear the economic risk of the investment in its Direct Allocation Shares, Backstop Shares and Backstop Premium Shares unless the offer and sale of its Direct Allocation Shares, Backstop Shares and Backstop Premium Shares is subsequently registered under the Securities Act and all applicable state or non-U.S. securities or "Blue Sky" laws or an exemption from such registration is available.

(b)   Such Commitment Party (i) is either (x) a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act ("**Rule 144A**") or an institutional "accredited investor" within the meaning of Rule 501(a) (1), (2), (3), (7), (8), (9), (12), or (13) of the Securities Act or (y) not a "U.S. Person" as such term is defined in Regulation S under the Securities Act ("**Regulation S**") and is not acquiring the Backstop Shares or Backstop Premium Shares for the account or benefit of a U.S. person (as defined in Regulations S) or for the account, benefit of, or with a view to the resale or distribution of the Backstop Shares or Backstop Premium Shares to, any Person, located or with a registered office in any member state of the European Economic Area or the United Kingdom other than an EU/UK Qualified Investor and (ii) has the knowledge, skill and experience in business, financial and investment matters so that the undersigned is capable of evaluating the merits, risks and consequences of an investment in the Backstop Shares and any Backstop Premium Shares and is able to bear the economic risk of loss of such investment, including the complete loss of such investment.  Such Backstop Commitment Party further represents that it fully understands the limitations on transfer and restrictions on sales and other dispositions set forth in this Agreement.

(c)   Such Backstop Commitment Party is either (i) not resident or located or has its registered office in any member state of the European Economic Area or the United Kingdom; or (ii) if such Backstop Commitment Party is resident or located or has its registered office in any member state of the European Economic Area or the United Kingdom, is an EU/UK Qualified Investor.

(d)   If such Backstop Commitment Party is being issued the Direct Allocation Shares, Backstop Shares and Backstop Premium Shares pursuant to Regulation S, such Backstop Commitment Party has been advised and acknowledges that: (a) in issuing and selling the securities to such person who is not a "U.S. person" (as defined in Regulation S) (a "**Non-U.S. person**") pursuant hereto, the Company and the Debtors are relying upon the "safe harbor" provided by Regulation S; (b) it is a condition to the availability of the Regulation S "safe harbor"

59

that the  Direct Allocation Shares, Backstop Shares and Backstop Premium Shares not be offered or sold in the United States (as defined in Regulation S) or to a U.S. person until the expiration of a one-year "distribution compliance period" (or a six-month "distribution compliance period," if the issuer is a "reporting issuer," as defined in Regulation S) following the Closing Date; and (c) notwithstanding the foregoing, prior to the expiration of the one-year "distribution compliance period" (or six-month "distribution compliance period," if the issuer is a "reporting issuer," as defined in Regulation S) after the Closing (the "**Restricted Period**"),  Direct Allocation Shares, Backstop Shares and Backstop Premium Shares may be offered and sold by the holder thereof only if such offer and sale is made in compliance with the terms of this Agreement and either: (X) if the offer or sale is within the United States or to or for the account of a U.S. person, the securities are offered and sold pursuant to an effective registration statement or pursuant to Rule 144 under the Securities Act or pursuant to an exemption from the registration requirements of the Securities Act; or (Y) the offer and sale is outside the United States and to other than a U.S. person; or (Z) if to a person or undertaking resident, located or with a registered office in any member state of the European Economic Area or the United Kingdom, such Person is an EU/UK Qualified Investor. Such Backstop Commitment Party agrees that with respect to the  Direct Allocation Shares, Backstop Shares and Backstop Premium Shares being issued pursuant to Regulation S, until the expiration of the Restricted Period: (a) such Non-U.S. person, its agents or its Representatives have not and will not solicit offers to buy, offer for sale or sell any of the  Direct Allocation Shares, Backstop Shares and Backstop Premium Shares, or any beneficial interest therein in the United States or to or for the account of a U.S. person; (b) notwithstanding the foregoing, the  Direct Allocation Shares, Backstop Shares and Backstop Premium Shares may be offered and sold by the holder thereof only if such offer and sale is made in compliance with the terms of this Agreement and either: (X) if the offer or sale is within the United States or to or for the account of a U.S. person, the securities are offered and sold pursuant to an effective registration statement or pursuant to Rule 144 under the Securities Act or pursuant to an exemption from the registration requirements of the Securities Act; or (Y) the offer and sale is outside the United States and to other than a U.S. person, provided, that any offer or sale to a Person resident, located or with a registered office in any member state of the European Economic Area or the United Kingdom is only made to an EU/UK Qualified Investor; and (c) such Non-U.S. person shall not engage in hedging transactions with regard to the securities unless in compliance with the Securities Act. The restrictions in this Agreement applicable to such Backstop Commitment Parties are binding upon subsequent Transferees of the applicable Direct Allocation Shares, Backstop Shares and Backstop Premium Shares, except for Transferees pursuant to an effective registration statement. Each Backstop Commitment Party agrees that after the Restricted Period, the Direct Allocation Shares, Backstop Shares and Backstop Premium Shares being issued pursuant to Regulation S may be offered or sold within the United States or to or for the account of a U.S. person only pursuant to applicable securities Laws.  Each Backstop Commitment Party acknowledges that, to the extent any Direct Allocation Shares, Backstop Shares and Backstop Premium Shares are being issued to such Backstop Commitment Party pursuant to Regulation S, the offer and sale of such Direct Allocation Shares, Backstop Shares and Backstop Premium Shares is made in an "offshore transaction" under Regulation S.

(e)      Such Backstop Commitment Party is not funding the Backstop Shares as a result of any advertisement, article, notice or other communication regarding the Backstop Shares or Backstop Premium Shares published in any newspaper, magazine or similar media or broadcast

over television or radio or presented at any seminar or, to such Backstop Commitment Party's knowledge, any other general solicitation or general advertisement or directed selling efforts.

Section 5.12    Legal Proceedings.  As of the date hereof, there are no Legal Proceedings pending or threatened to which such Backstop Commitment Party is a party or to which any property of such Backstop Commitment Party is the subject that would reasonably be expected to prevent, materially delay or materially impair the ability of such Backstop Commitment Party to consummate the transactions contemplated hereby.

Section 5.13    Arm's Length.    Such Backstop Commitment Party acknowledges and agrees that the Company and the Debtors are acting solely in the capacity of an arm's-length contractual counterparty to such Backstop Commitment Party with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering).

Section 5.14    No Other Representations or Warranties.  Except for the representations and warranties of such Backstop Commitment Party expressly contained in this Article V, neither such Backstop Commitment Party nor any other Person makes any express or implied representations or warranties regarding such Backstop Commitment Party, and such Backstop Commitment Party hereby disclaims any such representation or warranty with respect to the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement, including any representation or warranty as to the accuracy or completeness of any information regarding such Backstop Commitment Party furnished or made available to the Company, the Debtors or their Subsidiaries, or any representation or warranty arising from statute or otherwise in Law.

**ARTICLE VI**

**ADDITIONAL COVENANTS**

Section 6.1    Orders Generally.  The Debtors shall use commercially reasonable efforts to take all steps reasonably necessary and desirable, consistent with the Restructuring Support Agreement, and the Plan to (a) obtain entry of the Backstop Order, the Disclosure Statement Order, and the Confirmation Order, and (b) cause the Backstop Order, the Disclosure Statement Order, and the Confirmation Order supported by the Required Backstop Commitment Parties to become Final Orders (and request that such Orders become effective immediately upon entry by the Bankruptcy Court pursuant to a waiver of Rules 3020 and 6004(h) of the Bankruptcy Rules, as applicable).

Section 6.2    Conduct of Business.

(a)    Except as expressly set forth in this Agreement, the Restructuring Support Agreement or the Plan, or as required by applicable Law, Collective Bargaining Agreement or with the prior written consent of Required Backstop Commitment Parties (requests for which, including related information, shall be directed to the Ad Hoc Group of Senior Secured Noteholders Advisors and Ad Hoc Group of Convertible Noteholders Advisors, and which consent

61

will not be unreasonably withheld, delayed or conditioned), during the period from the date of this Agreement to the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with its terms (the "**Pre-Closing Period**"), the Debtors and their Subsidiaries shall, taking into account the Restructuring Transactions and the commencement and pendency of the Chapter 11 Cases, operate in the ordinary course of business consistent with past practice and the operations contemplated by the Company's business plan (as may be updated from time to time, with the consent of the Required Backstop Commitment Parties for any material updates (which consent shall not be unreasonably withheld, delayed or conditioned)), including using commercially reasonable efforts to (i) preserve substantially intact its business organization, operations and assets, (ii) keep available the services of its executive officers and key employees on commercially reasonable terms, (iii) maintain in effect all Company Permits, (iv) maintain satisfactory relationships of the Company with any persons with which the Company has material business relations and with Governmental Entities that have jurisdiction over its business and operations, and (v) protect and maintain material Intellectual Property Rights owned by the Company, including avoiding the cancellation of any such material registered Intellectual Property Rights.

(b)      For the avoidance of doubt, the following shall be deemed to occur outside of the ordinary course of business of the Debtors and their Subsidiaries and shall require the prior written consent (delivery by electronic mail will be deemed sufficient) of the Required Backstop Commitment Parties (which shall not be unreasonably withheld, delayed or conditioned) unless the same would otherwise be permissible under the Restructuring Support Agreement, the Plan, this Agreement or required by any Material Contract existing on the date hereof or applicable Law:

(i)      entry into, or any material amendment, modification, termination, waiver, supplement, restatement or other change to, any Material Contract (including, for the avoidance of doubt, (a) any contracts for the sale of aircrafts, (b) any contracts in connection with enhanced equipment trust certificate (EETC) transactions, and (c) any agreements with RTX Corporation or Pratt & Whitney regarding compensation for the loss of utilization related to removal of engines from service) or any assumption of any Material Contract in connection with the Chapter 11 Cases (other than (A) any Material Contracts that are otherwise addressed by clause (vii) below, (B) any such amendment modification, waiver, supplement, restatement or other change that, taken as a whole, is no less favorable to the Debtors than the Contract prior thereto, or (C) any extension of a Material Contract on substantially similar terms in the ordinary course of business);

(ii)      breach any obligation under or seek to amend, suspend, waive, or terminate any Material Contract;

(iii)      entry into any transaction with a Related Party, including the entry into, or any amendment, modification, waiver, supplement, restatement or other change to, any Contract between any Debtor, on the one hand, and any Related Party of any of the Debtors, or Affiliate thereof, on the other hand (each a "**Related Party Transaction**");

(iv)     entry into, or any material amendment, modification, waiver, supplement, restatement or other change to, any employment agreement or consulting or arrangement with its officers or members of senior management (which, for the sake of clarity, means any "insider" (as defined in the Bankruptcy Code) to which any of the Debtors or any of their respective Subsidiaries is a party;

(v)     any (A) material increase in the compensation (whether in the form of salary, hourly rate, bonus, target bonus, equity award, severance or otherwise) payable to any "insider" (as defined in the Bankruptcy Code), or granting of any bonus, benefit payment (contingent or otherwise) to any such individual, except annual compensation increases and merit-based adjustments in the ordinary course of business or as required by the terms of and in accordance with any written employment or engagement agreement currently in effect between the Debtors and such person or (B) adoption or amendment of any material agreement that has the effect of the foregoing;

(vi)     any (A) hiring, transfer or termination by any of the Debtors without cause, or (B) material reduction by any of the Debtors without cause in the title or responsibilities, in each case, of any employee who, as of the date of this Agreement, is at the level of Senior Vice President or above;

(vii)     the adoption, termination or material amendment of any material Company Benefit Plan (including any plans that if adopted as of the date hereof would be "Company Benefit Plans") by any of the Debtors, other than in the ordinary course of business;

(viii)     making, rescinding or changing any material election in respect of income or other material Taxes or accounting policies of any Debtor (other than making elections that are consistent with the Debtor's past practice or in the ordinary course of business); changing an annual accounting period; changing any material method of accounting in respect of income or other material Taxes; amending any material Tax return; entering into any "closing agreement" (as defined in Section 7121 of the Tax Code) or similar Contract in respect of material amount of income or other material Taxes with any Governmental Entity; settling or compromising any income or other material Tax claim, action or assessment in respect of income or other material Taxes; surrendering any right to claim a material refund of Taxes; seek any ruling with respect to material Taxes from any governmental authority; consenting to any extension or waiver of the limitation period applicable to any income or other material Tax claim or assessment (other than any extension or waiver in the ordinary course of business); in each case, except (a) such actions being taken in the ordinary course of business and as required by applicable Law, (b) only to the extent such action would be binding on any of the Debtors after the Closing and (c) with respect to the matter set forth on Section 6.2(b)(viii) of the Company Disclosure Schedules (which shall not be deemed to occur outside of the ordinary course of business);

(ix)    commencement, release, assignment, compromise, discharge, waiver, settlement, agreement to settle or satisfaction of any material Legal Proceeding (other than any Legal Proceeding with respect to any Tax matters);

(x)    (A) entry into any lease or sublease for real property or amendment of any Real Property Lease in any material respect, or (B) the failure to perform, in any material respect, all applicable obligations under each material Real Property Lease as and when required under each such material Real Property Lease;

(xi)    entry into any agreement to sell, transfer, assign, pledge, lease, burden or encumber any Owned Real Property, or permitting any new encumbrance to attach to, or be recorded against, title to any Owned Real Property;

(xii)    [Reserved];

(xiii)    any exclusive licensing of Material Intellectual Property Rights to third parties; and

(xiv)    directly or indirectly, create, issue, incur, assume, suffer to exist or become liable in respect of any material indebtedness for borrowed money, evidenced by bonds, notes, debentures or capitalized lease obligations, or Lien of any kind, including any local law liens, on any property or asset (other than Permitted Liens and any debt secured by such Permitted Liens outstanding as of the date hereof).

(c)    Except as otherwise provided in this Agreement, nothing in this Agreement shall give the Backstop Commitment Parties, directly or indirectly, any right to control or direct the operations of the Debtors prior to the Closing Date.  Prior to the Closing Date, the Debtors shall exercise, consistent with the terms and conditions of this Agreement, control and supervision of the business of the Debtors.

Section 6.3    Access to Information; Confidentiality.

(a)    Subject to applicable Law and Section 6.3(b), upon reasonable notice during the Pre-Closing Period, the Debtors shall afford the Backstop Commitment Parties and their Representatives upon request reasonable access, during normal business hours and without unreasonable disruption or interference with the Debtors' business or operations, to the Debtors' employees, properties, books, Contracts and records and, during the Pre-Closing Period, the Debtors shall furnish promptly to such parties all reasonable information concerning the Debtors' business, properties, Collective Bargaining Agreements and personnel as may reasonably be requested by any such party; provided, that the foregoing shall not require the Debtors (i) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company, would cause any of the Debtors to violate any of their respective obligations with respect to confidentiality to a third party if the Company shall have used its commercially reasonable efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure, (ii) to disclose any legally privileged information of any of the Debtors or their Subsidiaries or (iii) to violate any applicable Laws or Orders; provided, further, that such access shall not include any invasive or environmental investigation, sampling, testing or analysis (other than a Phase I

64

environmental site assessment).  All requests for information and access made in accordance with this <u>Section 6.3</u> shall be directed to an Executive Officer of the Company or such Person as may be designated by the executive officers of the Company.

(b)    From and after the date hereof until the date that is one (1) year after the expiration of the Pre-Closing Period, each Backstop Commitment Party shall, and shall cause its Representatives to, (i) keep confidential and not provide or disclose to any Person any documents or information received or otherwise obtained by such Backstop Commitment Party or its Representatives pursuant to <u>Section 6.3(a)</u>, <u>Section 6.4</u> or in connection with a request for approval pursuant to <u>Section 6.2</u> (except that provision or disclosure may be made to any Affiliate, Affiliated Fund or Representative of such Backstop Commitment Party who needs to know such information for purposes of this Agreement or the other Transaction Agreements and who agrees to observe the terms of this <u>Section 6.3(b)</u> or is under a professional or contractual duty of confidentiality to such Backstop Commitment Party (and such Backstop Commitment Party will remain liable for any breach of such terms by any such Affiliate or Representative)), and (ii) not use such documents or information for any purpose other than in connection with this Agreement or the other Transaction Agreements or the transactions contemplated hereby or thereby.  Notwithstanding the foregoing, the immediately preceding sentence shall not apply in respect of documents or information that (A) is now or subsequently becomes generally available to the public through no violation of this <u>Section 6.3(b)</u>, (B) becomes available to a Backstop Commitment Party or its Representatives on a non-confidential basis, (C) becomes available to a Backstop Commitment Party or its Representatives through document production or discovery in connection with the Chapter 11 Cases or other judicial or administrative process, but subject to any confidentiality restrictions imposed by the Chapter 11 Cases or other such process, or (D) such Backstop Commitment Party or any Representative thereof is required to disclose pursuant to judicial or administrative process or pursuant to applicable Law or applicable securities exchange rules; <u>provided</u>, that, such Backstop Commitment Party or such Representative shall provide the Company with prompt written notice of such legal compulsion and shall use commercially reasonable efforts to cooperate with the Company to obtain a protective Order or similar remedy to cause such information or documents not to be disclosed, including interposing all available objections thereto, at the Company's sole cost and expense; <u>provided</u>, <u>further</u>, that, in the event that such protective Order or other similar remedy is not obtained, the disclosing party shall furnish only that portion of such information or documents that is legally required to be disclosed and shall exercise its commercially reasonable efforts (at the Company's sole cost and expense) to obtain assurance that confidential treatment will be accorded such disclosed information or documents.  Notwithstanding the foregoing, any Backstop Commitment Party or its Affiliates or Representatives may disclose such information or documents without notice of any kind to any regulatory authority (including any self-regulatory authority) in connection with any routine examination, investigation, regulatory sweep or other regulatory inquiry not specifically targeted to the disclosing party.

(c)    Except as required by this Agreement and the other Transaction Agreements, each of the Debtors agrees that it shall only disclose material non-public information to any Backstop Commitment Party or its Representatives who (i) has confirmed it wishes to receive such material non-public information and (ii) is party to a non-disclosure agreement containing customary cleansing mechanisms as to which such information is subject.

Section 6.4     <u>Financial Information</u>.  During the Pre-Closing Period, the Debtors shall deliver to the Ad Hoc Group of Senior Secured Noteholders Advisors and Ad Hoc Group of Convertible Noteholders Advisors and to each Backstop Commitment Party that so requests, all financial statements, forecasts and reports the Debtors are required to promptly deliver to any lender under the DIP Facility as of the date hereof (the "**<u>Financial Reports</u>**").

Section 6.5     <u>Commercially Reasonable Efforts</u>.

(a)     To the extent not obligated under the terms of the Restructuring Support Agreement, and without in any way limiting any other respective obligation of the Debtors or any Backstop Commitment Party in this Agreement, each Party shall use commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement and the Plan, including using commercially reasonable efforts in:

(i)     timely preparing and filing all documentation reasonably necessary to effect all necessary notices, reports and other filings of such Person and to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party or Governmental Entity;

(ii)     cooperating with the defense of any Legal Proceedings in any way challenging (A) this Agreement, the Plan, the Registration Rights Agreement or any other Transaction Agreement, (B) the Backstop Order, the Disclosure Statement Order, and the Confirmation Order, or (C) the consummation of the transactions contemplated hereby and thereby, including seeking to have any stay or temporary restraining Order entered by any Governmental Entity vacated or reversed; and

(iii)     working together in good faith to finalize the Company Organizational Documents, Transaction Agreements, the Registration Rights Agreement and all other documents relating thereto for timely inclusion in the Plan and filing with the Bankruptcy Court.

(b)     Subject to applicable Laws or applicable rules relating to the exchange of information, and in accordance with the Restructuring Support Agreement, the Backstop Commitment Parties and the Debtors shall have the right to review in advance, and to the extent practicable each will consult with the other on all of the information relating to Backstop Commitment Parties or the Debtors, as the case may be, and any of their respective Subsidiaries, that appears in any filing made with, or written materials submitted to, any third party and/or Governmental Entity in connection with the transactions contemplated by this Agreement or the Plan; provided, however, that the Backstop Commitment Parties are not required to provide for review in advance declarations or other evidence submitted in connection with any filing with the Bankruptcy Court.  In exercising the foregoing rights, the Parties shall act as reasonably and as promptly as practicable.

66

(c)     Nothing contained in this <u>Section 6.5</u> shall limit the ability of any Backstop Commitment Party to consult with the Debtors, to appear and be heard, or to file objections, concerning any matter arising in the Chapter 11 Cases to the extent not inconsistent with the Transaction Agreements.

Section 6.6     <u>Registration Rights Agreement; Company Organizational Documents</u>.

(a)     The Plan will provide that from and after the Plan Effective Date each Backstop Commitment Party shall be entitled to registration rights  pursuant to a registration rights agreement to be entered into as of the Plan Effective Date, which agreement shall be in form and substance consistent with the terms set forth in the Restructuring Support Agreement and otherwise in form and substance acceptable to the Required Backstop Commitment Parties (the "**Registration Rights Agreement**").  A form of the Registration Rights Agreement shall be filed with the Bankruptcy Court as part of the Plan Supplement or an amendment thereto.

(b)     The Plan will provide that on the Plan Effective Date, the Company Organizational Documents will be duly authorized, approved, adopted and in full force and effect. Forms of the Company Organizational Documents shall be filed with the Bankruptcy Court as part of the Plan Supplement or an amendment thereto.

Section 6.7     <u>Blue Sky</u>.  The Company shall file a Form D with the SEC with respect to the Direct Allocation Shares, Backstop Shares and Backstop Premium Shares issued hereunder to the extent required under Regulation D of the Securities Act and shall provide, upon request, a copy thereof to each Backstop Commitment Party or its Representatives.  The Company shall, within the time specified by the applicable law or regulation, use commercially reasonable efforts to obtain an exemption for, or to qualify the offer, sale and issuance (as applicable) of the Rights Offering Shares, the Backstop Shares and the Backstop Premium Shares to the Backstop Commitment Parties pursuant to this Agreement under applicable securities and "Blue Sky" Laws of the states of the United States (or to obtain an exemption from such qualification) and any applicable foreign jurisdictions, and shall provide evidence of any such action so taken to the Backstop Commitment Parties, as soon as reasonably practicable thereafter.  The Company shall use commercially reasonable efforts to timely make all filings and reports relating to the offer, sale and issuance (as applicable) of the Direct Allocation Shares, Backstop Shares , Backstop Premium Shares and Rights Offering Shares issued hereunder required under applicable securities and "Blue Sky" Laws of the states of the United States.  The Company shall pay all fees and expenses in connection with satisfying its obligations under this <u>Section 6.7</u>.

Section 6.8     <u>Use of Proceeds</u>.  The Company and the Debtors will apply the proceeds from the Direct Allocation, the exercise of the Subscription Rights and the sale of the Backstop Shares for the purposes identified in the Disclosure Statement and the Plan.

Section 6.9     <u>Share Legend</u>.  Each certificate evidencing (i) Direct Allocation Shares, (ii) Backstop Shares, and (iii) Backstop Premium Shares issued

hereunder shall be stamped or otherwise imprinted with a legend (the "**Legend**") in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

In the event that any such Direct Allocation Shares, Backstop Shares or Backstop Premium Shares are uncertificated, such Direct Allocation Shares, Backstop Shares or Backstop Premium Shares shall be subject to a restrictive notation substantially similar to the Legend in the share ledger or other appropriate records maintained by the Company or agent and the term "Legend" shall include such restrictive notation.  The Issuer shall promptly remove the Legend (or restrictive notation, as applicable) set forth above from the certificates evidencing any such shares (or the share register or other appropriate Company records, in the case of uncertified shares), upon request, at any time after the restrictions described in such Legend cease to be applicable, including, as applicable, when such shares may be sold without volume limitations, manner of sale requirements or current public information requirements under Rule 144 of the Securities Act.  The Company may reasonably request such opinions, certificates or other evidence that such restrictions no longer apply as a condition to removing the Legend.

Section 6.10   <u>Antitrust Approval</u>.

(a)      Each Party agrees to use commercially reasonable efforts to (i) if applicable, file, or cause to be filed, the Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission and any filings (or, if required by any Antitrust Authority, any drafts thereof) under any other Antitrust Laws that are necessary to consummate and make effective the transactions contemplated by this Agreement as soon as reasonably practicable and in all cases in compliance with any filing deadlines included in the relevant Antitrust Laws (and with respect to any filings required pursuant to the HSR Act, no later than 10 (ten) Business Days following the date hereof) and (ii) promptly furnish any documents or information reasonably requested by any Antitrust Authority.

(b)      The Debtors and each Backstop Commitment Party that is subject to an obligation pursuant to the Antitrust Laws to notify or make any filing with respect to any transaction contemplated by this Agreement, the Plan or the other Transaction Agreements and that has notified the Debtors in writing of such obligation (each such Backstop Commitment Party, a "**Filing Party**") agree to reasonably cooperate with each other in the preparation of and as to the appropriate time of filing such notification and its content.  The Debtors and each Filing Party shall, to the extent permitted by applicable Law: (i) promptly notify each other of, and if in writing, furnish each other with copies of (or, in the case of material oral communications, advise each other orally) of any material communications from or with an Antitrust Authority (except that no Party will be obligated to provide complete copies of its premerger filing submitted under the HSR Act); (ii) not participate in any meeting with an Antitrust Authority unless it consults with each

68

other Filing Party and the Debtors, as applicable, in advance and, to the extent practicable and permitted by the Antitrust Authority and applicable Law, give each other Filing Party and the Debtors, as applicable, a reasonable opportunity to attend and participate thereat; (iii) furnish each other Filing Party and the Debtors, as applicable, with copies of all material correspondence and communications between such Filing Party or the Debtors and any Antitrust Authority; (iv) furnish each other Filing Party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to any Antitrust Authority; and (v) not withdraw its filing, if any, or agree to extend any waiting periods under the HSR Act without the prior written consent of the Required Backstop Commitment Parties and the Debtors. The communications contemplated by this Section 6.10 may be made by the Debtors or a Filing Party on an outside counsel-only basis or subject to other agreed upon confidentiality safeguards. The obligations in this Section 6.10 shall not apply to filings, correspondence, communications or meetings with Antitrust Authorities unrelated to the transactions contemplated by this Agreement, the Plan or the other Transaction Agreements. Notwithstanding the foregoing, nothing in this Agreement shall require any party to provide to the other party any information or materials that (i) are sensitive personally identifiable information, (ii) are legally privileged, or (iii) are competitively sensitive.

(c) The Debtors and each Filing Party shall use their commercially reasonable efforts to obtain all authorizations, approvals, consents, or clearances under any applicable Antitrust Laws and to cause the termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement at the earliest possible date after the date of this Agreement. Notwithstanding the foregoing, nothing in this Section 6.10 shall require any Backstop Commitment Party or any of their Affiliates to propose or agree to accept any undertaking or condition, to enter into any consent decree, to make any divestiture or sale, to accept any operational restriction, or to take any other action that could be expected to limit the rights of the Backstop Commitment Party or its Affiliates or, from and after the Closing, the Debtors.

Section 6.11   Alternative Restructuring Proposal.   Notwithstanding anything to the contrary in this Agreement, and subject to the Restructuring Support Agreement, each of the Debtors and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or Representatives shall have the rights to take any action with respect to an Alternative Restructuring Proposal as set forth in Section 6.03 of the Restructuring Support Agreement.

Section 6.12   Rule 144A Transferability.   To the extent that the New Common Equity is then not listed on a national securities exchange, the Company shall use commercially reasonable efforts to ensure as soon as reasonably practicable after the Plan Effective Date that the New Common Equity can be transferred pursuant to Rule 144A, including compliance with the requirements under Rule 144(A)(d)(4) and any other applicable securities Laws.

Section 6.13   Anti-Corruption Laws, Money Laundering Laws, Ex-Im Laws and Sanctions.

69

(a)    The Debtors and their respective Subsidiaries shall comply in all respects with Anti-Corruption Laws, Money Laundering Laws, Ex-Im Laws and Sanctions.

(b)    The Debtors and their respective Subsidiaries shall maintain in effect policies and procedures designed to ensure compliance by the Debtors, their respective Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws, Money Laundering Laws, Ex-Im Laws and Sanctions. The Debtors and their respective Subsidiaries shall cooperate with reasonable requests from any (i) Senior Secured Backstop Commitment Party or its Related Purchasers (as applicable) or (ii) Convertible Backstop Commitment Party or its Related Purchasers (as applicable), for any information or documentation relating to compliance with Anti-Corruption Laws, Anti-Money Laundering Laws, Sanctions and Ex-Im Laws and Debtors and their respective Subsidiaries' associated policies and procedures.

(c)    Debtors will not, and will not permit any of its Subsidiaries to, directly or knowingly indirectly, use the proceeds of the Rights Offering, or lend, contribute or otherwise make available such proceeds to any other Debtor, its Subsidiaries, joint venture or other Person, (i) for the purpose of financing activities, investments, activities, or transactions involving any Sanctioned Country or Sanctioned Person; or (ii) in any manner in violation of Sanctions, Ex-Im Laws, Anti-Corruption Laws or Money Laundering Laws by any Person (including any agent, Backstop Commitment Parties, arranger, advisor or other individual or entity participating in a transaction).

(d)    Each Debtor shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, fund all or part of any repayment of the Rights Offering or other payments under this Agreement in a manner that would cause any Person (including any agent, Backstop Commitment Parties, arranger, advisor or other individual or entity participating in a transaction) to be in violation of any Anti-Corruption Laws, Anti-Money Laundering Laws, Ex-Im Laws or Sanctions.

Section 6.14    DTC Eligibility.  The Company shall use commercially reasonable efforts to promptly make, when applicable from time to time, all Offering Shares eligible for deposit, clearance and settlement with DTC in accordance with, and to the extent permitted pursuant to, applicable DTC rules and procedures.

## ARTICLE VII

## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

Section 7.1    Conditions to the Obligations of the Backstop Commitment Parties.  The obligations of each Backstop Commitment Party to consummate the transactions contemplated hereby shall be subject to (unless waived in accordance with Section 7.2) the satisfaction of the following conditions prior to or at the Closing:

(a)    Backstop Order.  The Bankruptcy Court shall have entered the Backstop Order, and such Order shall be a Final Order.

(b)    Disclosure Statement Order.  The Bankruptcy Court shall have entered the Disclosure Statement Order, and such Order shall be a Final Order.

(c)    <u>Confirmation Order</u>.   The Bankruptcy Court shall have entered the Confirmation Order, and such Order shall be a Final Order.

(d)    <u>Direct Allocation and Rights Offering</u>.   The Direct Allocation and the Rights Offering shall have been conducted, in all material respects, in accordance with the Backstop Order, the Disclosure Statement Order, the Rights Offering Procedures and this Agreement, as applicable.

(e)    <u>Plan Effective Date and Issuances Pursuant to this Agreement</u>.   The following shall have occurred, or shall occur concurrently with the Closing (i) the Plan Effective Date and (ii) the issuance of the Direct Allocation Shares, the Rights Offering Shares, the Backstop Shares and the Backstop Premium Shares.

(f)    <u>Registration Rights Agreement; Company Organizational Documents</u>.

(i)    The Registration Rights Agreement shall have been executed and delivered by the Company, shall otherwise have become effective with respect to the Backstop Commitment Parties and the other parties thereto, and shall be in full force and effect.

(ii)    The Company Organizational Documents shall have been duly approved and adopted and shall be in full force and effect.

(g)    <u>Expense Reimbursement</u>.   The Debtors shall have paid all Expense Reimbursements accrued through the Closing Date pursuant to <u>Section 3.2</u>; <u>provided</u>, that invoices for such Expense Reimbursement must have been received by the Debtors at least three (3) Business Days prior to the Closing Date in order to be required to be paid as a condition to Closing.

(h)    <u>Antitrust Approvals</u>.   All applicable waiting periods (and any extensions thereof) under any Antitrust Laws, or imposed by any Antitrust Authority, in connection with the transactions contemplated by this Agreement shall have been terminated or expired and all authorizations, approvals, consents or clearances under the Antitrust Laws or otherwise required by a Governmental Entity in connection with the transactions contemplated by this Agreement shall have been obtained.

(i)    <u>Federal Aviation Administration</u>.   All authorizations, approvals, consents or clearances required by the FAA in connection with the transactions contemplated by this Agreement and the Restructuring Support Agreement shall have been obtained.

(j)    [Reserved].

(k)    <u>No Legal Impediment to Issuance</u>.   No Law or Order shall have become effective or been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the transactions contemplated by this Agreement;

(l)    <u>Representations and Warranties</u>.

71

(i)     The representations and warranties of the Debtors contained in, Section 4.10 (Absence of Certain Changes) shall be true and correct in all respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date after giving effect to the Plan (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(ii)    The representations and warranties of the Debtors contained in Section 4.1 (Organization and Qualification), Section 4.2 (Corporate Power and Authority), Section 4.3 (Execution and Delivery; Enforceability), Section 4.4 (Authorized and Issued Interests), Section 4.5 (Issuance), Section 4.6 (No Conflict), Section 4.26 (No Broker's Fees), Section 4.27 (Investment Company Act) and Section 4.30 (Securities Registration Exemption; No Integration; No General Solicitation) shall be true and correct in all material respects on and as of the Closing Date after giving effect to the Plan (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date).

(iii)   The representations and warranties of the Debtors contained in Section 4.24 (No Unlawful Payments) and Section 4.25 (Compliance with Money Laundering and Sanctions Laws) shall, with respect to the Debtors, taken as a whole, be true and correct in all material respects on and as of the Closing Date after giving effect to the Plan (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date).

(iv)    The representations and warranties of the Debtors contained in this Agreement other than those referred to in clauses (i), (ii) and (iii) above shall be true and correct (disregarding all materiality or Material Adverse Effect qualifiers) on and as of the Closing Date after giving effect to the Plan with the same effect as if made on and as of the Closing Date after giving effect to the Plan (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and correct does not constitute, individually or in the aggregate, a Material Adverse Effect.

(m)    Covenants.  The Debtors shall have performed and complied, in all material respects, with all of their respective covenants and agreements contained in this Agreement and the Restructuring Support Agreement that contemplate, by their terms, performance or compliance prior to the Closing Date.

(n)    Material Adverse Effect.  Since the date of this Agreement, there shall not have occurred, and there shall not exist, any Event that has had or would be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(o)    Officer's Certificate.  The Backstop Commitment Parties shall have received on and as of the Closing Date a certificate of the chief executive officer or chief financial

officer of the Company confirming that the conditions set forth in <u>Sections 7.1(l)</u> (Representations and Warranties), <u>Section 7.1(m)</u> (Covenants) and <u>Section 7.1(n)</u> (Material Adverse Effect) have been satisfied.

(p)    <u>Funding Notice</u>.  Each Backstop Commitment Party shall have received a Funding Notice in accordance with the terms of <u>Section 2.4</u>.

(q)    <u>Exit Financing Facility</u>.  The Exit Financing Facility shall have become effective, shall be for the amounts set forth in the Restructuring Support Agreement, if applicable, and shall otherwise be in form and substance substantially in accordance with the Restructuring Support Agreement or as otherwise set forth in the Plan.

