1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - -x

In the Matter of:

SPIRIT AIRLINES, INC.,                          Main Case No.

                                                24-11988-shl

        Debtor.

- - - - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                300 Quarropas Street

                White Plains, New York


                December 17, 2024

                11:12 AM


B E F O R E:

HON. SEAN H. LANE

U.S. BANKRUPTCY JUDGE

2

Doc. #219 Notice Of Agenda

Doc. #4 (All Trade Motion) Motion Of The Debtor For Entry Of Interim And Final Orders (I) Authorizing The Debtors To Satisfy Prepetition Trade Claims In The Ordinary Course Of Business, (II) Authorizing Financial Institutions To Honor And Process Related Checks And Transfers, And (III) Granting Related Relief

Doc. #5 (Wages Motion) Motion To Authorize / Motion Of The Debtor For Entry Of Interim And Final Orders Authorizing (I) The Debtors To (a) Honor Prepetition Employee Obligations And (b) Maintain Employee Benefits Programs And Pay Related Administrative Obligations, (II) Current And Former Employees To Proceed With Outstanding Workers Compensation Claims, And (III) Financial Institutions To Honor And Process Related Checks And Transfers

Doc. #10 (Critical Airline Agreements Motion) Motion To Authorize / Motion Of The Debtor For Entry Of Interim And Final Orders (I) Authorizing The Debtors To Satisfy Critical Airline Obligations, (II) Modifying The Automatic Stay, And (III) Authorizing Financial Institutions To Honor And Process Related Checks And Transfers

Doc. #11 (Customer Programs Motion) Motion To Authorize / Motion Of The Debtor For Entry Of Interim And Final Orders Authorizing (I) The Debtors To Honor Prepetition Obligations To Customers And Otherwise Continue Customer Practices And (II) Financial Institutions To Honor And Process Related Checks And Transfers

Doc. #9 (Utilities Motion) Motion To Authorize / Motion Of The Debtor For Entry Of Interim And Final Orders (I) Prohibiting Utilities From Altering, Refusing, Or Discontinuing Service, (II) Deeming Utilities Adequately Assured Of Future Performance, And (III) Establishing Procedures For Determining Requests For Additional Adequate Assurance

Doc. #12 (Insurance Motion) Motion To Authorize / Motion Of The Debtor For Entry Of Interim And Final Orders Authorizing (I) The Debtors To (A) Continue And Renew Their Liability, Property, Casualty, Surety Bond, And Other Corporate Insurance Programs, And Honor All Obligations In Respect Thereof And (B) Enter Into New Premium Financing Agreements And (II) Financial Institutions To Honor And Process Related Checks And Transfers

Doc. #8 (Tax Attributes Motion) Motion to Authorize / Motion of the Debtor for Entry of Interim and Final Orders Authorizing

4

(I) the Debtors to Pay Certain Prepetition Taxes, Governmental Assessments, and Fees and (ii) Financial Institutions to Honor and Process Related Checks and Transfers

Doc. #146 Application To Employ Ordinary Course Professionals / Motion Of The Debtors For Entry Of An Order Authorizing The Retention And Compensation Of Professionals Utilized In The Ordinary Course Of Business

Doc. #23 (Aircraft Sale Agreement) Motion Of The Debtor For Entry Of Interim And Final Orders Authorizing The Debtor To Assume And Perform Under Aircraft Sale Agreement With G.A. Telesis LLC (Including, Without Limitation, Selling Aircraft Free And Clear Of Encumbrances)

Doc. #145 (1110(a) Motion) Motion To Authorize Motion Of The Debtors For Entry Of An Order (I) Authorizing The Debtors To Enter Into Agreements Under Section 1110(A) Of The Bankruptcy Code And (II) Approving Related Procedures

Doc. #152 Application To Employ Alvarez & Marsal North America, LLC As Financial Advisors / Application To Employ And Retain Alvarez & Marsal North America, LLC As Financial Advisors To Debtors And Debtors In Possession Pursuant To Sections 327(A)

And 328 Of The Bankruptcy Code

Doc. #149 Application To Employ Perella Weinberg Partners LP As Investment Banker To Debtors /Application Of Debtors For Entry Of An Order Authorizing The Employment And Retention Of Perella Weinberg Partners LP As Investment Banker To The Debtors And Debtors In Possession, Effective As Of The Petition Date

Doc. #148 Application To Employ Epiq Corporate Restructuring LLC As Administrative Agent / Application Of Debtors For Entry Of An Order Authorizing The Employment And Retention Of Epiq Corporate Restructuring, LLC As Administrative Agent, Effective As Of The Petition Date

Doc. #25 (Ernst & Young Retention Application) Application Of The Debtor For Interim And Final Orders Authorizing The Debtors To Employ And Retain Ernst & Young LLP As Audit And Tax Services Provider Nunc Pro Tunc To The Petition Date

Doc. #22 (DIP) Motion To Authorize / Motion Of Debtors For Entry Of Interim And Final Orders, Pursuant To 11 U.S.C. Sections 105, 361, 362, 363, 364, 503, 506, 507, and 552, (I) Authorizing The Debtors, Upon Entry Of The Final Order, To Obtain Senior Secured Super Priority Post-Petition Financing,

6

(II) Authorizing The Debtors Use Of Any Cash Collateral, (III) Providing Adequate Protection To Prepetition Secured Parties, (IV) Scheduling A Final Hearing, And (V) Granting Related Relief

Doc. #7 (Cash Management Motion) Motion To Authorize / Motion Of The Debtor For Entry Of Interim And Final Orders (I) Authorizing (A) The Debtors To Maintain Their Existing Cash Management System, Bank Accounts, And Business Forms, (B) The Debtors To Open And Close Bank Accounts, And (C) Financial Institutions To Administer The Bank Accounts And Honor And Process Related Checks And Transfers, (II) Waiving Deposit And Investment Requirements, And (III) Allowing Intercompany Transactions And Affording Administrative Expense Priority To Post-Petition Intercompany Claims

Doc. #13 (Taxes And Fees Motion) Motion To Authorize / Motion Of The Debtor For Entry Of Interim And Final Orders Authorizing (I) The Debtor To Pay Certain Prepetition Taxes, Governmental Assessments, And Fees And (II) Financial Institutions To Honor And Process Related Checks And Transfers

Doc. #173 Motion To Authorize Motion Of The Debtors For An Order Authorizing The Debtors To Perform Under Sale Leaseback

7

Transactions With JSA International U.S. Holdings, LLC For Up To Four Airbus A321NEO Aircraft And Related Matters

Doc. #174 Motion To File Under Seal Debtors' Motion For An Order Authorizing The Filing Of Certain Information Under Seal In Connection With The Motion Of The Debtors For An Order Authorizing The Debtors To Perform Under Sale Leaseback Transactions With JSA International U.S. Holdings, LLC For Up To Four Airbus A321NEO Aircraft And Related Matters

Doc. #150 Application To Employ Debevoise & Plimpton LLP As As Debtors' Fleet Counsel / Application Of The Debtors For Authority To Employ And Retain Debevoise & Plimpton LLP As Fleet Counsel Nunc Pro Tunc To The Petition Date

Doc. #115 Motion To Approve / Motion Of The Debtors For Entry Of Orders (I) Approving The Disclosure Statement On An Interim And Final Basis, (II) Scheduling A Combined Hearing For Final Approval Of The Disclosure Statement And Confirmation Of The Plan, (III) Establishing Certain Dates And Deadlines In Connection With The Solicitation And Confirmation Of The Plan, (IV) Approving The Forms Of Ballots, Solicitation Package, And Notices, (V) Approving The Solicitation And Tabulation Procedures, (VI) Approving The Equity Rights Offering

8

Procedures And Related Materials, And (VII) Authorizing The Debtors To (A) Assume And Perform Under The Backstop Commitment Agreement And (B) Pay The Backstop Obligations

Doc. #147 Application To Employ Davis Polk & Wardwell LLP As Debtors' Counsel / Application Of The Debtors For Entry Of An Order Authorizing The Employment And Retention Of Davis Polk & Wardwell LLP As Attorneys For The Debtors Nunc Pro Tunc To The Petition Date

Doc. #151 Application To Employ Morris, Nichols, Arsht & Tunnell LLP As Conflicts Counsel For The Debtors // Application Of The Debtors For Authority To Employ And Retain Morris, Nichols, Arsht & Tunnell LLP As Conflicts Counsel For The Debtors Nunc Pro Tunc To The Petition Date

Transcribed by:  Colin Richilano

eScribers, LLC

7227 North 16th Street, Suite #207

Phoenix, AZ 85020

(800) 257-0885

operations@escribers.net

eScribers, LLC

9

A P P E A R A N C E S (All present by video or telephone):

DAVIS POLK & WARDWELL LLP

    Attorneys for Debtor

    450 Lexington Avenue

    New York, NY 10017


BY:  MARSHALL S. HUEBNER, ESQ.

    CHRISTOPHER ROBERTSON, ESQ.

    MOCHE MELCER, ESQ.


DEBEVOISE & PLIMPTON LLP

    Attorneys for Debtor

    66 Hudson Boulevard

    New York, NY 10001


BY:  JASMINE BALL, ESQ.



MORRIS, NICHOLS, ARSHT & TUNNELL LLP

    Attorneys for Debtors

    1201 North Market Street

    Wilmington, DE 19899


BY:  ROBERT J. DEHNEY, ESQ.

WILLKIE FARR & GALLAGHER LLP

Attorneys for Official Committee of Unsecured Creditors

787 7th Avenue

New York, NY 10019

BY:   BRETT H. MILLER, ESQ.

TODD M. GOREN, ESQ.

AKIN GUMP STRAUSS HAUER & FELD LLP

Attorneys for AHG of Senior Secured Noteholders

1 Bryant Park

New York, NY 10036

BY:   JASON P. RUBIN, ESQ.

MICHAEL S. STAMER, ESQ.

11

PAUL HASTINGS LLP

     Attorneys for Ad Hoc Group of Convertible Noteholders

     71 South Wacker Drive

     Suite Forty-Fifth Floor

     Chicago, IL 60606

BY:   GEOFFREY KING, ESQ.

     MATTHEW L. WARREN, ESQ.

ALSTON & BIRD LLP

     Attorneys for Wilmington Trust

     90 Park Avenue

     New York, NY 10016

     BY:  WILLIAM HAO, ESQ.

VEDDER PRICE P.C.

     Attorneys for GA Telesis; ORIX and many other aircraft

     1633 Broadway

     31st Floor

     New York, NY 10019

BY:   MICHAEL J. EDELMAN, ESQ.

12

UNITED STATES DEPARTMENT OF JUSTICE

     Attorneys for Office of the United States Trustee

     1 Bowling Green

     New York, NY 10004


BY:   SHARA C. CORNELL, ESQ.



KAPLAN KIRSCH LLP

     Attorneys for Airport Consortium

     1634 I Street, NW

     Suite 300

     Washington, DC 20036


BY:   ERIC T. SMITH, ESQ.



ALSO PRESENT:

     ANDREW HARMEYER, ESQ., Milbank LLP

13

P R O C E E D I N G S

THE COURT:  Good morning.  This is Judge Sean Lane in United States Bankruptcy Court for the Southern District of New York.  And we are here for an 11 o'clock hearing in Spirit Airlines, Inc., a jointly administered Chapter 11 case.  And we will start, as we always do, with appearances.  So let me find out who is here on behalf of the debtors.

MR. HUEBNER:  Good morning, Your Honor.  From Davis, Polk & Wardwell, Marshall Huebner on behalf of the Spirit debtors, handling nonaircraft matters.  Alongside me today will be my colleagues Christopher Robinson and Moche Melcer.  And I believe Ms. Ball is on to handle aircraft matters.

THE COURT:  All right.  Good morning to you and all the folks on your team.

So let me find out who's here on behalf of -- I believe there's an official committee of unsecured creditors.

MR. MILLER:  Thank you, Your Honor.  Brett Miller and Todd Goren, Willkie Farr & Gallagher, on behalf -- well, proposed counsel for the official committee of unsecured creditors.

THE COURT:  All right.  Good morning.  And then I believe there are some ad hoc groups as well who have filed some papers.  So let me get the appearances from those folks.

MR. RUBIN:  Yes, good morning, Your Honor.  Jason Rubin for Akin Gump Strauss Hauer & Feld on behalf of the ad

hoc group of senior secured noteholders.  Also on the line today is my partner, Mike Stamer.

THE COURT:  All right.  Good morning.  I believe there's at least one other group.

MR. KING:  Good morning, Your Honor.  Geoffrey King of Paul Hastings on behalf of the ad hoc group of convertible noteholders.  And I'm joined on the line with my partner, Matthew Warren, as well.

THE COURT:  All right.  Good morning.

On behalf of Wilmington Trust?  All right.

MR. HAO:  Good --

THE COURT:  I'm sorry.  Go ahead, please.

MR. HAO:  Good morning, Your Honor.  William Hao, Alston Bird, on behalf of Wilmington Trust in its capacities in connection with the aircraft debt.

THE COURT:  All right.  Good morning.  I believe we have someone here for GA Telesis.  So Mr. Edelman?

MR. EDELMAN:  Good morning, Your Honor.  Michael Edelman from Vedder Price for GA Telesis.  And while I'm still on, we're also representing GSA and Financial US Holdings LLC and ORIX Aviation, among other aircraft counterparties.

THE COURT:  All right.  Good morning.  On behalf of the United States Trustee's Office?

MS. CORNELL:  Good morning, Your Honor.  You have Shara Cornell here on behalf of the Office of the United States

Trustee.

THE COURT: All right. Good morning.

As is always the circumstance in a case of this size, the appearances go on, on a list that I have for pages. Page after page after page after page. It's always difficult to know when to jump off that list and to just simply ask if there's anyone else. So hopefully without offending anyone, let me just turn it over to anybody else who needs to make an appearance at this time. I know there's a lot of people who are here for listening in, but don't expect to speak.

MS. BALL: Good morning, Your Honor. I'm just confirming Mr. Huebner's statement that Jasmine Ball for Debevoise & Plimpton as proposed fleet counsel is on the line.

THE COURT: All right. Good morning.

MR. SMITH: And good morning, Your Honor. Eric Smith on behalf of the airport consortium.

THE COURT: All right. Good morning.

MR. DEHNEY: Good morning, Your Honor. Robert Dehney from Morris Nichols, proposed conflicts counsel.

THE COURT: All right. Good morning. Anyone else?

MR. HARMEYER: Your Honor, Andrew Harmeyer from Milbank. And I'm here today on behalf of Citibank as agent under the revolving credit facility.

THE COURT: All right. Good morning. Anyone else?

All right. If someone needs to chime in later, hasn't

made an appearance, obviously you can make an appearance at that time. Again, it's hard for me to know who may or may not be here, particularly if language has been added to an order that was also of particular concern.

So with that, let me turn it over back to debtor's counsel. And I do have the amended agenda for today's hearing at docket 243. The one thing I was going to just mention as a matter of logistics -- and I hate to -- I don't want to sound like a skull, but it does have an impact on my ability to get ready some of the logistics.

One is that I know it may seem that having fewer number of binders makes it seem better than having a smaller number of binders. I'm sorry, a larger number of binders. But binders of the size that I have, if they reach a certain size, are hard to actually use. And so I'm okay with getting a larger number of smaller binders.

And as for the timing, I think we do get courtesy copies. But I think the fact that I have three binders for today shows the challenge of courtesy copies, in the sense that we could spend a lot of time here in chambers collating various things and trying to figure out where things are. But one tip that I would suggest is to try to get me them in time, so that if I'm marking something up, I can mark up what's in the binders, even if it means you supplement. And so I think I got some binders, the first set, yesterday afternoon, later in the

day.  And that's a little bit of a challenging timeline because I'm not getting through all these things if I wait until then.

And I guess last but not least, if there are new filings -- there's always new filings and that's perfectly fine, understandable -- to just email a copy to chambers.  If a tree falls in the forest and I'm not there to see it, I don't know necessarily to check the docket every hour on an hourly basis.  So if I'm using an outdated version of an order, for example, and I know a bunch of things were filed last night when I was looking at what I had, so that's just helpful.

Again, I've gotten where I need to be.  Everybody's been lovely to deal with in terms of sending over stuff, so I'm not trying to give anybody a hard time.  But sometimes judges neglect to mention these things, and then people understandably don't quite know what's helpful from our perspective.

So with that exceedingly minor but practical point out of the way, I will turn it over to Mr. Huebner to start us off.

MR. HUEBNER:  Sure, Your Honor.  And thank you for the guidance, it actually is helpful to know because courts have different preferences.  Some want as few binders as possible.  It sounds like we will stay away from the eight-inch and ten.inch monsters with the little holes in the spines and keep you with the five-, six-inch maximum and just give you more of them.

THE COURT:  Yeah, I mean, it may be that someone has

magical powers akin to the Harry Potter movies to make those things work, the ten-inch binders.  I have no such talent.  So thank you.  I appreciate it.  Again, I realize that, having been on the other side of the podium, that unless someone tells you, you don't know.

MR. HUEBNER:  Yep.

THE COURT:  So yeah, so fair enough.  So thank you so much.

MR. HUEBNER:  Okay.

THE COURT:  Appreciate it.

MR. HUEBNER:  We will reserve Wingardium Leviosa for others.

THE COURT:  Fair enough.

MR. HUEBNER:  So Your Honor, good morning.  For the record Marshall Huebner of Davis, Polk & Wardwell LLP, on behalf of the debtors.

Let me begin as is not always appropriate, but it's sometimes appropriate, with a little bit of a case update since this is the second-day hearing, although I actually think it's our fourth hearing.  Normally would be the second one, but for things that Your Honor enabled us to get done in the interest of all the Spirit stakeholders, since the case was filed on November 18th.

The case is going well and as planned so far.  As I think Your Honor knows from the pleadings, the thresholds for

the overwhelming and asymptoting ever closer to a hundred percent impaired creditor support continued to grow.  We now have 99.8 percent of the very large loyalty bond issuance parties to the RSA and in the Akin Gump group and 99.4 percent of the convertible note issuance now supportive and in the RSA, represented by the Paul Hastings Group, totaling 98.1 percent of all impaired creditors represented by counsel, contractually bound to be supportive, and also obviously their counsel having been involved along with their financial professionals in the crafting of all the documents before you today.

As the Court of course knows, the U.S. Trustee declined this Court's twice issued invitation to wait until today to see if a creditors committee was needed, and if we fell on track.  We respect that, that's their decision.  I just note for the record that a committee was appointed on November 29th.  That committee, happily, is deeply experienced, representative, and highly sophisticated.  We want to thank its five members in advance for both how quickly they jumped in and began to exercise and fulfill their statutory duties with seriousness and focus, as well as the law firm that they retained.

Actually, you'll hear from one of Messrs. Miller or Goren in a little bit.  I think they continue their role as the probably most frequently hired airline creditor committee representatives in human history, and we're very happy to have

such an experienced duo and firm with us in this case.  They have already commented on many of the documents, including the plan and disclosure statement that I will get to in a couple of minutes.

Your Honor, I do want to, though, go back for just a minute to sort of an echo of the first day hearing.  Your Honor, as the Court may remember, I actually went pretty light and fast at the first day hearing.  I don't believe in, sort of, sound and light shows and fifty-page PowerPoints and walking you through the photo montage of the company's history.  But I do want to be clear that the fact that this case is going better, frankly, than planned so far in the cases should not be read for a minute to mask or understate how very, very hard the debtors and their advisors worked to avoid for so long being here at all.

Davis Polk and I have been working with Spirit for over four years.  And I believe that the company did everything possible to avoid these proceedings.  The Cromer declaration laid out the many things that were done in the recent past -- financings, aircraft deferrals, other liquidity initiatives, M&A initiatives and the like, including the fact that unfortunately, the merger negotiations that had been underway with Frontier terminated.  And it was only when all the out.of.court initiatives that were realistic and in front of the company no longer sort of provided additional runway that

21

was needed that the board made the difficult decision, and it is always a difficult decision, to commence these proceedings as the best way forward for Spirit.

It should be remembered that Spirit is a public company.  And this is a deeply experienced public company board.  But I should note as an aside, Your Honor, that as of the last proxy, that board owned almost 800,000 shares of Spirit public equity, all of which is being cancelled for no consideration under the plan.

Obviously filing a public company, including a pretty famous public company and a storied and important public company, is not something that any board of directors takes lightly.  And that was certainly no exception in this case.

So Your Honor, with those very brief framing remarks, let me first do something technical which is to move the Mendelsohn declaration into evidence.  Mr. Mendelsohn is on the line today.  We don't know of any party that wishes to cross-examine him, but when a declaration is admitted, it's appropriate the declarant be here today, Your Honor.  That is an Exhibit ECF Number 115.  And it supports some of the relief that we are seeking today.  And unless there are objections, I would ask that the declaration be formally admitted into evidence for today's hearing.

THE COURT:  All right.  Thank you very much.  Anyone wish to be heard on the request to admit that declaration into

evidence?  All right.  Hearing no objection either here this morning or seeing any on the docket, I'm happy to receive that declaration as evidence for today's proceedings.

(Mendelsohn declaration was hereby received into evidence as Debtor's Exhibit 115, as of this date.)

And while we're talking about today's proceedings -- also on the issue of how different judges do different things -- I note there were a certificate of no objection filed for various motions, and then there are some that are uncontested and then there are some that are subject to discussion.  What I tend to do -- the certificate of no objection is helpful because it lets me know, in fact, that there is no objection.  But if there's going to be a hearing anyway, I tend to just put those things on for the hearing.

We don't spend a lot of time on them, but the idea is, particularly when a case is moving quickly as this one is, that it gives the maximum amount of due process available and gives us all comfort that everyone has been given every opportunity to weigh in.  So that's how I handled those.  So I'm not -- by having them on the agenda and not cancelling them, I'm not trying to send any profound message about the amount of time you need to spend on them, but just that they're here and we'll briefly address them in case anybody wishes to be heard.  But I appreciate the fact that they're on the agenda, so thank you for that.

MR. HUEBNER:  Yep.  And Your Honor, I think the difference between those two categories is we obviously adhere as closely as we know how to local rules and chambers' rules. I think you have to have it be uncontested I think three days before the hearing in order to even file a CNO.  We originally thought we could just get those out of the agenda, off the paperwork, out of the binders, and frankly spare the people relevant to those from being on the line and in many cases charging the estate; that's the reason there was a bifurcation, because the ones that we settled within three days of the hearing, we settled too recently to CNO.  Perhaps the Court's preference is to file the CNOs as sort of an informational filing, but still keep them on an upcoming hearing.  Obviously, it goes without saying, we're just us and you're the Court, so that's what we're going to do.

THE COURT:  All right.  And again, we'll address those first out of the box.  And that way, if anybody is here just for those, they can move along, I expect, fairly quickly.

MR. HUEBNER:  Yep.  So Your Honor, then let me do one other super quick thing and then turn the podium over to Mr. Robertson, who's going to address anything but the one contested matter, I believe.

The other thing is, just as a matter of judicial notice, I think the Cromer first day declaration, which is ECF Number 2 which was already admitted into evidence, also

24

provides background and support for today's relief.  I don't think we need to re-move it into evidence, but I just note that along with the new minutes and declaration, the prior declarations are somewhat relevant and helpful as well as part of today's evidentiary record.

THE COURT:  All right.  Great.  And the one other thing, obviously, that had been revised proposed orders that have been submitted I think yesterday evening, which include the financing motion which, when it came in front of me on the first day, was sort of at, I guess one might say, initial stages.  We weren't even talking about approving financing.  We were talking about approving a commitment.

And so I saw a revised formal order that was submitted, but I just -- and I suspect that in going through those changes, that might be one way to update the record as to the current state of the record, as opposed to the state of the record on the first day hearing.  But I mean, that's the one where I see that there's a need for that kind of exercise.

MR. HUEBNER:  Yeah, and I think that's exactly the exercise that Mr. Robertson is about to give you, Your Honor.

THE COURT:  Okay.  Great.  Thank you.

All right.  Mr. Robertson?

MR. ROBERTSON:  Good morning, Your Honor.  Christopher Robertson, Davis Polk & Wardwell, on behalf of the debtors. Can I be heard clearly?

25

THE COURT:  You can be heard just fine.  Thanks so much.

MR. ROBERTSON:  Thank you, Your Honor.  So there are -- I'll start with the fourteen matters that are in the motions with certificates of no objections filed bucket.  Sort of within this bucket, there are just a couple of points we wanted to clarify on the record with respect to the final insurance order, which I will walk through now if that's okay with Your Honor.

THE COURT:  Yeah, please.

MR. ROBERTSON:  So I'm referring to the final proposed -- the proposed final order that was filed on December 13th at docket 199 for the insurance motion.  Two things to clarify.

First, paragraph 5 of the proposed order provides in relevant part that the debtors are authorized but not directed to replace any letters of credit held by or for the account of any of aircraft lessors with cash to be held on account of any such obligation and that the debtor shall provide no less than five business days' notice to counsel to the ad hoc group of senior secured noteholders, the ad hoc group of convertible noteholders, the committee, and the pre-petition agent's trustees, prior to replacing any letters of credit with cash.

Spirit has two LCs that need to be replaced within five business days of entry of this order.  One expires today.

The other expires on Saturday.  The requisite parties, all the parties that are listed, have consented to the replacement of these two letters of credit upon entry of the order.  But the LC banks have requested -- I'm sorry.  The beneficiaries of the LCs have requested that we clarify that the cash can be posted immediately and not wait the five business days.  So we would request that Your Honor so order this portion of the record, if that's agreeable with Your Honor, so that it is 100 percent clear to all parties that Spirit may immediately replace these two letter of credit security deposits upon entry of the order.

THE COURT:  All right.  Thank you very much.  And I think we'll just take these as we go.  So I'll throw it open if anybody wishes to be heard on that particular point or on this particular motion.  All right.  Hearing nothing.

I'm happy to so order the record.  I appreciate the transparency and the clarity on the record.  I think that's very helpful.  And so I'm happy to so order the record to make it very clear that notwithstanding the five-day notice provision discussed in the order that these are happening immediately, given the circumstances.

MR. ROBERTSON:  Thank you, Your Honor.  And then the second clarification on the same order.  In paragraph 6 of the proposed order, there's language that the debtors agreed to include to resolve informal comments from their insurers.

Clause A of paragraph 6 provides that nothing in the

order alters, amends, or modifies the terms and conditions of any of the corporate insurance programs, including but not limited to any obligation of any carrier to pay defense costs or any amounts within the deductible, any right of any carrier to seek reimbursement from the debtors therefore, and the obligation of the debtors to reimburse any carrier therefore.

We inadvertently, in taking comments from our insurers, admitted a subclause 2 to that reservation. So we propose to submit a revised form of final order. What I just read into the record would be sort of clause A-1. Clause A-2 would provide that nothing in the order alters, amends, et cetera the right, if any, of any carrier to draw on and apply any collateral to the obligations, if any, under the corporate insurance programs to the extent that the debtors failed to reimburse the carrier therefore. This is language that would allow the insurers to take their collateral, assuming they have any, to the extent the debtors don't reimburse the insurers for reimbursable obligations.

Again, under our all trade order we have the authority to make those reimbursement payments. And we don't expect this language to be anything other than comfort to the insurers, so we were okay with it. But that's the other change.

THE COURT: All right. Anybody wish to be heard on that clarification?

All right. Thank you again for that. Always good to

**SPIRIT AIRLINES, INC.**

28

have these things as clear as possible on the record.

And just while you mentioned "orders", in light of the fact that there's always at least one order that gets tweaked from the things filed just before, what I'll ask is that you submit maybe two or three emails of orders, so that I make sure I have the most up-to-date versions of the orders. And that way, an order like this one that has a new tweak will -- I know I'm entering the proper version. So we'll wait for those emails in chambers, just so we're -- and you can just sort of send them along as you have them really, grouping them how you like.

MR. ROBERTSON: Appreciate it, Your Honor.

One other point I wanted to note on the fourteen, the motion on CNO, Your Honor will see -- probably have not seen yet because it only happened a few minutes ago -- there was a supplemental declaration filed to the Alvarez and Marsal retention application. It's additional disclosure regarding an earlier engagement by an affiliate of A&M that A&M wanted to put on the record for purposes of disclosure around pre-petition payments.

I believe -- and I don't want to speak for Ms. Cornell -- I believe that at least the issue had been previewed for Ms. Cornell. I don't suppose that, Ms. Cornell, you've had a chance to read the declaration either. But since it was just filed and it relates to a matter on CNO, I wanted to make sure

that folks were aware.

THE COURT:  All right.  Thank you very much.  Again, also very helpful to keep folks in the know on the current status of things.  And I'm sure that that's helpful for folks who have an interest in that retention application, in terms of moving the ball forward.  So thank you very much.

MR. ROBERTSON:  Thank you, Your Honor.

So with that, I don't have anything further on the fourteen matters that are on CNO.  I'm happy to address any questions that Your Honor may have about any of the orders.  Otherwise, I would ask that those orders be entered, and we'll move on to the next items on the agenda.

THE COURT:  All right.  Thank you.  And just to be clear, these include the all trade motion, the wages motion, the critical airline agreements motion, customers' programs motion, the utilities motion, the insurance motion, tax attributes motion, ordinary course of professionals motion, the GA Telesis LLC (GAT) motion, the Alvarez & Marsal retention application, the Perella Weinburg Partners LP retention application, the Epiq retention application, and last but not least, the Ernst & Young retention application.

So just to sum those up on the record, anyone wish to be heard in connection with those matters for which certificates of no objection have been filed?

MS. BALL:  Your Honor, Jasmine Ball from Debevoise &

Plimpton, proposed fleet counsel.  Just one technical item, just because we mentioned the other declarations.  The GAT, the sale motion, also has a second declaration of Mr. Cromer, which is at ECF Number 97 that was admitted previously into evidence, that we would assume, similar to the other declarations that Mr. Huebner mentioned, would also support the final order at this hearing.

THE COURT:  All right.  Thank you very much.  Again, always helpful to have as robust and clear a record as possible, so.

Anything else from any other party?

All right.  With that, I'm happy to approve the fourteen matters that are on Roman numeral I of the agenda, motions with certificates of no objection filed.  And as I find that the relief requested is appropriate, given the facts and circumstances and consistent with the applicable law, largely for the same reasons that the relief was granted on an interim basis, consent interim relief was granted in the first day hearing.  And I think we have an ample record.  And again, I appreciate the additional comments to make it very clear on the record the latest updates.

So with that, anybody who was waiting with bated breath for those fourteen to get resolved and was going to move on with their day can do so at this point.  And with that, we're ready to go on to Roman numeral II.

31

MR. ROBERTSON:  Thank you, Your Honor.  At this time, I would cede the podium back to Mr. Huebner if you would like to address the scheduling motion, to give you the agenda in the order --

THE COURT:  Well, here's what I would suggest.  I would suggest we do the scheduling motion last.  We do the other matters on, so that we deal with all the substantive requests on for today and clear the field on that.  And then we turn back to the scheduling motion which is at Roman numeral III.  Just because I think -- the way I conceptualize it is that part of the discussion about the scheduling motion is the question about progress in the case and how well the case is going, whether there are any issues that raise any concerns by having a combined hearing.  And I think by addressing all the substantive things that are teed up for today other than the scheduling motion, that that helps inform the record on that motion, so.

MR. HUEBNER:  Your Honor, we completely agree.  There was one thing I would like to do, though.  There are 114 people on this Zoom and virtually nobody has dropped.  And I actually shudder to think how many the estate is paying for.

I actually would like to formally request that everyone whose motion was just addressed and does not have a legitimate reason for staying on the hearing please exit or at least do not bill the debtors from this minute forward.  If you

want to listen on your own nickel, it's fine.  But this is a very costly hearing that, with one exception, is utterly uncontested.  And I hope that people are listening out of intellectual interest, not because they believe it's appropriate to charge the estate for it.