(r)    <u>Key Contracts</u>.  As of the Plan Effective Date, except as otherwise provided in the Restructuring Support Agreement, or any applicable provisions of the Plan (which shall govern in the event of any inconsistency), the Debtors shall have assumed all executory Contracts and unexpired leases other than those identified on a schedule of rejected Contracts included in the Plan Supplement (or pursuant to a separate motion filed with the Bankruptcy Court), which shall be in form and substance reasonably acceptable to the Company, the Required Backstop Commitment Parties and otherwise consistent with the Restructuring Support Agreement, and any applicable provisions of the Plan.

(s)    <u>Restructuring Support Agreement</u>.  The Restructuring Support Agreement remains in full force and effect in accordance with its terms and shall not have been terminated in accordance with its terms (except as a result of the occurrence of the Plan Effective Date).

(t)    <u>DIP Documentation</u>. There shall not have occurred an event of default under the DIP Documentation (as defined in the DIP Orders) that has not been cured or waived in accordance therewith.

(u)    <u>Plan Effective Date</u>.  All conditions precedent to the Plan Effective Date shall have been satisfied or waived by the Required Backstop Commitment Parties.

(v)    <u>Minimum Liquidity</u>. After giving effect to the Restructuring Transactions and the Closing and, assuming the effectiveness of the Plan, the sum of unrestricted cash, cash equivalents and short-term investments on the Company's balance sheet plus availability under any exit revolving credit facility (the "**Exit Revolver**") entered into by the Company that is in effect immediately following the Closing shall be at least $700,000,000 (the "**Minimum Liquidity Threshold**"); <u>provided</u> that, if the Exit Revolver is less than $300,000,000, then the Minimum Liquidity Threshold shall be reduced dollar for dollar by the amount that Exit Revolver is less than $300,000,000; <u>provided</u> further that, the Minimum Liquidity Threshold shall under no circumstances be lower than $650,000,000.

Section 7.2    <u>Waiver of Conditions to Obligations of Backstop Commitment Parties</u>.  All or any of the conditions set forth in <u>Section 7.1</u> may only be waived in whole or in part with respect to all Backstop Commitment Parties by a written instrument executed by the Required Backstop Commitment Parties in their sole discretion, and if so waived, all Backstop Commitment Parties shall be bound by such waiver, <u>provided</u>, that any such waiver that would have the effect of amending, restating,

modifying, or changing this Agreement or any of such Backstop Commitment Party's rights hereunder in a manner that would otherwise require any Backstop Commitment Party's consent pursuant to Section 10.8 shall also require the consent of such Backstop Commitment Party.

Section 7.3    Conditions to the Obligations of the Debtors.    The obligations of the Debtors to consummate the transactions contemplated hereby with the Backstop Commitment Parties are subject to (unless waived by the Debtors) the satisfaction of each of the following conditions:

(a)    Backstop Order.  The Bankruptcy Court shall have entered the Backstop Order, and such Order shall be a Final Order.

(b)    Disclosure Statement Order.  The Bankruptcy Court shall have entered the Disclosure Statement Order, and such Order shall be a Final Order.

(c)    Confirmation Order.  The Bankruptcy Court shall have entered the Confirmation Order, and such Order shall be a Final Order.

(d)    Plan Effective Date.  The Plan Effective Date shall have occurred, or shall be deemed to have occurred concurrently with the Closing, as applicable, in accordance with the terms and conditions in the Plan and in the Confirmation Order.

(e)    Antitrust Approvals.  All applicable waiting periods under any Antitrust Laws, or imposed by any Antitrust Authority in connection with the transactions contemplated by this Agreement shall have been terminated or expired and all authorizations, approvals, consents or clearances under the Antitrust Laws or otherwise required by any Governmental Entity in connection with the transactions contemplated by this Agreement shall have been obtained.

(f)    Federal Aviation Administration.  All authorizations, approvals, consents or clearances required by the FAA in connection with the transactions contemplated by this Agreement and the Restructuring Support Agreement shall have been obtained.

(g)    [Reserved].

(h)    No Legal Impediment to Issuance.  No Law or Order shall have become effective or been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the transactions contemplated by this Agreement.

(i)    Representations and Warranties.  The representations and warranties of the Backstop Commitment Parties contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date), except where the failure to be so true and correct would not, individually or in the aggregate, prevent or materially impede the Backstop Commitment Parties from consummating the transactions contemplated by this Agreement.

74

(j)     Covenants.  The Backstop Commitment Parties shall have performed and complied, in all material respects, with all of their covenants and agreements contained in this Agreement and the Restructuring Support Agreement and in any other document delivered pursuant to this Agreement, except where the failure to perform or comply would not, individually or in the aggregate, prevent or materially impede the Backstop Commitment Parties from consummating the transactions contemplated by this Agreement.

(k)     Exit Financing Facility.  The Exit Financing Facility shall have become effective, shall be for the amounts set forth in the Restructuring Support Agreement, if applicable, and shall otherwise be in form and substance substantially in accordance with the Restructuring Support Agreement or as otherwise set forth in the Plan.

(l)     Restructuring Support Agreement.  The Restructuring Support Agreement shall remain in full force and effect in accordance with its terms and shall not have been terminated in accordance with its terms (except as a result of the occurrence of the Plan Effective Date).

## ARTICLE VIII

## INDEMNIFICATION AND CONTRIBUTION

Section 8.1     Indemnification Obligations.  Following the entry of the Backstop Order, the Company and the other Debtors (the "**Indemnifying Parties**" and each, an "**Indemnifying Party**") shall, to the maximum extent permitted by law, jointly and severally, indemnify and hold harmless each Backstop Commitment Party and its Affiliates, Affiliated Funds equity holders, members, partners, general partners, managers and its and their respective Representatives and controlling persons (each, an "**Indemnified Person**") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than any Taxes) arising out of a claim asserted by a third-party (collectively, "**Losses**") that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with this Agreement, including the Rights Offering Backstop Commitment, the Direct Allocation Amount, the Rights Offering or the Direct Allocation, the payment of the Backstop Premium or the use of the proceeds of the Direct Allocation or the Rights Offering, or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, the other Debtors, their respective equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable documented (with such documentation subject to redaction to preserve attorney client and work product privileges) legal or other third-party expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Agreement or the Plan are consummated or whether or not this Agreement is terminated; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (a) as to a Defaulting Commitment Party, its Related Parties or any Indemnified Person related

75

thereto, caused by a Commitment Party Default by such Backstop Commitment Party, or (b) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the fraud, bad faith or willful misconduct of such Indemnified Person.

Section 8.2 <u>Indemnification Procedure</u>.  Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding (an "**Indemnified Claim**"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; <u>provided</u>, that (a) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (b) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this <u>Article VIII</u>.  In case any such Indemnified Claims are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Person, the Indemnifying Party will be entitled to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Person; <u>provided</u>, that if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims.  Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election to so assume the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Person, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof or participation therein (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required)), (ii) the Indemnifying Party shall not have employed counsel reasonably acceptable to such Indemnified Person to represent such Indemnified Person within a reasonable time after the Indemnifying Party has received notice of commencement of the Indemnified Claims from, or delivered on behalf of, the Indemnified Person, (iii) after the Indemnifying Party assumes the defense of the Indemnified Claims, the Indemnified Person determines in good faith that the Indemnifying Party has failed or is failing to defend such claim and provides written notice of such determination and the basis for such determination, and such failure is not reasonably cured within ten (10) Business Days of receipt of such notice, or (iv) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.

Section 8.3    <u>Settlement of Indemnified Claims</u>.  In connection with any Indemnified Claim for which an Indemnified Person is assuming the defense in accordance with this <u>Article VIII</u>, the Indemnifying Party shall not be liable for any settlement of any Indemnified Claims effected by such Indemnified Person without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed).  If any settlement of any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, this <u>Article VIII</u>.  The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld, conditioned or delayed in the Indemnified Person's sole discretion), effect any settlement of any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (a) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims and (b) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

Section 8.4    <u>Contribution</u>.    If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are subject to indemnification pursuant to <u>Section 8.1</u>, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations.  It is hereby agreed that the relative benefits to the Indemnifying Party, on the one hand, and all Indemnified Persons, on the other hand, shall be deemed to be in the same proportion as (a) the total value received or proposed to be received by the Company pursuant to the funding of the Direct Allocation Shares, Rights Offering Shares and Backstop Shares contemplated by the Rights Offering, this Agreement and the Plan bears to (b) the Backstop Premium paid or proposed to be paid to the Backstop Commitment Parties.  The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their comparative or contributory negligence or otherwise to the Indemnifying Parties, any Person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other Person in connection with an Indemnified Claim.

Section 8.5    <u>Treatment of Indemnification Payments</u>.  All amounts paid by an Indemnifying Party to an Indemnified Person under this <u>Article VIII</u> shall, to the extent permitted by applicable Law, be treated as adjustments to the Funding Amount for all applicable Tax purposes.  The provisions of this <u>Article VIII</u> are an integral part of the transactions contemplated by this Agreement and without these provisions the Backstop

Commitment Parties would not have entered into this Agreement. The Backstop Order shall provide that the obligations of the Debtors under this <u>Article VIII</u> shall constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code and shall not be subject to set-off, recharacterization, avoidance or disallowance and are payable without further Order of the Bankruptcy Court, and that the Debtors may comply with the requirements of this <u>Article VIII</u> without further Order of the Bankruptcy Court.

Section 8.6    <u>No Survival</u>. All representations, warranties, covenants and agreements made in this Agreement shall not survive the Closing Date except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

## ARTICLE IX

## TERMINATION

Section 9.1    <u>Consensual Termination</u>. This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date by mutual written consent of the Debtors and the Required Backstop Commitment Parties.

Section 9.2    <u>Automatic Termination; Termination by the Backstop Commitment Parties</u>.

(a)    Notwithstanding anything to the contrary in this Agreement, this Agreement shall terminate automatically without any further action or notice by any Party at 5:00 p.m., New York City time, on the same date as the occurrence of any of the following Events; <u>provided</u>, that, the Required Backstop Commitment Parties may waive such termination or extend any applicable dates in accordance with <u>Section 10.8</u>:

(i)    the Closing Date has not occurred by 11:59 p.m., New York City time, on the Outside Date, unless prior thereto the Plan Effective Date occurs and the Direct Allocation and the Rights Offering have been consummated; and

(ii)    the Restructuring Support Agreement is terminated as to all parties thereto in accordance with its terms.

(b)    This Agreement may be terminated by the Required Backstop Commitment Parties, upon written notice to the Company upon the occurrence of any of the following Events:

(i)    (A) the Company or any of the other Debtors shall have breached any representation, warranty, covenant or other agreement made by the Company or any of the other Debtors in this Agreement or any such representation or warranty shall have become inaccurate and such breach or inaccuracy would, individually or in the aggregate, cause a condition set forth in <u>Section 7.1(l)</u> (Representations and Warranties), <u>Section 7.1(m)</u> (Covenants) or <u>Section 7.1(n)</u>

78

(Material Adverse Effect) not to be satisfied, (B) the Backstop Commitment Parties shall have delivered written notice of such breach or inaccuracy to the Debtors, (C) notwithstanding anything to the contrary in <u>Section 9.2(b)</u>, such breach or inaccuracy is not cured by the Company or the Debtors by the eighth (8th) Business Day after receipt of such notice, and (D) as a result of such failure to cure, any condition set forth in <u>Section 7.1(l)</u> (Representations and Warranties), <u>Section 7.1(m)</u> (Covenants), or <u>Section 7.1(n)</u> (Material Adverse Effect) is not capable of being satisfied; <u>provided</u>, that, this Agreement shall not terminate pursuant to this <u>Section 9.2(b)(i)</u> if (i) the Backstop Commitment Parties constituting the Required Backstop Commitment Parties are then in willful or intentional breach of this Agreement or (ii) if one or more Backstop Commitment Parties constituting the Required Backstop Commitment Parties is then in breach of any representation, warranty, covenant or other agreement hereunder that would result in the failure of any condition set forth in <u>Section 7.3(j)</u> or <u>Section 7.3(k)</u> being satisfied;

(ii)     any Law or final and non-appealable Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement or the other Transaction Agreements (and, if applicable, such Law has not been reversed or vacated within eight (8) Business Days), in each case, on substantially the terms provided for therein, in a way that cannot be remedied in all material respects by the Debtors in a manner satisfactory to the Required Backstop Commitment Parties (<u>provided</u>, that to the extent inconsistent with the Restructuring Support Agreement or this Agreement, any economic treatment provided thereunder shall be reasonably acceptable to the Debtors and the Required Backstop Commitment Parties in their sole discretion);

(iii)    the Company or any Debtor (A) amends or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documents in a manner that is inconsistent with this Agreement; (B) suspends or revokes the Transaction Agreements; or (C) publicly announces its intention to take any such action listed in sub-clauses (A) or (B) of this subsection;

(iv)     any of the Restructuring Support Agreement, the Backstop Order, Disclosure Statement Order or Confirmation Order is terminated, reversed, stayed, dismissed, vacated, or reconsidered, or any such Order is modified or amended after entry without the prior written consent of the Required Backstop Commitment Parties as applicable (and such action has not been reversed or vacated within eight (8) Business Days), in a manner that prevents or prohibits the consummation of the transactions contemplated by this Agreement or the other Transaction Agreements in each case, on substantially the terms provided for therein, in a way that cannot be remedied in all material respects by the Debtors in a manner satisfactory to the Required Backstop Commitment Parties as applicable;

(v)      any of the Orders approving any Exit Financing Facility, this Agreement, the Rights Offering Procedures, the Plan or the Disclosure Statement or the Confirmation Order are reversed, stayed, dismissed, vacated or reconsidered

or modified or amended without the acquiescence or written consent of the Required Backstop Commitment Parties, as applicable (and such action has not been reversed or vacated within thirty (30) calendar days after its issuance) in a manner that prevents or prohibits the consummation of the Restructuring Transactions contemplated in this Agreement or any of the Definitive Documents in each case, on substantially the terms provided for therein, in a way that cannot be remedied in all material respects by the Debtors satisfactory to the Required Backstop Commitment Parties, as applicable;

(vi)    the Company or any of the other Debtors files any motion, application or adversary proceeding (or any of the Company or any of the other Debtors supports any such motion, application, or adversary proceeding filed or commenced by any third party) challenging the validity or enforceability, or seeking avoidance or subordination, of the Senior Secured Notes Claims, _provided_, that, in the event that this Agreement is to be terminated by the Required Backstop Commitment Parties under this subsection upon written notice to the Debtors in accordance with this Section 9.2(b)(vi), the Company or any of the other Debtors shall have until 5:00 p.m., New York City time, on the fifth (5th) Business Day following receipt of such notice to withdraw such motion, application or adversary proceeding or otherwise cure before the Required Backstop Commitment Parties are permitted to terminate pursuant to this Section 9.2(b)(vi);

(vii)    (A) the Bankruptcy Court approves or authorizes an Alternative Restructuring Proposal; or (B) any Debtor enters into any Contract providing for the consummation of any Alternative Restructuring Proposal or files any motion or application seeking authority to propose, join in or participate in the formation of, any actual or proposed Alternative Restructuring Proposal;

(viii)    the acceleration of any obligations or termination of commitments under the DIP Facility or the DIP Financing Documents; or

(ix)    the Bankruptcy Court enters an order denying the Senior Secured Backstop Premium or Convertible Backstop Premium.

Section 9.3    Termination by the Debtors.    This Agreement may be terminated immediately by the Debtors upon written notice to each Backstop Commitment Party upon the occurrence of any of the following Events, subject to the rights of the Debtors to fully and conditionally waive, in writing, on a prospective or retroactive basis the occurrence of such Event:

(a)    any Law or final and non-appealable Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan, the Direct Allocation or the Rights Offering or the transactions contemplated by this Agreement or the other Transaction Agreements, in each case, on substantially the terms provided for therein, in a way that cannot be remedied in all material respects by the Debtors in a manner satisfactory to the Required Backstop Commitment Parties;

80

(b)    subject to the right of the Backstop Commitment Parties to arrange a Commitment Party Replacement in accordance with <u>Section 2.5(a)</u> (which will be deemed to cure any breach by the replaced Backstop Commitment Party for purposes of this subsection <u>(b)</u>, (i) any Backstop Commitment Party shall have breached any representation, warranty, covenant or other agreement made by such Backstop Commitment Party in this Agreement or any such representation or warranty shall have become inaccurate and such breach or inaccuracy would, individually or in the aggregate, cause a condition set forth in <u>Section 7.3(i)</u> (Representations and Warranties) or <u>Section 7.3(j)</u> (Covenants) not to be satisfied, (ii) the Debtors shall have delivered written notice of such breach or inaccuracy to such Backstop Commitment Party, (iii) such breach or inaccuracy is not cured by such Backstop Commitment Party by the tenth (10th) Business Day after receipt of such notice, and (iv) as a result of such failure to cure, any condition set forth in <u>Section 7.3(j)</u> (Representations and Warranties) or <u>Section 7.3(k)</u> (Covenants) is not capable of being satisfied; <u>provided</u>, that the Debtors shall not have the right to terminate this Agreement pursuant to this <u>Section 9.3(b)</u> if any Debtor is then in willful or intentional breach of this Agreement;

(c)    the Backstop Order, Disclosure Statement Order or Confirmation Order is terminated, reversed, stayed, dismissed, vacated, or reconsidered, or any such Order is modified or amended after entry without the prior acquiescence or written consent (not to be unreasonably withheld, conditioned or delayed) of the Debtors (and such action has not been reversed or vacated within eight (8) Business Days) in a manner that prevents or prohibits the consummation of the Restructuring Transactions contemplated in this Agreement or any of the Definitive Documents in a way that cannot be remedied in all material respects by the Backstop Commitment Parties subject to the reasonable satisfaction of the Debtors;

(d)    the Restructuring Support Agreement is terminated as to all parties in accordance with its terms; or

(e)    any of the Orders approving any Exit Financing Facility, this Agreement, the Rights Offering Procedures, the Plan or the Disclosure Statement or the Confirmation Order are reversed, stayed, dismissed, vacated or reconsidered or modified or amended without the acquiescence or consent (not to be unreasonably withheld, conditioned or delayed) of the Debtors (and such action has not been reversed or vacated within thirty (30) calendar days after its issuance) in a manner that prevents or prohibits the consummation of the Restructuring Transactions contemplated in this Agreement or any of the Definitive Documents in a way that cannot be remedied in all material respects by the Backstop Commitment Parties subject to the reasonable satisfaction of the Debtors.

Section 9.4    <u>Effect of Termination</u>.

(a)    Upon termination of this Agreement pursuant to this <u>Article IX</u>, this Agreement shall forthwith become void and there shall be no further obligations or liabilities on the part of the Parties; <u>provided</u>, that (i) the obligations of the Debtors to pay the Expense Reimbursement pursuant to <u>Article III</u> and to satisfy their indemnification obligations pursuant to <u>Article VIII</u> shall survive the termination of this Agreement and shall remain in full force and effect, in each case, until such obligations have been satisfied, (ii) the provisions set forth in <u>Article VIII</u>, this <u>Section 9.4</u> and <u>Article X</u> shall survive the termination of this Agreement in accordance

81

with their terms, (iii) subject to Section 10.11 (Damages), nothing in this Section 9.4 shall relieve any Party from liability for its fraud, gross negligence or any willful or intentional breach of this Agreement and (iv) all amounts deposited by the Backstop Commitment Parties in the Escrow Account shall be returned to the Backstop Commitment Parties in accordance with the terms of the Escrow Agreement.  For purposes of this Agreement, "**willful or intentional breach**" means a breach of this Agreement that is a consequence of an act undertaken by the breaching Party with the knowledge that the taking of such act would, or would reasonably be expected to, cause a breach of this Agreement.

(b)     If this Agreement is terminated in connection with a termination of the Restructuring Support Agreement, then the Backstop Cash Premium (in satisfaction of the Backstop Premium) will become payable by the Debtors on the date of termination in cash to the Backstop Commitment Parties or their designees based upon their respective Commitment Percentage, and the Debtors will pay the Backstop Cash Premium by wire transfer of immediately available funds to such accounts as the Backstop Commitment Parties may designate within three (3) Business Days following such termination. If this Agreement is terminated (1) pursuant to Section 9.3(b) or (2) as a result of a termination of the Restructuring Support Agreement due to the breach of the Restructuring Support Agreement by any Consenting Stakeholder (any Backstop Commitment Party or Consenting Stakeholder whose breach resulted in such termination pursuant to clause (1) or (2), a "**Breaching Consenting Stakeholder**"), then the Backstop Cash Premium will become payable by the Debtors on the date of termination in cash to the Backstop Commitment Parties (other than the Breaching Consenting Stakeholder(s)), or their designees, based upon their respective Commitment Percentage and the Debtors shall pay the Backstop Cash Premium by wire transfer of immediately available funds to such accounts as the Backstop Commitment Parties (other than the Breaching Consenting Stakeholder(s)) may designate within three (3) Business Days following such termination.

(c)     To the extent that all amounts due in respect of the Backstop Cash Premium pursuant to Section 9.4(b) have actually been paid by the Debtors to the Backstop Commitment Parties in connection with a termination of this Agreement, then (without limitation of any rights or remedies under the Restructuring Support Agreement), the Backstop Commitment Parties shall not have any additional recourse, including with respect to the Backstop Premium against the Debtors for any obligations or liabilities relating to or arising from this Agreement (other than obligations and liabilities pursuant to Section 8.1, any Expense Reimbursement and any other obligation or liability that expressly survives the termination of this Agreement) except for liability for intentional fraud, gross negligence or willful or intentional breach of this Agreement pursuant to Section 9.4(a).  The Backstop Cash Premium payable pursuant to this Section 9.4 shall constitute an allowed administrative expense claim of the Debtors' estates pursuant to sections 503(b) and 507 of the Bankruptcy Code and shall not be subject to set-off, recharacterization, avoidance or disallowance.

## ARTICLE X

## GENERAL PROVISIONS

Section 10.1   Notices.   All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given if delivered

personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses (or at such other address for a Party as may be specified by like notice):

(a)     If to the Company or any of the other Debtors:

Spirit Airlines, Inc.
2800 Executive Way
Miramar, FL 33025
Attn:   Thomas Canfield
Email: thomas.canfield@Spirit.com

with a copy to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attn:   Marshall Huebner
        Darren Klein
        Christopher Robertson
Email: marshall.huebner@davispolk.com
        darren.klein@davispolk.com
        christopher.robertson@davispolk.com

If to the Backstop Commitment Parties:

To each Backstop Commitment Party at the addresses or e-mail addresses set forth below the Backstop Commitment Party's signature in its signature page to this Agreement.

*If to a Senior Secured Backstop Commitment Party, with a copy to:*

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn:  Michael Stamer
        Jason P. Rubin
        Stephen B. Kuhn
Email: mstamer@akingump.com
        jrubin@akingump.com
        skuhn@akingump.com

*If to a Convertible Backstop Commitment Party, with a copy to:*

Paul Hastings LLP
71 S. Wacker Drive

83

Chicago, IL 60606
Attn:   Matthew L. Warren
         Geoffrey M. King
Email: mattwarren@paulhastings.com;
         geoffking@paulhastings.com

Paul Hastings LLP
1170 Peachtree Street N.E.
Suite 100
Atlanta, GA 30309
Attn: Zach Cochran
Email: zachcochran@paulhastings.com

Section 10.2    <u>Assignment; Third Party Beneficiaries</u>.    Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by any Party (whether by operation of Law or otherwise) without the prior written consent of the Debtors and the Required Backstop Commitment Parties, other than an assignment by a Backstop Commitment Party expressly permitted by <u>Section 2.3</u>, and any purported assignment in violation of this <u>Section 10.2</u> shall be void *ab initio*.  Except as provided in <u>Article VIII</u> with respect to the Indemnified Persons, this Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any Person any rights or remedies under this Agreement other than the Parties.  Notwithstanding anything to the contrary herein, each Party recognizes, acknowledges and agrees that this Agreement binds only the desk or business unit that executes this Agreement and shall not be binding on any other desk, business unit or Affiliate, unless such desk, business unit or Affiliate separately becomes a Party hereto.

Section 10.3    <u>Prior Negotiations; Entire Agreement</u>.

(a)    This Agreement (including the Schedules attached hereto and the documents and instruments referred to in this Agreement) and the Restructuring Support Agreement constitute the entire agreement of the Parties and supersede all prior agreements, arrangements or understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement, except that the Parties hereto acknowledge that any confidentiality agreements heretofore executed among the Parties will each continue in full force and effect.

(b)    Notwithstanding anything to the contrary in the Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (and any amendments, supplements or modifications thereto) or an affirmative vote to accept the Plan submitted by any Backstop Commitment Party, nothing contained in the Plan (including any amendments, supplements or modifications thereto) or Confirmation Order (including any amendments, supplements or modifications thereto) shall alter, amend or modify the rights of the Backstop Commitment Parties under this Agreement unless such alteration, amendment or modification has been made in accordance with <u>Section 10.8</u>.

Section 10.4   <u>Governing Law; Venue</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

Section 10.5   <u>Binding Agreement</u>.  Each Party agrees that this Agreement is a binding and enforceable agreement with respect to the subject matter contained herein or therein (including an obligation to negotiate in good faith). With respect to any Debtor that becomes a party to this Agreement after the date of this Agreement hereof, this Agreement shall become effective as to and fully binding upon such Debtor at the time it executes and delivers a Company Acknowledgment in accordance with the terms hereof, and such Debtor, as of such time and without further action, shall be deemed to have made to the other Parties all representations and warranties in Article IV of this Agreement. Prior to the date that the Debtors set forth on Exhibit D become a party to this Agreement, references to "Debtors" in this Agreement shall be deemed to be a reference to the Company.

Section 10.6   <u>Waiver of Jury Trial</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 10.7   <u>Counterparts</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery (including by .pdf), each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

Section 10.8   <u>Waivers and Amendments; Rights Cumulative; Consent</u>. This Agreement may be amended, restated, modified or changed only by a written instrument signed by the Debtors and the Required Backstop Commitment Parties (other than a Defaulting Commitment Party); <u>provided</u>, <u>that</u>, in addition, each Backstop Commitment Party's prior written consent shall be required for any amendment that would have the effect of directly or indirectly: (a) modifying such Backstop Commitment Party's Direct Allocation Amount or Commitment Amount, (b) increasing the Funding Amount to be paid by such Backstop Commitment Party in respect of  such Backstop Commitment Party's Rights Offering Shares, Backstop Shares and Direct Allocation Shares (c) amending the definition of Outside Date, (d) increasing the Senior Secured

85

Rights Offering Amount or the Convertible Rights Offering Amount without each Commitment Party having the opportunity (but not the obligation) to participate pro rata in such increase, (e) amending any of the following: (1) <u>Section 3.2</u> (Payment of Backstop Premium), (2) this <u>Section 10.8</u> (Waivers and Amendments; Rights Cumulative; Consent); (3) <u>Article VIII</u> (Indemnification and Contribution); or (4) <u>Article IX</u> (Termination); or (f) otherwise having a materially adverse and disproportionate effect on such Backstop Commitment Party.  The terms and conditions of this Agreement may be waived (i) by the Debtors only by a written instrument executed by the Debtors and (ii) by the Backstop Commitment Parties only by a written instrument executed by the Required Backstop Commitment Parties (<u>provided</u>, that each Backstop Commitment Party's prior written consent shall be required for any waiver having the direct or indirect effects referred to in the proviso to the first sentence of this <u>Section 10.8</u>).  No delay on the part of any Party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege pursuant to this Agreement, nor any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further wavier or exercise thereof or the waiver or exercise of any other right, power or privilege pursuant to this Agreement.  Except as otherwise provided in this Agreement, the rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any Party otherwise may have at law or in equity.  For the avoidance of doubt, nothing in this Agreement shall affect or otherwise impair the rights, including consent rights, of the Backstop Commitment Parties under the Restructuring Support Agreement or any other Definitive Document.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

Section 10.9    <u>Headings</u>. The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

Section 10.10 <u>Specific Performance</u>.  The Parties agree that irreparable damage may occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled, whether at law, in equity or otherwise.  Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law, in equity or otherwise.

Section 10.11 <u>Damages</u>. Notwithstanding anything to the contrary in this Agreement, none of the Parties will be liable for, and none of the Parties shall claim or

seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits as a result of any breach of or other claim or cause of action arising out of or in connection with this Agreement.

Section 10.12  No Reliance.  No Backstop Commitment Party or any of its Related Parties shall have any duties or obligations to the other Backstop Commitment Parties in respect of this Agreement, the Plan or the transactions contemplated hereby or thereby, except those expressly set forth herein.  Without limiting the generality of the foregoing, (a) no Backstop Commitment Party or any of its Related Parties shall be subject to any fiduciary or other implied duties to the other Backstop Commitment Parties or to the Company or the other Debtors, (b) no Backstop Commitment Party or any of its Related Parties shall have any duty to take any discretionary action or exercise any discretionary powers on behalf of any other Backstop Commitment Party, (c) no Backstop Commitment Party or any of its Related Parties shall have any duty to the other Backstop Commitment Parties to obtain, through the exercise of diligence or otherwise, to investigate, confirm or disclose to the other Backstop Commitment Parties any information relating to Company or any of its Subsidiaries that may have been communicated to or obtained by such Backstop Commitment Party or any of its Affiliates in any capacity, (d) no Backstop Commitment Party may rely, and each Backstop Commitment Party confirms that it has not relied, on any due diligence investigation that any other Backstop Commitment Party or any Person acting on behalf of such other Backstop Commitment Party may have conducted with respect to the Company or any of its Affiliates or any of their respective securities, and (e) each Backstop Commitment Party acknowledges that no other Backstop Commitment Party is acting as a placement agent, initial purchaser, underwriter, broker or finder with respect to its Backstop Shares, Direct Allocation Shares or Backstop Premium Shares.

Section 10.13  Publicity.  Except as required by applicable Laws or by any listing authority or stock exchange or any regulatory or governmental body, at all times prior to the Closing Date or the earlier termination of this Agreement in accordance with its terms, the Debtors and the Backstop Commitment Parties shall consult with each other prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public announcements with respect to the transactions contemplated by this Agreement, it being understood that nothing in this Section 10.13 shall prohibit any Party from filing any motions or other pleadings or documents with the Bankruptcy Court in connection with the Chapter 11 Cases.  Except as required by applicable Law, by any listing authority or stock exchange or any regulatory or governmental body, or as ordered by the Bankruptcy Court or other court of competent jurisdiction, no Party or its advisors shall (a) use the name of any Commitment Party in any public manner (including in any press release) with respect to this Agreement, the transaction contemplated hereby or the Restructuring Transactions or (b) disclose to any Person (including, for the avoidance of doubt, any other Party) the Direct Allocation Amount and/or the Commitment Amount of any Backstop Commitment Party as determined pursuant to this Agreement without such Backstop Commitment Party's prior written consent, and if the Company determines that it is required to attach a copy of this Agreement to any Definitive Documents or any other filing or similar document relating to the transactions contemplated hereby, it will redact any reference to

or concerning a specific Backstop Commitment Party's name, Direct Allocation Amount, Commitment Amount, and Pro Rata Share of the Rights Offering Shares, if applicable.

Section 10.14 <u>Settlement Discussions</u>.   This Agreement and the transactions contemplated herein are part of a proposed settlement of a dispute between the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Section 408 of the U.S. Federal Rules of Evidence and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any Legal Proceeding, except to the extent filed with, or disclosed to, the Bankruptcy Court in connection with the Chapter 11 Cases (other than a Legal Proceeding to approve or enforce the terms of this Agreement).

Section 10.15 <u>No Recourse</u>.   Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Parties may be partnerships or limited liability companies, each Party covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any Party's Affiliates, or any of such Party's Affiliates' or respective Related Parties in each case other than the Parties to this Agreement and each of their respective successors and permitted assignees under this Agreement, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable Law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Related Parties, as such, for any obligation or liability of any Party under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; <u>provided</u>, <u>however</u>, nothing in this <u>Section 10.15</u> shall relieve or otherwise limit the liability of any Party hereto, any Related Purchaser party to this Agreement, or any of their respective successors or permitted assigns for any breach or violation of its obligations under this Agreement or such other documents or instruments.  For the avoidance of doubt, prior to the Plan Effective Date, none of the Parties will have any recourse, be entitled to commence any proceeding or make any claim under this Agreement or in connection with the transactions contemplated hereby except against any of the Parties, any Related Purchaser party to this Agreement, or their respective successors and permitted assigns, as applicable.

Section 10.16 <u>Specific Execution</u>.   The Parties understand that the Consenting Stakeholders are engaged in a wide range of financial services and businesses. In furtherance of the foregoing, the Parties acknowledge and agree that, to the extent a Consenting Stakeholder expressly indicates on its signature page hereto that it is executing this Agreement on behalf of specific trading desk(s) and/or business group(s) of the Consenting Stakeholder, the obligations set forth in this Agreement shall only apply to such trading desk(s) and/or business group(s) and shall not apply to any other trading desk or business group of the Consenting Stakeholder so long as they are not acting at the direction or for the benefit of such Consenting Stakeholder or such Consenting Stakeholder's investment in the Company; provided, that the foregoing shall not diminish or otherwise affect the obligations and liability therefor of any legal entity that (i) executes this Agreement or (ii) on whose behalf this Agreement is executed by a Consenting

88

Stakeholder. The Company acknowledges that the Consenting Stakeholder may have engaged an investment manager or advisor which acts as (i) the sole investment manager or advisor for certain single-manager accounts, and (ii) investment manager or adviser solely to a designated pool of assets of certain multi-manager accounts. In respect of the multi-manager accounts, to the extent a Consenting Stakeholder expressly indicates on its signature page hereto that such investment advisor or manager (A) is its discretionary advisor with respect to the accounts of the Consenting Stakeholder or (B) has executed the Agreement on Consenting Stakeholder's behalf ("Investment Advisor"), the Investment Advisor has no visibility, control or oversight in respect of the trading of other investment managers or advisers to such multi-manager accounts of the Consenting Stakeholder. As such, notwithstanding anything to the contrary herein, all agreements, covenants, representations or warranties herein that relate to any Consenting Stakeholder shall, with respect to any multi-manager accounts, solely apply to the portion of the account over which such Investment Advisor has discretion and not the Consenting Stakeholder as a whole.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the undersigned Parties have duly executed this Agreement as of the date first above written.

SPIRIT AIRLINES INC.

By: _____

Name: Fred Cromer
Title: Chief Financial Officer

[*Signature Page to Backstop Commitment Agreement*]

[*Backstop Commitment Parties Signature Pages on File with the Company*]

## **SCHEDULE 1**

**Senior Secured Commitment Schedule**

[*Senior Secured Commitment Schedule on File with the Company*]

## SCHEDULE 2

**Convertible Commitment Schedule**

[*Convertible Commitment Schedule on File with the Company*]

## EXHIBIT A

## Form of Joinder Agreement

### JOINDER AGREEMENT

This Joinder Agreement (the "***Joinder Agreement***") to the Backstop Commitment Agreement dated as of November 18, 2024 (as amended, supplemented or otherwise modified from time to time, the "***Backstop Agreement***"), among the Company and the Backstop Commitment Parties is executed and delivered by the undersigned (the "***Joining Party***") as of [●] (the "***Joinder Date***").  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Backstop Agreement.

Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Backstop Agreement, a copy of which is attached to this Joinder Agreement as **Annex 1** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Backstop Commitment Party" and as a "Backstop Commitment Party" for all purposes under the Backstop Agreement.

Representations and Warranties.  The Joining Party hereby severally, and not jointly and severally, makes the representations and warranties of the Backstop Commitment Parties as set forth in Article V of the Backstop Agreement to the Company as of the date hereof.

Governing Law. This Joinder Agreement shall be governed by and construed in accordance with the Laws of the State of New York, but without giving effect to applicable principals of conflicts of law to the extent that the application of the Law of another jurisdiction would be required thereby.

*[Signature pages to follow]*

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[JOINING PARTY]**

By: _____

      Name:

      Title:

**<u>EXHIBIT B</u>**

**<u>Form of Commitment Party Transfer Form</u>**

Reference is hereby made to that certain Backstop Commitment Agreement, dated as of November 18, 2024, (the "**<u>Backstop Commitment Agreement</u>**"), by and among the Company, the other Debtors, and the Backstop Commitment Parties.  Capitalized terms used but not defined herein shall have the meanings assigned to them in the Backstop Commitment Agreement.

The purpose of this notice ("**<u>Notice</u>**") is to advise you, pursuant to <u>Section 2.3(a)</u> of the Backstop Commitment Agreement, of the proposed transfer by [●] (the "**<u>Transferor</u>**") to [●] (the "**<u>Transferee</u>**") of [●] amount of the Transferor's (A) rights and obligations to participate in the Direct Allocation and purchase the Direct Allocation Shares and (B) rights and obligations to provide the Rights Offering Backstop Commitment and to purchase any Backstop Shares and receive Backstop Premium Shares.

This Notice shall serve as a Commitment Party Transfer Form in accordance with the terms of the Backstop Commitment Agreement, including <u>Section 2.3(a)</u> thereof.  Please acknowledge receipt of this Notice delivered in accordance with <u>Section 2.3(a)</u> by returning a countersigned copy of this Notice to the Transferor, the Transferee, and the applicable advisors.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have caused this Notice to be executed and delivered as of the date first written above.

**[TRANSFEROR]**

By: _____
   Name:
   Title:

**[TRANSFEREE]**

By: _____
   Name:
   Title:

Acknowledged and accepted by

**SPIRIT AIRLINES, INC.**

By: _____
      Name:
      Title:

## EXHIBIT C

## FORM OF COMPANY ACKNOWLEDGMENT

With respect to the Backstop Commitment Agreement, dated as of November 18, 2024, as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof (the "**Agreement**"), the undersigned (the "**Debtor**") hereby acknowledges, agrees and confirms that, by its execution of this Agreement, from and after the Effective Date (as defined below), the Debtor:

(1) becomes and shall be treated for all purposes under the Agreement as a Debtor;

(2) agrees to be subject to and bound by all of the terms of the Agreement; and

(3) is deemed, without further action, to make to the other Parties as of the Effective Date the representations and warranties that the Parties make in Article IV of the Agreement.

The Company Acknowledgment shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

Capitalized terms used in this Company Acknowledgment but not otherwise defined shall have the respective meanings set forth in the Agreement.  The Agreement shall control over any provision in this Company Acknowledgment that is inconsistent with the Agreement.

*[Signature page to follow]*

Date Executed: [                    ] (the "**<u>Effective Date</u>**")

By: _____

Name:

Authorized Signatory

## <u>EXHIBIT D</u>

### <u>DEBTORS TO SIGN COMPANY ACKNOWLEDGMENT</u>

Spirit Finance Cayman 1 Ltd.

Spirit Finance Cayman 2 Ltd.

Spirit IP Cayman Ltd.

Spirit Loyalty Cayman Ltd.

## <u>EXHIBIT D</u>

## COMPANY ACKNOWLEDGMENT

With respect to the Restructuring Support Agreement, dated as of November [•], 2024, as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof (the "**Agreement**"), the undersigned (the "**Company Party**") hereby acknowledges, agrees and confirms that, by its execution of this Agreement, from and after the Effective Date (as defined below), the Company Party:

(1) becomes and shall be treated for all purposes under the Agreement as a Company Party;

(2) agrees to be subject to and bound by all of the terms of the Agreement; and

(3) is deemed, without further action, to make to the other Parties as of the Effective Date the representations and warranties that the Parties make in Section 9 of the Agreement.

The Company Acknowledgment shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

Capitalized terms used in this Company Acknowledgment but not otherwise defined shall have the respective meanings set forth in the Agreement.  The Agreement shall control over any provision in this Company Acknowledgment that is inconsistent with the Agreement.

*[Signature page to follow]*

Date Executed: November 25, 2024 (the "**Effective Date**")

By: **SPIRIT FINANCE CAYMAN 1 LTD.**

Name: Thomas Canfield

Authorized Signatory

*[Signature Page to the Exhibit D of the Restructuring Support Agreement – Company Acknowledgement]*

Date Executed: November 25, 2024 (the "**Effective Date**")

By: **SPIRIT FINANCE CAYMAN 2 LTD.**

Name: Thomas Canfield

Authorized Signatory

Date Executed: November 25, 2024 (the "**Effective Date**")

By: **SPIRIT IP CAYMAN LTD.**

Name: Thomas Canfield

Authorized Signatory

*[Signature Page to the Exhibit D of the Restructuring Support Agreement – Company Acknowledgement]*

Docusign Envelope ID: 92497CB1-9B4B-4871-9702-1C4E4BAE2A95

Date Executed: November 25, 2024 (the "**Effective Date**")

By: **SPIRIT LOYALTY CAYMAN LTD.**

Name: Thomas Canfield

Authorized Signatory

*[Signature Page to the Exhibit D of the Restructuring Support Agreement – Company Acknowledgement]*

## **EXHIBIT E**

**DIP Term Sheet**

[To be filed with the DIP Motion]

## **EXHIBIT F**

### **Company Parties to Sign Company Acknowledgment**

Spirit Finance Cayman 1 Ltd.

Spirit Finance Cayman 2 Ltd.

Spirit IP Cayman Ltd.

Spirit Loyalty Cayman Ltd.

## **EXHIBIT G**

**Exit Secured Notes Facility Term Sheet**

**SPIRIT AIRLINES, INC.**

**11.00% / 12.00% SENIOR SECURED NOTES DUE 2030**

**Summary of Terms and Conditions**

This Summary of Terms and Conditions (this "Exit Secured Notes Facility Term Sheet") sets forth certain terms of the Exit Secured Notes Facility referred to the Restructuring Support Agreement to which this Exit Secured Notes Facility Term Sheet is attached. This Exit Secured Notes Facility Term Sheet does not address all of the terms and conditions of the Exit Secured Notes Facility and the applicable Definitive Exit Secured Notes Documentation, and all terms and conditions not set forth herein shall be subject to the Documentation Principles set forth herein. Capitalized terms used but not defined in this Exit Secured Notes Facility Term Sheet shall have the meanings ascribed to such terms in the Restructuring Support Agreement or the Plan (as defined in the Restructuring Support Agreement). Section 1.02 of the Restructuring Support Agreement shall apply to this Exit Secured Notes Facility Term Sheet, *mutatis mutandis*.

| | |
|---|---|
| **Issuer:** | Spirit Airlines, Inc. (the "Issuer"), a Delaware corporation. |
| **Guarantors:** | Each of the direct and indirect subsidiaries of the Issuer existing on the Issue Date (as defined below) or subsequently acquired and/or formed subsidiaries (collectively, the "Guarantors"; together with the Issuer, individually, an "Obligor" and, collectively, the "Obligors"). |
| **Trustee and Collateral Agent:** | An institution reasonably acceptable to the Required Noteholders and the Issuer will serve as indenture trustee and notes collateral agent (in such capacity, together with its successors and assigns, the "Trustee"). |
| **Initial Noteholders:** | The Exit Secured Notes will be issued on the Issue Date to each Holder of Allowed Senior Secured Notes Claims and each Holder of Allowed Convertible Notes Claims that is either (i) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act, (ii) a non-U.S. person as defined under Regulation S under the Securities Act, or (iii) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3), (7), (8), (9), (12) or (13) under the Securities Act (collectively, the "Exit Secured Noteholders") in accordance with the Plan of Reorganization. |
| **Issue Date:** | Effective Date (the "Issue Date"). |
| **Amount:** | $840.0 million aggregate principal amount of senior secured notes due 2030 to be issued on the Issue Date (the "Exit Secured Notes"), of which (i) $700.0 million would be issued to Holders of Allowed Senior Secured Notes Claims and (ii) $140.0 million would be issued to Holders of Allowed Convertible Notes Claims, in each case, in accordance with the terms of the Plan of Reorganization. |

| | |
|---|---|
| **Interest:** | Interest shall accrue on the Exit Secured Notes from the Issue Date, at the option of the Issuer, to be publicly announced prior to the beginning of each quarter, (x) at 12.00% per annum, of which 8.00% per annum shall be payable in cash and 4.00% per annum shall be payable in-kind or (y) at 11.00% per annum payable in cash, in each case, in arrears on a quarterly basis on the last day of each fiscal quarter.  Interest shall be calculated on the basis of a 360-day year composed of twelve 30-day months. |
| **Default Interest:** | During the continuance of an Event of Default (as defined below), all overdue Exit Secured Notes Obligations (as defined below) will bear interest at an additional 2.00% per annum, payable in cash on demand. |
| **Maturity:** | All obligations under the Exit Secured Notes, including the principal of, and accrued interest on (including any interest on interest), the Exit Secured Notes and all other amounts owing to the Trustee and the Exit Secured Noteholders with respect to the Exit Secured Notes (collectively, the "Exit Secured Notes Obligations"), will be due and payable in full in cash on the earlier of (i) the fifth anniversary of the Issue Date (the "Maturity Date") and (ii) the date of any acceleration of the Exit Secured Notes following the occurrence and continuation of an Event of Default (as defined below), by operation of law or otherwise (such earlier date, the "Termination Date"). |
| **Purpose:** | As set forth in the Plan of Reorganization. |
| **Documentation Principles:** | The indenture and other definitive documentation for the Exit Secured Notes (collectively, the "Definitive Exit Secured Notes Documentation") shall be consistent with the terms and conditions set forth in this Exit Secured Notes Facility Term Sheet and otherwise in form and substance reasonably satisfactory to the Required Noteholders and the Issuer, it being understood and agreed that the starting precedent for the Definitive Exit Secured Notes Documentation shall be a combination of (x) the Prepetition Secured Notes Indenture and the other Prepetition Secured Notes Documents (each, as defined in the Adequate Protection Order) and (y) the Prepetition RCF Credit Agreement (as defined in the Adequate Protection Order) and the Collateral Documents (as defined in the Prepetition RCF Credit Agreement), as applicable. The provisions of this paragraph are referred to herein as the "Documentation Principles". |
| **Collateral:** | The Exit Secured Notes Obligations shall be secured by liens on and security interest in the Prepetition Secured Notes Collateral (as |

2

defined in the Adequate Protection Order), the Prepetition RCF Collateral (as defined in the Adequate Protection Order) (but solely to the extent permitted by the terms of the Exit RCF Documents) and all rights, title and interests of the unencumbered assets and property of the Obligors (after giving effect to the repayment of the DIP Facility), whether real or personal, tangible or intangible, now existing or hereafter acquired, including all unencumbered aircraft, inventory, equipment, fixtures, leasehold interests, commercial tort claims, accounts receivable, investment property, documents, chattel paper (whether electronic or tangible), intercompany loans, general intangibles (including patents, trademarks and other intellectual property), instruments, business interruption insurance, supporting obligations and proceeds of all of the foregoing (collectively, the "Exit Secured Notes Collateral"); provided that the Exit Secured Notes Collateral shall not include (collectively, the "Excluded Assets") (x) property that cannot be subject to liens pursuant to applicable law, rule, contract or regulation (including any requirement to obtain the consent (after the use of commercially reasonable efforts to obtain such consent) of any governmental authority or third party, unless such consent has been obtained) or restrictions of contract (including federal concessions as well as equipment leases and financing arrangements) existing on the Issue Date or the time of entry of such contract (other than to the extent such restriction is ineffective under the UCC or other applicable law) and/or (y) any property subject to a purchase money security interest, capital lease or similar financing arrangement. Notwithstanding the foregoing, the Issuer and the Required Noteholders shall cooperate in good faith to mutually determine whether the Issuer's cash, cash equivalents and deposit accounts shall be included in the Exit Secured Notes Collateral, Excluded Assets or treated in another manner.

**Lien Priority:**   The Exit Secured Notes Obligations shall be secured by (x) to the extent permitted by the terms of the Exit RCF Documents, second-priority liens on the Prepetition RCF Collateral, junior to only the liens thereon securing the Exit Revolving Credit Facility and (y) a first-priority lien on all other Exit Secured Notes Collateral, in each case, pursuant to the terms of an intercreditor agreement that shall be in form and substance reasonably satisfactory to the Required Noteholders and the Issuer.

**Optional Redemption:**   The Issuer may redeem the Exit Secured Notes at its option, in whole or in part, at any time prior to the second anniversary of the Issue Date at a redemption price equal to 100% of the principal amount of the Exit Secured Notes redeemed, plus accrued and unpaid interest to the redemption date plus a customary T+50 basis point make-whole premium; provided that, notwithstanding the foregoing, the Issuer may redeem the Exit Secured Notes at its option, in whole, at any

NY 76475792V1

time on or prior to the date that is ninety (90) days after the Issue Date, at a redemption price equal to 100% of the principal amount of the Exit Secured Notes redeemed, plus accrued and unpaid interest to the redemption date, plus an 8.0% premium.

At any time on or after the second anniversary of the Issue Date and prior to the third anniversary of the Issue Date, the Issuer may redeem the Exit Secured Notes, in whole or in part, at a redemption price equal to 100% of the principal amount of the Exit Secured Notes redeemed, plus accrued and unpaid interest to the redemption date, plus a 6.0% premium. Thereafter, the Issuer may redeem the Exit Secured Notes, in whole or in part, at par, plus accrued and unpaid interest to the redemption date.

The premiums described in this section shall also be immediately due and payable upon the acceleration of the Exit Secured Notes after the occurrence of an Event of Default, by operation of law or otherwise. The premiums described in this section shall be presumed to be the liquidated damages sustained by each Exit Secured Noteholder as the result of the early termination of the Exit Secured Notes and the Issuer agrees that it is reasonable under the circumstances currently existing.

| | |
|---|---|
| **Mandatory Offer to Purchase upon a Change of Control:** | The Issuer will be required to offer to purchase the Exit Secured Notes upon the occurrence of a change of control (to be defined in a manner reasonably acceptable to the Required Noteholders, and which shall include a merger with, acquisition by or other business combination with, another public company), which offer shall be at 101% of the principal amount of the Exit Secured Notes *plus* accrued and unpaid interest to the date of any such redemption. |
| **Mandatory Offer to Purchase upon an Asset Sale and/or with Excess Cash Flow:** | Subject to the Documentation Principles, the Issuer will be required to offer to purchase the Exit Secured Notes (x) upon the occurrence of certain non-ordinary course asset sales of Exit Secured Notes Collateral and (y) in an amount equal to excess cash flow (to be defined in a manner reasonably acceptable to the Required Noteholders and the Issuer) for periods to be mutually agreed, in each case, which offer shall be at 100% of the principal amount of the Exit Secured Notes *plus* accrued and unpaid interest to the date of any such redemption. |
| **Affirmative Covenants, Negative Covenants, Financial Covenants and Events of Default:** | The Definitive Exit Secured Notes Documentation will contain affirmative covenants, negative covenants, financial covenants and events of default subject to the Documentation Principles. |

In addition, the negative covenants in the Definitive Exit Secured

Notes Documentation shall include a Liability Management Transaction (the "LMT Covenant") covenant that does not permit the Issuer to, and shall not permit any of its Subsidiaries to, enter into any Liability Management Transaction; provided however, the Issuer and its subsidiaries shall be permitted to enter into a Liability Management Transaction so long as each Exit Secured Noteholders is offered a bona fide right to participate in such transaction, on a pro rata basis, on not less than ten (10) Business Days' notice prior to the deadline to so elect.

Liability Management Transaction shall mean any of the following: (i) any exchange (or any transaction primarily designed to circumvent the restrictions set forth in the covenants hereof or contemporaneously achieve the same effect as an exchange) of any existing debt of the Issuer or any of its Subsidiaries (the "Existing LMT Debt") with any other debt (including preferred equity) of the Issuer or any of its Subsidiaries (the "New LMT Debt") in a transaction that is not primarily for a bona fide business purpose and instead is primarily designed to "uptier" holders of such Existing LMT Debt on a non-pro rata basis into New LMT Debt that is contractually or structurally senior to the Existing LMT Debt, (ii) any investment, asset sale or other disposition of assets to an Affiliate of the Issuer or any of its Subsidiaries that is not an Obligor (including any non-Obligor Subsidiary, Affiliate that is not an Obligor or unrestricted Subsidiary), in each case, to (a) facilitate a new debt financing (including any preferred equity) incurred by such non-Obligor Person under such debt (including a debtor-in-possession financing or preferred equity financing) or (b) to guarantee an existing debt financing or (iii) any transaction whereby an obligation owed to an Affiliate of a Loan Party (other than another Loan Party) would directly or indirectly be pari passu or senior (in right of payment or security) to the Exit Secured Notes.

| | |
|---|---|
| **Financial and Other Reporting Requirements:** | The Definitive Exit Secured Notes Documentation will contain reporting requirements subject to the Documentation Principles. |
| **Required Noteholders:** | As of any time of determination, (i) on or prior to the Issue Date, collectively, the Required Consenting Senior Secured Noteholders and the Required Consenting Convertible Noteholders and (ii) after the Issue Date, holders of at least a majority in aggregate principal amount of the Exit Secured Notes outstanding at such time (the "Required Noteholders"). |
| **Amendments:** | The Exit Secured Notes Definitive Documentation shall not be amended, waived or otherwise modified without the prior written consent of the Required Noteholders; provided that, in addition to the |

consent of the Required Noteholders, no such amendment, waiver or other modification shall, without the prior written consent of:

(i)     each holder of Exit Secured Notes directly and adversely affected thereby, (A) reduce the principal amount of, premium, if any, or interest, if any, on the Exit Secured Notes, (B) extend the stated maturity, date of any principal payment or interest payment periods of the Exit Secured Notes, (C) reduce the make-whole or any prepayment premium or any other fee due to an Exit Secured Noteholder, (D) amend, waive, or modify, or have the effect of amending, waiving or modifying, any legal right of an Exit Secured Noteholder to receive any fee, principal or interest payment or to institute suit for the enforcement of such payment, (E) amend, waive or modify, or have the effect of amending, waiving or modifying, a default or Event of Default for non-payment of principal or interest (whether in cash or paid in-kind), including the cure periods applicable to any such default, and/or (F) amend, waive or modify, or have the effect of amending, waiving or modifying, any right to receive interest or any fee payable in cash when due;

(ii)    all of the holders of Exit Secured Notes, (A) amend, waive or modify, or have the effect of amending, waiving or modifying, (i) the amendment provision of the Exit Secured Notes Definitive Documentation or (ii) any other provision of the Exit Secured Notes Definitive Documentation which provides for the unanimous consent or approval of the holders of Exit Secured Notes to reduce the percentage of principal amount of holders of Exit Secured Notes required thereunder, (B) release, or have the effect of releasing, all or substantially all of the liens on the Exit Secured Notes Collateral, (C) release, or have the effect of releasing, all or substantially all of the value of the guarantees by the Guarantors, (D) amend, waive or modify, or have the effect of amending, waiving or modifying, the priority or terms of any waterfall provisions (whether in connection with proceeds from Exit Secured Notes Collateral or otherwise), (E) amend, waive or modify, or have the effect of amending, waiving or modifying, the LMT Covenant, and/or (F) amend, waive or modify, or have the effect of amending, waiving or modifying, the Exit Secured Notes Definitive Documentation to permit additional debt or commitments thereunder for the purpose of influencing voting thresholds;

(iii)   holders of no less than 85% of the outstanding principal amount of the Exit Secured Notes, (A) subordinate the liens on the Exit Secured Notes Collateral to liens securing any other debt (other

6

than the Exit Revolving Credit Facility or refinancings or replacements thereof), (B) subordinate the Exit Secured Notes in right of payment to the payment of any other debt or (C) release, or have the effect of releasing, through one or a series of related transactions, liens on Exit Secured Notes Collateral having a fair market value (as reasonably determined by the Issuer) in excess of 20% of the total fair market value of all Exit Secured Notes Collateral; provided that, notwithstanding the foregoing, (x) the liens on the Exit Secured Notes Collateral may be subordinated to the liens securing any other debt, (y) the Exit Secured Notes may be subordinated to other debt and/or (z) liens on Exit Secured Notes Collateral having a fair market value in excess of 20% of the total fair market value of all Exit Secured Notes Collateral may be released, in each case, with the consent of holders of not less than 67% of the Exit Secured Notes if each Exit Secured Noteholder is offered a bona fide opportunity to participate in such other debt or transaction closed in connection with such release on a pro rata basis on not less than ten (10) Business Days' notice prior to the deadline to participate therein; or

(iv)   holders of no less than [67/85]% of the outstanding principal amount of the Exit Secured Notes to amend, waive or modify, or have the effect of amending, waiving or modifying, any financial covenant or Event of Default for failure to comply with a financial covenant.

Neither the Issuer, nor any of its subsidiaries, shall, directly or indirectly, pay or cause to be paid any consideration to any Exit Secured Noteholder for or as an inducement to any consent, waiver or amendment unless such consideration is offered to be paid and is paid to all Exit Secured Noteholders that consent to such transaction in the applicable time frame set forth in the solicitation documents relating to such transaction.

The Issuer shall provide a copy of each amendment to each of the Exit Secured Noteholders (whether their consent is needed or not for such amendment), for their consent, no less than three (3) Business Days prior to the proposed execution of such amendment.

Notwithstanding anything set forth above, no amendment or modification of the Exit Secured Notes Definitive Documentation may be effected that would adversely change (x) the economic terms, (y) the interests in the Exit Secured Notes Collateral or (z) the legal remedies, in each case, of a particular Exit Secured Noteholder in a manner disproportionate to the rights or interests of any other Exit

7

Secured Noteholder without the prior consent of each Noteholder so affected; provided that no transaction set forth in clause (iii) above shall constitute a disproportionate adverse change.

**No Registration Rights**:   The Issuer shall not be required to file a registration statement with the Securities and Exchange Commission ("<u>SEC</u>") relating to the initial issuance or any resale of the Exit Secured Notes and shall not be required to commence an offer to exchange the Exit Secured Notes for SEC registered notes or other notes.

**Transfer Restrictions:**   The Exit Secured Notes will be subject to restrictions on transfer and may only be offered or sold in transactions exempt from or not subject to the registration requirements of the Securities Act, including resales pursuant to Rule 144A under the Securities Act or Regulation S under the Securities Act.  The Issuers do not intend to list the Exit Secured Notes on any securities exchange.

**Trust Indenture Act:**   The New Indenture will not be qualified under, or required to comply with the provisions of, the United States Trust Indenture Act of 1939 (as amended from time to time).

**Ratings:**   The Issuer shall use commercially reasonable efforts to obtain, at the expense of the Issuer, public ratings (but no specific ratings) of the Exit Secured Notes and the Issuer from Moody's and S&P within 30 days after the Issue Date.

**Governing Law:**   The State of New York (except for security/collateral documentation that the Trustee determines should be governed by federal law or local law).

**Counsel to Noteholders:**   Akin Gump Strauss Hauer & Feld LLP and Paul Hastings LLP.

NY 76475792V1

## **EXHIBIT H**

**Governance Term Sheet**

## SPIRIT AIRLINES, INC.
## GOVERNANCE TERM SHEET

*This term sheet (this "**Term Sheet**") describes certain corporate governance provisions to be in effect after the Restructuring of Spirit Airlines, Inc. and the other Debtors. Capitalized terms used in this Term Sheet but not defined herein shall have the meanings set forth in the RSA and the Restructuring Term Sheet, as applicable, of which this Term Sheet forms a part.*

| | |
|---|---|
| **Reorganized Company** | Reorganized Company (the "**Company**") will be a Delaware corporation. It is intended that the Company will be a public reporting company on a National Securities Exchange.<br><br>"**National Securities Exchange**" means The New York Stock Exchange, The Nasdaq Global Select Market or The Nasdaq Global Market. |
| **Capital Stock** | One class of voting common stock (the "**New Common Stock**") and authorized but unissued "blank check" preferred stock, having such designations, preferences, limitations and relative rights, including preferences over the New Common Stock with respect to dividends and distributions, as the New Board may determine. |
| **Board of Directors** | The New Board shall consist of up to nine (9) directors composed of: (i) the chief executive officer of the Company; and (ii) up to eight directors selected by a committee (the "**Selection Committee**") comprised of five (5) Consenting Senior Secured Noteholders and three (3) Consenting Convertible Noteholders.  The Selection Committee shall approve each director by the affirmative vote of a majority of the members of the Selection Committee, which majority shall include at least a majority of the Consenting Senior Secured Noteholder members and a majority of the Consenting Convertible Noteholder members. No institution may serve as both a Consenting Senior Secured Noteholder member and as a Consenting Convertible Noteholder member of the Selection Committee. Notwithstanding the foregoing, if the Selection Committee cannot reach agreement on directors pursuant to clause (ii), the New Board shall consist of (a) the chief executive officer of the Company, (b) six (6) directors selected by the Required Consenting Senior Secured Noteholders and (c) two (2) directors selected by the Required Consenting Convertible Noteholders.<br><br>All members of the New Board other than the chief executive officer of the Company shall meet the independence requirements of a National Securities Exchange.<br><br>After the Plan Effective Date, the members of the New Board will be in a single class elected by the holders of the New Common Stock annually. |
| **Stockholder Approvals** | In addition to any approvals required under applicable law and regulation, without the approval of the holders of a majority of the outstanding New |

Common Stock (provided that after the New Common Stock is listed on a National Securities Exchange, such approval shall be of the holders of a relevant majority standard of the shares of New Common Stock as specified under the voting standard of such National Securities Exchange), the Company shall not authorize, adopt or amend any equity incentive plan other than the Management Incentive Plan or authorize any increase in the amount of shares or equity awards permitted to be granted under the Management Incentive Plan or any other equity incentive plan or equity compensation plan.

In addition, until such time as the New Common Stock is listed on a National Securities Exchange, without the approval of the holders of a majority of outstanding New Common Stock, the Company shall not:

(i)   issue shares of New Common Stock for cash in excess of 5% of the fully-diluted number of shares of New Common Stock outstanding and authorized for issuance under the Plan on the Plan Effective Date (including all shares contemplated under the claims recovery, the Rights Offering, the Backstop Commitment Agreement and the Management Incentive Plan) or authorize or issue any shares of preferred stock; *provided* that this limitation shall not apply in connection with the adoption of a *bona fide* stockholder rights plan by the Company's board of directors;

(ii)  enter into any sales, transfers or licenses of any Company subsidiary, division, operation, business, line of business, assets or property, in each case, held by the Company or any of its subsidiaries with any person other than the Company or one or more of its wholly-owned subsidiaries involving consideration in excess of $50,000,000 per transaction or series of related transactions; *provided* that this limitation shall not apply to sales, transfers or licenses in the ordinary course of business involving any aircraft, aircraft engines or simulators; or

(iii) make any acquisition, by merger, consolidation or stock or asset purchase or investment with respect to any business, assets, property or any corporation or other entity, involving consideration in excess of $50,000,000 per transaction or series of related transactions; *provided* that this limitation shall not apply to any acquisition or investment in the ordinary course of business involving any aircraft, aircraft engines or simulators.

Following such time as the New Common Stock is listed on a National Securities Exchange, the approvals required under applicable law and regulation (including the requirements of the applicable National Securities Exchange) shall apply in connection with the foregoing actions.

| | |
|---|---|
| **Transfer Restrictions** | The New Common Stock will be transferable without Company consent, subject to (i) compliance with applicable securities laws and (ii) limitations |

| | |
|---|---|
| | of ownership by non-U.S. citizens, which shall be included in the New Organizational Documents in substantially similar form as the Company's organizational documents existing as of the date hereof (subject to such changes as the Required Consenting Stakeholders may reasonably request consistent with DOT regulations) and the language thereof shall be acceptable to the Consenting Senior Secured Noteholders and the Consenting Convertible Noteholders in accordance with Section 3.02 of the RSA.<br><br>If requested by the Required Consenting Stakeholders before the Plan Effective Date, the New Organizational Documents will include transfer restrictions designed to limit an ownership change for purposes of Section 382 of the U.S. Internal Revenue Code or otherwise the Company may implement a stockholder rights plan designed for such purpose, in each case effective upon the Plan Effective Date. |
| **Registration Rights** | On the Plan Effective Date, the Company will enter into, and all initial holders of the New Common Stock will be deemed pursuant to the Prepackaged Plan and the Confirmation Order to enter into, a registration rights agreement (the "Registration Rights Agreement") providing for the following:<br><br>• Direct Listing and S-1 Resale Shelf. The Company shall use commercially reasonable efforts to, on or as soon as reasonably practicable after the Plan Effective Date:<br><br>    o cause the New Common Stock to be registered under Section 12(b) of the Securities Exchange Act of 1934, as amended;<br><br>    o obtain a listing of the New Common Stock on a National Securities Exchange; and<br><br>    o register all of the New Common Stock that is not issued and distributed pursuant to Section 1145(a) and therefore constitute "restricted securities" or that are "control securities" for purposes of Rule 144 or applicable successor rule ("Rule 144") under the Securities Act of 1933, as amended (the "Securities Act") (such New Common Stock, together with any securities issued or issuable in respect of such New Common Stock by way of conversion, exchange, stock dividend, split or combination, recapitalization, merger, consolidation or otherwise, the "Registrable Securities") on a shelf registration statement (the "S-1 Resale Shelf") on Form S-1 or applicable successor form ("Form S-1"); provided that any Registrable Securities shall cease to be Registrable Securities on the first date that (i) all such securities shall have become freely tradable under Rule 144 without a holding period, current public |

information requirement, limitation on volume, manner of sale restrictions or notice requirements and (ii) any and all restrictive legends or designations associated with such shares have been removed. The S-1 Resale Shelf shall provide for offerings on a delayed or continuous basis pursuant to Rule 415 under the Securities Act or applicable successor rule ("Rule 415").

The Company shall prepare and file such amendments, post-effective amendments and supplements to the S-1 Resale Shelf as may be necessary to keep the S-1 Resale Shelf effective until the earlier of (1) the date that no Registrable Securities remain, (2) the date that all Registrable Securities have been sold pursuant to Rule 144 or a registration statement or (3) the date the S-3 Resale Shelf (as defined below) has become effective.

- S-3 Resale Shelf. Once the Company has qualified for the use of a registration statement on Form S-3 or applicable successor form ("Form S-3"), the Company shall as promptly as practicable register all of the remaining Registrable Securities that have not been sold pursuant to Rule 144 or a registration statement, on a shelf registration statement on Form S-3 (the "S-3 Resale Shelf"). The S-3 Resale Shelf shall provide for offerings on a delayed or continuous basis pursuant to Rule 415. The Company shall use commercially reasonable efforts to prepare and make all such filings as may be necessary to keep the S-3 Resale Shelf effective until the earlier of (1) the date that no Registrable Securities remain and (2) the date that all such Registrable Securities have been sold pursuant to Rule 144 or a registration statement.

- Shelf Takedowns. If requested by holders of Registrable Securities representing at least 10% of the then-outstanding Registrable Securities, the Company shall conduct a shelf takedown off of the S-1 Resale Shelf or S-3 Resale Shelf, as applicable, covering New Common Stock requested by such holders (a "Takedown Request"). Such holders may specify the type of offering to be covered by the Takedown Request, such as an underwritten offering or registered block trade. The number of Takedown Requests shall be limited to no more than three in any twelve-month period for all holders and only if the gross proceeds of such offering are expected to be greater than $35 million.

- Piggyback Registrations. Each holder of Registrable Securities who holds at least 3% of the then-outstanding New Common Stock will have the right to include its New Common Stock each time the Company conducts an offering pursuant to a Takedown Request (other than a registered block trade) or proposes for any reason to register any of its New Common Stock under the Securities Act, subject to customary exceptions (such as registrations on Form S-4

| | |
|---|---|
| | or Form S-8). |
| | • <u>Other Provisions</u>. The Registration Rights Agreement will also contain customary provisions relating to the registration procedures to be followed by the Company, indemnification obligations, delay and suspension rights, selection of underwriters, priority, cutbacks, lock-ups (to the extent requested by an applicable underwriter) and payment of expenses of registrations by the Company (including reasonable fees and disbursements of counsel for the selling holders of Registrable Securities, but excluding underwriter discounts and commissions). |
| **DTC** | The New Common Stock is to be DTC-eligible and issued through DTC, other than any shares of New Common Stock required to bear a "restricted" legend under applicable securities laws (which shall be in DTC under a restricted CUSIP if feasible and permitted by DTC, otherwise in book entry form). The Company shall use commercially reasonable efforts to remove any such restricted legends when permitted under applicable securities laws, including obtaining any necessary legal opinions. |
| **State Law Business Combination Provision** | The Certificate of Incorporation shall contain a provision in which the Company elects not to be subject to the restrictions on transactions with interested stockholders set forth in Section 203 of the Delaware General Corporation Law. |
| **Other Terms** | The New Organizational Documents shall also provide for the indemnification and exculpation of directors, officers and appropriate persons to the fullest extent permitted by applicable law. |

## EXHIBIT I

**Form of Joinder**

## JOINDER

With respect to the Restructuring Support Agreement, dated as of [•], 2024, as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof (the "**Agreement**"), the undersigned (the "**Joinder Party**") hereby acknowledges, agrees and confirms that, by its execution of this Agreement, from and after the Effective Date (as defined below), the Joinder Party:

(1) becomes and shall be treated for all purposes under the Agreement as a Consenting Stakeholder as appropriate, with respect to (i) all Company Claims/Interests that the Joinder Party holds and (ii) the Transferred Company Claims/Interests (if applicable) to the same extent the transferor was bound by the Agreement;

(2) agrees to be subject to and bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as **Annex 1** (as such terms may be amended from time to time in accordance with the terms thereof) and by the vote of the transferor with respect to any Transferred Company Claims/Interests, if the transferor of the Company Claims/Interests voted on the Plan before the effectiveness of the Transfer of the Company Claims/Interests to be Transferred in connection with the execution of this Joinder; and

(3) is deemed, without further action, to make to the other Parties as of the Effective Date the representations and warranties that the Parties make in Section 8 and Section 9 of the Agreement.

The Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

Capitalized terms used in this Joinder but not otherwise defined shall have the respective meanings set forth in the Agreement. The Agreement shall control over any provision in this Joinder that is inconsistent with the Agreement.