THE COURT:  All right.  That's a very fair comment.  And with that -- so let's move on to Roman numeral II in whatever order you'd like to address it, Counsel.

MR. ROBERTSON:  Thank you, Your Honor.  Once again, Christopher Robertson, Davis Polk & Wardwell, on behalf of the debtors.

The first three uncontested matters are the DIP, cash management, and taxes.  As a initial matter, I would like to readmit the declaration of Mr. Bruce Mendelsohn in support of the DIP into the record of today's hearing.

THE COURT:  All right.  Anybody wish to be heard on that request?  All right.  Hearing nothing, I'm happy to consider that declaration as evidence for purposes of today's hearing.

MR. ROBERTSON:  Thank you, Your Honor.

So I think the first thing I'd like to do is address the limited objection of the airport consortium.  That objection pertained to all three of the motions that I just mentioned, so I think it makes sense to kind of address the resolution to that objection as an urgent matter.

24-11988-shl   Doc 349   Filed 01/08/25   Entered 01/14/25 15:07:49   Main Document
Pg 33 of 129
SPIRIT AIRLINES, INC.

33

So there was a group of airports that filed a limited objection to the DIP, cash management, and taxes.  We're pleased to report that this objection has been resolved.  Fundamentally, the airport consortium's objection relates to the debtor's collection of passenger facility charges, or PFCs.  The PFC program is a program that allows the collection of charges at commercial airports that are controlled by public agencies.  And the PFCs are used to fund FAA-approved projects, enhance safety, security, or capacity, reduce noise, and reduce air carrier competition.  The PFCs are collected on behalf of the airport operators.  And under federal statute, the charges are held in trust for the airports, and they're not a estate property.

FAA regulations further require that a covered air carrier, which Spirit is, in Chapter 11 segregate PFCs in a separate, dedicated bank account.  We've included language in the final cash management and DIP orders that clarify that the PFCs are excluded from the DIP collateral -- as they must be, they're not a estate property -- and that the debtors intend to segregate the PFCs they collect, as required under applicable regulations.

Your Honor, the debtors filed a notice of revised proposed final cash management order at docket number 216.  Your Honor will see that there's a new paragraph 8 of that order that provides the debtors are authorized to establish and

34

maintain a bank account, segregate the PFCs.  The order also clearly defines passenger facility charges by reference to section 40117 of Title 49 of the United States Code.

The debtors are, in fact, in the process of opening this account and will provide counsel to the aircraft consortium with the account information, the bank and the account number, once it's established.  The debtors also filed a notice of revised, proposed final DIP order.  There were two notices last night, one at docket 236 and then an additional notice at 242 which just contained changed pages blacklines.

Your Honor, of relevance to the airport consortium objection, we added language in the definition of excluded assets to clarify that the PFCs are not DIP collateral.  The DIP would maintain a security interest in the residual balance of that PFC account that I mentioned, to the extent that the PFC account holds funds in excess of PFCs actually collected. And this is just because that account may be overfunded based on estimated PFC collections from time to time, and that there's cash in that account that isn't actually PFCs, that's DIP collateral in the residual balance.

I'd also like to pause here.  We had one comment late last night that should be entirely uncontroversial which is that the adequate protection means also have an interest in the residual amount in that account.  Again, not the PFCs, not the cash of Citi in the account, but the residual interest, to the

extent that the account is eventually overfunded in respect to PFCs collected.

There are no changes to the taxes order in respect to this objection.  We would like to clarify for the record that where the taxes motion refers to lower case passenger facility charges, the motion is referring to sort of capital defined term, passenger facility charges as defined in the cash management order.

With that, Your Honor, that is the resolution of the objection.  I would pause if Your Honor has any questions or would like to hear from counsel to the consortium.

THE COURT:  All right.  Well, let me throw it open to the airport consortium if there's anything Counsel wants to add.

MR. SMITH:  Thank you, Your Honor.  Not much left to say after debtor counsel's statement.  Very thorough.  We appreciate the debtor's responsiveness and willingness to discuss these things and to resolve this.  We've reviewed the edits to the order.  And we consider our limited objection to the three motions to be resolved.

THE COURT:  All right.  Thank you very much.

All right.  So while we're at it, I'll throw it open for anybody else who wishes to be heard on the first three matters in Roman numeral II that is going forward on an uncontested basis.  And more particularly, the DIP motion, the

cash management motion, and the taxes and fees motion.

MS. CORNELL:  Your Honor, this is Shara Cornell with the Office of the United States Trustee's office.  I would like to be heard with respect to the cash management order, please.

THE COURT:  Sure.

MS. CORNELL:  So while we did not file an objection, we did request from the debtors that this order be on an interim basis and not a final basis.  As Your Honor may remember at the first day hearing, the 345 extension goes through January 2nd which is approximately two weeks from now.

Our financial analysts and the debtor's financial analysts have been working quite closely together to discuss certain bank accounts and whether or not they're 345 compliant, which it appears that some of those accounts may not be.  But it's my understanding that the financial analysts are still in active conversations about that.

So it would be my suggestion that today would be an interim order which does not, in any way, impact the January 2nd current extension deadline.  And then we can come back to Your Honor sometime in mid-January or earlier January with either a further proposed interim order or a final order, or the United States Trustee's Office at that time could make a more formalized objection pursuant to 345 if there is one.

THE COURT:  All right.  Mr. Robertson, your thoughts?

MR. ROBERTSON:  Thank you, Your Honor.  I think Ms.

37

Cornell did a lot of my work for me on cash management here.  I understand that we are agreed on making cash management a second interim order.  I understand that the extension that we agreed on the time to comply of 345(b) would be extended to January 17th, and it's Friday of that week.  We've been, I think, upfront that we intend to, so this case, stay on the track that we all expect it to be on, request a further extension.  But we're agreed on the extension to the 17th at this time.

I defer to Your Honor if it makes sense to hold time for a hearing we hopefully never have to have on final cash management or if it makes sense for us to come back to chambers in the new year and schedule that hearing if it's needed, which I hope it's not.

THE COURT:  I appreciate the parties working together on this and trying to do this efficiently, particularly given the circumstances of this case and the anticipated speed at which it's going to move.  I am open to whatever suggestions you all have on the most efficient way to do this.  So you can have one now, or you can have one later.  You can talk to each other and reach out to chambers and just let us know.  I don't need it to be papered a particular way.  Again, however you want to handle it is fine.  We all have dealt with 345 issues in the past.  And given where this case is, I don't want it to become something that takes up a whole lot of bandwidth if

that's not necessary.  So just let me know what you come up with, and it's fine.

So to get to Mr. Huebner's point about hearings drawing a crowd, that's entirely appropriate, of course.  But you'd hate to draw a crowd for a hearing on that particular issue; that would seem to be not a good result for anyone.  So let me know.

And with that, let me ask if there's anyone else who has anything to say as to number 1, 2, and 3?

All right.  Mr. Robertson, my only comment is this. Is when we -- it has to do with the DIP motion.  And I just want to make sure that the record is clear.  When the DIP motion came in on the first day, there wasn't actually a request to approve the DIP, but rather to approve the commitment letter, in exchange for the consideration that was mentioned.

And I didn't -- so the only update on the docket is the revised order.  So I can certainly infer by the order that now is the request to approve the DIP, and that's pretty clear. So the redline version of the proposed order, you can see the benefit, the approval of the DIP facility.  But I just want -- if you want to make a brief statement on the record to that effect, just a little bit of belt and suspenders for me. Probably two sentences would work.  But just since you have your declarant here, you can just make a proffer as to what

your declarant would say.  However you want to handle it.

MR. ROBERTSON:  Sure, absolutely, Your Honor.  Very, very briefly.

The motion we filed on the first day, Your Honor's absolutely correct, saw entry of an interim order that was actually tailored just for adequate protection, and then a final order approving the DIP.  We filed the final order on, I believe, December 12th.  And then I worked with the revised last night.  The final order seeks approval of a 300.million.dollar post-petition senior secured financing.

The reason we had kind of held off until final order was really just because the DIP -- the debtor's budget didn't show a need for the DIP day one.  And in order to save kind of incremental costs and borrowing costs, we deferred the final.  The budget which was attached to the DIP motion, which is the same budget that's attached to the final order, shows a benefit to drawing the DIP at this point in the case to maintain debtor's liquidity and demonstrate to the market that the debtors have the commitment to financing and are able to fund this fully consensual and unimpaired bankruptcy case.

The DIP priorities are set forth in a chart in the motion.  You'll see that there are provisions that sort of carve out the RCF collateral from the prime liens.  For instance, there are a few provisions in the order that we agreed with, other parties in interest, all informal comments

were resolved.  Almost to a T, those comments are about clarifying that the DIP is not prime -- certain parties that it will prime a collateral for insurers, our ability to use cash to pay for fuel, and the like.

Your Honor, with that I would pause.  If Your Honor has any questions, certainly happy to address them.  But I would --

THE COURT:  No, no I don't, actually.

MR. ROBERTSON:  -- visit our motion --

THE COURT:  That's exactly what I needed.  I just wanted to sort of have the record just clear, given sort of the unusual request on the first day.  Which is, again, understandable under the facts and circumstances, both given all the activity leading up to the filing and frankly, that there was no need on day one, so.

And I will just -- Mr. Robertson, just at the risk of being guilty of leading the witness, just say you have a witness would say all those things, to the extent it's not already reflected in declarations provided in support.

MR. ROBERTSON:  That is correct, Your Honor.  And he is in the courtroom, on Zoom.

THE COURT:  All right.  Thank you very much.

All right.  With that, anything else on numbers 1, 2, and 3?

MR. ROBERTSON:  Nothing from me, Your Honor.

THE COURT:  All right.  Thank you very much.

Anyone from anything else?

All right.  I'm happy to approve the DIP motion, the cash management motion, and the taxes and fees motion.  The cash management motion and the tax and fees motion really pretty much follow form from the relief requested and granted on an interim basis on the first day as appropriate under the facts and circumstances and applicable law, and continues to be appropriate this time on a final basis.

As for the DIP motion, as just discussed, there's been sort of a shift in the debtor's needs and what's appropriate.  And for all the reasons set forth on the record, I find that the DIP motion is appropriate to be granted on a final basis as necessary and appropriate and consistent with applicable law.

So that brings us up to number 4 on the agenda of -- I guess 4, 5, 6, 7, and 8.  And so Mr. Robertson, how do you want to handle or group those?

MR. ROBERTSON:  Thank you, Your Honor.  I would propose to skip past, for a second, 4, 5, and 6 only because Ms. Ball from Debevoise & Plimpton is on the line and Debevoise can handle those three.

I would propose to jump to 7 and 8 which are the Davis Polk retention and the Morris Nichols retention.

THE COURT:  Please.

MR. ROBERTSON: Very little to say about those.  We

42

had ongoing discussions with Ms. Cornell's office.  We and Morris Nichols both filed supplemental disclosures.  My understanding is that those disclosures have resolved the U.S Trustee's issues with respect to the retentions.  I frankly have nothing more to say about them, other than to ask Ms. Cornell if I've misstated anything.

THE COURT:  All right.  Ms. Cornell, anything you wanted to add?

MS. CORNELL:  Sure.  I'll keep it very brief, Your Honor.  Again, Shana Cornell on behalf of the Office of the United States Trustee.

The debtor has filed supplemental declarations in support of the Morris Nichols application and the Davis Polk application.  Had those declarations been filed in the first place, we likely would not have filed our objections.  But now they are filed and they appear to be fulsome.  And we have no further comments at this time.  Thank you.

THE COURT:  All right.  Thank you very much.

Anyone else who wishes to be heard on these two applications?

All right.  I am happy to approve the two applications as appropriate under the facts and circumstances.  And clearly, the picture that I got was that Morris Nichols has been involved prior to the filing for the same reasons their retention's being requested today, and that for all the reasons

that are parsed through in the papers that they are here for an appropriate and necessary role.

And so given all of that, I think that was the only issue that was really sort of flagged, I'm happy to approve the Davis Polk & Wardwell LLP application and the Morris, Nichols, Arsht & Tunnell LLP application.

And so I guess that, Mr. Robinson, unless I'm wrong, I guess that means Ms. Ball is up for numbers 4, 5, and 6?

MR. ROBERTSON: I think that's right. I will cede the podium. And thank you again, Your Honor.

THE COURT: Thank you very much. Appreciate it.

And again, I do appreciate the thoroughness of filling out the record. Always good to take one step forward without risk of having to later take two steps back.

So Ms. Ball, please.

MS. BALL: Good morning, Your Honor. Jasmine Ball from Debevoise & Plimpton, proposed fleet counsel for the debtors. And so I will cover items 4, 5, and 6.

As a technical matter, I wanted to first bring up the declaration of Mr. Fred Cromer which we filed at ECF number 189 in support of the sealing request and the sale/leaseback motion. Mr. Cromer is in the virtual courtroom and available for questions if there are any questions. But as a matter of process, we would request his declaration be entered as his formal testimony in support of the sealing motion and the

24-11988-shl Doc 349 Filed 01/08/25 Entered 01/14/25 15:07:49 Main Document
Pg 44 of 129
SPIRIT AIRLINES, INC.

44

sale/leaseback motion at this time.

THE COURT: All right. Thank you very much. Anybody wish to be heard on that request?

All right. Perhaps not surprisingly no one does wish to be heard. I'm happy to receive that declaration in support of the requested relief.

MS. BALL: Thank you very much, Your Honor.

I would propose to take it slightly out of order and take the sealing motions first with respect to the sale/leaseback motion, just because we are -- some of the items in the sale/leaseback motion are actually sealed.

So we did file at ECF Number 174 the motion requesting that some of the information in our sale/leaseback motion is redacted. We received no formal objections or informal comments on the sealing order. The sealing order and the motion itself does request that we file certain commercially sensitive information under seal with respect to the sale/leaseback transaction that includes information that the debtors, JSA, and Airbus would all view as commercially sensitive, such as purchase price, lease terms, rental amounts. Things that, with respect to the lease for example, that we would not have filed publicly with the FAA either, since we do file these leases with the FAA. And the debtors believe that this information would actually cause them harm in this competitive market if people actually knew. We did limit our

redactions to comply with Local Rule 98T-1 to only redact the specific items that we felt were sensitive and not, like, whole pages of black and things.

If the Court doesn't have any questions with respect to the sealing motion, I will stand on the papers and would request the proposed order be entered as filed.

THE COURT:  Thank you very much.  Let me ask if anyone wishes to be heard in connection with the sealing motion which I do note is not objected to.

All right.  Hearing no one and seeing no objection on the record and given the factual record here, I'm happy to grant the sealing motion.  This is exactly the kind of commercial information that is sensitive and easily fits within the statutory basis for sealing.  And having had the benefit and good fortune of having prior aircraft cases, I can say that with more confidence than perhaps I could in the past.  And so I'm happy to grant the sealing motion.  I do appreciate, again, the care which everything was presented in terms of the what's sealed and not oversealing and all that good stuff.  So thank you very much for that.  So the sealing motion is granted, and we can move on to the motion itself.

MS. BALL:  Thank you very much, Your Honor.  Now, returning to the substantive sale/leaseback motion which we filed at docket number 173.  We also received no formal objections or informal comments on the proposed order, so I

46

won't belabor the details set forth in the motion itself or in the declaration.  However, I thought it would be helpful to at least flag the following few items for the Court.

The agreement, the sale/leaseback agreement with JSA, covers six aircraft.  First two were actually delivered pre.petition.  This would be the third one that is planned to be delivered in two days.  The remaining three aircraft are expected to be delivered post-emergence if everything goes according to current plan.

Spirit has already updated its schedule.  I'm prepared to incorporate the aircraft into its schedule and felt extreme urgency to make sure that this delivery would actually happen on time.  And without the JSA transaction, Spirit would have to actually accept delivery of the aircraft and pay the purchase price to Airbus, resulting in Spirit basically coming out of cash on hand.  So the JSA transaction significantly assists in managing Spirit's liquidity and having to go out of pocket on the actual delivery of the aircraft itself, which was the reason for the urgency of the request.

Unless the Court has specific questions about the transaction, we'll rest on our papers on that and request the approval of the sale/leaseback order in accordance with how we filed it, which we will send to the Court again after the hearing.

THE COURT:  All right.  Thank you very much.

Anyone that wishes to be heard on the sale/leaseback motion?  All right.  Hearing no response and seeing no objection on the docket, I am happy to grant the sale/leaseback motion as appropriate under the facts and circumstances and consistent with applicable law and consistent, frankly, with how these sorts of things are handled in the airline industry.  And so again, I appreciate the clarity of the papers.  And the motion is granted.  So I guess we can move on to Debevoise & Plimpton's retention.

MR. EDELMAN:  Your Honor, just one thing with respect to this.  Since the delivery is occurring so quickly after this hearing, would it be possible to so order the record for --

THE COURT:  Yeah, that's entirely appropriate.  I'm happy to so order the record.  And frankly, it's my intention to so order the record on everything once we're done.  But I don't want to give anyone a raise in blood pressure, so I'm happy to so order the record as to this particular motion right now, given the timing that's involved.

MR. EDELMAN:  Thank you, Your Honor.

THE COURT:  Thank you.

MS. BALL:  Thank you very much, Your Honor.

Moving on to item 6 in the uncontested portion of the agenda, which is the application of the debtors to employ Debevoise & Plimpton which is at ECF Number 150.

We didn't receive formal objections.  But we did

48

receive informal comments and questions from the U.S. Trustee, and we agreed to resolve those without their needing to actually take the time to file objections.

What we would propose to do, and this was after discussion with Ms. Cornell, is modify paragraph number 5 of our proposed order to read as follows:  Debevoise shall apply any remaining amounts of the pre-petition retainer as a credit towards post-petition fees and expenses after such post.petition fees and expenses are approved, pursuant to the first order of the Court granting fees and expenses to Debevoise.

Debevoise is authorized, without further order of the Court, to reserve and apply amounts from the pre-petition retainers that would otherwise be applied towards payment of post-petition fees and expenses as are necessary and appropriate to compensate and reimburse Debevoise with the expenses incurred prior to the petition date, consistent with its ordinary course billing practices.  And that's the end of the quote.

We would modify that in the order itself.  And so unless Ms. Cornell -- and we also provided some additional information to Ms. Cornell, at their request, with respect to our pre-petition fees and our retainer amount as part of this. But we will revise our order and submit a revised order to the Court.  And so unless Ms. Cornell or others have any questions,

we would propose to move forward on that basis.

THE COURT:  All right.  Thank you very much.

Ms. Cornell, anything from your office?

MS. CORNELL:  Sure.  Again, this is Shana Cornell of the Office of the United States Trustee.  As Your Honor is aware, that is our customary language that's being pooled into the order.  And also, just for the clarity of the record, Debevoise did provide our office with a pillar (ph.) tax analysis of their pre-petition invoices and retainers.  And our office is satisfied at this time, and it has no further comments with respect to the application.

THE COURT:  All right.  Thank you very much.

Anyone else who wishes to be heard?

All right.  So based on the current, up-to-date record, I'm happy to grant their retention application of the Debevoise firm as appropriate under the facts and circumstances and consistent with applicable law.  And obviously Debevoise is playing an important role here.  And I appreciate the parties working together to informally resolve any questions and comments that were raised.  So thank you very much.

Ms. Ball, anything else from you?

MS. BALL:  No, Your Honor.  Thank you very much.  I cede the podium back to the Davis Polk team.

THE COURT:  All right.  Mr. Huebner, I think that means you in this instance.

MR. HUEBNER:  It is, Your Honor.  I'm not young, but here I am.  So for the record, Marshall Huebner.

Your Honor, one just tiny point on the already behind us Davis Polk and Morris Nichols declarations.  Ms. Cornell and I, I think, view 2014 slightly differently.  That's not something that we ultimately had to test in this case because we did submit rebuts of our own disclosures.

I do want to note for the record that those disclosures describe almost exclusively facts that transpired after our initial retention application was submitted.  Therefore, in fact, it would not have been possible to submit those declarations with the petitions and with the additional retention applications because as Your Honor noticed, for example, the RCF lenders were not necessarily originally on board.  (Indiscernible) counsel, then they got on board.  And then someone else, blah, blah.

So we all do the best we can.  We love disclosure.  I don't know that I know any firm more conservative than Davis Polk about disclosure, and I'm delighted it's behind us.  I just didn't want there to be an implication in the record that we somehow withheld existing information in our initial retention that could have been disclosed but was not, and that we somehow ferreted it out.  Quite the contrary.  She asked for it, which we had no problem with, explaining what has transpired since the transition date to land us where we now

are in this bit of responsibilities between Davis Polk and Morris Nichols.  So with that, Your Honor --

THE COURT:  All right.  I appreciate that.  And I guess to quote a nonlegal axiom, you don't want a good deed to go unpunished.  So that's fine.  I appreciate that.  And I appreciate, essentially, the commitment to disclosure, right, to avoid these kinds of problems.  So duly noted.  Thank you very much.

MR. HUEBNER:  Yep.  So Your Honor, that brings us to the solely contested matter which obviously is the procedures motion.  The actual name of the motion is, in fact, twelve lines long.  And so I will spare the record and everyone still on the line from reading it and just refer to it as the procedures motion which I think as the Court knows is at ECF Number 115.

THE COURT:  So maybe, Mr. Huebner, in the interest of time, I can provide some comments up front that might be helpful to just sort of move us along a bit.

So there's a reason I wanted to get through all the other motions first, right, because part of the -- as I understand it, part of the concern -- and maybe that's too strong a word, but part of the thinking that animates the U.S. Trustee's papers, I think, is the notion of, well, we don't know what's going to happen and where people are and what's necessary, so we should revert to normal rules of order.  And I

think that's why to me it's important to have gone through all the substantive matters today, frankly, without a hitch because I think it helps to confirm what has been stated, but on a trust but verify kind of notion, that things are moving smoothly and that parties are on board and that the concerns -- in terms of identifying any concerns that are out there.

So I think -- to sum it up, I think things appear to be quite well on track.  And I did see the expressions of support from various stakeholders for the requested relief. And so let me just share my view about what the request entails.

That is, it's a procedural motion, right.  To have a combined hearing is a procedural request.  I, like other judges in this court, have done it in a variety of cases when we think it's appropriate under the facts and circumstances.  We always do it in a caveat emptor sort of way, meaning -- by which I mean that we schedule a combined hearing.  If there are issues that arise, they arise, and nobody's giving up any substantive rights by combining the hearing.  And so we just take it as it comes.

So if I'm right about that, in terms of what's being requested, then I think the current facts and factual record and where we have started and where we are I think are all relevant to the request.  So I just want to make sure that I'm on the same page as you are, Mr. Huebner, as to how you view

the request.

MR. HUEBNER:  Very much so, Your Honor.  And in fact, in light of the developing facts, we've kept the U.S. Trustee's Office apprised on a periodic basis about the ever-growing support for the plan that now has over ninety-eight percent of all impaired creditors represented by counsel and bound to support the plan as well as, obviously, where this hearing ended up.

We did cordially ask if they would consider withdrawing the objection in light of the developments in the case, including the fact that the Official Committee of Unsecured Creditors that they appointed as the fiduciary by statute for all creditors in the case who are unsecured, as well as both groups of noteholders who now have 98.1 percent of all impaired creditors, as well as the debtor, of course, fiduciary for all.

Essentially, the entire universe stands on one side, and they stand alone on the other.  Unfortunately, we heard I believe on Friday that they were unwilling to withdraw their objection, thus necessitating the 108 people that are still on the line today to be at today's hearing.

THE COURT:  So let me --

MR. HUEBNER:  Your Honor --

THE COURT:  -- follow u since I think you and I are on the same page as to what it's intended to accomplish.  I only

24-11988-shl   Doc 349   Filed 01/08/25   Entered 01/14/25 15:07:49   Main Document
Pg 54 of 129
SPIRIT AIRLINES, INC.

54

had two questions that I thought might be helpful to get out in front of.  One is equity holders, meaning we all have seen on the docket a considerable number of letters.  They have a theme, which is why is my equity interest being wiped out or you shouldn't wipe it out.

And so my question would be, what -- and you hinted at this last time, but I think it was premature to have a detailed discussion.  What is the process for addressing these, right?  Because that seems to be something we know it's on the docket.  And again, my assumption is as a matter of substance, any substantive issues that people want to raise they have the right to raise.  Nothing about your request will change that.

But I was wondering whether there's any thinking you could share that might help things along in terms of putting some meat on the bones dealing with those kinds of issues.

MR. HUEBNER:  Absolutely, Your Honor.  And because this is the first time I think 634 has actually been used and challenged ironically, I think it might make sense to have a little bit of a discussion later about Section 105 and 634, because I think it may be important to talk about that at least a little bit.

THE COURT:  Oh, yeah, no, no.

MR. HUEBNER:  But let me --

THE COURT:  I'm just try to get -- there a couple of nitty-gritty things that I thought would be helpful to have you

eScribers, LLC

thoughts on --

MR. HUEBNER:  Agreed.

MR. RUBIN:  -- for purposes of filling out the record. And then whatever else needs to be addressed, we definitely can get there.

MR. HUEBNER:  So, Your Honor, no one in the country more than bankruptcy judges understands and experiences and is communicated with about the bewilderment, frustration, and anger of constituencies at all levels when a company becomes insolvent, whether it is the terrible opioid crisis and its victims that Your Honor and I talk about every month in Purdue, and I've been doing now for six years, whether it's an economic restructuring like this one.  The unavoidable reality is that sometimes companies become insolvent and have to restructure, right?

And as the Cromer declaration laid out, and I've talked about it a little bit now and again, we are here because there was no other choice.  And we're here because the completely disinterested board of directors of this large public company, after exploring all the initiatives, one after another after another after another lined up in the Cromer declaration and elsewhere, was left with no other way to save the enterprise itself and maximize its value.

And of course, under Delaware law, the fiduciary duty of the board of directors is to maximize the value of the

56

enterprise.  When the enterprise is solvent, that exercise of duty is for the benefit of shareholders, and creditors are left to their contractual rights.  When then it becomes insolvent, that duty is exercised for the ultimate economic benefit of creditors.  But the duty is always to the enterprise itself.

We've obviously read every one of the shareholder letters.  And now and again, I've taken a look at some of the archly worded websites that they come from.  Many of them, frankly, Your Honor are form letters that are generated off of the website and the like.  And I have no disrespect of any kind.  I understand full well the bewilderment of people who invested in a company that is well known in the country and hoped that they would make a killing and do very well and would be able to fund their lives and their families to the best of their abilities.

But I'm just a lawyer.  I can't change the realities of the capitalist system.  And where we are is that competition from infinitely better capitalized carriers, including the major carriers who have offerings that companies like Spirit simply cannot match, have sent the ULCCs, the country's ultra low cost carriers and the country's low cost carriers, into a very perilous place where many of them are figuring out how to sort of get through the fight of their lives.  It's an extraordinary thing that we have here that our creditor groups came together and agreed not only to equitize 795 million

dollars of debt but also to put in 350 million dollars of new equity capital on exit.

Ironically, Your Honor -- and again, I don't begrudge anyone for not understanding the bizarre and esoteric world of Chapter 11. Some of the letters muse why don't you cut deeper, why don't you get concessions from labor, why don't you restructure more? But of course, as this Court knows well, all of those things would just generate further claims that would put equity holders even further out of the money than they are now.

So if there were, for example, material contract savings to be had and we went and rejected a whole lot of contracts, that would have generated hundreds of millions of dollars of claims that, of course, under the absolute priority rule, have to be satisfied in full before there ever could be any recovery to equity holders. Which is why if you look at any indication, any angle of approach to the issue, the market has fully understood for rather a while that, absent a transaction, Spirit is insolvent. And that's the way it is.

The transaction part with which is worth pausing on, again, there are facts were just not at liberty to disclose as a public company, but we said all that we could in the Cromer declaration, which is that there were negotiations in 2024 with Frontier, and those negotiations concluded unsuccessfully without a deal. That's very unfortunate. And could there

possibly have been something that created value?  Sure.  But that's true of every company, right?  If only X, if only Kodak had made the shift to digital photography earlier, if only Toys 'R' Us had understood the shift in consumer sentiment, if only Bed Bath & Beyond had not launched a massive in-house brand that attracted no consumer rapport.

There are always hypothetical possibilities that might have saved companies.  And unfortunately, the more storied a name or a brand is, the more people who may or may not have all the skills and experience and knowledge to dabble heavily in public equities should or should not be investing.  Again, not for me to judge, not for me to say, right?  The stories of the meme stock purchase where someone became a millionaire, but for every one of those or the stories where it went the wrong way.

THE COURT:  So we --

MR. HUEBNER:  So --

THE COURT:  Let me just jump in here for a second.  So one of the reasons for my question was to get a sort of an explanation for anybody who's listening in who may not have gone through Mr. Cromer's declaration.  And I appreciate that.  Certainly, as somebody who presided over the American Airlines case, which was where bankruptcy was a result of competition from low cost carriers ironically, or Republic Airways which was a regional carrier where their issue was their relationship with the larger national carriers for whom they did a lot of

flying -- every case has its own story.

One thing I would ask you to segue to is the notion of what the process looks like here since you're talking about the process for the combined hearing and the notion that people can come in and be heard and how you're going to address any issues in terms of that hearing that would be of interest to those folks.

MR. HUEBNER:  Absolutely, Your Honor.  And let me say one other thing that's important, which is, as we pointed out in our reply brief, we are actually seeking neither opt-out nor opt-in releases with respect to equity holders.  So we're just not touching that ganglion of issues at all.  Whatever rights or claims they believe they have that are not otherwise dealt with by the bankruptcy itself and the debtors' discharge they retain.  So I'd want to be very clear about that.  Others might have well taken a different approach.  But in light of the need for speed in this case and the need to have it be as pristine as we thought it possibly could be from a legal and approval perspective, that was the way we approached it.

So, Your Honor, let me turn to sort of what you're talking about and talk a little bit for a minute retrospectively about the process and disclosure and information we provided and then talk a little bit about the process going forward as Your Honor requested, because in fact, the objection here is particularly ironic, given the truly best

in class disclosure and the like that we've been providing since the opening day of the case.

Your Honor, on November 18th, on the petition date itself, we didn't file a term sheet.  The seven-page, fully fleshed out plan of reorganization to the first-day declaration, ECF number 2.  There was no, like, filed the second before, the last minute before the hearing.  This was what you would see in a full prepack in some ways and more.  Prearranged cases often file only on a term sheet.  We've had a draft plan on file for twenty-nine days in virtually all of its glory.

Second, Your Honor, at the first-day hearing the same day, although we didn't have to do it, we announced our intention to seek relief using M-634.  As Your Honor, of course, remembers, you actually authorized us to short certain -- shorten the process a little bit.  We ended up not even using that, and in fact, doing the sort of fuller notice requirements contemplated under 634.

On November 26th, which is already twenty-one full days ago, we filed a full disclosure statement and plan.  Now, I note for the record that the, quote, full notice contemplated under 3017, even if we were not invoking the parallel processing efficiency of 105(d) and 634, we're not very many days shy of even that.  Like, in just a few days, we could have had a full final disclosure statement hearing.  So the fact

that we're here spending a ton of money and fighting about a small number of days when we've had a plan on file for twenty-nine days already and a disclosure statement for twenty-one is very disappointing.

On December 15, we filed an amended disclosure statement and plan along with red lines. Those are actually pretty minor red lines, the type that you would normally see on the eve of any disclosure statement hearing done under regular notice, right? The UCC was formed. They weighed in with a bunch of UCC comments, all reasonable, thoughtful. We negotiated. We took a bunch. We didn't take all. And then obviously, there were some developments in the case that not -- they don't affect the treatment of impaired creditors under the plan. They relate more to things like the exit facility and the like.