Date Executed: [                    ] (the "Effective Date")

_____
Name:
Title:

Address:

E-mail address(es):

| *Aggregate Principal Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Senior Secured Notes Claims | |
| 2025 Convertible Notes Claims | |
| 2026 Convertible Notes Claims | |

**<u>Exhibit G</u>**

**Joint Chapter 11 Plan of Reorganization**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **SPIRIT AIRLINES, INC.,** *et al.*, | **Case No. 24-11988 (SHL)** |
| Debtors.[1] | **Jointly Administered** |

### JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
### SPIRIT AIRLINES, INC. AND ITS DEBTOR AFFILIATES

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
Marshall S. Huebner
Darren S. Klein
Christopher S. Robertson
Moshe Melcer
Kayleigh Yerdon (*pro hac vice* pending)

*Proposed Counsel to the Debtors and Debtors in Possession*

Dated: December [●], 2024
         New York, New York

---

**THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR VOTES OF ACCEPTANCE OR REJECTION IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION IN THE CHAPTER 11 CASES.**

---

[1] The Debtors' names and last four digits of their respective employer identification numbers or registration numbers in the applicable jurisdictions are as follows: Spirit Airlines, Inc. (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

# **TABLE OF CONTENTS**

ARTICLE I.
    DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION
    OF TIME, GOVERNING LAW, AND OTHER REFERENCES .........................1

    **A.**    Defined Terms ........................................................................................ 1

    **B.**    Rules of Interpretation ....................................................................... 22

    **C.**    Computation of Time .......................................................................... 23

    **D.**    Governing Law .................................................................................... 23

    **E.**    Reference to Monetary Figures ........................................................... 24

    **F.**    Nonconsolidated Plan ......................................................................... 24

    **G.**    Consent Rights .................................................................................... 24

ARTICLE II.
    DIP SUPERPRIORITY CLAIMS; ADMINISTRATIVE CLAIMS;
    PRIORITY CLAIMS; AND U.S. TRUSTEE FEES ...........................................24

    **A.**    DIP Superpriority Claims ................................................................... 24

    **B.**    Administrative Claims ........................................................................ 25

        1.    General Administrative Claims .................................................25

        2.    Professional Fee Claims ............................................................25

        3.    Treatment of Priority Tax Claims .............................................27

    **C.**    U.S. Trustee Fees ................................................................................ 28

ARTICLE III.
    CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND
    INTERESTS ..........................................................................................................28

    **A.**    Classification and Treatment of Claims and Interests ......................... 29

        1.    Class 1 — Other Secured Claims ..............................................29

        2.    Class 2 — Other Priority Claims ..............................................29

        3.    Class 3 — Prepetition RCF Claims ..........................................30

        4.    Class 4 — Senior Secured Notes Claims ..................................31

        5.    Class 5 — Convertible Notes Claims ........................................31

        6.    Class 6 — General Unsecured Claims ......................................32

        7.    Class 7 — Section 510(b) Claims .............................................32

        8.    Class 8 — Intercompany Claims ...............................................32

        9.    Class 9 — Intercompany Interests ............................................33

        10.    Class 10 — Existing Interests ...................................................33

    **B.**    Special Provision Governing Unimpaired Claims ............................... 33

    **C.**    Voting Classes; Presumed Acceptance or Rejection by Nonvoting Classes ........ 33

        1.    Voting Classes Under the Plan ..................................................33

        2.    Acceptance of the Plan by Impaired Classes of Claims ................34

        3.    Presumed Acceptance of the Plan .............................................34

        4.    Presumed Rejection of the Plan .................................................34

        5.    Presumed Acceptance or Rejection of the Plan .............................34

        6.    Presumed Acceptance by Voting Classes with No Votes ..............34

**D.**     Elimination of Vacant Classes ................................................................ 34

**E.**     Controversy Concerning Impairment ...................................................... 35

ARTICLE IV.     IMPLEMENTATION OF THE PLAN .............................................................35

**A.**     Continued Existence and Vesting of Assets ........................................... 35

        1.     Reorganized Debtors.................................................................35

        2.     Transfer of Books and Records; Privilege .................................35

**B.**     Transactions Related to the Plan ............................................................ 36

**C.**     New Equity Interests............................................................................... 36

        1.     Issuance of New Equity Interests...............................................36

        2.     Exchange Act Registration and Listing .....................................37

        3.     Exemption from Registration.....................................................37

**D.**     Equity Rights Offering............................................................................ 40

**E.**     Exit Financing ........................................................................................ 41

        1.     Entry into Exit Financing Documents........................................41

        2.     Exemption from Registration.....................................................42

**F.**     Boards of Directors/Managers ............................................................... 43

**G.**     New Organizational Documents; No Further Action ............................. 43

**H.**     Cancellation of Instruments, Certificates, and Other Documents.......... 44

**I.**     Subordination ......................................................................................... 45

**J.**     Structural Simplification ........................................................................ 45

**K.**     Management Incentive Plan .................................................................... 46

**L.**     DTC Eligibility ...................................................................................... 46

ARTICLE V.     PROVISIONS GOVERNING DISTRIBUTIONS ...........................................46

**A.**     Timing and Calculation of Amounts to Be Distributed ......................... 46

**B.**     Sources for Plan Distributions and Transfers of Funds Among Debtors............. 47

**C.**     Distribution Agent .................................................................................. 47

**D.**     *De Minimis* Distributions ....................................................................... 48

**E.**     Delivery of Plan Distributions—Allowed Claims ................................. 48

**F.**     Fractional New Equity Interests.............................................................. 49

**G.**     Manner of Payment Under the Plan ........................................................ 49

**H.**     Allocation of Plan Distributions Between Principal and Interest ........... 49

**I.**     Compliance Matters ............................................................................... 50

**J.**     Foreign Currency Exchange Rate ........................................................... 50

**K.**     Fractional Dollars................................................................................... 50

**L.**     Undeliverable, Unclaimed, or Non-Negotiated Plan Distributions ....... 51

**M.**     Claims Paid by Third Parties .................................................................. 51

**N.**     Claims Payable by Third Parties............................................................. 52

ARTICLE VI.

      PROCEDURES FOR RESOLVING CLAIMS ................................................52

  **A.**    Objections to Claims .................................................................................. 52

  **B.**    Resolution of Disputed Claims ................................................................. 53

  **C.**    Estimation of Claims and Interests .......................................................... 53

  **D.**    No Distributions Pending Allowance or Settlement of Causes of Action ........... 54

  **E.**    No Amendments to Claims ....................................................................... 54

  **F.**    No Late-Filed Claims ............................................................................... 55

  **G.**    No Interest ................................................................................................ 55

  **H.**    Adjustment to Claims Without Objection ................................................ 55

  **I.**    Reservation of Rights to Object to Claims .............................................. 55

  **J.**    Disallowance of Claims ........................................................................... 56

  **K.**    Reimbursement or Contribution .............................................................. 56

ARTICLE VII.

      TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
      LEASES ....................................................................................................56

  **A.**    Assumption and Rejection of Executory Contracts and Unexpired Leases ......... 56

  **B.**    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ........ 57

  **C.**    Employment-Related Provisions .............................................................. 58

      1.    Employment Agreement and Benefit Programs ...........................58

      2.    Collective Bargaining Agreements ...............................................59

  **D.**    Rejection Claims ...................................................................................... 59

  **E.**    Reservation of Rights ............................................................................... 60

  **F.**    Transferred Cure Costs ............................................................................ 60

  **G.**    Indemnification ........................................................................................ 60

      1.    Debtor Indemnification Obligations .............................................60

      2.    Third-Party Indemnities ................................................................60

  **H.**    Insurance-Related Provisions ................................................................... 61

ARTICLE VIII.

      EFFECT OF CONFIRMATION OF THE PLAN ....................................62

  **A.**    Release of Liens ....................................................................................... 62

  **B.**    Releases; Discharges ................................................................................ 62

  **C.**    Term of Injunctions or Stays ................................................................... 63

  **D.**    Exculpation .............................................................................................. 63

  **E.**    Releases by the Debtors ........................................................................... 64

  **F.**    Voluntary Releases by the Releasing Parties .......................................... 66

  **G.**    Injunction ................................................................................................. 68

  **H.**    Setoff and Recoupment ........................................................................... 70

  **I.**    Preservation of Causes of Action ............................................................ 70

**J.**  Compromise and Settlement of Claims and Controversies .................................. 71

**K.**  Protection Against Discriminatory Treatment ..................................................... 71

ARTICLE IX.  CONDITIONS TO EFFECTIVE DATE......................................................72

**A.**  Conditions Precedent to the Effective Date .................................................... 72

**B.**  Waiver of Conditions to Effectiveness ................................................................ 73

**C.**  Effect of Non-Occurrence of Conditions to the Effective Date........................... 74

ARTICLE X.  MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ......74

**A.**  Plan Modifications ............................................................................................ 74

**B.**  Revocation or Withdrawal of Plan and Effects of Nonoccurrence of Confirmation or Effective Date ........................................................................ 75

ARTICLE XI.  RETENTION OF JURISDICTION ...................................................................75

ARTICLE XII.  MISCELLANEOUS PROVISIONS..................................................................78

**A.**  Exemption from Transfer Taxes and Recording Fees ......................................... 78

**B.**  Request for Expedited Determination of Taxes.................................................... 79

**C.**  Dissolution of Any Committee .......................................................................... 79

**D.**  Plan Supplement and Other Plan Documents ...................................................... 79

**E.**  No Admission .................................................................................................... 79

**F.**  Substantial Consummation ................................................................................ 80

**G.**  Section 1125 of the Bankruptcy Code ................................................................ 80

**H.**  Non-Severability ............................................................................................... 80

**I.**  Binding Effect.................................................................................................... 81

**J.**  Service of Documents ........................................................................................ 81

**K.**  Waiver or Estoppel ............................................................................................ 82

**L.**  Conflicts............................................................................................................ 82

**M.**  Entire Agreement .............................................................................................. 83

**<u>Introduction</u>**

Pursuant to section 1121(a) of the Bankruptcy Code,[1] the Debtors propose this *Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and its Debtor Affiliates* (including all appendices, exhibits, schedules, and supplements (including any Plan Supplements), and as it may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "**Plan**") to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes on the Plan and the hearing on the final approval of the Disclosure Statement and confirmation of the Plan (as such hearing may be continued from time to time, the "**Combined Hearing**"). The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Other agreements and documents may supplement this Plan and may be Filed with the Bankruptcy Court. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and <u>Article X</u>, the Debtors reserve the right to alter, supplement, amend, or otherwise modify (one or more times), revoke, or withdraw the Plan prior to its substantial consummation.

Reference is made to the Disclosure Statement, which includes information pertaining to the Debtors' prepetition business operations and financial history, the events leading up to the Chapter 11 Cases, a description of certain effects of confirmation of the Plan, certain risk factors associated with the Plan, the way Plan Distributions will be made, the confirmation process, and confirmation requirements.

Holders of Claims entitled to vote to accept or reject the Plan will receive a Ballot and a copy of the Disclosure Statement to enable them to vote on the Plan in accordance with the voting instructions and make any other elections or representations required pursuant to the Plan.

**ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

**A.    Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "**2025 Convertible Notes**" means the 4.75% Convertible Senior Notes due 2025 issued under the 2025 Convertible Notes Indenture.

2.    "**2025 Convertible Notes Claim**" means a Claim on account of the 2025 Convertible Notes.

---

[1] Capitalized terms used herein shall have the meanings ascribed to them in <u>Article I</u> unless otherwise defined elsewhere herein.

3.    "**2025 Convertible Notes Indenture**" means that certain Indenture, dated as of May 12, 2020, between Spirit Airlines, Inc., as issuer, and Wilmington Trust, National Association, as trustee, as supplemented by that certain First Supplemental Indenture, dated as of May 12, 2020, between Spirit Airlines, Inc., as issuer, and Wilmington Trust, National Association, as trustee, as amended, amended and restated, supplemented, or otherwise modified prior to the Petition Date.

4.    "**2026 Convertible Notes**" means the 1.00% Convertible Senior Notes due 2026 issued under the 2026 Convertible Notes Indenture.

5.    "**2026 Convertible Notes Claim**" means a Claim on account of the 2026 Convertible Notes.

6.    "**2026 Convertible Notes Indenture**" means that certain Indenture, dated as of May 12, 2020, between Spirit Airlines, Inc., as issuer, and Wilmington Trust, National Association, as trustee, as supplemented by that certain Second Supplemental Indenture, dated as of April 30, 2021, between Spirit Airlines, Inc., as issuer, and Wilmington Trust, National Association, as trustee, as amended, amended and restated, supplemented, or otherwise modified prior to the Petition Date.

7.    "**Administrative Claim**" means a Claim against any of the Debtors arising on or after the Petition Date and before the Effective Date for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b) and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including the following:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the businesses of the Debtors (including wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services, and reimbursement of expenses pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date, including Professional Fee Claims; (c) all fees and charges assessed against the Estates pursuant to 28 U.S.C. § 1930, including the U.S. Trustee Fees; (d) the DIP Superpriority Claims; (e) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), or (5) of the Bankruptcy Code and to the extent approved by the Bankruptcy Court; (f) Cure Costs; and (g) any fees and expenses that are earned and payable pursuant to the Plan or the Plan Documents (including the Backstop Premium). For the avoidance of doubt, for the purposes of treatment and Plan Distributions, the DIP Superpriority Claims shall be subject to Article II.A.

8.    "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if the referenced Entity were a Debtor.

9.    "**Allowed**" means, with respect to any Claim or Interest, except as otherwise provided in the Plan: (a) a Claim or Interest that either (i) is not Disputed or (ii) has been allowed by a Final Order; (b) a Claim or Interest that is allowed, compromised, settled, or otherwise resolved (i) pursuant to the terms of the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court by a Final Order, or (iii) pursuant to any contract, instrument, indenture, or other

2

agreement entered into or assumed in connection herewith; (c) a Claim relating to a rejected Executory Contract or Unexpired Lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order; or (d) a Claim or Interest as to which a Proof of Claim or Proof of Interest, as applicable, has been timely filed and as to which no objection has been filed. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays the amount, or turns over any property, for which such Entity is liable.  For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the (Reorganized) Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.   "**Allow**" and "**Allowing**" shall have correlative meanings. Notwithstanding anything to the contrary herein, to the extent applicable, and without prejudice to the rights of any Holder of an Allowed Administrative Claim to argue that section 502(d) of the Bankruptcy Code is inapplicable to its Administrative Claim, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such (Reorganized) Debtor.  Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest, late fees, or other similar related charges on such Claim from and after the Petition Date.

10.    "**Assets**" means all rights, titles, interest, and assets of the Debtors of any nature whatsoever, including all property of the Estates of any kind pursuant to section 541 of the Bankruptcy Code, Cash, Causes of Action, accounts receivable, tax refunds, claims of right, interests in property (including real, personal, tangible, and intangible property), and proceeds from any of the foregoing items in this Article I.A.10.

11.    "**Assumption Dispute**" has the meaning ascribed to it in Article VII.B.

12.    "**Avoidance Actions**" means any and all actual or potential avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors, their Estates, or other authorized parties in interest to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through and including 553, and 724(a) of the Bankruptcy Code, or under similar or related state, federal, and non-U.S. statutes, non-bankruptcy law, and common law, including fraudulent transfer laws or fraudulent conveyance laws.

13.    "**Backstop Commitment Agreement**" means that certain Backstop Commitment Agreement attached as Exhibit B to the Restructuring Support Agreement, by and among the Debtors and the Backstop Commitment Parties, including all exhibits, annexes, and schedules thereto, and as may be amended from time to time in accordance with its terms.

14.    "**Backstop Cash Premium**" has the meaning set forth in the Backstop Commitment Agreement.

15.    "**Backstop Commitment Parties**" has the meaning set forth in the Backstop Commitment Agreement.

16. "**Backstop Motion**" means a motion Filed in the Chapter 11 Cases seeking entry of the Backstop Order.

17. "**Backstop Order**" means the order entered by the Bankruptcy Court approving and authorizing the Debtors' entry into the Backstop Commitment Agreement and other Equity Rights Offering Documents and approving the Rights Offering Procedures.

18. "**Backstop Premium**" has the meaning set forth in the Backstop Commitment Agreement.

19. "**Backstop Premium Shares**" means the backstop premium payable to the Backstop Commitment Parties in New Equity Interests in consideration for the Backstop Commitment on the terms set forth in the Backstop Commitment Agreement.

20. "**Backstop Shares**" has the meaning set forth in the Backstop Commitment Agreement.

21. "**Ballot**" means the ballot upon which Holders of Claims entitled to vote on the Plan shall cast their vote to accept or reject the Plan, including, as applicable, any E-Ballots.

22. "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as applicable to the Chapter 11 Cases, as may be amended from time to time.

23. "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York with jurisdiction over these Chapter 11 Cases and, to the extent any reference made under 28 U.S.C. § 157 is withdrawn or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the United States District Court for the Southern District of New York.

24. "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075 and the general and chambers rules of the Bankruptcy Court.

25. "**Beneficial Owner**" means a beneficial owner for U.S. federal income tax purposes.

26. "**Business Day**" means any day, other than a Saturday, Sunday, or Legal Holiday.

27. "**Case Information Website**" means the case information website maintained by the Claims and Solicitation Agent at https://dm.epiq11.com/SpiritGoForward.

28. "**Cash**" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

29. "**Causes of Action**" means any claim, interest, damage, remedy, cause of action, proceeding, demand, right, action, suit, obligation, liability, account, defense, offset, power, privilege, license, Lien, indemnity, guaranty, franchise, debt, judgment, or controversy of any kind or character whatsoever, whether known or unknown, choate or inchoate, foreseen or unforeseen,

existing or hereinafter arising, contingent or noncontingent, disputed or undisputed, liquidated or unliquidated, secured or unsecured, matured or unmatured, suspected or unsuspected, assertable directly or derivatively, reduced to judgment or otherwise, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise pursuant to any theory of law.  For the avoidance of doubt, Causes of Action include the following:  (a) any right of setoff, counterclaim, or recoupment and any claim under contracts or for breaches of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any claims or causes of action for aiding and abetting (including of breaches of fiduciary duties), knowing participation (including knowing participation in breach of fiduciary duty), and conspiracy (including conspiracy to breach fiduciary duty); (d) any claims or causes of action for illegal dividends; (e) any claims or causes of action for fraud, misrepresentations, or omissions; (f) the right to object to, subordinate, disallow, or otherwise contest Claims or Interests; (g) claims or causes of action pursuant to sections 362, 510, 542, 543, 544–550, or 553 of the Bankruptcy Code; (h) any claim or defense, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (i) any Avoidance Action; (j) any claim or defense related to tax refunds or tax audits; and (k) any Retained Cause of Action.

30.    "**Certificate**" means any instrument evidencing a Claim or an Interest.

31.    "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor or group of Debtors, the chapter 11 case or cases pending for that Debtor or group of Debtors under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

32.    "**Claim**" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

33.    "**Claims and Solicitation Agent**" means Epiq Corporate Restructuring, LLC, the claims, noticing, and solicitation agent employed by the Debtors in the Chapter 11 Cases.

34.    "**Claims Register**" means the official register of Claims maintained by the Claims and Solicitation Agent.

35.    "**Class**" means a category of Claims against or Interests in the Debtors, as set forth in Article III, under section 1122(a) of the Bankruptcy Code.

36.    "**Collateral Agency and Accounts Agreement**" means that certain Collateral Agency and Accounts Agreement dated as of September 17, 2020, by and among Spirit IP Cayman Ltd. and Spirit Loyalty Cayman Ltd., each as co-issuers, the other grantors from time to time party thereto, Wilmington Trust, National Association, as depositary, collateral agent and trustee under the Senior Secured Notes Indenture and the other senior secured debt representatives from time to time party thereto, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms.

37.    "**Committee**" means any statutory committee appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

38.    "**Compensation and Benefits Programs**" has the meaning set forth in Article VII.C.

39.    "**Confirmation**" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

40.    "**Confirmation Date**" means the date on which Confirmation occurs.

41.    "**Combined Hearing**" has the meaning set forth in the Introduction above.

42.    "**Confirmation Objection Deadline**" has the meaning set forth in the Scheduling Order.

43.    "**Confirmation Order**" means an order of the Bankruptcy Court (a) approving the Disclosure Statement on a final basis, pursuant to section 1125 of the Bankruptcy Code, to the extent required, (b) confirming the Plan pursuant to section 1129 of the Bankruptcy Code, and (c) granting other related relief in form and substance acceptable to the Debtors and the Required Consenting Stakeholders, including all exhibits, appendices, supplements, and related documents.

44.    "**Consenting Convertible Noteholders**" means the Convertible Noteholders that are signatories to the Restructuring Support Agreement, and any subsequent Holder of the Convertible Notes that becomes party thereto in accordance with the terms of the Restructuring Support Agreement.

45.    "**Consenting Convertible Noteholders Advisors**" means, collectively, (a) Paul Hastings LLP, (b) Ducera Partners LLC, (c) one Cayman Islands local counsel, and (d) one aviation specialist counsel.

46.    "**Consenting Senior Secured Noteholders**" means the Senior Secured Noteholders that are signatories to the Restructuring Support Agreement, and any subsequent Holder of the Senior Secured Notes that becomes party thereto in accordance with the terms of the Restructuring Support Agreement.

47.    "**Consenting Senior Secured Noteholders Advisors**" means, collectively, (a) Akin Gump Strauss Hauer & Feld LLP, (b) Evercore Group L.L.C., (c) Appleby (Cayman) Ltd, as Cayman Islands local counsel, (d) Watson Farley & Williams LLP, as aviation counsel, and (e) any consultants or other professionals retained by the Consenting Senior Secured Noteholder Advisors with the consent of the Debtors (such consent not to be unreasonably withheld).

48.    "**Consenting Stakeholders**" means, collectively, the Consenting Convertible Noteholders and the Consenting Senior Secured Noteholders.

49.    "**Consummation**" means the occurrence of the Effective Date.

50.    "**Contingent**" means, when used in reference to a Claim, any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event that has not yet occurred as of the date on which such Claim is sought to be estimated or on which an objection to such Claim is Filed, whether or not such event is within the actual or presumed contemplation of the Holder of such Claim and whether or not a relationship between the Holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

51.    "**Continuing Senior Secured Notes Document**" has the meaning ascribed to it in Article IV.H.

52.    "**Convertible Notes Claims**" means, collectively, the 2025 Convertible Notes Claims and 2026 Convertible Notes Claims.

53.    "**Convertible Notes Documents**" means the Convertible Notes Indentures and certain other documents related to the Convertible Notes Indentures.

54.    "**Convertible Notes Equity Distribution**" means a share of the Total Convertible Notes Equity Entitlement based on the proportion that the principal amount of a Class 5 Holder's Claim bears to the aggregate principal amount of all Class 5 Holders' Claims, subject to any Ineligible Convertible Noteholder Adjustment.

55.    "**Convertible Notes Equity Rights Offering Amount**" means 21.25% of New Equity Interests issued pursuant to the Equity Rights Offering and the Backstop Commitment Agreement (other than the Backstop Premium Shares).

56.    "**Convertible Notes Indentures**" means, collectively, the 2025 Convertible Notes Indenture and the 2026 Convertible Notes Indenture.

57.    "**Convertible Notes Subscription Rights**" means the rights of Holders of the Convertible Notes Claims to purchase their Pro Rata share of the Convertible Notes Equity Rights Offering Amount, subject to the Equity Rights Offering Holdback, on the terms and conditions set forth in the Restructuring Support Agreement and the Equity Rights Offering Documents.

58.    "**Convertible Noteholder**" means a "Holder" as defined in the 2025 Convertible Notes Indenture or the 2026 Convertible Notes Indenture.

59.    "**Covered Claim**" means a claim or Cause of Action of the type set forth in Article VIII.D, Article VIII.E.1–4, or Article VIII.F.1–4.

60.    "**Cure Costs**" means an amount (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease), including an amount of $0.00, as applicable, required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed, or assumed and assigned, by the Debtors via the Plan pursuant to section 365 or 1123 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) Bankruptcy Code.

61.    "**D&O Liability Insurance Policies**" means all directors', managers', and officers', or employees' liability insurance policies (including any "tail policy" or excess policies)

of any of the Debtors that have been issued or provide coverage at any time to current or former directors, managers, officers, or employees of the Debtors, and all agreements, documents, or instruments related thereto.

62.    "**Debtors**," "**Company**," or "**Spirit**" means, collectively, the above-captioned debtors, in their capacities as debtors and debtors-in-possession in the Chapter 11 Cases.

63.    "**DIP Agent**" means Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent under certain of the DIP Documents.

64.    "**DIP Credit and Note Purchase Agreement**" means that certain Debtor in Possession Credit and Note Purchase Agreement on the terms set forth in the DIP Facility Term Sheet.

65.    "**DIP Documents**" means the DIP Facility Term Sheet, the DIP Credit and Note Purchase Agreement and all other agreements, documents, and instruments related thereto, including the DIP Order and any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements, as now in effect or as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with their terms and the terms of the DIP Order.

66.    "**DIP Facility**" mean the $300 million senior secured superpriority debtor-in-possession facility to be provided pursuant to, and subject to the terms and conditions of, the DIP Documents.

67.    "**DIP Facility Term Sheet**" means that certain DIP Facility Term Sheet attached as Exhibit E to the Restructuring Support Agreement.

68.    "**DIP Lenders**" means the lenders from time to time party to the DIP Documents.

69.    "**DIP Note Purchasers**" means the holders of notes pursuant to the DIP Documents.

70.    "**DIP Order**" means, collectively, the Interim DIP Order and Final DIP Order entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Documents and access the DIP Facility.

71.    "**DIP Secured Parties**" means the DIP Agent, the DIP Lenders, DIP Note Purchasers, and certain other secured parties, as further set forth in the DIP Documents.

72.    "**DIP Superpriority Claims**" means superpriority Claims relating to or arising out of the DIP Facility, as further set forth in the DIP Order (including for the avoidance of doubt, all adequate protection obligations set forth therein) and the DIP Documents.

73.    "**Disallowed**" means, with respect to a Claim, Interest, or any portion thereof, (a) an objection to the Claim has been Filed, (b) the Claim has been disallowed, subordinated, or expunged, in whole or in part, by a Final Order or stipulation, (c) the Claim has been withdrawn, in whole or in part, (d) the Claim is listed in the Schedules as zero or as Disputed, Contingent, or

Unliquidated and in respect of which a Proof of Claim has not been timely Filed or deemed timely Filed pursuant to the Plan, the Bankruptcy Code, or any Final Order of the Bankruptcy Court, (e) the Claim has been reclassified, expunged, subordinated, or estimated to the extent that such reclassification, expungement, subordination, or estimation results in a reduction in amount reflected on the Schedules or the applicable Proof of Claim, or (f) the Claim is evidenced by a Proof of Claim which was not timely or properly Filed.

74.    "**Disclosure Statement**" means the disclosure statement for the Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time, which shall be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders

75.    "**Disputed**" means, with respect to a Claim, Interest, or any portion thereof, (a) any such Claim to the extent neither Allowed or Disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503, or 1111 of the Bankruptcy Code or (b) with respect to which any party has filed a Proof or Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.  To the extent that only a portion of a Claim is disputed, such Claim shall be deemed Allowed in the amount not disputed, if any, and Disputed as to the balance of such Claim.

76.    "**Distribution Agent**" means, as applicable, the Reorganized Debtors or any Entity designated or retained by the Reorganized Debtors with the consent of the Required Consenting Stakeholders without the need for any further order of the Bankruptcy Court, to make or facilitate Plan Distributions.

77.    "**Distribution Date**" means, except as otherwise set forth herein, the date or dates determined by the Reorganized Debtors, on or after the Effective Date, upon which the Distribution Agent shall make Plan Distributions to Holders of Allowed Claims entitled to receive Plan Distributions.

78.    "**Distribution Record Date**" means, other than with respect to Securities held through DTC, the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive Plan Distributions, which date shall be the Confirmation Date or such other date and time designated by the (Reorganized) Debtors.  For the avoidance of doubt, the Distribution Record Date shall not apply to Securities held through DTC, which shall receive Plan Distributions, if any, in accordance with the applicable procedures of DTC.

79.    "**DOT**" means the United States Department of Transportation or any successor agency thereto.

80.    "**DTC**" means The Depository Trust Company.

81.    "**Effective Date**" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect, (b) all conditions precedent to the occurrence of the Effective Date set forth in <u>Article IX.A</u> have been satisfied or waived in accordance with <u>Article IX.B</u>, and (c) the Debtors declare the Plan effective.  Any action

to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter and shall otherwise be deemed in compliance with the Plan and Confirmation Order.

82.     "**Eligible Convertible Noteholder**" means any Convertible Noteholder that is not an Ineligible Convertible Noteholder.

83.     "**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

84.     "**Equity Rights Offering**" means the equity rights offering to be consummated on the Effective Date in accordance with the Equity Rights Offering Documents.

85.     "**Equity Rights Offering Amount**" means $350 million of proceeds generated by the Equity Rights Offering.

86.     "**Equity Rights Offering Documents**" means the Backstop Commitment Agreement, the Backstop Motion, the Backstop Order, the Scheduling Order, and any and all other agreements, documents, and instruments delivered or entered into in connection with, or otherwise governing, the Equity Rights Offering, including the Equity Rights Offering Procedures, subscription forms, and any other materials distributed in connection with the Equity Rights Offering.

87.     "**Equity Rights Offering Holdback**" means with respect to the Equity Rights Offering, the holdback only available to the Backstop Commitment Parties in accordance with and in the amounts set forth in the Backstop Commitment Agreement.

88.     "**Equity Rights Offering Holdback Shares**" means the shares of New Equity Interests that are issued to the Backstop Commitment Parties on account of the Equity Rights Offering Holdback.

89.     "**Equity Rights Offering Participants**" means the Holders of Convertible Notes Claims and Holders of Senior Secured Notes Claims entitled to participate in the Equity Rights Offering, pursuant to the Equity Rights Offering Procedures.

90.     "**Equity Rights Offering Procedures**" means those certain rights offering procedures with respect to the Equity Rights Offering, which rights offering procedures shall be set forth in the Equity Rights Offering Documents.

91.     "**Equity Rights Offering Shares**" means the shares of New Equity Interests issued pursuant to the Equity Rights Offering.

92.     "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461 (2018 & Supp. III 2021).

93.     "**Estate**" means, as to each Debtor, the bankruptcy estate created for the Debtor pursuant to section 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

94.    "**Exculpated Party**" means (a) each Debtor, (b) each Reorganized Debtor, (c) each DIP Secured Party, (d) each Consenting Stakeholder, (e) each Backstop Commitment Party, (f) each Prepetition Agent/Trustee, (g) any Committee and all members thereof, and (h) with respect to each of the foregoing Entities in clauses (a) through (g), such Entity's Related Parties.

95.    "**Executory Contract**" means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 or 1123 of the Bankruptcy Code.

96.    "**Existing Interests**" means all Interests in Spirit Airlines, Inc. existing immediately prior to the Effective Date.

97.    "**Exit Financing Documents**" means, collectively, the Exit Secured Notes Documents and Exit RCF Documents.

98.    "**Exit Financing Facilities**" means, collectively, the Exit Secured Notes Financing and Exit Revolving Credit Facility.

99.    "**Exit Revolving Credit Facility**" means a senior secured revolving credit facility to be entered into by one or more Reorganized Debtors in accordance with the Exit RCF Documents.

100.    "**Exit RCF Documents**" means all documentation effectuating the incurrence of the Exit Revolving Credit Facility.

101.    "**Exit Secured Notes**" means $840 million of senior secured notes to be issued by Reorganized Parent in accordance with the terms of the Restructuring Support Agreement and the Exit Secured Notes Documents.

102.    "**Exit Secured Notes Financing**" means $840 million of senior secured notes to be issued to the Required Consenting Stakeholders by the Reorganized Parent and guaranteed by each of the other Reorganized Debtors in accordance with the Restructuring Support Agreement and the Exit Secured Notes Documents.

103.    "**Exit Secured Notes Documents**" means all documentation effectuating the incurrence of the Exit Secured Notes Financing.

104.    "**Federal Judgment Rate**" means the federal judgment rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

105.    "**File**," "**Filed**," or "**Filing**" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Claims and Solicitation Agent.

106.    "**Final DIP Order**" means the order entered by the Bankruptcy Court approving the DIP Facility and providing adequate protection to the holders of Senior Secured Notes Claims and the holders of the Prepetition RCF Claims on a final basis, as such order may be amended

from time to time, subject to the consent rights set forth in the Restructuring Support Agreement and the DIP Documents.

107. "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek leave to appeal, or seek certiorari has expired and no appeal or petition for certiorari or motion for leave to appeal has been timely taken, or as to which any appeal that has been taken or any petition for certiorari or motion for leave to appeal that has been or may be filed, has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari or leave to appeal could be or was sought, or the new trial, reargument, petition for certiorari, leave to appeal, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

108. "**First Day Declaration**" means the *Declaration of Fred Cromer in Support of the Chapter 11 Proceedings and First Day Pleadings* [ECF No. 2], Filed at the onset of the Chapter 11 Cases.

109. "**General Unsecured Claim**" means any Claim against any of the Debtors that is not one of the following Claims:  (a) Administrative Claim (including a Professional Fee Claim, DIP Superpriority Claim, or a Claim related to U.S. Trustee Fees); (b) Priority Tax Claim; (c) Senior Secured Notes Claim; (d) Convertible Notes Claim; (e) Other Secured Claim; (g) Other Priority Claim; (g) Section 510(b) Claim; or (h) Intercompany Claim.

110. "**Governance Term Sheet**" means the governance term sheet attached as Exhibit H to the Restructuring Support Agreement.

111. "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

112. "**Holder**" means an Entity holding a Claim or Interest.

113. "**Impaired**" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

114. "**Indemnification Obligations**" means each indemnification obligation of a Debtor in effect immediately prior to the occurrence of the Effective Date, whether pursuant to a Debtor's bylaws, articles or certificate of incorporation, corporate charter, other formation, corporate, or organizational document, policy or practice of providing indemnification, board resolutions, management or indemnification agreements, employment contracts, other agreement or applicable law, or otherwise, to indemnify, defend, reimburse, or otherwise limit the liability of, or to advance fees and expenses to or on behalf of, any of the Debtors' Related Parties.

115. "**Ineligible Convertible Noteholder**" means a Convertible Noteholder that has not affirmatively certified that it is a non-U.S. person (within the meaning of Regulation S under the Securities Act), a Qualified Institutional Buyer, or an Institutional Accredited Investor.

116. "**Ineligible Convertible Noteholder Adjustment**" means the reallocation of the Total Convertible Notes Equity Entitlement at the Stated Pre-Money Plan Equity Value to apportion equal value on account of additional equity consideration to any Ineligible Convertible Noteholder for any of the Total Convertible Notes Exit Secured Notes Entitlement not distributed to such Holder. Such reallocation would reduce the Total Convertible Notes Equity Entitlement available to Eligible Convertible Noteholders, who would be distributed equivalent value in additional distribution from the Total Convertible Notes Exit Secured Notes Entitlement.

117. "**Institutional Accredited Investor**" means an institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3), (7), (8), (9), (12), and (13) under the Securities Act.