And so this, frankly, looks way more like a non accelerated case than an accelerated case. It's just we've been filing things so unbelievably early in the case that we're actually able to move at this speed really almost barely taking advantage candidly of 105(d), which we'll talk about in a few minutes and obviously 634 itself subsequently enacted by the judges.

So, Your Honor, in terms of the way forward, just to say it in hopefully more sort of plain language for people, assuming that the order is entered today, then we would have

conditional approval of the disclosure statement.  We would begin solicitation.  The only classes, the only people whose votes are being solicited under the plan are, of course, the convertible noteholders and their loyalty noteholders because all other creditor classes are unimpaired.  As Your Honor knows, those are sophisticated investors represented by very sophisticated professionals who have been on scene for many, many months, helped draft the plan of disclosure statement, and are already bound by contract.  So we assume that we will have somewhere between 98.1 and 100 percent impaired creditor acceptance of the plan.

Equity holders are being asked to do nothing.  They, of course, are going to have their equity canceled under the plan.  The way the Bankruptcy Code works, creditors receiving no distribution are deemed to reject a plan because, of course, nobody would vote in favor of a plan that gave them nothing.  And so that's obviously the way the law works in this country for a long time.

Equity holders, of course, have their rights to object to the plan.  So if somebody believes that somehow everything that the debtors and the UCC and the many declarants and the ad hoc committees and the like are saying and doing and testifying to and representing to the Court are somehow all incorrect and there's some better way, then, obviously, that will be taken into account by the Court.  And we will all respond as needed.

But I should also note that the debtors have a fiduciary out, which we've discussed before.  So while we don't believe any sort of magical better thing is going to show up, because I think we plumbed the depths of the possible before ultimately being constrained to file these cases, if something magical better does come up, the board's fiduciary duty remains unchanged by the fact that it's in Chapter 11.  In fact, if anything, it's state law duties, which align perfectly, get joined by sort of common law federal bankruptcy duties to maximize the value of the estate.  And you can be confident that the debtors' advisors have been in front of the board at every single board meeting for the last many months and will continue to give the board that advice.  And I know of no reason that anybody would possibly say that this board does not remain fully open to maximizing value in whatever way is possible.

So I don't know if that's helpful in terms of what the Court was thinking.

THE COURT:  It is.  And I guess the only other thing I would say is for folks who are in this circumstance at what a confirmation hearing looks like is the debtors put on evidence.  And so that would include evidence of valuation.  It would include some of the economics behind the results here, and that people can make their objections, and their objections will be heard and addressed, and that that's how a hearing would work.

64

And so that's a very broad strokes of course, Mr. Huebner.  So if there's anything else you wanted to weigh in on that particular topic.

MR. HUEBNER:  Yeah.  The other thing I'd mention, Your Honor, just for the benefit of the listening public, is that we have asked for and I believe already scheduled a confirmation hearing for January 29.  And the order, if the Court were to enter it today, will contain other dates relevant to that; the day that voting closes, the date that objections to confirmation, if any, are due, the date that the debtors' replies are due.  And obviously, the hearing would commence on the 29th of January.

So, Your Honor, I think that that probably -- again, before we turn to sort of the law and the objection, I think that that probably is what makes sense from the debtors' side.

THE COURT:  All right.  Thank you.  So that that was my one issue believe it or not, that was just one issue all dealing with equity holders and the letters that have been filed on the docket.

The other is that I did see that the order contains all the normal things that you have; tabulation procedures, voting record, dates, scheduling, what happens with various ballots in various circumstances.  But it also does contain something that's unusual, which is a discussion about the backstop commitment agreement.  And so there is some language

and some findings dealing with that that talk about the backstop commitment agreement being fair and reasonable and best available to the debtors under the circumstances and actual necessary costs and expense to preserve the debtors' estates.

And so I guess my question is, normally I see these motions, and they are addressed procedurally, just procedure, that is teeing up the plan.

Oh, you're on mute.

MR. HUEBNER: I know I'm on mute, Your Honor.

THE COURT: Oh, okay.

MR. HUEBNER: I was using -- I was using a lifeline to get the answer to your question.

THE COURT: All right. Fair enough. Fair enough. I just want to. I just want to make sure. So --

MR. HUEBNER: I would never interrupt you.

THE COURT: That's a part of the Zoom life we're all in these days, so no worries.

But I guess my thought is, while it talks about it being fair, reasonable, and best available in the circumstances -- and frankly, given the record, there's lots of explanation about why that is for purposes of the reorganization and emergence. But given that there's a dip here, right, there's a dip here to provide the debtors with the necessary liquidity to get through the process and do what it needs to do, so this

seemed to me like a plan provision. And so the question is about -- well, we -- while we all -- while we plan for success, we also plan for the alternative just in terms of being able to unring bells. And so that's my question about that. And so I'm looking at -- I think where I'm looking, paragraph 7 and 8, the proposed order and things of that sort.

MR. HUEBNER: Yeah. So let me do this. I'm going to watch Mr. Melcer's face. And let's see if I get this right.

Your Honor, the Mendelsohn declaration, which is in evidence, is specifically there to support these findings. And we actually think they are today issue because the backstop agreement, among other things, does contain a backstop termination fee that provides that if we end up finding something magical to do instead of the plan that we are ferociously and tenaciously focused on, there is a fee equal to ten percent of the backstop commitment amount that will be payable.

And I think that mechanistically -- I don't think that approval happens only at confirmation because then they'll have the commitment open the entire case, and they won't know if the promise that we made to them actually we have the authority to honor, or as the drill sergeant very famously said in Top Gun 1, son, your ego is writing checks your body can't cash. I mean, we tend not to make promises that we don't know that we have court authority to keep. And so I think that that is the

reason.

THE COURT:  Well, that -- let me just jump in for a second.  That I understand, right?  It's the it's the price of keeping the commitment open.  And I get that.  I guess the other -- but the question I had was whether there's anything else in terms of the grand scheme of things if, for some reason, the bell was unrung.  And I understand the fee to keep the commitment open.  I get it.  But the question is -- and particularly given your comment which I think is appropriate about the debtors having fiduciary out.  So I was just trying to unpack this in a way that I understand what it means.

MR. HUEBNER:  Yeah.  I mean, look, let me say like this and see if this resonates.  If we find something better to do than this, we are comfortable with the amount of the breakup fee.  And our investment banker has done a full market check and is confident that this is the right approach.

If we proceed with this transaction, it's tautological.  We believe this is the best available transaction, and the debtor entered into it and accepted its terms because on that issue as well, it believes and its bankers advised it and advised the Court under oath that those are market and appropriate terms under which we want both ourselves and the backstop parties to be locked in starting today.  I think those terms and the approval of backstop commitment were part of the initial filing of ECF 115.  No

party has objected.  So I don't think -- I don't think anybody is questioning whether the terms are inappropriate or off market.  And so we think that for sort of good order and locking down the things we need to do to know that we have an absolutely guaranteed emergence path, that, I think, is why we were requesting approval of that today.

THE COURT:  So I guess putting it another way, I guess maybe my question and my -- put more artfully is really that in a sense, it's really a separate motion from the consolidation request to have one hearing, right, in the sense of that's a procedural motion, this is a substantive request.  But it's a substantive request that, as you explain, stands on its own economic merit for purposes of the debtors' business judgment.

MR. HUEBNER:  Your Honor, I think that's exactly right.  Could we have analytically split it into approval of ERO and backstop agreement and then separately 634, parallel processing procedures motion?  We could have.

Enough things were sort of -- I know, I used the word ganglion already once.  I shouldn't use it twice in one hearing.  But there was just interconnectivity between things in the documents and the process, the milestones that we thought a single motion that explained the whole situation, sort of one and done, worked.  And obviously the fact that other than the U.S. Trustee's request for delay, no one seems to have a problem with any aspect of the motion.  I think --

THE COURT: No. I think -- well, it's been teed up on notice. And people have had an opportunity to be heard on it. So I completely agree on that score.

And I just wanted to confirm and just to make sure I sort of complete the loop that it's that fee that we've been talking about that is the price for unringing the bell and that that is the -- considering that fee is the price of unringing the Bell, the debtors, in their business judgment, believe this is the best path forward and that, just in terms of the full disclosure that that's sort of the bargain and the consideration for keeping the commitment open.

MR. HUEBNER: Your Honor, that -- I could not have said it better. That's exactly correct.

THE COURT: All right. Thank you. So that was my second point. I just wanted to make sure I had a handle on it.

And so with that, Mr. Huebner, is there anything else you wanted to say before I hear from other parties?

MR. HUEBNER: Yeah. I'm actually going to go very light, Your Honor. I actually have just a grand total of two pages of handwritten things to say and really only to make three points, right?

Number 1, Your Honor, is the lineup. We can't lose sight of sort of who's on what side of this objection, right? We have the Official Committee of Unsecured Creditors, 98.1 percent of all impaired creditors and debtors, i.e., 100

percent several times over of every economic beneficiary impaired by these bankruptcy cases other than stockholders, in support. And we have the U.S. Trustee purportedly speaking to protect impaired creditors, 98.1 percent of whom have their own separate counsel and 100 percent of whom have counsel through the official committee, stridently disagreeing with what the U.S. Trustee is trying to do here. And that, many courts have found in analogous situations, speaks very important volumes.

Number 2, Your Honor, is the statute because it's good to always start with the statute. So let's talk about 105(d)(2)(B)(vi). And I quote, "Unless inconsistent with another provision of this title or with applicable Federal Rules of Bankruptcy Procedure, the court," which is in the lead-in, "may issue an order at any such conference prescribing such limitations and conditions as the Court deems appropriate...including that provides in a case under Chapter 11 of this title," that's (d)(2)(B).

And now we'll go to (vi). "Provides that a hearing on approval of the disclosure statement may be combined with the hearing on confirmation of the plan."

For the record, Your Honor, 105 doesn't even require a motion. It doesn't even require notice. It says that at a status conference you can just say, hey, Your Honor, I think it would help the efficiency of this Chapter 11 case if you did a combined order. And by the way, it doesn't say a small Chapter

11 case or a real estate chapter 11 case.  It says in a case under Chapter 11 of this title.  So we'll get to 634 in a minute.

But frankly, 634 is more restrictive than the Bankruptcy Code itself.  The Code itself says that any Chapter 11 debtor at any status conference can make an oral request for a combined hearing and that if it helps "ensure that the case is handled expeditiously and economically," that's 105(d)(2) in the lead-in, that order can be entered.

As I went through before, Your Honor, we did way, way more than that.  This is our third or fourth hearing at which we are discussing our request for the expedited parallel processing that we actually could have requested at a status conference and you could have said sure and we could have gone from there.

Second, Your Honor, let's talk about the guidelines. So it was quite an interpretive hermeneutical experience to see the U.S. Trustee's pleading and attempt to argue that it knows what this Court intended, and that although the words and the exclusions and the carve-outs and the limitations that the U.S. Trustee would like to read in the guidelines are absolutely nowhere in the X.  Quite the contrary, they sort of wrote you a letter about what you must have meant.

But you actually said what you meant and not very long ago at all.  And I think you really only need to read the

opening paragraph of 634 to essentially dispense with most of the objection. And I quote, "The Court has promulgated the following guidelines to provide the bar and public with a common set of procedures generally to be followed by proponents of Chapter 11 plans that seek under 11 U.S.C. 105(d)(2)(B)(vi) to combine the hearing on the proponent's request for X, approval of disclosure statement for such plan, and why confirmation of the plan. These guidelines do not apply in prepackaged Chapter 11 cases, which are covered by separate guidelines promulgated by the Court, nor do they apply in cases under subchapter V of Chapter 11 of the Bankruptcy Code."

So a pretty monumental problem for the trustee is that right at the outset, which is where these things are appropriate to do, the Court said here are the guidelines for Chapter 11 cases, and here are the two enumerated circumstances where they do not apply. U.S. Trustee essentially would like to join the drafting committee and add a third one that says and they don't apply in mega cases, and in fact, they only apply in small business in other cases where we think it appropriate. But it's just not what the guidelines say.

And so I actually am not really going to say much more than that. They have zero case law, zero precedent, zero interpretive guidance that supports anything in their objection. And they have zero credit or support. Given the layout and makeup of this case, I just don't understand why

73

we're here today.

Let me say one last thing, because I think it's very important.  Spirit is a big company.  There's no question about that.  But the fact that Spirit is a big and well-known company does not make its Chapter 11 plan inordinately complex.  In fact, the chapter plan is in some ways shockingly analytically simple.  Two classes of bondholders are agreeing to equitize and take back debt and equity in lieu of their existing obligations which this company is unable to pay, 1.6305 or so I believe billion dollars of those obligations.

We're not trying to move through Chapter 11 quickly for any reason other than the most important of all reason.  As we said in our reply, there's no type of company for which consumer confidence is more important than an airline.  Customers, in our case guests, buy tickets months in advance.  They will not do so if they do not have virtual 100 percent confidence that in two months or four months or eight months the airline will be there, it will be flying, it will be flying safely, it will be flying with appropriate capitalization and an energized workforce and be able to take the guest, their children, their grandchildren, their friends 35,000 feet up in the air and bring them safely to their destination.

We asked for the relief requested, and it's supported by virtually every party in this case because it is in the best interests of Spirit and all of its stakeholders.  And we ask

that the U.S. Trustee's objection be overruled.

As I said, Your Honor, I'm going to leave it at that for now. There obviously was more in our reply brief. And I'm happy to answer any questions on rebuttal, should the Court have any.

THE COURT: All right. Thank you very much.

I do have three filings in support. I'm happy to hear from those folks now. Probably makes the most sense. But folks can certainly stand on their papers if they wish to do that.

So let me hear first from the official committee.

MR. MILLER: Your Honor, Brett Miller and Todd Goren from Willkie Farr & Gallagher, proposed counsel for the Official Committee of Unsecured Creditors.

I don't need -- I don't need to beat a dead horse. Our pleadings say what they say. But what is very important here, and I think you'll hear it from Mr. Rubin next, is the fact that this is a significant commitment by a group of lenders to do the right thing and equitize and provide further financing to allow the company to go forward with its plan.

And in terms of keeping things in place in terms of the financing that's been proposed and the termination fee that goes with it, the committee is supportive. Mr. Huebner, I think, stated at least once the number of creditors who are in support of this plan. And we, the committee, who are by

**SPIRIT AIRLINES, INC.**

75

definition in the plan, riding through the plan with payment in full, have looked at all the documents.  And we want to make sure, as fiduciaries for all creditors that the plan can go forward and can go forward on the time line that has been proposed which we believe is appropriate, and notwithstanding the U.S. Trustee's objection, we think does work within the statutory framework of the Code and 604.

So the Committee therefore does ask Your Honor and hopes Your Honor approves the requested relief and overrules the objection of the United States Trustee.  Thank you.

THE COURT:  All right.  Thank you very much.

Let me hear from the ad hoc group of convertible noteholders.

MR. KING:  Your Honor, can you hear me okay?

THE COURT:  Yes.

MR. KING:  Thank you, Your Honor.  For the record, Geoff King and Paul Hastings on behalf of the ad hoc group of convertible noteholders.  We filed our joinder in support of the debtors' reply at docket number 224.

Your Honor, I won't take long.  I'm just going to reiterate a lot of the points that the committee made and Mr. Huebner made.

Mr. Huebner said this earlier.  This plan has the support of ninety-four percent of the convertible noteholders. I'd also note that we have not yet heard from a convertible

noteholders that does not support the plan.

Echoing the sentiments of others, we think this case is perfectly tailored for order M-634.  This is just a balance sheet restructuring supported by virtually all of the affected creditors.  And while we respect the U.S. Trustee's concerns for  adequate time and due process, we echo the debtors' sentiment here that the proposed schedule is not prejudicing anybody, given that the documents have been subject to extensive negotiation among all of the impaired creditors.  And that includes the unsecured creditors' committee as well.

So without further belaboring the point, under the circumstances, the ad hoc group of convertible noteholders thinks it's fair and appropriate here to enter the scheduling order as proposed and avoid the unnecessary time and delay of the Chapter 11 process.  Unless Your Honor has any questions, that's all I have to say.

THE COURT:  All right.  Thank you very much.

And let me hear from the ad hoc group of senior secured noteholders who also filed a document.

MR. RUBIN:  Thank you, Your Honor.  Jason Rubin for Akin Gump Strauss Hauer & Feld on behalf of the ad hoc of the senior secured creditors.  I will keep this brief as well.

As Your Honor is aware, we did file a joinder to the debtors' apply to the U.S. Trustee's objection.  And we do join the debtors' request to overrule that objection.

As Mr. Huebner has stated, while these cases are not prepackaged, they certainly have a lot of the hallmarks of a prepackaged case, including the pre-petition negotiation of a full plan that was filed in the first day of the cases, and support, and overwhelming support, to the tune of ninety-eight percent from all impaired creditors in the only two voting classes and provides for the unimpairment of all general unsecured creditors.

This Court has created a paradigm through general order M-634 that is intended in certain appropriate circumstances to make the Chapter 11 process more efficient by providing for a more expeditious timeline to confirmation.  We believe that the facts and circumstances of these cases are such that these are the exact type of cases that should be able to benefit from that sort of expedited time frame.

Both the ad hoc group of senior secured noteholders and the ad hoc group of convertible noteholders, which comprise the two constituencies in the only voting classes, have already reviewed and commented on and negotiated the disclosure statement.  And neither of which comprises well in excess of the necessary majorities to confirm the plan needs a longer period of time to digest any of the information.

And, Your Honor, like the ad hoc group of convertible noteholders, we have not heard from a single holder of senior secured notes that is not supportive of the plan.  And to the

24-11988-shl   Doc 349   Filed 01/08/25   Entered 01/14/25 15:07:49   Main Document
Pg 78 of 129
SPIRIT AIRLINES, INC.

78

contrary, based on all the information that we've received and has been reported to us, approximately ninety-nine percent of all senior secured holders are now party to the RSA.

The ad hoc group believes it's clear that the plan, through the equitization of 795 million dollars of debt through the very significant 350 million dollars of new money equity financing, and the impairment of all general unsecured creditors, best position Spirit for success, should give confidence in Spirit's long-term viability for the benefit of its employees, its customers, and all of its contract parties.

And as Mr. Huebner just noted in his remarks, unnecessary delay for a business like that, the debtors, could risk these very real benefits.  And the relief requested by the debtors and reliance on M-634 will expedite the process to ensure that these benefits come to fruition.  And we submit that it's appropriate that the facts and circumstances of these cases.  Thank you, Your Honor.

THE COURT:  All right.  Thank you very much.

Let me hear from the United States Trustee's Office.

MS. CORNELL:  Good afternoon, Your Honor.  Shara Cornell with the Office of the United States Trustee.

I don't have too much to add to our papers.  I know Your Honor has read them and has read all the papers in this case.

Additional time will not infringe upon the debtors'

**SPIRIT AIRLINES, INC.**

79

RSA. We can accomplish what the debtors want to accomplish with the limited extension of time by giving everyone the notice provided for by the bankruptcy rules.

And with respect to Your Honor's questions about equity, our office also receives letters, letters that aren't always on the docket and that the debtors don't always receive. And it shouldn't be a secret. There has been a request for an equity committee in this case. The United States Trustee has not reached a decision as to whether to exercise its discretion to appoint such a committee. But this does mean that there are parties who would benefit from a real disclosure statement hearing and an opportunity to review it thoroughly before a confirmation hearing.

However, if the Court is going to overrule our objection on the combined hearing, I would like to raise for the record an objection to the disclosure statement. The current disclosure statement appears to be an opt-out plan. And if this gets approved, there may be no way to correct it in advance of confirmation. General unsecured creditors are impaired, and they are not being given the right to vote. There is no doubt that they're impaired if they have to give a third-party release. It's not statutory impairment.

THE COURT: So there's a reference to this in your objection. But I got to say that the -- it was a very general, that there's a release, it's improper. It didn't really

provide me a whole lot to work with.  So what is it specifically you're referring to the specific language, the specific consequences of that language?

MS. CORNELL:  Well, the specific consequences are that if it's not an opt-in plan, these creditors are impaired and should have the right to vote.

THE COURT:  But what creditors are we talking about?

MS. CORNELL:  General unsecured creditors, Your Honor.

THE COURT:  So what is the -- what is the release that you're talking about?

MS. CORNELL:  The releases within the plan itself. Let me pull them up.  Give me one moment.

But while I'm pulling that up, Your Honor, generally speaking, if the disclosure statement is approved, the concern is how do we deal with it if we're only going forward with one more hearing.  How can we unwind it to get to the place where voting is meaningful for releases in this particular case?  And I'm just pulling it up now.  But that's the general gist of the argument there.

And I -- again, I understand Your Honor's comments throughout this case.  I understand the comments of all of the parties in support.  I understand where debtors' counsel is coming from.

There are just additional nuances with some of these bigger cases where if a disclosure statement is approved in

advance, it is very hard to unwind if those changes need to be made.  And that is just the general argument.  And in this particular case, there are some releases that would need to be fleshed out further.

And again, I'm just -- I'm pulling it up now, and I apologize for not having it in front of me.  But I'd also be happy to submit further papers to Your Honor if that's more meaningful than just discussing it on the record.

THE COURT:  All right.  Well, let me maybe leave it there for the moment.

Anything else you wanted to tell me?  And I'll maybe ask other parties, whether it's the debtors or the committee, to chime in on the release question and see where we are.

So perhaps, Mr. Huebner, you want to take the laboring oar unless the committee has a desire to jump in, but they can jump in after you.

MR. HUEBNER:  I'm happy to go second.  I'm happy to go first.  I mean --

THE COURT:  Yeah.  Go ahead, please.

MR. HUEBNER:  Okay.  Your Honor, so first of all, I'm rather procedurally surprised at what just happened.  There is no, quote, objection to the disclosure statement contained.  Your Honor is quite right to note that in their objection to the procedures, there's essentially about six words on page 8 that say, "Further, while the debtors contend that the plan is

consensual and no parties will be impaired," which of course is not true because we have two classes of impaired creditors, "the plan contains complicated third-party releases.  See generally," blah blah blah, releases are a loss of right. That's it.

THE COURT:  Yeah.  No.  I --

MR. HUEBNER:  There's no objection.

THE COURT:  That's what I'm saying.  I --

MR. HUEBNER:  No law.

THE COURT:  A lot of ink --

MR. HUEBNER:  I mean --

THE COURT:  -- has been spilled --

MR. HUEBNER:  If --

THE COURT:  -- in a lot of cases on releases.  And --

MR. HUEBNER:  Correct.

THE COURT:  To properly raise the issue, people have to give me the issue.

MR. HUEBNER:  Correct.

THE COURT:  And so --

MR. HUEBNER:  Your Honor, this --

THE COURT:  So again, I'm not I'm not trying to give anybody a hard time, but that doesn't give me the issue.  I don't know --

MR. HUEBNER:  Yeah.

THE COURT:  -- what they are, how they work, who

they're for, what they're for, what it means.  I don't know if you have a view on that.  I'm certainly not -- I don't have a monopoly on wisdom.  And I'm trying to be efficient about these things.  I guess that's the --

MR. HUEBNER:  So, Your Honor --

THE COURT:  -- hallmark of the day.

MR. HUEBNER:  -- let me help So let me help, because we've obviously thought about this a great deal, as you might imagine.  And frankly, you would have gotten a thirty-page brief on the topic from us for today's hearing had they, in fact, raised the issue as they should have if they wanted it to be discussed today.  And you would have had all the law in the world, because every day, including yesterday, new cases come out that vindicate our view of the law.

But, Your Honor, this is actually much simpler than that.  Because I'm not sure what the -- it's harder to undo means.  If any provision of the plan is found unlawful on January 29th, it will be what it will be.  And we understand that.  This is not a disclosure objection at all.  This is saying essentially -- I have to kind of interpolate because, of course, there's no briefing on it and this is all a surprise, that the U.S. Trustee's Office views giving somebody an opt-out release as making them an impaired creditor under the plan.

Now, given that even the Harrington decision expressly said the court expresses no view on whether even non-consensual

84

involuntary releases are proper as to unimpaired creditors under the plan, I'm not sure analytically how they can square that approach with what the United States Supreme Court said on June 27th.  But we'll leave that alone for right now.  For now, let's just make life kind of easier.

THE COURT:  Well, but let me back up for a second here --

MR. HUEBNER:  We are providing --

THE COURT:  -- just to put a finer point on it.  If I'm understanding correctly the statement made today, which is not in the objection, the statement today seems to suggest that -- obviously there's a lot of case law about voting for a plan, does that constitute consent.  And I think the majority of cases find that that it does.  In fact, I'm not sure that there are cases that find it doesn't.

What I understand the point here is to say that for folks who aren't voting because they're deemed to be unimpaired, that the releases make them impaired.  And I think if I'm -- I could be singing from the wrong sheet of music.  But I think that's what the argument is, such that that that's the question in terms of whatever releases are in the plan.  It's just not just an opt-in and opt-out debate.  It's somebody doesn't vote, so they can't opt out, they're an impaired, but they are impaired because they're giving up some, some right.  So that's what I under understand the issue.

MR. HUEBNER:  Yeah.

THE COURT:  And what I had heard your comments before is to say, for people who are not affected, their rights are riding through.  So that's my question as to how do we tackle that.

MR. HUEBNER:  Yeah.  So let me take a step back then.  So first of all, here's how the plan works.  Equity holders are being asked to consider neither opt-in or opt-out releases.  They're just -- they keep what they keep.  And their equity itself, of course, will be canceled on the proposed effective date.

Unimpaired creditors have an opt-out release mechanic because they're all unimpaired and they're being paid in full.  And so that is entirely appropriate.  And asking people to start sending in forms when they're being paid in full is not where the law is.  And as I said, we have a very long brief ready to go.  And we think the law is super-duper consistent.

If the U.S. Trustee wants to take the position that offering someone an opt-out release who is otherwise unimpaired as opposed to an opt-in release, that the choice of mechanic itself makes them impaired, I think they're going to be making some new law that's going to be against the overwhelming weight of authority.  But that's not today's issue.  That's an issue that we are very, very ready to discuss on January 29th and to prove to this Court's, we hope, ample satisfaction that the

overwhelming weight of authority, again, joined only yesterday in another major case and last week in another major case as well, is that an opt-out release is a consensual release.

I should also note, what I was trying to say before, Your Honor, is that in Harrington, the Supreme Court expressly said they don't express a view on whether even non-consensual releases can still be visited upon otherwise unimpaired creditors.  Obviously, if the Supreme Court believed that a non-consensual release was a form of impairment, they couldn't have said that.  A fortiori squared, they can't possibly have meant that an opt-out release can constitutes impairment.  But again, that's just not today's issue.

Here's what today's issue is.  And let me make it actually very straightforward.  Under the bankruptcy rules as Ms. Cornell's office would seemingly like us to follow, had we waited six more days, we could have had approval of the disclosure statement under "normal notice."  How that really would have helped anyone I'm not really sure, but so be it.

Instead, we're actually providing people with much, much, much more time than the minimum because, of course, the disclosure statement approval is only provisional.  And people can raise both disclosure issues and confirmation issues on January 29th.  So ironically, we're actually providing much more due process and much --

THE COURT:  Yeah.  I don't think this is a notice

issue at all. I think it's a substantive issue. Now, it is a substantive issue that is often discussed in the context of a disclosure statement because it allows people to know what they're going to do and to say this is -- these are the appropriate procedures, I'm approving the ballot, I'm approving the form of notice and all of that.

I guess my problem today is multifold. We all know that this is an issue that's being discussed and litigated across the country. This is not the way to raise this issue. It really is not because it's not teased out in the papers. It really is a confirmation issue. But if you wanted to raise it now, it really is not the way to raise it. And frankly, I couldn't be more frustrated about that because I didn't expect to have this be what the conversation is. What I thought we were going to talk about was the question of timing: who needs who needs notices, is the notice sufficient, do people have enough opportunity to be heard and to present their rights on the question which seems to largely be for equity holders because unsecured creditors' rights are not being affected as creditors.

So that leaves me in an awkward position. I'm trying to do this in a way that does not leave a legacy of litigation trail behind it. And so I'm open to suggestions. I mean, certainly, the issue can be preserved for a confirmation hearing. And frankly, I don't know that factual development is

the key to that argument.  It's largely a legal argument.  I'm not saying it's exclusively a legal argument.  There's some cases to talk about the kind of creditors, do they have lawyers, and things of that sort.

But I do think that it's not -- it's not really a process issue, right?  This issue is being litigated all over the place.  People have an idea of what they want to say and what they want the Court to decide.  But Mr. Huebner --

MR. HUEBNER:  Right.

THE COURT:  -- so where does that leave --

MR. HUEBNER:  Your Honor, yeah.  So I actually ultimately think one knife cuts through it pretty easily.  If we were seeking to impose opt-out releases on shareholders, it would be perhaps a harder question.  If we were even seeking to solicit opt-in releases from shareholders, maybe there'd be something to think about.  But we're doing neither of those things.  And that's what makes this both so frustrating to me as well as to the Court, is that we took a quite conservative approach.  The only people as to opt-out releases apply are the bondholder impaired creditors, 98.1 of whom have already signed contracts agreeing to grant the releases and to not opt out.  And we think that's really 100 percent because we just -- as you heard from both counsel groups, no one's heard from the other teeny percentage.

THE COURT:  I actually don't -- and maybe Ms. Cornell

can straighten me out.  But I don't think that's the group that she's worried about.  I think she's worried about the other unsecured creditors who are passing through who would --

MR. HUEBNER:  I'm getting --

THE COURT:  Yeah.

MR. HUEBNER:  I'm getting there last, Your Honor.  I was trying to go category by category, right?  So first there's equity.  I don't think there's any hesitation there because the releases don't apply to them at all.

Then there's the impaired creditors, 98.1, dot dot dot, contractually bound, done.

Now she purports to speak for unimpaired creditors who aren't even unsecured creditors because they're all being paid in cash in full and riding through.  We are comfortable addressing at confirmation what happens if an unimpaired creditor who's paid 100 cents and is owed nothing comes and says I somehow didn't know that I could opt out and I didn't, and I demand a right to opt out.  What they're opting out to do is, of course, inexplicable because they're unimpaired and they're not owed anything.  So I don't even understand what we're doing here today, Your Honor.

THE COURT:  Well --

MR. GOREN:  But we understand the --

THE COURT:  Well, I guess that that's the reasons why addressing this on this record is incredibly problematic,

because it is the question about the releases being an opt-out of holding somebody else responsible for obligations owed in the context of this case or is it a release that's opting -- that purports to have somebody's release rights untethered to the case. And so again, that's why you can't simply -- it's like we used to deal with in -- after Stern v. Marshall came out, I remember Judge Peck expressing his frustration once where someone stood up to object and said Stern v. Marshall and then basically sat down. You need to give me more. And these are things that need to be parsed and considered.

So anything else that you want to say before I hear from the committee?

MR. HUEBNER: Yeah. Your Honor, just to give you comfort on the very last point, the release is most assuredly are tethered to the case. And we actually know of nothing that is of value that is affirmatively being released by someone or we would have disclosed it. This is just -- the bondholder groups and others are making very real contributions for equitization and new cash to enable the payment in full and on impairment of everyone else. And as you said before, no good deed goes unpunished. They don't intend to later be subject to frivolous lawsuits in the post-organization era for having supported and facilitated the unimpairment of everyone else in the entire ecosystem. We crafted them, I think, with care. We're of course always open to looking at them with people.

But again, at the end of the day, none of this was teed up for today.  And the fact that we're having this conversation with no briefing, with no citation to the documents, with no case law at all, is certainly not what we were led to expect we were here to do today.