118. "**Insurance Contracts**" means all insurance policies (including the D&O Liability Insurance Policies) that have been issued (or provide coverage) at any time to any of the Debtors (or any of their predecessors) and all agreements, documents, or instruments relating thereto.

119. "**Insurance Coverage Rights**" means any direct or derivative right, interest, claim, entitlement, or Cause of Action of any Debtor under any Insurance Contract, including the rights of any Debtor to proceeds, indemnification, reimbursement, contribution, benefits, or any other payment arising out of or under the Insurance Contracts.

120. "**Insurer**" means any company, third-party administrator, or other Entity that issued or entered into an Insurance Contract (or provides insurance coverage) and any respective predecessors, successors, or Affiliates of any of the foregoing Entities in this Article I.A.120.

121. "**Intercompany Claim**" means any Claim arising prior to the Petition Date against a Debtor and held by another Debtor.

122. "**Interest**" means, collectively, any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including any issued or unissued share of common stock, preferred stock, or other instrument evidencing any other equity, ownership, or profits interests in a Debtor, whether or not transferable, including membership interests in limited liability companies and partnership interests in partnerships, and any option, warrant, right, or other security or agreement, contractual or otherwise, to acquire or subscribe for, or which are convertible into any shares (or any class thereof) of, any such interest in a Debtor that existed immediately prior to the Effective Date, and any award of stock options, restricted stock units, performance stock units, equity appreciation rights, restricted equity, stock appreciation rights, or phantom equity of the Debtors (whether or not arising under or in connection with any employment agreement, separation agreement, or employee incentive plan or program of the Debtors and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or similar security, other than Intercompany Interests).

123. "**Interim DIP Order**" means the order entered by the Bankruptcy Court approving the DIP Facility and providing adequate protection to the holders of Senior Secured Notes Claims and the holders of the Prepetition RCF Claims on an interim basis, as such order may be amended from time to time, subject to the consent rights set forth in the Restructuring Support Agreement and the DIP Documents.

124. "**IRS**" means the U.S. Internal Revenue Service.

125.    "**Legal Holiday**" has the meaning set forth in Bankruptcy Rule 9006(a).

126.    "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

127.    "**Local Rules**" means the Local Bankruptcy Rules for the Southern District of New York.

128.    "**Management Incentive Plan**" means a management incentive plan providing for the issuance from time to time, of awards with respect to the New Equity Interests, to be adopted by the New Board promptly following the Effective Date, the terms and conditions of which, including any and all awards granted thereunder, shall be determined by the New Board, including, without limitation, with respect to the participants, allocation, timing, and the form and structure and extent of issuance and vesting.

129.    "**MIP Interests**" means 10% of the New Equity Interests, as of the Effective Date, reserved for issuance under the Management Incentive Plan in accordance with the terms thereof.

130.    "**New Board**" means initial members of the board of directors of Reorganized Parent.  The New Board shall comprise up to nine members as determined in accordance with the Restructuring Support Agreement and the Governance Term Sheet.

131.    "**New Equity Interests**" means the equity interests in Spirit Airlines, Inc., as reorganized pursuant to and under the Plan, or any successor or assign thereto by merger, consolidation, reorganization, or otherwise, on and after the Effective Date.

132.    "**New Organizational Documents**" means the organizational and governance documents for each of the Reorganized Debtors, including certificates of incorporation (including any certificate of designations), certificates of formation or certificates of limited partnership (or equivalent organizational documents), certificates of designation, bylaws, limited liability company agreements, shareholders' agreements, limited partnership agreements (or equivalent governing documents), and the Registration Rights Agreement, as applicable, in each case, consistent with the terms and conditions set forth in in the Restructuring Support Agreement, including the Governance Term Sheet attached thereto.

133.    "**Nonvoting Classes**" means, Class 1, Class 2, Class 3, Class 6, Class 7, Class 8, Class 9, and Class 10.

134.    "**Opt-Out Form**" means the form (including the E-Opt-Out Form) through which Holders of Claims or Interests in Nonvoting Classes (with the exception of the Holders of Existing Interests) can affirmatively elect to "opt out" of being a Releasing Party, as further set forth thereon and in the Scheduling Order.

135.    "**Other Administrative Claims**" means any Administrative Claims that are DIP Superpriority Claims, U.S. Trustee Fees, or Professional Fee Claims against a (Reorganized) Debtor.

136.   "**Other Priority Claims**" means any Claim (other than an Administrative Claim or a Priority Tax Claim) entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

137.   "**Other Secured Claims**" means any Secured Claim that is not a DIP Superpriority Claim, Prepetition RCF Claim, or Senior Secured Notes Claim.

138.   "**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

139.   "**Petition Date**" means the date on which a Debtor commenced its Chapter 11 Case.

140.   "**Plan Distribution**" means a payment or distribution to Holders of Allowed Claims under the Plan.

141.   "**Plan Documents**" means the documents (other than the Plan) to be executed, delivered, assumed, and performed in conjunction with the Consummation of the Plan on, prior to, or after the Effective Date, including any documents included in the Plan Supplement, which shall be in form and substance accept to the Required Consenting Stakeholders.

142.   "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits (or substantially final forms thereof) to be Filed no later than the Confirmation Objection Deadline or as soon as reasonably practicable thereafter, in form and substance acceptable to the Debtors and the Required Consenting Stakeholders, which may include, as and to the extent applicable, the following (or summaries of the material terms thereof): (a) a Schedule of Retained Causes of Action; (b) a Schedule of Rejected Contracts; (c) material Exit Financing Documents; (d) New Organizational Documents; (e) the identity of the members of the New Board and any officers of the Reorganized Debtors; (f) the Restructuring Steps Memorandum; (g) the Pre-Funded Warrants; and (h) any other documentation that is contemplated by the Plan.  For the avoidance of doubt, the Plan Supplement shall be subject to <u>Article XII</u>.

143.   "**Prepetition Agents/Trustees**" means, collectively, (a) Wilmington Trust, National Association, as trustee under the Convertible Notes Indentures, (b) Wilmington Trust, National Association, as trustee and collateral custodian under the Senior Secured Notes Indenture, (c) Wilmington Trust, National Association, as depositary, collateral agent and trustee under the Collateral Agency and Accounts Agreement, and (d) Citibank, N.A., as administrative agent and collateral agent under the Prepetition Revolving Credit Facility, in each case including any successors thereto.

144.   "**Prepetition RCF Claim**" means a Claim on account of the Prepetition Revolving Credit Facility.

145.   "**Prepetition RCF Lenders**" means the lenders from time to time party to the Prepetition Revolving Credit Facility.

146.   "**Prepetition Revolving Credit Facility**" refers to that certain credit and guaranty agreement, dated as of March 30, 2020 (as amended, amended and restated, supplemented, or otherwise modified from time to time), among Spirit Airlines, Inc., as borrower, each lender from time to time party thereto, and Citibank, N.A., as administrative agent and collateral agent.

147. "**Priority Tax Claim**" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

148. "**Pro Rata**" means, as applicable, the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in such particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

149. "**Professional**" means an Entity (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with section 327, 328, 330, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to (i) sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code or (ii) a Final Order authorizing such retention or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code (excluding those Entities entitled to compensation for services rendered after the Petition Date in the ordinary course of business pursuant to or in accordance with a Final Order granting such relief).

150. "**Professional Fee Claims**" means, at any given moment, all Administrative Claims arising from all accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Effective Date under sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code to the extent such fees and expenses have not been paid pursuant to or in accordance with an order of the Bankruptcy Court and regardless of whether a fee application has been Filed for such fees and expenses. To the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

151. "**Professional Fee Escrow Account**" means an interest-bearing account funded by the Debtors in an amount equal to the Professional Fee Reserve Amount no later than the earlier of (a) ten Business Days following the Confirmation Date and (b) the Effective Date.

152. "**Professional Fee Reserve Amount**" has the meaning set forth in <u>Article II.B.3(c)</u>.

153. "**Proof of Claim**" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

154. "**PSP Loans**" means the Company's three Payroll Support Program Agreements entered into by Spirit Airlines, Inc., the PSP Loan Lender, and the other parties from time to time thereto.

155. "**PSP Loan Lender**" means the lender under the PSP Loans.

156. "**Qualified Institutional Buyer**" means an entity that is a qualified institutional buyer as defined in Rule 144A of the Securities Act.

157.   "**Registration Rights Agreement**" means that certain registration rights agreement that will provide certain registration rights to certain holders of New Equity Interests and which shall be consistent with the Governance Term Sheet.

158.   "**Reinstated**" or "**Reinstatement**" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest so as to leave such Claim or Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default (i) curing any such default that occurred before, on, or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured, (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Interest as such maturity existed before such default, (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Interest (other than the Debtors or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure, and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder.

159.   "**Rejection Claim**" means a Claim under section 502(g) of the Bankruptcy Code.

160.   "**Rejection Damages Bar Date**" means with respect to Claims purportedly arising from the rejection an Executory Contract or Unexpired Lease, 4:00 p.m. (prevailing Eastern Time) on the date that is 30 days from the date that the (Reorganized) Debtors provide notice of the Bankruptcy Court's entry of any order (including the Confirmation Order) authorizing such rejection to the affected contract or lease counterparty.

161.   "**Related Parties**" means, with respect to an Entity, each of, and in each case in its capacity as such, such Entity's current and former Affiliates, and such Entity's and such Affiliates' current and former directors, board observers, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds (including any beneficial holders for the account of whom such funds are managed), predecessors, participants, successors, assigns, subsidiaries, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, actuaries, consultants, representatives, and other professionals and advisors and any such person's or Entity's respective heirs, executors, estates, and nominees.

162.   "**Released Party**" means each of the following, and in each case, solely in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) each DIP Secured Party; (d) each Consenting Senior Secured Noteholder; (e) each Consenting Convertible Noteholder;

(f) each Prepetition Agent/Trustee; (g) each Prepetition RCF Lender; (h) each Backstop Commitment Party; (i) the Distribution Agent; (j) any Committee and all members thereof; and (k) with respect to each of the foregoing Entities in clauses (a) through (j), such Entity's Related Parties; *provided, however*, that an Entity that (i) affirmatively elects to "opt out" of being a Releasing Party by timely objecting to Confirmation or by checking the appropriate box on such Holder's timely and properly submitted Ballot or Opt-Out Form, thereby indicating that such Holder elects to opt out of the Plan's release provisions, or (ii) timely objects to the releases herein and such objection is not resolved before Confirmation shall not be considered a "Released Party" notwithstanding anything to the contrary herein.

163. "**Releasing Party**" means each of the following, and in each case, solely in its capacity as such:  (a) the Debtors and their Estates; (b) the Reorganized Debtors; (c) each DIP Secured Party; (d) each Consenting Senior Secured Noteholder; (e) each Consenting Convertible Noteholder; (f) each Prepetition Agent/Trustee; (g) each Prepetition RCF Lender; (h) each Backstop Commitment Party; (i) each Holder of a Claim entitled to vote to accept or reject the Plan that does not affirmatively elect to "opt out" of being a Releasing Party by checking the appropriate box on such Holder's timely and properly submitted Ballot to indicate that such Holder elects to opt out of the Plan's release provisions; (j) each Holder of a Claim or Interest in a Nonvoting Class (with the exception of Holders of Existing Interests) that does not affirmatively elect to "opt out" of being a Releasing Party by checking the appropriate box on such Holder's timely and properly submitted Opt-Out Form to indicate that such Holder elects to opt out of the Plan's release provisions; and (k) with respect to each of the foregoing Entities in clauses (a) through (j), such Entities' Related Parties.

164. "**Reorganized Debtors**" means, collectively, the Debtors (including, for the avoidance of doubt, Reorganized Parent) and any successors thereto, whether by merger, consolidation, or otherwise (including, to the extent applicable, any new Entity that may be formed to, among other things, directly or indirectly acquire substantially all of the assets or equity of any of the Debtors pursuant to the Plan), in each case, on and after the Effective Date.

165. "**Reorganized Parent**" means as determined by the Debtors with the express consent of the Required Consenting Stakeholders, either (a) Spirit Airlines, Inc., as reorganized pursuant to and under the Plan, or any successor or assign thereto by merger, consolidation, reorganization, or otherwise, or (b) a new Entity that may be formed or caused to be formed to, among other things, directly or indirectly acquire substantially all of the assets or equity of the Debtors and issue the New Equity Interests to be distributed pursuant to the Plan, in each case, on and after the Effective Date.

166. "**Required Consenting Convertible Noteholders**" has the meaning set forth in the Restructuring Support Agreement.

167. "**Required Consenting Senior Secured Noteholders**" has the meaning set forth in the Restructuring Support Agreement.

168. "**Required Consenting Stakeholders**" has the meaning set forth in the Restructuring Support Agreement.

169. "**Restructuring Steps Memorandum**" means a document setting forth the material components of the Restructuring Transactions, as well as a description of the steps to effectuate such transactions, contemplated in accordance with the Plan.

170. "**Restructuring Support Agreement**" means that certain Restructuring Support Agreement and attached to the First Day Declaration as <u>Exhibit B</u>, by and among the Debtors and the other parties thereto, including all schedules and exhibits thereto, as it may be amended, supplemented, or otherwise modified from time to time in accordance with its terms.

171. "**Restructuring Transactions**" has the meaning ascribed to it in the Restructuring Support Agreement.

172. "**Retained Causes of Action**" means the Causes of Action listed on the Schedule of Retained Causes of Action.

173. "**Rights Offering Backstop Commitment**" has the meaning set forth in the Backstop Commitment Agreement.

174. "**Schedule of Rejected Contracts**" means a schedule, if any, of Executory Contracts or Unexpired Leases that the Debtors intend to reject pursuant hereto, as the same may be amended, supplemented, or otherwise modified from time to time.

175. "**Schedule of Retained Causes of Action**" means a schedule of certain Causes of Action, a copy of which is attached to the Disclosure Statement, that are not released, exculpated, or waived pursuant to the Plan or otherwise, as the same may be amended, supplemented, or otherwise modified from time to time.

176. "**Scheduling Motion**" means a motion Filed in the Chapter 11 Cases seeking approval of the Debtors' Chapter 11 solicitation and tabulation procedures.

177. "**Scheduling Order**" means the Bankruptcy Court's order approving the Scheduling Motion.

178. "**SEC**" means the United States Securities and Exchange Commission.

179. "**Section 510(b) Claim**" means a Claim or Cause of Action against any of the Debtors (a) arising from rescission of a purchase or sale of shares, notes, or any other Securities of any of the Debtors or an Affiliate of any of the Debtors, (b) for damages arising from the purchase or sale of any such Security, (c) for violations of the Securities laws, misrepresentations, or any similar Claims related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, (d) for reimbursement, contribution, or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim, including Claims based upon allegations that the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the offer or sale of Securities, or (e) for attorneys' fees, other charges, or costs incurred on account of any of the foregoing Claims or Causes of Action.

180. "**Secured**" means a Claim that is (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable

law or by reason of a Final Order of the Bankruptcy Court, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan, or separate Final Order of the Bankruptcy Court, as a secured claim.

181.    "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time, or any similar federal, state, or local law.

182.    "**Securities Exchange Act**" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as now in effect and hereafter amended, or any similar federal, state, or local law.

183.    "**Security**" has the meaning set forth in section 2(a)(1) of the Securities Act.

184.    "**Senior Secured Notes**" means the 8.00% Senior Secured Notes due 2025 issued by Spirit IP Cayman Ltd. and Spirit Loyalty Cayman Ltd. under the Senior Secured Notes Indenture.

185.    "**Senior Secured Notes Claim**" means a Claim on account of the Senior Secured Notes or any other agreement, instrument or document executed at any time in connection therewith, including all Obligations (as defined in the Senior Secured Notes Indenture).

186.    "**Senior Secured Notes Documents**" means the Senior Secured Notes Indenture and certain other documents related to the Senior Secured Notes Indenture, including all "Transaction Documents" (as defined in the Senior Secured Notes Indenture).

187.    "**Senior Secured Notes Equity Rights Offering Amount**" means 78.75% of the New Equity Interests issued pursuant to the Equity Rights Offering and the Backstop Commitment Agreement (other than the Backstop Premium Shares).

188.    "**Senior Secured Notes Indenture**" means that certain Indenture originally dated as of September 17, 2020, by and among Spirit IP Cayman Ltd. and Spirit Loyalty Cayman Ltd., each as co-issuers, Spirit Airlines, Inc., as parent guarantor, the other guarantors from time to time party thereto, and Wilmington Trust, National Association, as trustee and collateral custodian, as amended by that certain First Supplemental Indenture, dated as of November 17, 2022, as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms.

189.    "**Senior Secured Notes Subscription Rights**" means the rights of Holders of the Senior Secured Notes Claims to purchase their Pro Rata Share of the Senior Secured Notes Equity Rights Offering Amount, subject to the Equity Rights Offering Holdback and on the terms and conditions set forth in the Restructuring Support Agreement and the Equity Rights Offering Documents.

190.    "**Senior Secured Notes Trustee**" means Wilmington Trust, National Association, as trustee under the Senior Secured Notes Indenture, together with any permitted successors and assigns.

191.    "**Senior Secured Noteholder**" means a "Holder" as defined in the Senior Secured Notes Indenture.

192.    "**SOFR**" means, with respect to any Business Day, a rate per annum equal to the secured overnight financing rate for such Business Day published by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate) on its website, currently at www.newyorkfed.org (or any successor source for the secured overnight financing rate identified as such by the administrator of the secured overnight financing rate from time to time).

193.    "**Solicitation**" means the solicitation of votes with respect to this Plan.

194.    "**Stated Pre-Money Plan Equity Value**" means $456 million.

195.    "**Subscription Rights**" means, collectively, the Senior Secured Notes Subscription Rights and the Convertible Notes Subscription Rights.

196.    "**Tax Code**" means the Internal Revenue Code of 1986, as amended from time to time.

197.    "**Total Convertible Notes Equity Entitlement**" means 24.0% of the New Equity Interests, subject to dilution by the Equity Rights Offering (including the Equity Rights Offering Shares, the Equity Rights Offering Holdback Shares and the Backstop Shares), the Backstop Premium Shares, and the MIP Interests.

198.    "**Total Convertible Notes Exit Secured Notes Entitlement**" means $140 million in principal value of Exit Secured Notes, for distribution only to Eligible Convertible Noteholders upon the Effective Date.

199.    "**Treasury Regulations**" means the regulations promulgated under the Tax Code.

200.    "**Unsubscribed Equity**" means the Equity Rights Offering Shares that are not subscribed for in the Equity Rights Offering.

201.    "**U.S. Trustee**" means the office of the United States Trustee for the Southern District of New York.

202.    "**U.S. Trustee Fees**" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717, or as otherwise agreed by the U.S. Trustee.

203.    "**Unclaimed Distribution**" means (a) any Plan Distribution returned to the Reorganized Debtors or a Distribution Agent as undeliverable and remains unclaimed for 90 days thereafter, (b) any check issued on account of an Allowed Claim that is not negotiated within 120 calendar days from and after the date of issuance thereof, or (c) any Plan Distribution that remains unclaimed within 180 days of the later of the applicable Claim becoming an Allowed Claim and the Effective Date for any reason, including a Holder failing to return or otherwise provide the Reorganized Debtors or a Distribution Agent, as applicable, with forms or information necessary

or requested to effectuate a Plan Distribution (*e.g.*, tax identification information, properly completed distribution forms (to the extent required)).

204. "**Unexpired Lease**" means a nonresidential lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 or 1123 of the Bankruptcy Code.

205. "**Unimpaired**" means, with respect to a Class of Claims or Interests, a Class consisting of Claims or Interests that are not impaired within the meaning of section 1124 of the Bankruptcy Code.

206. "**Unliquidated**" means, when used in reference to a Claim, any Claim, the amount of liability for which has not been fixed, whether pursuant to an agreement, applicable law, or otherwise, as of the date on which such Claim is sought to be estimated.

207. "**Voting Classes**" means Class 4 and Class 5.

208. "**Voting Deadline**" has the meaning set forth in the Scheduling Order.

209. "**Voting Record Date**" has the meaning set forth in the Scheduling Order.

## B.   Rules of Interpretation

The following rules for interpretation and construction shall apply to the Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether Filed, to be Filed, or otherwise, shall mean such document, schedule, or exhibit as it may have been or thereafter may be amended, modified, or supplemented; *provided*, that any capitalized terms herein that are defined with reference to another document or other source, are defined with reference to such other source as of the date hereof, without giving effect to any termination of such other document or amendments to such capitalized terms in any such other source following the date hereof; (4) unless otherwise specified, all references herein to "Articles" or "Sections" are references to articles or sections, respectively, hereof or hereto; (5) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion hereof; (6) captions and headings to Articles, Sections, schedules, and exhibits are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest,"

"Holders of Interests," "Disputed Interests," and the like, as applicable; (11) references to "shareholders," "directors," and "officers" shall also include "members" and "managers," as applicable, as such terms are defined under the applicable state limited liability company laws or applicable foreign law; (12) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and are deemed to be followed by the words "without limitation"; (13) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (14) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (15) any reference herein to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (16) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (17) "(Reorganized) Debtors" are deemed to be written as "the Debtors or the Reorganized Debtors, as applicable"; and (18) unless otherwise specified, any section or exhibit references to an existing document, schedule, or exhibit are deemed to reference the equivalent provisions in any amendment thereto, whether or not such references herein are updated.

Any immaterial effectuating provisions may be interpreted by the (Reorganized) Debtors in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided*, that no effectuating provision shall be immaterial or deemed immaterial if it has any substantive legal or economic effect on any Entity.

## C.      Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  Unless otherwise specified, all references herein to times of day shall be references to prevailing Eastern Time.  In the event that any payment or act hereunder is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

## D.      Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection herewith (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters, without giving effect to conflict of laws principles; *provided, however*, that corporate governance matters relating to the (Reorganized) Debtors not incorporated in New York shall be governed by the laws of the state or other jurisdiction of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

### E.    Reference to Monetary Figures

All monetary figures referenced herein are denominated in U.S. dollars, unless otherwise expressly provided.

### F.    Nonconsolidated Plan

For purposes of administrative convenience and efficiency, the Plan has been Filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors.  The Plan does not provide for the substantive consolidation of any of the Debtors.

### G.    Consent Rights

Notwithstanding anything to the contrary herein, the Confirmation Order, or the Disclosure Statement, all consent, consultation, and approval rights set forth in the Restructuring Support Agreement and Plan Documents are incorporated herein by reference (including to the applicable definitions in Article I.A) and are fully enforceable as if stated in full herein.  In case of a conflict with respect to consent, consultation, or approval rights between the Restructuring Support Agreement or a Plan Document, on the one hand, and the Plan, on the other hand, the former shall control and govern.

## ARTICLE II.
## DIP SUPERPRIORITY CLAIMS; ADMINISTRATIVE CLAIMS; PRIORITY CLAIMS; AND U.S. TRUSTEE FEES

All Claims and Interests (except Administrative Claims, Professional Fee Claims, DIP Superpriority Claims, Priority Tax Claims, and U.S. Trustee Fees) are placed in the Classes set forth in Article III.  In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Superpriority Claims, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and U.S. Trustee Fees have not been classified, and the Holders thereof are not entitled to vote on the Plan.

### A.    DIP Superpriority Claims

In accordance with the DIP Order, all DIP Superpriority Claims are Allowed Claims for all purposes under the Plan.  Except to the extent already paid, on the Effective Date, each Holder of an Allowed DIP Superpriority Claim shall receive, in full and final satisfaction, compromise, settlement, discharge, and release of its Allowed DIP Superpriority Claim, either payment in full in Cash in accordance with the terms of the applicable DIP Documents or such other treatment acceptable to such Holder, in each case, that results in the full satisfaction of its Allowed DIP Superpriority Claims.  In addition, on the Effective Date, any outstanding fees and expenses incurred by the DIP Agent, the DIP Lenders, or their respective advisors, as required under the DIP Order, shall be paid in Cash in full.

**B.      Administrative Claims**

1.      General Administrative Claims

The (Reorganized) Debtors shall have exclusive authority (with the consent of the Required Consenting Stakeholders) to settle Administrative Claims without further Bankruptcy Court approval.  The (Reorganized) Debtors and the Claims and Solicitation Agent are authorized to update the Claims Register to reflect the foregoing without the need to File an application, motion, complaint, objection, or any other legal proceeding seeking to adjust such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court or the Holder of such Claim, as applicable.

Except with respect to Other Administrative Claims, and except to the extent that (a) an Administrative Claim has already been paid during the Chapter 11 Cases or (b) a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, discharge, and release of each Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (i) if an Administrative Claim is allowed on or prior to the Effective Date, on the Effective Date or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (iii) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (iv) at such time and upon such terms as may be agreed upon by such Holder and the (Reorganized) Debtors; or (v) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

For the avoidance of doubt, the failure by a Holder of an Allowed Administrative Claim to properly object to this Article II.B.1 before the Confirmation Objection Deadline shall be deemed to be such Holder's consent, pursuant to section 1129(a)(9) of the Bankruptcy Code, to be paid in accordance with the Plan following the Effective Date.

**Notwithstanding the foregoing, requests for payment of Administrative Claims need not be Filed for Administrative Claims that (a) previously have been Allowed by Final Order of the Bankruptcy Court or pursuant to this Article II.B, (b) the (Reorganized) Debtors (with the consent of the Required Consenting Stakeholders) have otherwise agreed in writing (email being sufficient) do not require such a Filing, (c) relate to post-petition ordinary course operations and are set forth in the (Reorganized) Debtors' books and records, or (d) arise pursuant to 28 U.S.C. § 1930.**

2.      Professional Fee Claims

Except to the extent that an Allowed Professional Fee Claim has already been paid during the Chapter 11 Cases or except to the extent that a Holder of an Allowed Professional Fee Claim

agrees to a less favorable treatment with the (Reorganized) Debtors, each Holder of a Professional Fee Claim shall be paid in full in Cash pursuant to the provisions of this <u>Article II.B.2</u>.

        *a.*       *Final Fee Applications*

All applications for payment of Professional Fee Claims shall be Filed within 45 days of the Effective Date or as soon as reasonably practicable thereafter.  Distributions on account of Allowed Professional Fee Claims shall be made as soon as reasonably practicable after such applications are approved by the Bankruptcy Court.

        *b.*       *Post-Confirmation Date Fees and Expenses*

Except as otherwise specifically provided for herein, on the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the (Reorganized) Debtors may employ and pay all professionals without any further notice to, action by, or order or approval of the Bankruptcy Court or any other party; *provided*, *however*, that each Professional shall provide, during the period from the Confirmation Date to the Effective Date, its fee and expense statements or invoices, in summary form, which shall not be required to contain time entries but shall include the number of hours billed by the applicable Professional (except for financial advisors compensated on other than an hourly basis) and a summary statement of services provided and the expenses incurred (which summary may be redacted or modified to the extent necessary to delete any information subject to the attorney-client or other privilege, any information constituting attorney work product, or any other confidential or otherwise sensitive information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to the (Reorganized) Debtors.

The (Reorganized) Debtors shall pay in Cash all such fees and expenses of any Professional, within ten days of presentment of such statements or invoices, if no written objections to the reasonableness of the fees and expenses charged in any such statement or invoice (or portion thereof) is made by the (Reorganized) Debtors.  Any objection raised by the (Reorganized) Debtors with respect to such fee and expense statements or invoices shall specify in writing the amount of the contested fees and expenses and the detailed basis for such objection. To the extent an objection only contests a portion of an invoice, the undisputed portion thereof shall be promptly paid.  If any such objection to payment of an invoice (or any portion thereof) is not otherwise resolved between the (Reorganized) Debtors, on the one hand, and the issuer of the invoice, on the other hand, either party may submit such dispute to the Bankruptcy Court for a determination as to the reasonableness of the relevant disputed fees and expenses set forth in the invoice.

        *c.*       *Professional Fee Reserve Amount*

All Professionals shall (i) estimate their accrued and unpaid Professional Fee Claims (whether billed or unbilled) prior to and as of the Effective Date and (ii) estimate their expected fees and expenses for professional services to be rendered or costs to be incurred following the Effective Date (the aggregate amount of such estimated fees and expenses, the "**Professional Fee**

**Reserve Amount**"); *provided*, that such estimates shall not be considered an admission or limitation with respect to the fees and expenses incurred or to be incurred by the Professionals. Each Professional shall deliver its respective estimates for its portion of the Professional Fee Reserve Amount to the Debtors as soon as reasonably practicable before the Effective Date. If a Professional does not provide its estimate, then the Debtors may estimate in good faith the unbilled fees and expenses for such Professional and shall fund such amount into the Professional Fee Escrow Account.

Within ten business days following the Confirmation Date, but in no event later than the Effective Date, the Debtors shall fund the Professional Fee Escrow Account with Cash in an amount equal to the Professional Fee Reserve Amount.

Fees owing to the applicable Holder of a Professional Fee Claim shall be paid in Cash to such Holder from funds held in the Professional Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid pursuant to the Interim Compensation Order; *provided*, that obligations with respect to Professional Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Professional Fee Escrow Account. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of accrued Professional Fee Claims, the Reorganized Debtors shall pay any such outstanding Professional Fee Claims.

The Professional Fee Escrow Account shall be maintained in trust solely for the benefit of the Professionals. Such funds shall not be considered property of the (Reorganized) Debtors or their Estates, but shall revert to the Reorganized Debtors, without any further order or action of the Bankruptcy Court, only after all Allowed Professional Fee Claims have been paid in full. No Liens, Claims, or interests shall encumber the Professional Fee Escrow Account in any way.

3.      Treatment of Priority Tax Claims

Except to the extent that (a) a Priority Tax Claim has already been paid during the Chapter 11 Cases or (b) a Holder of an Allowed Priority Tax Claim and the Debtors agree to a less favorable treatment, in full and final satisfaction, settlement, discharge, and release of each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive, at the option of the applicable (Reorganized) Debtor and the Required Consenting Stakeholders, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (i) Cash equal to the amount of such Allowed Priority Tax Claim on the Effective Date or (ii) treatment otherwise in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the (Reorganized) Debtors and the Holder of such Claim, as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business. The Reorganized Debtors shall have the right to pay any Allowed Priority Tax Claim or any remaining balance of an Allowed Priority Tax Claim (together with accrued but unpaid interest) in full at any time on or after the Effective Date without premium or penalty.

## C.     U.S. Trustee Fees

On the Effective Date or as soon thereafter as reasonably practicable, the Reorganized Debtors shall pay all U.S. Trustee Fees that are due and owing on the Effective Date.  Following the Effective Date, the Reorganized Debtors shall pay the U.S. Trustee Fees for each open Chapter 11 Case for each quarter (including any fraction thereof) until the first to occur of the Chapter 11 Cases being converted, dismissed, or closed.

## ARTICLE III.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

The Plan groups the Debtors together solely for the purposes of describing treatment hereunder, Confirmation hereof, and making Plan Distributions in accordance herewith in respect of Claims against and Interests in the Debtors under the Plan.  Notwithstanding such groupings, the Plan constitutes a separate chapter 11 plan for each Debtor.  The Plan is not premised upon, and shall not cause, the substantive consolidation of any of the Debtors.  Except for the Claims addressed in Article II, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving Plan Distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.  The votes of each Class shall be tabulated in accordance with the procedures contained in the Scheduling Order.  Such classification shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets.  Except as otherwise provided by or permitted hereunder, all Debtors shall continue to exist as separate legal entities.

The categories of Claims and Interests listed in the table below classify Claims and Interests for all purposes, including voting, confirmation, and Plan Distributions pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.[2]  The treatment provided in this chart is for informational purposes only and is qualified in its entirety by this Plan, including this Article III and the disclaimers included herein.  The Class numbers assigned below are for purposes of identifying each separate Class.

| Class | Claims or Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Deemed to accept |
| 2 | Other Priority Claims | Unimpaired | Deemed to accept |
| 3 | Prepetition RCF Claims | Unimpaired | Deemed to accept |
| 4 | Senior Secured Notes Claims | Impaired | Entitled to vote |

---

[2]  The claims contained in this Article III do not represent claims actually asserted by Holders in Proofs of Claim or otherwise.  Any controversies regarding the classification of any Claim herein shall be governed by the procedures set forth in the Scheduling Order.  If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the Holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan.

| Class | Claims or Interests | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 5 | Convertible Notes Claims | Impaired | Entitled to vote |
| 6 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 7 | Section 510(b) Claims | Impaired | Presumed to Reject |
| 8 | Intercompany Claims | Unimpaired or Impaired | Deemed to accept or presumed to reject |
| 9 | Intercompany Interests | Unimpaired or Impaired | Deemed to accept or presumed to reject |
| 10 | Existing Interests | Impaired | Presumed to reject |

**A.      Classification and Treatment of Claims and Interests**

Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, discharge, and release of such Holder's Allowed Claim or Allowed Interest (except to the extent (1) an Allowed Claim has been paid or otherwise satisfied or (2) a Holder has agreed to receive less favorable treatment than it would otherwise be entitled to), as specified below:

1.      Class 1 — Other Secured Claims

    a.      *Classification*:  Class 1 consists of all Other Secured Claims.

    b.      *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, at the option of the (Reorganized) Debtor(s) (with the consent of the Required Consenting Stakeholders), either of the following:

        i.      payment in full in Cash, payable on the later of (A) the Effective Date and (B) the date that is 30 Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter; or

        ii.      Reinstatement or such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    c.      *Voting*:  Class 1 is Unimpaired by the Plan.  Each Holder of an Allowed Other Secured Claim in Class 1 is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

2.      Class 2 — Other Priority Claims

    a.      *Classification*:  Class 2 consists of all Other Priority Claims.

b.    *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, at the option of the (Reorganized) Debtor(s) (with the consent of the Required Consenting Stakeholders), any of the following:

i.    payment in full in Cash;

ii.    Reinstatement or such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code; or

iii.    other treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

The failure to object to Confirmation by a Holder of an Allowed Other Priority Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code.

c.    *Voting*:  Class 2 is Unimpaired by the Plan.  Each Holder of an Allowed Other Priority Claim in Class 2 is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 — Prepetition RCF Claims</u>

a.    *Classification*:  Class 3 consists of all Prepetition RCF Claims.

b.    *Treatment*:  Each Holder of an Allowed Prepetition RCF Claim shall receive, at the option of the (Reorganized) Debtor(s) (with the consent of the Required Consenting Stakeholders), any of the following:

i.    payment in full in Cash upon the effectiveness of the Exit Revolving Credit Facility; or

ii.    Reinstatement or such other treatment rendering its Allowed Prepetition RCF Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

The failure to object to Confirmation by a Holder of an Allowed Prepetition RCF Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code.

c.    *Voting*:  Class 3 is Unimpaired by the Plan.  Each Holder of an Allowed Prepetition RCF Claim in Class 3 is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

4. <u>Class 4 — Senior Secured Notes Claims</u>

    a. *Classification*:  Class 4 consists of all Senior Secured Notes Claims.

    b. *Allowance*:  The Senior Secured Notes Claims shall be deemed Allowed against all of the Debtors in the aggregate principal amount outstanding under the Senior Secured Notes Indenture of $1.11 billion plus any and all other obligations related thereto or arising therefrom, including accrued and unpaid interest, costs, fees, expenses, and indemnities as of the Petition Date.

    c. *Treatment*:  Each Holder of a Senior Secured Notes Claim shall receive its Pro Rata share of: (i) 76.0% of the New Equity Interests, subject to dilution by the Equity Rights Offering (including the Equity Rights Offering Shares, the Equity Rights Offering Holdback Shares, and the Backstop Shares), the Backstop Premium Shares, and the MIP Interests; (ii) the Senior Secured Notes Subscription Rights (after accounting for the Equity Rights Offering Holdback); (iii) $700 million of the Exit Secured Notes; and (iv) to the extent not paid as adequate protection, cash in an amount equal to all accrued and unpaid interest (at the non-default rate) under the Senior Secured Notes Indenture through the Effective Date.

    d. *Voting*:  Class 4 is Impaired by the Plan.  Each Holder of a Senior Secured Notes Claim in Class 3 is entitled to vote to accept or reject the Plan.