THE COURT:  All right.  Let me hear from the official committee.

MR. GOREN:   Thank you, Your Honor.  Todd Goren, Willkie Farr, on behalf of the proposed counsel to the official committee.

I mean, the releases here are something we have taken a close look at.  We have been back and forth with Davis Polk actually on the language in the releases.  One of the things you may have noticed in the markup is that we incorporated a carve-out into the release to make it clear that the release isn't releasing anything related to any unsecured claim that a holder may have.

And I think other than that, if you read the releases, they're actually exceptionally narrow here.  They're not the typically broad releases you see in most cases.  They really are, as Mr. Huebner just said, tailored and focused on the restructuring transactions themselves, basically much more akin to what you would see in typical exculpation.  So for that reason, we got comfortable with the way Davis Polk was proposing to solicit opt-outs to unsecured creditors.

I guess what we would say in terms of process going forward is, I mean, either you could set up a separate briefing schedule or parties can just brief this as part of the combined hearing.  If you rule that there's something wrong with the way the debtors have solicited these opt-outs, then the ultimate question for the debtors at that point will be do they want to go back and do it over, potentially delay the case, or just drop it and they'll make that decision at that point.  But there there's no reason I don't think to hold things up at this point.  We should proceed.  And we can brief this either separately or part of the confirmation schedule, depending on what the other parties' preference is.

THE COURT:  All right.  Anyone else who wishes to be heard on this particular motion?

MS. CORNELL:  Your Honor, Shara Cornell with the Office of the United States Trustee.  May I just make one additional comment, please?

THE COURT:  Sure.

MS. CORNELL:  Thank you.  We're not here today to argue opt-in versus opt-out or that.  This is a procedural motion.  But it does go to the fact that this is a very complicated case.  And we are likely going to have an objection to the plan which involves non-consensual third-party releases.

But the point is, if we or any party has such an objection, there will be little to no time to make corrections

prior to confirmation.  In other words, the disclosure statement will serve little to no purpose.  And that's the procedural question here and why our -- why I raised the release.

THE COURT:  I'm having trouble understanding that.  I think the committee framed it correctly.  And I think that's why I tried to start my comments with my understanding of what a combined hearing is.  It's a procedural mechanism.  It's not a substitution or an exchange of what somebody's rights are in terms of making an objection.  So it's caveat emptor.  If that's what you -- we tee it up.  And if there are rulings, there are rulings.  And then people can decide what to do.  And I think ultimately, what I'm hearing Mr. Heubner say is it's the -- and the committee that they'll decide what they want to do, depending on whatever the rulings are on the issues.

And so I don't think that in that sense, it's a disclosure statement issue.  I suppose somebody could add language to the disclosure statement issue, saying that your office has announced its intention to make this argument and that the debtors and the committee strongly disagree and that that will be an issue to be discussed at the hearing.  I mean, that's disclosure.

But again, it's happening all across the country.  I understand if you are -- may not be well versed and somebody may not be as well versed in bankruptcy as the folks having

this conversation today.  But in terms of the disclosure and the process, they will have until we have the hearing on January 29th to say whatever they want to say.  And we'll have a hearing and discuss all the issues.

So with that, I'm going to grant the motion.  So I don't think the statute could be much clearer in terms of saying that the power of the Court under (d), the Court on its own motion or on request of a party-in-interest, may issue an order at such conference as the Court deems appropriate to ensure the case is handled expeditiously and economically, including an order and a case under Chapter 11 that provides that a hearing on approval of disclosure statement and may be combined with the hearing on confirmation of the plan.  That's very specific and clearly addresses this exact circumstances.

And I think that 634 tries to put some additional guidance on it to try to help parties, but it carves out things for which there are already rules.  And subchapter V is one of them where that rule wouldn't make any sense.  And it carves out prepacks.  But in fact, this isn't a prepack, as has been noted numerous times by U.S. Trustee's Office.  It is prearranged.  And so that gets into the specifics here of this case, which is, I think, what the rule asks me to do, asks me to look at each individual case and decide a request based on the facts and circumstances of the case.

And frankly, I want to be clear that these kinds of

requests to combine hearings are -- there's nothing new about them. And they are done in cases. Requests are made. They're considered. And they're considered under the facts and circumstances of the case. And I always say the same thing, caveat emptor. Everybody has a right to make the argument and confirmation. And if for some reason people make various arguments as to the final approval of the disclosure statement and the confirmation, then we see where we're at. And so it doesn't change anyone's substantive rights. It's designed to move things along quickly. And so there's a certain amount of a party saying, Judge, we're confident that this is the best path forward for us. And so if it is, great, it is. If it turns out that things go a different route, then they go a different route.

So, frankly, I'm not sure what the purpose of the objection is here under the facts and circumstances on two grounds. One is we are awfully close to the regular time frame contemplated by all this. Spirit is a well-known company. Its bankruptcy is well known. It's been publicized. We're getting letters from equity holders. It's been well publicized. And so I'm having trouble seeing that the timing per se is problematic. There seems to be nothing to suggest that that's the case.

And the views of the participants seem to confirm that. The U.S. Trustee's Office insisted on appointing a

creditors' committee.  The creditor committee has been appointed.  And they've joined with the debtors in saying this is a good idea.  Now, whether creditors' committee should have been appointed or not appointed is water under the bridge.  It's been appointed.  There's talk of an equity committee.  That is what it is.  We'll see where that goes.  But certainly, the committee and the two ad hoc groups who have spoken support this.

Again, everyone understands this motion doesn't grant any substantive rights to any party, that is that they lose -- that the debtors somehow are taking away anybody's rights to make any objection on the final approval of disclosure statement at a confirmation hearing.  It allows a case to move forward more promptly.

And I think there's a -- I want to dispel any notion that there's anything nefarious or problematic with that.  There's a reason that 105(d) exists to address this particular issue.  And there's a reason the court promulgated 634.  It was to make it easier.  And the rule talks about more expeditious and more efficient and more economical to allow a case to move this way when appropriate.

And again, we went through all of today's substantive matters before we got to this.  And to use the non-lingual metaphor crickets, there were -- no one had any issues.  The case thus far has gone as advertised.  That doesn't mean

anything for purposes of exactly what will happen in the confirmation hearing, but certainly past is prologue. And one would think it certainly gives folks and the debtors, I think, a legitimate right to stand up and say we think this is an appropriate request. And I agree.

So I think it is dangerous and incorrect to simplify something, to say that the size of the case dictates the complexity. This is a financial restructuring. If you look at overseas insolvency cases, schemes of arrangement are used to do exactly this kind of thing. They have their own particular efficient out-of-court -- largely out-of-court way of doing things of this sort. And it's because it's a financial restructuring, and no one else is affected other than the folks who come in who agree to be affected. And I think it's misguided to say, just given the size of the case, that this kind of a request is inappropriate.

And again, I appreciate the committee being here. I appreciate the other stakeholders being here to confirm what the debtors have said about the views of the creditor body and what they would like to see happen here. And I do appreciate that this case is filed in November. We have now been around for a while. And at this point, I think in all of our collective experience, we would expect if there's a creditor who is profoundly unhappy with the way things are going, that while we may not have gotten a formal motion or a formal

24-11988-shl   Doc 349   Filed 01/08/25   Entered 01/14/25 15:07:49   Main Document
Pg 98 of 129
SPIRIT AIRLINES, INC.

98

pleading, that we may have heard from those folks.

Instead, what I'm hearing, frankly, is from equity holders. And that's a reflection of the value here and the wiping out of equity, which is not uncommon in bankruptcy. And we'll cross that bridge when we get to it.

So given all that, I guess I have one other point, which is I don't think the issue of opt-in, opt-out has been sufficiently raised for purposes of the objection for purposes of today. I try to take all the arguments that are made to me very seriously and parse them through, win, lose, or draw. I can't do that based on what I received today.

So while one could argue that this is really a confirmation issue, I understand the U.S. Trustee's Office view about procedures and how these things will come up and disclosure statement context. I get it. But again, the committee and the debtors are aware of that. And they're aware that this is a procedural motion and are willing to go forward.

And again, I don't have this issue properly raised for purposes of making decisions. You don't want judges making decisions based on a the record that I have in front of me, and so I'll wait till I have an appropriate record.

And I also note that this is an issue largely that's a matter of law. It's being litigated around the country. It's at this point something that all the folks, I think, who are here today are, are familiar with. And I don't know that is

the kind of thing, unlike, say, complicated valuation fight, who's in or out of a backstop agreement, that is -- that requires the kind of time to unpack.  It's a legal issue. We'll get to it.  And we'll get to it in confirmation because, again, no one is waiving their rights to make any arguments about it.  But it would -- it's just not properly raised for purposes of today's hearing.

And so for all those reasons, I'm going to grant the scheduling -- the request to have a combined hearing.  I think there's a good reason for the request.  I think it fits the requirements of the rule.  And also in the spirit of 634, I don't see anything in 634 that says that you can't do this or you shouldn't do this.  It even hints at that.  It carves out specific things where other rules apply.  And so that's where I end up.

And with that, I had a couple of comments on the order that I can get to that are fairly standard.  I might as well just throw them out now.  I think -- I usually take out no votes to accept or reject the plan or received with respect to the voting class, such class has deemed to have voted to accept the plan.  I usually take that out.  And I didn't see language that dealt with what happens if -- how voting is handled if there's a claim that's been objected to because I think the contemplation -- I don't think it's in here because it just doesn't apply.

100

And the only other one of my standard comments is, if something is returned as undeliverable, I always ask that the party who is administering the voting take reasonable efforts to find and address.  That may or may not fit in these circumstances, but it seems to be pretty straightforward.  And so those are my only comments.

And I think the only other notes I have on the order dealt with the issue that we've discussed earlier on paragraph 7 and 8 about the backstop commitment agreement and really considering that, frankly, is a separate siloed issue in terms of something that's for benefit of the estate.  It's been properly raised.  Everybody knows what the debtors want to do and why they want to do it.  The justification for it has been explained.  There have been no objections.  And again, I understand the value of keeping the commitment open so that the proposed plan can go forward.

So given the record that I have here, I am happy to approve that.  And again, I was just trying to tease it out vis a vis the procedural context of the motion.  But I think Mr. Huebner, your explanation helped put it in context.  So thank you for that.

So that's where I am.  And so let me turn it over to Mr. Huebner for anything else.

Well, one other point.  Since I didn't expect this hearing to go quite this way in terms of the issues that are

24-11988-shl   Doc 349   Filed 01/08/25   Entered 01/14/25 15:07:49   Main Document
Pg 101 of 129
SPIRIT AIRLINES, INC.

101

raised, to the extent that anybody has a desire to appeal anything, I always want to make sure that my thinking is clear as possible for my other colleagues.  Whether they find me to be accurate, correct, or have a different conclusion, no one benefits from an unclear record.  So if there's -- anybody wants to litigate outside this courthouse, please let me know so I can take a look at the transcript and make sure that if there's any other thoughts I have, and I'll put them on the record and make sure that the transcript is clear so that some very busy district judge is not asked to decipher a transcript that's a little more extemporaneous than might otherwise be.

MR. HUEBNER:  Thank you very much, Your Honor.

Your Honor, just a couple of closing points for me. Number 1, I just do want to point out article 6A7 of the disclosure statement is a little section called plan releases may not be approved.  It already says in the disclosure statement, and I quote, "There can be no assurance that the third-party release, exculpation, discharge, and injunction provisions as provided in the plan will be granted.  Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the plan or the plan not being confirmed."

So we already took care of that one in advance.  We understand that this is a relief we are seeking on January 29th.  And if the Court finds it improper, we will have to go

from there.

THE COURT:  Yeah.  No.

MR. HUEBNER:  Number --

THE COURT:  And again, I think to put a more blunt point on it, it's your choice.  This is what you'd like to do and understand that that's how it's going to function.

MR. HUEBNER:  That's correct, Your Honor.

Number 2, just to be clear, because this is important because we don't think we're taking any procedural shortcut, if we had had this hearing in a mere six more days as a regular 1125 hearing, unless I'm wrong, Ms. Cornell would have said I don't like this, and we would have said that's a confirmation objection.  And like every court in recorded history that I know of, the question of whether an opt-out release is consensual would be addressed at confirmation as it is at every single week.  It's just not a disclosure objection.  So as I said, we think we're giving people more due process, more time, and a longer bite at the apple.

But now I want to zoom out and say one last thing. Your Honor, there are 21,000 employees whose livelihoods depend on this company.  And we're actually trying to save a living, breathing company on which millions of Americans and 21,000 employees rely every single day.  To extend this hearing had to be held at all today, it should have taken about twenty minutes.  And the headline should have been efficient,

universally supported, UCC now on board, Spirit efficient restructuring continues to hurtle towards effectuation. Unfortunately, instead, we have the U.S. Trustee's Office alone, originally purporting to speak for impaired creditors, who got up and said, well, Your Honor, we're right here and we couldn't possibly agree more -- couldn't possibly disagree more, Akin and Paul Hastings and now obviously the UCC's counsel.

And now they're saying, well, okay, now we're going to speak for unimpaired creditors, and we're going to try they're impaired. I would just hope that what Your Honor has urged on them multiple times, which is the exercise of prosecutorial discretion, has some role in when and where they choose to try to vindicate their views on topics. This case is going in the real world as well as any case of its size ever could. And my fear is that that's getting lost in the shuffle.

We intend to be in and out of bankruptcy in about two months with a revitalized, recapitalized, exciting, competitive U.S. carrier, the seventh biggest in the country. And I just hope for everyone's sake that we're allowed to get there in what our view is with full compliance with the law. Thank you, Your Honor.

THE COURT: So I will just end by noting two things. One is I consider the committee of fiduciary for all unsecured creditors, impaired and unimpaired, puts in air quotes. And so

they have already expressed that they looked and are continuing to look at the plan and release provisions.  And so that's relevant to me.

Exactly the significance of that will be decided as we go forward because it would be an interesting question if the committee finds something to be perfectly acceptable when the U.S. Trustee's Office does not for unimpaired creditors.

And that brings me to my last point, which is litigation.  One of the important things to do in this job, and I know the estate fiduciaries are very conscious of this -- and I think everyone's conscious of this.  It is always best -- it's not always possible, but it's always best to remove any extraneous issues that can lead to litigation outside this courthouse if at all possible just simply because it adds time and expense to a case.  And in cases, bankruptcy cases, Chapter 11 cases are about maximizing value and allowing cases, an enterprise, a debtor to move forward.

So it is clear to me, reading the same bankruptcy-related material that you all do, that this issue about opt in, opt out, is being raised and discussed and litigated and discussed again in case after case throughout the country.  I am sure this gives academics great joy as to have something to write about.  And I don't mean to slander academics.

But As a practical matter, to the extent that people can narrow their issues and allow cases to go on based on the

facts and circumstances and work together to see if language can be crafted and approaches can be taken to take issues off the table that nobody wants to have as an albatross in the case going forward, that's an important perspective to have.  And it's an important thing to do.  And so I think it's true in this case, it's true for all cases, because if you look at cases that go up on appeal, sometimes on appeal twice or sometimes even on appeal a third time, that takes time.  It means people have to wait for the ultimate resolution of their issues.

And so I certainly urge people to think practically in this period of goodwill and cooperation about how they can remove issues.  I'm not asking anybody to give up on points they think can't be resolved.  That's fine.  We deal with that all the time.  But it does strike me as perhaps not -- the more of these opinions I read, the more I'm wondering about the effect of efficiency on cases generally and whether there's a better way.

So you all are in the trenches, and you'll tell me whether I'm whistling in the dark.  I might be.  But again, it's my job to try to think creatively and to try to reach the best outcome in each individual case.  And so I offer my comments in that spirit.

MR. HUEBNER:  Thank you, Your Honor.  We certainly always remain open to thoughtfully discuss every issue with

106

every party.  And this one is, of course, no exception.

There is nothing further from the debtors.  We, of course, remember your procedural request that we simply send in a brand new armada of standalone orders to make sure that the Court has the right ones.  Those emails will start flowing forthwith.  We appreciate that you -- I think that you would so order the entire record --

THE COURT:  Yes.

MR. HUEBNER:  -- at the end of the hearing to leave no ambiguity that each and every motion was approved and so ordered.  And unless the Court has questions, I think there's nothing else from this end.

THE COURT:  All right.  I will so order the record so that the motions that I have granted are granted on the record and allows people to move forward with what they need to do.

So with that, I'll open it up to anyone else who might wish to be heard before we adjourn for the day.

All right.  Thank you all very much.  To the extent I don't see some of you between now and the holidays, happy holidays to all of you and your families.  All the best.  And some of you I expect I may see before the week is out.  All right.  Be well.

MR. HUEBNER:  Happy New Year, Your Honor.  And thank you.

(Whereupon these proceedings were concluded at 1:32 PM)

107

I N D E X

E X H I B I T S

| DEBTOR'S | DESCRIPTION | MARKED | ADMITTED |
|----------|-------------|--------|----------|
| 115 | Mendelsohn declaration | | 22 |

| RULINGS: | PAGE | LINE |
|----------|------|------|
| All motions in agenda item I granted | 30 | 12 |
| Motions in agenda item II granted as set forth on the record | 41 | 3 |
| Davis Polk & Wardwell LLP retention application approved | 43 | 3 |
| Morris, Nichols, Arsht & Tunnel LLP retention application approved | 43 | 3 |
| Sealing motion granted | 45 | 12 |
| Sale/leaseback motion granted | 47 | 3 |
| Debevoise retention motion granted | 49 | 16 |
| Motion to schedule a combined hearing is granted. | 94 | 7 |

108

C E R T I F I C A T I O N

I, Colin Richilano, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

Colin Richilano (CDLT-289)

TTA-Certified Digital Legal Transcriber

eScribers

7227 North 16th Street, Suite #207

Phoenix, AZ 85020

Date:  December 18, 2024

Spirit Airlines                                                                                December 17, 2024

## A

**A&M (2)**
28:18,18
**A-1 (1)**
27:10
**A-2 (1)**
27:10
**abilities (1)**
56:15
**ability (2)**
16:9;40:3
**able (6)**
39:19;56:14;61:19;
66:3;73:20;77:14
**absent (1)**
57:18
**absolute (1)**
57:14
**absolutely (6)**
39:2,5;54:16;59:8;
68:5;71:21
**academics (2)**
104:22,23
**accelerated (2)**
61:17,17
**accept (3)**
46:14;99:19,20
**acceptable (1)**
104:6
**acceptance (1)**
62:11
**accepted (1)**
67:19
**accomplish (3)**
53:25;79:1,1
**accordance (1)**
46:22
**according (1)**
46:9
**account (15)**
25:17,18;33:16;
34:1,5,6,7,15,16,17,
19,24,25;35:1;62:25
**accounts (2)**
36:13,14
**accurate (1)**
101:4
**across (2)**
87:9;93:23
**active (1)**
36:16
**activity (1)**
40:14
**actual (3)**
46:18;51:11;65:4
**actually (41)**
16:15;17:19;18:19;
19:22;20:7;31:20,22;
34:16,19;38:13;39:6;
40:8;44:11,24,25;
46:5,12,14;48:3;

54:17;59:10;60:15;
61:6,19;66:11,21;
69:18,19;71:13,24;
72:21;83:15;86:14,
19,23;88:11,25;
90:15;91:13,19;
102:21
**Ad (17)**
11:3;13:22,25;14:6;
25:20,21;62:21;
75:12,17;76:12,18,21;
77:16,17,23;78:4;
96:7
**add (5)**
35:14;42:8;72:17;
78:22;93:17
**added (2)**
16:3;34:12
**additional (10)**
20:25;28:17;30:20;
34:9;48:21;50:12;
78:25;80:24;92:17;
94:15
**address (12)**
22:23;23:16,21;
29:9;31:3;32:8,21,24;
40:6;59:5;96:17;
100:4
**addressed (5)**
31:23;55:4;63:25;
65:7;102:15
**addresses (1)**
94:14
**addressing (4)**
31:14;54:8;89:15,
25
**adds (1)**
104:14
**adequate (3)**
34:23;39:6;76:6
**adhere (1)**
23:2
**adjourn (1)**
106:17
**administered (1)**
13:5
**administering (1)**
100:3
**admit (1)**
21:25
**admitted (5)**
21:18,22;23:25;
27:8;30:4
**advance (5)**
19:18;73:15;79:19;
81:1;101:23
**advantage (1)**
61:20
**advertised (1)**
96:25
**advice (1)**
63:13
**advised (2)**

67:21,21
**advisors (2)**
20:14;63:11
**affect (1)**
61:13
**affected (5)**
76:4;85:3;87:19;
97:13,14
**affiliate (1)**
28:18
**affirmatively (1)**
90:16
**afternoon (2)**
16:25;78:20
**Again (46)**
16:2;17:11;18:3;
23:16;27:19,25;29:2;
30:8,19;32:9;34:24;
37:22;40:12;42:10;
43:10,12;45:17;
46:23;47:7;49:4;
54:10;55:17;56:7;
57:3,21;58:11;64:13;
80:20;81:5;82:21;
86:1,12;90:5;91:1;
93:23;96:9,22;97:17;
98:15,18;99:5;
100:14,18;102:4;
104:21;105:20
**against (1)**
85:22
**agencies (1)**
33:8
**agenda (9)**
16:6;22:20,24;23:6;
29:12;30:13;31:3;
41:15;47:23
**agent (1)**
15:22
**agent's (1)**
25:22
**ago (3)**
28:15;60:20;71:25
**agree (5)**
31:18;69:3;97:5,14;
103:6
**agreeable (1)**
26:8
**agreed (8)**
26:23;37:2,4,8;
39:25;48:2;55:2;
56:25
**agreeing (2)**
73:7;88:21
**agreement (8)**
46:4,4;64:25;65:2;
66:12;68:16;99:2;
100:9
**agreements (1)**
29:15
**ahead (2)**
14:12;81:19
**AHG (1)**

10:12
**air (4)**
33:10,14;73:22;
103:25
**Airbus (2)**
44:19;46:15
**aircraft (13)**
11:20;13:12;14:15,
21;20:20;25:18;34:5;
45:15;46:5,7,11,14,18
**airline (5)**
19:24;29:15;47:6;
73:14,18
**Airlines (2)**
13:5;58:21
**Airport (7)**
12:11;15:16;32:22;
33:4,11;34:11;35:13
**airports (3)**
33:1,7,12
**Airways (1)**
58:23
**AKIN (7)**
10:11;13:25;18:1;
19:4;76:21;91:22;
103:7
**albatross (1)**
105:3
**align (1)**
63:8
**allow (4)**
27:16;74:20;96:20;
104:25
**allowed (1)**
103:20
**allowing (1)**
104:16
**allows (4)**
33:6;87:3;96:13;
106:15
**almost (4)**
21:7;40:1;50:9;
61:19
**alone (3)**
53:18;84:4;103:4
**along (8)**
19:9;23:18;24:3;
28:10;51:18;54:14;
61:6;95:10
**Alongside (1)**
13:10
**ALSTON (2)**
11:11;14:14
**alternative (1)**
66:3
**alters (2)**
27:1,11
**although (3)**
18:19;60:13;71:19
**Alvarez (2)**
28:16;29:18
**always (24)**
13:6;15:3,5;17:4;

18:17;21:2;27:25;
28:3;30:9;43:13;
52:15;56:5;58:7;
70:10;79:6,6;90:25;
95:4;100:2;101:2;
104:11,12,12;105:25
**ambiguity (1)**
106:10
**amended (2)**
16:6;61:5
**amends (2)**
27:1,11
**American (1)**
58:21
**Americans (1)**
102:22
**among (3)**
14:21;66:12;76:9
**amount (7)**
22:17,21;34:24;
48:23;66:16;67:14;
95:10
**amounts (4)**
27:4;44:20;48:7,13
**ample (2)**
30:19;85:25
**analogous (1)**
70:8
**analysis (1)**
49:9
**analysts (3)**
36:11,12,15
**analytically (3)**
68:15;73:6;84:2
**ANDREW (2)**
12:20;15:21
**anger (1)**
55:9
**angle (1)**
57:17
**animates (1)**
51:22
**announced (2)**
60:13;93:19
**anticipated (1)**
37:17
**apologize (1)**
81:6
**appeal (4)**
101:1;105:7,7,8
**appear (2)**
42:16;52:7
**appearance (3)**
15:9;16:1,1
**appearances (3)**
13:6,23;15:4
**appears (2)**
36:14;79:17
**apple (1)**
102:18
**applicable (7)**
30:16;33:20;41:8,
14;47:5;49:17;70:12

**application (14)**
28:17;29:5,19,20,
20,21;42:13,14;43:5,
6;47:23;49:11,15;
50:10
**applications (3)**
42:20,21;50:13
**applied (1)**
48:14
**apply (13)**
27:12;48:6,13;72:8,
10,16,18,19;76:24;
88:19;89:9;99:14,25
**appoint (1)**
79:10
**appointed (6)**
19:15;53:12;96:2,4,
4,5
**appointing (1)**
95:25
**appreciate (21)**
18:3,10;22:24;
26:15;28:12;30:20;
35:17;37:15;43:11,
12;45:17;47:7;49:18;
51:3,5,6;58:20;97:17,
18,20;106:6
**apprised (1)**
53:4
**approach (5)**
57:17;59:16;67:16;
84:3;88:19
**approached (1)**
59:19
**approaches (1)**
105:2
**appropriate (33)**
18:17,18;21:19;
30:15;32:5;38:4;41:7,
9,11,13,14;42:22;
43:2;47:4,13;48:16;
49:16;52:15;67:9,22;
72:14,20;73:19;75:5;
76:13;77:10;78:16;
85:14;87:5;94:9;
96:21;97:5;98:21
**appropriateincluding (1)**
70:16
**approval (16)**
38:21;39:9;46:22;
59:18;62:1;66:19;
67:24;68:6,15;70:19;
72:7;86:16,21;94:12;
95:7;96:12
**approve (8)**
30:12;38:14,14,19;
41:3;42:21;43:4;
100:18
**approved (6)**
48:9;79:18;80:14,
25;101:16;106:10
**approves (1)**
75:9

**approving (5)**
24:11,12;39:7;87:5,
5
**approximately (2)**
36:10;78:2
**archly (1)**
56:8
**argue (3)**
71:18;92:20;98:12
**argument (8)**
80:19;81:2;84:20;
88:1,1,2;93:19;95:5
**arguments (3)**
95:7;98:9;99:5
**arise (2)**
52:18,18
**armada (1)**
106:4
**around (3)**
28:19;97:21;98:23
**arrangement (1)**
97:9
**Arsht (1)**
43:6
**artfully (1)**
68:8
**article (1)**
101:14
**aside (1)**
21:6
**aspect (1)**
68:25
**assets (1)**
34:13
**assists (1)**
46:16
**assume (2)**
30:5;62:9
**assuming (2)**
27:16;61:25
**assumption (1)**
54:10
**assurance (1)**
101:17
**assuredly (1)**
90:14
**asymptoting (1)**
19:1
**attached (2)**
39:15,16
**attempt (1)**
71:18
**Attorneys (7)**
10:3,12;11:3,12,20;
12:3,11
**attracted (1)**
58:6
**attributes (1)**
29:17
**authority (5)**
27:19;66:21,25;
85:23;86:1
**authorized (4)**

25:16;33:25;48:12;
60:15
**available (5)**
22:17;43:22;65:3,
20;67:18
**Avenue (2)**
10:4;11:13
**Aviation (1)**
14:21
**avoid (4)**
20:14,18;51:7;
76:14
**aware (5)**
29:1;49:6;76:23;
98:16,16
**away (2)**
17:21;96:11
**awfully (1)**
95:17
**awkward (1)**
87:21
**axiom (1)**
51:4

## B

**back (13)**
16:5;20:5;31:2,9;
36:19;37:12;43:14;
49:23;73:8;84:6;85:6;
91:12;92:7
**background (1)**
24:1
**backstop (10)**
64:25;65:2;66:11,
12,16;67:23,24;
68:16;99:2;100:9
**balance (3)**
34:14,20;76:3
**Ball (16)**
13:12;15:11,12;
29:6,25,25;41:20;
43:8,15,16,16;44:7;
45:22;47:21;49:21,22
**ballot (1)**
87:5
**ballots (1)**
64:23
**bandwidth (1)**
37:25
**bank (4)**
33:16;34:1,6;36:13
**banker (1)**
67:15
**bankers (1)**
67:21
**Bankruptcy (19)**
13:3;39:20;55:7;
58:22;59:14;62:14;
63:9;70:2,13;71:5;
72:11;79:3;86:14;
93:25;95:19;98:4;
101:20;103:17;

104:15
**bankruptcy- (1)**
104:18
**banks (1)**
26:4
**bar (1)**
72:3
**barely (1)**
61:19
**bargain (1)**
69:10
**based (7)**
34:17;49:14;78:1;
94:23;98:11,20;
104:25
**basically (3)**
46:15;90:9;91:22
**basis (11)**
17:8;30:18;35:25;
36:8,8;41:7,9,13;
45:14;49:1;53:4
**bated (1)**
30:22
**Bath (1)**
58:5
**beat (1)**
74:15
**became (1)**
58:13
**become (2)**
37:25;55:14
**becomes (2)**
55:9;56:3
**Bed (1)**
58:5
**began (1)**
19:19
**begin (2)**
18:17;62:2
**begrudge (1)**
57:3
**behalf (20)**
13:7,9,15,18,25;
14:6,10,14,22,25;
15:16,22;18:16;
24:24;32:10;33:10;
42:10;75:17;76:21;
91:9
**behind (4)**
50:3,19;63:23;
87:23
**belabor (1)**
46:1
**belaboring (1)**
76:11
**believes (3)**
62:20;67:20;78:4
**bell (3)**
67:7;69:6,8
**bells (1)**
66:4
**belt (1)**
38:23

**beneficiaries (1)**
26:4
**beneficiary (1)**
70:1
**benefit (10)**
38:21;39:16;45:14;
56:2,4;64:5;77:15;
78:9;79:11;100:11
**benefits (3)**
78:13,15;101:5
**best (15)**
21:3;50:17;56:14;
59:25;65:3,20;67:18;
69:9;73:24;78:8;
95:11;104:11,12;
105:22;106:20
**better (9)**
16:12;20:12;56:18;
62:24;63:3,6;67:13;
69:13;105:18
**bewilderment (2)**
55:8;56:11
**Beyond (1)**
58:5
**bifurcation (1)**
23:9
**big (2)**
73:3,4
**bigger (1)**
80:25
**biggest (1)**
103:19
**bill (1)**
31:25
**billing (1)**
48:18
**billion (1)**
73:10
**binders (11)**
16:12,13,13,14,16,
18,24,25;17:20;18:2;
23:7
**BIRD (2)**
11:11;14:14
**bit (12)**
17:1;18:18;19:23;
38:23;51:1,18;54:19,
21;55:17;59:21,23;
60:16
**bite (1)**
102:18
**bizarre (1)**
57:4
**black (1)**
45:3
**blacklines (1)**
34:10
**blah (5)**
50:16,16;82:4,4,4
**blood (1)**
47:16
**blunt (1)**
102:4