5. <u>Class 5 — Convertible Notes Claims</u>

    a. *Classification*:  Class 5 consists of all Convertible Notes Claims.

    b. *Allowance*:  The Convertible Notes Claims shall be deemed Allowed against Debtor Spirit Airlines, Inc. in the aggregate principal amount outstanding under the Convertible Notes Indentures of $525.1 million plus any and all other obligations related thereto or arising therefrom, including accrued and unpaid interest, costs, fees, expenses, and indemnities as of the Petition Date.

    c. *Treatment*: Each Holder of a Convertible Notes Claim shall receive (a) its Convertible Notes Equity Distribution; (b) its Pro Rata share of the Convertible Notes Subscription Rights (after accounting for the Equity Rights Offering Holdback); (c) its Pro Rata share of the Total Convertible Notes Exit Secured Notes Entitlement, subject to adjustment for any Ineligible Convertible Noteholder Adjustment; and (d) cash in an amount equal to all accrued and unpaid interest (at the non-default rate) under the Convertible Notes Indenture through the Effective Date.

    d. *Voting*:  Class 5 is Impaired by the Plan.  Each Holder of a Convertible Notes Claim in Class 5 is entitled to vote to accept or reject the Plan.

6.      <u>Class 6 — General Unsecured Claims</u>

   a.      *Classification*:  Class 6 consists of all General Unsecured Claims.

   b.      *Treatment*:  Each Holder of an Allowed General Unsecured Claim shall receive Reinstatement or such other treatment rendering its Allowed General Unsecured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.  On and after the Effective Date, the Reorganized Debtors shall continue to pay each Holder of an Allowed General Unsecured Claim in the ordinary course of business.

   c.      *Voting*:  Class 6 is Unimpaired by the Plan.  Each Holder of an Allowed General Unsecured Claim in Class 6 is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

7.      <u>Class 7 — Section 510(b) Claims</u>

   a.      *Classification*:  Class 6 consists of all Section 510(b) Claims.

   b.      *Treatment*:  All Section 510(b) Claims shall be cancelled, released, extinguished, and otherwise eliminated, and Holders of Section 510(b) Claims shall not receive any Plan Distributions or retain any interest in property on account of such Section 510(b) Claims.

   c.      *Voting*:  Class 7 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

8.      <u>Class 8 — Intercompany Claims</u>

   a.      *Classification*:  Class 8 consists of all Intercompany Claims.

   b.      *Treatment*:  All Allowed Intercompany Claims shall either be, in the discretion of the (Reorganized) Debtors (with the consent of the Required Consenting Stakeholders), (i) cancelled, released, extinguished, and otherwise eliminated and Holders of such Intercompany Claims shall not receive any Plan Distributions or retain any interest in property on account of such Intercompany Claims or (ii) Reinstated.

   c.      *Voting*:  Class 8 is either (i) Unimpaired, in which case the Holders of Allowed Intercompany Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired and receiving no Plan Distributions (and retaining no interest in property), in which case the Holders of such Intercompany Claims are presumed to have rejected the Plan pursuant to section 1126(g) of the

Bankruptcy Code. Therefore, no Holder of an Intercompany Claim is entitled to vote to accept or reject the Plan.

9.     <u>Class 9 — Intercompany Interests</u>

     a.     *Classification*:  Class 9 consists of all Intercompany Interests.

     b.     *Treatment*:  All Allowed Intercompany Interests shall either be, in the discretion of the (Reorganized) Debtors, (i) cancelled, released, extinguished, and otherwise eliminated and Holders of such Intercompany Interests shall not receive any Plan Distributions or retain any interest in property on account of such Intercompany Interests or (ii) Reinstated.

     c.     *Voting*:  Class 9 is either (i) Unimpaired, in which case the Holders of Allowed Intercompany Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired and receiving no Plan Distributions (and retaining no interest in property), in which case the Holders of such Intercompany Interests are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, no Holder of an Intercompany Interest is entitled to vote to accept or reject the Plan.

10.     <u>Class 10 — Existing Interests</u>

     a.     *Classification*:  Class 10 consists of all Existing Interests.

     b.     *Treatment*:  All Existing Interests shall be cancelled, released, extinguished, or otherwise eliminated and Holders of such Existing Interests shall not receive any Plan Distributions or retain any interest in property on account of such Existing Interests.

     c.     *Voting*:  Class 10 is Impaired by the Plan.  Each Holder of an Existing Interest is conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, no Holder of Existing Interests is entitled to vote to accept or reject the Plan.

## B.     Special Provision Governing Unimpaired Claims

Except as otherwise provided herein, nothing under the Plan shall affect the Debtors' rights regarding any Unimpaired Claims or Interests, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims or Interests.

## C.     Voting Classes; Presumed Acceptance or Rejection by Nonvoting Classes

1.     <u>Voting Classes Under the Plan</u>

Under the Plan, Classes 4 and 5 are Impaired, and each Holder of a Claim as of the Voting Record Date in such Classes is entitled to vote to accept or reject the Plan.

2.      Acceptance of the Plan by Impaired Classes of Claims

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class that actually voted on the Plan have voted to accept the Plan.

3.      Presumed Acceptance of the Plan

Under the Plan, (a) Classes 1, 2, 3, and 6 are Unimpaired, (b) the Holders of Claims in such Classes are conclusively presumed to have accepted the Plan, and (c) such Holders are not entitled to vote to accept or reject the Plan and the votes of such Holders shall not be solicited.

4.      Presumed Rejection of the Plan

Under the Plan, (a) Classes 7 and 10 are Impaired, (b) the Holders of Claims or Interests in such Classes are deemed to have rejected the Plan and shall receive no Plan Distributions on account of their Claims or Interests, and (c) such Holders are not entitled to vote to accept or reject the Plan and the votes of such Holders shall not be solicited.

5.      Presumed Acceptance or Rejection of the Plan

Under the Plan, Classes 8 and 9 are each either (a) Unimpaired, in which case the Holders of such Claims or Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (b) Impaired and receiving no Plan Distributions (and retaining no interest in property), in which case the Holders of such Claims or Interests are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  In either (a) or (b), as applicable, such Holders are not entitled to vote to accept or reject the Plan and the votes of such Holders shall not be solicited.

6.      Presumed Acceptance by Voting Classes with No Votes

If a Class contains Claims eligible to vote on the Plan, and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

**D.      Elimination of Vacant Classes**

Any Class of Claims or Interests that does not contain a Holder of an Allowed Claim or Allowed Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Combined Hearing, may be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**E.** **Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class thereof, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## IMPLEMENTATION OF THE PLAN

**A.** **Continued Existence and Vesting of Assets**

1.    <u>Reorganized Debtors</u>

Unless otherwise provided in the Restructuring Steps Memorandum, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized, and pursuant to the New Organizational Documents, for the purposes of satisfying their obligations under the Plan and the continuation of their businesses.

Except as otherwise provided herein  (including in the Restructuring Steps Memorandum), on and after the Effective Date, all property of the Estates, wherever located, including all claims, rights, and Causes of Action, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, and other encumbrances and interests.  On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property, wherever located, and prosecute, compromise, or settle any Claims (including any Administrative Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court, and free and clear of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, other than restrictions expressly imposed by this Plan, and the Confirmation Order.  Such claims and Causes of Action include any of the Debtors' rights to indemnification from third parties and the Debtors' rights in respect of any Insurance Contracts.

2.    <u>Transfer of Books and Records; Privilege</u>

On or prior to the Effective Date, all documents, books, and records of the Debtors shall be transferred and assigned to the Reorganized Debtors, and such transfer or assignment shall not result in the destruction or waiver of any attorney-client privilege, work-product protection, joint defense or common interest privilege, or other privilege or protection of immunity (a) held by any or all of the Debtors or their Estates, (b) held by the board of directors (or similar body) or any subcommittee of the board of directors (or similar body) of any of the Debtors, or (c) attaching to any document, communication, or thing (regardless of media); each such privilege shall be transferred to and vest exclusively in the Reorganized Debtors.

For the avoidance of doubt, any communications prior to the Effective Date between the Debtors, the Prepetition Agents/Trustees (including their predecessors), the Consenting Stakeholders, and their respective Related Parties shall be protected by common interest privilege.

**B.      Transactions Related to the Plan**

On, before, or after the Effective Date, the (Reorganized) Debtors, with the consent of the Required Consenting Stakeholders, may take all actions as may be deemed necessary or appropriate to effectuate the Plan or any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the following: (1) the execution, filing, and delivery, as applicable, of any appropriate agreements, instruments, or other documents of borrowing, financing, merger, amalgamation, consolidation, restructuring, conversion, disposition, sale, transfer, formation, incorporation, partnership, organization, operation, governance, equity issuance, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including the documents comprising the Plan Supplement; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the cancelation, extinguishment or transfer of any of the Debtors' interests in the equity of any non-Debtor Affiliates, if any; (4) the implementation of appropriate structures for the issuance of the New Equity Interests (including potentially alternative forms of New Equity Interests) pursuant to the Plan in order to comply with any applicable DOT rules and regulations (including to address any applicable limitations on the amount of voting stock in Reorganized Parent that may be owned by non-U.S. Citizens (as defined by the DOT rules and regulations)) and other applicable law; and (5) all other actions that the (Reorganized) Debtors or the Required Consenting Stakeholders deem to be necessary or appropriate to implement the Plan and the transactions contemplated hereby (including, for the avoidance of doubt, in a tax efficient manner), including making filings or recordings that may be required by applicable law or retaining the corporate existence and structure of the Debtors and non-Debtor Affiliates.

**C.      New Equity Interests**

1.      <u>Issuance of New Equity Interests</u>

On the Effective Date or as soon as reasonably practicable thereafter, the New Equity Interests shall be issued by the Reorganized Parent pursuant to the Plan and the Equity Rights Offering Documents, and the New Equity Interests shall be distributed by the Distribution Agent to the Entities entitled to receive the New Equity Interests pursuant to, and in accordance with, the terms of the Plan, the Equity Rights Offering Documents, the Restructuring Support Agreement, and the New Organizational Documents.

All such New Equity Interests, and all New Equity Interests issuable in accordance with this Plan shall, upon issuance, be duly authorized, validly issued, fully paid, and nonassessable. The issuance of such New Equity Interests is authorized without the need for any further corporate or other similar action and without any further action by any Holder of an Allowed Claim or Interest.

In connection with the foregoing, the (Reorganized) Debtors shall undertake and execute all necessary actions in order to comply with the terms and conditions of the Plan, Equity Rights Offering Documents, Restructuring Support Agreement, and New Organizational Documents. Any Entity's receipt of New Equity Interests shall be deemed as its acceptance and agreement to

be bound by the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.

### 2.    Exchange Act Registration and Listing

Reorganized Parent shall use its reasonable best efforts to, on or as soon as reasonably practicable after the Effective Date, (a) cause the New Equity Interests to be registered under Section 12(b) of the Securities Exchange Act, (b) obtain a listing of the New Equity Interests on the New York Stock Exchange or Nasdaq, and (c) register all of the New Equity Interests that constitute "restricted securities" or "control securities" for purposes of Rule 144 under the Securities Act on a shelf registration statement on Form S-1, which shall provide for offerings on a delayed or continuous basis pursuant to Rule 415 under the Securities Act.

### 3.    Exemption from Registration

The New Equity Interests are "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

After the Petition Date, the Debtors will rely on (a) section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution, if applicable, of New Equity Interests under the Plan (other than the Equity Rights Offering Holdback Shares, the Backstop Shares, and the Backstop Premium Shares), and to the extent such exemption is not available, then such New Equity Interests will be offered, issued, and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws and (b) Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, or Regulation S under the Securities Act, and similar Blue-Sky Laws provisions, to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution, if applicable, of the Equity Rights Offering Holdback Shares, the Backstop Shares and the Backstop Premium Shares to certain Holders of Senior Secured Notes Claims and certain eligible Holders of Convertible Notes Claims.

Section 1145(a)(1) of the Bankruptcy Code exempts the issuance, offer, sale, and distribution of Securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local Securities laws if the following three principal requirements are satisfied:  (a) the Securities must be offered and sold under a plan of reorganization and must be Securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the Securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the Securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property. *See* 11 U.S.C. § 1145(a)(1).

The offer, issuance, and distribution of the New Equity Interests (other than the Equity Rights Offering Holdback Shares, the Backstop Shares, and the Backstop Premium Shares) satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such offering, issuance, and distribution are exempt from registration under the Securities Act and any state or local law requiring registration.  To the extent any "offer or sale" of New Equity Interests may be

deemed to have occurred, such offer or sale is made under the Plan and in exchange for Claims against one or more of the Debtors, or principally in exchange for such Claims and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code. The availability of the exemptions under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to occurrence of the Effective Date of the Plan.

To the degree that section 1145 of the Bankruptcy Code is not available for the offer, issuance, and distribution of the New Equity Interests, Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under the Securities Act. Regulation S provides that the offering or issuance of securities to persons that, at the time of the issuance, were outside of the United States and were not "U.S. persons" (and were not purchasing for the account or benefit of a "U.S. person") within the meaning of Regulation S is exempt from registration under Section 5 of the Securities Act.

The Equity Rights Offering Holdback Shares, the Backstop Shares, and the Backstop Premium Shares may be offered and issued without registration under the Securities Act in reliance upon the exemption from registration provided under Section 4(a)(2) of the Securities Act (including, potentially, pursuant to the safe harbor provided by Regulation D promulgated under the Securities Act) or Regulation S or other applicable exemptions. Each Holder of a Senior Secured Notes Claim or a Convertible Notes Claim that will receive the Equity Rights Offering Holdback Shares, the Backstop Shares, and the Backstop Premium Shares is required to represent that it is an Institutional Accredited Investor, a "qualified institutional buyer" (as defined under Rule 144A of the Securities Act) or a "non-U.S. person" within the meaning of Regulation S of the Securities Act.

The Equity Rights Offering Holdback Shares, the Backstop Shares, and the Backstop Premium Shares will be deemed "restricted securities" (as defined by Rule 144 under the Securities Act), will bear customary legends and transfer restrictions, and may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act (such as Rule 144) is available, in each case, subject to the limitations in the applicable New Organizational Documents. Any persons receiving restricted securities under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

Subject to any limitations in the New Organizational Documents, the New Equity Interests (other than the Equity Rights Offering Holdback Shares, the Backstop Shares, and the Backstop Premium Shares) issued and distributed under the Plan in reliance on section 1145(a)(1) of the Bankruptcy Code may be freely transferred by recipients following the initial issuance under the Plan without registration unless, as more fully described below, the holder is an "underwriter" with respect to such securities.

Generally, an "underwriter" (for purposes of section 1145 of the Bankruptcy Code) is any person who:

(A) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such a claim or interest;

(B) offers to sell securities offered or sold under the plan for the holders of such securities;

(C) offers to buy securities offered or sold under the plan from the holders of such securities, if such offer to buy is—

(i) with a view to distribution of such securities; and

(ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or

(D) is an issuer, as defined in section 2(a)(11) of the Securities Act, with respect to such securities.

11 U.S.C. § 1145(b)(1).  Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

To the extent that any Entities who receive New Equity Interests pursuant to the Plan are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, resales of such New Equity Interests by such Entities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  However, resales of such New Equity Interests satisfying the applicable requirements of Rule 144 under the Securities Act with respect to "control securities" (or another available exemption under the Securities Act) may be permitted.  Rule 144 permits the public resale of Securities received by such persons if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

Whether or not any particular person may be deemed to be an "underwriter" with respect to the New Equity Interests or any other Security issued pursuant to the Plan depends upon various facts and circumstances applicable to that Entity.  Accordingly, the Debtors express no view as to whether any particular Entity receiving New Equity Interests or other Securities hereunder may be an "underwriter" with respect to such New Equity Interests or other Securities.

Any transfer agent, or other similarly situated agent, trustee, or other non-governmental Entity shall accept and rely upon the Plan and Confirmation Order in lieu of a legal opinion for purposes of determining whether the initial offer and sale of the New Common Interests were exempt from registration under section 1145(a) of the Bankruptcy Code, and whether the New Common Interests were, under the Plan, validly issued, fully paid, and non-assessable.

The Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order to any Entity (including DTC and any transfer agent for the New Equity Interests) with respect to the treatment of the New Equity Interests to be issued under the Plan under applicable securities laws. DTC and any transfer agent for the New Equity Interests shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Equity Interests to be issued under the Plan are exempt from registration or eligible for DTC book-entry delivery, settlement, and depository services, and whether the New Equity Interests are, under the Plan, validly issued, fully paid, and non-assessable. Notwithstanding anything to the contrary in the Plan, no Entity (including DTC and any transfer agent for the New Equity Interests) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Equity Interests to be issued under the Plan are exempt from registration, and whether the New Equity Interests were, under the Plan, validly issued, fully paid, and non-assessable.

## D.      Equity Rights Offering

The Plan provides that the Equity Rights Offering Amount will be raised through the Equity Rights Offering. On the Effective Date, the Debtors shall consummate the Equity Rights Offering, subject to the terms and conditions set forth in the Backstop Commitment Agreement, the other Equity Rights Offering Documents, and the Plan.

Upon exercise of the Subscription Rights by the Equity Rights Offering Participants pursuant to the terms of the Backstop Commitment Agreement, the Equity Rights Offering Procedures, the Plan, and the other Equity Rights Offering Documents, the Reorganized Debtors shall be authorized to issue the Equity Rights Offering Shares (including the Equity Rights Offering Holdback Shares) issuable pursuant to the exercise of Subscription Rights in accordance with the Plan, the Backstop Commitment Agreement, the Equity Rights Offering Procedures, and the other Equity Rights Offering Documents.

The Equity Rights Offering Amount will be 100% backstopped by the Backstop Commitment Parties, and the Backstop Commitment Parties shall be obligated on a several, but not joint and several, basis to purchase the Unsubscribed Equity in accordance with and subject to the terms and conditions of the Backstop Commitment Agreement.

Subject to, and in accordance with the Backstop Commitment Agreement, as consideration for the Rights Offering Backstop Commitment, (a) on the Effective Date, the Backstop Commitment Parties shall receive the Backstop Premium Shares, which will be payable on, and as a condition to, the Effective Date in New Equity Interests in accordance with and subject to the terms of the Backstop Commitment Agreement, subject to dilution on account of the MIP Interests or (b) in the circumstances provided in the Backstop Commitment Agreement and subject to the terms thereof, shall receive the Backstop Cash Premium, and shall have been fully earned as of the effective date of the Backstop Commitment Agreement.

For the avoidance of doubt, the Equity Rights Offering Holdback Shares, the Backstop Shares, and the Backstop Premium Shares shall be solely on account of the new money provided through the Equity Rights Offering Holdback and the Rights Offering Backstop Commitments and not on account of any Holder's Senior Secured Notes Claims or Convertible Notes Claims.

Notwithstanding any other provision of this Plan, any Backstop Commitment Party that will hold, on a pro forma basis, 5.00% or more of the New Equity Interests may elect at any time prior to the Closing Date to receive, in lieu of all or a portion of the New Equity Interests that would otherwise be issuable to it, pre-funded warrants to acquire such New Equity Interests exercisable for an exercise price equal to the par value of the New Equity Interests (the "**Pre-Funded Warrants**").  The Pre-Funded Warrants will include customary beneficial ownership limitation provisions prohibiting the exercise of the Pre-Funded Warrants to the extent that, after giving effect to an exercise of the Pre-Funded Warrants, the Backstop Commitment Party, together with any affiliates and any members of a Section 13(d) group with the Backstop Commitment Party and/or its affiliates, would beneficially own (as such term is defined under Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in excess either 4.99% or 9.99% of the outstanding New Equity Interests (which threshold shall be specified by the applicable Backstop Commitment Party).

**E.      Exit Financing**

1.      <u>Entry into Exit Financing Documents</u>

On the Effective Date, the Reorganized Debtors shall be authorized to enter into the Exit Financing Documents (including, for the avoidance of doubt, all documentation allowing for the issuance of (i) the Exit Secured Notes and (ii) the Exit Revolving Credit Facility) without the need for any further corporate or other similar action.  The material Exit Financing Documents shall have terms acceptable to the Required Consenting Stakeholders and the agents for and lenders under each respective Exit Financing Facility, the forms of which shall be set forth in the Plan Supplement.

The entry of the Confirmation Order shall be deemed approval of the Exit Financing Documents (including the transactions contemplated thereby, and all actions taken, to be taken, undertakings to be made, and obligations to be incurred by the (Reorganized) Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein and the grant of all guarantees, Liens, and other security interests contemplated thereby) and authorization for the (Reorganized) Debtors to enter into and execute the Exit Financing Documents and such other documents as the agents and lenders thereunder may reasonably require, subject to such modifications as the (Reorganized) Debtors may deem to be reasonably necessary to consummate the Exit Financing Facilities.  The Reorganized Debtors may use the Exit Financing Facilities for any purpose permitted thereunder.

On the effective date of each Exit Financing Facility, (a) the (Reorganized) Debtors are authorized to execute and deliver the applicable Exit Financing Documents and perform their obligations thereunder, including the payment or reimbursement of any fees, expenses, losses, damages, or indemnities, (b) the applicable Exit Financing Documents shall constitute the legal, valid, and binding obligations of the Reorganized Debtors that are parties thereto, enforceable in accordance with their terms, and (c) no obligation, payment, transfer, or grant of security under the applicable Exit Financing Documents shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff, or counterclaim.  The Reorganized Debtors and the other persons granting any Liens and security interests to secure the obligations under the applicable Exit Financing

Documents are authorized to make all filings and recordings, and to obtain all governmental approvals and consents deemed necessary or desirable to establish and further evidence perfection of such Liens or security interests under the provisions of any applicable federal, state, provincial, or other law (whether domestic or foreign) (it being understood that perfection shall occur automatically by virtue of the occurrence of the Effective Date, subject to the satisfaction in full or waiver of all DIP Obligations in accordance with the terms of the DIP Documents, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

2.    Exemption from Registration

In connection with the Exit Secured Notes Financing, the Plan provides for the offering, issuance, and distribution of the Exit Secured Notes, which are "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

The Debtors are relying on Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, or Regulation S under the Securities Act, and similar Blue-Sky Laws provisions, to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution under the Plan of the Exit Secured Notes to Holders of Senior Secured Notes Claims and certain eligible Holders of Convertible Notes Claims, including in connection with the Solicitation.

Section 4(a)(2) of the Securities Act provides that the offering or issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under Section 5 of the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under the Securities Act. Regulation S provides that the offering or issuance of securities to persons that, at the time of the issuance, were outside of the United States and were not "U.S. persons" (and were not purchasing for the account or benefit of a "U.S. person") within the meaning of Regulation S is exempt from registration under Section 5 of the Securities Act.

The Exit Secured Notes may be offered and issued without registration under the Securities Act in reliance upon the exemption from registration provided under section 4(a)(2) of the Securities Act (including, potentially, pursuant to the safe harbor provided by Regulation D promulgated under the Securities Act) or Regulation S or other applicable exemptions. Each Holder of a Senior Secured Notes Claim is a "qualified institutional buyer" (as defined under Rule 144A of the Securities Act) or a "non-U.S. person" within the meaning of Regulation S of the Securities Act. Each Holder of a Convertible Notes Claim that will receive the Exit Secured Notes is required to represent that it is an Institutional Accredited Investor, a "qualified institutional buyer" (as defined under Rule 144A of the Securities Act) or a "non-U.S. person" within the meaning of Regulation S of the Securities Act.

The Exit Secured Notes will be deemed "restricted securities" (as defined by Rule 144 of the Securities Act) that may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act (such as Rule 144A or Regulation S) is available, and in compliance with any

applicable state or foreign securities laws.  Any and all of the Exit Secured Notes offered, issued, or distributed under the Plan pursuant to Regulation S under the Securities Act shall be subject to any applicable restrictions on transfer set forth in Regulation S and may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act (such as Rule 144A or Regulation S) is available, and in compliance with any applicable state or foreign securities laws.

Any persons receiving restricted securities under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

The Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order to any Entity (including DTC) with respect to the treatment of the Exit Secured Notes to be issued under the Plan under applicable securities laws. DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the Exit Secured Notes to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  Notwithstanding anything to the contrary in the Plan, no Entity (including DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Exit Secured Notes to be issued under the Plan are exempt from registration.

**F.      Boards of Directors/Managers**

The number of directors or managers that initially, on the Effective Date, shall be members of the Reorganized Debtors' boards of directors or managers (or similar governing entities) shall be as set forth in the New Organizational Documents or otherwise set forth in the Plan Supplement, and shall be consistent with the terms set forth in the Governance Term Sheet.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known, the Debtors shall disclose, in the Plan Supplement, the identity and affiliations of the Persons proposed to serve on the Reorganized Debtors' boards of directors or managers (or similar governing entities).  Commencing on the Effective Date, each of the Reorganized Debtors' directors or managers shall serve pursuant to the terms of applicable law and the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance therewith.

Unless reappointed pursuant to the preceding paragraph, the members of the boards of directors or managers (or similar governing entities) of the Debtors prior to the Effective Date shall have no continuing obligations to the Company in their capacities as such on and after the Effective Date, and each such member shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.

**G.      New Organizational Documents; No Further Action**

On the Effective Date, the New Organizational Documents of each of the Reorganized Debtors shall be deemed executed and authorized in all respects (including by the holders of New Equity Interests).

Notwithstanding any requirement under non-bankruptcy law, except as set forth herein, upon  the  Effective  Date,  (1) all  actions  contemplated  by  the  Plan  (including  the  New

Organizational Documents, the Exit Financing Documents, and any other document contemplated by the Plan Supplement) and (2) all matters provided for hereunder involving the (Reorganized) Debtors' corporate structure, or corporate action to be taken by or required of the (Reorganized) Debtors, shall be deemed authorized and approved in all respects and shall be deemed to have occurred (unless contemplated hereunder to occur after the Effective Date) and be effective as provided herein, without the need for further approval, act, action (including corporate, board, shareholder, manager, or similar action), consent, or authorizations under any applicable law, order, rule, or regulation with respect thereto.

On the Effective Date, the Reorganized Debtors may—and, to the extent required under this Plan or applicable non-bankruptcy law, shall—file the New Organizational Documents with the applicable Secretary of State or other applicable authorities in its respective state or country of incorporation or organization. After the Effective Date, the Reorganized Debtors may amend and restate the New Organizational Documents in accordance with their terms, the Plan, and applicable law.

Pursuant to, and only to the extent required by, section 1123(a)(6) of the Bankruptcy Code, except as required by applicable law, the New Organizational Documents shall include a provision prohibiting the issuance of nonvoting equity securities.

On the Effective Date, the Reorganized Parent shall enter into and deliver the Registration Rights Agreement to each Holder of New Equity Interests, which shall become effective and binding in accordance with its terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Entity. Holders of New Equity Interests shall be deemed to have executed the Registration Rights Agreement and be parties thereto, without the need to deliver signature pages thereto.

## H.    Cancellation of Instruments, Certificates, and Other Documents

On the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, (1) the DIP Facility, the Senior Secured Notes Documents, the Convertible Notes Documents, and any Interest, Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Interest, including, for the avoidance of doubt, any and all shareholder or similar agreements related to Interests and the DIP Documents, Senior Secured Notes Documents, and Convertible Notes Documents shall terminate, be cancelled, discharged, and deemed surrendered, as applicable; none of the Reorganized Debtors shall have any continuing obligations thereunder, and the Prepetition Agents/Trustees, and its respective agents, successors, and assigns shall each be automatically and fully released and discharged of and from all duties and obligations thereunder, and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, certificate or articles of incorporation, or similar documents governing the shares, Certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be released; *provided*, that notwithstanding such termination, cancellation, discharge, Confirmation, Consummation, or anything to the contrary contained in the Plan, any such

agreement that governs the rights of the Holder of an Allowed Claim (including the DIP Documents, Senior Secured Notes Documents, and Convertible Notes Documents) shall continue in effect solely for purposes of:  (1) enabling (A) such Holder to receive Plan Distributions on account of such Allowed Claim, as provided herein and (B) the Prepetition Agents/Trustees to exercise their respective charging liens for the payment of fees and expenses and for indemnification as provided in the applicable indenture; (2) preserving all rights (including rights of enforcement), remedies, exculpations, indemnities (including with respect to any indemnification or contribution from the respective Holders of Allowed Claims under the DIP Documents, Senior Secured Notes Documents, and Convertible Notes Documents), powers, and protections of the Prepetition Agents/Trustees against any Entity, pursuant to and subject to the terms of the DIP Documents, the Senior Secured Notes Documents, and Convertible Notes Documents; (3) permitting the Prepetition Agents/Trustees to enforce the respective obligations owed to them or their respective Holders of Claims under the Plan or the Confirmation Order, in accordance with the DIP Documents, Senior Secured Notes Documents, and Convertible Notes Documents; and (4) permitting the Prepetition Agents/Trustees to perform any functions that are necessary to effectuate the foregoing, including appearing in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; *provided, further*, that the preceding proviso shall not affect the resolution of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the (Reorganized) Debtors, as applicable, except to the extent set forth in or provided for under the Plan or the Confirmation Order.  For the avoidance of doubt, to the extent any Senior Secured Notes Document is, upon Consummation, either (a) an Exit Secured Notes Document or (b) is otherwise agreed by the Debtors and the Required Consenting Noteholders to remain in full force and effect on the Effective Date (a "**Continuing Senior Secured Notes Document**"), this Article IV.H shall not apply with respect to such Senior Secured Notes Document.

**I.        Subordination**

The allowance, classification, and treatment of all Claims and Interests under the Plan takes into consideration any and all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  On the Effective Date, any and all subordination rights or obligations that a Holder of a Claim or Interest may have with respect to any Plan Distributions shall be terminated, and all actions related to the enforcement of such subordination rights shall be enjoined permanently.  Accordingly, Plan Distributions to Holders of Allowed Claims shall not be subject to turnover or payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment, or other legal process by a beneficiary of such terminated subordination rights; *provided*, that any such subordination rights shall be preserved in the event the Confirmation Order is vacated, the Effective Date does not occur in accordance with the terms hereunder, or the Plan is revoked or withdrawn.

**J.        Structural Simplification**

At any time after the Confirmation Date, with the consent of the Required Consenting Stakeholders, the (Reorganized) Debtors may take any action reasonably designed to simplify the corporate structure of the (Reorganized) Debtors without the need for (1) a further order of the Bankruptcy Court, (2) any other or further actions to be taken by or on behalf of the (Reorganized)

Debtors, or (3) any payments to be made in connection therewith.  Such action may include causing any (Reorganized) Debtor to merge with and into any other (Reorganized) Debtor or causing any (Reorganized) Debtor to liquidate or dissolve.  Each of the (Reorganized) Debtors may execute and file documents, and take all other actions as each deems appropriate, relating to the allowance of and to effect the prompt corporate restructuring of the (Reorganized) Debtors as provided herein without the payment of any fee, tax, or charge and without the need for the filing of reports or certificates.

Moreover, on and after the first day following the date of any such action, the applicable (Reorganized) Debtor(s) (1) shall be deemed to have withdrawn business operations from any jurisdiction in which they were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal and (2) shall not be liable in any manner to any taxing or other authority for franchise, business, license, or similar taxes accruing on or after such the date of any such action.

## K.    Management Incentive Plan

Promptly after the Effective Date, the New Board shall adopt the Management Incentive Plan, which will provide for the grants of equity and equity-based awards to employees, directors, consultants, and other service providers of the Reorganized Debtor(s), as determined at the discretion of the New Board.  The terms and conditions, including with respect to participants, allocation, timing, and the form and structure of the equity or equity-based awards, shall be determined at the discretion of the New Board after the Effective Date.

## L.    DTC Eligibility

The Debtors and the Reorganized Debtors, as applicable, shall use commercially reasonable efforts to promptly make the New Equity Interests, other than any New Equity Interests required to bear a "restricted" legend under applicable securities laws (which shall be deposited in DTC to the extent permitted by DTC, otherwise in book entry form), and the Exit Secured Notes eligible for deposit with DTC.

## ARTICLE V.
## PROVISIONS GOVERNING DISTRIBUTIONS

## A.    Timing and Calculation of Amounts to Be Distributed

Subject to any reserves or holdbacks established pursuant to the Plan, on the applicable Distribution Date or as soon as practicable thereafter, Holders of Allowed Claims shall receive the full amount of Plan Distributions provided for Allowed Claims in the applicable Classes as of such date.  Because of the size and complexities of the Chapter 11 Cases, the Debtors at the present time cannot accurately predict the timing of the Distribution Dates.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

If and to the extent there are Disputed Claims, Plan Distributions on account of any such Disputed Claims (which shall only be made if and when they become Allowed Claims) shall be made pursuant to the provisions set forth in the Plan with respect to the treatment of Allowed Claims on or as soon as reasonably practicable after the next Distribution Date that is at least 20 calendar days after each such Claim is Allowed; *provided*, that Plan Distributions on account of Professional Fee Claims shall be made as soon as reasonably practicable after such Claims are Allowed by the Bankruptcy Court or as provided in any other applicable order of the Bankruptcy Court.

For all purposes associated with Plan Distributions, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single Plan Distribution. For the avoidance of doubt, Claims held by a single Entity at different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for such Claim at each applicable Debtor. Any such Claims shall be released and discharged pursuant to Article VIII and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.

## B.    Sources for Plan Distributions and Transfers of Funds Among Debtors

Plan Distributions shall be funded, as applicable, with (1) Cash on hand, including any proceeds from the Equity Rights Offering and the Exit Financing Facilities, and (2) the other Assets of the Reorganized Debtors. The (Reorganized) Debtors shall be entitled to transfer funds between and among the Debtors and non-Debtor subsidiaries as the (Reorganized) Debtors as deemed necessary or appropriate to enable the payments and Plan Distributions required by the Plan.

## C.    Distribution Agent

The (Reorganized) Debtors may serve as the Distribution Agent or may retain and direct another Entity as Distribution Agent to assist with the Plan Distributions. A Distribution Agent may make all Plan Distributions and shall be empowered to effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder and to exercise such other powers as may be vested in such Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by such Distribution Agent to be necessary and proper to carry out its duties.

Except as otherwise set forth herein, the Reorganized Debtors shall be authorized, without further Bankruptcy Court, to reimburse any Entity for its reasonable, documented, and customary out-of-pocket expenses incurred in providing post-Confirmation services directly related to Plan Distributions.