**board (14)**
21:1,6,7,12;50:15,
15;52:5;55:19,25;
63:11,12,13,14;103:1
**board's (1)**
63:6
**body (2)**
66:23;97:19
**bond (1)**
19:3
**bondholder (2)**
88:20;90:17
**bondholders (1)**
73:7
**bones (1)**
54:15
**borrowing (1)**
39:14
**both (9)**
19:18;40:13;42:2;
53:14;67:22;77:16;
86:22;88:17,23
**bound (4)**
19:8;53:7;62:9;
89:11
**Bowling (1)**
12:4
**box (1)**
23:17
**brand (3)**
58:5,9;106:4
**breakup (1)**
67:14
**breath (1)**
30:23
**breathing (1)**
102:22
**BRETT (3)**
10:7;13:17;74:12
**bridge (2)**
96:4;98:5
**brief (10)**
21:14;38:22;42:9;
59:10;74:3;76:22;
83:10;85:16;92:3,10
**briefing (3)**
83:21;91:3;92:2
**briefly (2)**
22:23;39:3
**bring (2)**
43:19;73:22
**brings (3)**
41:15;51:9;104:8
**broad (2)**
64:1;91:20
**Broadway (1)**
11:21
**Bruce (1)**
32:14
**Bryant (1)**
10:13
**bucket (2)**
25:5,6

**budget (3)**
39:12,15,16
**bunch (3)**
17:9;61:10,11
**business (7)**
25:20,25;26:6;
68:13;69:8;72:19;
78:12
**busy (1)**
101:10
**buy (1)**
73:15

**C**

**called (1)**
101:15
**came (4)**
24:9;38:13;56:25;
90:6
**can (53)**
16:1,23;23:18;
24:25;25:1;26:5;28:9;
30:24;36:19;37:19,
20,20;38:18,20,25;
41:21;45:15,21;47:8;
50:17;51:17;55:4;
59:4;63:10,24;70:23;
71:6,9;74:9;75:3,4,
14;79:1;80:16;81:15;
84:2;86:7,11,22;
87:24;89:1;92:3,10;
93:12;99:17;100:16;
101:7,17;104:13,25;
105:2,2,12
**canceled (2)**
62:13;85:10
**cancelled (1)**
21:8
**cancelling (1)**
22:20
**candidly (1)**
61:20
**capacities (1)**
14:14
**capacity (1)**
33:9
**capital (2)**
35:6;57:2
**capitalist (1)**
56:17
**capitalization (1)**
73:19
**capitalized (1)**
56:18
**care (3)**
45:18;90:24;101:23
**carrier (9)**
27:3,4,6,12,15;
33:10,15;58:24;
103:19
**carriers (6)**
56:18,19,21,21;

58:23,25
**carve (1)**
39:23
**carve-out (1)**
91:15
**carve-outs (1)**
71:20
**carves (3)**
94:16,18;99:13
**case (77)**
13:5;15:3;18:18,22,
24;20:1,11;21:13;
22:16,23;31:12,12;
35:5;37:6,17,24;
39:17,20;50:6;53:11,
13;58:22;59:1,17;
60:2;61:12,17,17,18;
66:20;70:16,24;71:1,
1,1,7;72:22,25;73:15,
24;76:2;77:3;78:24;
79:8;80:17,21;81:3;
84:12;86:2,2;90:3,5,
15;91:4;92:7,22;
94:10,11,22,23,24;
95:4,23;96:13,20,25;
97:7,15,21;103:14,15;
104:15,21,21;105:3,6,
22
**cases (34)**
20:12;23:8;45:15;
52:14;60:9;63:5;70:2;
72:9,10,15,18,19;
77:1,4,13,14;78:17;
80:25;82:14;83:13;
84:14,15;88:3;91:20;
95:2;97:9;104:15,15,
16,16,25;105:6,7,17
**cash (22)**
25:18,23;26:5;
32:12;33:2,17,23;
34:19,25;35:7;36:1,4;
37:1,2,11;40:3;41:4,
5;46:16;66:23;89:14;
90:19
**categories (1)**
23:2
**category (2)**
89:7,7
**cause (1)**
44:24
**caveat (3)**
52:16;93:10;95:5
**cede (3)**
31:2;43:9;49:23
**cents (1)**
89:16
**certain (7)**
16:14;36:13;40:2;
44:16;60:15;77:10;
95:10
**certainly (14)**
21:13;38:18;40:6;
58:21;74:9;77:2;83:2;

87:24;91:4;96:6;97:2,
3;105:11,24
**certificate (2)**
22:8,11
**certificates (3)**
25:5;29:24;30:14
**cetera (1)**
27:12
**challenge (1)**
16:19
**challenged (1)**
54:18
**challenging (1)**
17:1
**chambers (5)**
16:20;17:5;28:9;
37:12,21
**chambers' (1)**
23:3
**chance (1)**
28:24
**change (4)**
27:22;54:12;56:16;
95:9
**changed (1)**
34:10
**changes (3)**
24:15;35:3;81:1
**Chapter (21)**
13:5;33:15;57:5;
63:7;70:16,24,25;
71:1,2,5;72:5,9,11,15;
73:5,6,11;76:15;
77:11;94:11;104:15
**charge (1)**
32:5
**charges (6)**
33:5,7,11;34:2;
35:6,7
**charging (1)**
23:9
**chart (1)**
39:21
**check (2)**
17:7;67:15
**checks (1)**
66:23
**Chicago (1)**
11:6
**children (1)**
73:21
**chime (2)**
15:25;81:13
**choice (3)**
55:18;85:20;102:5
**choose (1)**
103:13
**Christopher (3)**
13:11;24:23;32:10
**circumstance (2)**
15:3;63:20
**circumstances (23)**
26:20;30:16;37:17;

40:13;41:8;42:22;
47:4;49:16;52:15;
64:23;65:3,20;72:15;
76:12;77:11,13;
78:16;94:14,24;95:4,
16;100:5;105:1
**citation (1)**
91:3
**Citi (1)**
34:25
**Citibank (1)**
15:22
**claim (2)**
91:16;99:23
**claims (3)**
57:8,14;59:13
**clarification (2)**
26:22;27:24
**clarify (6)**
25:7,14;26:5;33:17;
34:13;35:4
**clarifying (1)**
40:2
**clarity (3)**
26:16;47:7;49:7
**class (3)**
60:1;99:20,20
**classes (6)**
62:2,5;73:7;77:7,
18;82:2
**Clause (3)**
26:25;27:10,10
**clear (19)**
20:11;26:9,18;28:1;
29:14;30:9,20;31:8;
38:12,19;40:11;
59:15;78:4;91:15;
94:25;101:2,9;102:8;
104:18
**clearer (1)**
94:6
**clearly (4)**
24:25;34:2;42:22;
94:14
**close (2)**
91:12;95:17
**closely (2)**
23:3;36:12
**closer (1)**
19:1
**closes (1)**
64:9
**closing (1)**
101:13
**CNO (5)**
23:5,11;28:14,25;
29:9
**CNOs (1)**
23:12
**Code (6)**
34:3;62:14;71:5,5;
72:11;75:7
**collateral (7)**

27:13,16;33:18;
34:13,20;39:23;40:3
**collating (1)**
16:20
**colleagues (2)**
13:11;101:3
**collect (1)**
33:20
**collected (3)**
33:10;34:16;35:2
**collection (2)**
33:5,6
**collections (1)**
34:18
**collective (1)**
97:23
**combine (2)**
72:6;95:1
**combined (12)**
31:14;52:13,17;
59:4;70:19,25;71:7;
79:15;92:3;93:8;
94:13;99:9
**combining (1)**
52:19
**comfort (3)**
22:18;27:21;90:14
**comfortable (3)**
67:14;89:14;91:24
**coming (2)**
46:15;80:23
**commence (2)**
21:2;64:11
**comment (5)**
32:6;34:21;38:10;
67:9;92:17
**commented (2)**
20:2;77:19
**comments (21)**
26:24;27:7;30:20;
39:25;40:1;42:17;
44:15;45:25;48:1;
49:11,20;51:17;
61:10;80:20,21;85:2;
93:7;99:16;100:1,6;
105:23
**commercial (2)**
33:7;45:13
**commercially (2)**
44:16,19
**commitment (15)**
24:12;38:15;39:19;
51:6;64:25;65:2;
66:16,20;67:4,8,25;
69:11;74:18;100:9,15
**Committee (38)**
10:3;13:16,19;
19:13,15,16,24;25:22;
53:11;69:24;70:6;
72:17;74:11,14,23,25;
75:8,21;76:10;79:8,
10;81:12,15;90:12;
91:7,10;93:6,14,20;

96:1,1,3,5,7;97:17;
98:16;103:24;104:6
**committees (1)**
62:22
**common (2)**
63:9;72:4
**communicated (1)**
55:8
**companies (3)**
55:14;56:19;58:8
**company (20)**
20:17,25;21:5,5,10,
11,12;55:9,20;56:12;
57:22;58:2;73:3,4,9,
13;74:20;95:18;
102:21,22
**company's (1)**
20:10
**compensate (1)**
48:16
**competition (3)**
33:10;56:17;58:22
**competitive (2)**
44:25;103:18
**complete (1)**
69:5
**completely (3)**
31:18;55:19;69:3
**complex (1)**
73:5
**complexity (1)**
97:8
**compliance (1)**
103:21
**compliant (1)**
36:13
**complicated (3)**
82:3;92:22;99:1
**comply (2)**
37:4;45:1
**comprise (1)**
77:17
**comprises (1)**
77:20
**conceptualize (1)**
31:10
**concern (3)**
16:4;51:21;80:14
**concerns (4)**
31:13;52:5,6;76:5
**concessions (1)**
57:6
**concluded (2)**
57:24;106:25
**conclusion (1)**
101:4
**conditional (1)**
62:1
**conditions (2)**
27:1;70:15
**conference (5)**
70:14,23;71:6,14;
94:9

**confidence (4)**
45:16;73:14,17;
78:9
**confident (3)**
63:10;67:16;95:11
**confirm (5)**
52:3;69:4;77:21;
95:24;97:18
**confirmation (24)**
63:21;64:6,10;
66:19;70:20;72:8;
77:12;79:13,19;
86:22;87:11,24;
89:15;92:11;93:1;
94:13;95:6,8;96:13;
97:2;98:13;99:4;
102:12,15
**confirmed (1)**
101:22
**confirming (1)**
15:12
**conflicts (1)**
15:19
**connection (3)**
14:15;29:23;45:8
**conscious (2)**
104:10,11
**consensual (4)**
39:20;82:1;86:3;
102:15
**consent (2)**
30:18;84:13
**consented (1)**
26:2
**consequences (2)**
80:3,4
**conservative (2)**
50:18;88:18
**consider (5)**
32:18;35:19;53:9;
85:8;103:24
**considerable (1)**
54:3
**consideration (3)**
21:9;38:15;69:11
**considered (3)**
90:10;95:3,3
**considering (2)**
69:7;100:10
**consistent (7)**
30:16;41:14;47:5,5;
48:17;49:17;85:17
**consolidation (1)**
68:9
**Consortium (7)**
12:11;15:16;32:22;
34:6,11;35:11,13
**consortium's (1)**
33:4
**constituencies (2)**
55:9;77:18
**constitute (1)**
84:13

**constitutes (1)**
86:11
**constrained (1)**
63:5
**consumer (3)**
58:4,6;73:14
**contain (3)**
64:8,23;66:12
**contained (2)**
34:10;81:22
**contains (2)**
64:20;82:3
**contemplated (3)**
60:18,21;95:18
**contemplation (1)**
99:24
**contend (1)**
81:25
**contested (2)**
23:22;51:10
**context (5)**
87:2;90:3;98:15;
100:19,20
**continue (2)**
19:23;63:13
**continued (1)**
19:2
**continues (2)**
41:8;103:2
**continuing (1)**
104:1
**contract (3)**
57:11;62:9;78:10
**contracts (2)**
57:13;88:21
**contractual (1)**
56:3
**contractually (2)**
19:7;89:11
**contrary (3)**
50:23;71:22;78:1
**contributions (1)**
90:18
**controlled (1)**
33:7
**conversation (3)**
87:14;91:3;94:1
**conversations (1)**
36:16
**Convertible (12)**
11:3;14:6;19:5;
25:21;62:4;75:12,18,
24,25;76:12;77:17,23
**cooperation (1)**
105:12
**copies (2)**
16:18,19
**copy (1)**
17:5
**cordially (1)**
53:9
**CORNELL (32)**
12:7;14:24,25;

28:22,23,23;36:2,2,6;
37:1;42:6,7,9,10;48:5,
21,22,25;49:3,4,4;
50:4;78:20,21;80:4,8,
11;88:25;92:15,15,
19;102:11
**Cornell's (2)**
42:1;86:15
**corporate (2)**
27:2,13
**corrections (1)**
92:25
**correctly (2)**
84:10;93:6
**cost (3)**
56:21,21;58:23
**costly (1)**
32:2
**costs (4)**
27:3;39:14,14;65:4
**counsel (22)**
13:19;15:13,19;
16:6;19:7,8;25:20;
30:1;32:8;34:5;35:11,
13;43:17;50:15;53:6;
70:5,5;74:13;80:22;
88:23;91:9;103:8
**counsel's (1)**
35:16
**counterparties (1)**
14:21
**country (8)**
55:6;56:12;62:17;
87:9;93:23;98:23;
103:19;104:21
**country's (2)**
56:20,21
**couple (5)**
20:3;25:6;54:24;
99:16;101:13
**course (22)**
19:11;29:17;38:4;
48:18;53:15;55:24;
57:7,14;60:15;62:3,
13,15,19;64:1;82:1;
83:21;85:10;86:20;
89:19;90:25;106:1,3
**COURT (151)**
13:2,3,13,21;14:3,9,
12,16,22;15:2,14,17,
20,24;17:25;18:7,10,
13,19;11;20:7;21:24;
23:14,16;24:6,21;
25:1,10;26:11;27:23;
29:2,13;30:8;31:5;
32:6,16;35:12,21;
36:5,24;37:15;40:8,
10,22;41:1,24;42:7,
18;43:11;44:2;45:4,7;
46:3,20,23,25;47:13,
20;48:10,13,25;49:2,
12,24;51:3,14,16;
52:14;53:22,24;

54:22,24;57:7;58:15,
17;62:23,25;63:18,
19;64:7,16;65:11,14,
17;66:25;67:2,21;
68:7;69:1,14;70:13,
15;71:19;72:2,10,14;
74:4,6;75:11,15;
76:17;77:9;78:18;
79:14,23;80:7,9;81:9,
19;82:6,8,10,12,14,
16,19,21,25;83:6,25;
84:3,6,9;85:2;86:5,8,
25;88:8,10,18,25;
89:5,22,24;91:6;
92:13,18;93:5;94:7,7,
9;96:18;101:20,25;
102:2,4,13;103:23;
106:5,8,11,13
**courtesy (2)**
16:17,19
**courthouse (2)**
101:6;104:14
**courtroom (2)**
40:21;43:22
**courts (2)**
17:19;70:7
**Court's (3)**
19:12;23:11;85:25
**cover (1)**
43:18
**covered (2)**
33:14;72:9
**covers (1)**
46:5
**crafted (2)**
90:24;105:2
**crafting (1)**
19:10
**created (2)**
58:1;77:9
**creatively (1)**
105:21
**credit (7)**
15:23;25:17,23;
26:3,10;48:7;72:24
**creditor (10)**
19:2,24;56:24;62:5,
10;83:23;89:16;96:1;
97:19,23
**Creditors (45)**
10:3;13:16,20;19:7,
13;53:6,12,13,15;
56:2,5;61:13;62:14;
69:24,25;70:4;74:14,
24;75:3;76:5,9,22;
77:6,8;78:8;79:19;
80:5,7,8;82:2;84:1;
85:12;86:8;87:20;
88:3,20;89:3,10,12,
13;91:25;103:4,10,
25;104:7
**creditors' (4)**
76:10;87:19;96:1,3

**crickets (1)**
96:24
**crisis (1)**
55:10
**critical (1)**
29:15
**Cromer (8)**
20:18;23:24;30:3;
43:20,22;55:16,21;
57:22
**Cromer's (1)**
58:20
**cross (1)**
98:5
**cross- (1)**
21:17
**crowd (2)**
38:4,5
**current (7)**
24:16;29:3;36:19;
46:9;49:14;52:22;
79:17
**customary (1)**
49:6
**Customers (2)**
73:15;78:10
**customers' (1)**
29:15
**cut (1)**
57:5
**cuts (1)**
88:12

## D

**d2B (1)**
70:17
**dabble (1)**
58:10
**dangerous (1)**
97:6
**dark (1)**
105:20
**date (7)**
22:5;48:17;50:25;
60:3;64:9,10;85:11
**dates (2)**
64:8,22
**Davis (14)**
13:8;18:15;20:16;
24:24;32:10;41:22;
42:13;43:5;49:23;
50:4,18;51:1;91:12,
24
**day (24)**
17:1;20:6,8;23:24;
24:10,17;30:18,24;
36:9;38:13;39:4,13;
40:12,15;41:7;60:2,
13;64:9;77:4;83:6,13;
91:1;102:23;106:17
**days (14)**
23:4,10;25:25;26:6;

46:7;60:10,20,24,24;
61:2,3;65:18;86:16;
102:10
**days' (1)**
25:20
**DC (1)**
12:14
**dead (1)**
74:15
**deadline (1)**
36:19
**deal (7)**
17:12;31:7;57:25;
80:15;83:8;90:6;
105:14
**dealing (3)**
54:15;64:18;65:1
**dealt (4)**
37:23;59:13;99:22;
100:8
**debate (1)**
84:22
**Debevoise (14)**
15:13;29:25;41:20,
20;43:17;47:8,24;
48:6,11,12,16;49:8,
16,17
**debt (4)**
14:15;57:1;73:8;
78:5
**debtor (7)**
25:19;35:16;42:12;
53:15;67:19;71:6;
104:17
**debtors (48)**
13:7,10;18:16;
20:14;24:24;25:16;
26:23;27:5,6,14,17;
31:25;32:11;33:19,
22,25;34:4,7;36:7;
39:19;43:18;44:19,
23;47:23;62:21;63:1,
21;65:3,24;67:10;
69:8,25;78:12,14;
79:1,6;81:12,25;92:5,
6;93:20;96:2,11;97:3,
19;98:16;100:12;
106:2
**debtors' (12)**
59:14;63:11;64:10,
15;65:4;68:13;75:19;
76:6,24,25;78:25;
80:22
**debtor's (8)**
16:5;22:5;33:5;
35:17;36:11;39:12,
18;41:11
**December (3)**
25:12;39:8;61:5
**decide (4)**
88:8;93:12,14;
94:23
**decided (1)**

104:4
**decipher (1)**
101:10
**decision (6)**
19:14;21:1,2;79:9;
83:24;92:8
**decisions (2)**
98:19,20
**declarant (3)**
21:19;38:25;39:1
**declarants (1)**
62:21
**declaration (24)**
20:18;21:16,18,22,
25;22:3,4;23:24;24:3;
28:16,24;30:3;32:14,
18;43:20,24;44:5;
46:2;55:16,22;57:23;
58:20;60:6;66:9
**declarations (8)**
24:4;30:2,5;40:19;
42:12,14;50:4,12
**declined (1)**
19:12
**dedicated (1)**
33:16
**deductible (1)**
27:4
**deed (2)**
51:4;90:21
**deemed (3)**
62:15;84:17;99:20
**deems (2)**
70:15;94:9
**deeper (1)**
57:5
**deeply (2)**
19:16;21:5
**defense (1)**
27:3
**defer (1)**
37:10
**deferrals (1)**
20:20
**deferred (1)**
39:14
**defined (2)**
35:6,7
**defines (1)**
34:2
**definitely (1)**
55:4
**definition (2)**
34:12;75:1
**Dehney (2)**
15:18,18
**Delaware (1)**
55:24
**delay (4)**
68:24;76:14;78:12;
92:7
**delighted (1)**
50:19

**delivered (3)**
46:5,7,8
**delivery (4)**
46:12,14,18;47:11
**demand (1)**
89:18
**demonstrate (1)**
39:18
**DEPARTMENT (1)**
12:2
**depend (1)**
102:20
**depending (2)**
92:11;93:15
**deposits (1)**
26:10
**depths (1)**
63:4
**describe (1)**
50:9
**designed (1)**
95:9
**desire (2)**
81:15;101:1
**destination (1)**
73:22
**detailed (1)**
54:7
**details (1)**
46:1
**developing (1)**
53:3
**development (1)**
87:25
**developments (2)**
53:10;61:12
**dictates (1)**
97:7
**difference (1)**
23:2
**different (7)**
17:20;22:7,7;59:16;
95:13,14;101:4
**differently (1)**
50:5
**differs (1)**
101:21
**difficult (3)**
15:5;21:1,2
**digest (1)**
77:22
**digital (1)**
58:3
**DIP (27)**
32:12,15;33:2,17,
18;34:8,13,14,20;
35:25;38:11,12,14,19,
21;39:7,12,13,15,17,
21;40:2;41:3,10,13;
65:23,24
**directed (1)**
25:16
**directors (3)**

21:12;55:19,25
**disagree (2)**
    93:20;103:6
**disagreeing (1)**
    70:6
**disappointing (1)**
    61:4
**discharge (2)**
    59:14;101:18
**disclose (1)**
    57:21
**disclosed (2)**
    50:22;90:17
**disclosure (42)**
    20:3;28:17,19;
    50:17,19;51:6;59:22;
    60:1,20,25;61:3,5,8;
    62:1,8;69:10;70:19;
    72:7;77:19;79:11,16,
    17;80:14,25;81:22;
    83:19;86:17,21,22;
    87:3;93:1,17,18,22;
    94:1,12;95:7;96:12;
    98:15;101:15,16;
    102:16
**disclosures (4)**
    42:2,3;50:7,9
**discretion (2)**
    79:9;103:13
**discuss (5)**
    35:18;36:12;85:24;
    94:4;105:25
**discussed (10)**
    26:19;41:10;63:2;
    83:12;87:2,8;93:21;
    100:8;104:20,21
**discussing (2)**
    71:12;81:8
**discussion (6)**
    22:11;31:11;48:5;
    54:8,19;64:24
**discussions (1)**
    42:1
**disinterested (1)**
    55:19
**dispel (1)**
    96:15
**dispense (1)**
    72:1
**disrespect (1)**
    56:10
**distribution (1)**
    62:15
**District (2)**
    13:3;101:10
**docket (14)**
    16:7;17:7;22:2;
    25:13;33:23;34:9;
    38:17;45:24;47:3;
    54:3,9;64:19;75:19;
    79:6
**document (1)**
    76:19

**documents (6)**
    19:10;20:2;68:21;
    75:2;76:8;91:4
**dollars (6)**
    57:1,1,14;73:10;
    78:5,6
**done (9)**
    18:21;20:19;47:15;
    52:14;61:8;67:15;
    68:23;89:11;95:2
**dot (3)**
    89:10,10,11
**doubt (1)**
    79:21
**down (2)**
    68:4;90:9
**draft (2)**
    60:10;62:8
**drafting (1)**
    72:17
**draw (3)**
    27:12;38:5;98:10
**drawing (2)**
    38:4;39:17
**drill (1)**
    66:22
**Drive (1)**
    11:4
**drop (1)**
    92:8
**dropped (1)**
    31:20
**due (6)**
    22:17;64:10,11;
    76:6;86:24;102:17
**duly (1)**
    51:7
**duo (1)**
    20:1
**duties (3)**
    19:19;63:8,9
**duty (5)**
    55:24;56:2,4,5;63:6

**E**

**earlier (5)**
    28:18;36:20;58:3;
    75:23;100:8
**early (1)**
    61:18
**easier (2)**
    84:5;96:19
**easily (2)**
    45:13;88:12
**ECF (9)**
    21:20;23:24;30:4;
    43:20;44:12;47:24;
    51:14;60:6;67:25
**echo (2)**
    20:6;76:6
**Echoing (1)**
    76:2

**economic (4)**
    55:12;56:4;68:13;
    70:1
**economical (1)**
    96:20
**economically (2)**
    71:8;94:10
**economics (1)**
    63:23
**ecosystem (1)**
    90:24
**EDELMAN (6)**
    11:25;14:17,18,19;
    47:10,19
**edits (1)**
    35:19
**effect (2)**
    38:23;105:17
**effective (1)**
    85:10
**effectuation (1)**
    103:2
**efficiency (3)**
    60:23;70:24;105:17
**efficient (7)**
    37:19;77:11;83:3;
    96:20;97:11;102:25;
    103:1
**efficiently (1)**
    37:16
**efforts (1)**
    100:3
**ego (1)**
    66:23
**eight (1)**
    73:17
**eight-inch (1)**
    17:21
**either (6)**
    22:1;28:24;36:21;
    44:22;92:2,10
**else (27)**
    15:7,8,20,24;30:11;
    35:23;38:8;40:23;
    41:2;42:19;49:13,21;
    50:16;55:4;64:2;67:6;
    69:16;81:11;90:2,11,
    20,23;92:13;97:13;
    100:23;106:12,16
**elsewhere (1)**
    55:22
**email (1)**
    17:5
**emails (3)**
    28:5,9;106:5
**emergence (2)**
    65:23;68:5
**employ (1)**
    47:23
**employees (3)**
    78:10;102:20,23
**emptor (3)**
    52:16;93:10;95:5

**enable (1)**
    90:19
**enabled (1)**
    18:21
**enacted (1)**
    61:21
**end (7)**
    48:18;66:13;91:1;
    99:15;103:23;106:9,
    12
**ended (2)**
    53:8;60:16
**energized (1)**
    73:20
**engagement (1)**
    28:18
**enhance (1)**
    33:9
**enough (6)**
    18:7,13;65:14,14;
    68:18;87:17
**ensure (3)**
    71:7;78:15;94:10
**entails (1)**
    52:11
**enter (2)**
    64:8;76:13
**entered (6)**
    29:11;43:24;45:6;
    61:25;67:19;71:9
**entering (1)**
    28:8
**enterprise (5)**
    55:23;56:1,1,5;
    104:17
**entire (4)**
    53:17;66:20;90:24;
    106:7
**entirely (4)**
    34:22;38:4;47:13;
    85:14
**entry (4)**
    25:25;26:3,10;39:5
**enumerated (1)**
    72:15
**Epiq (1)**
    29:20
**equal (1)**
    66:15
**equities (1)**
    58:11
**equitization (2)**
    78:5;90:19
**equitize (3)**
    56:25;73:7;74:19
**equity (23)**
    21:8;54:2,4;57:2,9,
    16;59:11;62:12,13,
    19;64:18;73:8;78:6;
    79:5,8;85:7,9;87:18;
    89:8;95:20;96:5;98:2,
    4
**era (1)**

90:22
**ERIC (2)**
    12:16;15:15
**Ernst (1)**
    29:21
**ERO (1)**
    68:16
**esoteric (1)**
    57:4
**ESQ (11)**
    10:7,8,16,17;11:8,9,
    16,25;12:7,16,20
**essentially (6)**
    51:6;53:17;72:1,16;
    81:24;83:20
**establish (1)**
    33:25
**established (1)**
    34:7
**estate (9)**
    23:9;31:21;32:5;
    33:12,19;63:10;71:1;
    100:11;104:10
**estates (1)**
    65:5
**estimated (1)**
    34:18
**et (1)**
    27:11
**eve (1)**
    61:8
**even (17)**
    16:24;23:5;24:11;
    57:9;60:16,22,24;
    70:21,22;83:24,25;
    86:6;88:14;89:13,20;
    99:13;105:8
**evening (1)**
    24:8
**eventually (1)**
    35:1
**ever- (1)**
    53:4
**Everybody (2)**
    95:5;100:12
**Everybody's (1)**
    17:11
**everyone (7)**
    22:18;31:23;51:12;
    79:2;90:20,23;96:9
**everyone's (2)**
    103:20;104:11
**evidence (12)**
    21:16,23;22:1,3,4;
    23:25;24:2;30:4;
    32:18;63:21,22;66:10
**evidentiary (1)**
    24:5
**exact (2)**
    77:14;94:14
**exactly (8)**
    24:19;40:10;45:12;
    68:14;69:13;97:1,10;

| | | | | |
|---|---|---|---|---|
| 104:4 | expires (2) | 59:24;60:17,25;63:7, | 17:20;28:15;39:24; | 65:1;66:10 |
| **examine (1)** | 25:25;26:1 | 7;68:23;72:18;73:4,6; | 46:3;60:24;61:20 | **finds (2)** |
| 21:18 | **explain (1)** | 74:18;83:11;84:14; | **fewer (1)** | 101:25;104:6 |
| **example (4)** | 68:12 | 91:2;92:21;94:19 | 16:11 | **fine (7)** |
| 17:9;44:21;50:14; | **explained (2)** | **facts (17)** | **fiduciaries (2)** | 17:5;25:1;32:1; |
| 57:11 | 68:22;100:14 | 30:15;40:13;41:8; | 75:3;104:10 | 37:23;38:2;51:5; |
| **exceedingly (1)** | **explaining (1)** | 42:22;47:4;49:16; | **fiduciary (7)** | 105:14 |
| 17:16 | 50:24 | 50:9;52:15,22;53:3; | 53:12,16;55:24; | **finer (1)** |
| **exception (3)** | **explanation (3)** | 57:21;77:13;78:16; | 63:2,6;67:10;103:24 | 84:9 |
| 21:13;32:2;106:1 | 58:19;65:21;100:20 | 94:24;95:3,16;105:1 | **field (1)** | **firm (4)** |
| **exceptionally (1)** | **exploring (1)** | **factual (3)** | 31:8 | 19:20;20:1;49:16; |
| 91:19 | 55:20 | 45:11;52:22;87:25 | **fifty-page (1)** | 50:18 |
| **excess (2)** | **express (1)** | **failed (1)** | 20:9 | **first (31)** |
| 34:16;77:20 | 86:6 | 27:14 | **fight (2)** | 16:25;20:6,8;21:15; |
| **exchange (2)** | **expressed (1)** | **Failure (1)** | 56:23;99:1 | 23:17,24;24:10,17; |
| 38:15;93:9 | 104:1 | 101:19 | **fighting (1)** | 25:15;30:18;32:12, |
| **exciting (1)** | **expresses (1)** | **fair (8)** | 61:1 | 21;35:23;36:9;38:13; |
| 103:18 | 83:25 | 18:7,13;32:6;65:2, | **figure (1)** | 39:4;40:12;41:7; |
| **excluded (2)** | **expressing (1)** | 14,14,20;76:13 | 16:21 | 42:14;43:19;44:9; |
| 33:18;34:12 | 90:7 | **fairly (2)** | **figuring (1)** | 46:5;48:10;51:20; |
| **exclusions (1)** | **expressions (1)** | 23:18;99:17 | 56:22 | 54:17;74:11;77:4; |
| 71:20 | 52:8 | **falls (1)** | **file (13)** | 81:18,20;85:7;89:7 |
| **exclusively (2)** | **expressly (2)** | 17:6 | 23:5,12;36:6;44:12, | **first-day (2)** |
| 50:9;88:2 | 83:24;86:5 | **familiar (1)** | 16,23;48:3;60:4,9,10; | 60:5,12 |
| **exculpation (2)** | **extemporaneous (1)** | 98:25 | 61:2;63:5;76:23 | **fit (1)** |
| 91:23;101:18 | 101:11 | **families (2)** | **filed (34)** | 100:4 |
| **exercise (6)** | **extend (1)** | 56:14;106:20 | 13:22;17:9;18:22; | **fits (2)** |
| 19:19;24:18,20; | 102:23 | **famous (1)** | 22:8;25:5,12;28:4,16, | 45:13;99:10 |
| 56:1;79:9;103:12 | **extended (1)** | 21:11 | 25;29:24;30:14;33:1, | **five (4)** |
| **exercised (1)** | 37:4 | **famously (1)** | 22;34:7;39:4,7;42:2, | 19:18;25:20,25; |
| 56:4 | **extension (6)** | 66:22 | 12,14,15,16;43:20; | 26:6 |
| **Exhibit (2)** | 36:9,19;37:3,8,8; | **far (3)** | 44:22;45:6,24;46:23; | **five- (1)** |
| 21:20;22:5 | 79:2 | 18:24;20:12;96:25 | 60:6,20;61:5;64:19; | 17:23 |
| **existing (2)** | **extensive (1)** | **FARR (4)** | 75:18;76:19;77:4; | **five-day (1)** |
| 50:21;73:8 | 76:9 | 10:2;13:18;74:13; | 97:21 | 26:18 |
| **exists (1)** | **extent (8)** | 91:9 | **filing (6)** | **flag (1)** |
| 96:17 | 27:14,17;34:15; | **fast (1)** | 21:10;23:13;40:14; | 46:3 |
| **exit (3)** | 35:1;40:18;101:1; | 20:8 | 42:24;61:18;67:25 | **flagged (1)** |
| 31:24;57:2;61:14 | 104:24;106:18 | **favor (1)** | **filings (3)** | 43:4 |
| **expect (9)** | **extraneous (1)** | 62:16 | 17:4,4;74:7 | **fleet (3)** |
| 15:10;23:18;27:20; | 104:13 | **fear (1)** | **filling (2)** | 15:13;30:1;43:17 |
| 37:7;87:13;91:5; | **extraordinary (1)** | 103:16 | 43:12;55:3 | **fleshed (2)** |
| 97:23;100:24;106:21 | 56:24 | **federal (3)** | **final (22)** | 60:5;81:4 |
| **expected (1)** | **extreme (1)** | 33:11;63:9;70:12 | 25:7,11,12;27:9; | **Floor (2)** |
| 46:8 | 46:11 | **fee (7)** | 30:6;33:17,23;34:8; | 11:5,22 |
| **expedite (1)** | | 66:13,15;67:7,15; | 36:8,21;37:11;39:7,7, | **flowing (1)** |
| 78:14 | **F** | 69:5,7;74:22 | 9,11,14,16;41:9,13; | 106:5 |
| **expedited (2)** | | **fees (8)** | 60:25;95:7;96:12 | **flying (4)** |
| 71:12;77:15 | **FAA (3)** | 36:1;41:4,5;48:8,9, | **Financial (7)** | 59:1;73:18,18,19 |
| **expeditious (2)** | 33:14;44:22,23 | 10,15,23 | 14:20;19:9;36:11, | **focus (1)** |
| 77:12;96:19 | **FAA-approved (1)** | **feet (1)** | 11,15;97:8,12 | 19:20 |
| **expeditiously (2)** | 33:8 | 73:21 | **financing (7)** | **focused (2)** |
| 71:8;94:10 | **face (1)** | **FELD (3)** | 24:9,11;39:10,19; | 66:15;91:21 |
| **expense (2)** | 66:8 | 10:11;13:25;76:21 | 74:20,22;78:7 | **folks (15)** |
| 65:4;104:15 | **facilitated (1)** | **fell (1)** | **financings (1)** | 13:14,23;29:1,3,4; |
| **expenses (5)** | 90:23 | 19:14 | 20:20 | 59:7;63:20;74:8,9; |
| 48:8,9,10,15,17 | **facility (7)** | **felt (2)** | **find (9)** | 84:17;93:25;97:3,13; |
| **experience (3)** | 15:23;33:5;34:2; | 45:2;46:11 | 13:6,15;30:14; | 98:1,24 |
| 58:10;71:17;97:23 | 35:5,7;38:21;61:14 | **ferociously (1)** | 41:12;67:13;84:14, | **follow (3)** |
| **experienced (3)** | **fact (26)** | 66:15 | 15;100:4;101:3 | 41:6;53:24;86:15 |
| 19:16;20:1;21:5 | 16:18;20:11,21; | **ferreted (1)** | **finding (1)** | **followed (1)** |
| **experiences (1)** | 22:12,24;28:3;34:4; | 50:23 | 66:13 | 72:4 |
| 55:7 | 50:11;51:11;53:2,11; | **few (6)** | **findings (2)** | **following (2)** |