If a Distribution Agent is an independent third party designated to serve in such capacity, the Reorganized Debtors shall be permitted to provide to such Distribution Agent, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant

to the Plan and reimbursement of reasonable, actual, and documented out-of-pocket expenses incurred in providing post-Confirmation services directly related to Plan Distributions.

**D.**     *De Minimis* **Distributions**

Notwithstanding anything herein to the contrary, neither the Reorganized Debtors nor any Distribution Agent shall be required to make Plan Distributions or payments of less than $250 (whether Cash or otherwise), and Cash that otherwise would be payable under the Plan to Holders of Allowed Claims but for this provision shall be available for Plan Distributions to other Holders of Allowed Claims.

**E.**     **Delivery of Plan Distributions—Allowed Claims**

The Distribution Record Date shall not apply to Securities held through DTC for which a Plan Distribution is made in exchange for such Securities.  Distributions to claims other than with respect to Securities held through DTC shall only be made to the record Holders of Allowed Claims as of the Distribution Record Date, at which time the Claims Register shall be deemed closed for purposes of determining whether a Holder of such a Claim is a record Holder entitled to Plan Distributions.  The (Reorganized) Debtors, any Distribution Agent, the Prepetition Agents/Trustees, and each of the foregoing's respective Related Parties shall have no obligation to recognize, for purposes of Plan Distributions pursuant to, or in any way arising from, the Plan (or for any other purpose), any Claims that are transferred after the Distribution Record Date. Instead, the foregoing parties shall be entitled to recognize only those record Holders set forth in the registers as of the Distribution Record Date.  Furthermore, if a Claim is transferred 20 or fewer calendar days before the Distribution Record Date, Plan Distributions shall be made to the transferee only if the transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

With respect to a Plan Distribution to be made with Cash, if any dispute arises as to the identity of a Holder of an Allowed Claim that is entitled to receive a Plan Distribution, in lieu of making such Plan Distribution to such person, the Plan Distributions may be made into an escrow account until the disposition thereof is determined by Final Order or by written agreement among the interested parties to such dispute.

Subject to Bankruptcy Rule 9010, a Plan Distribution to a Holder of an Allowed Claim to be sent by mail may be delivered to (1) the address provided by such Holder, if any, (2) the address set forth on the first page of any Proof of Claim Filed by such Holder, (3) the last known address of such Holder on the books and records of the Debtors or their agents if such Holder did not File a Proof of Claim, (4) the address set forth in any written notice of an address change delivered to the (Reorganized) Debtors or any Distribution Agent, (5) in the case of a Holder whose Claim is governed by an agreement and administered by an agent, the address contained in the official records of such Entity, or (6) the address of any counsel that has appeared in the Chapter 11 Cases on such Holder's behalf.  The foregoing shall also apply with respect to any forms or notices related to Plan Distributions that, for the avoidance of doubt, may be sent via email to an email address that satisfies any of subclauses (1)–(6) in the previous sentence.

All distributions on account of the Senior Secured Notes Claims shall be made to, or at the direction of, the Senior Secured Notes Trustee for further distribution to the Senior Secured Noteholders in accordance with the Senior Secured Notes Documents, and subject to the rights of the Senior Secured Notes Trustee to assert its charging lien under the Senior Secured Notes Documents.  If the Senior Secured Notes Trustee is unable to make, or consents to the Reorganized Debtors making, such distributions, the Reorganized Debtors, with the cooperation of the Senior Secured Notes Trustee, shall make such distributions to the extent practicable to do so, provided that any charging lien of the Senior Secured Notes Trustee shall attach to the property to be distributed in the same manner as if such distributions were made through the Senior Secured Notes Trustee.  The Senior Secured Notes Trustee shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and the Debtors or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of a Senior Secured Notes Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter.  The Reorganized Debtors shall reimburse the Senior Secured Notes Trustee for any reasonable and documented fees and expenses incurred after the Effective Date in connection with making distributions pursuant to and in accordance with the Plan.

## F.    Fractional New Equity Interests

Notwithstanding any other provision herein to the contrary, no fractional New Equity Interests shall be issued or distributed pursuant to this Plan.  Whenever any Plan Distribution of a fraction of a New Equity Interest would otherwise be required hereunder, the actual Plan Distribution made shall reflect a rounding of such fraction to the nearest whole New Equity Interest (up or down), with fractions half or less being rounded down and fractions in excess of a half being rounded up.  If two or more Holders are entitled to equal fractional entitlements and the number of Holders so entitled exceeds the number of whole New Equity Interests, as the case may be, which remain to be allocated, the (Reorganized) Debtors shall allocate the remaining whole New Equity Interests to such Holders by random lot or such other impartial method as the (Reorganized) Debtors deem fair (in the (Reorganized) Debtors' sole discretion).  Upon the allocation of all the whole New Equity Interests authorized hereunder, all remaining fractional portions of the entitlements shall be cancelled and shall be of no further force and effect.

## G.    Manner of Payment Under the Plan

Any Cash payment may be made by check, wire transfer, or any other customary payment method.  In the case of non-U.S. creditors, Cash payments may be made in such funds and by such means as are necessary or customary in the applicable jurisdiction.

## H.    Allocation of Plan Distributions Between Principal and Interest

Plan Distributions in respect of Allowed Claims shall be allocated first to the principal amount of the Allowed Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of an Allowed Claim, to any portion of such Allowed Claim for accrued but unpaid interest for all purposes, including federal income tax purposes.

## I.     Compliance Matters

In connection with the Plan, each Reorganized Debtor and any Distribution Agent, as applicable, shall comply with all tax deduction, withholding, payment, and reporting requirements imposed by applicable law, and all Allowed Claims and Plan Distributions shall be subject to any such deduction, withholding, and reporting requirements as determined in the good-faith discretion of the Reorganized Debtors or a Distribution Agent, as applicable.  In connection with the Plan and all Plan Distributions, the (Reorganized) Debtors and any Distribution Agent are authorized to take any and all actions that may be deemed necessary or appropriate to comply with the foregoing requirements (including, in the case of a non-Cash issuance that is subject to withholding, liquidating a portion of the Plan Distributions to generate sufficient funds to pay applicable withholding taxes; *provided, however*, that, in such case, the Distribution Agent shall first notify the intended recipient in writing of such contemplated sale and offer the intended recipient a reasonable opportunity to provide sufficient Cash to satisfy such withholding tax in lieu of such liquidation, and withholding Plan Distributions pending receipt of information necessary to facilitate such Plan Distributions) and establish any other mechanisms that the (Reorganized) Debtors or any Distribution Agent, as applicable, believe are reasonable and appropriate, and all Allowed Claims and Plan Distributions shall be subject to any such withholding and reporting requirements.  All Holders of Claims shall be required to provide an IRS Form W-9 or an appropriate IRS Form W-8 and any other IRS Form and any other information (including information with respect to any underlying Beneficial Owners) necessary to allow the Reorganized Debtors to comply with all withholding, payment, and reporting requirements with respect to such taxes.  The Reorganized Debtors and any Distribution Agent, as applicable, reserve the right to withhold the full amount required by law on any Plan Distribution on account of any Holder of an Allowed Claim that fails to timely provide the required information to a Distribution Agent or the Reorganized Debtors.  The Reorganized Debtors and any Distribution Agent each reserve the right to allocate and distribute all Plan Distributions in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens, and similar encumbrances.  Any amounts deducted, withheld, or reallocated pursuant to this Article V shall be treated as if distributed to the Holder of the Allowed Claim.

## J.     Foreign Currency Exchange Rate

As of the Confirmation Date, any Claim denominated in a currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate on the Petition Date, as quoted at 4:00 p.m. (prevailing Eastern Time), midrange spot rate of exchange for the applicable currency as published in the *Wall Street Journal*, National Edition, on the day after the Petition Date.  The (Reorganized) Debtors and the Claims and Solicitation Agent are authorized to update the Claims Register to reflect the foregoing without the need to File an application, motion, complaint, objection, or any other legal proceeding seeking to adjust such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court or the Holder of such Claim, as applicable.

## K.     Fractional Dollars

Notwithstanding any other provision of the Plan, Plan Distributions or payments pursuant to the Plan need not be made in fractions of dollars.  Whenever any payment of a fraction of a

50

dollar under the Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction down to the nearest whole dollar.

## L.    Undeliverable, Unclaimed, or Non-Negotiated Plan Distributions

Plan Distributions shall not be made to a Holder who is the intended recipient of an Unclaimed Distribution.    The underlying Claim of an Unclaimed Distribution shall be automatically discharged and cancelled, and may be expunged from the Claims Register by the Reorganized Debtors or the Claims and Solicitation Agent without the need to File an application, motion, complaint, objection, or any other legal proceeding seeking to expunge such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court or the Holder of such Claim, as applicable.    The Holder of such Claim shall be deemed to have forfeited its Claim and shall be forever barred and enjoined from asserting any such claim against the (Reorganized) Debtors and their Estates, any Distribution Agent, and each of the foregoing's respective agents, attorneys, representatives, employees, or independent contractors or any of its or their property.    Unclaimed Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code.    All title to and all beneficial interests in the Cash relating to such Unclaimed Distribution, including any dividends or interest attributable thereto, shall remain with or revert to the Reorganized Debtors; checks previously delivered with respect to a now-Unclaimed Distribution shall be null and void; Unclaimed Distributions that are New Equity Interests shall be cancelled notwithstanding any state or other escheat or similar laws to the contrary.    The reversion of such Cash shall be free of any restrictions thereon notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the Plan Distribution that is an Unclaimed Distribution, to the contrary. Nothing contained in the Plan shall require the (Reorganized) Debtors or any Distribution Agent to attempt to locate any Holder of an Allowed Claim.

## M.    Claims Paid by Third Parties

To the extent a Holder of an Allowed Claim receives a Plan Distribution on account of a Claim and also receives payment from a party that is not a (Reorganized) Debtor or a Distribution Agent on account of such Claim, such Holder shall, within 14 calendar days of receipt thereof, repay or return the Plan Distribution to the applicable Reorganized Debtor, to the extent that the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of the Claim as of the date of any such Plan Distribution.    The failure of such Holder to timely repay or return such Plan Distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each calendar day after the 14-day grace period specified above until the amount is repaid.

To the extent that a Holder receives payment in full or in part on account of a Claim, such Claim may be adjusted or expunged on the Claims Register without a claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court or the Holder of such Claim, as applicable; *provided*, that, to the extent the non-Debtor party making the payment is subrogated to the Holder's Claim, the non-Debtor party shall have a 30-calendar-day grace period following payment in full to notify the Claims and Solicitation Agent and the Reorganized Debtors of such subrogation rights.

**N.** **Claims Payable by Third Parties**

To the extent that one or more of the Debtors' Insurers satisfies any Claim in full or in part, then immediately upon such satisfaction, such Claim may be expunged from or reduced on (to the extent of such satisfaction) the Claims Register without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court or the Holder of such Claim, as applicable. Nothing contained herein shall constitute or be deemed a waiver of any Cause of Action that a Debtor or any Entity may hold against any other non-Debtor Entity (including Insurers) under any Insurance Contract, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers under any such Insurance Contract.

## ARTICLE VI.
## PROCEDURES FOR RESOLVING CLAIMS

This Article VI shall not apply to DIP Superpriority Claims, Senior Secured Notes Claims, and Convertible Notes Claims, which Claims shall be Allowed in accordance with the Plan and not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, crossclaims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Entity. This Article VI shall also not apply to Professional Fee Claims, objections to which shall be governed by the Bankruptcy Rules, Local Rules, or an order of the Bankruptcy Court.

**A.** **Objections to Claims**

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan, except as required by the Plan, Holders of Claims need not File Proofs of Claim, and the (Reorganized) Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced, except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. If a Holder of a Claim Files or submits a Proof of Claim in the Chapter 11 Cases, such Claim shall be considered objected to and Disputed without further action by the Debtors, and the Holder electing to File such Claim shall be deemed to have consented to the jurisdiction of the Bankruptcy Court for all purposes with respect to the Claim.

After the Effective Date, the Reorganized Debtors shall have the exclusive authority to object to all Claims that are not Allowed Claims. If any objection to a Claim Filed by the Debtors remains pending as of the Effective Date, the Reorganized Debtors shall be deemed substituted for the Debtors as the objecting party.

Except as otherwise provided herein, agreed to by the (Reorganized) Debtors (in their or its sole discretion), or otherwise approved by the Bankruptcy Court, each Proof of Claim Filed after the Effective Date shall be deemed Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor; such Proofs of Claim

shall be Disallowed without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court and can be expunged from the Claims Register (including by the Claims and Solicitation Agent). Holders of such Claims may not receive any Plan Distributions on account of such Claims, unless, on or before the Combined Hearing, such late-Filed Claim has been deemed timely Filed by a Final Order or as agreed by the Debtors in writing (email being sufficient).

The Reorganized Debtors shall have the exclusive authority to determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that any Unimpaired Claim is Allowed. The Reorganized Debtors shall also be entitled to assert all of the (Reorganized) Debtors' rights, claims, defenses, offsets, rights of recoupment, setoffs, rights of disallowance, subrogation, recharacterization, and equitable subordination and counterclaims with respect to Claims.

### B.    Resolution of Disputed Claims

On and after the Effective Date, the Reorganized Debtors shall have the exclusive authority to File, litigate, compromise, settle, otherwise resolve, or withdraw any objections to Claims, to compromise and settle any such Claims, and to administer and adjust the Claims Register to reflect any such settlement or compromise, in each case, without notice to or approval by the Bankruptcy Court or any other party.

### C.    Estimation of Claims and Interests

Before the Effective Date, the Debtors, and on or after the Effective Date, the Reorganized Debtors, in consultation with the Required Consenting Stakeholders, may (but are not required to) determine, resolve, and otherwise adjudicate all Contingent Claims, Unliquidated Claims, and Disputed Claims in the Bankruptcy Court or such other court of the (Reorganized) Debtors' choice having jurisdiction over the validity, nature, or amount thereof. At any time, the (Reorganized) Debtors may request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason or purpose, regardless of whether any party in interest has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but either is subject to appeal or has not become a Final Order, shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court. If the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim, or Disputed Claim, that estimated amount shall constitute the maximum limitation on such Claim for all purposes and may be used as evidence in any supplemental proceedings, and the (Reorganized) Debtors may pursue supplementary proceedings to object to the ultimate allowance of such Claim; *provided*, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently

compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such Claim unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 20 calendar days after the date such Claim is estimated by the Bankruptcy Court.

**D.      No Distributions Pending Allowance or Settlement of Causes of Action**

Notwithstanding any other provision hereof, no payments or Plan Distributions shall be made (1) for a Disputed Claim, unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order and the Disputed Claim has become an Allowed Claim, (2) to a specific Holder of an Allowed Claim, if such Holder is also the Holder of a Disputed Claim, unless and until all objections to such Disputed Claim(s) have been settled or withdrawn or have been determined by a Final Order and each Disputed Claim has become an Allowed Claim, or (3) to a specific Holder of an Allowed Claim, if such Holder is or may be liable to the (Reorganized) Debtors on account of a Cause of Action, unless and until such Cause of Action (to the extent applicable and without prejudice to the rights of any Holder of an Allowed Administrative Claim to argue that section 502(d) of the Bankruptcy Code is inapplicable to its Administrative Claim) has been settled or withdrawn or has been determined by Final Order of the Bankruptcy Court or such other court having jurisdiction over the matter; *provided*, that if only a portion of an Allowed Claim is Disputed, such Claim shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount. Following any such settlement or determination in clause (3) of the preceding sentence where the Holder of a Claim is liable to the (Reorganized) Debtors on account of any Cause of Action, any such payment or Plan Distribution to such Holder may be offset against the liability such Holder has to the (Reorganized) Debtors.

Notwithstanding the foregoing or any other provision in the Plan or the Plan Documents, nothing in the Plan or the Plan Documents shall (1) constitute a determination that section 502(d) of the Bankruptcy Code is, or is not, applicable to Administrative Claims or (2) prejudice the rights of (a) any Holder of an Allowed Administrative Claim to File a motion (or prosecute a pending motion) before or after the Effective Date, seeking entry of an order compelling payment of its Allowed Administrative Claim on or after the Effective Date on the basis that section 502(d) of the Bankruptcy Code is inapplicable to its Allowed Administrative Claim or (b) the (Reorganized) Debtors to oppose any such motion on any grounds.

**E.      No Amendments to Claims**

On and after the Confirmation Date, the Holder of a Claim (other than a Professional Fee Claim) must obtain the (Reorganized) Debtors' written consent (email being sufficient) or a Final Order of the Bankruptcy Court to amend a Claim. Unless otherwise permitted by a Final Order of the Bankruptcy Court, any Proofs of Claim that violate this Article VI.E shall be Disallowed without the need for any objection by the (Reorganized) Debtors or any further notice to or action, order, or approval of the Bankruptcy Court and can be expunged from the Claims Register (including by the Claims and Solicitation Agent).

### F.  No Late-Filed Claims

All Claims Filed after the Effective Date and for which no Final Order has been entered by the Bankruptcy Court determining that such Claims were timely Filed shall be Disallowed and expunged from the Claims Register (including by the Claims and Solicitation Agent) at the direction of the (Reorganized) Debtors to reflect the same, without the need to File an application, motion, complaint, objection, or any other legal proceeding seeking to adjust or expunge such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court or the Holder of such Claim, as applicable.  The (Reorganized) Debtors have no obligation to review or respond to any Claim Filed after the Effective Date unless (1) the filer has obtained a Final Order from the Bankruptcy Court authorizing it to File such Claim after the Effective Date or (2) the (Reorganized) Debtors have consented to the Filing of such Claim in writing.

### G.  No Interest

Other than as provided by section 506(b) of the Bankruptcy Code or as specifically provided for in the DIP Order, the Plan, or the Confirmation Order, post-petition interest shall not accrue or be paid on Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Claim or Disputed Claim for the period from and after the Effective Date; *provided*, that nothing in this Article VI shall limit any rights of any Governmental Unit to interest under section 503, 506(b), 1129(a)(9)(A), or 1129(a)(9)(C) of the Bankruptcy Code or as otherwise provided for under applicable law.

### H.  Adjustment to Claims Without Objection

Any Claim that has been paid or otherwise satisfied (in whole or in part), amended, superseded, cancelled, or otherwise Disallowed (including pursuant to the Plan), any Claim that has been Filed against the wrong Debtor, and any Claim that is duplicative or redundant of another Claim against the same Debtor, may, on or after the Confirmation Date, be adjusted or expunged from the Claims Register (including by the Claims and Solicitation Agent) at the direction of the (Reorganized) Debtors to reflect the same, without the need to File an application, motion, complaint, objection, or any other legal proceeding seeking to adjust or expunge such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court or the Holder of such Claim, as applicable.

### I.  Reservation of Rights to Object to Claims

The failure of the (Reorganized) Debtors to object to any Claim shall not be construed as an admission to the amount, priority, character, or validity of any such Claim, any portion thereof, or any other claim related thereto, whether or not such claim is asserted in any currently pending or subsequently initiated proceeding, and shall be without prejudice to the right of the (Reorganized) Debtors to contest, challenge the validity of, or otherwise defend against, any such Claim in the Bankruptcy Court or non-bankruptcy forum.

## J.    Disallowance of Claims

Any Claims held by an Entity from which the Bankruptcy Court has determined that property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer that the Bankruptcy Court has determined is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Entity has paid the amount, or turned over any such property, for which such Entity is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Plan Distributions on account of such Claims until such time as all Causes of Action against that Entity have been settled or a Final Order of the Bankruptcy Court with respect thereto has been entered and the full amount of such obligation to the Debtors has been paid or turned over in full.

## K.    Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is Contingent as of the Effective Date, such Claim, notwithstanding section 502(j) of the Bankruptcy Code, (1) shall be deemed Disallowed as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court and (2) can be expunged from the Claims Register (including by the Claims and Solicitation Agent) unless, in each case, prior to the Effective Date (1) such Claim has been adjudicated as noncontingent or (2) the Holder of such Claim has Filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer Contingent.

## ARTICLE VII.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan or a Final Order, each Executory Contract and Unexpired Lease shall be deemed automatically assumed (subject to the payment of any applicable Cure Cost), pursuant to sections 365 and 1123 of the Bankruptcy Code, as of the Effective Date, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease:  (1) has been previously assumed, assumed and assigned, or rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court, in which case, such Final Order shall control; (2) previously expired or was terminated pursuant to its terms; (3) is the subject of a motion or notice of intent to assume, assume and assign, or reject pending as of the Effective Date; or (4) is otherwise rejected pursuant to the terms hereof (including any Schedule of Rejected Contracts), in which case such rejections shall be deemed effective on the Effective Date (or earlier, if so set forth herein or on any Schedule of Rejected Contracts).  Except as otherwise provided herein, each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor(s) in accordance with its terms, except as modified hereby.

Contracts and leases entered into after the Petition Date by any Debtor will be performed by the applicable (Reorganized) Debtor liable thereunder in the ordinary course of its business or

as authorized by the Bankruptcy Court.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order and, on the Effective Date, shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by a Final Order of the Bankruptcy Court.

Except as otherwise provided herein, or agreed to by the (Reorganized) Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, indemnities, options, rights of first refusal, and any other interests.  To the maximum extent permitted by law, and to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases and actions taken in accordance therewith (1) do not alter in any way the prepetition nature of the Executory Contracts and Unexpired Leases, or the validity, priority, or amount of any Claims that may arise under the same, (2) are not and do not create post-petition contracts or leases, (3) do not elevate to administrative expense priority any prepetition Claims of the counterparties to the Executory Contracts and Unexpired Leases against any of the Debtors, and (4) do not entitle any Entity to a Claim under any section of the Bankruptcy Code on account of the difference between the terms of any prepetition Executory Contracts and Unexpired Leases and subsequent modifications, amendments, supplements, or restatements.

The Restructuring Support Agreement shall be assumed upon Confirmation and the Debtors and Consenting Stakeholders shall continue to perform thereunder and comply therewith in all respects during the period through and including the Effective Date.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, and rejections described in this <u>Article VII</u>, pursuant to sections 365 and 1123 of the Bankruptcy Code, as of the date made applicable by the preceding paragraph.

## B.   Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

All Cure Costs shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitations described herein, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.  In the event of a dispute regarding (1) the amount of any Cure Claim, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter

pertaining to assumption (each, an "**Assumption Dispute**"), the Bankruptcy Court shall hear such dispute prior to the assumption becoming effective; *provided*, that the (Reorganized) Debtors may settle any such dispute and shall pay any agreed upon cure amount without any further notice to any party or any action, order, or approval.

To the extent an Assumption Dispute relates solely to proposed Cure Costs, the applicable (Reorganized) Debtor may assume or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of the Assumption Dispute; *provided*, that such (Reorganized) Debtor reserves Cash in an amount sufficient to pay the full amount asserted as the required cure payment by the non-Debtor party to such Executory Contract or Unexpired Lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court).

Notwithstanding anything to the contrary herein, (1) no pending Assumption Dispute shall prevent or delay Plan Consummation and (2) to the extent an Assumption Dispute is resolved or determined against the applicable (Reorganized) Debtor, within 45 days of such resolution or determination, such (Reorganized) Debtor may reject the applicable Executory Contract or Unexpired Lease, and the non-Debtor counterparty may thereafter File a Proof of Claim for any purported Rejection Damages in accordance with the Plan.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and full payment of any applicable Cure Costs pursuant to this Article VII.B, shall result in the full release and satisfaction of any Cure Costs, other Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Cost has been fully satisfied, shall be deemed Disallowed upon the later of entry of the Confirmation Order or such satisfaction in full without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court and can be expunged from the Claims Register (including by the Claims and Solicitation Agent).

## C.     Employment-Related Provisions

### 1.     Employment Agreement and Benefit Programs

Each of the Debtors may, prior to the Effective Date, enter into new employment or similar agreements with employees that become effective on or prior to the Effective Date and survive Consummation of the Plan; *provided*, that the consent of the Required Consenting Senior Secured Noteholders shall be required with respect to any such agreement with an insider (as defined in the Bankruptcy Code).

Notwithstanding anything to the contrary herein, all employment, confidentiality, and non-competition agreements (including, for the avoidance of doubt, any agreements with third-party personnel vendors or any agreements with independent contractors), offer letters (including any severance set forth therein), bonus, gainshare, and incentive programs (including short-term and long-term cash incentive programs), vacation, holiday pay, paid-time off, leaves, retention, change

in control, sale bonus, severance, retirement, supplemental retirement, indemnity, executive retirement, pension, deferred compensation, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, programs, agreements and arrangements, and all other wage, compensation, employee expense reimbursement, unemployment insurance, workers' compensation, and all other compensation or benefit obligations (including, for the avoidance of doubt, letter agreements with respect to certain employees' rights and obligations in the event of certain terminations of their employment in connection with and following the Consummation of the Plan) in each case with the Debtors as of immediately prior to the Effective Date (the "**Compensation and Benefit Programs**") are deemed to be, and will be treated as, Executory Contracts under this Plan and, on the Effective Date, shall be deemed assumed pursuant to sections 365 and 1123 of the Bankruptcy Code (as amended prior to or on the Effective Date, in each case, as applicable) except for:  (a) all (1) equity or equity-based incentive plans, employee stock purchase plans, and any other agreements or awards, or provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Interests or New Equity Interests and (2) any agreement or plan whose value is related to Interests or New Equity Interests or other ownership interests of the Debtors, in each case, shall not constitute or be deemed to constitute Executory Contracts and shall be deemed terminated on the Effective Date; (b) Compensation and Benefits Programs that have been rejected pursuant to an order of a Bankruptcy Court; (c) Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract; and (d) Compensation and Benefit Programs that have been superseded by a new agreement that has been executed with the counterparty thereto prior to Consummation of the Plan in accordance with the first paragraph of this Article VII.C.1.

     2.     Collective Bargaining Agreements

Subject to the occurrence of the Effective Date, the Debtors' collective bargaining agreements with (a) the Aircraft Mechanics Fraternal Association, (b) the Transportation Workers Union of America, (c) the International Association of Machinists and Aerospace Workers, (d) the Professional Airline Flight Control Association, (e) the Association of Flight Attendants, and (f) the Air Line Pilots Association, International, and (g) with respect to each of the foregoing entities in clauses (a) through (f), each of their affiliated local unions, as applicable, shall be deemed assumed pursuant to sections 365 and 1123 of the Bankruptcy Code and the Reorganized Debtors shall be bound by all obligations thereunder in all respects, with Cure Costs relating to such agreements being determined and paid in the ordinary course.

**D.**    **Rejection Claims**

Any Rejection Claim must be Filed with the Claims and Solicitation Agent by the Rejection Damages Bar Date.  Any Rejection Claim for which a Proof of Claim is not properly and timely Filed and served in accordance with the Plan, the Bankruptcy Rules, or the Local Rules shall be Disallowed as of the Rejection Damages Bar Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court and can be expunged from the Claims Register (including by the Claims and Solicitation Agent).

The (Reorganized) Debtors may contest any Rejection Claim in accordance herewith. Allowed Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.

**E.      Reservation of Rights**

Nothing contained in the Plan (including the Plan Supplement) constitutes an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor, any Reorganized Debtor, or any other Entity has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the (Reorganized) Debtors shall have 90 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  If any such dispute is not timely resolved, either party may submit the dispute to the Bankruptcy Court for adjudication.

**F.      Transferred Cure Costs**

With respect to payment of any Cure Costs or disputes over any Cure Costs, none of the (Reorganized) Debtors, any Distribution Agent, or any other Entity, as applicable, shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Cure Cost.

**G.      Indemnification**

1.      Debtor Indemnification Obligations

Each Indemnification Obligation shall be deemed to be and treated as an Executory Contract under the Plan.  Subject to the occurrence of the Effective Date, each Indemnification Obligation shall (a) be deemed assumed by the (Reorganized) Debtors in accordance with Article VII.A pursuant to sections 365 and 1123 of the Bankruptcy Code, (b) remain intact, in full force and effect, (c) not be modified, reduced, discharged, impaired, revoked, or otherwise affected in any way, (d) not be limited, reduced, or terminated after the Effective Date, and (e) survive unaffected irrespective of whether such indemnification is owed for an act or event occurring before, on, or after the Petition Date; *provided*, that the immediately preceding subclauses (a)–(e) shall not apply to any obligation of any Debtor to indemnify, hold harmless, or any obligation of similar import that is on account of conduct determined in a Final Order as constituting fraud, willful misconduct, gross negligence, bad faith, self-dealing, or breach of the duty of loyalty.  For the avoidance of doubt, subject to the occurrence of the Effective Date, the indemnification obligations in the proviso of the immediately preceding sentence shall be deemed rejected by the (Reorganized) Debtors pursuant to section 365 of the Bankruptcy Code.

2.      Third-Party Indemnities

All of the Debtors' rights to indemnification by third parties shall vest in the Reorganized Debtors on the Effective Date.

**H.      Insurance-Related Provisions**

Notwithstanding anything to the contrary in the Plan, the Plan Documents, the Confirmation Order, any Claim objection, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening, grants an injunction, discharge, or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases):

1.      nothing, including the vesting of the Insurance Contracts with the Reorganized Debtors or any relief permitting any Entity to pursue proceeds available under any Insurance Contracts granted pursuant to this Plan, the Plan Documents, the Confirmation Order, or any other Final Order of the Bankruptcy Court, shall impair, expand, or modify (a) the rights and obligations of the (Reorganized) Debtors (and their Estates), named insureds, any insured or beneficiary, or any of the Insurers under any of the Insurance Contracts, (b) the coverage and benefits provided under the Insurance Contracts, (c) the obligations, terms, and conditions of the Insurance Contracts, or (d) the enforceability of the Insurance Contracts; and

2.      on and after the Effective Date (a) all Insurance Contracts which identify any of the Debtors as first named insureds or as a counterparty thereto shall vest unaltered in their entireties with the Reorganized Debtors, (b) any nonmonetary obligations, together with direct or derivative rights, interests, claims, entitlements, or Causes of Action, of any Debtor under any of the Insurance Contracts, including the rights of any Debtor to proceeds, indemnification, reimbursement, contribution, benefits, or other payment arising, at any time, out of or under the Insurance Contracts, regardless of whether such rights or obligations arise or become due before or after the Effective Date, shall vest with the Reorganized Debtors, (c) the Reorganized Debtors shall have standing to pursue the Insurance Coverage Rights, and (d) the Reorganized Debtors shall be authorized to perform any administrative responsibilities on behalf of any named insured under the Insurance Contracts.

For the avoidance of doubt, each Insurer is prohibited and enjoined from denying, refusing, altering, or delaying coverage on any basis regarding or related to the Chapter 11 Cases or the Plan, including the treatment set out herein for any insured claim or Causes of Action.

After the Confirmation Date, none of the (Reorganized) Debtors shall terminate or otherwise reduce the "side-A" coverage under any D&O Liability Insurance Policy in effect on the Confirmation Date with respect to conduct occurring prior thereto. Each such Entity shall be entitled to the full benefits of any such side-A coverage for the full term of such policy, subject to the terms and conditions thereof and hereof, regardless of whether such Entity is an "insured" on or after the Effective Date.

At all times after the Effective Date, the Reorganized Debtors shall purchase or maintain "side-A" liability tail coverage for the six-year period following the Effective Date on terms no less favorable than, and with an aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under, the "side-A" coverage provided through the Debtors' existing

D&O Liability Insurance Policies. From and after the Effective Date, reasonable directors' and officers' insurance policies shall remain in place in the ordinary course.

## ARTICLE VIII.
## EFFECT OF CONFIRMATION OF THE PLAN

### A.    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Confirmation Order, on the Effective Date and concurrently with the applicable Plan Distributions being made and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the (Reorganized) Debtors, and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Reorganized Debtors and their successors and assigns. On and after the Effective Date, each party secured by such pre-Effective Date mortgages, deeds of trust, Liens, pledges, or other security interests (including the Prepetition Agent) shall execute and deliver (at the request and expense of the Reorganized Debtors), and the Reorganized Debtors shall be authorized to file, any documents deemed necessary or appropriate to evidence such release in the name of such party secured by such pre-Effective Date mortgages, deeds of trust, Liens, pledges, or other security interests. With respect to the security interests securing the DIP Obligations, the release and termination of such security interests shall be subject to satisfaction in full or waiver of all DIP Obligations in accordance with the terms of the applicable DIP Documents.

To the extent that any Holder of a Secured Claim that has been satisfied in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or its agent) shall take any and all steps requested by the Reorganized Debtors that are deemed reasonable, necessary, or appropriate to record or effectuate the cancellation or extinguishment of such Liens or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

### B.    Releases; Discharges

The releases and discharges of Claims, Interests, and Causes of Action described in the Plan, including releases by the Debtors and by Holders, constitute good-faith compromises and settlements of the matters covered thereby and such releases are consensual. Such compromises and settlements are made in exchange for consideration, are in the best interest of Holders, are fair, equitable, and reasonable, and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan.

Each of the release, indemnification, discharge, and exculpation provisions set forth in the Plan or in the Confirmation Order (1) is within the jurisdiction of the Bankruptcy Court under sections 1334(a), 1334(b), and 1334(e) of title 28 of the United States Code, (2) is an essential means of implementing the Plan, (3) is an integral and non-severable element of the transactions incorporated into the Plan, (4) confers a material benefit on, and is in the best interests of, the Debtors, their Estates, and their creditors, (5) is important to the overall objectives of the Plan to finally resolve all claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors, (6) is fair, equitable, and reasonable and in exchange for good and valuable consideration, and (7) is consistent with sections 105, 1123, 1129, 1141, and other applicable provisions of the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the releases, stipulations, and exculpation provisions hereof are in addition to and do not replace, the release, stipulations, and other provisions of any Final Order of the Bankruptcy Court.

To the fullest extent provided under section 1141(d)(1)(A) of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided in the Plan or the Confirmation Order:  (1) all consideration distributed under the Plan shall be in complete satisfaction, settlement, discharge, and release of, or in exchange for (as applicable), all Claims and Interests of any kind or nature whatsoever against the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests; (2) the Plan shall bind all Entities who have held, hold, or may hold Claims against or Interests in the Debtors; and (3) all Entities shall be precluded from asserting against the (Reorganized) Debtors, their Estates, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, act, omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.  Except as otherwise expressly provided for in the Plan or the Confirmation Order, upon the Effective Date, the Debtors shall be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims and Interests of any kind or nature whatsoever, including demands and liabilities that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

## C.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the later of (1) the Effective Date or (2) the date indicated in the order providing for such injunction or stay.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## D.    Exculpation

**Pursuant to section 1123(b) and 105(a) of the Bankruptcy Code, to the fullest extent permitted by applicable law, and except as otherwise specifically provided for in the Plan or Confirmation Order, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party is released, discharged, and exculpated from any Cause of Action for**

any claim related to, any act or omission in connection with, related to, or arising out of the Chapter 11 Cases, the formulation, preparation, marketing, dissemination, negotiation, filing, or pursuit of approval, confirmation, or consummation of the DIP Facility, the DIP Documents, the Restructuring Support Agreement, the Plan (including the Plan Supplement and other Plan Documents), the Disclosure Statement, the Exit Financing Facilities, the Exit Financing Documents, the Equity Rights Offering, the Equity Rights Offering Documents, any settlement, contract, instrument, release, or other agreement or document created or entered into in connection therewith or in the Chapter 11 Cases, and any other act taken or omitted to be taken in connection with or in contemplation of the Chapter 11 Cases, the reorganization of the Debtors, or the administration of, or property to be distributed under, the Plan (including the issuance and distribution of any interests (including the New Equity Interests) issued or to be issued under or in connection with the Plan), except for claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct (including actual fraud) or gross negligence.  Each Exculpated Party shall be entitled to reasonably rely upon the advice of counsel concerning its duties and responsibilities pursuant to, or in connection with, the Plan.