Spirit Airlines

December 17, 2024

46:3;72:3
**follows (1)**
    48:6
**forest (1)**
    17:6
**form (5)**
    27:9;41:6;56:9;
    86:9;87:6
**formal (7)**
    24:13;43:25;44:14;
    45:24;47:25;97:25,25
**formalized (1)**
    36:23
**formally (2)**
    21:22;31:22
**formed (1)**
    61:9
**forms (1)**
    85:15
**forth (4)**
    39:21;41:12;46:1;
    91:12
**forthwith (1)**
    106:6
**fortiori (1)**
    86:10
**fortune (1)**
    45:15
**Forty-Fifth (1)**
    11:5
**forward (22)**
    21:3;29:6;31:25;
    35:24;43:13;49:1;
    59:24;61:23;69:9;
    74:20;75:4,4;80:15;
    92:2;95:12;96:14;
    98:17;100:16;104:5,
    17;105:4;106:15
**found (2)**
    70:8;83:17
**four (2)**
    20:17;73:17
**fourteen (5)**
    25:4;28:13;29:9;
    30:13,23
**fourth (2)**
    18:20;71:11
**frame (2)**
    77:15;95:17
**framed (1)**
    93:6
**framework (1)**
    75:7
**framing (1)**
    21:14
**frankly (18)**
    20:12;23:7;40:14;
    42:4;47:5,14;52:2;
    56:9;61:16;65:21;
    71:4;83:9;87:12,25;
    94:25;95:15;98:2;
    100:10
**Fred (1)**

43:20
**frequently (1)**
    19:24
**Friday (2)**
    37:5;53:19
**friends (1)**
    73:21
**frivolous (1)**
    90:22
**front (7)**
    20:24;24:9;51:17;
    54:2;63:11;81:6;
    98:20
**Frontier (2)**
    20:23;57:24
**fruition (1)**
    78:15
**frustrated (1)**
    87:13
**frustrating (1)**
    88:17
**frustration (2)**
    55:8;90:7
**fuel (1)**
    40:4
**fulfill (1)**
    19:19
**full (16)**
    56:11;57:15;60:8,
    19,20,21,25;67:15;
    69:9;75:2;77:4;85:13,
    15;89:14;90:19;
    103:21
**fuller (1)**
    60:17
**fully (4)**
    39:20;57:18;60:4;
    63:15
**fulsome (1)**
    42:16
**function (1)**
    102:6
**fund (3)**
    33:8;39:19;56:14
**Fundamentally (1)**
    33:4
**funds (1)**
    34:16
**further (15)**
    29:8;33:14;36:21;
    37:7;42:17;48:12;
    49:10;57:8,9;74:19;
    76:11;81:4,7,25;
    106:2

**G**

**GA (4)**
    11:20;14:17,19;
    29:18
**GALLAGHER (3)**
    10:2;13:18;74:13
**ganglion (2)**

59:12;68:19
**GAT (2)**
    29:18;30:2
**gave (1)**
    62:16
**general (8)**
    77:7,9;78:7;79:19,
    24;80:8,18;81:2
**generally (4)**
    72:4;80:13;82:4;
    105:17
**generate (1)**
    57:8
**generated (2)**
    56:9;57:13
**Geoff (1)**
    75:17
**GEOFFREY (2)**
    11:8;14:5
**gets (3)**
    28:3;79:18;94:21
**gist (1)**
    80:18
**given (21)**
    22:18;26:20;30:15;
    37:16,24;40:11,13;
    43:3;45:11;47:18;
    59:25;65:21,23;67:9;
    72:24;76:8;79:20;
    83:24;97:15;98:6;
    100:17
**gives (4)**
    22:17,17;97:3;
    104:22
**giving (5)**
    52:18;79:2;83:22;
    84:24;102:17
**glory (1)**
    60:11
**goes (6)**
    23:14;36:9;46:8;
    74:23;90:21;96:6
**Good (37)**
    13:2,8,13,21,24;
    14:3,5,9,11,13,16,18,
    22,24;15:2,11,14,15,
    17,18,20,24;18:14;
    24:23;27:25;38:6;
    43:13,16;45:15,19;
    51:4;68:3;70:9;78:20;
    90:20;96:3;99:10
**goodwill (1)**
    105:12
**GOREN (7)**
    10:8;13:18;19:23;
    74:12;89:23;91:8,8
**grand (2)**
    67:6;69:19
**grandchildren (1)**
    73:21
**grant (9)**
    45:12,17;47:3;
    49:15;88:21;94:5;

96:9;99:8;101:20
**granted (9)**
    30:17,18;41:6,13;
    45:20;47:8;101:19;
    106:14,14
**granting (1)**
    48:10
**Great (5)**
    24:6,21;83:8;95:12;
    104:22
**Green (1)**
    12:4
**grounds (1)**
    95:17
**Group (20)**
    11:3;14:1,4,6;19:4,
    6;25:20,21;33:1;
    41:17;74:18;75:12,
    17;76:12,18;77:16,17,
    23;78:4;89:1
**grouping (1)**
    28:10
**groups (6)**
    13:22;53:14;56:24;
    88:23;90:18;96:7
**grow (1)**
    19:2
**growing (1)**
    53:5
**GSA (1)**
    14:20
**guaranteed (1)**
    68:5
**guess (18)**
    17:3;24:10;41:16;
    43:7,8;47:8;51:4;
    63:19;65:6,19;67:4;
    68:7,7;83:4;87:7;
    89:24;92:1;98:6
**guest (1)**
    73:20
**guests (1)**
    73:15
**guidance (3)**
    17:19;72:23;94:16
**guidelines (7)**
    71:16,21;72:3,8,10,
    14,20
**guilty (1)**
    40:17
**GUMP (4)**
    10:11;13:25;19:4;
    76:21
**Gun (1)**
    66:22

**H**

**hallmark (1)**
    83:6
**hallmarks (1)**
    77:2
**hand (1)**

46:16
**handle (6)**
    13:12;37:23;39:1;
    41:17,21;69:15
**handled (5)**
    22:19;47:6;71:8;
    94:10;99:22
**handling (1)**
    13:10
**handwritten (1)**
    69:20
**HAO (4)**
    11:16;14:11,13,13
**happen (4)**
    46:12;51:24;97:1,
    20
**happened (2)**
    28:15;81:21
**happening (2)**
    26:19;93:23
**happens (4)**
    64:22;66:19;89:15;
    99:22
**happily (1)**
    19:16
**happy (26)**
    19:25;22:2;26:15,
    17;29:9;30:12;32:17;
    40:6;41:3;42:21;43:4;
    44:5;45:11,17;47:3,
    14,17;49:15;74:4,7;
    81:7,17,17;100:17;
    106:19,23
**hard (6)**
    16:2,15;17:13;
    20:13;81:1;82:22
**harder (2)**
    83:16;88:14
**harm (1)**
    44:24
**HARMEYER (3)**
    12:20;15:21,21
**Harrington (2)**
    83:24;86:5
**Harry (1)**
    18:1
**HASTINGS (5)**
    11:2;14:6;19:6;
    75:17;103:7
**hate (2)**
    16:8;38:5
**HAUER (3)**
    10:11;13:25;76:21
**headline (1)**
    102:25
**hear (12)**
    19:22;35:11;69:17;
    74:7,11,17;75:12,14;
    76:18;78:19;90:11;
    91:6
**heard (29)**
    21:25;22:23;24:25;
    25:1;26:13;27:23;

29:23;32:16;35:23;
36:4;42:19;44:3,5;
45:8;47:1;49:13;
53:18;59:5;63:25;
69:2;75:25;77:24;
85:2;87:17;88:23,23;
92:14;98:1;106:17
**hearing (77)**
13:4;16:6;18:19,20;
20:6,8;21:23;22:1,13,
14;23:5,11,13;24:17;
26:14;30:7,19;31:14,
24;32:2,15,17,19;
36:9;37:11,13;38:5;
45:10;46:24;47:2,12;
52:13,17,19;53:8,21;
59:4,6;60:7,12,25;
61:8;63:21,25;64:7,
11;68:10,20;70:18,
20;71:7,11;72:6;
79:12,13,15;80:16;
83:10;87:25;92:4;
93:8,13,21;94:2,4,12,
13;96:13;97:2;98:2;
99:7,9;100:25;
102:10,11,23;106:9
**hearings (2)**
38:3;95:1
**heavily (1)**
58:10
**held (5)**
25:17,18;33:12;
39:11;102:24
**help (5)**
54:14;70:24;83:7,7;
94:16
**helped (3)**
62:8;86:18;100:20
**helpful (14)**
17:10,15,19;22:12;
24:4;26:17;29:3,4;
30:9;46:2;51:18;54:1,
25;63:17
**helps (3)**
31:16;52:3;71:7
**hereby (1)**
22:4
**here's (3)**
31:5;85:7;86:13
**hermeneutical (1)**
71:17
**hesitation (1)**
89:8
**Heubner (1)**
93:13
**hey (1)**
70:23
**highly (1)**
19:17
**hinted (1)**
54:6
**hints (1)**
99:13

**hired (1)**
19:24
**history (3)**
19:25;20:10;102:13
**hitch (1)**
52:2
**Hoc (17)**
11:3;13:22;14:1,6;
25:20,21;62:22;
75:12,17;76:12,18,21;
77:16,17,23;78:4;
96:7
**hold (2)**
37:10;92:9
**holder (2)**
77:24;91:17
**holders (12)**
54:2;57:9,16;59:11;
62:12,19;64:18;78:3;
85:7;87:18;95:20;
98:3
**holding (1)**
90:2
**Holdings (1)**
14:20
**holds (1)**
34:16
**holes (1)**
17:22
**holidays (2)**
106:19,20
**Honor (137)**
13:8,17,24;14:5,13,
18,24;15:11,15,18,21;
17:18;18:14,21,25;
20:5,7;21:6,14,19;
23:1,19;24:20,23;
25:3,9;26:7,8,21;
28:12,14;29:7,10,25;
31:1,18;32:9,20;
33:22,24;34:11;35:9,
10,15;36:2,8,20,25;
37:10;39:2;40:5,5,20,
25;41:18;42:10;
43:10,16;44:7;45:22;
47:10,19,21;49:5,22;
50:1,3,13;51:2,9;53:2,
23;54:16;55:6,11;
56:9;57:3;59:8,20,24;
60:3,12,14;61:23;
62:5;64:5,13;65:10;
66:9,22;68:14;69:12,
19,22;70:9,21,23;
71:10,16;74:2,12;
75:8,9,14,16,20;
76:15,20,23;77:23;
78:17,20,23;80:8,13;
81:7,20,23;82:20;
83:5,15;86:5;88:11;
89:6,21;90:13;91:8;
92:15;101:12,13;
102:7,20;103:5,11,22;
105:24;106:23

**Honor's (3)**
39:4;79:4;80:20
**hope (5)**
32:3;37:14;85:25;
103:11,20
**hoped (1)**
56:13
**hopefully (3)**
15:7;37:11;61:24
**hopes (1)**
75:9
**horse (1)**
74:15
**hour (1)**
17:7
**hourly (1)**
17:7
**HUEBNER (76)**
13:8,9;17:17,18;
18:6,9,11,14,15;23:1,
19;24:19;30:6;31:2,
18;49:24;50:1,2;51:9,
16;52:25;53:2,23;
54:16,23;55:2,6;
58:16;59:8;64:1,4;
65:10,12,16;66:7;
67:12;68:14;69:12,
16,18;74:23;75:22,
23;77:1;78:11;81:14,
17,20;82:7,9,11,13,
15,18,20,24;83:5,7;
84:8;85:1,6;88:8,9,
11;89:4,6;90:13;
91:21;100:20,23;
101:12;102:3,7;
105:24;106:9,23
**Huebner's (2)**
15:12;38:3
**human (1)**
19:25
**hundred (1)**
19:1
**hundreds (1)**
57:13
**hurtle (1)**
103:2
**hypothetical (1)**
58:7

**I**

**idea (3)**
22:15;88:7;96:3
**identifying (1)**
52:6
**ie (1)**
69:25
**II (3)**
30:25;32:7;35:24
**III (1)**
31:10
**IL (1)**
11:6

**imagine (1)**
83:9
**immediately (3)**
26:6,9,20
**impact (2)**
16:9;36:18
**impaired (26)**
19:2,7;53:6,15;
61:13;62:10;69:25;
70:2,4;76:9;77:6;
79:20,21;80:5;82:1,2;
83:23;84:18,23,24;
85:21;88:20;89:10;
103:4,11,25
**impairment (5)**
78:7;79:22;86:9,11;
90:20
**implication (1)**
50:20
**important (14)**
21:11;49:18;52:1;
54:20;59:9;70:8;73:3,
12,14;74:16;102:8;
104:9;105:4,5
**impose (1)**
88:13
**improper (2)**
79:25;101:25
**inadvertently (1)**
27:7
**inappropriate (2)**
68:2;97:16
**Inc (1)**
13:5
**include (5)**
24:8;26:24;29:14;
63:22,23
**included (1)**
33:16
**includes (2)**
44:18;76:10
**including (9)**
20:2,21;21:10;27:2;
53:11;56:18;77:3;
83:13;94:11
**inconsistent (1)**
70:11
**incorporate (1)**
46:11
**incorporated (1)**
91:14
**incorrect (2)**
62:23;97:6
**incredibly (1)**
89:25
**incremental (1)**
39:14
**incurred (1)**
48:17
**indication (1)**
57:17
**Indiscernible (1)**
50:15

**individual (2)**
94:23;105:22
**industry (1)**
47:6
**inexplicable (1)**
89:19
**infer (1)**
38:18
**infinitely (1)**
56:18
**inform (1)**
31:16
**informal (5)**
26:24;39:25;44:14;
45:25;48:1
**informally (1)**
49:19
**information (11)**
34:6;44:13,17,18,
24;45:13;48:22;
50:21;59:23;77:22;
78:1
**informational (1)**
23:12
**infringe (1)**
78:25
**in-house (1)**
58:5
**initial (5)**
24:10;32:13;50:10,
21;67:25
**initiatives (4)**
20:20,21,24;55:20
**injunction (1)**
101:18
**ink (1)**
82:10
**inordinately (1)**
73:5
**insisted (1)**
95:25
**insolvency (1)**
97:9
**insolvent (4)**
55:10,14;56:3;
57:19
**instance (2)**
39:24;49:25
**instead (4)**
66:14;86:19;98:2;
103:3
**insurance (5)**
25:8,13;27:2,14;
29:16
**insurers (6)**
26:24;27:8,16,17,
21;40:3
**intellectual (1)**
32:4
**intend (4)**
33:19;37:6;90:21;
103:17
**intended (3)**

53:25;71:19;77:10
**intention (3)**
47:14;60:14;93:19
**interconnectivity (1)**
68:20
**interest (10)**
18:21;29:5;32:4;
34:14,23,25;39:25;
51:16;54:4;59:6
**interesting (1)**
104:5
**interests (1)**
73:25
**interim (8)**
30:17,18;36:8,18,
21;37:3;39:5;41:7
**interpolate (1)**
83:20
**interpretive (2)**
71:17;72:23
**interrupt (1)**
65:16
**into (17)**
21:16,22,25;22:4;
23:25;24:2;27:10;
30:4;32:15;46:11;
49:6;56:21;62:25;
67:19;68:15;91:15;
94:21
**invested (1)**
56:12
**investing (1)**
58:11
**investment (1)**
67:15
**investors (1)**
62:6
**invitation (1)**
19:12
**invoices (1)**
49:9
**invoking (1)**
60:22
**involuntary (1)**
84:1
**involved (3)**
19:9;42:24;47:18
**involves (1)**
92:23
**ironic (1)**
59:25
**ironically (4)**
54:18;57:3;58:23;
86:23
**issuance (2)**
19:3,5
**issue (43)**
22:7;28:22;38:6;
43:4;57:17;58:24;
64:17,17;66:11;
67:20;70:14;82:16,
17,22;83:11;84:25;
85:23,23;86:12,13;

87:1,1,2,8,9,11,24;
88:6,6;93:17,18,21;
94:8;96:18;98:7,13,
18,22;99:3;100:8,10;
104:19;105:25
**issued (1)**
19:12
**issues (19)**
31:13;37:23;42:4;
52:17;54:11,15;59:5,
12;86:22,22;93:15;
94:4;96:24;100:25;
104:13,25;105:2,10,
13
**item (2)**
30:1;47:22
**items (5)**
29:12;43:18;44:10;
45:2;46:3

### J

**January (11)**
36:10,18,20;37:5;
64:7,12;83:18;85:24;
86:23;94:3;101:24
**Jasmine (3)**
15:12;29:25;43:16
**JASON (3)**
10:16;13:24;76:20
**job (2)**
104:9;105:21
**join (2)**
72:17;76:24
**joinder (2)**
75:18;76:23
**joined (4)**
14:7;63:9;86:1;
96:2
**jointly (1)**
13:5
**joy (1)**
104:22
**JSA (4)**
44:19;46:4,13,16
**Judge (5)**
13:2;58:12;90:7;
95:11;101:10
**judges (6)**
17:13;22:7;52:13;
55:7;61:22;98:19
**judgment (2)**
68:13;69:8
**judicial (1)**
23:23
**jump (6)**
15:6;41:22;58:17;
67:2;81:15,16
**jumped (1)**
19:18
**June (1)**
84:4
**JUSTICE (1)**

12:2
**justification (1)**
100:13

### K

**KAPLAN (1)**
12:10
**keep (9)**
17:22;23:13;29:3;
42:9;66:25;67:7;
76:22;85:9,9
**keeping (4)**
67:4;69:11;74:21;
100:15
**kept (1)**
53:3
**key (1)**
88:1
**killing (1)**
56:13
**kind (14)**
24:18;32:24;39:11,
13;45:12;52:4;56:11;
83:20;84:5;88:3;
97:10,16;99:1,3
**kinds (3)**
51:7;54:15;94:25
**KING (6)**
11:8;14:5,5;75:14,
16,17
**KIRSCH (1)**
12:10
**knew (1)**
44:25
**knife (1)**
88:12
**knowledge (1)**
58:10
**known (2)**
56:12;95:19
**knows (7)**
18:25;19:11;51:14;
57:7;62:6;71:18;
100:12
**Kodak (1)**
58:2

### L

**labor (1)**
57:6
**laboring (1)**
81:14
**laid (2)**
20:19;55:16
**land (1)**
50:25
**Lane (1)**
13:2
**language (15)**
16:3;26:23;27:15,
21;33:16;34:12;49:6;

61:24;64:25;80:2,3;
91:13;93:18;99:21;
105:1
**large (2)**
19:3;55:19
**largely (5)**
30:16;87:18;88:1;
97:11;98:22
**larger (3)**
16:13,16;58:25
**last (17)**
17:3,9;21:7;29:20;
31:6;34:9,22;39:9;
54:7;60:7;63:12;73:2;
86:2;89:6;90:14;
102:19;104:8
**late (1)**
34:21
**later (6)**
15:25;16:25;37:20;
43:14;54:19;90:21
**latest (1)**
30:21
**launched (1)**
58:5
**law (22)**
19:20;30:16;41:8,
14;47:5;49:17;55:24;
62:17;63:8,9;64:14;
72:22;82:9;83:12,14;
84:12;85:16,17,22;
91:4;98:23;103:21
**lawsuits (1)**
90:22
**lawyer (1)**
56:16
**lawyers (1)**
88:4
**layout (1)**
72:25
**LC (1)**
26:4
**LCs (2)**
25:24;26:5
**lead (1)**
104:13
**lead-in (2)**
70:14;71:9
**leading (2)**
40:14,17
**lease (2)**
44:20,21
**leases (1)**
44:23
**least (9)**
14:4;17:3;28:3,22;
29:21;31:25;46:3;
54:20;74:24
**leave (6)**
74:2;81:9;84:4;
87:22;88:10;106:9
**leaves (1)**
87:21

**led (1)**
91:5
**left (3)**
35:15;55:22;56:2
**legacy (1)**
87:22
**legal (4)**
59:18;88:1,2;99:3
**legitimate (2)**
31:24;97:4
**lenders (2)**
50:14;74:19
**less (1)**
25:19
**lessors (1)**
25:18
**lets (1)**
22:12
**letter (3)**
26:10;38:15;71:23
**letters (11)**
25:17,23;26:3;54:3;
56:7,9;57:5;64:18;
79:5,5;95:20
**levels (1)**
55:9
**Leviosa (1)**
18:11
**liberty (1)**
57:21
**liens (1)**
39:23
**lieu (1)**
73:8
**life (2)**
65:17;84:5
**lifeline (1)**
65:12
**light (7)**
20:7,9;28:2;53:3,
10;59:16;69:19
**lightly (1)**
21:13
**likely (2)**
42:15;92:22
**limit (1)**
44:25
**limitations (2)**
70:15;71:20
**limited (5)**
27:3;32:22;33:1;
35:19;79:2
**line (9)**
14:1,7;15:13;21:17;
23:8;41:20;51:13;
53:21;75:4
**lined (1)**
55:21
**lines (3)**
51:12;61:6,7
**lineup (1)**
69:22
**liquidation (1)**

101:21
**liquidity (4)**
20:20;39:18;46:17;
65:24
**list (2)**
15:4,6
**listed (1)**
26:2
**listen (1)**
32:1
**listening (4)**
15:10;32:3;58:19;
64:5
**litigate (1)**
101:6
**litigated (4)**
87:8;88:6;98:23;
104:20
**litigation (3)**
87:22;104:9,13
**little (16)**
17:1,22;18:18;
19:23;38:23;41:25;
54:19,21;55:17;
59:21,23;60:16;
92:25;93:2;101:11,15
**livelihoods (1)**
102:20
**lives (2)**
56:14,23
**living (1)**
102:21
**LLC (2)**
14:20;29:18
**LLP (9)**
10:2,11;11:2,11;
12:10,20;18:15;43:5,
6
**local (2)**
23:3;45:1
**locked (1)**
67:23
**locking (1)**
68:4
**logistics (2)**
16:8,10
**long (6)**
20:14;51:12;62:18;
71:24;75:20;85:16
**longer (3)**
20:25;77:21;102:18
**long-term (1)**
78:9
**look (9)**
56:7;57:16;67:12;
91:12;94:23;97:8;
101:7;104:2;105:6
**looked (2)**
75:2;104:1
**looking (4)**
17:10;66:5,5;90:25
**looks (3)**
59:3;61:16;63:21

**loop (1)**
69:5
**lose (3)**
69:22;96:10;98:10
**loss (1)**
82:4
**lost (1)**
103:16
**lot (13)**
15:9;16:20;22:15;
37:1,25;57:12;58:25;
75:21;77:2;80:1;
82:10,14;84:12
**lots (1)**
65:21
**love (1)**
50:17
**lovely (1)**
17:12
**low (3)**
56:21,21;58:23
**lower (1)**
35:5
**loyalty (2)**
19:3;62:4
**LP (1)**
29:19

## M

**M&A (1)**
20:21
**M-634 (4)**
60:14;76:3;77:10;
78:14
**magical (4)**
18:1;63:3,6;66:14
**maintain (3)**
34:1,14;39:17
**major (3)**
56:19;86:2,2
**majorities (1)**
77:21
**majority (1)**
84:13
**makes (8)**
16:12;32:24;37:10,
12;64:15;74:8;85:21;
88:17
**makeup (1)**
72:25
**making (7)**
37:2;83:23;85:21;
90:18;93:10;98:19,19
**management (12)**
32:13;33:2,17,23;
35:8;36:1,4;37:1,2,
12;41:4,5
**managing (1)**
46:17
**many (13)**
11:20;20:2,19;23:8;
31:21;56:8,22;60:23;

62:7,8,21;63:12;70:7
**mark (1)**
16:23
**market (6)**
39:18;44:25;57:17;
67:15,22;68:3
**marking (1)**
16:23
**markup (1)**
91:14
**Marsal (2)**
28:16;29:18
**Marshall (5)**
13:9;18:15;50:2;
90:6,8
**mask (1)**
20:13
**massive (1)**
58:5
**match (1)**
56:20
**material (2)**
57:11;104:19
**matter (12)**
16:8;23:22,23;
28:25;32:13,25;
43:19,23;51:10;
54:10;98:23;104:24
**matters (11)**
13:10,12;25:4;29:9,
23;30:13;31:7;32:12;
35:24;52:2;96:23
**MATTHEW (2)**
11:9;14:8
**maximize (3)**
55:23,25;63:10
**maximizing (2)**
63:15;104:16
**maximum (2)**
17:23;22:17
**may (31)**
16:2,2,11;17:25;
20:7;26:9;29:10;
34:17;36:8,14;54:20;
58:9,9,19;70:14,19;
79:18;91:14,17;
92:16;93:24,25;94:8,
12;97:25;98:1;100:4,
4;101:16,20;106:21
**maybe (8)**
28:5;51:16,21;68:8;
81:9,11;88:15,25
**mean (14)**
17:25;24:17;52:17;
66:24;67:12;79:10;
81:18;82:11;87:23;
91:11;92:2;93:21;
96:25;104:23
**meaning (2)**
52:16;54:2
**meaningful (2)**
80:17;81:8
**means (8)**

16:24;34:23;43:8;
49:25;67:11;83:1,17;
105:9
**meant (3)**
71:23,24;86:11
**meat (1)**
54:15
**mechanic (2)**
85:12,20
**mechanism (1)**
93:8
**mechanistically (1)**
66:18
**meeting (1)**
63:12
**mega (1)**
72:18
**Melcer (1)**
13:11
**Melcer's (1)**
66:8
**members (1)**
19:18
**meme (1)**
58:13
**Mendelsohn (5)**
21:16,16;22:4;
32:14;66:9
**mention (3)**
16:7;17:14;64:4
**mentioned (6)**
28:2;30:2,6;32:24;
34:15;38:16
**mere (1)**
102:10
**merger (1)**
20:22
**merit (1)**
68:13
**message (1)**
22:21
**Messrs (1)**
19:22
**metaphor (1)**
96:24
**MICHAEL (3)**
10:17;11:25;14:18
**mid-January (1)**
36:20
**might (13)**
24:10,15;51:17;
54:1,14,18;58:7;
59:15;83:8;99:17;
101:11;105:20;
106:16
**Mike (1)**
14:2
**Milbank (2)**
12:20;15:22
**milestones (1)**
68:21
**MILLER (6)**
10:7;13:17,17;

19:22;74:12,12
**million (4)**
56:25;57:1;78:5,6
**millionaire (1)**
58:13
**millions (2)**
57:13;102:22
**minimum (1)**
86:20
**minor (2)**
17:16;61:7
**minute (6)**
20:6,13;31:25;
59:21;60:7;71:3
**minutes (5)**
20:4;24:3;28:15;
61:21;102:25
**misguided (1)**
97:15
**misstated (1)**
42:6
**Moche (1)**
13:11
**modifies (1)**
27:1
**modify (2)**
48:5,20
**moment (2)**
80:12;81:10
**money (3)**
57:9;61:1;78:6
**monopoly (1)**
83:3
**monsters (1)**
17:22
**montage (1)**
20:10
**month (1)**
55:11
**months (7)**
62:8;63:12;73:15,
17,17,17;103:18
**monumental (1)**
72:12
**more (43)**
17:23;35:25;36:23;
42:5;45:16;50:18;
55:7;57:7;58:8,9;
60:8;61:14,16,24;
68:8;71:4,11;72:21;
73:14;74:3;77:11,12;
80:16;81:7;86:16,20,
24;87:13;90:9;91:22;
96:14,19,20,20;
101:11;102:4,10,17,
17;103:6,7;105:15,16
**morning (25)**
13:2,8,13,21,24;
14:3,5,9,13,16,18,22,
24;15:2,11,14,15,17,
18,20,24;18:14;22:2;
24:23;43:16
**Morris (8)**