The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes on, and distribution of consideration (including the New Equity Interests) pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  To the extent that any of the Exculpated Parties owed fiduciary duties to the Debtors, their Estates, or the Bankruptcy Court in connection with the Chapter 11 Cases, the Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, fully, completely, professionally, and admirably satisfied such duties.

E.      Releases by the Debtors

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided for in the Plan or Confirmation Order, on and after the Effective Date, for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, the Released Parties shall be deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all claims, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal, state, foreign, or other applicable laws, or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, lender liability, joint liability, or otherwise that the Debtors, the Reorganized Debtors, their Estates, and their respective Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or that any Holder of a Claim or Interest or other Entity would have been legally entitled to assert derivatively for or on behalf of the Debtors, the Reorganized Debtors, their Estates, or their respective

Affiliates, based on, relating to, or in any manner arising from, in whole or in part, the following:

1.    the Debtors or their non-Debtor Affiliates (including the management, ownership, or operation thereof or the issuance of Securities thereby), the Reorganized Debtors, the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, or the formulation, preparation, marketing, dissemination, negotiation, or Filing of the DIP Facility, the DIP Documents, Restructuring Support Agreement, the Senior Secured Notes Documents, the Convertible Notes Documents, the Prepetition Revolving Credit Facility, the Plan (including the Plan Supplement and other Plan Documents), the Disclosure Statement, the Exit Financing Facilities, the Exit Financing Documents, the Equity Rights Offering, the Equity Rights Offering Documents, any settlement, contract, instrument, release, or other agreement or document created or entered into in connection therewith, any prepetition transactions, or in the Chapter 11 Cases, and any other prepetition or post-petition act taken or omitted to be taken in connection with or in contemplation of the Chapter 11 Cases, the reorganization of the Debtors, or the administration of, or property to be distributed under, the Plan (including the issuance and distribution of any Securities (including the New Equity Interests) issued or to be issued under or in connection with the Plan);

2.    any Plan Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by, or in furtherance of, the Plan or the reliance by any Released Party on the Plan, or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan or the Disclosure Statement;

3.    the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party (excluding any assumed Executory Contract or Unexpired Lease), or the restructuring of Claims or Interests prior to or in the Chapter 11 Cases; and

4.    the negotiation, formulation, marketing, preparation, or performance of or under the Plan and Disclosure Statement (including the Plan Supplement and other Plan Documents), the DIP Facility, the DIP Documents, the Restructuring Support Agreement, the Senior Secured Notes Documents, the Convertible Notes Documents, the Prepetition Revolving Credit Facility, the Exit Financing Facilities, the Exit Financing Documents, the Equity Rights Offering, the Equity Rights Offering Documents, or, in each case, related agreements, instruments, or other documents, or any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, *provided,* that if any Released Party directly or indirectly

brings or asserts any Claim or Cause of Action that has been released or is contemplated to be released pursuant to the Plan in any way arising out of or related to any document or transaction that was in existence prior to the Effective Date against any other Released Party, and such Released Party does not abandon such Claim or Cause of Action upon request, then the release set forth in the Plan shall automatically and retroactively be null and void *ab initio* with respect to the Released Party bringing or asserting such Claim or Cause of Action; *provided, further*, that the immediately preceding proviso shall not apply to (a) any action by a Released Party in the Bankruptcy Court (or any other court determined to have competent jurisdiction), including any appeal therefrom, to prosecute the amount, priority, or secured status of any prepetition or ordinary course Administrative Claim against the Debtors or (b) any release or indemnification provided for in any settlement or granted under any other Final Order (*provided*, that, in the case of the preceding proviso, the Debtors shall retain all defenses related to any such action).

The foregoing releases in this Article VIII.E shall not apply to any Retained Causes of Action or any claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including actual fraud) or gross negligence. Notwithstanding anything contained herein to the contrary, the foregoing releases shall not release any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan (including the Plan Supplement and any of the Continuing Senior Secured Notes Documents).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute its finding that each release described in the Plan is (1) in exchange for the good and valuable consideration provided by the Released Parties (including the Released Parties' contributions to facilitate the resolution of the Chapter 11 Cases and implementation of the Plan), a good-faith settlement, and compromise of such claims, (2) in the best interests of the Debtors and all Holders of Claims, (3) fair, equitable, and reasonable, (4) given and made after due notice and opportunity for hearing, and (5) subject to the occurrence of the Effective Date, a bar to the Debtors or the Reorganized Debtors asserting any Covered Claim released under or pursuant to the Plan against any of the applicable Released Parties or their respective property.

F.      **Voluntary Releases by the Releasing Parties**

Except as otherwise specifically provided for in the Plan or Confirmation Order, on and after the Effective Date, for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal, state, or

other applicable laws, or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on, relating to, or in any manner arising from, in whole or in part, the following:

1.   the Debtors or their non-Debtor Affiliates (including the management, ownership, or operation thereof or the issuance of Securities thereby), the Reorganized Debtors, the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, or the formulation, preparation, marketing, dissemination, negotiation, or Filing of the DIP Facility, the DIP Documents, Restructuring Support Agreement, the Senior Secured Notes Documents, the Convertible Notes Documents, the Prepetition Revolving Credit Facility, the Plan (including the Plan Supplement and other Plan Documents), the Disclosure Statement, the Exit Financing Facilities, the Exit Financing Documents, the Equity Rights Offering, the Equity Rights Offering Documents, any settlement, contract, instrument, release, or other agreement or document created or entered into in connection therewith, any prepetition transactions, or in the Chapter 11 Cases, and any other prepetition or post-petition act taken or omitted to be taken in connection with or in contemplation of the Chapter 11 Cases, the reorganization of the Debtors, or the administration of, or property to be distributed under, the Plan (including the issuance and distribution of any Securities (including the New Equity Interests) issued or to be issued under or in connection with the Plan);

2.   any Plan Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by, or in furtherance of, the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan or the Disclosure Statement;

3.   the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party (excluding any assumed Executory Contract or Unexpired Lease), or the restructuring of Claims or Interests prior to or in the Chapter 11 Cases; and

4.   the negotiation, formulation, marketing, preparation, or performance of or under the Plan and Disclosure Statement (including the Plan Supplement and other Plan Documents), the DIP Facility, the DIP Documents, Restructuring Support Agreement, the Senior Secured Notes Documents, the Convertible Notes Documents, the Prepetition Revolving Credit Facility, the Exit Financing Facilities, the Exit Financing Documents, the Equity Rights Offering, the Equity Rights Offering Documents, or, in each case, related

agreements, instruments, or other documents, or any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided,* that if any Released Party directly or indirectly brings or asserts any claim or Cause of Action that has been released or is contemplated to be released pursuant to the Plan in any way arising out of or related to any document or transaction that was in existence prior to the Effective Date against any other Released Party, and such Released Party does not abandon such claim or Cause of Action upon request, then the release set forth in the Plan shall automatically and retroactively be null and void *ab initio* with respect to the Released Party bringing or asserting such claim or Cause of Action; *provided, further*, that the immediately preceding proviso shall not apply to (a) any action by a Released Party in the Bankruptcy Court (or any other court determined to have competent jurisdiction), including any appeal therefrom, to prosecute the amount, priority, or secured status of any prepetition or ordinary course Administrative Claim against the Debtors or (b) any release or indemnification provided for in any settlement or granted under any other Final Order (*provided*, that, in the case of the preceding proviso, the Debtors shall retain all defenses related to any such action).

The foregoing releases in this <u>Article VIII.F</u> shall not apply to any (1) Retained Causes of Action, (2) claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including actual fraud) or gross negligence, or (3) rights, remedies, exculpations, indemnities, powers, and protections under the DIP Documents preserved in <u>Article IV.H</u>.  Notwithstanding anything contained herein to the contrary, the foregoing releases shall not release any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan (including the Plan Supplement and any the Continuing Senior Secured Notes Documents).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute its finding that each release described in the Plan is (1) in exchange for the good and valuable consideration provided by the Released Parties, a good-faith settlement, and compromise of such claims, (2) in the best interests of the Debtors and all Holders of Claims, (3) fair, equitable, and reasonable, (4) given and made after due notice and opportunity for hearing, and (5) subject to the occurrence of the Effective Date, a bar to the Releasing Party asserting any Covered Claim released under or pursuant to the Plan against any of the applicable Released Parties or their respective property.

G.    **Injunction**

Except as otherwise specifically provided in the Plan, the Confirmation Order, or any Final Order entered by the Bankruptcy Court in the Chapter 11 Cases, all Entities who have held, hold, or may hold claims or interests that arose prior to the Effective Date, and all other parties in interest, along with their respective Related Parties, are permanently enjoined, from and after the Effective Date, on account of, in connection with, or with respect to any such claim or interest for which an Exculpated Party has been exculpated under <u>Article</u>

**VIII.D of the Plan or for which a Released Party has been released under Article VIII.E or Article VIII.F of the Plan (as applicable), from (1) commencing or continuing in any manner any action or other proceeding on account of, in connection with, or with respect to any such claims or interests released, exculpated, or settled pursuant to the Plan, other than to enforce any right to a Plan Distribution, (2) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against any Released Party or Exculpated Party, or the property or interest in property thereof, on account of, in connection with, or with respect to any such claims or interests released, exculpated, or settled pursuant to the Plan, other than to enforce any right to a Plan Distribution, (3) creating, perfecting, or enforcing any Lien or encumbrance against any Released Party or Exculpated Party, or the property or interest in property thereof, on account of, in connection with, or with respect to any such claims or interests released, exculpated, or settled pursuant to the Plan, other than to enforce any right to a Plan Distribution, (4) asserting any right of setoff or subrogation against any obligation due from any Released Party or Exculpated Party, or against the property or interest in property thereof, on account of, in connection with, or with respect to any such claims or interests released, exculpated, or settled pursuant to the Plan, notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise, except to the extent that (a) a right to setoff is asserted with respect to a Proof of Claim that explicitly preserves such setoff and is timely and properly Filed by the Effective Date or pursuant to section 502(h) of the Bankruptcy Code and Bankruptcy Rule 3002(c)(3) or (b) such Entity was excused from Filing or otherwise not required to File a Proof of Claim pursuant to a Final Order of the Bankruptcy Court, and (5) interfering with the implementation or Consummation of the Plan or any of the Plan Documents. Such injunction shall extend to any successors or assignees of the Released Parties and Exculpated Parties and their respective properties and interest in properties. Each of the Debtors, the Reorganized Debtors, the Exculpated Parties, and the Released Parties is expressly authorized hereby to seek the enforcement of such injunctions.**

**No Entity may commence, continue, amend, or otherwise pursue, join in, or support any other Entity commencing, continuing, amending, or pursuing, a Cause of Action, Covered Claim, or claim of any kind against any Released Party or Exculpated Party, as applicable, that arose, arises from, or is reasonably likely to arise from, or relates to or is reasonably likely to relate to, any Covered Claim subject to Articles VIII.D, E, or F of the Plan without first (1) requesting a determination from the Bankruptcy Court, after notice (to all affected parties) and a hearing, that such claim, Cause of Action, or Covered Claim, as applicable, represents a colorable claim against a Debtor or a Released Party, as applicable, and is not a claim, Cause of Action, or Covered Claim that was released or exculpated under or pursuant to the Plan, which request must attach the complaint or petition proposed to be filed by the requesting Entity (which complaint or petition must satisfy the applicable Rules of Federal Procedure), and (2) obtaining from the Bankruptcy Court, in the form of a Final Order, specific authorization for such Entity to bring such claim, Cause of Action, or Covered Claim, as applicable, against a Debtor or any other Released Party or Exculpated Party, as applicable. Any such request shall include a proposed attorney fee reserve, subject to modification by the Bankruptcy Court, that shall be deposited to the Bankruptcy Court's registry to indemnify all potential defendants against costs associated with the successful defense of any claim that is allowed to proceed. For the avoidance of**

doubt, any Entity that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any claim, Cause of Action, or Covered Claim not explicitly included in the authorized complaint or petition must first obtain authorization from the Bankruptcy Court *before* filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a claim, Cause of Action, or Covered Claim is colorable and, only to the extent legally permissible, shall have jurisdiction to adjudicate the underlying colorable claim, Cause of Action, or Covered Claim.

**H.    Setoff and Recoupment**

Except as otherwise expressly provided for in the Plan or the Confirmation Order, each (Reorganized) Debtor, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may, but shall not be required to, set off or recoup (to the extent applicable) against any Allowed Claim and any Plan Distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may have against the Holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim shall constitute a waiver, abandonment, or release by such Debtor, such Reorganized Debtor, of any such claims, rights, and Causes of Action that they may have against such Holder.  Except as otherwise specifically provided in the Plan, including Article VIII.G, nothing herein shall (1) alter any rights of setoff or recoupment (to the extent available under applicable law) of any Holder of an Allowed Claim or Allowed Administrative Claim against the (Reorganized) Debtors or (2) constitute a waiver of the rights, claims, or defenses of the (Reorganized) Debtors or any other party in interest to dispute such rights of setoff or recoupment on any grounds.  In no event shall any Holder of a Claim be entitled to set off any such Claim against any Claim, right, or Cause of Action of the Debtor, unless (1) such Holder has indicated in any timely- and properly-Filed Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise or (2) such Holder was not required to File a Proof of Claim pursuant to a Final Order of the Bankruptcy Court.

**I.    Preservation of Causes of Action**

The Debtors, the Reorganized Debtors, and their Estates retain all Retained Causes of Action and may enforce all rights related thereto that they may have or choose to assert on behalf of their respective Estates, as applicable, under any provision of the Bankruptcy Code or any applicable analogous statute or non-bankruptcy law, whether such Cause of Action arose before or after the Petition Date.  For the avoidance of doubt, and notwithstanding anything to the contrary herein, the Retained Causes of Action shall not include any Causes of Action of any kind that were released pursuant to a Final Order of the Bankruptcy Court or any other claims against any DIP Agent or DIP Lender.  Upon Consummation, the Reorganized Debtors shall have, retain, reserve, and be entitled to commence, assert, and pursue all Retained Causes of Action.

Except as set forth in the Plan, the Confirmation Order, or a Final Order of the Bankruptcy Court, nothing contained in the Plan or the Confirmation Order shall, or shall be deemed to, release any post-Effective Date obligations of any party under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or in connection with Consummation.

The Debtors' inclusion or failure to include or describe with sufficient specificity any Retained Cause of Action herein, on any Schedule of Retained Causes of Action, or in the Confirmation Order shall not be deemed an admission, denial, or waiver of any Retained Cause of Action that the Debtors or their Estates may hold. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation, including any argument of waiver on account of the failure to include or describe with sufficient specificity any Retained Cause of Action herein, on any Schedule of Retained Causes of Action, or in the Confirmation Order. For the avoidance of doubt, in no instance shall "Retained Causes of Action" include any claim or Cause of Action with respect to, or against, a Released Party that was released pursuant to the Plan.

**No Entity may rely on the absence of a specific reference herein, on any Schedule of Retained Causes of Action, or in the Confirmation Order to any Cause of Action against them as any indication that the (Reorganized) Debtors will not pursue any and all available Causes of Action against them.**

### J. Compromise and Settlement of Claims and Controversies

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Plan Distributions and other benefits provided under the Plan and as a mechanism to effect a fair distribution of value to the Debtors' constituencies, the provisions of the Plan shall also constitute a good-faith compromise and settlement of all Claims, Causes of Action, and controversies incorporated in the Plan.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, controversies, and Causes of Action and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates, and the Holders of such Claims, and is fair, equitable, and reasonable. Subject to Article V, all Plan Distributions made to or for the benefit of Holders of Allowed Claims in any Class are intended to be and shall be final. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice or action, order, or approval of the Bankruptcy Court, the Debtors, with the consent of the Required Consenting Stakeholders, may compromise and settle claims and Causes of Action against other Entities and, upon Consummation, such right shall pass to the Reorganized Debtors.

### K. Protection Against Discriminatory Treatment

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against

any (Reorganized) Debtor or any Entity with which a (Reorganized) Debtor has been or is associated, solely because such (Reorganized) Debtor (1) is or was a debtor under chapter 11, (2) may have been insolvent before the commencement of the Chapter 11 Cases or during the Chapter 11 Cases prior to the Effective Date, or (3) has not paid a debt that is dischargeable in the Chapter 11 Cases.

## ARTICLE IX.
## CONDITIONS TO EFFECTIVE DATE

### A.    Conditions Precedent to the Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied on or prior to the Effective Date or waived in accordance with Article IX.B:

1.    The Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect.

2.    The Backstop Commitment Agreement shall not have been terminated and shall remain in full force and effect.

3.    The Bankruptcy Court shall have approved the Disclosure Statement on a final basis.

4.    The Bankruptcy Court shall have entered the Confirmation Order, which shall have become a Final Order, and the Plan shall not have been amended, altered, or modified from the Plan as confirmed by the Confirmation Order in any material respect, unless such material amendment, alteration, or modification has been made in accordance with the Plan.

5.    All applicable authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan shall have been obtained (and all applicable waiting periods shall have expired).

6.    Any and all professional fees and expenses of Professionals already approved by the Bankruptcy Court shall have been paid in full.

7.    The Professional Fee Reserve Amount shall have been funded into the Professional Fee Escrow Account.

8.    The unpaid, reasonable, and documented fees and expenses of the Consenting Senior Secured Noteholder Advisors, the Consenting Convertible Noteholder Advisors, and the Prepetition Agents/Trustees (in each case inclusive of any estimates through the Effective Date) shall have been paid in full in Cash; *provided*, that payment of any such amounts incurred by such professionals as of the Effective Date but not invoiced to the Debtors at least two Business Days prior to the Effective Date shall not be a condition precedent to the effectiveness of the Plan and shall be payable by the Reorganized Debtors within five Business Days after

the receipt of summary invoices therefor (in all cases without any requirement (y) to provide itemized time detail or (z) for the Bankruptcy Court review or approval (including to File a fee application with the Bankruptcy Court)).

9.  No governmental entity or federal or state court of competent jurisdiction shall have enacted, issued, promulgated, enforced, or entered any law or order (whether temporary, preliminary, or permanent) in any case that is in effect and that prevents or prohibits consummation of the Plan, and no Governmental Unit shall have instituted any action or proceeding (that remains pending on what could otherwise be the Effective Date) seeking to stay, enjoin, restrain, or otherwise prohibit Plan Consummation.

10. The PSP Loan Lender has agreed to modify the interest rate of the PSP Loans on terms agreeable to the Debtors, in consultation with the Required Consenting Stakeholders.

11. All documents and agreements necessary to implement the Plan, including the New Organizational Documents, the Exit Financing Documents, the Equity Rights Offering Documents, and all other items contained in the Plan Supplement, shall be in form and substance acceptable to the Debtors and the Required Consenting Stakeholders and shall have been effected or executed and remain in full force and effect.

12. All conditions precedent to the consummation of the Exit Financing Facilities, Equity Rights Offering, and Backstop Commitment shall have been satisfied or waived in accordance with the terms of the Exit Financing Documents, Equity Rights Offering Documents, and Backstop Commitment Agreement, as applicable.

13. All conditions precedent to the issuance of the New Equity Interests, other than any conditions related to the occurrence of the Effective Date, shall have occurred.

## B.    Waiver of Conditions to Effectiveness

The Debtors, with the consent of the Required Consenting Stakeholders, may waive or modify any of the conditions set forth in Article IX.A at any time (other than the conditions set forth in Article IX.A.4 and IX.A.10), without any notice to other parties in interest or the Bankruptcy Court and without any further notice to or formal action other than proceeding to confirm or consummate the Plan; *provided*, that the condition in Articles IX.A.6–A.8 may only be waived with the express written consent of each affected professional or agent. The condition set forth in Article IX.A.10 may be waived by the Debtors at any time, in consultation with the Consenting Stakeholders. The failure to satisfy any condition before the Confirmation Date or the Effective Date may be asserted by the Debtors as a reason not to seek Confirmation or declare an Effective Date, regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors). The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of such rights or any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

**C.      Effect of Non-Occurrence of Conditions to the Effective Date**

If the Effective Date does not occur on or before the termination of the Restructuring Support Agreement, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan, the Confirmation Order, or the Disclosure Statement shall (i) constitute a waiver or release of any Claims, Interests, or Causes of Action, (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect; *provided, however*, that such termination of the Restructuring Support Agreement and rendering of the Plan null and void shall not affect the validity or enforceability of any other order entered by the Bankruptcy Court or of any agreement, instrument, or other documents executed by any Debtor prior to the date of such termination, including the DIP Documents and any other agreement, instrument, or other document executed in connection therewith.

**ARTICLE X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

**A.      Plan Modifications**

Subject to certain restrictions and requirements set forth in section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors, with the consent of the Required Consenting Stakeholders, may alter, amend, or modify the Plan, including the Plan Supplement, in its entirety, in part, or as to a particular Debtor, without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date.  In addition, should the Plan fail to be accepted by the requisite number and amount of Claims voting, as required to satisfy section 1129 of the Bankruptcy Code, and notwithstanding any other provision of the Plan to the contrary, the Debtors reserve the right to reclassify Claims and Interests.

After the Confirmation Date and before substantial consummation of the Plan, the Debtors, in consultation with the Required Consenting Stakeholders, may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, including the Plan Supplement or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and effects of the Plan.

After the Confirmation Date but before the Effective Date, the Debtors, in consultation with the Consenting Stakeholders, may make appropriate technical adjustments and modifications to the Plan, including the Plan Supplement, without further order or approval of the Bankruptcy Court; *provided*, that such adjustments and modifications do not materially and adversely affect the treatment of Holders or their Claims or Interests.

After the Effective Date, the Reorganized Debtors may amend, supplement, or otherwise modify the Plan Documents in accordance with their terms and applicable non-bankruptcy law.

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon, pursuant to section 1127(a) of the Bankruptcy Code, and a finding that such modifications to the Plan do not require additional disclosure or solicitation under Bankruptcy Rule 3019.

## B.     Revocation or Withdrawal of Plan and Effects of Nonoccurrence of Confirmation or Effective Date

The Debtors, with the consent of the Required Consenting Stakeholders, reserve the right to revoke, withdraw, or delay consideration of the Plan prior to the Confirmation Date and to File subsequent plans.  If the Debtors revoke or withdraw the Plan, or if the Confirmation Order is vacated pursuant to a Final Order, in each case, in its entirety, in part, or as to a particular Debtor, or if the Confirmation Date or the Effective Date does not occur, then, absent further order of the Bankruptcy Court and as to all or such Debtors, as applicable, (1) the Plan shall be null and void in all respects, (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void, and (3) nothing contained in the Plan or the Confirmation Order, and no acts taken in preparation for Consummation of the Plan, shall (a) constitute or be deemed to constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of such Debtors or any other Entity (including the application of res judicata or collateral estoppel), or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

If the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction over any request to extend the deadline for assuming or rejecting Executory Contracts or Unexpired Leases.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on or after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code to:

1.     hear, adjudicate, decide, determine, or resolve all matters relating to the assumption or rejection of Executory Contracts or Unexpired Leases, including any Assumption Disputes and whether a contract or lease is or was executory or expired, and the allowance of Claims resulting therefrom;

2.     hear, adjudicate, decide, determine, or resolve any motion, adversary proceeding, application, contested matter, or other matter pending on the Effective Date;

3.     hear, adjudicate, decide, determine, or resolve all matters relating to the allowance, disallowance, liquidation, classification, priority, amount, validity, or estimation of any Claim;

4.  ensure that Plan Distributions to Holders of Allowed Claims are accomplished as provided herein;

5.  hear, adjudicate, decide, determine, or resolve all applications for compensation and reimbursement of Professional Fee Claims;

6.  hear, adjudicate, decide, determine, or resolve any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

7.  hear, adjudicate, decide, determine, or resolve disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any Plan Document, any settlements, transactions, or payments contemplated hereby or in furtherance hereof, or any agreement, instrument, or other document governing or relating to any of the foregoing;

8.  take any action, issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, any Plan Document, or any other order of the Bankruptcy Court;

9.  take any action or issue such orders as may be necessary or appropriate to construe, enforce, execute, implement, and consummate, or to maintain the integrity of, the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, the Plan Documents, and contracts, instruments, releases, and other agreements or documents created or entered into in connection with the Plan;

10. enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

11. hear, adjudicate, decide, determine, or resolve matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

12. hear, adjudicate, decide, determine, or resolve any other matter not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

13. hear, adjudicate, decide, determine, or resolve any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, any of the Plan Documents, or any other contract, instrument, release, or other agreement or document related to the Plan, the Disclosure

Statement, or the Plan Supplement; *provided*, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in a Plan Document that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court and any disputes concerning such Plan Documents shall be governed in accordance with the provisions thereof;

14.   recover all assets of the Debtors and property of the Debtors' Estates for the benefit of the Reorganized Debtors, wherever located;

15.   hear, adjudicate, decide, determine, or resolve any rights, claims, or Causes of Action held by or accruing to the (Reorganized) Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

16.   enforce and interpret all orders, judgments, injunctions, releases, discharges, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Entity;

17.   hear, adjudicate, decide, determine, or resolve matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

18.   enter final decrees in each of the Chapter 11 Cases;

19.   enforce any order for the sale of property pursuant to section 363, 1123, or 1146(a) of the Bankruptcy Code, including the Sale Order;

20.   grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

21.   grant any consensual request to extend the deadline for the lessors, conditional vendors, or Holders of Secured Interests in equipment, to take possession of such equipment pursuant to section 1110(b) of the Bankruptcy Code;

22.   hear, adjudicate, decide, determine, or resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including (a) with respect to the repayment or return of Plan Distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to <u>Article V</u>, (b) with respect to the releases, injunctions, discharges, and other provisions contained in <u>Article VIII</u>, including entry of such orders as may be necessary or appropriate to implement such provisions, (c) those that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan, or (d) related to section 1141 of the Bankruptcy Code;

23.   hear, adjudicate, decide, determine, or resolve whether a party's potential claim or Cause of Action represents a colorable claim against a Debtor or any other Released

77

Party or Exculpated Party, as applicable, and is not a claim that was released or exculpated hereunder;

24. hear, adjudicate, decide, determine, or resolve any and all disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Combined Hearing, the Rejection Damages Bar Date, or the deadline for responding or objecting to a Cure Cost;

25. hear, adjudicate, decide, determine, or resolve such other matters, and for such other purposes as may be provided in the Confirmation Order; and

26. hear, adjudicate, decide, determine, or resolve any and all disputes arising from or relating to the Chapter 11 Cases, any orders entered therein (including the interpretation thereof), and any of the foregoing.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have jurisdiction to hear and determine disputes concerning Claims that arose prior to the Effective Date.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.    Exemption from Transfer Taxes and Recording Fees

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, (1) the issuance, distribution, transfer, or exchange of any securities, instruments, or documents (including the New Equity Interests, Exit Secured Notes, and Subscription Rights), (2) the creation, filing, or recording of any lien, mortgage, deed of trust, or other security interest, (3) the making, assignment, filing or recording of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated in the Plan, (4) the grant of collateral under the Exit Financing Documents, and (5) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery, or recording of any deed, bill of sale, assignment, or other instrument of transfer under, in furtherance of, contemplated by, arising out of, or in any way related to, the Plan, and Plan Documents, or the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, personal or real property tax (including real estate transfer tax), mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment. Upon entry of the Confirmation Order, the appropriate federal, state, or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Entity with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax

or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**B.      Request for Expedited Determination of Taxes**

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date, and in the case of any Debtor that is to be dissolved in accordance with the Restructuring Steps Memorandum or the Plan, through the completion of its dissolution.

**C.      Dissolution of Any Committee**

On the Effective Date, any appointed Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purposes of (1) prosecuting requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date by any Committee and its Professionals and (2) appearing in connection with any appeals taken of the Confirmation Order.  Notwithstanding anything herein, the Reorganized Debtors shall not be responsible for paying any fees or expenses incurred by the members of, or advisors to, any Committee after the Effective Date.

**D.      Plan Supplement and Other Plan Documents**

Draft forms of certain Plan Documents and certain other documents, agreements, instruments, schedules, and exhibits specified in the Plan shall, where expressly so provided for in the Plan, be contained in the Plan Supplement and Filed from time to time.  Unless otherwise expressly provided in the Plan, the Debtors may alter, modify, or amend any Plan Supplement document in accordance with Article X.

On or before the Confirmation Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  Once Filed, copies of such Filings shall be available for free download on the Debtors' Case Information Website.

The (Reorganized) Debtors, all Holders of Claims receiving Plan Distributions, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**E.      No Admission**

Other than as expressly provided under the Plan or in the Confirmation Order, nothing in the Plan, Disclosure Statement, or any document or pleading Filed in connection therewith shall constitute or be deemed to constitute an admission that any of the Debtors are subject to or liable for any Claim.

F.      **Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be "substantially consummated," as defined in section 1101 of the Bankruptcy Code.

G.      **Section 1125 of the Bankruptcy Code**

As of, and subject to the occurrence of, the Confirmation Date, the Debtors and their Related Parties shall be deemed to have solicited votes on the Plan and participated in the issuance or distribution of any Securities and interests (including the New Equity Interests) under the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code (including sections 1125(a) and 1125(e) of the Bankruptcy Code) and any applicable non-bankruptcy law, rule, or regulation, including those governing the adequacy of disclosure in connection with such solicitation; therefore, none of the Debtors nor their Related Parties shall have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the issuance or distribution of any Securities and interests (including the New Equity Interests) under the Plan.

No Entity may commence, continue, amend, or otherwise pursue, join in, or support any other party commencing, continuing, amending, or pursuing, a claim or Cause of Action subject to the terms of the immediately preceding paragraph against any Debtor or any of their Related Parties, without first (1) requesting a determination from the Bankruptcy Court, after notice (to all affected parties) and a hearing, that such claim or Cause of Action, as applicable, represents a colorable claim against a Debtor or one of their Related Parties, as applicable, and is not a claim or Cause of Action that was released or exculpated pursuant to the immediately preceding paragraph, which request must attach the complaint or petition proposed to be filed by the requesting party (which complaint or petition must satisfy the applicable Rules of Federal Procedure), and (2) obtaining from the Bankruptcy Court, in the form of a Final Order, specific authorization for such party to bring such claim or Cause of Action, as applicable, against a Debtor or any of their Related Parties, as applicable. Any such request shall include a proposed attorney fee reserve, subject to modification by the Bankruptcy Court, that shall be deposited to the Bankruptcy Court's registry to indemnify all potential defendants against costs associated with the successful defense of any claim that is allowed to proceed. For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any claim or Cause of Action not explicitly included in the authorized complaint or petition must first obtain authorization from the Bankruptcy Court *before* filing any such amendment in the court where such complaint or petition is pending. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a claim or Cause of Action is colorable and, only to the extent legally permissible, shall have jurisdiction to adjudicate the underlying colorable claim or Cause of Action.

H.      **Non-Severability**

If, before Confirmation, any term or provision of the Plan or any other Plan Document is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of

the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided*, that any such alteration or interpretation shall be acceptable to the Debtors and the Required Consenting Stakeholders.

Entry of the Confirmation Order shall constitute a judicial determination that each term and provision of the Plan and each Plan Document, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, as well as the Required Consenting Stakeholders, and (3) non-severable and mutually dependent.

## I.      Binding Effect

Notwithstanding any Bankruptcy Rule (including Bankruptcy Rules 3020(e), 6003, and 6004(h)) or Local Rule to the contrary, upon the occurrence of the Effective Date (or, to the extent expressly provided herein or in the Confirmation Order, the Confirmation Date), the Plan shall be binding upon and inure to the benefit of the (Reorganized) Debtors, all present and former Holders of Claims or Interests (whether or not such Holders shall receive or retain any property or interest in property under the Plan and irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, or injunctions described in the Plan, each Entity acquiring property under the Plan, any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors, all other parties in interest in the Chapter 11 Cases, and their respective Related Parties.

## J.      Service of Documents

After the Effective Date, to be effective, any notice, request, or demand to or upon, as applicable, the Reorganized Debtors, the Consenting Stakeholders, or the DIP Agent must be in writing (email being sufficient) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually received and confirmed by the relevant party as follows:

| The (Reorganized) Debtors |
| --- |
| Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, New York 10017<br>Attention: Marshall Huebner, Darren S. Klein, Christopher S. Robertson, Moshe Melcer, Kayleigh Yerdon<br>Email: spirit.notice@davispolk.com |
| **The Consenting Senior Secured Noteholders** |
| Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>New York, New York 10036<br>Attention: Michael Stamer, Jason P. Rubin<br>Email: mstamer@akingump.com, jrubin@akingump.com |

| The Consenting Convertible Noteholders |
|---|
| Paul Hastings LLP<br>71 S. Wacker Drive<br>Chicago, IL 60606<br>Attention: Matthew L. Warren, Geoffrey King<br>Email: mattwarren@paulhastings.com, geoffking@paulhastings.com<br><br>Paul Hastings LLP<br>1170 Peachtree Street N.E.<br>Suite 100<br>Atlanta, GA 30309<br>Attention: Zach Cochran<br>Email: zachcochran@paulhastings.com |

After the Effective Date the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed a renewed request to receive documents pursuant to Bankruptcy Rule 2002.

In accordance with Bankruptcy Rules 2002 and 3020(c), within 14 calendar days of the date of entry of the Confirmation Order, the (Reorganized) Debtors shall serve a notice of Confirmation to all parties served with the Combined Hearing Notice in the same manner so served; *provided*, that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Combined Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address," or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address.

## K.    Waiver or Estoppel

**Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel or any other Entity, if such agreement was not disclosed herein or in papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

## L.    Conflicts

Except as set forth herein (including Article I.G), (1) to the extent that any provision of any Plan Document (though subject to clause (2) of this Article XII.L) or any Final Order of the Bankruptcy Court (other than the Confirmation Order) conflicts with or is in any way inconsistent with any provision of the Plan or the Confirmation Order, the Plan or the Confirmation Order, as applicable, shall govern and control, (2) to the extent that any provision of the Plan (excluding the Plan Supplement) conflicts with or is in any way inconsistent with any provision of the Plan Supplement, the Plan Supplement shall govern and control (unless otherwise set forth in such Plan Supplement document), and (3) to the extent that any provision of the Plan conflicts with or is in

any way inconsistent with any provision of the Confirmation Order, the Confirmation Order shall govern and control.

**M.      Entire Agreement**

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

*[Remainder of page intentionally left blank]*

Respectfully submitted,
December [●], 2024

Spirit Airlines, Inc., on behalf of itself and
each of its Debtor affiliates

_____

Fred Cromer
Chief Financial Officer