15:19;41:23;42:2,
13,23;43:5;50:4;51:2
**most (8)**
19:24;28:6;37:19;
72:1;73:12;74:8;
90:14;91:20
**motion (78)**
24:9;25:13;26:14;
28:14;29:14,14,15,16,
16,16,17,17,18;30:3;
31:3,6,9,11,16,17,23;
35:5,6,25;36:1,1;
38:11,13;39:4,15,22;
40:9;41:3,4,4,5,5,10,
13;43:22,25;44:1,10,
11,12,13,16;45:5,8,
12,17,20,21,23;46:1;
47:2,4,8,17;51:11,11,
14;52:12;68:9,11,17,
22,25;70:22;92:14,
21;94:5,8;96:9;97:25;
98:17;100:19;106:10
**motions (9)**
22:9;25:5;30:14;
32:23;35:20;44:9;
51:20;65:7;106:14
**move (17)**
21:15;23:18;29:12;
30:23;32:7;37:18;
45:21;47:8;49:1;
51:18;61:19;73:11;
95:10;96:13,20;
104:17;106:15
**movies (1)**
18:1
**moving (4)**
22:16;29:6;47:22;
52:4
**much (43)**
18:8;21:24;25:2;
26:11;29:2,6;30:8;
35:15,21;40:22;41:1,
6;42:18;43:11;44:2,7;
45:7,20,22;46:25;
47:21;49:2,12,20,22;
51:8;53:2;72:21;74:6;
75:11;76:17;78:18,
22;83:15;86:19,20,20,
23,24;91:22;94:6;
101:12;106:18
**multifold (1)**
87:7
**multiple (1)**
103:12
**muse (1)**
57:5
**music (1)**
84:19
**must (2)**
33:18;71:23
**mute (2)**
65:9,10

## N

**name (2)**
51:11;58:9
**narrow (2)**
91:19;104:25
**national (1)**
58:25
**necessarily (2)**
17:7;50:14
**necessary (8)**
38:1;41:14;43:2;
48:15;51:25;65:4,24;
77:21
**necessitating (1)**
53:20
**need (19)**
17:11;22:22;24:2,
18;25:24;37:22;
39:13;40:15;59:16,
17;68:4;71:25;74:15,
15;81:1,3;90:9,10;
106:15
**needed (5)**
19:13;21:1;37:13;
40:10;62:25
**needing (1)**
48:2
**needs (8)**
15:8,25;41:11;55:4;
65:25;77:21;87:15,16
**nefarious (1)**
96:16
**neglect (1)**
17:14
**negotiated (2)**
61:11;77:19
**negotiation (2)**
76:9;77:3
**negotiations (3)**
20:22;57:23,24
**neither (4)**
59:10;77:20;85:8;
88:16
**New (20)**
10:5,14;11:14,23;
12:5;13:3;17:3,4;
24:3;28:7;33:24;
37:13;57:1;78:6;
83:13;85:22;90:19;
95:1;106:4,23
**next (2)**
29:12;74:17
**Nichols (8)**
15:19;41:23;42:2,
13,23;43:5;50:4;51:2
**nickel (1)**
32:1
**night (4)**
17:9;34:9,22;39:9
**nine (1)**
61:3

**ninety-eight (2)**
53:5;77:5
**ninety-four (1)**
75:24
**ninety-nine (1)**
78:2
**nitty-gritty (1)**
54:25
**nobody (3)**
31:20;62:16;105:3
**nobody's (1)**
52:18
**noise (1)**
33:9
**non (1)**
61:16
**nonaircraft (1)**
13:10
**non-consensual (4)**
83:25;86:6,9;92:23
**none (1)**
91:1
**nonlegal (1)**
51:4
**non-lingual (1)**
96:23
**nor (2)**
59:10;72:10
**normal (3)**
51:25;64:21;86:17
**Normally (3)**
18:20;61:7;65:6
**note (14)**
19:5,15;21:6;22:8;
24:2;28:13;45:9;50:8;
60:21;63:1;75:25;
81:23;86:4;98:22
**noted (3)**
51:7;78:11;94:20
**Noteholders (18)**
10:12;11:3;14:1,7;
25:21,22;53:14;62:4,
4;75:13,18,24;76:1,
12,19;77:16,17,24
**notes (2)**
77:25;100:7
**notice (16)**
23:24;25:20;26:18;
33:22;34:8,10;60:17,
21;61:9;69:2;70:22;
79:3;86:17,25;87:6,
16
**noticed (2)**
50:13;91:14
**notices (2)**
34:9;87:16
**noting (1)**
103:23
**notion (5)**
51:23;52:4;59:2,4;
96:15
**notwithstanding (2)**
26:18;75:5

**November (5)**
18:23;19:15;60:3,
19;97:21
**nowhere (1)**
71:22
**nuances (1)**
80:24
**number (27)**
16:12,13,13,16;
21:20;23:25;30:4;
33:23;34:7;38:9;
41:15;43:20;44:12;
45:24;47:24;48:5;
51:15;54:3;60:6;61:2;
69:22;70:9;74:24;
75:19;101:14;102:3,8
**numbers (2)**
40:23;43:8
**numeral (5)**
30:13,25;31:9;32:7;
35:24
**numerous (1)**
94:20
**NW (1)**
12:12
**NY (5)**
10:5,14;11:14,23;
12:5

## O

**oar (1)**
81:15
**oath (1)**
67:21
**object (2)**
62:19;90:8
**objected (3)**
45:9;68:1;99:23
**objection (48)**
22:1,8,12,13;29:24;
30:14;32:22,23,25;
33:2,3,4;34:12;35:4,
10,19;36:6,23;45:10;
47:3;53:10,20;59:25;
64:14;69:23;72:2,24;
74:1;75:6,10;76:24,
25;79:15,16,24;81:22,
23;82:7;83:19;84:11;
92:22,25;93:10;
95:16;96:12;98:8;
102:13,16
**objections (11)**
21:21;25:5;42:15;
44:14;45:25;47:25;
48:3;63:24,24;64:9;
100:14
**obligation (3)**
25:19;27:3,6
**obligations (5)**
27:13,18;73:9,10;
90:2
**obviously (21)**

16:1;19:8;21:10;
23:2,13;24:7;49:17;
51:10;53:7;56:6;
61:12,21;62:17,24;
64:11;68:23;74:3;
83:8;84:12;86:8;
103:7
**occurring (1)**
47:11
**o'clock (1)**
13:4
**off (7)**
15:6;17:17;23:6;
39:11;56:9;68:2;
105:2
**offending (1)**
15:7
**offer (1)**
105:22
**offering (1)**
85:19
**offerings (1)**
56:19
**Office (25)**
12:3;14:23,25;36:3,
3,22;42:1,10;49:3,5,8,
10;53:4;78:19,21;
79:5;83:22;86:15;
92:16;93:19;94:20;
95:25;98:13;103:3;
104:7
**Official (10)**
10:3;13:16,19;
53:11;69:24;70:6;
74:11,14;91:6,9
**often (2)**
60:9;87:2
**Once (6)**
32:9;34:7;47:15;
68:19;74:24;90:7
**one (72)**
14:4;16:7,11,21;
18:20;19:22;22:16;
23:19,21;24:6,10,15,
17;25:25;28:3,7,13;
30:1;31:19;32:2;34:9,
21;36:23;37:20,20;
39:13;40:15;43:13;
44:4;45:10;46:6;
47:10;50:3;53:17;
54:2;55:6,13,20;56:6;
58:14,18;59:2,9;
64:17,17;68:10,19,23,
24;72:17;73:2;80:12,
15;88:12;91:13;
92:16;94:17;95:17;
96:24;97:2,13;98:6,
12;99:5;100:1,24;
101:4,23;102:19;
103:24;104:9;106:1
**ones (2)**
23:10;106:5
**one's (1)**

88:23
**ongoing (1)**
42:1
**only (30)**
20:23;28:15;38:10,
17;41:19;43:3;45:1;
53:25;56:25;58:2,2,3,
4;60:9;62:2,2;63:19;
66:19;69:20;71:25;
72:18;77:6,18;80:15;
86:1,21;88:19;100:1,
6,7
**open (14)**
26:12;35:12,22;
37:18;63:15;66:20;
67:4,8;69:11;87:23;
90:25;100:15;105:25;
106:16
**opening (3)**
34:4;60:2;72:1
**operators (1)**
33:11
**opinions (1)**
105:16
**opioid (1)**
55:10
**opportunity (4)**
22:18;69:2;79:12;
87:17
**opposed (2)**
24:16;85:20
**opt (6)**
84:23;88:21;89:17,
18;104:19,20
**opt-in (8)**
59:11;80:5;84:22;
85:8,20;88:15;92:20;
98:7
**opting (2)**
89:18;90:3
**opt-out (15)**
59:10;79:17;83:22;
84:22;85:8,12,19;
86:3,11;88:13,19;
90:1;92:20;98:7;
102:14
**opt-outs (2)**
91:25;92:5
**oral (1)**
71:6
**order (84)**
16:3;17:8;23:5;
24:13;25:8,12,15,25;
26:3,7,10,15,17,19,22,
23;27:1,9,11,19;28:3,
7;30:6;31:4;32:8;
33:23,25;34:1,8;35:3,
8,19;36:4,7,18,21,21;
37:3;38:18,18,20;
39:5,7,7,9,11,13,16,
24;44:8,15,15;45:6,
25;46:22;47:12,14,15,
17;48:6,10,12,20,24,

24;49:7;51:25;61:25;
64:7,20;66:6;68:3;
70:14,25;71:9;76:3,
14;77:10;94:9,11;
99:16;100:7;106:7,13
**ordered (1)**
106:11
**orders (8)**
24:7;28:2,5,6;
29:10,11;33:17;106:4
**ordinary (2)**
29:17;48:18
**originally (3)**
23:5;50:14;103:4
**ORIX (2)**
11:20;14:21
**others (5)**
18:12;48:25;59:15;
76:2;90:18
**Otherwise (6)**
29:11;48:14;59:13;
85:19;86:7;101:11
**ourselves (1)**
67:23
**out (53)**
13:7,15;16:21;
17:16;20:19;23:6,7,
17;32:3;37:21;39:23;
43:13;44:8;46:15,17;
50:23;52:6;54:1,4,5;
55:3,16;56:22;57:9;
59:9;60:5;63:2;67:10;
81:4;83:14;84:23;
87:10;88:21;89:1,17,
18,18;90:7;94:16,19;
95:13;98:4;99:2,13,
18,18,21;100:18;
101:14;102:19;
103:17;104:20;
106:21
**outcome (1)**
105:22
**outdated (1)**
17:8
**outofcourt (1)**
20:24
**out-of-court (2)**
97:11,11
**outset (1)**
72:13
**outside (2)**
101:6;104:13
**over (12)**
15:8;16:5;17:12,17;
20:17;23:20;53:5;
58:21;70:1;88:6;92:7;
100:22
**overfunded (2)**
34:17;35:1
**overrule (2)**
76:25;79:14
**overruled (1)**
74:1

**overrules (1)**
75:9
**oversealing (1)**
45:19
**overseas (1)**
97:9
**overwhelming (4)**
19:1;77:5;85:22;
86:1
**owed (3)**
89:16,20;90:2
**own (7)**
32:1;50:7;59:1;
68:12;70:4;94:8;
97:10
**owned (1)**
21:7

**P**

**Page (7)**
15:4,5,5,5;52:25;
53:25;81:24
**pages (4)**
15:4;34:10;45:3;
69:20
**paid (4)**
85:13,15;89:13,16
**papered (1)**
37:22
**papers (11)**
13:23;43:1;45:5;
46:21;47:7;51:23;
74:9;78:22,23;81:7;
87:10
**paperwork (1)**
23:7
**paradigm (1)**
77:9
**paragraph (8)**
25:15;26:22,25;
33:24;48:5;66:5;72:1;
100:8
**parallel (3)**
60:22;68:16;71:12
**Park (2)**
10:13;11:13
**parse (1)**
98:10
**parsed (2)**
43:1;90:10
**part (12)**
24:4;25:16;31:11;
48:23;51:20,21,22;
57:20;65:17;67:25;
92:3,11
**participants (1)**
95:24
**particular (12)**
16:4;26:13,14;
37:22;38:5;47:17;
64:3;80:17;81:3;
92:14;96:17;97:10

**particularly (6)**
16:3;22:16;35:25;
37:16;59:25;67:9
**parties (18)**
19:4;26:1,2,9;
37:15;39:25;40:2;
49:18;52:5;67:23;
69:17;78:10;79:11;
80:22;81:12;82:1;
92:3;94:16
**parties' (1)**
92:12
**partner (2)**
14:2,7
**Partners (1)**
29:19
**party (10)**
21:17;30:11;68:1;
73:24;78:3;92:24;
95:11;96:10;100:3;
106:1
**party-in-interest (1)**
94:8
**passenger (4)**
33:5;34:2;35:5,7
**passing (1)**
89:3
**past (5)**
20:19;37:24;41:19;
45:16;97:2
**path (3)**
68:5;69:9;95:12
**PAUL (5)**
11:2;14:6;19:6;
75:17;103:7
**pause (3)**
34:21;35:10;40:5
**pausing (1)**
57:20
**pay (4)**
27:3;40:4;46:14;
73:9
**payable (1)**
66:17
**paying (1)**
31:21
**payment (3)**
48:14;75:1;90:19
**payments (2)**
27:20;28:20
**PC (1)**
11:19
**Peck (1)**
90:7
**people (33)**
15:9;17:14;23:7;
31:19;32:3;44:25;
51:24;53:20;54:11;
56:11;58:9;59:4;
61:24;62:2;63:24;
69:2;82:16;85:3,14;
86:19,21;87:3,16;
88:7,19;90:25;93:12;

95:6;102:17;104:24;
105:9,11;106:15
**per (1)**
95:21
**percent (18)**
19:2,3,4,6;26:8;
53:6,14;62:10;66:16;
69:25;70:1,4,5;73:16;
75:24;77:6;78:2;
88:22
**percentage (1)**
88:24
**Perella (1)**
29:19
**perfectly (4)**
17:4;63:8;76:3;
104:6
**Perhaps (6)**
23:11;44:4;45:16;
81:14;88:14;105:15
**perilous (1)**
56:22
**period (2)**
77:22;105:12
**periodic (1)**
53:4
**perspective (3)**
17:15;59:19;105:4
**pertained (1)**
32:23
**petition (3)**
28:20;48:17;60:3
**petitions (1)**
50:12
**PFC (4)**
33:6;34:15,16,18
**PFCs (12)**
33:5,8,10,15,18,20;
34:1,13,16,19,24;35:2
**ph (1)**
49:8
**photo (1)**
20:10
**photography (1)**
58:3
**picture (1)**
42:23
**pillar (1)**
49:8
**place (5)**
42:15;56:22;74:21;
80:16;88:7
**plain (1)**
61:24
**plan (61)**
20:3;21:9;46:9;
53:5,7;60:5,10,20;
61:2,6,14;62:3,8,11,
14,15,16,20;65:8;
66:1,2,3,14;70:20;
72:7,8;73:5,6;74:20,
25;75:1,1,3,23;76:1;
77:4,21,25;78:4;

79:17;80:5,11;81:25;
82:3;83:17,23;84:2,
12,21;85:7;92:23;
94:13;99:19,21;
100:16;101:15,19,20,
21,21;104:2
**planned (3)**
18:24;20:12;46:6
**plans (1)**
72:5
**playing (1)**
49:18
**pleading (2)**
71:18;98:1
**pleadings (2)**
18:25;74:16
**please (9)**
14:12;25:10;31:24;
36:4;41:24;43:15;
81:19;92:17;101:6
**pleased (1)**
33:3
**Plimpton (5)**
15:13;30:1;41:20;
43:17;47:24
**Plimpton's (1)**
47:9
**plumbed (1)**
63:4
**PM (1)**
106:25
**pocket (1)**
46:17
**podium (5)**
18:4;23:20;31:2;
43:10;49:23
**point (23)**
17:16;26:13;28:13;
30:24;38:3;39:17;
50:3;69:15;76:11;
84:9,16;90:14;92:6,8,
10,24;97:22;98:6,24;
100:24;101:14;102:5;
104:8
**pointed (1)**
59:9
**points (5)**
25:6;69:21;75:21;
101:13;105:13
**Polk (14)**
13:9;18:15;20:16;
24:24;32:10;41:23;
42:13;43:5;49:23;
50:4,19;51:1;91:12,
24
**pooled (1)**
49:6
**portion (2)**
26:7;47:22
**position (3)**
78:8;85:18;87:21
**possibilities (1)**
58:7

**possible (11)**
17:20;20:18;28:1;
30:10;47:12;50:11;
63:4,16;101:3;
104:12,14
**possibly (6)**
58:1;59:18;63:14;
86:10;103:6,6
**posted (1)**
26:5
**post-emergence (1)**
46:8
**post-organization (1)**
90:22
**postpetition (1)**
48:9
**post-petition (3)**
39:10;48:8,15
**potentially (1)**
92:7
**Potter (1)**
18:1
**power (1)**
94:7
**PowerPoints (1)**
20:9
**powers (1)**
18:1
**practical (2)**
17:16;104:24
**practically (1)**
105:11
**practices (1)**
48:18
**pre- (1)**
28:19
**Prearranged (2)**
60:9;94:21
**precedent (1)**
72:22
**preference (2)**
23:12;92:12
**preferences (1)**
17:20
**prejudicing (1)**
76:7
**premature (1)**
54:7
**prepack (2)**
60:8;94:19
**prepackaged (3)**
72:9;77:2,3
**prepacks (1)**
94:19
**prepared (1)**
46:10
**prepetition (1)**
46:6
**pre-petition (6)**
25:22;48:7,13,23;
49:9;77:3
**prescribing (1)**
70:14

**PRESENT (2)**
12:19;87:17
**presented (1)**
45:18
**preserve (1)**
65:4
**preserved (1)**
87:24
**presided (1)**
58:21
**pressure (1)**
47:16
**pretty (8)**
20:7;21:10;38:19;
41:6;61:7;72:12;
88:12;100:5
**previewed (1)**
28:22
**previously (1)**
30:4
**PRICE (7)**
11:19;14:19;44:20;
46:15;67:3;69:6,7
**prime (3)**
39:23;40:2,3
**prior (6)**
24:3;25:23;42:24;
45:15;48:17;93:1
**priorities (1)**
39:21
**priority (1)**
57:14
**pristine (1)**
59:17
**probably (6)**
19:24;28:14;38:24;
64:13,15;74:8
**problem (4)**
50:24;68:25;72:12;
87:7
**problematic (3)**
89:25;95:22;96:16
**problems (1)**
51:7
**procedural (10)**
52:12,13;68:11;
92:20;93:3,8;98:17;
100:19;102:9;106:3
**procedurally (2)**
65:7;81:21
**procedure (2)**
65:7;70:13
**procedures (8)**
51:10,14;64:21;
68:17;72:4;81:24;
87:5;98:14
**proceed (2)**
67:17;92:10
**proceedings (5)**
20:18;21:2;22:3,6;
106:25
**process (20)**
22:17;34:4;43:24;

54:8;59:3,4,22,24;
60:16;65:25;68:21;
76:6,15;77:11;78:14;
86:24;88:6;92:1;94:2;
102:17
**processing (3)**
60:23;68:17;71:13
**professionals (3)**
19:9;29:17;62:7
**proffer (1)**
38:25
**profound (1)**
22:21
**profoundly (1)**
97:24
**program (2)**
33:6,6
**programs (3)**
27:2,14;29:15
**progress (1)**
31:12
**projects (1)**
33:8
**prologue (1)**
97:2
**promise (1)**
66:21
**promises (1)**
66:24
**promptly (1)**
96:14
**promulgated (3)**
72:2,10;96:18
**proper (2)**
28:8;84:1
**properly (4)**
82:16;98:18;99:6;
100:12
**property (2)**
33:13,19
**proponents (1)**
72:4
**proponent's (1)**
72:6
**propose (6)**
27:9;41:19,22;44:8;
48:4;49:1
**proposed (26)**
13:19;15:13,19;
24:7;25:12,12,15;
26:23;30:1;33:23;
34:8;36:21;38:20;
43:17;45:6,25;48:6;
66:6;74:13,22;75:5;
76:7,14;85:10;91:9;
100:16
**proposing (1)**
91:25
**prosecutorial (1)**
103:12
**protect (1)**
70:4
**protection (2)**

34:23;39:6
**prove (1)**
85:25
**provide (9)**
25:19;27:11;34:5;
49:8;51:17;65:24;
72:3;74:19;80:1
**provided (6)**
20:25;40:19;48:21;
59:23;79:3;101:19
**provides (9)**
24:1;25:15;26:25;
33:25;66:13;70:16,
18;77:7;94:11
**providing (5)**
60:1;77:12;84:8;
86:19,23
**provision (4)**
26:19;66:1;70:12;
83:17
**provisional (1)**
86:21
**provisions (4)**
39:22,24;101:19;
104:2
**proxy (1)**
21:7
**public (12)**
21:4,5,8,10,11,11;
33:7;55:20;57:22;
58:11;64:5;72:3
**publicized (2)**
95:19,20
**publicly (1)**
44:22
**pull (1)**
80:12
**pulling (3)**
80:13,18;81:5
**purchase (3)**
44:20;46:14;58:13
**Purdue (1)**
55:11
**purportedly (1)**
70:3
**purporting (1)**
103:4
**purports (2)**
89:12;90:4
**purpose (2)**
93:2;95:15
**purposes (10)**
28:19;32:18;55:3;
65:22;68:13;97:1;
98:8,8,19;99:7
**pursuant (2)**
36:23;48:9
**put (11)**
22:14;28:19;57:1,9;
63:21;68:8;84:9;
94:15;100:20;101:8;
102:4
**puts (1)**

Spirit Airlines

December 17, 2024

103:25
**putting (2)**
54:14;68:7

**Q**

**quick (1)**
23:20
**quickly (6)**
19:18;22:16;23:18;
47:11;73:11;95:10
**quite (9)**
17:15;36:12;50:23;
52:8;71:17,22;81:23;
88:18;100:25
**quote (7)**
48:19;51:4;60:21;
70:11;72:2;81:22;
101:17
**quotes (1)**
103:25

**R**

**R' (1)**
58:4
**raise (10)**
31:13;47:16;54:11,
12;79:15;82:16;
86:22;87:9,11,12
**raised (9)**
49:20;83:11;93:3;
98:8,18;99:6;100:12;
101:1;104:20
**rapport (1)**
58:6
**rather (3)**
38:14;57:18;81:21
**RCF (2)**
39:23;50:14
**reach (3)**
16:14;37:21;105:21
**reached (1)**
79:9
**read (11)**
20:13;27:10;28:24;
48:6;56:6;71:21,25;
78:23,23;91:18;
105:16
**reading (2)**
51:13;104:18
**readmit (1)**
32:14
**ready (4)**
16:10;30:25;85:17,
24
**real (5)**
71:1;78:13;79:11;
90:18;103:15
**realistic (1)**
20:24
**realities (1)**
56:16

**reality (1)**
55:13
**realize (1)**
18:3
**really (21)**
28:10;39:12;41:5;
43:4;61:19;68:8,9;
69:20;71:25;72:21;
79:25;86:17,18;
87:10,11,12;88:5,22;
91:20;98:12;100:9
**reason (16)**
23:9;31:24;39:11;
46:19;51:19;63:14;
67:1,7;73:12,12;
91:24;92:9;95:6;
96:17,18;99:10
**reasonable (4)**
61:10;65:2,20;
100:3
**reasons (7)**
30:17;41:12;42:24,
25;58:18;89:24;99:8
**rebuts (1)**
50:7
**rebuttal (1)**
74:4
**recapitalized (1)**
103:18
**receive (5)**
22:2;44:5;47:25;
48:1;79:6
**received (6)**
22:4;44:14;45:24;
78:1;98:11;99:19
**receives (1)**
79:5
**receiving (1)**
62:14
**recent (1)**
20:19
**recently (1)**
23:11
**record (56)**
18:15;19:15;24:5,
15,16,17;25:7;26:7,
15,16,17;27:10;28:1,
19;29:22;30:9,19,21;
31:16;32:15;35:4;
38:12,22;40:11;
41:12;43:13;45:11,
11;47:12,14,15,17;
49:7,15;50:2,8,20;
51:12;52:22;55:3;
60:21;64:22;65:21;
70:21;75:16;79:16;
81:8;89:25;98:20,21;
100:17;101:5,9;
106:7,13,14
**recorded (1)**
102:13
**recovery (1)**
57:16

**red (2)**
61:6,7
**redact (1)**
45:1
**redacted (1)**
44:14
**redactions (1)**
45:1
**redline (1)**
38:20
**reduce (2)**
33:9,9
**refer (1)**
51:13
**reference (2)**
34:2;79:23
**referring (3)**
25:11;35:6;80:2
**refers (1)**
35:5
**reflected (1)**
40:19
**reflection (1)**
98:3
**regarding (1)**
28:17
**regional (1)**
58:24
**regular (3)**
61:8;95:17;102:10
**regulations (2)**
33:14,21
**reimbursable (1)**
27:18
**reimburse (4)**
27:6,15,17;48:16
**reimbursement (2)**
27:5,20
**reiterate (1)**
75:21
**reject (2)**
62:15;99:19
**rejected (1)**
57:12
**relate (1)**
61:14
**related (2)**
91:16;104:19
**relates (2)**
28:25;33:4
**relationship (1)**
58:24
**release (21)**
79:22,25;80:9;
81:13;83:23;85:12,
19,20;86:3,3,9,11;
90:3,4,14;91:15,15;
93:4;101:18;102:14;
104:2
**released (1)**
90:16
**releases (24)**
59:11;80:11,17;

81:3;82:3,4,14;84:1,
18,21;85:8;86:7;
88:13,15,19,21;89:9;
90:1;91:11,13,18,20;
92:23;101:15
**releasing (1)**
91:16
**relevance (1)**
34:11
**relevant (6)**
23:8;24:4;25:16;
52:24;64:8;104:3
**reliance (1)**
78:14
**relief (14)**
21:20;24:1;30:15,
17,18;41:6;44:6;52:9;
60:14;73:23;75:9;
78:13;101:20,24
**rely (1)**
102:23
**remain (2)**
63:15;105:25
**remaining (2)**
46:7;48:7
**remains (1)**
63:6
**remarks (2)**
21:14;78:11
**remember (4)**
20:7;36:9;90:7;
106:3
**remembered (1)**
21:4
**remembers (1)**
60:15
**remove (2)**
104:12;105:13
**re-move (1)**
24:2
**rental (1)**
44:20
**reorganization (2)**
60:5;65:22
**replace (2)**
25:17;26:9
**replaced (1)**
25:24
**replacement (1)**
26:2
**replacing (1)**
25:23
**replies (1)**
64:11
**reply (4)**
59:10;73:13;74:3;
75:19
**report (1)**
33:3
**reported (1)**
78:2
**representative (1)**
19:17

**representatives (1)**
19:25
**represented (4)**
19:6,7;53:6;62:6
**representing (2)**
14:20;62:23
**Republic (1)**
58:23
**request (38)**
21:25;26:7;31:22;
32:17;36:7;37:7;
38:14,19;40:12;
43:21,24;44:3,16;
45:6;46:19,21;48:22;
52:10,13,24;53:1;
54:12;68:10,11,12,24;
71:6,12;72:6;76:25;
79:7;94:8,23;97:5,16;
99:9,10;106:3
**requested (13)**
26:4,5;30:15;41:6;
42:25;44:6;52:9,22;
59:24;71:13;73:23;
75:9;78:13
**requesting (2)**
44:12;68:6
**requests (3)**
31:8;95:1,2
**require (3)**
33:14;70:21,22
**required (1)**
33:20
**requirements (2)**
60:18;99:11
**requires (1)**
99:3
**requisite (1)**
26:1
**reservation (1)**
27:8
**reserve (2)**
18:11;48:13
**residual (4)**
34:14,20,24,25
**resolution (3)**
32:25;35:9;105:9
**resolve (4)**
26:24;35:18;48:2;
49:19
**resolved (6)**
30:23;33:3;35:20;
40:1;42:3;105:14
**resonates (1)**
67:13
**respect (17)**
19:14;25:7;35:1,3;
36:4;42:4;44:9,17,21;
45:4;47:10;48:22;
49:11;59:11;76:5;
79:4;99:19
**respond (1)**
62:25
**response (1)**

47:2
**responsibilities (1)**
   51:1
**responsible (1)**
   90:2
**responsiveness (1)**
   35:17
**rest (1)**
   46:21
**restrictive (1)**
   71:4
**restructure (2)**
   55:14;57:7
**restructuring (6)**
   55:13;76:4;91:22;
   97:8,13;103:2
**result (3)**
   38:6;58:22;101:20
**resulting (1)**
   46:15
**results (1)**
   63:23
**retain (1)**
   59:15
**retained (1)**
   19:21
**retainer (2)**
   48:7,23
**retainers (2)**
   48:14;49:9
**retention (13)**
   28:17;29:5,18,19,
   20,21;41:23,23;47:9;
   49:15;50:10,13,22
**retentions (1)**
   42:4
**retention's (1)**
   42:25
**retrospectively (1)**
   59:22
**returned (1)**
   100:2
**returning (1)**
   45:23
**revert (1)**
   51:25
**review (1)**
   79:12
**reviewed (2)**
   35:18;77:19
**revise (1)**
   48:24
**revised (8)**
   24:7,13;27:9;33:22;
   34:8;38:18;39:8;
   48:24
**revitalized (1)**
   103:18
**revolving (1)**
   15:23
**riding (3)**
   75:1;85:4;89:14
**right (102)**

13:13,21;14:3,9,10,
16,22;15:2,14,17,20,
24,25;21:24;22:1;
23:16;24:6,22;26:11,
14;27:4,12,23,25;
29:2,13;30:8,12;32:6,
16,17;35:12,21,22;
36:24;38:10;40:22,
23;41:1,3;42:7,18,21;
43:9;44:2,4;45:10;
46:25;47:2,17;49:2,
12,14,24;51:3,6,20;
52:12,21;54:8,12;
55:15;58:2,12;61:9;
64:16;65:14,23;66:8;
67:3,16;68:10,15;
69:14,21,23;72:13;
74:6,19;75:11;76:17;
78:18;79:20;80:6;
81:9,23;82:4;84:4,24;
88:6,9;89:7,18;91:6;
92:13;95:5;97:4;
103:5;106:5,13,18,22
**rights (13)**
   52:19;56:3;59:12;
   62:19;85:3;87:17,19;
   90:4;93:9;95:9;96:10,
   11;99:5
**risk (3)**
   40:16;43:14;78:13
**Robert (1)**
   15:18
**Robertson (26)**
   23:21;24:20,22,23,
   24;25:3,11;26:21;
   28:12;29:7;31:1;32:9,
   10,20;36:24,25;
   38:10;39:2;40:9,16,
   20,25;41:16,18,25;
   43:9
**Robinson (2)**
   13:11;43:7
**robust (1)**
   30:9
**role (4)**
   19:23;43:2;49:18;
   103:13
**Roman (5)**
   30:13,25;31:9;32:7;
   35:24
**route (2)**
   95:13,14
**RSA (4)**
   19:4,5;78:3;79:1
**RUBIN (7)**
   10:16;13:24,25;
   55:3;74:17;76:20,20
**Rule (7)**
   45:1;57:15;92:4;
   94:18,22;96:19;99:11
**rules (8)**
   23:3,3;51:25;70:13;
   79:3;86:14;94:17;

99:14
**rulings (3)**
   93:11,12,15
**runway (1)**
   20:25

## S

**safely (2)**
   73:19,22
**safety (1)**
   33:9
**sake (1)**
   103:20
**sale (1)**
   30:3
**sale/leaseback (11)**
   43:21;44:1,10,11,
   13,18;45:23;46:4,22;
   47:1,3
**same (9)**
   26:22;30:17;39:16;
   42:24;52:25;53:25;
   60:12;95:4;104:18
**sat (1)**
   90:9
**satisfaction (1)**
   85:25
**satisfied (2)**
   49:10;57:15
**Saturday (1)**
   26:1
**save (3)**
   39:13;55:22;102:21
**saved (1)**
   58:8
**savings (1)**
   57:12
**saw (2)**
   24:13;39:5
**saying (10)**
   23:14;62:22;82:8;
   83:20;88:2;93:18;
   94:7;95:11;96:2;
   103:9
**scene (1)**
   62:7
**schedule (7)**
   37:13;46:10,11;
   52:17;76:7;92:3,11
**scheduled (1)**
   64:6
**scheduling (8)**
   31:3,6,9,11,16;
   64:22;76:13;99:9
**scheme (1)**
   67:6
**schemes (1)**
   97:9
**score (1)**
   69:3
**se (1)**
   95:21

**seal (1)**
   44:17
**sealed (2)**
   44:11;45:19
**sealing (11)**
   43:21,25;44:9,15,
   15;45:5,8,12,14,17,20
**Sean (1)**
   13:2
**second (13)**
   18:20;26:22;30:3;
   37:3;41:19;58:17;
   60:7,12;67:3;69:15;
   71:16;81:17;84:6
**second-day (1)**
   18:19
**secret (1)**
   79:7
**section (3)**
   34:3;54:19;101:15
**Secured (9)**
   10:12;14:1;25:21;
   39:10;76:19,22;
   77:16,25;78:3
**security (3)**
   26:10;33:9;34:14
**seeing (4)**
   22:2;45:10;47:2;
   95:21
**seek (3)**
   27:5;60:14;72:5
**seeking (5)**
   21:21;59:10;88:13,
   14;101:24
**seeks (1)**
   39:9
**seem (4)**
   16:11,12;38:6;
   95:24
**seemed (1)**
   66:1
**seemingly (1)**
   86:15
**seems (6)**
   54:9;68:24;84:11;
   87:18;95:22;100:5
**segregate (3)**
   33:15,20;34:1
**segue (1)**
   59:2
**send (4)**
   22:21;28:10;46:23;
   106:3
**sending (2)**
   17:12;85:15
**Senior (9)**
   10:12;14:1;25:21;
   39:10;76:18,22;
   77:16,24;78:3
**sense (11)**
   16:19;32:24;37:10,
   12;54:18;64:15;68:9,
   10;74:8;93:16;94:18

**sensitive (4)**
   44:17,20;45:2,13
**sent (1)**
   56:20
**sentences (1)**
   38:24
**sentiment (2)**
   58:4;76:7
**sentiments (1)**
   76:2
**separate (6)**
   33:16;68:9;70:5;
   72:9;92:2;100:10
**separately (2)**
   68:16;92:11
**sergeant (1)**
   66:22
**seriously (1)**
   98:10
**seriousness (1)**
   19:20
**serve (1)**
   93:2
**set (6)**
   16:25;39:21;41:12;
   46:1;72:4;92:2
**settled (2)**
   23:10,11
**seven-page (1)**
   60:4
**seventh (1)**
   103:19
**several (1)**
   70:1
**shall (2)**
   25:19;48:6
**Shana (2)**
   42:10;49:4
**SHARA (5)**
   12:7;14:25;36:2;
   78:20;92:15
**share (2)**
   52:10;54:14
**shareholder (1)**
   56:6
**shareholders (3)**
   56:2;88:13,15
**shares (1)**
   21:7
**sheet (4)**
   60:4,9;76:4;84:19
**shift (3)**
   41:11;58:3,4
**shockingly (1)**
   73:6
**short (1)**
   60:15
**shortcut (1)**
   102:9
**shorten (1)**
   60:16
**show (2)**
   39:13;63:3

Spirit Airlines

December 17, 2024

**shows (3)**
16:19;20:9;39:16
**shudder (1)**
31:21
**shuffle (1)**
103:16
**shy (1)**
60:24
**side (4)**
18:4;53:17;64:15;
69:23
**sight (1)**
69:23
**signed (1)**
88:20
**significance (1)**
104:4
**significant (2)**
74:18;78:6
**significantly (1)**
46:16
**siloed (1)**
100:10
**similar (1)**
30:5
**simple (1)**
73:7
**simpler (1)**
83:15
**simplify (1)**
97:6
**simply (5)**
15:6;56:20;90:5;
104:14;106:3
**singing (1)**
84:19
**single (5)**
63:12;68:22;77:24;
102:16,23
**situation (1)**
68:22
**situations (1)**
70:8
**six (5)**
46:5;55:12;81:24;
86:16;102:10
**six-inch (1)**
17:23
**size (6)**
15:3;16:14,14;97:7,
15;103:15
**skills (1)**
58:10
**skip (1)**
41:19
**skull (1)**
16:9
**slander (1)**
104:23
**slightly (2)**
44:8;50:5
**small (3)**
61:2;70:25;72:19

**smaller (2)**
16:12,16
**SMITH (4)**
12:16;15:15,15;
35:15
**smoothly (1)**
52:5
**solely (1)**
51:10
**solicit (2)**
88:15;91:25
**solicitation (1)**
62:2
**solicited (2)**
62:3;92:5
**solvent (1)**
56:1
**somebody (7)**
58:21;62:20;83:22;
84:22;90:2;93:17,24
**somebody's (2)**
90:4;93:9
**somehow (6)**
50:21,23;62:20,23;
89:17;96:11
**someone (9)**
14:17;15:25;17:25;
18:4;50:16;58:13;
85:19;90:8,16
**sometime (1)**
36:20
**sometimes (5)**
17:13;18:18;55:14;
105:7,8
**somewhat (1)**
24:4
**somewhere (1)**
62:10
**son (1)**
66:23
**sophisticated (3)**
19:17;62:6,7
**sorry (3)**
14:12;16:13;26:4
**sort (35)**
20:6,8,25;23:12;
24:10;25:5;27:10;
28:9;35:6;39:22;
40:11,11;41:11;43:4;
51:18;52:16;56:23;
58:18;59:20;60:17;
61:24;63:3,9;64:14;
66:6;68:3,18,23;69:5,
10,23;71:22;77:15;
88:4;97:12
**sorts (1)**
47:6
**sound (2)**
16:8;20:9
**sounds (1)**
17:21
**South (1)**
11:4

**Southern (1)**
13:3
**spare (2)**
23:7;51:12
**speak (5)**
15:10;28:21;89:12;
103:4,10
**speaking (2)**
70:3;80:14
**speaks (1)**
70:8
**specific (7)**
45:2;46:20;80:2,3,
4;94:14;99:14
**specifically (2)**
66:10;80:2
**specifics (1)**
94:21
**speed (3)**
37:17;59:17;61:19
**spend (3)**
16:20;22:15,22
**spending (1)**
61:1
**spilled (1)**
82:12
**spines (1)**
17:22
**Spirit (23)**
13:4,9;18:22;20:16;
21:3,4,8;25:24;26:9;
33:15;46:10,13,15;
56:19;57:19;73:3,4,
25;78:8;95:18;99:11;
103:1;105:23
**Spirit's (2)**
46:17;78:9
**split (1)**
68:15
**spoken (1)**
96:7
**square (1)**
84:2
**squared (1)**
86:10
**stages (1)**
24:11
**stakeholders (4)**
18:22;52:9;73:25;
97:18
**STAMER (2)**
10:17;14:2
**stand (4)**
45:5;53:18;74:9;
97:4
**standalone (1)**
106:4
**standard (2)**
99:17;100:1
**stands (2)**
53:17;68:12
**start (7)**
13:6;17:17;25:4;

70:10;85:15;93:7;
106:5
**started (1)**
52:23
**starting (1)**
67:23
**state (3)**
24:16,16;63:8
**stated (3)**
52:3;74:24;77:1
**statement (34)**
15:12;20:3;35:16;
38:22;60:20,25;61:3,
6,8;62:1,8;70:19;
72:7;77:20;79:11,16,
17;80:14,25;81:22;
84:10,11;86:17,21;
87:3;93:2,17,18;
94:12;95:7;96:13;
98:15;101:15,17
**STATES (16)**
12:2,3;13:3;14:23,
25;34:3;36:3,22;
42:11;49:5;75:10;
78:19,21;79:8;84:3;
92:16
**status (4)**
29:4;70:23;71:6,13
**statute (5)**
33:11;53:13;70:9,
10;94:6
**statutory (4)**
19:19;45:14;75:7;
79:22
**stay (2)**
17:21;37:6
**staying (1)**
31:24
**step (2)**
43:13;85:6
**steps (1)**
43:14
**Stern (2)**
90:6,8
**still (6)**
14:19;23:13;36:15;
51:12;53:20;86:7
**stock (1)**
58:13
**stockholders (1)**
70:2
**stood (1)**
90:8
**storied (2)**
21:11;58:8
**stories (2)**
58:12,14
**story (1)**
59:1
**straighten (1)**
89:1
**straightforward (2)**
86:14;100:5

**STRAUSS (3)**
10:11;13:25;76:21
**Street (1)**
12:12
**stridently (1)**
70:6
**strike (1)**
105:15
**strokes (1)**
64:1
**strong (1)**
51:22
**strongly (1)**
93:20
**stuff (2)**
17:12;45:19
**subchapter (2)**
72:11;94:17
**subclause (1)**
27:8
**subject (3)**
22:10;76:8;90:21
**submit (7)**
27:9;28:5;48:24;
50:7,11;78:15;81:7
**submitted (3)**
24:8,14;50:10
**subsequently (1)**
61:21
**substance (1)**
54:10
**substantive (13)**
31:7,15;45:23;52:2,
18;54:11;68:11,12;
87:1,2;95:9;96:10,22
**substitution (1)**
93:9
**success (2)**
66:2;78:8
**sufficient (1)**
87:16
**sufficiently (1)**
98:8
**suggest (5)**
16:22;31:5,6;84:11;
95:22
**suggestion (1)**
36:17
**suggestions (2)**
37:18;87:23
**Suite (2)**
11:5;12:13
**sum (2)**
29:22;52:7
**super (1)**
23:20
**super-duper (1)**
85:17
**supplement (1)**
16:24
**supplemental (3)**
28:16;42:2,12
**support (24)**

19:2;24:1;30:6;
32:14;40:19;42:13;
43:21,25;44:5;52:9;
53:5,7;66:10;70:3;
72:24;74:7,25;75:18,
24;76:1;77:5,5;80:22;
96:7
**supported (4)**
73:23;76:4;90:23;
103:1
**supportive (4)**
19:5,8;74:23;77:25
**supports (2)**
21:20;72:23
**suppose (2)**
28:23;93:17
**Supreme (3)**
84:3;86:5,8
**Sure (28)**
17:18;28:5,25;29:4;
36:5;38:12;39:2;42:9;
46:12;49:4;52:24;
58:1;65:15;69:4,15;
71:14;75:3;83:16;
84:2,14;86:18;92:18;
95:15;101:2,7,9;
104:22;106:4
**surprise (1)**
83:21
**surprised (1)**
81:21
**surprisingly (1)**
44:4
**suspect (1)**
24:14
**suspenders (1)**
38:23
**system (1)**
56:17

### T

**table (1)**
105:3
**tabulation (1)**
64:21
**tackle (1)**
85:4
**tailored (3)**
39:6;76:3;91:21
**talent (1)**
18:2
**talk (12)**
37:20;54:20;55:11;
59:21,23;61:20;65:1;
70:10;71:16;87:15;
88:3;96:5
**talked (1)**
55:17
**talking (8)**
22:6;24:11,12;59:3,
21;69:6;80:7,10
**talks (2)**

65:19;96:19
**tautological (1)**
67:18
**tax (3)**
29:16;41:5;49:8
**taxes (6)**
32:13;33:2;35:3,5;
36:1;41:4
**team (2)**
13:14;49:23
**tease (1)**
100:18
**teased (1)**
87:10
**technical (3)**
21:15;30:1;43:19
**tee (1)**
93:11
**teed (3)**
31:15;69:1;91:2
**teeing (1)**
65:8
**teeny (1)**
88:24
**Telesis (4)**
11:20;14:17,19;
29:18
**tells (1)**
18:4
**ten (1)**
66:16
**tenaciously (1)**
66:15
**tend (3)**
22:11,14;66:24
**teninch (1)**
17:22
**ten-inch (1)**
18:2
**term (3)**
35:7;60:4,9
**terminated (1)**
20:23
**termination (2)**
66:13;74:22
**terms (27)**
17:12;27:1;29:5;
44:20;45:18;52:6,21;
54:14;59:6;61:23;
63:17;66:3;67:6,20,
22,24;68:2;69:9;
74:21,21;84:21;92:1;
93:10;94:1,6;100:10,
25
**terrible (1)**
55:10
**test (1)**
50:6
**testifying (1)**
62:22
**testimony (1)**
43:25
**tethered (1)**

90:15
**Thanks (1)**
25:1
**theme (1)**
54:4
**there'd (1)**
88:15
**therefore (5)**
27:5,6,15;50:11;
75:8
**thinking (4)**
51:22;54:13;63:18;
101:2
**third (4)**
46:6;71:11;72:17;
105:8
**third-party (4)**
79:22;82:3;92:23;
101:18
**thirty-page (1)**
83:9
**thorough (1)**
35:16
**thoroughly (1)**
79:12
**thoroughness (1)**
43:12
**though (2)**
20:5;31:19
**thought (9)**
23:6;46:2;54:1,25;
59:18;65:19;68:22;
83:8;87:14
**thoughtful (1)**
61:10
**thoughtfully (1)**
105:25
**thoughts (3)**
36:24;55:1;101:8
**three (12)**
16:18;23:4,10;28:5;
32:12,23;35:20,23;
41:21;46:7;69:21;
74:7
**thresholds (1)**
18:25
**throughout (2)**
80:21;104:21
**throw (4)**
26:12;35:12,22;
99:18
**thus (2)**
53:20;96:25
**tickets (1)**
73:15
**till (1)**
98:21
**timeline (2)**
17:1;77:12
**times (3)**
70:1;94:20;103:12
**timing (4)**
16:17;47:18;87:15;

95:21
**tiny (1)**
50:3
**tip (1)**
16:21
**Title (4)**
34:3;70:12,17;71:2
**today (35)**
13:10;14:2;15:22;
16:19;19:10,13;
21:17,19,21;25:25;
31:8,15;36:17;42:25;
52:2;53:21;61:25;
64:8;66:11;67:24;
68:6;73:1;83:12;
84:10,11;87:7;89:21;
91:2,5;92:19;94:1;
98:9,11,25;102:24
**today's (15)**
16:6;21:23;22:3,6;
24:1,5;32:15,18;
53:21;83:10;85:23;
86:12,13;96:22;99:7
**TODD (4)**
10:8;13:18;74:12;
91:8
**together (5)**
36:12;37:15;49:19;
56:25;105:1
**ton (1)**
61:1
**took (3)**
61:11;88:18;101:23
**Top (1)**
66:22
**topic (2)**
64:3;83:10
**topics (1)**
103:14
**total (1)**
69:19
**totaling (1)**
19:6
**touching (1)**
59:12
**towards (3)**
48:8,14;103:2
**Toys (1)**
58:3
**track (3)**
19:14;37:7;52:8
**trade (2)**
27:19;29:14
**trail (1)**
87:23
**transaction (8)**
44:18;46:13,16,21;
57:19,20;67:17,19
**transactions (1)**
91:22
**transcript (3)**
101:7,9,10
**transition (1)**

50:25
**transparency (1)**
26:16
**transpired (2)**
50:9,25
**treatment (1)**
61:13
**tree (1)**
17:6
**trenches (1)**
105:19
**tried (1)**
93:7
**tries (1)**
94:15
**trouble (2)**
93:5;95:21
**true (4)**
58:2;82:2;105:5,6
**truly (1)**
59:25
**Trust (5)**
11:12;14:10,14;
33:12;52:4
**Trustee (16)**
12:3;15:1;19:11;
42:11;48:1;49:5;70:3,
7;71:21;72:12,16;
75:10;78:21;79:8;
85:18;92:16
**trustees (1)**
25:23
**Trustee's (19)**
14:23;36:3,22;42:4;
51:23;53:4;68:24;
71:18;74:1;75:6;76:5,
24;78:19;83:22;
94:20;95:25;98:13;
103:3;104:7
**try (8)**
16:22;54:24;94:16;
98:9;103:10,13;
105:21,21
**trying (14)**
16:21;17:13;22:21;
37:16;67:10;70:7;
73:11;82:21;83:3;
86:4;87:21;89:7;
100:18;102:21
**tune (1)**
77:5
**Tunnell (1)**
43:6
**turn (8)**
15:8;16:5;17:17;
23:20;31:9;59:20;
64:14;100:22
**turns (1)**
95:13
**tweak (1)**
28:7
**tweaked (1)**
28:3

| | | | | |
|---|---|---|---|---|
| **twelve (1)** | 15:23;21:9;27:13, | 51:5;90:21 | 96:23 | **visited (1)** |
| 51:11 | 19;33:11,20;40:13; | **unring (1)** | **used (5)** | 86:7 |
| **twenty (1)** | 41:7;42:22;44:17; | 66:4 | 33:8;54:17;68:18; | **volumes (1)** |
| 102:24 | 47:4;49:16;52:15; | **unringing (2)** | 90:6;97:9 | 70:8 |
| **twenty- (1)** | 55:24;57:14;60:18, | 69:6,7 | **using (5)** | **vote (4)** |
| 61:2 | 22;61:8,13;62:3,13; | **unrung (1)** | 17:8;60:14,17; | 62:16;79:20;80:6; |
| **twenty-nine (1)** | 65:3;67:21,22;70:16; | 67:7 | 65:12,12 | 84:23 |
| 60:10 | 71:2;72:5,11;76:11; | **Unsecured (18)** | **usually (2)** | **voted (1)** |
| **twenty-one (2)** | 83:23;84:2,25;86:14, | 10:3;13:16,19; | 99:18,21 | 99:20 |
| 60:19;61:3 | 17;94:7,11;95:3,16; | 53:12,13;69:24; | **utilities (1)** | **votes (2)** |
| **twice (3)** | 96:4 | 74:14;76:10;77:8; | 29:16 | 62:3;99:19 |
| 19:12;68:19;105:7 | **understandable (2)** | 78:7;79:19;80:8; | **utterly (1)** | **voting (10)** |
| **two (26)** | 17:5;40:13 | 87:19;89:3,13;91:16, | 32:2 | 64:9,22;77:6,18; |
| 23:2;25:13,24;26:3, | **understandably (1)** | 25;103:24 | | 80:17;84:12,17; |
| 10;28:5;34:8;36:10; | 17:14 | **unsuccessfully (1)** | | 99:20,22;100:3 |
| 38:24;42:19,21; | **understands (2)** | 57:24 | **V** | |
| 43:14;46:5,7;54:1; | 55:7;96:9 | **untethered (1)** | | **W** |
| 69:19;72:15;73:7,17; | **understate (1)** | 90:4 | **valuation (2)** | |
| 77:6,18;82:2;95:16; | 20:13 | **unusual (2)** | 63:22;99:1 | **Wacker (1)** |
| 96:7;103:17,23 | **understood (2)** | 40:12;64:24 | **value (9)** | 11:4 |
| **type (3)** | 57:18;58:4 | **unwilling (1)** | 55:23,25;58:1; | **wages (1)** |
| 61:7;73:13;77:14 | **underway (1)** | 53:19 | 63:10,15;90:16;98:3; | 29:14 |
| **typical (1)** | 20:22 | **unwind (2)** | 100:15;104:16 | **wait (6)** |
| 91:23 | **undo (1)** | 80:16;81:1 | **variety (1)** | 17:2;19:12;26:6; |
| **typically (1)** | 83:16 | **up (40)** | 52:14 | 28:8;98:21;105:9 |
| 91:20 | **unfortunate (1)** | 16:23,23;29:22; | **various (6)** | **waited (1)** |
| | 57:25 | 31:15;37:25;38:1; | 16:20;22:9;52:9; | 86:16 |
| **U** | **unfortunately (4)** | 40:14;41:15;43:8,19; | 64:22,23;95:6 | **waiting (1)** |
| | 20:22;53:18;58:8; | 51:17;52:7,18;53:8; | **VEDDER (2)** | 30:22 |
| **UCC (4)** | 103:3 | 55:21;60:16;63:3,6; | 11:19;14:19 | **waiving (1)** |
| 61:9,10;62:21; | **unhappy (1)** | 65:8;66:13;69:1; | **verify (1)** | 99:5 |
| 103:1 | 97:24 | 73:21;80:12,13,18; | 52:4 | **walk (1)** |
| **UCC's (1)** | **unimpaired (14)** | 81:5;84:6,24;90:8; | **versed (2)** | 25:8 |
| 103:7 | 39:20;62:5;84:1,18; | 91:2;92:2,9;93:11; | 93:24,25 | **walking (1)** |
| **ULCCs (1)** | 85:12,13,19;86:7; | 97:4;98:14;99:15; | **version (3)** | 20:10 |
| 56:20 | 89:12,15,19;103:10, | 103:5;105:7,13; | 17:8;28:8;38:20 | **wants (4)** |
| **ultimate (3)** | 25;104:7 | 106:16 | **versions (1)** | 35:13;85:18;101:6; |
| 56:4;92:5;105:9 | **unimpairment (2)** | **upcoming (1)** | 28:6 | 105:3 |
| **ultimately (4)** | 77:7;90:23 | 23:13 | **versus (1)** | **Wardwell (5)** |
| 50:6;63:5;88:12; | **UNITED (16)** | **update (3)** | 92:20 | 13:9;18:15;24:24; |
| 93:13 | 12:2,3;13:3;14:23, | 18:18;24:15;38:17 | **vi (1)** | 32:10;43:5 |
| **ultra (1)** | 25;34:3;36:3,22; | **updated (1)** | 70:18 | **WARREN (2)** |
| 56:20 | 42:11;49:5;75:10; | 46:10 | **viability (1)** | 11:9;14:8 |
| **unable (1)** | 78:19,21;79:8;84:3; | **updates (1)** | 78:9 | **Washington (1)** |
| 73:9 | 92:16 | 30:21 | **victims (1)** | 12:14 |
| **unavoidable (1)** | **universally (1)** | **upfront (1)** | 55:11 | **watch (1)** |
| 55:13 | 103:1 | 37:6 | **view (10)** | 66:8 |
| **unbelievably (1)** | **universe (1)** | **upon (4)** | 44:19;50:5;52:10, | **water (1)** |
| 61:18 | 53:17 | 26:3,10;78:25;86:7 | 25;83:2,14,25;86:6; | 96:4 |
| **unchanged (1)** | **unlawful (1)** | **up-to-date (2)** | 98:13;103:21 | **way (36)** |
| 63:7 | 83:17 | 28:6;49:14 | **views (4)** | 17:17;21:3;23:17; |
| **unclear (1)** | **unless (11)** | **urge (1)** | 83:22;95:24;97:19; | 24:15;28:7;31:10; |
| 101:5 | 18:4;21:21;43:7; | 105:11 | 103:14 | 36:18;37:19,22; |
| **uncommon (1)** | 46:20;48:21,25; | **urged (1)** | **vindicate (2)** | 52:16;55:22;57:19; |
| 98:4 | 70:11;76:15;81:15; | 103:11 | 83:14;103:14 | 58:14;59:19;61:16, |
| **uncontested (6)** | 102:11;106:11 | **urgency (2)** | **virtual (2)** | 23;62:14,17,24; |
| 22:10;23:4;32:3,12; | **unlike (1)** | 46:12,19 | 43:22;73:16 | 63:15;67:11;68:7; |
| 35:25;47:22 | 99:1 | **urgent (1)** | **virtually (4)** | 70:25;71:10,10; |
| **uncontroversial (1)** | **unnecessary (2)** | 32:25 | 31:20;60:10;73:24; | 79:18;87:9,12,22; |
| 34:22 | 76:14;78:12 | **USC (1)** | 76:4 | 91:24;92:4;96:21; |
| **undeliverable (1)** | **unpack (2)** | 72:5 | **vis (2)** | 97:11,24;100:25; |
| 100:2 | 67:11;99:3 | **use (4)** | 100:18,19 | 105:18 |
| **under (39)** | **unpunished (2)** | 16:15;40:3;68:19; | **visit (1)** | **ways (2)** |
| | | | 40:9 | |

| | | | | |
|---|---|---|---|---|
| 60:8;73:6 | 106:17 | **years (2)** | **115 (4)** | 36:10,19 |
| **website (1)** | **wishes (9)** | 20:17;55:12 | 21:20;22:5;51:15; | |
| 56:10 | 21:17;22:23;26:13; | **Yep (4)** | 67:25 | **3** |
| **websites (1)** | 35:23;42:19;45:8; | 18:6;23:1,19;51:9 | **12th (1)** | |
| 56:8 | 47:1;49:13;92:13 | **yesterday (4)** | 39:8 | **3 (2)** |
| **week (4)** | **withdraw (1)** | 16:25;24:8;83:13; | **13th (1)** | 38:9;40:24 |
| 37:5;86:2;102:16; | 53:19 | 86:1 | 25:13 | **300 (1)** |
| 106:21 | **withdrawing (1)** | **York (6)** | **15 (1)** | 12:13 |
| **weeks (1)** | 53:10 | 10:5,14;11:14,23; | 61:5 | **300milliondollar (1)** |
| 36:10 | **withheld (1)** | 12:5;13:4 | **150 (1)** | 39:10 |
| **weigh (2)** | 50:21 | **Young (2)** | 47:24 | **3017 (1)** |
| 22:19;64:2 | **within (7)** | 29:21;50:1 | **1633 (1)** | 60:22 |
| **weighed (1)** | 23:10;25:6,24;27:4; | | 11:21 | **31st (1)** |
| 61:9 | 45:13;75:6;80:11 | **Z** | **1634 (1)** | 11:22 |
| **weight (2)** | **without (9)** | | 12:12 | **345 (4)** |
| 85:22;86:1 | 15:7;23:14;43:13; | **zero (4)** | **173 (1)** | 36:9,13,23;37:23 |
| **Weinburg (1)** | 46:13;48:2,12;52:2; | 72:22,22,22,24 | 45:24 | **345b (1)** |
| 29:19 | 57:25;76:11 | **Zoom (4)** | **174 (1)** | 37:4 |
| **well-known (2)** | **witness (2)** | 31:20;40:21;65:17; | 44:12 | **35,000 (1)** |
| 73:4;95:18 | 40:17,18 | 102:19 | **17th (2)** | 73:21 |
| **weren't (1)** | **wondering (2)** | | 37:5,8 | **350 (2)** |
| 24:11 | 54:13;105:16 | **1** | **189 (1)** | 57:1;78:6 |
| **what's (7)** | **word (2)** | | 43:20 | |
| 16:23;17:15;41:11; | 51:22;68:18 | **1 (7)** | **18th (2)** | **4** |
| 45:18;51:24,24;52:21 | **worded (1)** | 10:13;12:4;38:9; | 18:23;60:3 | |
| **Whereupon (1)** | 56:8 | 40:23;66:23;69:22; | **199 (1)** | **4 (5)** |
| 106:25 | **words (3)** | 101:14 | 25:13 | 41:15,16,19;43:8, |
| **whistling (1)** | 71:19;81:24;93:1 | **1.6305 (1)** | | 18 |
| 105:20 | **work (8)** | 73:9 | **2** | **40117 (1)** |
| **whole (5)** | 18:2;37:1;38:24; | **1:32 (1)** | | 34:3 |
| 37:25;45:2;57:12; | 63:25;75:6;80:1; | 106:25 | **2 (7)** | **49 (1)** |
| 68:22;80:1 | 82:25;105:1 | **100 (7)** | 23:25;27:8;38:9; | 34:3 |
| **who's (6)** | **worked (3)** | 26:8;62:10;69:25; | 40:23;60:6;70:9; | |
| 13:15;23:21;58:19; | 20:14;39:8;68:23 | 70:5;73:16;88:22; | 102:8 | **5** |
| 69:23;89:16;99:2 | **workforce (1)** | 89:16 | **20036 (1)** | |
| **whose (3)** | 73:20 | **10004 (1)** | 12:14 | **5 (6)** |
| 31:23;62:2;102:20 | **working (4)** | 12:5 | **2014 (1)** | 25:15;41:16,19; |
| **WILLIAM (2)** | 20:16;36:12;37:15; | **10016 (1)** | 50:5 | 43:8,18;48:5 |
| 11:16;14:13 | 49:19 | 11:14 | **2024 (1)** | |
| **willing (1)** | **works (3)** | **10019 (2)** | 57:23 | **6** |
| 98:17 | 62:14,17;85:7 | 10:5;11:23 | **21,000 (2)** | |
| **willingness (1)** | **world (3)** | **10036 (1)** | 102:20,22 | **6 (7)** |
| 35:17 | 57:4;83:13;103:15 | 10:14 | **216 (1)** | 26:22,25;41:16,19; |
| **WILLKIE (4)** | **worried (2)** | **105 (2)** | 33:23 | 43:8,18;47:22 |
| 10:2;13:18;74:13; | 89:2,2 | 54:19;70:21 | **224 (1)** | **604 (1)** |
| 91:9 | **worries (1)** | **105d (3)** | 75:19 | 75:7 |
| **Wilmington (3)** | 65:18 | 60:23;61:20;96:17 | **236 (1)** | **60606 (1)** |
| 11:12;14:10,14 | **worth (1)** | **105d2 (1)** | 34:9 | 11:6 |
| **win (1)** | 57:20 | 71:8 | **242 (1)** | **634 (13)** |
| 98:10 | **write (1)** | **105d2Bvi (2)** | 34:10 | 54:17,19;60:18,23; |
| **Wingardium (1)** | 104:23 | 70:11;72:5 | **243 (1)** | 61:21;68:16;71:2,4; |
| 18:11 | **writing (1)** | **108 (1)** | 16:7 | 72:1;94:15;96:18; |
| **wipe (1)** | 66:23 | 53:20 | **26th (1)** | 99:11,12 |
| 54:5 | **wrong (5)** | **11 (22)** | 60:19 | **6A7 (1)** |
| **wiped (1)** | 43:7;58:14;84:19; | 13:4,5;33:15;57:5; | **27th (1)** | 101:14 |
| 54:4 | 92:4;102:11 | 63:7;70:17,24;71:1,1, | 84:4 | |
| **wiping (1)** | **wrote (1)** | 2,6;72:5,5,9,11,15; | **29 (1)** | **7** |
| 98:4 | 71:22 | 73:5,11;76:15;77:11; | 64:7 | |
| **wisdom (1)** | | 94:11;104:16 | **29th (7)** | **7 (4)** |
| 83:3 | **Y** | **1125 (1)** | 19:16;64:12;83:18; | 41:16,22;66:5; |
| **wish (8)** | | 102:11 | 85:24;86:23;94:3; | 100:9 |
| 21:25;27:23;29:22; | **year (2)** | **114 (1)** | 101:25 | **71 (1)** |
| 32:16;44:3,4;74:9; | 37:13;106:23 | 31:19 | **2nd (2)** | 11:4 |

**Spirit Airlines**

**December 17, 2024**

**787 (1)**
  10:4
**795 (2)**
  56:25;78:5
**7th (1)**
  10:4

**8**

**8 (6)**
  33:24;41:16,22;
  66:5;81:24;100:9
**800,000 (1)**
  21:7

**9**

**90 (1)**
  11:13
**97 (1)**
  30:4
**98.1 (7)**
  19:6;53:14;62:10;
  69:24;70:4;88:20;
  89:10
**98T-1 (1)**
  45:1
**99.4 (1)**
  19:4
**99.8 (1)**
  19:3