1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

SPIRIT AIRLINES, INC.,                    Lead Case No.

      Debtor.                             24-11988-shl

- - - - - - - - - - - - - - - - - - - -x

ZIM AIRCRAFT CABIN SOLUTIONS, LLC,

      Plaintiff,                          Adv. Proc. No.

v.                                        21-04044shl

SPIRIT AIRLINES, INC.,

      Defendant.

- - - - - - - - - - - - - - - - - - - -x

        United States Bankruptcy Court

        300 Quarropas Street

        White Plains, New York


        February 13, 2025

        10:07 AM

B E F O R E:

HON. SEAN H. LANE

U.S. BANKRUPTCY JUDGE


ECRO:  ELECTRONICALLY RECORDED

2

1

2  Omnibus Hearing / Confirmation Hearing

3

4  Doc. #477 Notice Of Agenda

5

6  Doc. #270 (Confirmation Hearing) Disclosure Statement For The

7  Joint Plan Of Reorganization Of Spirit Airlines, Inc. And Its

8  Debtor Affiliates

9

10  Doc. #354 (Confirmation Hearing) First Amended Joint Chapter 11

11  Plan Of Spirit Airlines, Inc, And It's Debtor Affiliates

12

13  Doc. #358 (Seal Motion) Motion Of The Debtors For Entry Of An

14  Order Authorizing The Debtors To Redact Commercially Sensitive

15  Information

16

17  Doc. #7 (Cash Management) Motion Of The Debtor For Entry Of

18  Interim And Final Orders (I) Authorizing (A) The Debtors To

19  Maintain Their Existing Cash Management System, Bank Accounts,

20  And Business Forms, (B) The Debtors To Open And Close Bank

21  Accounts, And (C) Financial Institutions To Administer The Bank

22  Accounts And Honor And Process Related Checks And Transfers,

23  (II) Waiving Deposit And Investment Requirements, And (III)

24  Allowing Intercompany Transactions And Affording Administrative

25  Expense Priority To Post-Petition Intercompany Claims

3

1

2   Status Conference Re: Doc. #428 Amended Motion For Relief From

3   Stay Re: Steven P. Endres (Pro Se)

4

5   Adversary proceeding: 24-04044-shl Zim Aircraft Cabin

6   Solutions, LLC v. Spirit Airlines, Inc.

7   Pre-Trial Conference

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Michael Drake

21   eScribers, LLC

22   7227 North 16th Street, Suite #207

23   Phoenix, AZ 85020

24   (800) 257-0885

25   operations@escribers.net

4

1

2   A P P E A R A N C E S (All present by video or telephone):

3   DAVIS POLK & WARDELL LLP

4        Attorneys for Debtor

5        450 Lexington Avenue

6        New York, NY 10017

7

8   BY:   MARSHALL S. HUEBNER, ESQ.

9        BENJAMIN S. KAMINETZKY, ESQ.

10       DARREN S. KLEIN, ESQ.

11       CHRISTOPHER ROBERSTON, ESQ.

12       MARK J. TOBAK, ESQ.

13

14

15  DEBEVOISE & PLIMPTON LLP

16       Attorneys for Debtor

17       66 Hudson Boulevard

18       New York, NY 10001

19

20  BY:   JASMINE BALL, ESQ.

21

22

23

24

25

5

1

2   BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD LLP

3        Attorneys for ZIM Aircraft Cabin Solutions, LLC

4        230 North Elm Street

5        Suite 2000

6        Greensboro, North Carolina 27401

7

8   BY:   DANIEL ADAMS, ESQ.

9        CLINT MORSE, ESQ.

10

11

12   PILLSBURY WINTHROP SHAW PITTMAN LLP

13        Attorneys for BNP Paribas

14        31 West 52nd Street

15        New York, NY 10019

16

17   BY:   ANDREW V. ALFANO, ESQ.

18        MICHAEL G. BURKE, ESQ.

19

20

21

22

23

24

25

6

1

2  WHITE & CASE LLP

3       Attorneys for Apple Bank and Sabadell Bank

4       1221 Avenue of the Americas

5       New York, NY 10020

6

7  BY:   ANDREW ZATZ, ESQ.

8

9

10  WHITE & CASE LLP

11       Attorneys for Apple Bank and Sabadell Bank

12       200 South Biscayne Boulevard

13       Suite 4900

14       Miami, Florida 33131

15

16  BY:   ANDREA KROPP, ESQ.

17

18

19  SEWARD & KISSEL LLP

20       Attorneys for Wilmington Trust, National Association

21       One Battery Park Plaza

22       New York, NY 10004

23

24  BY:   GREGG BATEMAN, ESQ.

25       ANDREW MATOTT, ESQ.

7

1

2    ALSTON & BIRD LLP

3          Attorneys for Wilmington Trust

4          90 Park Avenue

5          New York, NY 10016

6

7    BY:   DYLAN CASSIDY, ESQ.

8          GERARD S. CATALANELLO, ESQ.

9          WILLIAM HAO, ESQ.

10

11

12   ALSTON & BIRD LLP

13         Attorneys for Wilmington Trust

14         350 South Grand Avenue

15         Suite 5100

16         Los Angeles, CA 90071

17

18   BY:   DOUGLAS J. HARRIS, ESQ.

19

20

21

22

23

24

25

8

 1

 2    MORRIS JAMES LLP

 3         Attorneys for Wilmington Trust Company, as Owner Trustee

 4         500 Delaware Avenue

 5         Suite 1500

 6         Wilmington, DE 19801

 7

 8    BY:   SIENA B. CERRA, ESQ.

 9         JASON S. LEVIN, ESQ.

10         ERIC J. MONZO, ESQ.

11

12

13    SCHULTE ROTH & ZABEL LLP

14         Attorneys for Wilmington Savings Fund Society, as DIP

15         Agent

16         919 3rd Avenue

17         New York, NY 10022

18

19    BY:   REUBEN E. DIZENGOFF, ESQ.

20

21

22

23

24

25

9

1

2  DAY PITNEY LLP

3       Attorneys for International Aero Engines

4       195 Church Street

5       15th Floor

6       New Haven, CT 06510

7

8  BY:   JOSHUA W. COHEN, ESQ.

9

10

11  MANIER & HEROD, P.C.

12       Attorneys for Arch Insurance Company

13       1201 Demonbreun Street

14       Suite 900

15       Nashville, TN 37203

16

17  BY:   CHRISTINA G. BURU, ESQ.

18       SCOTT C. WILLIAMS, ESQ.

19

20

21

22

23

24

25

10

1

2   VEDDER PRICE P.C.

3        Attorneys for GA Telesis & JSA International U.S.

4        Holdings, LLC

5        1633 Broadway

6        31st Floor

7        New York, NY 10019

8

9   BY:   MICHAEL J. EDELMAN, ESQ.

10

11

12   VEDDER PRICE P.C.

13        Attorneys for Aircraft Counterparties

14        222 North LaSalle Street

15        Chicago, IL 60601

16

17   BY:   BROOKE BLACKWELL, ESQ.

18

19

20    KATTEN MUCHIN ROSENMAN LLP

21        Attorneys for Perella Weinberg Partners

22        50 Rockefeller Plaza

23        New York, NY 10020

24

25   BY:   SHAYA ROCHESTER, ESQ.

11

1

2   UNITED STATES DEPARTMENT OF JUSTICE

3          Office of the United States Trustee

4          1 Bowling Green

5          New York, NY 10004

6

7   BY:   SHARA C. CORNELL, ESQ.

8          ANNIE WELLS, ESQ.

9

10

11   UNITED STATES DEPARTMENT OF JUSTICE

12          Office of the United States Trustee

13          5 Post Office Square

14          Boston, MA 02109

15

16   BY:   ERIC K. BRADFORD, ESQ.

17

18

19   SUGARMAN SUSSKIND BRASWELL HERRERA PA

20          Attorneys for AFA-CWA

21          150 Alhambra Circle

22          Suite 725

23          Coral Gables, FL 33134

24

25   BY:   D. MARCUS BRASWELL, JR., ESQ.

12

1

2   ARNOLD & PORTER KAYE SCHOLER LLP

3         Attorneys of United States Treasury

4         70 West Madison

5         Suite 4200

6         Chicago, IL 60602

7

8   BY:   MARJORIE A. CARTER, ESQ.

9

10

11  ARNOLD & PORTER KAYE SCHOLER LLP

12        Attorneys for United States Treasury

13        601 Massachusetts Avenue

14        Washington, DC 20001

15

16  BY:   ROSA EVERGREEN, ESQ.

17

18

19  SEHAM, SEHAM, MELTZ & PETERSEN, LLP

20        Attorneys for Aircraft Mechanics Fraternal Association

21        199 Main Street

22        7th Floor

23        White Plains, NY 10601

24

25  BY:   GEORGE DIAMANTOPOULOS, ESQ.

13

1

2  MORRIS NICHOLS ARSHT & TUNNELL LLP

3        Attorneys for Interested Party

4        1201 North Market Street

5        16th Floor

6        Wilmington, DE 19899

7

8  BY:   ROBERT DEHNEY, ESQ.

9        ECHO QIAN, ESQ.

10        JAKE RACHBERG, ESQ.

11

12

13  BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC

14        Attorneys for Brasfield & Gorrie, L.L.C.

15        3414 Peachtree Road

16        Suite 1500

17        Atlanta, GA 30326

18

19  BY:   KATHLEEN G. FURR, ESQ.

20

21

22

23

24

25

14

1

2   KAPLAN KIRSCH LLP

3        Attorneys for Allegheny County Airport Authority

4        1634 I Street Northwest

5        Suite 300

6        Washington, DC 20006

7

8   BY:   ADAM ELI KOTEEN GERCHICK, ESQ.

9        ERIC T. SMITH, ESQ.

10

11

12   ARENTFOX SCHIFF LLP

13        Attorneys for Dania Live 1748 II, LLC, Kimco Realty

14        Corporation

15        1301 Avenue of the Americas

16        42nd Floor

17        New York, NY 10019

18

19   BY:   BRETT D. GOODMAN, ESQ.

20

21

22

23

24

25

15

1

2   WILLKIE FARR & GALLAGHER LLP

3         Attorneys for Official Committee of Unsecured Creditors

4         787 7th Avenue North

5         New York, NY 10019

6

7   BY:   TODD GOREN, ESQ.

8         BRETT H. MILLER, ESQ.

9

10

11   BURR & FORMAN LLP

12         Attorneys for Discover Bank

13         420 20th Street North

14         Suite 3400

15         Birmingham, AL 35203

16

17   BY:   JAMES HAITHCOCK, ESQ.

18

19

20   DUANE MORRIS LLP

21         Attorneys for

22         30 South 17th Street

23         Philadelphia, PA 19103

24

25   BY:   RYAN SPENGLER, ESQ.

16

1

2   MILBANK LLP

3       Attorneys for Interested Party

4       55 Hudson Yards

5       New York, NY 10001

6

7   BY:   ANDREW HARMEYER, ESQ.

8       TYSON LOMAZOW, ESQ.

9       ALEX MILLER, ESQ.

10

11

12   CITY OF PHILADELPHIA

13       Attorneys for City of Philadelphia

14       1401 JFK Boulevard

15       5th Floor

16       Philadelphia, PA 19102

17

18   BY:   MEGAN HARPER, ESQ.

19

20

21

22

23

24

25

17

1

2  MARKOWITZ, RINGEL, TRUSTY & HARTOG, P.A.

3        Attorneys for AGI Ground LLC

4        101 Northeast Third Avenue

5        Suite 1210

6        Ft. Lauderdale, FL 33301

7

8  BY:   ROSS R. HARTOG, ESQ.

9

10

11  U.S. SECURITIES & EXCHANGE COMMISSION

12        Attorneys for U.S. Securities & Exchange Commission

13        100 Pearl Street

14        Suite 20-100

15        New York, NY 10004

16

17  BY:   NEAL R. JACOBSON, ESQ.

18

19

20

21

22

23

24

25

18

1

2    OFFICE OF THE CALIFORNIA ATTORNEY GENERAL

3         Attorneys for California Department of Justice

4         300 South Springs Street

5         Suite 1702

6         Los Angeles, CA 90013

7

8    BY:   MATTHEW C. HEYN, ESQ.

9

10

11   FROST BROWN TODD LLP

12        Attorneys for FTI Consulting, Inc.

13        301 East Fourth Street

14        Cincinnati, OH 45202

15

16   BY:   JOY KLEISINGER, ESQ.

17

18

19   PAUL HASTINGS LLP

20        Attorneys for Ad Hoc Group of Convertible Noteholders

21        200 Park Avenue

22        Metlife Building

23        New York, NY 10166

24

25   BY:   MATTHEW LASKOWSKI, ESQ.

19

1

2  PAUL HASTINGS LLP

3       Attorneys for Ad Hoc Group of Convertible Noteholders

4       71 South Wacker Drive

5       45th Floor

6       Chicago, IL 60606

7

8  BY:   GEOFFREY KING, ESQ.

9        MATTHEW L. WARREN, ESQ.

10

11

12  NORTON ROSE FULLBRIGHT US LLP

13       Attorneys for Credit Agricole

14       1301 Avenue of the Americas

15       New York, NY 10019

16

17  BY:   DAVID A. ROSENZWEIG, ESQ.

18        CATHY SHU, ESQ.

19

20

21

22

23

24

25

1

2    TROUTMAN PEPPER LOCKE LLP

3         Attorneys for Phillips 66

4         601 Poydras Street

5         Suite 2660

6         New Orleans, LA 70115

7

8    BY:   BRADLEY KNAPP, ESQ.

9

10

11

12   AKIN GUMP STRAUSS HAUER & FELD LLP

13         Attorneys for AHG of Senior Secured Noteholders

14         1 Bryant Park

15         New York, NY 10036

16

17   BY:   GABRIEL KORN, ESQ.

18         ABID QURESHI, ESQ.

19         JASON P. RUBIN, ESQ.

20         MICHAEL S. STAMER, ESQ.

21         KEVIN ZUZOLO, ESQ.

22

23

24

25

1

2    AKIN GUMP STRAUSS HAUER & FELD LLP

3         Attorneys for AHG of Senior Secured Noteholders

4         2001 K Street Northwest

5         Washington, DC 20006

6

7    BY:   EMMA SANZOTTA, ESQ.

8         BLAINE SCOTT, ESQ.

9

10

11   BARNES & THORNBURG LLP

12        Attorneys for Metropolitan Airports Commission

13        225 South Sixth Street

14        Suite 2800

15        Minneapolis, MN 55402

16

17   BY:   CONNIE A. LAHN, ESQ.

18

19

20   CLIFFORD CHANCE US LLP

21        Attorneys for Keystone 9 Limited

22        Two Manhattan West

23        New York, NY 10001

24

25   BY:   MICHELLE M. MCGREAL, ESQ.

22

1

2    SCHULTE ROTH & ZABEL

3          Attorneys for Wilmington Savings Fund Society, FSB as DIP

4          Agent

5          919 3rd Avenue

6          New York, NY 10022

7

8    BY:    DOUGLAS S. MINTZ, ESQ.

9

10

11   HOLLAND & KNIGHT LLP

12         Attorneys for Aircraft Lessors

13         787 Seventh Avenue

14         31st Floor

15         New York, NY 10019

16

17   BY:    BARBRA R. PARLIN, ESQ.

18

19

20

21

22

23

24

25

23

1

2   HOLLAND & KNIGHT LLP

3        Attorneys for Various Aircraft Lessors

4        1722 Routh Street

5        Suite 1500

6        Dallas, TX 75201

7

8   BY:   BRIAN SMITH, ESQ.

9

10

11   STEVENS & LEE, P.C.

12        Attorneys for STS Aviation Group, Inc.

13        485 Madison Avenue

14        20th Floor

15        New York, NY 10022

16

17   BY:   CONSTANTINE D. POURAKIS, ESQ.

18

19

20

21

22

23

24

25

24

1

2   STINSON LLP

3        Attorneys for Lumen Technologies, Inc.

4        1144 15th Street

5        Suite 2400

6        Denver, CO 80202

7

8   BY:   LUCAS SCHNEIDER, ESQ.

9

10

11   PRYOR CASHMAN LLP

12        Attorneys for Computershare Trust Company, National

13        Association

14        7 Times Square

15        New York, NY 10036

16

17   BY:   MATTHEW W. SILVERMAN, ESQ.

18        JAKE STARR, ESQ.

19

20

21

22

23

24

25

25

1

2   MOORE AND VAN ALLEN PLLC

3        Attorneys for Wilmington Trust Company, as Owner Trustee

4        1000 North Tryon Street

5        Suite 4700

6        Charlotte, NC 28202

7

8   BY:   HALEE SMITH, ESQ

9        ZACHARY SMITH, ESQ.

10

11

12  BALLARD SPAHR LLP

13        Attorneys for Masergy Communications, Inc.

14        919 North Market Street

15        11th Floor

16        Wilmington, DE 19801

17

18  BY:   MARGARET A. VESPER, ESQ.

19

20

21  ALSO PRESENT:

22        MICHAEL ADAMS, Graham Capital

23        MENACHEM BRODY

24        JOHN BUTLER, Nationwide

25        ROBERT CARUSO, Alvarez & Marsal

1

2    ALSO PRESENT:

3         FRED CROMER, Alvarez & Marsal

4         JOSHUA ELLISON, Air Line Pilots Association

5         STEVEN P. ENDRES, Exhaustless Inc.

6         FRANCISCO FORNELL, Balyasny Asset Management L.P

7         DEKARLOS GUNN

8         STEPHENIE KJONVEDT, Epiq

9         CEPHAS KNAUSENBERGER, Spirit Airlines employee

10        JOSEPH G. KOSINSKI, Kore Capital

11        DILLON KRENZ

12        PRATEEK KUMAR

13        CRAIG MCBETH, Judson LLC

14        SCOTT MCCABE, Seaport Global

15        CHRIS MCGILL

16        BRUCE MENDELSOHN, Perella Weinberg Partners

17        ANDREW J. MILLER, Kore Capital

18        RYAN P. MULLER, Air Lines Pilots Association

19        DAVID SHERIDAN, Spirit Airlines employee

20        IAN SILVERBRAND, Goldman Sachs

21        DIEGO SIMONIAN, Perella Weinberg Partners

22        JOSEPH TISCH, Cyrus Capital

23        MICHAEL J. UNGER, Equity holder

24

25

1           P R O C E E D I N G S

2           THE COURT:  Good morning.  Please be seated.  Thank

3    you.  Just waiting for the magical green flag to speak, which

4    was that we're being recorded.

5           So good morning, all.  I appreciate you all being

6    here.  I know that there's -- I did see there was a email about

7    people being here versus not being here.  I understand based on

8    my prior life the concerns related to that.  I can certainly

9    promise that I will give equal and complete weight to the

10   content of everything that everybody says, regardless of where

11   anyone is located and so just to try to allay any concerns.

12          And so let's start as we normally do for this -- for

13   any hearing.  And again, we're here for Spirit Airlines, Inc.,

14   Chapter 11 case for an omnibus hearing, including a

15   confirmation hearing.  And we'll start with appearances.

16          So let me find out who's here on behalf of the debtor.

17          You're on mute.

18          MR. HUEBNER:  Good morning, Your Honor.  Can I be

19   heard clearly?  It's Marshall Huebner of Davis Polk for the

20   debtors.

21          THE COURT:  Yes.  All right.  Good morning.

22          And let me find out who's here on behalf of the

23   official committee.

24          MR. MILLER:  Good morning, Your Honor.  You've got

25   Brett Miller and Todd Goren from Willkie Farr & Gallagher on

1   behalf of the official committee of unsecured creditors.

2          THE COURT:  All right.  Good morning.

3          And let me find out who is here on behalf of the SEC.

4          MR. JACOBSON:  Good morning, Your Honor.  Neal

5   Jacobson on behalf of the Securities and Exchange Commission.

6          THE COURT:  All right.  Good morning.

7          And on behalf of the United States Trustee's office?

8          MS. CORNELL:  Good morning, Your Honor.  Shara Cornell

9   on behalf of the office of the United States Trustee.

10          THE COURT:  All right.  Good morning.

11          Can everybody hear her okay?  All right.  I'm seeing a

12   sea of nodding heads.  Thank you for that.

13          And let me find out who is here on behalf of the ad

14   hoc group of convertible noteholders.

15          MR. KING:  Good morning, Your Honor.  Geoffrey King of

16   Paul Hastings on behalf of the ad hoc group of convertible

17   noteholders.  And I'm joined as well by my partner, Matt

18   Warren, who's on the phone as well.

19          THE COURT:  All right.  Good morning.

20          And on behalf of the ad hoc group of senior secured

21   noteholders?

22          MR. RUBEN:  Good morning, Your Honor.  Jason Ruben

23   from Akin Gump Strauss Hauer & Feld.  And I'm joined today by

24   my partner, Michael Stamer and Abid Qureshi.

25          THE COURT:  All right.  Good morning.

1      I know there are a number of parties who filed papers

2  relating to the request for relief that are on for today, but

3  whose issues have been resolved?  I imagine some of them may be

4  here.  Some of them may not be here.  I'm not trying to shut

5  anybody out.

6      So obviously, if you're here and you want to make an

7  appearance, great.  But I imagine a lot of those folks are

8  going to not be active participants.  And that's fine.  So with

9  that said, let me ask if any of those folks want to make an

10  appearance now.

11      And I do see someone from ZIM Aircraft Cabin

12  Solutions.

13      MR. MORSE:  Good morning, Your Honor.  Clint Morse for

14  ZIM Aircraft.

15      We're really here for the second hearing, which is in

16  the adversary, the pre-trial conference.  But that's -- so we

17  do not plan to do any -- to make any statements in the

18  confirmation hearing.

19      THE COURT:  All right.  Good morning.  Thank you very

20  much.

21      And so with that, I'll turn it open to anybody else

22  who would like to make an appearance at this time.

23      MR. HEYN:  Good morning, Your Honor.  Deputy Attorney

24  General Matt Heyn on behalf of the California Attorney General.

25      THE COURT:  All right.  Good morning.  Good to have

30

1  you here.

2           Anyone else?

3           All right.  So it seems to be the group for the

4  moment.  If for some reason someone needs to chime in later,

5  that's perfectly fine.  You'll just make your appearance at

6  that time.

7           And since we are primarily on Zoom, to the extent that

8  technology does not cooperate -- and we've all had that

9  experience -- if you can't hear anything that's going on in the

10  courtroom, please somebody signal.  I've seen lawyers just

11  wildly gesture, whatever works to get attention.  And we'll do

12  the best to work our way through it.  We all have had lots of

13  practice on that during the COVID pandemic at its height.  And

14  likewise, if we have any problems hearing any of you, we will

15  make sure to let you know.

16          And with that, I do have the amended agenda.  Give me

17  a second to just pull it out.  And it's at docket 487.  And

18  give me one minute to just -- since I'm making piles -- to

19  separate out my materials into a few piles for ease of

20  reference for the argument.  And give me one second.  And I

21  should be in the position to move forward.

22          All right.  With that, I'll turn it over to debtors

23  counsel to start us off for today's hearing.

24          MR. HUEBNER:  Thank you very much, Your Honor.  Good

25  morning.

31

1          For the record --

2          THE COURT:  Mr. Huebner, I will say your voice is a

3  little bit lower than normal, so maybe get a little bit closer

4  to that microphone or have someone turn the volume up.

5          MR. HUEBNER:  Sure.  Is this better, Your Honor?

6          THE COURT:  About the same.  I feel like I'm at the

7  eye doctor.  About the same.

8          MR. HUEBNER:  Yeah, we all know what that's like.

9  I'll lean in a little bit more and try to speak up a little bit

10  more.  Is that --

11          THE COURT:  Okay.

12          MR. HUEBNER:  Is this better?

13          THE COURT:  Yeah.

14          MR. HUEBNER:  Okay.  Good morning, Your Honor.

15          Again, for the record, a slightly louder Marshall

16  Huebner of Davis Polk on behalf of Spirit Airlines, Inc.,

17  debtor affiliates.  With me today are my colleagues Darren

18  Klein, Ben Kaminetzky, Marc Toback, Chris Robertson.  Given the

19  number of items on the docket for later of the hearing -- and

20  while he is not speaking today, as Your Honor probably has

21  figured out, we're all mostly here today just to do what Mr.

22  Melcer tells us to do.  So hopefully, we will not screw it up.

23          Your Honor, we are delighted to be here today seeking

24  confirmation of Spirit's plan of reorganization and final

25  approval of its disclosure statement along with a few other

32

1  miscellaneous items.

2        A few housekeeping matters before we dive in.  The

3  debtors have filed several declarations as evidentiary support

4  for the matters before us today, including Mr. Cromer, the CFO,

5  at docket 391; Mr. Robert Caruso, managing director at Alvarez

6  & Marsal at docket 392; Mr. Diego Simonian, a partner at

7  Perella Weinberg Partners, at docket 393; Mr. Bruce Mendelsohn,

8  also a Perella partner at 394; the declaration of Ms. Stephenie

9  Kjontvedt, which for the record is spelled K-J-O-N, T like

10 Thomas, V like Victor, E, D like dog, T like Thomas -- it would

11 not be obvious to an American, although I guess if you lived in

12 Norway, you'd probably get it on the first shot -- with Epiq,

13 regarding this solicitation and tabulation of ballots at docket

14 452; and the second supplemental declaration of Mr. Cromer with

15 respect to the cash management motion at docket 475.

16       If there are no objections, Your Honor, I would

17 propose to move each of these declarations into evidence.  I

18 know for the record that each of the declarants is in the

19 virtual courtroom today and available for cross-examination

20 should the Court have any questions.  No party requested any

21 opportunity to cross-examine any of the witnesses.

22       Ms. Cornell advised that she did not plan to, although

23 she did reserve her right as to cash management, although I'm

24 hoping she did not.  So we would be grateful if anyone,

25 including Ms. Cornell, has a new plan to cross the witness

33

1    would make themselves known.  Otherwise, we'd request they be

2    admitted into evidence.

3           THE COURT:  All right.  Thank you very much.

4           So let me ask first if there's anyone on the Zoom

5    hearing who wishes -- who has any objection to the Court

6    receiving all of these declarations for purposes of today's

7    proceeding or who has any wish to cross-examine any of the

8    witnesses.

9           It's unclear exactly how long to wait.  I think I've

10   waited long enough, and I don't hear any party who has any

11   objection or who wishes to be heard.  And since the -- I

12   understand there are only two live objections to confirmation.

13   And one of them is the SEC, who's on the phone.  I just want to

14   make sure --

15          Mr. Jacobson, I just want to specifically confirm that

16   you don't have any objection or desire to cross-examine the

17   witness -- any of these witnesses.

18          MR. JACOBSON:  That is correct, Your Honor.

19          THE COURT:  Okay.  Thank you very much.

20          And so with no objection on the Zoom and no desire to

21   cross-examine the witness, I'll turn to the U.S. Trustee's

22   Office, who's in the courtroom, to ask the U.S. Trustee's

23   Office views.

24          MS. CORNELL:  Shara Cornell on behalf of the Office of

25   the United States Trustee.  No objection, Your Honor.

34

1          THE COURT:  All right.  So the U.S. trustee does not

2   have any objection.  And so with that, I will receive all the

3   declarations that have been so identified and contained in the

4   binders that I received and/or identified on the amended

5   agenda.  I'll receive them all for purposes of today's

6   proceeding, which includes a number of matters, most notably

7   final approval of disclosure statement, confirmation, and

8   motion practice.  All right.  Those items are on the docket.

9          By the way, I will say just one thing.  I believe the

10  declaration of Mr. Simonian at docket 393 referenced a

11  valuation analysis that was attached to disclosure statements.

12  And it mentions it as Exhibit C.  I think it's actually Exhibit

13  D.  So I just want to -- sorry, my obsessive-compulsive nature

14  has come out, but it's pretty clear what it's referencing.  So

15  I think there's no issue there.  But I just want to mention

16  that for the record just so it's clear that we're all on the

17  same page.

18          MR. HUEBNER:  You're the greatest.  I'll just leave it

19  at that.

20          Your Honor, turning then to the --

21          THE COURT:  I need more hobbies.  I'll just leave it

22  at that.

23          MR. HUEBNER:  That's true of almost everyone in this

24  conference room.  Just say that for the record.

25          Your Honor, these Chapter 11 cases have been an

35

1   extraordinary and overwhelming success and, in fact, are an

2   exemplar of how our bankruptcy system is supposed to work.

3          Spirit is the seventh largest airline in the country.

4   It reported close to 9.5 billion dollars in liabilities for the

5   fiscal quarter preceding the petition date.  Despite its size

6   and complexity, we are here today to confirm a 99.99 percent

7   consensual plan only eighty-seven days since the petition date.

8          As Your Honor knows as well as anyone, airline

9   bankruptcies are exceedingly complex and usually take years and

10  cost tens or hundreds of millions of dollars in fees.

11         In dramatic contrast, the speed and efficiency of and

12  the universal consensus reflected in these cases, which were

13  not prepackaged cases, is virtually unprecedented, if not

14  actually unprecedented.  It permeates every single aspect of

15  these cases.

16         Other than the several prior -- every single one of

17  them overruled -- objections of the United States Trustee, not

18  a single party in this case brought a single objection to this

19  Court on a single matter since the day we filed in November.

20  But for the United States Trustee, there would not have been

21  one minute of contested oral argument on anything in the

22  entirety of these Chapter 11 cases that are swiftly moving to

23  completion to recapitalize the country's seventh biggest

24  airline carrier.

25         Votes on the plan have, of course, come in.  And the

36

1    grand total of the votes to reject the plan is four.  Four

2    creditors, who hold .01 percent of all impaired claims, voted

3    against the plan.  We're as close to 100 percent as one could

4    possibly get, $1,503,000,004.17 in favor and $176,457.83 not.

5            Moreover, Your Honor, to my knowledge, we are the

6    first debtors ever to use and follow General Order 634 and the

7    first mega case to adhere to the new SDNY confirmation order

8    guidelines.  Our order is 19 pages instead of 119 or 219.  And

9    it actually began as ten, but then other people, of course, had

10   additions they could not live without.

11           THE COURT:  Well, I will say, as I was reading that, I

12   knew that somewhere Judge Gerber of this Court was smiling.  I

13   think that was perhaps his great white whale for a number of

14   years to try to get, although not exclusively.  So it was

15   noteworthy, the size of the confirmation order.

16           MR. HUEBNER:  Well, and Your Honor, honestly, it's a

17   very important point because I and others at others at Davis

18   Polk, and of course many others as well, work very hard on the

19   rules, committees, and other working groups that Judge Glen and

20   others have convened over the years.  And it's actually deeply

21   gratifying.  And it should be gratifying to everybody to see

22   those orders in action, cutting down on the paperwork, cutting

23   down on the workload, saving creditors a lot of time and money,

24   and enabling higher recoveries, and frankly, cutting down the

25   extraordinary demands we so often make on judges and their

1  chambers.

2      So we do regrettably have to address the Government's

3  limited objections, but we also cannot allow that to detract

4  from what we have here today:  an overwhelming, incredible

5  success and a ringing endorsement of our bankruptcy system at

6  its best.

7      To recap --

8      THE COURT:  Just to -- and I apologize if I'm jumping

9  out of order.  You're getting to this.  But I know there are a

10  number of planned supplements and things to fill out the

11  record.  So I assume at some point you're going to do that

12  again.  And I'll leave it to you.

13      MR. HUEBNER:  Yes.

14      THE COURT:  I just wanted to flag it.

15      MR. HUEBNER:  Yeah.  So by the time you count to

16  fourteen, I will get to them with docket references.

17      So Your Honor, what does the plan, in essence, mean?

18  700 million dollars of senior secured notes and 140 dollars

19  million of convertible notes are being exchanged into 840

20  million dollars of new exit secured notes.  All of the

21  remaining senior secured notes and convertible notes,

22  approximately 795 million dollars, are being equitized.  There

23  is a fully backstopped equity rights offering to which the

24  reorganized debtors will raise 350 dollars million to further

25  support the reorganized balance sheet.

38

1          There is a new exit revolving credit facility.  There

2     are zero rejected contracts, zero.  And 100 percent of general

3     unsecured creditors arrive through these cases entirely

4     unimpaired.  Regrettably, as I will talk about in a little bit

5     more detail in a few minutes, the equity interest in Spirit are

6     being canceled.

7          With respect to Your Honor's question about plan

8     supplements, over the last month, the debtors have also filed

9     multiple plan supplements, including docket numbers 357, 471,

10    483, and 484.  Those include, among other things, the exit

11    notes indenture, documentation relating to the exit revolving

12    credit facility, the registration rights agreement, the warrant

13    agreements, the new organizational documents, and the

14    1129(a)(5) disclosures.  So those were worked out by all the

15    parties and put on the docket as is appropriate.  And they are

16    there for all to see.

17         Turning to confirmation, Your Honor, there is not a

18    single unresolved objection from even a single economic

19    party-in-interest.  The objections of the following parties

20    have all been formally withdrawn:  ZIM Aircraft Cabin

21    Solutions, LLC; The Texas Taxing Authority; Oracle America,

22    Inc.; the City of Philadelphia; Masergy Communications, Inc.;

23    and the Los Angeles World Airport.

24         In addition, Your Honor, the objection of the Dallas-

25    Fort Worth airport has been resolved through the inclusion of

39

1   language in the proposed confirmation order that re-clarifies

2   that cure costs will continue to be paid in the ordinary course

3   of business and the executory contracts will be handled as

4   though these Chapter 11 cases had not commenced.

5           At the request of the airport consortium that appeared

6   earlier in the case, we represent that Spirit will not be

7   rejecting any contracts between confirmation and effectiveness

8   of the confirmed plan.  This is, of course, pretty obvious

9   since there is no class in which rejection claims could go, so

10  there would be no home to actually fit the rejected contract.

11          I also think I may have said on one phone call that we

12  would confirm at the confirmation hearing that the LA Airport

13  had successfully opted out.  Confirmed.

14          We would like to thank all those creditors for their

15  constructive approach in resolving their objections.  Although

16  we were being paid in cash in full and you're prepared,

17  hopefully, it should be resolvable.

18          In addition to the overwhelming votes in favor of the

19  plan -- 99.99 percent in amount of all claims voting to

20  accept -- representatives for the senior secured notes, the

21  convertible notes, and the Unsecured Creditors' Committee have

22  also filed statements in support of the plan.  And as the Court

23  knows, those two groups represent over ninety-eight percent of

24  all impaired creditors in the case.

25          The only remaining objections to the plan, as we will

40

1  discuss today, are the unfortunate single-issue objections from

2  the U.S. Trustee and the SEC, parties who not only have no

3  economic stake in these cases but are also carved out entirely

4  from their releases.  More on that in a few minutes.

5          Your Honor, before turning to the agenda, I do think

6  it is appropriate to briefly address Frontier.  Your Honor may

7  have either seen some of the stockholder letters or perhaps the

8  news articles about the 8-Ks issued by both Spirit and Spirit

9  and Frontier, where Frontier asserted that it offered Spirit's

10 stakeholders more value than provided for under our plan.

11         Unfortunately -- and I and so very many others wish it

12 were otherwise -- that is simply not the case.  Frontier's

13 February 4 offer consisted of 400 million dollars of second-

14 lien debt, slated to be behind a much larger of new first-lien

15 debt, and nineteen percent of the equity of the pro forma

16 company.  Frontier took the position that these two components

17 were together worth 1.785 billion dollars, which, in fact, is

18 more than our impaired debt.

19         Spirit's February 7th counter was reasonable,

20 straightforward, eminently fair, and, in fact, quite elegant.

21 In essence, Spirit accepted the quantum of value Frontier

22 repeatedly publicly stated it would offer but merely put them

23 to their proof.  We changed the debt equity split somewhat from

24 400 million of second lien to 600 million of first lien, and

25 then with the lower equity piece on which various parties had

41

1   very different assessments of value, we said let's explore and

2   agree on a reasonable market-based mechanism to ensure nothing

3   more than that we are getting, in fact, the 1.185 billion in

4   equity value purportedly on offer.

5            Frontier could and should simply have said yes.  Maybe

6   they could have pushed for 450 or 500 of debt instead of 600,

7   increasing the equity component in like amount.  But if their

8   proposal was really at the value level that they repeatedly

9   announced was on offer, a level that we accepted, we should

10   have been able to quickly work out the market-based mechanism

11   to ensure that Spirit got the promised equity value.  This is,

12   in fact, relatively commonplace in M&A and is, in essence, all

13   we had asked for.  Instead of responding at all, Frontier

14   essentially walked away, not budging on a single issue.  All

15   they did was resubmit the last proposal.  They didn't move a

16   single dollar or a term or a comma.  And they refused every

17   overture to engage with us to explore a mutually agreeable I-

18   cut-you-choose valuation mechanism to do nothing more than

19   ensure that we got the benefit of the purportedly proffered

20   bargain, nor did they address, among other things, closing

21   risks, including antitrust approval, or the funding of what

22   would be a far longer and uncertain Chapter 11 cases while we

23   all work to get the deal documented, approved by the

24   regulators, and closed.

25            This was very sad and quite unfortunate as there is so

42

1    much logic in the combination of these two carriers.  I and we

2    would have loved nothing, nothing more than to have canceled

3    this confirmation hearing and replaced it with an announcement

4    that we had reached agreement with Frontier that, in fact, paid

5    off creditors and, in fact, even provided a non-trivial

6    recovery for equity.

7          But alas, it was not to be.  Frontier walked away in

8    November and then again in February.  And it was certainly not

9    for lack of very intense engagement on our side.  But the 400

10   million dollars in second-lien debt and the fixed number of

11   shares actually offered by them fell far, far short of

12   rendering us solvent and are, as separately determined by our

13   independently -- by our independent and experienced board of

14   directors, that both sets of bondholders markedly inferior to

15   the plan up for confirmation today.

16         And so here we are with the unfortunate outcome that,

17   while creditors are doing fine, in most cases unimpaired and in

18   all cases getting the benefit of the bargains they had struck,

19   it is unavoidable that, because of the absolute priority rule,

20   there can and will be no recovery for equity.  What we do have

21   is exquisite, hyper-efficient execution on a plan that offers

22   far more certainty and value to our stakeholders than

23   Frontier's twice repeated last offer.

24         With that brief framing summary, Your Honor, there are

25   five matters on the agenda today.  One is final approval of the

43

1    disclosure statement and confirmation of the plan.  Two is an

2    uncontested sealing motion.  Three is final approval of our

3    cash management motion, which, despite the fact that today is

4    the confirmation hearing, the trustee is still objecting to.

5    Four is a status conference regarding the ex-parte motion of

6    Stephen P. Andres filed a docket number 428.  And five is the

7    pre-trial conference for the ZIM Aircraft Cabin Solutions

8    adversary proceeding.

9         Your Honor, if it pleases the Court, given that

10   confirmation is uncontested but for one purely legal issue, we

11   will rest entirely on our papers, including our confirmation

12   brief at docket 390, for everything else.  And I would propose

13   jumping right in to the one contested issue, which is the opt-

14   out and (indiscernible).

15        THE COURT:  All right.  I just had one thing I think

16   would be helpful to address.  Over the course of time, you had

17   mentioned some letters from shareholders or issues that

18   shareholders might have in terms of tracking what's going on

19   with Frontier.  And on that, I would just offer this

20   observation based on prior airline cases.

21        When there's been discussions of a merger, there

22   either is a proposed merger or there isn't.  In some senses, we

23   live in very much a binary world.  That certainly came up in

24   the American Airlines case as to what was going to happen or

25   not going to happen.  And until there actually is a proposed

44

1    merger, there isn't.  And so I just mention that to folks

2    because, as you mentioned, there are a lot of steps along the

3    way, boxes that need to be checked, issues that need to be

4    addressed, including regulatory approvals.

5            So as is clear in other airline cases, however, an

6    airline will continue to assess all of its business

7    opportunities going forward.  That's what airlines and

8    companies do.  But for purposes of today, just want to add that

9    thought.

10           But even aside from that, there have been from time to

11   time, shareholder letters that have been submitted,

12   particularly early on in the case, that I think are really

13   getting to the valuation of the enterprise in terms of equity

14   being wiped out.  I didn't see any objection that was filed by

15   any for purposes of today.  But certainly, those letters are on

16   the docket even if they were filed right after the case was

17   filed.  And so I don't know if there's anything you'd want to

18   say in terms of addressing that vis a vis valuation for

19   purposes of the record and any such shareholders who might be

20   listening in.

21           MR. HUEBNER:  Sure, Your Honor.  I actually think I

22   addressed this briefly either at the last hearing or the one

23   before.  But given that this is hopefully likely the final

24   hearing in this case, I'm happy to address it briefly again,

25   especially now that we have the factual record in front of us

45

1    and admitted into evidence.

2          The job of Spirit, of its board, of its management

3    team, and its advisors is to maximize the value of the

4    enterprise and to get as many people as high a recovery as is

5    humanly possible.  The board's duties unquestionably were fully

6    aligned with that of shareholders, which was to do everything

7    possible to procure enough value from whatever source possible

8    to pay creditors in full and leave shareholders in place.

9          Unfortunately, that was simply not possible.  As Your

10   Honor knows from the first-day declaration, we canvased the

11   world and spent several years in potential M&A processes and

12   changes in the industry and headwinds facing all ULCCs.  And

13   obviously, the extraordinary success of the larger U.S.

14   carriers unfortunately put us in an increasingly precarious

15   financial situation.

16         Now, the confirmation record is before the Court and

17   on the public docket for all to see.  We have the testimony of

18   various outside experts and from the company that relate to

19   valuation, in particular Mr. Simonian's declaration, which

20   addresses the valuation, and the disclosure statement, of

21   course, also contains a liquidation analysis.

22         As I said before -- maybe I said it too obliquely --

23   we would have loved absolutely nothing more than to have

24   reached agreement with Frontier at the levels they said were on

25   offer, which would have been enough to get equity -- what I

46

1   call a nontrivial recovery.  It wasn't massive, but it was not

2   trivial either.

3         But unfortunately, that deal, which was the only

4   remaining path to avoid the absolutely necessary, extremely

5   important and value-maximizing reorganization actually before

6   the Court today, simply went away again as it did in November

7   when we asked for a market mechanism merely to validate that we

8   were going to get the value and equity that was proffered,

9   because the opinion of our experts and our board and our

10  bankers was that the actual number of shares proffered, coupled

11  with the 400 million dollars in second-lien debt, fell hundreds

12  of millions of dollars shy of the amount necessary to put

13  equity back in the money and enable us to avoid what was an

14  absolutely laudatory goal that everybody was trying to achieve,

15  which was essentially reinstating equity and giving them the

16  recovery as well.  But that deal just isn't here.  Whether it

17  is or was, I don't know.  But I know that it's not now.

18        And so in order to save the airline for the traveling

19  public, for its 21,000 employees, for its billions of dollars

20  of unimpaired creditors, and for its 1.63 billion dollars of

21  impaired creditors, the plan before the Court is, as I said

22  before, really a shining example of the bankruptcy system doing

23  what it is supposed to.  And by law, we are not allowed to give

24  equity holders a recovery unless creditors are paid in full.

25  That colloquially referred to as the absolute priority rule is

47

1  one of the absolute bedrocks, prime directives of the

2  bankruptcy system.  And because our value is simply not

3  sufficient to pay all creditors in full, we have no choice

4  under federal law but to have the equity holders be in the

5  class they are in deemed to reject and receiving no

6  distribution.

7          So it is very unfortunate.  Nobody takes it lightly,

8  certainly not the board or the management team or others who

9  themselves held equity, which is likewise all being wiped out.

10  But those are the economic circumstances in which we find

11  ourselves.  And frankly, most big companies go into Chapter 11

12  only when they have no other choice and because they are, in

13  fact, insolvent.

14          THE COURT:  All right.  Thank you very much.

15          MR. HUEBNER:  Is that helpful?

16          THE COURT:  Yes.  Thank you very much.

17          MR. HUEBNER:  So Your Honor --

18          THE COURT:  So turning to the objections, does it make

19  sense to hear the objecting parties first and then hear

20  responses, or how would you like to handle that?

21          MR. HUEBNER:  No.  I think not, Your Honor.  It is our

22  hearing, and we're the movant.  And we would very much like to

23  go first.

24          THE COURT:  All right.

25          MR. HUEBNER:  I think it will actually help the

48

1   issues.

2          Your Honor, on the procedural point, I'm going to

3   dispense with what I was going to say.  It's obviously

4   mortifying to me that, at my own confirmation hearing, I'm at

5   Davis Polk and the objector in the courtroom.  I'm just going

6   to say one thing and leave it at that.

7          We agreed in writing on February 11th and 12th that

8   none of us would attend in person.  And I made it clear in

9   writing that we were advising other parties likewise that they

10  should not come in person.

11         To find out at 8:30 this morning that the objector is,

12  in fact, going in person and they're there and we're not, I'm

13  just embarrassed for myself, Your Honor.  It's no disrespect to

14  the Court.  I never, ever, ever would have not been there in

15  person if I thought there was a one percent chance that anybody

16  else would go back on --

17         THE COURT:  You should not be at all concerned from my

18  point of view.  We are fully hybrid at all times.  And I can

19  hear you just fine.  And so it's no worries.

20         And with that, I think we can move forward.

21         MR. HUEBNER:  Okay.  Thank you, Your Honor.

22         The plan's voluntary releases, which I will refer to

23  this morning as the releases, are entirely lawful, appropriate,

24  and consensual.  As a point of fact, though they are repeatedly

25  misdescribed in both objections, they are incredibly

49

1    conservative.  We did not, as many plans do and many judges

2    have approved, compel creditors who voted to accept the plan to

3    grant the releases.  We did not, as some judges have approved,

4    have them apply at all to classes receiving no distributions

5    and deemed to reject.  We did not, as many judges have

6    approved, have them apply to creditors receiving de minimis

7    distributions.

8          Rather, they applied only to creditors being paid in

9    full because of the concessions and funding provided by the

10   released parties and to a tiny number of impaired creditors in

11   classes 4 and 5, who are receiving very material distributions

12   and benefiting entirely from the funding being provided by

13   other similarly situated creditors, the ninety-eight percent.

14         That ninety-eight percent of all impaired creditors

15   consented in writing by contract to the releases.  Thus, as to

16   compared creditors, the opt-out mechanism applies only to the

17   two percent of them not in the RSA, not one of whom has

18   contacted anyone to complain about the releases.  In fact, not

19   a single creditor anywhere has objected to the releases.  And

20   many, about 190, in fact, opted out, most using the portal that

21   it took Mr. Melcer ninety-one seconds to utilize.

22         Based on Epiq's tabulation affidavit, we know that

23   1,615 opt-out forms were sent to creditors in the four

24   unimpaired voting classes.  Out of the 1,615 forms, Epiq had

25   only two instances -- two -- of forms being returned as

1  undeliverable, which they could not ultimately complete

2  service.  For those keeping statistical score, that is .12

3  percent.  And the recipients of those two forms were two

4  individuals who were listed in the schedules as claimants for

5  unclaimed property, meaning we already couldn't find them.  It

6  may have been a voucher or a refund check or a suitcase.  One

7  claim was scheduled for fifty dollars -- a five-zero -- the

8  other for 279.87.

9         So I really don't understand at all who the U.S.

10  Trustee and the SEC purport to be protecting here in the case

11  where --

12         THE COURT:  So let me ask you a question about the

13  valuation here that's -- right, because there's a discussion

14  about the benefits that parties -- so if the consenting

15  stakeholders didn't have a deal, right, and weren't the path

16  forward, based on the existing valuation, can you tell me what

17  unsecured creditors would get in, say, a freefall situation?

18         MR. HUEBNER:  Sure.  So Your Honor, I'm going to

19  answer, if you don't mind, a little bit more generally rather

20  than mathematically because, of course, the mathematical answer

21  is unknowable, right?

22         We have 350 million dollars of new equity coming into

23  the company.  We have 1.1 billion dollars of secured claims, of

24  which the majority is equitizing.  And they're agreed to simply

25  never again be repaid and take their chances, obviously, as an

51

1   equity holder.

2          As the Court knows well, you can't cram down secured

3   creditors with equity.  We also have an RCF group that has

4   agreed to re-up their revolving credit facility, to give us 275

5   million dollars of access to fresh liquidity.  If we didn't

6   have a global deal where the ninety-eight percent RSA parties

7   agreed to do all of their things and the RCF agreed to do all

8   of those things, I don't know exactly where we would be.  I

9   know it would be a lot, lot, lot worse than where we ended up

10  for everybody.  I certainly don't think we would have a

11  non-impairment plan.  And we would have to cut hard and deep,

12  including a proceeding that would have been a three-months long

13  contract rejections, likely many other forms of relief.  And

14  things would have been worse by -- I mean, the concessions of

15  795 to equity and the 350 alone are 1.2 billion dollars of

16  essentially value being provided so that everybody else can be

17  repaid without any impairment.

18         So the liquidation analysis obviously speaks

19  separately.  It's certainly my fervent hope that we would have

20  figured something else out and not liquidated.  But Your Honor,

21  if you look to the liquidation as illustrative of what's the

22  sort of end of the spectrum on what happens if -- what would

23  have happened were we not able to reach a deal, it would have

24  been absolutely devastating with billions of dollars of lost

25  value.

52

1            THE COURT:  Okay.  Thank you.

2            And I understand the need to speak generally because

3    you don't know exactly how the case would unfold.  Yeah.

4            MR. HUEBNER:  Right.  So Your Honor, I pleaded with

5    both the trustee and the SEC to withdraw their objections, not

6    as a matter of principle -- because I understand the

7    principle -- but given the extraordinary facts of this case,

8    which are like virtually no other.

9            I should also note that neither the U.S. Trustee nor

10   the SEC objected to the solicitation materials approved by this

11   Court that repeatedly, clearly, unmistakably, and intrusively

12   described the rights to opt out and each of the multiple easy

13   ways we provided for creditors to do so.  But those materials

14   were approved by order of this Court as sufficient and

15   appropriate weeks ago.

16           Moreover, as I will turn to in a few minutes and as

17   the eighty -- eight-zero -- or so cases cited in our brief and

18   our correction of the material misrepresentation of the very

19   few cases cited in the objectors' brief, there is not a single

20   jurisdiction anywhere in this country that categorically

21   prohibits opt-outs as the objectors ask this Court to do.

22   Zero.  And how many judges in this district would reject our

23   opt-out leases under our best in class and maybe best ever

24   facts in Spirit?  It might be one, although I'll talk about

25   Chassix in a few minutes, but I would not be surprised if,

53

1    instead of being one, it were zero.

2            As we documented our brief, the judges in the district

3    are overwhelmingly on our side.  Judge Beckerman in Delonis

4    (ph.), Glidemaster (ph.), and Bloomalex (ph.); Judge Bentley in

5    PacificCo; Judge Chapman on many, many occasions, including

6    Cumulus, Stearns, and Century 21; Judge Drain routinely

7    including Tops, Cenveo, and Sungard; Judge Garrity in LATAM;

8    Judge Glenn in Avianca; Judge Jones in Revlon; Judge Mastando

9    in Times Square JV; Judge Morris in Barneys; and of course,

10   Your Honor, although it was rather a while ago, in Centric

11   Brands.

12           This massive preponderance of judicial authority,

13   which is similar all over the country, carries massive weight

14   for two reasons:  one, they got it right; and two, as Judge

15   Gerber noted in Adelphia, "the interest of predictability in

16   this district are of great importance".

17           The objectors bring you but two cases from the

18   district:  Chassix from Judge Wiles and SunEdison from Judge

19   Bernstein.  They materially misdescribed not one but both of

20   the cases, which really surprised me.  All one really has to do

21   is just read the cases to conclude that they provide very, very

22   little, if any at all, help to the objectors.

23           In SunEdison, creditors had to grant the releases if

24   they voted in favor of the plan.  The only way not to be bound

25   by them was to vote against the plan.  There was no opt-out at

54

1  all.  We, of course, did no such thing, making SunEdison

2  totally irrelevant.

3       In Chassix as well, voting in favor of the plan forced

4  creditors to grant third-party releases.  Those who voted to

5  reject were able to opt in to releases as they saw fit.

6       Moreover, both Judge Bernstein in SunEdison and Judge

7  Wiles in Chassix explicitly rested their decisions in no small

8  part on the fact that meager recoveries led to an unacceptable

9  risk that creditors simply did not pay attention to the case.

10  That is the polar opposite of the facts here, where almost all

11  creditors are unimpaired and the rest are getting very material

12  recoveries.

13       Moreover, as I noted above, in both cases, a creditor

14  who voted for the plan couldn't opt out, which Judge Wiles

15  rather remarkably approved as a consensual release, irrevocably

16  welding a yes vote on the debtor's plan to releasing third

17  parties.  We do no such thing.  It is, therefore, wildly

18  inappropriate to assert that Chassix supports the requested

19  categorical bar on opt-out releases, even more so because Judge

20  Wiles expressly held that the creditors voting for the plan had

21  granted consent for releases merely by voting and explicitly

22  said his ruling was not a categorical bar in opt-out releases,

23  which were dependent -- and it was dependent on the facts

24  before him and the other facts might lead to a different

25  result.

55

1          The objectors also cite a very tiny number of opinions

2     from outside the Southern District, for example by Judges

3     Walrath, Owens, and Stickles, as being categorically opposed to

4     opt-outs.  This is not true.

5          As we laid out in our brief -- and I will rest on our

6     paper because it went on for pages -- we explicated with great

7     clarity those decisions were unquestionably and expressly based

8     on the facts of those cases, which looked nothing at all like

9     ours.  WAMU is a great example of just how radically different

10    the facts were.  And that they are wrong is irrefutable because

11    each of these judges and many others, Walrath, Owens, and

12    Stickles, subsequently approved opt-outs in many other cases,

13    including cases where the facts were, in fact, closer than ours

14    and others that were far more aggressive than ours.  So I know

15    exactly how Judge Judges Walrath, Owens, and Stickles would

16    rule today.

17         For example, Judge Walrath who penned WAMU, also

18    penned Homer City, which used an opt-out mechanism for voting

19    and obtaining creditors but required unimpaired, nonvoting

20    creditors to formally object to confirmation if they did not

21    want to grant the releases.  We did nothing of the kind.

22          Belatedly, as we note in our brief, the U.S. Trustee

23    argues that pages 15 to 17 of its objection that a vote in

24    favor of the plan should not be deemed tantamount to consenting

25    to the plan releases.  These pages are both bizarre and ironic

1   since, one, both of the very few cases they mistakenly claim to

2   support them, like Chassix, hold the exact opposite and, in

3   fact, say that a vote in favor of the plan can and does

4   mandatorily give third-party releases, and two, our plan does

5   not have this structure.  So why they go on for pages about the

6   fact that accepting votes should not be deemed to compel

7   releases in our case is completely beyond me.

8        Leaving no strawman unrepresented, the U.S. Trustee's

9   objection in page 19 also either profoundly misunderstands or

10  blatantly mischaracterizes to this Court our nonvoting classes

11  and plant.  And I quote, "the debtors have deemed multiple

12  classes, 7, 8, 9, and 10, as nonvoting classes.  However,

13  despite not being entitled to vote for or against the plan,

14  claimants in each of these four classes must separately and

15  affirmatively opt out of the third-party releases in the plan".

16       This assertion is patently false.  Not one of those

17  four classes is subject to the release structure.  Not a single

18  party in any of those classes has to opt out.  Classes 8 and 9

19  is intercompany claims.  Class 10 is existing shareholders,

20  which we've said about 100 times are not subject to the

21  release.  And as we noted in our confirmation brief in

22  paragraph 50, class 7 would have been 510(b) subordinated

23  claims, but it is empty and, therefore, eliminated.  I have no

24  idea why they told the Court that those four classes are bound

25  to opt out.  It is patently untrue.

57

1         Now, let's move on to the law, on to the overwhelming

2    judicial support everywhere on our planet and indeed across our

3    entire galaxy for the use of appropriately structured opt-out

4    releases in appropriate circumstances, none of which changes

5    one bit following Harrington.  Both objectors sort of

6    acknowledge what is indisputable.  The Supreme Court in

7    Harrington expressly stated that it was not addressing or

8    otherwise altering the landscape of consensual third party

9    releases or weighing in on what constitutes consent.

10   Accordingly, the massive plethora of pre-Harrington cases in

11   our favor still hold.

12        Unsurprisingly, most judges who have decided this

13   issue since Harrington of course still authorized use of

14   appropriate consensual opt-out releases, including in the last

15   three weeks alone, three judges in three different

16   jurisdictions, who have all overruled the trustee's pleading.

17   And that should surprise no one.

18        To drive this point home, it bears mention the courts

19   in the Fifth Circuit have been living in a no nonconsensual

20   release post-Harrington world for decades.  But despite

21   presaging Harrington and not allowing nonconsensual releases,

22   they have simultaneously for years approved appropriate opt-out

23   releases and to quote Judge Lopez in Robertshaw issued after

24   Harrington in "hundreds of Chapter 11 cases".

25        Indeed, the Southern District of Texas's complex case

58

1    procedures expressly codified the use of opt-outs because they

2    are not tied to and do not rest on the hypothetical

3    availability of nonconsensual release.

4        THE COURT:  So let me ask you -- this gets to the hub

5    of one of the objections, which is the source of law.  As I

6    understand it, despite the Supreme Court's statements that

7    they're not addressing consensual releases, I understand the

8    objecting parties to say that, one, that it's relevant because

9    it means that it isn't clearly consensual, then it runs afoul

10   of Harrington.  But I also read the -- particularly, the U.S.

11   Trustee's objection to be that Harrington and other recent

12   Supreme Court decisions in their view seem to call into

13   question the source of law to be applied.  So what you've cited

14   to me is similar to -- it's a similar approach to Robertshaw in

15   saying nothing has changed, this is what decisions have done,

16   they've looked at the facts and circumstances, consent is not a

17   magical, unknowable issue, and we should continue to do that.

18       But what I hear them saying is, no, we are now looking

19   for a specific source of authority in the Code.  And I take

20   that to mean that, essentially, people have continued to sort

21   of move away from any gap-filling in the code or any ability to

22   do something that isn't specifically authorized in a clear as a

23   bell kind of a manner.  So what's your response to that, what I

24   perceive to be sort of drift in the law from the point of view

25   of the objecting parties?

59

1          MR. HUEBNER:  So Your Honor, I can't tell you how

2    happy it makes me that, almost every time for the last several

3    years, you've stopped me with a question; I can actually prove

4    to you that it's actually the next thing I was about to turn

5    to.  And iii on source of law is literally -- I just finished

6    that.  And that will go in there.

7          THE COURT:  All right.

8          MR. HUEBNER:  So if you'll permit me --

9          THE COURT:  Great minds think alike, or as my

10   grandmother used to say, fools seldom differ.  So I'll leave

11   that to you.

12         MR. HUEBNER:  Oh, I'm not quick enough to come up with

13   a good response to that one, so I'm going to just let it go.

14         So Your Honor, let me say one thing first that's sort

15   of not in there because I'm going to walk through categorically

16   the Bankruptcy Code, general due process issues, state law, and

17   the restatement.  I'm going to hit it all because source of law

18   is very important.

19         But I guess I would say this.  Respectfully, I'm going

20   to slightly differ with the way Your Honor just characterized

21   it.  I don't view there as being a trend necessarily to --

22   unless you can show me the exact Code provision, it is

23   forbidden.  I think that the Supreme Court went out of its way

24   in Harrington to say -- using the Latin canon I can never

25   pronounce right, so I'm just going to pass on it -- that in

60

1  light of the seriousness of nonconsensual third-party releases,

2  1123(b)(6) was simply not capacious enough in light of (1)

3  through (5) to give a remedy that big that, according to

4  Justice Gorsuch -- who, by the way, was wrong, but that's for

5  another day -- has no historical precedent in the Bankruptcy

6  Code outside the text of the statute.

7      And so I think that it is true, to be sure, that there

8  is sort of a general conservatism looking for things that are

9  more base.  But to say that everything that is not expressly

10 permitted is now prohibited is definitely not true.  And how do

11 I know that?  Because Justice Gorsuch actually said two things.

12 One, we today do not express a view on whether nonconsensual

13 releases can be imposed on unimpaired creditors, which actually

14 does absolutely tremendous thematic violence, the idea that

15 Your Honor and others might have expressed because both the

16 Code certainly has no expressed home in it for nonconsensual

17 releases of impaired creditors.

18      And then the second thing he did was, when he did

19 articulate what they were not deciding today, he talked about

20 the consensual releases rest on a different foundation.  So

21 it's a micro-quibble, which I hope you'll permit me, but I

22 think that that sort of -- the (indiscernible) of the law on

23 this is actually not unimportant.  As you'll see in the next

24 few minutes because I'm actually going to hit -- I'm going to

25 hit it all here.

61

1        And what's a great way to hit it?  A great way to hit

2    it is Smallhold because Judge Goldblatt is awesome and

3    thoughtful and articulate, and he actually was troubled by this

4    question.  But with all due respect to him -- because he's just

5    great -- I don't think he got it right.  And in explaining why,

6    I'm going to answer Your Honor's question.  And of course, in

7    any event, his decision has no precedential or binding weight

8    on this Court.

9        First of all, I need to talk about the facts of

10   Smallhold because the extent that the other side has a

11   "favorite case", it's probably Smallhold.  But we just, I

12   think, read it a little differently than they do.

13       First of all, Judge Goldblatt held in Smallhold that

14   those who returned a ballot but did not check the opt-out box

15   consented to the releases regardless of how they voted.  So

16   let's not lose sight that Smallhold is absolutely fatal to the

17   objectors' argument that an opt-out structure is categorically

18   impermissible.  He found that, under bankruptcy law, returning

19   a ballot that gave you an opt-out option even if you reject the

20   plan is sufficient indicia of consent.  He allowed opt-outs

21   even for rejecting creditors who did not opt out.

22       Second, Judge Goldblatt directly eviscerated the

23   speculative, unsupported, and waved argument made by the

24   trustee both there and here that people both, quote, may

25   have -- that's not a quote -- may have been confused by the

62

1    solicitation materials and that somehow this hypothetical

2    confusion should disqualify opt-outs.  Judge Goldblatt held --

3    and this is applicable to Your Honor's ruling earlier in the

4    case about solicitation materials -- that creditors were

5    "clearly informed and on notice of the right to opt out of the

6    releases before casting their votes.  And because the ballot

7    provided a simple mechanism by which these creditors could opt

8    out, there is no risk of coercion or distortion of the plan

9    voting process".  665 B.R. at 717.

10        So Smallhold instructs Your Honor, at an absolute

11   minimum, that Your Honor should approve the use of opt-outs for

12   all voting creditors and gives you in his mind the source of

13   law, which is proper notice, indication of consent even through

14   silence on the ballot by not checking the box is sufficient.

15        Third, Your Honor, in Smallhold, nonvoting creditors

16   we're not given any way to opt out of the releases other than

17   filing an objection to the plan that was both mean and

18   unreasonable by the debtors.  And we are neither.

19        Quite the contrary, unimpaired creditors in Smallhold

20   were not sent an opt-out form.  Ours were.  They did not have

21   our ninety-one-second easy-access opt-out portal.  And they

22   were forced to retain counsel and formally object to

23   confirmation just because they didn't want to consent to their

24   releases.

25        I agree with Judge Goldblatt that these creditors

63

1   "were never given an opportunity to opt out".  And again,

2   that's utterly, completely the other side of the spectrum for

3   what we did here.

4        Four, Your Honor, even Judge Goldblatt, arguably their

5   knight in shining armor who it turns out is on our side,

6   expressly said that there was an undeveloped record regarding

7   unimpaired creditors.  So he expressly left open today's issue.

8        Our record, by contrast, is picture perfect.  We filed

9   a plan on the first day of the cases that had this mechanic in

10  Technicolor for all to see.  We gave full notice to everybody.

11  Nothing ever changed.  The trustee signaled their unhappiness

12  with it early on.  It was actually discussed, I think, on the

13  docket at least once, maybe more than once.

14       And equally importantly, unlike in other cases, this

15  gets back to Your Honor's question before, the reason everyone

16  else is unimpaired is because of the financial contributions,

17  concessions, liquidity, and funding of the released party.

18  There could not be a better record anywhere for the question

19  that Judge Goldblatt -- that even Judge Goldblatt left open,

20  which is opt-out releases for unimpaired, nonvoting creditors.

21       But now, let's go deeper into the law because I want

22  to deal head on --

23       THE COURT:  Well, let me --

24       MR. HUEBNER:  -- and leave no --

25       THE COURT:  Well, let me ask you this question.

64

1       So there's a discussion in the papers, obviously,

2   about what law controls the bankruptcy cases that are out

3   there.  And the restatement is cited by the U.S. Trustee's

4   Office.  And so I did note that Judge Goldblatt did make a

5   mention of there's some interesting ideas as to class actions

6   and the theories behind that, meaning the level of

7   representation, whether the bell has rung in terms of your

8   participation in a way that's meaningful, which echoes Judge

9   Wiles and, I think, Judge Bernstein in Chassix and SunEdison

10  and other things.

11      What do you make of his comment in that regard in

12  terms of understanding the applicable law?  And again, he

13  didn't use it.  He didn't develop it.  And so this may be an

14  unfair question both to you and even, frankly, to him.  But I

15  don't know if you have any thoughts on that.

16      MR. HUEBNER:  It's not unfair at all.  It's actually

17  grab-and-go number four.  And I'm going to get there in about

18  four minutes.

19      But first, I actually want to talk about -- because I

20  think it's the gating item analytically -- his "default theory

21  of opt out releases" because that's actually, I think, was the

22  primary analytic driver of his opinion.  What he basically said

23  was, I allowed these pre-Harrington because I could have

24  entered a nonconsensual release, and therefore, I can sort of

25  do a lesser remedy, which is have an opt-out release.  And so

65

1    he called that the default theory, which is because I could

2    have defaulted people, I can do this.

3         The problem is, with all due respect, he's wrong.  And

4    here's why.  Because the Third Circuit, like all of its sisters

5    other than those who are a fortiori because bar nonconsensual

6    releases, had a very demanding test for nonconsensual third

7    party releases.  In that circuit, it was Continental.  And they

8    were not available in most cases.  In fact, they were available

9    only in rare and extraordinary cases.

10        So here's the exquisite intellectual irony.  The very

11   reason people did opt out releases in cases like Smallhold was

12   because nonconsensual releases were not available for the judge

13   to use because the continental standard would not have been

14   met, and therefore, the judge would have had no ability under

15   the "default theory" to impose a nonconsensual third-party

16   release.  And his default theory collapses as intellectually

17   unsustainable.

18        And what's the further proof of this?  Just go back to

19   the Fifth Circuit and others, arguably the Ninth and the Tenth,

20   although I don't really quite agree with that.  There were

21   hundreds of cases in circuits that forbade nonconsensual

22   releases pre-Harrington but allowed opt-out releases,

23   conclusively proving that, at least to the overwhelming

24   majority of U.S. judges, the default theory is not and cannot

25   possibly be what undergirds the legal propriety of opt-out

66

1  basis.

2         Second, Your Honor, is Judge Goldblatt's concern that

3  there's no "limiting principle" post-Harrington.  Multiple

4  answers.  And he loved this analogy, which was kind of nifty.

5  But as I thought more and more about it, it just sort of seemed

6  to sort of be ever more ephemeral to me.  As he said, how is

7  this different from "each creditor who fail to check an opt-out

8  box on the ballot was required to make a 100 dollar

9  contribution to the college education fund -- college education

10  for the children of the CEO of the debtor"?

11         Why is this not right?  Four answers.  One, there are

12  limiting principles and guardrails all over the Bankruptcy

13  Code, especially in connection with plan confirmation.  If a

14  debtor actually proposed a plan with a negative notice to

15  donate to the CEO's kid's college fund, it never would have

16  gotten out of the starting gate.  It would have failed

17  1129(a)(3) as being a plan not proposed in good faith.  It

18  would have failed 1123(b)(6) as not being a provision that is

19  appropriate and not inconsistent with other provisions of this

20  title.

21         And then, of course, there's the general equitable

22  supervision of the Court.  The Second Circuit in Purdue made

23  this abundantly clear after laying out all the rigorous factors

24  that it believed correctly should apply to nonconsensual

25  releases.  It said -- but on top of this -- there's an overlay

67

1   of equity, which is what a Bankruptcy Court is, and nothing can

2   be improved that is ultimately inequitable and inappropriate.

3        Finally, Your Honor, there are factors.  If you look

4   at our brief at pages 30 to 31, courts have been actually quite

5   rigorous in policing when opt outs are appropriate.  Cases like

6   LaVie, which I think lay out six factors by which to assess

7   opt-out releases and the timing of the outcome.

8        Finally, Your Honor, on this one point, there is a

9   world of difference between granting a release to those whose

10  massive economic concessions and new equity funding make

11  possible your plan distributions with an opt-out mechanism and

12  someone attempting to bind you via an opt-out mechanism to

13  require you to take affirmative action, like funding someone

14  else's kid going to college.  This is more akin to an

15  affirmative injunction and is governed by entirely different

16  rules in any event.

17        And now let's go on to the next prong, Your Honor,

18  because even if every single one of the many dispositive things

19  about Smallhold I just laid out is wrong and you want to look

20  at state law, contract law permits obtaining consent through

21  the opt-out mechanism under our facts.

22        THE COURT:  So before we do that, there was a

23  reference in papers back and forth that was this default theory

24  has been referenced anywhere.  And I believe there was a cite,

25  the DBSD case.  I looked at DBSD and didn't see, frankly, a

68

1    reference to default.  And I'm not familiar with authority in

2    this circuit where anyone had articulated that as a specific

3    theory used to justify prior decisions on the issue of

4    releases.  Am I missing something?

5            MR. HUEBNER:  Yeah, I don't think so.  I don't have

6    DBSD by heart.  I don't know.

7            THE COURT:  Well, I went back to look at the trial

8    court decision because, obviously, that's where a finding would

9    be made, on appeal.  The Circuit Court is not going to make a

10   finding, and they're going to address what's been done in the

11   trial court.  And I think the pages that were referenced just

12   talk about releases, the consensual releases, but they talk

13   about it in ways that I think are fairly typical of ways that

14   courts in this district and this circuit have talked about

15   consensual releases.

16           MR. HUEBNER:  Yeah.  Your Honor, that's what I was

17   going to say, which is what I do know is that seventeen honest

18   (d)(1) cases I did cite, they use the rubric of consent in the

19   context -- and I'll elaborate on this in a few minutes -- that

20   this is a legal proceeding in a federal court, in which notices

21   are given, opportunities to object are given, consequences are

22   clearly laid out, and consequences follow.  And I think, for

23   most of the judges, it's more sort of about delaying due

24   process and the like than it is about the specific sort of

25   contract law theory.

69

1        And certainly, the default theory, even if there is

2   some stray reference they can bring to you, we're not aware of

3   it.  We think Judge Goldblatt -- and again, his opinion was

4   very articulate.  And the fact that he changed position from

5   his prior case, I think it was arsenal, that approved opt-out

6   releases shows you how principled he is.  But even though I

7   think he's wonderful, I just don't think he's right.  And I

8   think that I walked through sort of why that is.

9        THE COURT:  No.  Smallhold is a very thoughtful

10  opinion.  And I think, as courts wrestle with these issues,

11  that's what folks hope to get, which is thoughtful opinions,

12  speaking as a jurist.

13       MR. HUEBNER:  Yeah.  So now, let's talk about contract

14  law, which is really kind of their hypothetical citadel, in

15  which they try to take their last stand, leaving aside the way

16  they twist the case is they actually try to cite.

17       So the problem here, Your Honor, is that it is also

18  just deeply analytically flawed because the objectors

19  mischaracterize the releases as a free-standing, standalone

20  agreement between the releasing parties and the released

21  parties that just, like, arrived out of the blue like, hey,

22  Bill, do you want to release Jenny.  But that's not what they

23  are.  And they myopically and quite inappropriately try to cast

24  the release and its acceptance as the totality of the "offer

25  and acceptance playing field".  But of course, this is not

70

1    true.

2         The releases are one term of a plan and part of the

3    multifaceted, multibillion-dollar bargain that made the plan

4    and its distribution possible.  The release is a part of the

5    overall bargain under which consenting stakeholders made

6    massive concessions on their debt claims and are providing

7    hundreds of millions of dollars of fresh equity capital, which

8    is what allows the plan to leave virtually all other creditors

9    unimpaired.  And as part of that comprehensive set of

10   compromises, the consenting stakeholders agreed to provide and

11   obtain the releases and bargain that other creditors would be

12   offered the opportunity to either give or withhold their

13   releases through this exact, reasonable, and fair mechanism.

14        At least two important consequences follow from the

15   fact that the releases are part of a Chapter 11 plan of a

16   Chapter 11 debtor.  First, as virtually every judge that has

17   addressed this issue has held, bankruptcy law and federal law

18   concepts of appropriate notice, not state contract law, governs

19   their validity.  There is a typo in a brief, which I'm sure you

20   caught.  It was supposed to say all fifty, question mark, and

21   it said all fifty, I believe percentage sign, because, of

22   course, what state law will even apply when you're dealing with

23   international creditors, creditors in all fifty states, et

24   cetera.

25        And second, even if state contract law does govern --

71

1  we'll talk about some cases in about four minutes -- the

2  releases appropriately provided the consent can be manifested

3  by deciding not to return an opt-out form and not checking a

4  box or by not going on the court.

5         First, let's talk about bankruptcy law.  A confirmed

6  plan of reorganization, as the courts have used over the

7  decades, is something of a hybrid of a super contract

8  contemplated under federal law between and among a debtor and

9  its creditors that is a creature of federal statute and is an

10 exercise of federal power expressly conferred by the

11 Constitution and ultimately embodied in a federal court order.

12 Whether the plan's voluntary releases are appropriate, whether

13 the plan's mechanic for consent is proper, are questions of

14 bankruptcy law, not state law, as dozens of courts, including

15 virtually, if not every single SDNY bankruptcy judge, has

16 concluded.

17        As Judge Baisier noted in LaVie, there is no basis to

18 refer to the releases themselves as a "contract" or a

19 "agreement".  The issue is consent.  Moreover, Harrington

20 itself does not refer to the releases as a contract but as both

21 consensual, close quote, releases.

22        So you don't need to undertake a traditional state law

23 contract style analysis.  You need notice, due process,

24 appropriateness and consent as is true of so many things in a

25 bankruptcy case and, in fact, in virtually all federal and

72

1   legal proceedings virtually everywhere.

2          We submit the analysis can, in fact, stop there

3   because this is a question of bankruptcy law.  And the

4   overwhelming weight of Bankruptcy Court authority approves

5   releases far more aggressive than these.

6          But even if you think you can't stop there and you

7   want to talk about state contract law -- something I actually

8   don't think any SDNY judge has ever held, and we're DBSD in the

9   background -- we still win.

10          First, the plan releases must be considered together

11   as a single offer and acceptance.  So leases are not a

12   standalone bilateral offer and acceptance.  Of course, they're

13   not.  The actual bargain offered to creditors here if they were

14   unimpaired was we will pay you in cash in full and assume your

15   contract.  But in exchange, you will grant these releases

16   unless you affirmatively choose not to, which you are free to

17   do.  The consideration for the releases therefore encompasses

18   the entire set of benefits provided for and received under the

19   plan.

20          Moreover -- this is very important -- the Second

21   Circuit in Metromedia eviscerated the trustee's claim that the

22   release must be supported by separate standalone release only

23   consideration.  In many cases in and at the Second Circuit,

24   including the Second Circuit decision in Drexel, the subject

25   creditors got no consideration at all for the release.  And

73

1   that was just fine with the court.  And here I quote the Second

2   Circuit verbatim.  "Appellants also claim that, notwithstanding

3   any other limitation on nondebtor releases, good and sufficient

4   consideration must be paid to any enjoined creditor.  Such

5   consideration has weight and equity, but it is not required.

6   In Drexel Burnham, the complainant creditors received none of

7   the proceeds of the settlement of Drexel personnel".  960 F.2d

8   285 at 293 (2nd Cir. 1992).

9          THE COURT:  Well, won't the other side -- won't the

10  objectors argue that that's all about nonconsensual releases,

11  that in announcing a test for nonconsensual releases, that

12  you're separating it?  You're providing your own separate

13  analytical framework from simply the consideration that comes

14  with the contract.

15         MR. HUEBNER:  Your Honor, they could try that, but

16  they would be right out of place because it's a fortiori

17  squared.  If you could have imposed a nonconsensual release on

18  someone getting nothing, now that they're unlawful and the

19  fallback is you have to give people an opportunity to opt out,

20  of course the same analysis obtains.  But they don't have to

21  get separate consideration just for the release.

22         This is what actually makes the many decisions,

23  including really bizarrely Chassix, I think very troubling in

24  the other direction, right?  The notion that an accepting

25  creditor is not allowed to opt out of the release, I think it's

74

an equal treatment problem.  I think it's coercive because the

notion that, like, I can hang back and say, you know what, I'm

going to let Kaylee (ph.) vote for the plan because I think

it's going to carry, and she's going to be forced to give the

releases, but I'm just going to hang back because I can opt out

of them and still get all the benefits.  We're actually getting

different plan recoveries, but they're coerced.

THE COURT:  Well, I think Judge Drain has always

been -- has always articulated the notion of separating the

release issue from the plan for that reason.  I think that's

correct.

MR. HUEBNER:  Correct, which is why I found it

surprising that many judges uphold opt-out structures way, way

more aggressive than this one --

THE COURT:  Well, let me ask you.  And this gets into

the question about the approach here.  And it seems pretty

clear that cases have approached this on a facts and

circumstances, which means, frankly, that you can go very far

down the rabbit hole in assessing each -- the circumstances of

each party involved, right?  So I guess I wanted to get your

comment on that.

So for example, here, you have parties to the RSA.

The SEC does not object to that.  The U.S. Trustee's Office

does.  They believe that opt-out -- opt in, sorry -- is the

only option for everyone under all circumstances.  But I

1   understand the SEC basically says, if you're part of the RSA,

2   they don't seem to have a problem with that because you've

3   manifested your consent.  But then you've got voting yes,

4   you've got voting no, you've got no votes, you've got deemed to

5   accept, you've got deemed to reject.  You haven't asked for the

6   ability to have a consensual release for all those categories

7   and specifically that the folks who are deemed to reject, which

8   was the subject of other decisions.

9          So I just wanted to get your take generally --

10         MR. HUEBNER:  Sure.

11         THE COURT:  -- about articulating rationale and

12  looking at the facts and circumstances for each of those

13  classes and what that means for purposes of turning to state

14  law.  That may be on your outline already but --

15         MR. HUEBNER:  Sure, sure.  No.  This one I'm going

16  to -- this one I'm going to freewheel on.

17         So Your Honor, Ms. Cornell will, of course, speak for

18  herself.  I don't think I read her objection as objecting to

19  the release as being given by the RSA parties.  They signed a

20  contract, in which it expressly said they pre-agreed to grant

21  the releases provided for under the plan.  And so I could be

22  wrong, but I think that, fundamentally at base, the SEC' issue

23  is the one-point-x percent that we just couldn't find, none of

24  whom has objected in Classes 4 and 5.  And I think that,

25  fundamentally, Ms. Cornell's issue is not impaired creditors,

76

1  who are being paid in cash in full through the contributions of

2  the releasing parties.  But again, I certainly don't want to

3  captain her or misspeak.

4       But given your early comment in the case that Diego's

5  declaration had a wrong exhibit reference, the probability that

6  I'm right and you're wrong is asymptotic --

7       THE COURT:  No.  It may be that it's not clear.  I

8  think the SEC papers are fairly clear in their view of

9  protecting the interests of folks who aren't part of the RSA

10  and essentially reducing the categories here because there's a

11  lot of cases that talk about voting in favor of the plan means

12  consent.  And I think one can argue -- and I think you would

13  argue -- that the RSA is sort of a super version of that

14  because it's a much more nuanced and much more specific version

15  of that.

16       MR. HUEBNER:  Correct.  And Your Honor, look, I would

17  love nothing more than for you to adopt a facts and

18  circumstances test.  In fact, Judge Goldblatt very kindly cited

19  an article that I wrote on this topic where, essentially,

20  that's what I advocate for.  And why do I love it?  Because

21  you'll never, ever have a better, cleaner fact pattern than

22  this one, right?

23       Many courts mandate accepting creditors to grant the

24  releases.  We don't.  Many courts only allow certain parties to

25  opt out by filing objections with counsel.  We don't.  Many

77

1    courts have approved creditors getting no distribution to opt

2    out.  I think that's just wrong.  Like, why would you want to

3    give releases if you're getting no distribution?  I'm fine with

4    that not being there.  We never asked for it.

5         Many courts get stuck on creditors getting one one-

6    thousandth of one percent or a tenth of one percent or two

7    percent.  And they say it's just too much.  People know they're

8    wiped out.  They're just not reading the documents.  We don't.

9    Many creditors can't prove that the released parties actually

10   provided the consideration necessary to get everyone else their

11   recovery.  That's why Drexel and Metromedia are so important

12   because, in Drexel, the D's and O's paid in very little, and

13   most creditors didn't get anything out of it.  But they still

14   were found to have their releases appropriately applied to

15   them.

16        This is the opposite.  Everybody is getting paid

17   because of what the consenting stakeholders/the release parties

18   did.  So --

19        THE COURT:  So there's an argument made.  And I think

20   this is a reference to a case that talks about there's not

21   value here because it's all tied up with what you're getting

22   anyway.  In other words, these creditors would get this value

23   anyway separate and apart from the release.  And I think you've

24   already answered that in terms of saying it's all part and

25   parcel of one thing.  But what --

1            MR. HUEBNER:  Correct.

2            THE COURT:  What case -- and maybe you've already

3   answered this as well in the prior discussion.  I guess you'd

4   cite Metromedia for that notion and just bankruptcy law for the

5   notion that you can't -- you shouldn't be separating out on a

6   contractual theory basis.

7            MR. HUEBNER:  Yeah.  So I'm going to turn to state law

8   in a minute or two, and you're going to see it there also.  So

9   those are not the only arrows in my quiver.  But I think that's

10  exactly the point.  In other words, the plan is the bargain.

11  And the plan is everyone gets paid.  And this release structure

12  is part of the plan, and you have complete freedom to choose.

13  No court has ever said unless -- to my knowledge, maybe that's

14  overbroad -- unless you can show that you got twelve extra

15  dollars because you didn't check the box, the releases fail.

16  You're allowed to consent to things because you want the plan

17  to go through, because you agree with the structure, because

18  you don't have a problem with it, or in this case, as to

19  virtually everybody, because you're being paid in cash in full,

20  and there's no reason not to because this was just the deal

21  that was agreed to by the corporation.

22           THE COURT:  So let me ask, when we talk about the

23  facts and circumstances of different cases, mass tort cases are

24  very different from this case, right?  There's a lot of

25  discussion about the familiarity with legal proceedings as

1   opposed to somebody who -- accept or not accept the RSA,

2   they've gotten an offer based on their existing rights -- are

3   in a fairly sophisticated posture.

4          And so where does the sophistication of the creditor

5   factor in here, or does it not at all?

6          MR. HUEBNER:  So Your Honor, it's a great question.

7   And I'm actually going to go right to the SEC's footnote 9 and

8   23(b)(3), which, as I said, was our grab-and-go number four

9   because I think it's actually -- this is -- yeah.  I'm just

10  loving this conversation.  So I'm just grateful intellectually

11  on top of everything else.

12         So here's how I think about it.  Number one, I would

13  think it's hard to identify on the main a group of people who

14  are probably less sophisticated and less likely to have counsel

15  than the victims of the mass tort, who in many cases are just

16  individuals who took a product, had a surgery, used a medical

17  device, bought a pill, right?

18         Here by contrast, these are economic counterparties to

19  the country's seventh largest carrier.  And the class is

20  perfectly bounded.  There were -- whatever the number was --

21  1,615 or 1,621 opt out notices sent.  So we know exactly who

22  unimpaired creditors are.  In many ways, this is a fortiori in

23  our favor with respect to mass tort.

24         The SEC argues in footnote 9 that 23(b)(3), and the

25  class action is a poor analogy for four reasons.  And they're

1  wrong on all four.

2          A, the class must be specifically defined.  It could

3  not possibly be more specifically defined than here.  We know

4  exactly to the penny how much the one-point-x percent of the

5  bonds, not only RSA and Classes 4 and 5 are.  And we know

6  exactly who the unimpaired creditors are who we sent notices

7  to.

8          B, the class must be represented by counsel.  So the

9  noteholders and the convertible noteholders' counsel has

10  essentially represented the interests of the entire class.

11  They sought to get 100 percent into both classes.  The classes

12  were open to all comers.  They turned nobody away, right?  And

13  their numbers, as this Court knows, went higher and higher as

14  the case went on because there were no sort of special venues

15  here, right?

16          C, the Court must ensure compliance with all these

17  requirements.  Here we are.  And by the way, this Court already

18  did a lot of that in approving the notice procedures that were

19  not objected to that were found to be sufficient, appropriate,

20  clear notice of everything being asked of creditors, including

21  the opt outs.

22          And D, the settlement must be approved as fair,

23  reasonable, and adequate.  I don't know how you could possibly

24  ever in history get more fair, reasonable, and adequate than

25  unimpaired and paid in cash in full as to virtually everybody

1    on the planet except for a for a tiny number of bondholders who

2    don't have to pay in to the 350 but are getting all the

3    benefits and having their new debt supported by the equity

4    contributions of the parties.

5          But Your Honor, those aren't the only class

6    representatives because you also have the Official Committee of

7    Unsecured Creditors that looks out as a DOJ, ironically,

8    appointed fiduciary who has no objection to what we're doing

9    here.  And you have the debtor, who, by federal law, is a

10   fiduciary for all stakeholders.

11         So instead of, like, a billionaire class action lawyer

12   who's, like, doing their thing -- and I'll just leave it at

13   that -- we have an unbelievably reticulated set of statutory

14   safeguards.  We have at least four different law firms looking

15   out for lots of different people.  And we have a settlement

16   that to say, it's fair, reasonable, and adequate as opposed to

17   like, we'll give you a twenty-nine cent coupon off in two years

18   if you buy another ice cream cone, we have, eight or so billion

19   dollars of dollars in predators unimpaired and the two percent

20   reaping all the benefits of someone else's equity investment.

21         So the fact is, Your Honor -- and I say this in the

22   article -- we sort of mostly left it out here because you were

23   gracious enough to give us an extended page limit, and we

24   didn't want to be abusive.  23(b)(3) does not even allow opt

25   ins.  What the rule requires and what the rule contemplates is

82

1  only opt outs because the assumption is, once you have a good

2  deal that was negotiated by fiduciaries that a court has to

3  approve, the working assumption is that people should want into

4  it as opposed to, through neglect, not being into it.

5       And so I don't think 23(b)(3) helps that at all.  In

6  fact, I think quite the contrary.  The only federal thing out

7  there about opt in versus opt out says that opt ins are

8  unlawful and opt outs are mandatory.

9       THE COURT:  Well, there's a reference to some

10  arbitration in cases, and I believe even some arbitration class

11  action cases.  Any comments on those?

12       MR. HUEBNER:  I mean, Your Honor, what the Supreme

13  Court itself said -- and they're a pretty high authority,

14  right, in Phillips Petroleum v. Shutts -- is we reject

15  petitioner's contention that the due process clause of the

16  Fourteenth Amendment requires that absent plaintiffs

17  affirmatively "opt in" to the class rather than being deemed to

18  be members of the class if they do not "opt out".  The

19  procedures followed by Kansas, where a fully descriptive notice

20  is sent first class mail to each class member with an

21  explanation of the right to opt out satisfies due process.  The

22  court went on to say -- I'm sorry.  The pin cite on that is 472

23  U.S. 797, page 812, Chief Justice Rehnquist.  He wasn't Chief

24  Justice yet.  He was just Justice at the time, right?

25       What he went on to say -- and this is why, as you

83

1   talked about before, all the courts with virtually no

2   exceptions talk about due process and think about it from the

3   federal perspective.  Justice Rehnquist went on to say on the

4   issue of opt outs, "the Constitution does not require more to

5   protect what must be the somewhat rare species of class member

6   who is unwilling to execute an 'opt out' form but whose claim

7   is nonetheless so important that he cannot be presumed to

8   consent to being a member of the class by his failure to do

9   so".

10          And by the way, if you read Judge Glenn's Avianca

11  opinion, this is exactly what he says on this issue in this

12  context, right?  "If a creditor with a right to vote is sent a

13  ballot" -- or in this case, fill out some forms -- back into

14  the quote, "that clearly explains that a ballot must be

15  returned and the opt out box checked if the creditor elects not

16  to approve the third party release, the release is effective as

17  to that creditor".

18          So whatever legal regime you want to throw at us,

19  we're just totally comfortable because we think the Supreme

20  Court is clear.  The Second Circuit is clear.  And obviously,

21  the Bankruptcy Courts and the like have been completely,

22  overwhelmingly clear.

23          But now, let's go to the very, very, very last city of

24  refuge in which they try to go, which is state law.  The answer

25  is no different.  In fact, the case that they cite out of the

84

1   Western District of New York relies on the New York statute

2   that expressly says release of "a contract, obligation, or

3   lease or any mortgage or security interest" -- that is, in

4   writing -- "shall not be invalid because of the absence of

5   consideration".

6         And Stein Mart -- by the way, which is a great

7   interesting case -- went through Florida law, which I think is

8   quite similar, and specifically held that under Florida state

9   law, opt out releases were also appropriate.

10        We explain in footnote 69 on page 25 of our brief

11  that, even if this New York law applied to the releases here,

12  we think we do fine because, as I said before --

13        I'm almost done, Your Honor.  I do want to give the

14  Court just a flag that there's not that much more here at least

15  on my opening.

16        The offer of the releases does not come as an

17  unexpected, unsolicited, free-floating offer of a release.

18  Rather, it comes as part of the plan itself, the culmination of

19  these bankruptcy cases, and the vehicle under which most

20  creditors are being paid in full as the Court knows.

21        And now, let's talk about the restatement because the

22  objectors incorrectly argue that an offer can't be accepted by

23  a silence under the restatement.  Well, the restatement, of

24  course, is not law anywhere as courts have noted.  Let's just

25  pretend that it is for analytic completeness and purity because

85

it works just fine for us because there are three separate,
independent exceptions to that rule in the restatement.  And
each one of them is independently satisfied here.

Exception 1, where an offeree takes the benefit of
offered services with reasonable opportunity to reject them and
reason to know that they were offered with the expectation of
compensation.  Here, virtually 100 percent of the creditors
were not party to the RSA will recover payment in full.  So
they are massively benefiting from the release parties by way
of their recovery.  And of course, they have had perfect reason
to know they were offered their releases and a reasonable
opportunity to reject them.  In fact, all they had to do was
click the mouse for a minute and a half.

Exception 2, where the offer has stated or given the
offeree reason to understand that ascent may be manifested by
silence or inaction, and the offeree, in remaining silent and
inactive, intends to accept the offer.  Here, the debtors
clearly and conspicuously informed all creditors of the opt out
releases and the plan from the day the cases were filed out of
the requirement to opt out in order to preserve any included
claims, whether by returning an opt out form or using the
portal, et cetera.  And this Court approved to no objection the
material that so advised creditors multiple times, including in
all bold and all caps.

Exception number 3 --

1           THE COURT:  SO let me ask you about the second

2   exception here.  It's not the most clearly worded exception.

3   And the cases seem to be a bit all over the place.  And so one

4   case talked about silence except where the offeree intends to

5   accept the offer and makes a point of talking about there needs

6   to be essentially some manifestation of that intent.

7   Otherwise, it's essentially the offeree's option, pass or play.

8   And then there's another case -- and I'm looking at all federal

9   cases.  That was Manigault, which is 506 F. Supp. 2d 156.

10          And another case, Weiss v. Macy's Retail Holdings, 256

11   (sic) F. Supp. 3d 358, talks about the clear rule being that

12   you don't have an obligation to break your silence, but it has

13   to be something where a failure to speak is inconsistent with

14   honest dealings or misleading.  And so what would you say about

15   how to apply (b) under these facts and circumstances?

16          MR. HUEBNER:  Sure.  So Your Honor, obviously, I'm

17   certainly not going to claim that every single case ever in the

18   country handed down by any judge is, like, a perfect flying

19   buttress for everything we're saying.  Of course, that's not

20   true, right?  So if if this standard on this one of three

21   exceptions (indiscernible) has no applicability, the fact that

22   some courts have said, it has to be sort of like a sleazy

23   silence kind of thing, I don't think that's what the

24   restatement says.  I think that if you look at the words of the

25   exception, right, what the offer has stated -- yes -- was given

87

1    an offer a reason to understand -- yes -- pursuant to federal

2    court approves the station materials -- it said it in like day-

3    glo technicolor -- that ascent may be manifested by silence or

4    inaction, which is exactly what all the materials said, and the

5    offeree remaining silent and inactive intends to accept the

6    offer.  There's nothing in the restatement that talks about

7    evil hiding in wait, trickery, right, so I just don't see that

8    as part of the test but again --

9        THE COURT:  Well I guess that's one of the reasons I

10   was getting into specific breakdowns of different classes here.

11   I suppose one could argue that this applies to some but not all

12   the folks.  It might apply, for example, for judges who are

13   talking about voting yes on the plan or even voting no on the

14   plan on the same form but not opting out because you've

15   manifested essentially -- and I guess another way, if you talk

16   about manifestations -- it's engagement.  You've engaged in the

17   process on its terms.  But that may not be true for folks who

18   are deemed to reject or deemed to accept -- deemed to reject is

19   the issue here -- deemed to accept.

20       MR. HUEBNER:  So Your Honor, yeah, here's what I would

21   say.  I think a very different case might actually present this

22   issue, but this one doesn't, and let me explain what I mean.

23   If we had tried to apply after our releases -- as many cases

24   have done -- to holders, equity or debt receiving no

25   distribution and deemed to reject, I think this fact would be

88

1  much more cumbersome because is it a reasonable assumption that

2  this is the type of you remaining silent you intend to accept?

3  It's hard to imagine a theory why a wiped out shareholder would

4  require remaining silent, but we didn't do that, right.

5       When you go up one level, where you go to rejecting

6  creditors in general, you may be receiving material

7  distributions, and they are -- in most cases actually say I

8  have no problem with rejecting creditors who failed to check

9  the box being deemed to get their releases because I'm not

10  going to purport to patronize them and say they were confused.

11  The Court approved the materials, they were clear, you chose to

12  fill out a ballot, sign it, send it in, you clearly read it,

13  it's gone.  But we're not doing that either, right.  Rejected

14  creditors have the opportunity to decide to accept or not, and

15  they're not bound to object.  So there may be harder fact

16  patterns where debtors push the envelope.  We're not even in

17  the same building as the envelope.  These releases are so --

18       THE COURT:  Well let me ask you, would you argue that

19  by being given a ballot to accept or reject the plan, and by

20  being at the same time given a form to opt out, that if a

21  creditor decides to -- regardless of their vote, they vote and

22  they decide not -- say they vote no and they decide to opt but

23  they don't submit an opt out form, would you say that B is

24  something that applies because there's a manifestation of

25  intent?

89

1          MR. HUEBNER:  Yes and I think Judge Goldblatt said

2    that expressly in Smallhold, as did many other judges,

3    including I think one of either Abianca (ph.) or Latan (ph.),

4    which is if you filled out the ballot, whether you accepted or

5    rejected -- there's a great quote, I wish I had memorized it,

6    but I'm just a guy -- like all the intentionality that you

7    manifested in filling out the ballot, voting, signing it,

8    dating it, sending it in, I'm just not going to assume after I

9    approve the materials that you were confused and you meant to

10   opt out.  It's just patronizing and inappropriate, and I'm not

11   going to do it.

12          THE COURT:  All right, so I get that.  So under those

13   facts, there's an argument there.  So then moving on to the

14   other category, which I think is the thing that, as you said,

15   the U.S. Trustees don't seem to be focusing on particularly,

16   they deem to accept, therefore you don't have to vote but you

17   have a chance to opt out.  And so what would -- are you making

18   a pitch under -- I understand you're making a pitch under A

19   because the value, but for B, are you making a pitch under B

20   that there's some manifestation of intent by -- under the facts

21   and circumstances here?

22          MR. HUEBNER:  Yeah, and there's a great answer, which

23   is we sent out the number of forms we did and we got back 190

24   opt outs, and almost all of those were from unimpaired

25   creditors who used the form.  It worked exactly as we hoped and

1    intended it would, which drives the point home with a railroad

2    spike.  171 of the 190 opt outs, and remember, we only sent out

3    1,600 odd forms.  So it's like ten percent of the people who

4    got the forms or so -- I don't know the exact numbers, I don't

5    want to be held to them -- went on the portal, click, click,

6    click and opted out, so we know it worked.

7            And remember, only .12 percent of the mailings -- a

8    tenth of one percent -- got returned as undeliverable.  It was

9    two unclaimed property claimants with a 50 dollar -- remember I

10   said $297.67 claim, and there is cedement (ph.) parties that an

11   airline has to track until they're allowed to turn the proceeds

12   over to the state.  So it's basically zero; there were zero

13   undelivered opt out forms, and there was a relatively high opt

14   out rate using our super easy to use portal.

15           So I just think the facts could not possibly be more

16   comforting to the Court and should have been sufficiently

17   comforting to the objectors.  But Your Honor, again, each of

18   these exceptions to the restatement is independent.  I don't

19   have to win any of them because I don't think that the

20   restatement applies at all; I don't think state law applies.  I

21   only have to win number two, but I think we do anyway, and then

22   there's number three, which again is an independent exemption,

23   and I quote, "Where because of previous dealings or otherwise",

24   or otherwise, "it is reasonable that the offeree should notify

25   the offeror if he" -- apologies, the gendered language is not

91

1  me, it's the restatement -- "does not intend to accept" --

2  close the quote.

3       I can't think of better circumstances in which it is

4  reasonable that an offeree should notify the offeror.  The

5  factual legal circumstances of these cases, the decades of case

6  law on these issues, the unimpairment of virtually everybody

7  make it beyond reasonable having gotten federally court

8  approved forms that say this is what you need to do --

9       THE COURT:  Let me ask you, you would agree though

10 that there's a stronger case for the prior dealings exception

11 for folks who are noteholders who were offered an RSA or

12 engaged in a particular level as partners with the debtor and

13 the business as opposed to a general unsecured creditor who may

14 have sold Spirit a copier and is awaiting payment?

15      MR. HUEBNER:  You know, Your Honor, honestly with

16 apologies, I'm not going to quite concede that.  I've been

17 doing airline bankruptcies for way over twenty years

18 unfortunately and candidly, many of the counter parties to a

19 huge U.S. carrier have been through this many times, many

20 numbers of creditors' committees, I've sat on multiple

21 creditors' committees.

22      THE COURT:  Don't I need a record of that, I mean in

23 terms of -- and again, this gets into sort of facts and

24 circumstances, and that seems to be the way courts look at it

25 is you go through sort of class by class of folks and what

92

1    their situations are, and you may be right, but does it require

2    me to have a factual record on that deemed to accept and not

3    voting general unsecured class?

4          MR. HUEBNER:  So Your Honor, I certainly don't think

5    you need a factual record more developed than here, and if you

6    look at all of the other cases, no one has ever required

7    anything like that to my knowledge.  In other words, the

8    question is a malayed question of appropriate notice and

9    appropriately putting on creditors an extremely light burden to

10   respond if they choose to opt out, and I'm not sure there has

11   ever been a lighter touch obligation than ours.  You don't have

12   to object, you can just go on a portal and click, which again,

13   the number of people who did it, I think --

14         THE COURT:  So I take your answer then for that to be

15   that -- well one, I don't think you're conceding the

16   restatement necessarily applies, but two that if it does apply,

17   that cases have not made that kind of specific factual showing

18   on a creditor basis or subsets of a class but rather looked at

19   the facts and the circumstances of the case, the ones that

20   you're relying on here, and that's your pitch for C.

21         MR. HUEBNER:  Yeah, I think that's right, Your Honor.

22   And again, to be clear, I'm on my like twelfth line of defense

23   now.  The notion that the restatement is what governs a federal

24   bankruptcy court, which is every court practically, as

25   (indiscernible) just said, is not the law anywhere, right.

93

1   Like there's a reason that we have 80 cases, and if you read

2   them, they mostly say the same thing, which is the question is

3   was notice appropriate, are the releases appropriate, et

4   cetera, et cetera, I think looking, as I said, has the factors.

5   But Your Honor, it's funny because this is sort of actually my

6   close.  I'm pretty much on the wrong page, and it's actually

7   where I was going to end.  And so I think your question once

8   again is almost eerily prescient, right?

9          As Judge Goldblatt said in Smallhold, and we could not

10  agree more, you just can't ignore instructions in a federally

11  court approved notice that is sent to you.  He said it when he

12  was discussing the creditors who failed to check the opt out

13  box, that they're bound to the documents and they're bound to

14  the instructions and they're bound to the notice.  This of

15  course was the point of so many Southern District judges,

16  including Judge Chapman's Cumulus opinion, which has been

17  citied, eight, nine, ten, twelve times by your brothers and

18  sisters on the bench.  And I quote, "Inaction is action under

19  appropriate circumstances.  When someone is clearly and

20  squarely told, if you fail to act, your rights will be

21  affected, that person is then given information that puts them

22  on notice and they need to do something or else that's not a

23  track", close quote.  Creditors of major economic parties are

24  required to pay attention to bankruptcy proceedings; they're

25  required to pay attention to court approved notices.  Creditors

94

1    by now should all expect that a plan is going to be proposed

2    that may provide them with recoveries, in this case massive

3    recoveries, and certainly we're binding on them once

4    confirmation is obtained under 1141.

5          In this court and every court, people all have a right

6    to assume and expect the parties read and abide by court

7    approved form instructions.  Your Honor, there's a lot more

8    that I could say, but I think I've said enough, so I'm going to

9    leave it at that.

10          I want to take thirty more seconds to zoom out away

11   from the objections because I'm not going to let them eclipse

12   the day.  Today is an extraordinary day for Spirit Airlines and

13   all of its stakeholders.  It's an extraordinary day for the

14   99.99 percent of the creditors that voted in favor of the plan.

15   It's a great day for the zero creditors who objected to

16   anything ever in this case.  It's a great day for the 99 or so

17   percent of its creditors who are totally unimpaired due to the

18   concessions and funding of the release parties, and it's a

19   great day for the Southern District of New York, two of whose

20   brand new guidelines save massive amounts of often wasted time

21   and money.  We have done a multibillion dollar airline non-

22   prepack in 87 days with likely the highest quantum of creditor

23   support and non-objection ever seen.  We ask that the plan be

24   confirmed as presented so that we can get this fantastic

25   company the heck out of Chapter 11.

95

1          THE COURT:  All right.  At this point, I think it

2    makes sense to hear from parties in support.  I do have a few

3    statements that were submitted.  So let me start with the

4    official committee.

5          MR. GOREN:  Thank you, Your Honor, Todd Goren from

6    Willkie Farr on behalf of the Official Committee of Unsecured

7    Creditors.  We obviously filed a statement in support of the

8    plan, yet we won't touch the release issue; I think Mr. Huebner

9    has covered the waterfront on that one so --

10         THE COURT:  Well let me just ask you to touch it to

11   the extent that making it very clear on the record what your

12   position is because it talks about the case generally and the

13   obvious good result, putting aside any release issue here.  So

14   I just want to be very clear in terms of the committee's

15   engagement on the issue and the overall position it's taking as

16   to the one question that is in dispute as to the plan.

17         MR. GOREN:  The committee, we provided some comments

18   early on to the release provisions; those were accepted by the

19   debtors to sort of make it clear exactly what and what wasn't

20   being released.  I think the position the committee took, and I

21   think the only thing at this point I'm authorized to say, is

22   the committee supports the plan; that includes releases.  We

23   haven't really taken a specific position on the releases or

24   not.  The committee wants to see the plan confirmed.  It's

25   obviously in the best interest of all unsecured creditors to

1    get the plan confirmed.

2            THE COURT:  Is it right then to take your comment to

3    mean that you're not weighing in on the particular subtleties

4    and niceties that the conjurers of the legal argument, but you

5    are weighing in to say you support the requested relief?

6            MR. GOREN:  I think that's fair to say, Your Honor.

7            THE COURT:  All right, fair enough.  Anything else

8    from the committee?

9            MR. GOREN:  No, I mean obviously we're very supportive

10   of the plan.  This is -- as Mr. Huebner has said -- really a

11   testament to the good work by a lot of people of wanting and

12   getting this company out of bankruptcy very quickly.  It's

13   clearly in the best interest of everybody.  An unimpaired plan

14   for general unsecured creditors is a rarity, particularly in

15   the airline industry, so we are hopeful that the plan can be

16   confirmed and we can promptly move to emergence.

17           THE COURT:  All right, thank you very much.  And with

18   that, let me turn to the Ad Hoc Group of Convertible

19   Noteholders who filed the statement at Docket 455.

20           MR. KING:  Good morning, Your Honor.  For the record,

21   Geoffrey King of Paul Hastings on behalf of the Ad Hoc Group of

22   Convertible Noteholders.  Your Honor, I have just a few

23   comments, and I'll keep this brief.  As you know, the Ad Hoc

24   Group of Convertible Noteholders to debtors and the Ad Hoc

25   Group of Secured Notes entered into the RSA prior to the

1    petition date after intense negotiations, and the plan was and

2    is obviously a critical component to the transactions that

3    underlie the RSA, and it remains overwhelmingly supported by

4    the Ad Hoc Group.

5         As we pointed out in our papers, over 95 percent of

6    the holders of convertible notes have thrown their support

7    behind this plan, and consistent with Mr. Huebner's

8    presentation, we are not aware of a single convertible

9    noteholder that has objected to any part of this plan.  But

10   overall, as Mr. Huebner has comprehensively showed through his

11   excellent presentation today and the debtors showed in their

12   papers, we do support the plan, we support the relief

13   requested.  We believe the plan satisfies the requirements of

14   the Bankruptcy Code, complies fully with applicable law and

15   should be confirmed.  So with that, we echo the debtor's

16   request to overrule the objections and confirm the plan.

17        THE COURT:  All right.  Let me ask this question if

18   you have any comments or maybe you don't.  So there's a lot of

19   talk about what creditors are giving up by virtue of the third

20   party release.  Of course, there's plenty of cases that deal

21   with the question of creditor on creditor violence, right;

22   there's a recent decision about certain kinds of transactions

23   that Judge Isgur had in front of him, and those are not the

24   only litigation out there about ulterior transactions and other

25   types of things.  And so just to put a little -- I don't know

98

1  if you want to put any context in terms of your client's views

2  about the releases and whether they're relevant at all to those

3  kinds of considerations.

4        MR. KING:  Your Honor, no, I don't really view that --

5  or view the releases kind of in that context.  I think our

6  group viewed the releases as part --

7        UNIDENTIFIED MALE:  That's the furthest thing from --

8        THE COURT:  Somebody's got a live mic; I'm not sure

9  who it was, but that's not such a great idea.

10       Continue, Mr. King.

11       MR. KING:  Yeah, sorry, Your Honor.  Like I was

12  saying, we view the releases kind of in the totality of the

13  plan, in kind of a comprehensive manner.  And so when we were

14  negotiating the plan, obviously, the plan required us to weigh

15  in and consent to those provisions.  I think we viewed the

16  releases as part of kind of the overall deal for lack of a

17  better term.  And like we said in our papers, we believe that

18  those do comply with applicable law, but we view the whole plan

19  kind of in the totality as part of the underlying transaction.

20       THE COURT:  All right.  Thank you very much.

21       And with that, we turn to the Ad Hoc Group of Senior

22  Secured Noteholders.

23       MR. RUBIN:  Good morning, Your Honor, Jason Rubin

24  again from Akin Gump Strauss Hauer and Feld on behalf of the Ad

25  Hoc Group of Senior Secured Noteholders.  I also have just a

99

1 few brief comments.  I do want to start by just highlighting

2 and affirming that today is a very good day for Spirit, for its

3 employees, its customers, its contract counterparties, and

4 today is the culmination of many months of hard work, hard

5 fought, good faith negotiations and collaboration from our

6 clients, the Ad Hoc Group of Convertible Noteholders, and the

7 debtors as well.

8       Through the transaction and the plan, including the

9 authorization of almost 800 million dollars of debt and the

10 noteholders' firm commitment to Spirit in the form of a 350

11 million dollar new money equity investment that's backstopped

12 by the two ad hoc groups, we believe that Spirit will be

13 positioned for long-term success and well positioned to achieve

14 its goal of being the leading ultra-low cost carrier in the

15 industry.

16       As we noted in our statement that we filed at Docket

17 Number 456, we also believe that the plan satisfies the

18 Bankruptcy code requirements for confirmation and is consistent

19 with applicable law, and we do believe that the Court should

20 approve the (indiscernible) statement on a final basis as well

21 as confirm the plan in the forms presented to the Court.

22       And if I could just address the question you just

23 asked Mr. King, which is we negotiated this plan holistically.

24 Our clients agreed to an RSA and agreed to support a plan that

25 did contain the opt outs.  To answer your question on sort of

100

1  the creditor on creditor violence point, this is not a case

2  where there's anything close to that happening here.  This is

3  a --

4         THE COURT:  I wasn't meaning to suggest that.  I guess

5  I was meaning to suggest that what the contours of buying peace

6  of mind look like; that's what I was -- again, I wasn't

7  suggesting, and I apologize if that gave that impression.

8  There's been sort of no evidence of that here at all, so that

9  was not my intent; it was just to try to sort of probe what it

10 means for purposes of the ad hoc groups that are here.

11        MR. RUBIN:  Understood, Your Honor.  As I said, we

12 agreed to this plan holistically, which included the

13 equitization of new money investment, the unimpairment and law

14 of unsecured creditors, and the third party release pursuant to

15 the opt out mechanic, and we are supportive of that plan and

16 believe that it can be confirmed.

17        THE COURT:  All right, thank you very much.

18        MR. RUBIN:  Thank you.

19        THE COURT:  And with that, is there anybody else who

20 wishes to be heard before I turn to the objecting parties?

21        All right, so I think at this point, my thought would

22 be to hear from Mr. Jacobson on behalf of the SEC, and we'll be

23 turning the virtual podium over to him.

24        MR. JACOBSON:  Your Honor, actually, I'm going to cede

25 the podium to the Deputy A.G. from California before I speak

1   and also, I believe it might make more sense for the U.S.

2   Trustee to start because the U.S. Trustee's objection is more

3   comprehensive than ours and deals with --

4           THE COURT:  All right.

5           MR. JACOBSON:  -- more aspects.

6           THE COURT:  I'm happy to do -- let me ask the U.S. --

7           MS. CORNELL:  Happy to go.

8           THE COURT:  All right, so in light of that comment --

9   and again, I understand people often chat ahead of time about

10  an appropriate order of presentation.  I don't want to do any

11  violence to that, so I'll hear from you two nice people in a

12  minute, but first, we'll hear from the U.S. Trustee's Office,

13  who is here in the courtroom.

14          And Ms. Cornell, I might suggest you use the podium.

15          MS. CORNELL:  I think that the Deputy A.G. wanted to

16  speak in advance of both the Securities and Exchange Commission

17  and --

18          THE COURT:  All right.  So I think deputy A.G. from

19  California is up --

20          MS. CORNELL:  I'm sorry.

21          THE COURT:  That's perfectly fine, unless you'd like

22  to pass this cup to some other party.

23          MS. CORNELL:  If somebody else wants to do it.

24          THE COURT:  Let me hear from you, sir.  Happy to hear

25  from you.

102

1          MR. HEYN:  Your Honor, thank you, Deputy Attorney

2   General Matthew Heyn, H-E-Y-N, for the Attorney General of

3   California.  My apologies for not filing anything in advance of

4   this hearing.  We didn't have notice of the hearing.  I didn't

5   find out about it until Monday, and I'll just keep my comments

6   very brief.

7          Spirit Airlines owes the California Attorney General

8   about 123,000 dollars.  The debt arises from the litigation to

9   enjoin the merger between Spirit Airlines and Jet Blue.  Spirit

10   owes attorney's fees.  On October 15th, they signed a

11   settlement agreement agreeing to pay those attorney's fees.  We

12   were not listed on the schedule of creditors, and so we were

13   forced to file a proof of claim for those attorney's fees.

14          We have not opted out of the releases, and the reason

15   is that we didn't get notice of the opt out deadline.  We've

16   searched up and down and left and right, and I've consulted

17   with many of the states that are also parties to the settlement

18   agreement and are also owed attorneys' fees, and it doesn't

19   appear that they've received notice of the opt out either.  As

20   a matter of fundamental fairness and in due process, we think

21   that applying the release to parties that didn't get notice of

22   it is improper.  Applying it to any general unsecured

23   creditors --

24          THE COURT:  Well let me ask -- there's several ways

25   you can go from here.  You might be making a principal

1    objection or you might say, I just want to make sure that I'm

2    considered or anybody else who's in my circumstance considered

3    to be opted out.  And so I don't know which it is.  One is a

4    more holistic kind of big picture argument; the other may be a

5    more practical question to ask Mr. Huebner as to the debtor's

6    position on that and potentially resolve concerns that your

7    client might have.  So --

8             MR. HEYN:  Your Honor?

9             THE COURT:  Yeah?

10            MR. HEYN:  I understand just from researching this

11   hurriedly in advance of this hearing that the most recent

12   confirmation order has paragraph 14, which specifically carves

13   out the release from governmental entities.  I'm not exactly

14   sure that this totally resolves my issues; it does seem to

15   though.  It does seem to say well, whatever violence we do to

16   other unsecured creditors, we're not going to do that to the

17   government.

18            THE COURT:  Okay, let me turn it over to Mr. Huebner

19   to find out if there's a live controversy here.

20            MR. HUEBNER:  Yeah, so Your Honor, I guess today is

21   ambushed by government's day, so let me be very clear.  Number

22   one, he didn't do research; we told him yesterday expressly and

23   sent him the provision as soon as he emailed us that he is of

24   course expressly, explicitly and unquestionably carved out of

25   this.  Number two, the law is completely clear that parties to

104

1  whom the releases don't obtain, don't have standing to object

2  to them.  Number three, is the claim is against the debtors,

3  which has nothing to do with any of this because we're paying

4  all of our claims.  Number four, he was not required to file a

5  proof of claim; no one was because it is a total non-impairment

6  case, as we've told the whole world every single day since

7  November 18th.  Spirit is paying every single claim in cash, in

8  full, in the ordinary course except for the bonds, who have

9  voted 99.99 percent to accept their treatment.

10           Finally, we have people madly looking at laptops in

11  the background, but I think it is also false that he received

12  no notice.  I believe based on what Mr. Melcer is telling me

13  that if you look on our documents, you will see entries for the

14  Attorney General of California listed as claimants.

15           But the good news is we don't need to resolve any of

16  that because we love California, I personally love California,

17  and so they are unquestionably carved out.  We had an exchange

18  of emails about this yesterday where we sent them the

19  provision, and they said, great, we agree.  I don't know why

20  he's at the podium, and I don't appreciate saying whatever

21  violence they do to other creditors.  With all due respect, we

22  are paying every creditor in cash in full except for the bonds

23  who have accepted other treatment.  So I think we can probably

24  put that one to bed pretty quickly.

25           THE COURT:  So I understand your statement to be that

105

1    by virtue of this paragraph 14, that states or government

2    employees are not covered by the -- are essentially considered

3    opted out and aren't covered by this provision?

4           MR. HUEBNER:  That's correct, Your Honor.  It applies

5    to all U.S. governmental units, which definitely includes --

6    there's a definite -- it refers to domestic governmental units

7    as well, and we're totally fine -- and again, we had an

8    exchange of emails about all of this and he said, great,

9    thanks, if my memory is right, so I'm just super confused by

10   what we're doing here.

11          MR. HEYN:  Just to correct, Your Honor, I just said

12   thank you for sending this; that's all I said.

13          THE COURT:  Frankly, I'm not interested in getting it

14   down to this level of granularity.  If I understand things

15   correctly, I don't think I have a live case or controversy for

16   a variety of reasons here; that it doesn't cover governmental

17   units and that to the extent California is concerned about the

18   obligation that it's owed based on its proof of claim, that

19   it's an unimpairment plan and California and other similarly

20   situated government agents will be paid.  So I think those two

21   issues or two understandings I have would seem to mean I have

22   no case and controversy.  So if anybody thinks I'm missing

23   something, I welcome hearing that, but otherwise, I think we

24   can probably move on.

25          MR. HUEBNER:  Yeah, and Your Honor, to be clear, we do

1   want to make sure that California gets proper notice.  So if

2   it's not a problem, Mr. Heyn, I would ask you to coordinate

3   with Mr. Melcer if there's a different address or email address

4   that you would like us to use, I mean, that's sort of -- the

5   last couple of minutes aside, if you are a creditor on this

6   docket and we owe you money, we want to make sure you get it.

7   We've been triaging calls since November to make sure the wire

8   transfers go out and people get paid in the accords, and that's

9   why nobody's objected to anything.  Because anyone who has

10  called us and said, hey, I'm owed money, where's my money, we

11  just make sure it gets sent.  So we're delighted to coordinate

12  and make sure that you miss neither notices nor payments where

13  appropriate.

14          THE COURT:  All right.  I --

15          MR. HUEBNER:  Thank you.

16          THE COURT:  Thank you.  I appreciate California being

17  here, and we -- I think we have clarity on that issue.  So with

18  that, I do think we can turn to Ms. Cornell, then, from the

19  United States Trustee's Office, unless there's any other party

20  who wishes to be heard before I turn to the objecting parties.

21          All right.  Hearing nothing.  Ms. Cornell, there is

22  a -- two microphones in front of you.  One is for amplification

23  in this courtroom, and the other is for purposes of the Zoom.

24  So I think you should be set, but I'm just explaining why

25  you've got devices littering your landscape there.  So

1  apologies to the extent you --

2        MS. CORNELL:  You'll let me know if I start echoing,
3  then?

4        MR. HUEBNER:  No, I don't think there's any --

5        MS. CORNELL:  Okay.

6        THE COURT:  -- echoing issues.  It's just that one
7  makes sure that you're properly heard for purposes of Zoom.
8  So --

9        MS. CORNELL:  Okay.

10        THE COURT:  -- why don't you -- why don't I get your
11  appearance, and I'll confirm that everybody on Zoom can hear
12  you.

13        MS. CORNELL:  Perfect.  Shara Cornell, on behalf of
14  the Office of the United States Trustee.

15        THE COURT:  All right.  Can everybody hear Ms.
16  Cornell?  All right.  Hearing no dissent, I'll turn the podium
17  over to you, Ms. Cornell.

18        MS. CORNELL:  Thank you, Your Honor.  Just because
19  things have been done in --

20        THE COURT:  Can you do me a favor and just move the
21  microphone a little closer for my purposes?

22        MS. CORNELL:  Closer to me?

23        THE COURT:  Yeah.

24        MS. CORNELL:  Yeah?  That better?

25        THE COURT:  Yeah.  Thank you.

1          MS. CORNELL:  Okay.  Just because things have been

2     done in the past doesn't make them right.  And it doesn't mean

3     that we should continue doing them.  In this case, since day

4     one, the debtors have been very vocal -- creditors are

5     unimpaired, they're getting paid in full.  They're passing

6     through.  The debtor said it at the first day hearing; they

7     reiterated it at every subsequent hearing.  They said it today.

8     But it isn't really true.

9          Creditors are giving something up.  They're being

10    forced to provide a release to third parties.  As we'll discuss

11    later, the use of the word "unimpaired" by the debtors, it

12    isn't really true here, and that's because of 1124.  The

13    debtors have said over and over again that creditors are

14    unimpaired and are passing through.  But oh, yeah, by the way,

15    you also have to give a release in exchange for no

16    consideration.  That isn't unimpaired.  But again, I'm going to

17    circle back to that.

18         THE COURT:  Is it your view that a release, by

19    definition, requires consideration?  In other words -- the

20    reason why I ask is because Mr. Huebner made the argument that

21    there's a big -- there's a big deal here.  And the parties who

22    contributed the funds made a recovery possible.  Folks who are

23    unimpaired as to their bankruptcy claims are getting the

24    benefit.  And they may be perfectly content to waive any claims

25    that may exist against the folks who are being released in that

109

1   context.

2           MS. CORNELL:  Well, they might be certainly happy to

3   waive those rights, but we don't know that, because they're

4   being required to opt out and not opt in.

5           THE COURT:  So is your view -- and this was a source

6   of confusion before --

7           MS. CORNELL:  Sure.

8           THE COURT:  -- there are different groups of people

9   here.

10          MS. CORNELL:  Um-hum.

11          THE COURT:  There are parties to the RSA.  There are

12  people voting yes.  There are people who are voting no.  There

13  are people who are deemed to accept.  There are people who

14  don't vote.  In your view, does an opt out -- I'm sorry.  Is an

15  opt in required for all those folks?

16          MS. CORNELL:  It's the United States Trustee's

17  position that an opt in plan is appropriate.  However, in this

18  particular case, I really want to highlight the unfairness with

19  respect to the nonvoting parties.

20          THE COURT:  But before we get there --

21          MS. CORNELL:  Okay.

22          THE COURT:  I am -- and that's how I took your papers.

23  But I'm confused as to how the U.S. Trustee's Office can object

24  based on consent for the parties to the RSA.  And your papers

25  used the term -- I think it's -- hold on one minute here, I

110

1   want to get this right.  It doesn't just use the term consent.

2   It uses the term, I think, express consent.  And I don't see

3   any cases talking about that as a term.  I see cases talking

4   about what constitutes consent.

5       And I'm confused as to the parties to the RSA.  And

6   that also has bigger implications --

7       MS. CORNELL:  Um-hum.

8       THE COURT:  -- in other cases where there may be lots

9   of things happening outside of court or outside the vote on the

10  plan, where parties can, as a matter of the record, manifest

11  consent, whether you're talking about getting money out of a

12  trust, if you're a victim of mass torts or other things.

13      So why does your office view an opt in as a

14  requirement for the parties to the RSA, who I think everybody

15  can agree are the call that is -- it's the easiest argument for

16  the debtors to make here -- the debtor to make here.

17      MS. CORNELL:  I agree, it is their easiest argument.

18  The position of the United States Trustees Program is that opt

19  outs don't work for anyone, and it's inconsistent with state

20  law.

21      THE COURT:  But how?  How?  We have people who've

22  signed on to a contractual agreement.  They're represented by

23  counsel.  They're sophisticated folks.  What basis does your

24  office have, in the law, to require this quote, "express,"

25  unquote, consent?  I have consent.  I have people signing on as

1 a matter of contract.

2           MS. CORNELL:  Um-hum.

3           THE COURT:  What more can possibly be required?  We

4 have lots of things to parse through in terms of --

5           MS. CORNELL:  Sure.

6           THE COURT:  -- people who don't vote, people who are

7 deemed to accept.  I get that, and I get the debate on that.

8 But for the RSA, it seems that -- what's the expression --

9 consistency is the hobgoblin of small minds.  I don't get it.

10 It seems to fly in the face of every fact that I have here.

11 And so what is your authority for the fact that an RSA, a

12 contractual agreement, does not satisfy the consent

13 requirement?

14           MS. CORNELL:  Your Honor, all I have for you at this

15 time is that our official position is that --

16           THE COURT:  I think your official position needs to be

17 revisited.  The cases talk about -- and state law would

18 require, even if we went to state law -- an assessment of each

19 individual set of circumstances.  And the RSA -- your office's

20 position doesn't make any sense.  And frankly, they don't

21 provide any justification for that position, as to folks who

22 are parties to the RSA.

23           We should be focusing on everybody else.  And it's

24 very frustrating to me that we even have to talk about that

25 group of people, because you can't tell me what, about their

112

1   contractual sign on to this, is defective in any way, shape, or

2   form.  So I don't know if you have a Rule 11 basis to make that

3   argument.  So let's move on to everybody else.

4           MS. CORNELL:  Okay.  Circling back, in this case we've

5   heard repeatedly that there has been a 99.99 percent vote in

6   favor of this plan.  But who voted for this plan?  How many of

7   the creditors in this case voted in the plan?  Based on my

8   calculation, only twenty-five percent of creditors were allowed

9   to vote on this plan.

10          THE COURT:  So let's talk about the people who vote.

11          MS. CORNELL:  Yes.

12          THE COURT:  What do you say to -- you cite a number of

13  cases approvingly.  But some of those very same cases say a

14  vote on the plan is sufficient, that it manifests consent.  So

15  Jasics (ph.), Judge Wiles, Smallhold, others.  There seems to

16  be quite a bit of authority.  I understand the debtors to say,

17  picking up on Judge Drain and other judges, that you should be

18  able to get the benefits of the plan and not get the release.

19  And so an opt out is superior to simply construing a vote in

20  favor.  So what -- how do you parse out those kinds of

21  considerations?

22          MS. CORNELL:  Well, it certainly is superior to have

23  an opt out than nothing, but that doesn't mean that it's the

24  right way to do it.  And just because it's been the next step

25  in the way plans have been proposed also doesn't mean it's the

113

1  right way to do it.  The best way to achieve --

2           THE COURT:  No, I understand your office's view that

3  the best way is an opt in.

4           MS. CORNELL:  Um-hum.

5           THE COURT:  I get it.  But I'm asking your office to

6  grapple with the cases that you rely upon that said a vote in

7  favor of the plan is sufficient to manifest consent for a

8  consensual release.  Because I can't take part of those

9  cases --

10          MS. CORNELL:  Um-hum.

11          THE COURT:  -- and not look at the whole case.  And so

12 I'm just trying to get your office's view on that --

13          MS. CORNELL:  Sure.

14          THE COURT:  -- on how you parse those.  And it's

15 perfectly fine if you say they got that right, and they got

16 that wrong.  Certainly, I think Mr. Huebner had some views,

17 similar views --

18          MS. CORNELL:  Um-hum.

19          THE COURT:  -- on other cases, so.

20          MS. CORNELL:  Well, I think that's -- I think that's

21 true.  An affirmative vote does not give people the choice to

22 show that they are knowingly giving a release.  It's just a

23 vote in favor of the plan, and nothing affirmative in a vote in

24 that the release -- you need to have an affirmative act to

25 constitute knowing and informed consent.

1          THE COURT:  So would you -- I guess your office's

2     view -- and I want to confirm it -- is that having a vote in

3     favor of the plan and an opt out is better than simply

4     construing a vote in favor of the plan as consent, but it's not

5     far enough.

6          MS. CORNELL:  I think that might be fair.

7          THE COURT:  All right.  So yeah.  And if I --

8          MS. CORNELL:  I understand.

9          THE COURT:  -- I'm just trying to get --

10          MS. CORNELL:  I understand.

11          THE COURT:  -- clarification on position.  So I don't

12     want to put words in your mouth, so if I say something and you

13     think about it and say it sounds right, and then later you say

14     no, that actually is completely, profoundly wrong, please feel

15     free at any point to jump in.  I'm not trying to do that.

16          All right.  So why don't I just let you go on to your

17     other points, Counsel.

18          MS. CORNELL:  Okay.  Releases are a valuable right.

19     How much were they worth in Purdue -- billions?  Section 1124

20     does not limit impairment to economic --

21          (Audio interference)

22          THE COURT:  All right.  Somebody's got a live mic.

23     And President Reagan's comment about the bombing will begin in

24     fifteen minutes is sort of a good illustrative example of why

25     you don't want to have a live mic.

115

1          All right.  Ms. Cornell?

2          MS. CORNELL:  Thank you.  Section 1124 does not limit

3     impairment to economic impairment.  It includes legal and

4     equitable rights.  What is a release, if not a legal and

5     equitable right?  It is something of value and cannot just be

6     taken by the debtors.

7          This isn't a complicated case.  I think that Mr.

8     Huebner and I can agree on that.  But the debtors have voting

9     classes, and the debtors have nonvoting classes.  The voting

10    classes voted in favor of the plan.

11         THE COURT:  But let me ask you again -- this gets to

12    my frustration --

13         MS. CORNELL:  Sure.

14         THE COURT:  -- I think that your office has a bright

15    line that I'm having trouble -- the arguments apply to

16    everybody without any recognition that there's nuance.

17         So I get the notion that if somebody is unimpaired and

18    isn't voting -- so their claim in the bankruptcy is unimpaired.

19         MS. CORNELL:  Um-hum.

20         THE COURT:  But there's a notion that again, that a

21    vote manifests consent, and if somebody has -- hence, cases --

22    and that if somebody decided to vote, but not decided to opt

23    out, that even under your view of the restatement, that would

24    satisfy the second requirement, because somebody has

25    essentially given a context for what they've done and said,

116

1  I've looked at the papers and I'm doing this; I'm not doing

2  that.  What's your response to that?

3        MS. CORNELL:  I would say possibly.  However, I would

4  have to take that back and get back to Your Honor with that

5  specific answer.

6        THE COURT:  All right.  All right, Counsel.  I'm sorry

7  to keep interrupting you, but please.

8        MS. CORNELL:  By all means.  In this case, the

9  nonvoting creditors never entered into agreement nor received

10 any consideration from the third parties that they're

11 releasing.  These nonvoting parties have to manually opt out of

12 releases.  If they don't opt out, even though they aren't

13 voting for the plan or its terms, including the releases, they

14 are going to be bound.

15        This creates a default where parties are bound by

16 third-party releases without giving consent.  It's confusing --

17 not being entitled to vote for the plan and then being required

18 to affirmatively opt out.  Obtaining consent by virtue of

19 confusion over whether or not you are required to vote or send

20 in a separate form is also not informed consent.

21        THE COURT:  So your view about -- your office's view

22 about confusing --

23        MS. CORNELL:  Um-hum.

24        THE COURT:  -- I understand to not be based on the

25 specific language here, or the specific boxes, but based on the

1   fact that there is an opt out.

2          MS. CORNELL:  Yes, Your Honor.

3          THE COURT:  You're asking to do --

4          MS. CORNELL:  Yes, Your Honor.

5          THE COURT:  -- two different things.  All right.

6          MS. CORNELL:  Exactly.

7          THE COURT:  All right.  Please continue, Counsel.

8          MS. CORNELL:  Thank you.  Perhaps one of the greatest

9   takeaways from Purdue -- that the Bankruptcy Code does not

10  provide authority for releases.  But now what?  As the

11  Smallhold court found, the presumption is that releases as

12  being okay is gone.  But you need to look to an actual law as

13  authority.  We need to look to state law.

14          But this is not new either.  Bankruptcy courts have

15  been looking to state laws for decades to interpret and apply

16  property law.  Butner is not a new case, and it is not novel

17  for bankruptcy courts to look to state laws.  And when you look

18  to state laws, you need knowing and informed consent with an

19  affirmative act.  Silence alone is not and cannot constitute

20  consent.

21          THE COURT:  So what law do you want me to apply?  Your

22  office cites the restatement, but I think we all recognize that

23  that's --

24          MS. CORNELL:  Um-hum.

25          THE COURT:  -- a compendium of wisdom about the state

1   of the law in all the jurisdictions.

2            MS. CORNELL:  Sure.

3            THE COURT:  And your office sort of doesn't have a

4   view on that --

5            MS. CORNELL:  Um-hum.

6            THE COURT:  -- and reserves rights.  But I actually

7   have to write an opinion that sorts through this, so what

8   guidance do you offer in terms of following through on your

9   position?

10            MS. CORNELL:  Absolutely, Your Honor.  And I believe

11   as our brief states, I don't want to get into a choice of law

12   battle at this point, but whether the debtors would be

13   proceeding under New York law or Delaware law, the law is the

14   same.  And the way that -- I'm going to just read to you, if

15   that's helpful.

16            THE COURT:  That's fine.

17            MS. CORNELL:  Under New York general obligation law,

18   5-1103, McKinney 2022, "An agreement, promise or undertaking to

19   change, or modify, or to discharge in whole or in part, any

20   obligation, shall not be invalid because of the absence of

21   consideration, provided that the agreement, promise, or

22   undertaking changing, modifying, or discharging such obligation

23   shall be in writing and signed by the party against whom it has

24   sought to enforce the change, modification, or discharge, or by

25   his agent."

1          What this is saying is that there needs to be an

2     affirmative act, and under New York law, it needs to be in

3     writing.  Silence is not -- does not rise to the level of

4     informed consent under New York law, Delaware law, the

5     restatement, and I would challenge the debtors to find any

6     state law that does not require some iota of informed consent

7     with a affirmative act coupled with it.

8          And again, I don't want to get into a choice of law

9     battle at this point because, you know, that's not something

10    that was briefed.  But when looking to state law, it's quite

11    clear what informed consent needs to be.  It needs to be

12    knowing, informed, and manifested by an affirmative act.  These

13    long-standing rules of contract law are especially important

14    when considering the difference between a third-party release

15    and a release by a creditor of a debtor under a plan.

16          That's why -- I don't want to butcher the name --

17    that's why Norcia is such an important case.  Creditors are not

18    expecting to be entering a contractual relationship with third

19    parties under a plan, nor should they be.  The plan is between

20    debtors and its creditors.  Extending --

21          THE COURT:  Well, but let me ask you --

22          MS. CORNELL:  Sure.

23          THE COURT:   -- this is certainly a theme that the

24    debtors have, which is to say, under the facts of this case,

25    particularly for the folks who are covered by the RSA --

120

1          MS. CORNELL:  Um-hum.

2          THE COURT:  -- the vast majority of whom signed in,

3   signed up -- although there are a couple, it sounds like, that

4   may not have -- wouldn't they -- would they expect to have

5   their rights vis-a-vis the folks who are essentially making the

6   economic sacrifice, and making the plan here possible?

7          Putting aside the general unsecured creditors --

8   somebody who sold Spirit a copier -- but that notion doesn't

9   strike me as particularly offensive if you are in the weeds

10  on --

11         MS. CORNELL:  Um-hum.

12         THE COURT:  -- on being a convertible note holder, a

13  senior secured note holder, given their level of

14  sophistication, given all the negotiations about the RSA, and

15  then sort of the way the cases unfold.  So what can you tell me

16  about your views on that?

17         MS. CORNELL:  Sure.  Under those facts and

18  circumstances, maybe it is different.  But looking at those

19  facts -- and looking at how we have parties here that are part

20  of the RSA, and negotiated the RSA, and they're

21  sophisticated -- and you compare that to the nonvoting parties

22  that were not privy to that -- it only highlights how egregious

23  it is that these third-party releases are going to be applied

24  to them.

25         THE COURT:  Well, my frustration is your office

1   doesn't take a nuanced position about this, which I think is

2   required, whether you apply the cases that are out there,

3   right?  In Avianca, Judge Glenn said --

4           MS. CORNELL:  Um-hum.

5           THE COURT:  -- okay, okay, okay -- but not you --

6           MS. CORNELL:  Yeah.

7           THE COURT:  -- deemed to reject.  And the debtors did

8   not bring that here, a deemed to reject for the shareholders,

9   and indeed I would be very inclined to be like Judge Glenn on

10  that.

11          But so that's why I'm a little frustrated.  I don't

12  think one size fits all, given the way the restatement --

13          MS. CORNELL:  Um-hum.

14          THE COURT:  -- analyzes things or given the way the

15  bankruptcy court cases analyze things.

16          So I know you don't want to win parts of your argument

17  by throwing other parts under the bus, but I'm just sort of

18  asking, how do you -- I guess all that speech --

19          MS. CORNELL:  Um-hum.

20          THE COURT:  -- my apologies, leads to the following

21  question:  Does your office agree that I should be looking at

22  this by, sort of, category-by-category basis, going from the

23  folks who are in the RSA, to folks who are voting in the plan,

24  to folks who aren't voting in the plan, or who didn't vote in

25  the plan -- that I need to look at each of those circumstances?

1          MS. CORNELL:  I think the answer would be perhaps.

2    However, I don't have authority at this time to say one way or

3    another.  But can certainly, again, get back to Your Honor with

4    an answer to that question --

5          THE COURT:  Well, I mean --

6          MS. CORNELL:  -- if Your Honor would require.

7          THE COURT:  -- today's the day and your office --

8          MS. CORNELL:  I understand.

9          THE COURT:  -- has filed objections in countless

10   cases, so I don't know that your office is going to have an

11   epiphany between now and whenever, so -- but I am expressing my

12   frustration, because these things have tended to be things that

13   bankruptcy judges have struggled with --

14         MS. CORNELL:  Um-hum.

15         THE COURT:  -- (indiscernible) on the facts and

16   circumstances, right?  And mass tort adds this whole other

17   level --

18         MS. CORNELL:  Sure.

19         THE COURT:  -- of complication.  And I just -- I think

20   if your office hews to the view that it's always wrong, that --

21   I think, given the facts here with the RSA -- is not very

22   difficult for me to say, I disagree with you.

23         MS. CORNELL:  Um-hum.

24         THE COURT:  It's not always -- it's not always wrong

25   in this case.  But I don't think your office is trying to give

123

1    up its arguments on the other nuances, but without sort of

2    recognizing that it should be a nuanced approach.  It sort of

3    puts me in a bind.  Is your office just asking me to assess,

4    sort of, whether it's permissible generally -- opt in versus

5    opt out -- or is it asking me to do something more nuanced?

6              MS. CORNELL:  I think that in this particular case,

7    we're asking you to do both.  We're asking you to decide

8    whether or not, generally, it's okay.  And then if it is

9    permissible under certain circumstances, to look at the facts

10   of each individual class, as we're trying to focus on here.  If

11   that makes sense, Your Honor.

12             THE COURT:  All right.  Please continue.

13             MS. CORNELL:  Thank you.  The debtor has tried to

14   distract from a lot of these points by repeating the voting

15   record in this case.  But as I said earlier, the voting on the

16   plan has nothing to do with these issues, because the people

17   being deemed to consent to the releases are not voting on the

18   plan.

19             While it's admirable that the debtors have a plan

20   that's been overwhelmingly voted in favor of, but ninety-nine

21   percent of twenty-five percent isn't really ninety-nine

22   percent, is it?  The debtors submit that they received 190 opt

23   out elections.  Of all the creditors in this case, only 190

24   creditors sent in an opt out form.  Out of roughly 1,700

25   unsecured creditors, 1,500 didn't make the election.  This

124

1  means that almost ninety percent either ignored the releases

2  through choice, or through confusion, or inadvertence.

3      THE COURT:  Well, let me ask you about that.  And

4  that's why I've been trying to differentiate the --

5      MS. CORNELL:  Um-hum.

6      THE COURT:  -- level of sophistication of people here.

7  It doesn't strike me as all that offensive if a party who is

8  involved with the RSA received an offer and has decided to go

9  ahead, or even not go ahead, to say like, yeah, this is a --

10  this is a -- this is an acceptable result.  I don't have any

11  desire to sue these people --

12      MS. CORNELL:  Um-hum.

13      THE COURT:  -- and to move on.  And then going to the

14  unsecured creditors again, I seem to be stuck on the copy

15  salesman -- or salesperson -- they may not care one way or the

16  other.  And I'm assuming that, because they're getting full

17  pay.

18      So focusing on the copy salesperson for a second.  I

19  guess your view is, one, just it's confusing.  And are you

20  saying that they have no incentive?  What am I to make of the

21  fact that they're getting paid only because of the way the case

22  has unfolded?  So they may have actually had a reason to pay

23  attention, as opposed to somebody who's deemed denied

24  shareholders being wiped out.

25      MS. CORNELL:  Well, I'd say that that's a lot of

125

1  speculation either way, and that the only way to find out the

2  answer to that is to provide an opt in mechanism so that we can

3  really see whether or not there has been a thought-out process

4  on whether or not these creditors want to be part of these

5  releases or not.

6         The current process is confusing in that we even have

7  to ask that question.  We don't know why they didn't.  We do

8  not know.  Because we're just blindly sending out an opt out

9  form to close to 1,700 creditors.  And guess what?  We're only

10 receiving ten percent back.  We have ninety percent --

11        THE COURT:  Yeah.  But --

12        MS. CORNELL:  -- of those creditors --

13        THE COURT:  -- but you're assuming that -- doesn't

14 that betray your thinking, that you think that 100 percent

15 would opt out, and that they didn't just because they think

16 it's a -- they were confused because they -- your office seems

17 to believe everybody would opt out, and that's the only

18 rational response to this.

19        MS. CORNELL:  Well, I don't know if that's the only

20 rational response to this, but I guess --

21        THE COURT:  But you're essentially asking me to impute

22 the fact that only ten percent opted out, meaning that the

23 other ninety percent were confused, or the process led them to

24 a circumstance where they --

25        MS. CORNELL:  Um-hum.

126

1      THE COURT:  -- weren't otherwise engaged, because

2  otherwise -- and I sort of implied -- they would have done

3  similarly.

4      MS. CORNELL:  Well, we really have no way of knowing.

5  And truthfully, if the debtors wanted to show that it was the

6  alternative -- it was that these folks don't care about the

7  releases -- then why didn't they just send out an opt in form

8  instead, to these 1,700 creditors?  What would have the

9  difference made [sic]?

10      Because the debtor seems to be claiming that they're

11  not sending in those forms because they don't care about the

12  releases.  It's the same -- it's just two sides of the coin.

13  And the real way to figure it out is to send out an opt in form

14  instead of an opt out form.

15      THE COURT:  All right.

16      MS. CORNELL:  The nonvoters should have an opportunity

17  to meaningfully -- meaningfully -- opt out of releases that

18  they have not even had an opportunity to negotiate or vote on.

19      THE COURT:  So -- and I apologize for --

20      MS. CORNELL:  Yeah.

21      THE COURT:  -- jumping around a little bit here, but

22  there was a discussion I had with Mr. Huebner --

23      MS. CORNELL:  Yeah.

24      THE COURT:  -- about some of the restatement --

25      MS. CORNELL:  Sure.

127

1          THE COURT:  -- exceptions, and the -- so let me -- if

2     it doesn't do too much violence to your outline, and I clearly

3     did some violence to Mr. Huebner's, I wanted to, sort of, walk

4     through those.

5          MS. CORNELL:  Sure.

6          THE COURT:  But if there's something else, while

7     you're on your topic, that you want to get to before we do

8     that, I'm happy to wait.

9          MS. CORNELL:  No, I'm actually mostly done.  I think

10    I've made my point.  I think Your Honor understands --

11         THE COURT:  All right.

12         MS. CORNELL:  -- the points being made in this case.

13         THE COURT:  So for the first restatement, there's this

14    question about an offer, taking the benefit of offered

15    services, and sort of the expectation that, well, it says,

16    "with reasonable opportunity to reject them and a reason to

17    know they were offered with the expectation of compensation."

18         Mr. Huebner's argument is without this plan in this

19    case, these folks are not getting what they're getting, right?

20    That's why they're unimpaired, so -- particularly focusing on

21    the folks who are unimpaired and weren't voting.  And that

22    therefore, they have reason to fall under A.  So what's your

23    view on that?

24         MS. CORNELL:  Well, I suppose I'd point to the fact

25    that we don't know what would happen if there wasn't the RSA.

128

1    Mr. Huebner rightfully said, we don't know the economics of
2    what would happen, but we really don't know what would happen.
3          THE COURT:  But I have the economics of the value
4    being given up, and we're still not getting money to equity.
5    That's the --
6          MS. CORNELL:  Um-hum.
7          THE COURT:  -- factual record I have.  So despite the
8    folks who would have to be paid, who are secured, and the folks
9    who would be part of the unsecured claim pool, all that --
10   whatever's being equitized creating the value -- I mean, I
11   think I have a record in front of me that folks are not --
12   without this deal, folks are not getting -- they're not getting
13   paid in full, and I have the liquidation analysis.
14         So -- so I don't know the precise number, but that's
15   why I asked the question.  I wanted it to be -- I wanted the
16   understanding on the record.  I don't think the record suggests
17   anything other than that conclusion.  Is your office debating
18   the factual record on that point?
19         MS. CORNELL:  No, no.  I was just drawing -- I guess I
20   was redirecting to the debtor's response about how they view
21   the answer to that question.  And I think the answer to the
22   question is we don't know that these unsecured creditors would
23   not continue being paid in the ordinary course absent the
24   RSA's --
25         THE COURT:  But then you are taking --

1          MS. CORNELL:  -- releases --

2          THE COURT:  You are taking --

3          MS. CORNELL:  -- the releases under the RSA, because

4    whether or not the releases under the RSA are necessary and

5    required in order to make those payments --

6          THE COURT:  No, but that's not what "A" is.  "A" is

7    that you're getting -- well, maybe it is.  I misspoke there.

8    So you're saying that that is a different -- if you look at

9    "A" -- well, do me a favor and flush that out how that relates

10   to "A" because I'm not sure I'm following precisely.

11         MS. CORNELL:  Sure.  And again, I'm kind of working

12   through it in my head also.  If you're offering services with

13   the expectations of compensation for those services, and we're

14   taking the group of unsecured creditors in this case and their

15   expectation of compensation, the funds -- based on the debtor's

16   liquidation analysis and the plan itself, the funds are coming

17   from those noteholders as part of the RSA agreement.  And the

18   releases are part of that agreement, correct?

19         THE COURT:  Right.

20         MS. CORNELL:  So --

21         THE COURT:  And I think they're anchored to that

22   agreement.  I think the notion is just whether you find these

23   permissible or not permissible.  I don't think anyone's arguing

24   there's anything particularly sinister here, meaning the folks

25   who were involved in this deal, the requested consensual

1    releases, or purported consensual releases, are tied to that

2    deal, right?

3           MS. CORNELL:  Um-hum.

4           THE COURT:  So it's understandable even if it wouldn't

5    be approved.  So with that, where do you see the analysis in

6    "A"?

7           MS. CORNELL:  Well, it's a little bit different, isn't

8    it, because we are still in the bankruptcy paradigm here.  And

9    we're in -- in a post-filing world, the creditors are operating

10   under a little bit of a different paradigm, aren't they, in how

11   they would continue to be paid and what they're owed.  So I'm

12   just trying to think it out a little bit further on the basis

13   of what they're being paid and the way that it's been

14   characterized.  I'm sorry for taking --

15          THE COURT:  Yeah.  I mean, I guess Mr. Huebner is

16   making the point that there's a benefit being offered here, and

17   that these folks, he says that they're going to ask for the

18   releases subject to an opt out.  Although, I suppose one could

19   say that the requested benefit is the ability to ask for a

20   release, right?  And that we've done all this stuff.  And we

21   think people don't want to give it to us, but we're going to

22   ask because we're making this plan happen.

23          And so that's what I understand.  And that the value

24   that is on the record makes the payment of these things

25   possible.  And so at the very least under those circumstances

1   and the way that the actual documentation works, which nobody

2   should have taken an issue with, that it's appropriate.

3        Now, I guess, if you think it's inherently confusing,

4   I suppose that that's an argument.  But again, these exceptions

5   are designed to say where silence or inaction can operate as an

6   acceptance under the restatement.

7        MS. CORNELL:  Well, I think that one of the bigger

8   issues here is that these creditors would get paid under the

9   plan whether or not they're subject to the releases, right?  It

10  has no bearing on their payment the way that this plan is

11  structured.  And I think that says a lot about whether or not

12  this exception applies.  They are going to get paid either way.

13  Who is benefiting from the releases, and why are they receiving

14  the releases here?  And I think that would be my answer.

15       THE COURT:  All right.  Unless you had anything else

16  on "A"?  So two deals with how offeror has stated or given the

17  offeree reason to understand that assent may be manifested by

18  silence or inaction, and the offeree can remain silent or

19  inactive intends to accept the offer.  I think whether you look

20  at the restatement or the cases, it's pretty clear that they

21  say it does not affect the general rule that silence is not

22  enough under the restatement.  But it does suggest that there

23  may be contexts where somebody can manifest their assent, and

24  their silence and inaction can be acceptance.

25       And so I had a conversation with Mr. Huebner about

132

1    whether this is one way to view the case law where parties are

2    voting to accept the plan, and judges have said that that's

3    sufficient consent.  Mr. Huebner says we've done more than that

4    here.  But putting that aside for a second, the idea is it's a

5    manifestation of assent saying we're engaged in the process,

6    we're looking at what we're doing, and therefore, that would

7    satisfy a "B".  Do you have a thought on that?

8         MS. CORNELL:  Well, I suppose if we're going to take

9    it the way that Your Honor has been taking it throughout this

10   discussion about how there are different classes, I don't see

11   how that could possibly be true for the nonvoting classes here,

12   particularly the general unsecured creditors.  How can we say

13   that they have been involved or that we can take any of their

14   actions?

15        There's no proof of claims that have been filed here.

16   I haven't seen notices of appearances for 1,700 unsecured

17   creditors to show that they're actively involved.  What has

18   been done to show that they have been involved?  What has

19   happened in this case to show that those creditors have even

20   read the plan?

21        THE COURT:  Well, I would agree that the nonvoting

22   folks are in a markedly different spot than you look at "B".

23   But I guess I'm trying to understand those cases where judges

24   have said -- again, they did it without reference to the

25   restatement.  They weren't using the restatement.  But if you

133

1   look at their decisions to say where somebody has voted, it

2   constitutes consent and for purposes of what's in the plan.

3          And so let me ask you to address -- I understand your

4   view that for folks who were nonvoting that there's -- your

5   view is there's nothing there.  But for "B" for folks who are

6   voting, how do you understand that consistent with the case law

7   that's out there, even in Chassix where Judge Wiles says, I'm

8   not okay with this, but voting on a plan is voting on a plan,

9   and certainly, Smallhold has some similar language.  So what's

10  your view on "B" and for voting folks?

11         MS. CORNELL:  I think the answer to that is that the

12  clearest way to know if someone has manifested the appropriate

13  amount of consent -- I'm sorry.  The clearest way to know that

14  creditors have manifested the maximum amount of consent, so

15  that there is no confusion whatsoever, is to provide a

16  secondary option.  There's voting, and then there's opting into

17  the releases so that there is no confusion.

18         THE COURT:  I get that.  I get that, and I know your

19  office uses the word "express consent", but I think the cases

20  used the word "consent".

21         MS. CORNELL:  Yes.

22         THE COURT:  So I think there are clearer and less

23  clear records --

24         MS. CORNELL:  Sure.

25         THE COURT:  -- about consent, but I don't know that

1   it's meaningful to talk about consent as if you satisfy

2   consent, you satisfy consent.  If you don't, you don't.  Some

3   cases are easier to decide.  Some cases aren't.

4        But I guess my question is, while I don't think anyone

5   would -- or it might be hard to debate the point whether the

6   clearest way to do this for the -- but the question is whether

7   there's consent here for the voting folks based on the

8   restatement exception "B", I guess, is my specific question.

9        MS. CORNELL:  And my answer would be based on the

10  United States Trustee's position is that, no, there wouldn't

11  be, because they need that separate affirmative action and

12  consent with respect to the releases themselves.  That that

13  would be my response.

14       THE COURT:  Do you think "B" could ever apply in

15  cases?  Because if that's your view that you always need

16  separate opt in consent, you would never be looking at the

17  exceptions.  So is your view that "B" never applies for a

18  consensual release in the Bankruptcy Code?

19       MS. CORNELL:  For a third-party release?

20       THE COURT:  Yes.

21       MS. CORNELL:  For a third-party release, I think that

22  would be our position, yes.  Again, I just want to draw the

23  distinction between third-party releases and debtor releases.

24       THE COURT:  Yeah, fair enough.

25       MS. CORNELL:  I just want to make sure.  I know I was

135

1   saying it kind of generally.  But just --

2          THE COURT:  Debtor releases are the side.  That's the

3   code.  I get it.  I guess I'm struggling with that answer in

4   the sense that if you're saying it's a matter of contract and

5   you cite the restatement for that and the restatement has these

6   exceptions in it, and you're saying but they can't apply, I'm

7   struggling to understand how that would be the case.  How you

8   can intellectually square that with the fact that you're asking

9   me to look at that as the source of authority and then saying,

10  it can never apply.  Because then that means you're only

11  selectively using part of the restatement.

12         And again, if the restatement is the sum-up of what

13  state law says, then it would seem to say what you're saying is

14  you're asking me to look at only part of what state law says

15  without all of state law.  And I don't know that there's any

16  authority for that.

17         MS. CORNELL:  That's fair.  And I don't think that I

18  have a great answer for Your Honor at this time, and I'm sorry

19  for that.

20         THE COURT:  All right.  All right.  So moving right

21  along to "C", and I promise this is the last one of these.

22  This is about prior previous dealings.  And I think Mr.

23  Huebner's view in response to my question was, there isn't a

24  need to develop a specific factual record as to specific

25  creditors or specific classes of creditors other than what's

1   here.  And so obviously, there's case law out there on what

2   precisely this means.

3          So what's your view about analyzing the various

4   differing situations of folks and exception "C"?

5          MS. CORNELL:  Well, my view on that would be that it

6   would be incredibly difficult to apply across the board in

7   bankruptcy cases because we have so many different situated

8   creditors.  And even in this case, even taking the unsecured

9   creditors, we have different types of creditors.  And it would

10  be an incredibly tedious process, and it would be a lot easier

11  to just take the United States Trustee's proposed approach and

12  provide an opt in procedure to avoid such a process.

13         I wouldn't even know where to begin with respect to

14  each of the individual claimants in this case, because there

15  are 1,700 unsecured creditors, and I can't claim to know all of

16  their circumstances or their previous dealings with the

17  debtors.

18         THE COURT:  All right.

19         MS. CORNELL:  But I would have to guess that none of

20  them have had previous dealings with the debtors that include

21  third-party releases of noteholders.

22         THE COURT:  So let me sort of differentiate for a

23  second to give the exploded view of the different -- once

24  again, the different parties.

25         MS. CORNELL:  Sure.

1          THE COURT:  So you have general unsecured creditors,

2    again my favorite example of somebody selling a copier, versus

3    somebody who is a senior secured noteholder or a convertible

4    noteholder.  And so I clearly have a more developed factual

5    record as to the noteholders, whether you're talking about

6    senior secured noteholders or the convertible noteholders, than

7    I do with the general unsecured population.

8          Any comments or observations or thoughts about that

9    and whether that makes a difference, does it make a difference,

10   or how to approach exception "C"?

11         MS. CORNELL:  Not really.  Other than what Your Honor

12   just pointed out is why it's so difficult to apply exception

13   "C", is because of the record and because of the different

14   claimants and what we know and why it's a difficult exception

15   to apply in this case.  Other than that, I'm not sure I have a

16   great answer for Your Honor.

17         THE COURT:  All right.  Fair enough.  All right.  So

18   thank you for indulging me as I went through these, just

19   because I wanted to make sure to cover them.

20         Are there any other points you want to make, Counsel?

21         MS. CORNELL:  I don't think so.  I would be remiss if

22   I didn't leave the podium just reminding the Court about the

23   unfairness to these nonvoting creditors in this case that have

24   been told since the beginning that they're just going to pass

25   through.  They're going to get paid.  Nothing to see here.

138

1    Nothing's being changed.

2           But they are losing a right, a right to sue, which is

3    a right, and it is valuable.  And to take that away without

4    knowing an informed consent with an affirmative act, it's not

5    only not permissible under state law, but it's also unfair.

6    And I just want to leave Your Honor with that thought, that

7    it's unfair in this case.

8           And unless Your Honor has any other comments for me, I

9    would cede the podium to the Securities and Exchange

10   Commission.

11          THE COURT:  All right.  Thank you very much.

12          MS. CORNELL:  Thank you.

13          THE COURT:  And again, I appreciate your willingness

14   to jump around.

15          MS. CORNELL:  Oh, no problem.

16          THE COURT:  I know I do a violence to very nice

17   presentations when I do that, so I need you to do that in

18   person.  Although, I think I jumped on Mr. Huebner's song a few

19   times as well.  So I seem to be fairly equal opportunity on

20   that.  So thank you very much.

21          All right.  With that, let me turn to the SEC.

22          MR. JACOBSON:  Good afternoon, Your Honor.  Neal

23   Jacobson on behalf of the Securities and Exchange Commission.

24   I'm going to limit my argument here to the noteholders who did

25   not return a ballot, so these would be nonvoting noteholders.

139

1          My review of docket 452, which is the vote tabulation

2    declaration, it appears that there are approximately 110

3    million dollars in senior secured notes, and perhaps 12.5

4    million dollars in convertible notes in amount that did not

5    return a ballot, or did not take any action to indicate their

6    consent to a release.

7          We're not aware of any federal statute or federal rule

8    that permits a bankruptcy court to deem a failure to opt out of

9    a third-party release as consent to the release of non-debtors

10   outside of mass tort or asbestos cases.  And we're not aware of

11   any comparable situation outside of the bankruptcy context,

12   where a party who fails to respond to a legal notice from one

13   entity is then deemed to provide a blanket release to third

14   parties who are not even named in the caption of the notice.

15         So in a class action, other cases where a party fails

16   to opt out, they're not on notice that their failure to opt out

17   of a class action is going to result in their release of claims

18   against third parties who are not even named in the action,

19   which is what a third-party release does in the bankruptcy

20   case.

21         The debtor has argued that there's some type of

22   bankruptcy law that courts have followed in the past that,

23   perhaps based on the facts and circumstances, that a release

24   may be valid or an opt out may be a valid way to determine

25   consent.  But that will result in disparate rulings by

1  different courts.  Your Honor took the time to look at the

2  different types of creditors who might have been involved in

3  the case, who might not have been involved to determine whether

4  or not they provided consent.

5       Our view is similar to the U.S. Trustee's view, that

6  the only way to really know whether a creditor or a shareholder

7  or any party in interest has consented through a third-party

8  release is to require that they opt in to the release.

9       THE COURT:  So let me --

10      MR. JACOBSON:  Otherwise --

11      THE COURT:  Let me --

12      MR. JACOBSON:  Yes.

13      THE COURT:  Let me ask you about that.  I've certainly

14  struggled with this in terms of consistency.  And I understand

15  Ms. Cornell's point about, well, the easiest way to do this is

16  with bright lines.  On the other hand, what's been cited to me,

17  at least by the U.S. Trustee's Office, is something that

18  doesn't provide a bright line.  And sometimes, when I have

19  these sort of debates, I think, well, I just work here, meaning

20  I'm going to apply whatever law should be applied, and that may

21  be fifty states and foreign jurisdictions, or it may be federal

22  law, it may be whatever it is.

23      And so I guess I'm trying to understand what you would

24  have me do as to the source of law.  Because what we're talking

25  about here in terms of various possible options is the result

141

1    rather than necessarily, I guess, it's somewhat relevant to
2    what laws should apply.  But it's really the result of the
3    application of the appropriate law.  So what's the SEC's view
4    about law and what bankruptcy courts were applying before
5    Purdue and whether Purdue changed that?
6            MR. JACOBSON:  Well, I think what Purdue did is, it
7    made it clear that third-party releases are an exception.  And
8    just going back to small hold and default theory, you can't
9    just put a third-party release into a plan if nobody objects.
10   It becomes the law because it's part of a plan.
11           THE COURT:  Right.
12           MR. JACOBSON:  And it's binding.  So we know that.  So
13   we know that third-party releases require some type of consent.
14   And the Supreme Court, although it stated that it's not opining
15   on consent, realized that third-party releases require consent.
16           So I understand the Court's difficulty in determining
17   or trying to figure out what law applies.  And I think that is
18   a major issue because there is no bankruptcy law that applies
19   to consent as far --
20           THE COURT:  Well, so --
21           MR. JACOBSON:  So --
22           THE COURT:  I get that.  But it depends, doesn't it,
23   on your view about how to approach the problem?  So what I
24   think the other side would say, although I'm sure Mr. Huebner
25   would say it slightly differently, is that the Supreme Court

142

1  said, we're not touching that.  And there's a whole bunch of

2  authority about judges evaluating this issue based on notions

3  of due process and looking at the facts and circumstances.  And

4  why does that change as a result of Purdue, which expressly

5  said, we're not touching it?

6       Now, that does not mean that the Supreme Court can't

7  revisit that issue.  And the Supreme Court does that from time

8  to time, say, we're not touching it.  And then, the next

9  opinion comes down five years later and says, in ruling that

10 way, we never meant to imply that this was appropriate, but it

11 does mean, I think, that until they speak, they haven't spoken.

12 And that's what Court of Appeals -- that's the privilege they

13 hold for themselves as they try to decide big issues.

14      So if we take them at their word, there seems to be a

15 notion that I can't apply the same test, I guess maybe is a big

16 word, but approach that's been applied in this district, in

17 this circuit, and in other courts around the country, and I'm

18 struggling to understand why that's true.

19      MR. JACOBSON:  Right.  Well, I think, Your Honor, what

20 the U.S. Trustee said at the outset of her argument was that

21 just because something was done in the past doesn't mean it's

22 right.  And in some ways, perhaps, the decision in Purdue just

23 brought to light the issue of third-party releases in a way

24 that it was not understood before.  Because certainly third-

25 party releases, nonconsensual were permitted in most circuits.

1   Granted, there are very stringent requirements, so it brought

2   that to the forefront.

3         And if you do review other bankruptcy cases, there's a

4   statement.  It appears that, yes, failure to opt out, yeah,

5   that looks like consent.  That looks good enough for me because

6   it makes sense that this party, if they fail to opt out, they

7   must have consented.  There might be just some kind of

8   general -- I think it's a human nature, like that looks right

9   to me; although, there's no specific law that addresses it.

10  And I believe that is an issue that both the courts and parties

11  have been struggling with.

12        What is true is, I believe, in every state opting in

13  to a release would be deemed consent.  There may be states

14  where permutations on the restatement might be different, but

15  clearly, a manifestation of consent can definitely be found by

16  someone who says, I consent.  That's why --

17        THE COURT:  No, I think that's right.  But the

18  question is, for better or for worse, judges don't get to

19  decide the facts of the case that come in front of them.  So I

20  have to deal with what I have.  And here I have the groups of

21  creditors that exist.  And I know you sort of focused on the

22  nonvoting.

23        I took the SEC's pleadings to mean that they weren't

24  objecting to the folks who signed on to the RSA.  And then,

25  there's that intermediate group of people who voted, which I

1  don't think we've gotten to yet.  But I want to make sure to

2  get that before we're done here, just so I understand what the

3  SEC's position is on those things.

4          MR. JACOBSON:  Right.  So again, we limited why we are

5  agreeing with the U.S. Trustee's arguments in general.  Since

6  we are the agency responsible for protecting investors, we only

7  focused our objection on the noteholders who are investors.  So

8  I have to limit my argument to those noteholders.  I don't know

9  from the declaration whether there are any noteholders who

10  voted to reject the plan who didn't opt out of the release, or

11  who may have voted in favor of the plan who are not part of the

12  RSA, who voted in favor and also opted out of the release.

13          So it's kind of hard to -- and they are a few, and one

14  of the reasons that I'm limiting the focus of the argument now

15  to nonvoting creditors is because we do understand that a

16  majority of them did sign the RSA and voted in favor of the

17  plan.  So in our view, signing the RSA is sufficient

18  manifestation of consent.

19          THE COURT:  All right.  All right.  And that would be

20  true, although I can't imagine this factual situation exists

21  but I've been wrong about these things before, that if somebody

22  signed the RSA, I'm assuming they also voted in favor of the

23  plan, because probably the RSA required them to vote in favor

24  of the plan.

25          MR. JACOBSON:  I believe it required them, if they

145

1    have the option to vote in favor of the plan and if they have

2    the option to either opt in or opt out of the release, they had

3    to like not exercise the right to get out of the releases.

4    So --

5              THE COURT:  All right.  So I understand, then, the

6    SEC's position that you're not asserting an objection as to the

7    folks who signed on to the RSA.

8              MR. JACOBSON:  Correct.

9              THE COURT:  That for folks who voted, I guess I'm a

10   little -- it sounds like you don't quite know if they're --

11   since you're looking at the sort of investors, you're not quite

12   sure what the facts are there.  But do you have sort of

13   guidelines as to what you want me to take?  Again, I don't mean

14   to be badgering.  And I think I was --

15             MR. JACOBSON:  I think --

16             THE COURT:  -- tormenting Ms. Cornell a bit, but I

17   just -- I'm trying to make sure I understand where everybody

18   comes out on various things, because those are the -- the

19   objections are what I have to address.

20             MR. JACOBSON:  Correct.  So I would say at this point

21   we are focusing on the noteholders who did not vote, did not

22   submit any ballot so, therefore, also did not check an opt out

23   or not check an opt out because they didn't submit anything.

24             THE COURT:  All right.

25             MR. JACOBSON:  And there may be -- there may be --

146

1        THE COURT:  And we don't know if there's a null set or

2    not --

3        MR. JACOBSON:  I don't know.

4        THE COURT:  -- as to folks who may have voted and not

5    checked anything.

6        MR. JACOBSON:  Correct.  And certainly, we agree

7    that -- we agree with the U.S. Trustee's Office that that

8    checking or not checking is separate from the voting.  And

9    while we certainly understand with the decision of Smallhold is

10   like the logical like argument; although, I'm not sure what the

11   legal argument is, but the logical argument, hey, you submitted

12   a ballot.  You vote in favor of the plan.  There's an opt out

13   box right there.  You didn't check it.  Obviously, you must

14   have then granted the release.

15       I don't know if that's more of a commonsense argument.

16   I don't know if it's a legal argument.  So we --

17       THE COURT:  Well, but I mean, there's an argument for

18   that.  And that's why I sort of went through the even assuming

19   the restatement that is i.e. state law applies, that that might

20   be a manifestation of consent, and that might be one way to put

21   a more specific legal gloss on the judges who actually say,

22   hey, if you vote in favor.

23       So it sounds like you're with the U.S. Trustee's

24   Office in saying it's not enough for you; although, you're not

25   quite sure how big of an issue it is here.

1          MR. JACOBSON:  In this case.  And I also say that

2     Judge Goldblatt and my reading of Judge Goldblatt's decision in

3     Smallhold was not that this is okay under bankruptcy law.  I

4     believe he stated that this is okay under state contract law.

5     That --

6          THE COURT:  Well, let me ask about it, and that's why

7     I asked Mr. Huebner the question about the statement at the

8     end.  And again, as I said to him, you can't know what Judge

9     Goldblatt's thinking.  But he's very transparent in the issues

10    he's working through, and he offered to comment in that vein,

11    which I appreciate, is people mentioned class action concepts,

12    and those are interesting, and those may be applicable.

13          So I'm trying to understand.  I don't know that he is

14    necessarily adopting a state framework if you throw that

15    comment out there because you're essentially saying there's

16    other considerations that one might need to look at, and I

17    don't know where I am.  So I think if he decided state law and

18    state law only, I'm not sure where the class action concepts

19    fit in.

20          MR. JACOBSON:  Well, I believe he stated -- I mean,

21    because the argument has been made by other debtors in other

22    cases, and it's circulating out there that this is -- and in

23    other -- there are other bankruptcy courts that have referenced

24    the class action as an analogy to this.  We don't believe it's

25    an appropriate analogy for the reasons we stated in the

1    footnote, which Mr. Huebner says doesn't apply here because

2    there are representatives and the noteholders were adequately

3    represented.

4         I think there is a difference, though, because there

5    is no actual rule that governs consent in the bankruptcy

6    context.  And unlike all these other cases, we're talking about

7    releasing third parties.  So in a class action, you get a

8    notice that all your claims against XYZ company are going to be

9    settled, and you're going to get whatever you're going to get

10   unless you opt out.

11        There's nothing in there that says you're also

12   releasing multiple other parties who are not named in the

13   caption.  And I think that's really a major difference between

14   the general notion of due process, did you get notice of

15   something or not get notice of something, where you're actually

16   expecting the person to understand that they're giving up

17   rights against nonparties.

18   And here, when we talk about the consideration, the noteholders

19   provided consideration, and so they -- maybe they should get

20   released.  We believe that there should be an opt in for that.

21   But we're also talking here -- the release is broad.  It's

22   officers, directors, accountants, attorneys, a whole host of

23   people who the average person who gets a notice that they have

24   to send an opt out is not thinking that they're going to be

25   releasing potentially hundreds of people and entities that

1    might be liable for something.

2            THE COURT:  But let me ask you again.  You may have

3    said this, and I may have missed it as we were going through

4    things.  So what source of authority, what law should I apply,

5    right?  So the US Trustee's Office says state law and points to

6    the restatement.  The debtor says no existing federal law and

7    notions of due process and fairness.  And I ask because there

8    are the exceptions and whether we need to sort of work through

9    them for each of the different situations here, so what's the

10   SEC's view on that?

11           MR. JACOBSON:  We believe it would be state law.

12           THE COURT:  All right.  And so what's your view about

13   what state law is the -- the restatement's nice, but it's --

14           MR. JACOBSON:  Right.

15           THE COURT:  -- it's the restatement.  And in a case

16   like this, this runs into the question about consequences of

17   choice of law versus uniform bankruptcy and things of that

18   sort.  So what's the SEC's view about what state law?

19           MR. JACOBSON:  Well, it would either be where the

20   bankruptcy case is pending, where the company is incorporated,

21   I mean, then you'd get into a much -- like a more in-depth

22   analysis, perhaps, of the choice of law.  Although, again,

23   pretty much every state would say that an opt in is sufficient.

24   And I'm not sure if the actual states are really so different

25   in terms of their application of the restatement.  We might

150

1    find a case here or there, but I'm not so sure that the state

2    laws are that different.

3         And certainly I think evolving a bankruptcy rule by --

4    I don't know if it's a common law type of bankruptcy rule

5    that's evolving with bankruptcy courts that are looking at the

6    facts and circumstances and say this comports with due process,

7    this doesn't.  It seems to me that that is much less helpful

8    than a bright-line rule that an opt in is required.

9         THE COURT:  All right.

10        MR. JACOBSON:  And it's not clear how and you can --

11   and courts can certainly rely on other court's decisions where

12   they held that opt out is sufficient.  But again, the legal

13   basis for those decisions is not clear either.  So relying on

14   past precedent that does not articulate the source of the law,

15   I believe also is not the best way to move forward.

16        THE COURT:  But I guess that's saying that Purdue

17   changed everything in terms of what -- because I guess by

18   implication, it has to mean that Purdue means that you've got

19   to change the way you frame the issues, which means that the

20   consequences of that decision are significant here.

21        MR. JACOBSON:  With respect to third-party releases,

22   yes, we believe that that's --

23        THE COURT:  Well, but no, with respect to consent.

24        MR. JACOBSON:  Well, consent for third-party releases,

25   then.  Well, consent in general if you -- I mean, there are

151

1    bankruptcy rules that govern, for instance, voting on a plan or

2    not voting on a plan or filing a claim or not filing a claim

3    where they're set in a rule that has been adopted and should be

4    known to everyone.  There is no rule about consent to a third-

5    party release, right?

6          THE COURT:  So --

7          MR. JACOBSON:  So the --

8          THE COURT:  So I think you echo Ms. Cornell in saying

9    that the benefit of consistency in an opt in, but of course, if

10   you apply state law, state law has its own exceptions.  So I

11   think I would ask you the same questions about the -- if your

12   views are different or you have some views which the U.S.

13   Trustee's Office doesn't on each of the three exceptions that

14   are cited in the restatement as applied here.

15         MR. JACOBSON:  Well, again, I think when we're talking

16   about people who didn't vote, I don't believe that any of the

17   exceptions would apply to nonvoting creditors.  And including

18   nonvoting, non-RSA noteholders who by definition are probably

19   not a large block.  They may have been individual holders of

20   notes who held in brokerage accounts; that could be a mom and

21   pop who owns bond.  We don't know.  So I believe that the

22   exceptions would not apply to the non-RSA noteholders.

23         THE COURT:  All right.  So what about -- and some of

24   these may overlap somewhat.  What about folks who vote on the

25   plan?  In your point of view, do any of those -- and again,

152

1  maybe you have the same view as the U.S. Trustee's Office that

2  it's a different question.  But again, I'm just sort of

3  referencing --

4          MR. JACOBSON:  Right.

5          THE COURT:  -- the exception notion that saying it's

6  manifested in some other way and I guess that --

7          MR. JACOBSON:  Right.

8          THE COURT:  -- is probably the issue.

9          MR. JACOBSON:  Yeah.  So certainly by voting and not

10 opting out, it's a stronger argument that there's consent.  But

11 we do agree with the U.S. Trustee's position that the decision

12 on the opt out should be an opt in and not an opt out, even on

13 a ballot.  If you vote in favor of the plan, you should have to

14 opt in to the release.  So we do agree with the U.S. Trustee on

15 that, although we understand that conceptually, it appears --

16 we understand why a court may view the actual voting on the

17 plan and not checking the opt out to be consent as well, as the

18 Judge in Smallhold.

19         THE COURT:  All right.  And what do you make of the

20 debtor's argument about A, the first of the exceptions talking

21 about the benefits, and with the notion that they were offered

22 with the expectation -- with a certain expectation.

23         MR. JACOBSON:  Again, this has benefits, though, that

24 are not provided by the debtor, and the releases are going to

25 third parties and not to the debtor.  So in some ways I can see

153

1  how the statement will not fit in perfectly with the notion of

2  third-party releases.  But we don't believe that again, this is

3  with respect to nonvoting.  You have to assume that they, the

4  nonvoting class or nonvoting creditors, reviewed the ballots

5  and understood that they had to do something.  And we don't

6  believe that there should be a requirement that they actually

7  have to do anything.

8          THE COURT:  So you joined the US Trustee's Office in

9  saying it's not so much the language of the paper here and the

10 ballots, but that the notion that an opt out essentially is

11 always sort of inherently problematic for the reasons you

12 articulate?

13         MR. JACOBSON:  Correct.  But I would argue here, just

14 like the unimpaired classes, I believe it was known that as a

15 practical matter under the RSA that the noteholders would have

16 accepted the plan.  So any straggling noteholder of the 110

17 million or so and the 12.5 million of convertible note holders

18 who might have been smaller holders.  They would assume, I

19 think, many of them that would assume that there's no reason to

20 even look at anything, because they understand that it's going

21 to be accepted under the plan anyway, because 95 percent of the

22 RSA, 95 percent of the holders already agreed to the agreement.

23 So there's no real reason for them to look at any papers that

24 they get in the mail.

25         Or in this case, it might be an email from a broker

154

1  that says, hey, we have something for you.  Open this up and

2  look at it.  So they may not even know that it involves any

3  kind of release.

4          THE COURT:  All right.  And I guess I can't promise

5  it's the last question, but I hope it's the last question --

6          MR. JACOBSON:  You're good.

7          THE COURT:    -- on these exceptions, which is the

8  prior course of dealings.  Because I obviously think there's

9  more of a record here as to noteholders, given the RSA

10  negotiations and the ad hoc groups and things of that sort,

11  than there are for general unsecured creditors.

12          MR. JACOBSON:  Right, Your Honor.  So I think anybody,

13  any party that was involved in actually negotiating this, we

14  understand that this exception could apply.  But to the smaller

15  holders who are not involved in the negotiations and don't even

16  know about the negotiations most likely because they occurred

17  pre-petition, I don't think that that -- we don't believe that

18  that exception would apply.

19          THE COURT:  All right.  Well, I guess it seems hard to

20  fathom that somebody wouldn't have heard of the negotiations

21  and would stick their head that far in the sand and actually be

22  a noteholder here.  I mean, I'm having trouble getting that

23  there's been certainly a lot of discussion about it.  The

24  record seems to suggest extensive negotiations and extensive

25  notice to people, in fact, to try to get them to sign up, so I

1   can understand and it seems pretty clear that there's --

2   there's blasts out there.

3          I don't know of the changes that result, but I have

4   trouble imagining that noteholders somewhere sitting in a -- in

5   a kitchen confused about why they're getting a piece of paper

6   relating to their rights as a noteholder.  Am I missing

7   something on that?

8          MR. JACOBSON:  Well, they may not -- they may get the

9   piece of paper that says you can vote on this plan.  They

10  already know, perhaps from all the publicity, that there's no

11  reason to vote on the plan because it's soon to be accepted,

12  it's already been accepted as a practical matter.  And you're

13  talking about a third-party release, which I don't believe --

14  it may have been noticed in the notice section of the

15  newspaper, but it's not something that was discussed in the

16  press necessarily that like a mom and pop note holder would

17  realize that if they don't opt out of a release, that when they

18  get this piece of paper that they have to actually submit

19  something in order to preserve their rights against third-

20  party.

21         THE COURT:  But does that -- doesn't that ask me to

22  sort of make inconsistent conclusions about their

23  sophistication?  One that they're sophisticated enough to

24  understand that they should sit this one out, on the other

25  hand, they're not sophisticated enough to know what sort of the

156

1    the deal is in terms of including this request for releases?  I

2    think you're either sophisticated, you're either paying

3    attention or you're not.  So I'm having a little bit of

4    trouble --

5            MR. JACOBSON:  I don't --

6            THE COURT:  -- imagining such an investor in my head

7    who's all in on some things, but not all in on others.

8            MR. JACOBSON:  I believe that if you're negotiating

9    the RSA, you're clearly sophisticated.  Or if you're

10   represented by someone who's negotiated the RSA, you're

11   sophisticated.  I don't think Your Honor needs to get into

12   sophistication versus not, but in terms of just looking at the

13   course of conduct, the only -- I believe our position would be

14   that you can only look at course of conduct for parties that

15   were actually involved in negotiating the RSA.

16           THE COURT:  So your comments I guess are I wouldn't

17   say limited to C, but sort of our response to the question

18   about C in terms of prior conduct, meaning that there needs to

19   be some conduct that I have in the record?

20           MR. JACOBSON:  Right.

21           THE COURT:  All right.

22           MR. JACOBSON:  Correct.

23           THE COURT:  All right.  Thank you, Counsel.  I

24   appreciate both you and Ms. Cornell's willingness to take the

25   trip down exceptions 1, 2, and 3.

1        MR. JACOBSON:  Yes.

2        THE COURT:  Anything else that that you want to

3    address?

4        MR. JACOBSON:  One thing which the U.S. Trustee did

5    not raise and I just want to point out, and I'm not sure how

6    relevant it will be to Your Honor, but the debtor has stated a

7    few times that nobody objected to the procedures, and they were

8    accepted by everyone.  My understanding is the U.S. Trustee

9    objected to the whole concept of combining the plan and

10   disclosure statement and having -- and in their objection they

11   stated one of the -- one of the concerns they had was

12   authorizing procedures --

13       THE COURT:  But that objection was --

14       MR. JACOBSON:  -- in advance of the grant.

15       THE COURT:  That objection was to say, Judge, if

16   there's a problem with how this is being done as an opt out,

17   then if we have a disclosure statement and the Court makes a

18   ruling, things can get fixed.  If we have a combined hearing,

19   then it is what it is and do people really want to do that?

20   And the debtors --

21       MR. JACOBSON:  Right.

22       THE COURT:  -- and Mr. Huebner -- the debtor, Mr.

23   Huebner, said we understand how it works and we're essentially

24   willing to take that risk.

25       MR. JACOBSON:  Okay.

1          THE COURT:  So it was really about -- the objection

2   was about the combined hearing and the meaning of the Court's

3   rules about combined hearings and some of the rules; is it a

4   pre-pack?  Is it not a pre-pack?  And the arguments sort of

5   echoing the 1950s, does it walk like a duck?  Does it talk like

6   a duck?  And so I think that's where the objection was.

7          I don't think there was any objection to the clarity

8   of the language and to the actual notices that were being sent

9   out.  So I think, as I understand today from both the US

10  Trustee's Office and the SEC, is the objection is to the

11  notion, the idea that an opt out is inherently problematic and

12  confusing no matter what language you have.

13         MR. JACOBSON:  Correct.

14         THE COURT:  But essentially, it's putting lipstick on

15  a pig could be a little more blunt.

16         MR. JACOBSON:  Okay.

17         THE COURT:  But not to the specific language used

18  here?

19         MR. JACOBSON:  Correct, Your Honor.

20         THE COURT:  All right.

21         MR. JACOBSON:  Thank you.

22         THE COURT:  All right.  Thank you.  Anything else, Mr.

23  Jacobson?

24         MR. JACOBSON:  No, Your Honor, thank you.

25         THE COURT:  And I'll thank you as well for the

159

1  willingness to engage in a colloquy back and forth to do

2  violence, no doubt, to your very clear and beautifully written

3  presentation.

4       So with that, I think we're back up to the debtor,

5  unless there's somebody else who I'm somehow missing.  Is there

6  anybody else who would request an opportunity to speak before I

7  turn the podium back over to Mr. Huebner on behalf of Spirit?

8       All right.  Hearing nothing, Mr. Huebner, my first

9  question to you is -- is a nonlegal one.

10       MR. ENDRES:  Your Honor?

11       THE COURT:  Yes?

12       MR. ENDRES:  Yes, this is Steven Endres.

13       THE COURT:  All right, sir.

14       MR. ENDRES:  I was wondering if this is the time to

15  speak?

16       THE COURT:  Well, I understand you filed a piece of

17  paper and it is on the agenda to be discussed.  And your motion

18  to contest the petition for relief and relief from the

19  automatic stay.  So right now, what we're talking about is

20  confirmation, which is whether the -- the plan that the debtors

21  have put forward should be approved.  And more particularly,

22  we've been talking about a specific provision of the plan and

23  the materials that went out dealing with a release question.

24       MR. ENDRES:  Oh, okay.

25       THE COURT:  So I don't know if what you want to talk

160

1    about is anchored to that.  And again, I looked at your papers

2    and I didn't frankly see that, but let me give you a minute to

3    explain your thinking.

4            MR. ENDRES:  No, I just wanted to double-check that

5    you weren't ending the meeting yet.

6            THE COURT:  Oh no, no.

7            MR. ENDRES:  That's all.

8            THE COURT:  No, no.  We're a little ways away from

9    that.  I will certainly give you an opportunity to speak and

10   the request, and I just wanted to make sure that you didn't

11   have anything to say about the confirmation questions that are

12   on and that we're hearing argument on.  I understand you have

13   your motion, and that is number four in terms of having a

14   status conference.

15           Although perhaps Mr. Huebner, I don't know if you want

16   to sort of take things slightly out of order to address that

17   now or we want to button up confirmation?

18           MR. HUEBNER:  Your Honor, I'm not the person handling

19   that, so I think we definitely should take it in the agenda

20   order and Mr. Kaminetzky will be ready when it is time for

21   that.

22           THE COURT:  All right.  So sir, I think we will get to

23   that.  I can't give you a precise time as to exactly when we're

24   going to get to that.  I was just going to ask Mr. Huebner what

25   his suggestion was for proceeding.  We do have a number of

161

1    other things on for today, and it's 1:20.

2            So let me ask Mr. Huebner if people want to take a

3    break for lunch and come back.  Mr. Huebner?

4            MR. HUEBNER:  Yes, Your Honor.  My suggestion is this.

5    I'm not going to take very long to respond to the last hour or

6    so of colloquy.  I think it probably is measurably the most

7    logical, only if it is okay with the Court, that we just finish

8    this topic.  Because I just have ten, eleven points maybe to

9    make and I'll try to be rapid fire and efficient and then we

10    can break and then come back at the Court's pleasure and do the

11    rest of the agenda.

12            THE COURT:  All right.  So I think that makes sense to

13    finish this and then we can move on.

14            So I think, Mr. Enders, what I think that means is

15    that we're going to talk about confirmation for another twenty

16    would be my rough guess, give or take a little bit of

17    additional time, and then we'll take a break for lunch.  So I

18    think what that means is there's no chance that we're going to

19    be talking about your particular request until 2:30; it might

20    be 3 o'clock.  I'm not sure exactly when, but I mentioned that

21    to the extent you don't want to sit through more of this and

22    you want to come back when your pleading is going to be

23    discussed.  I think we will not discuss it before 2:30.  And

24    you could log off Zoom if you want; you're free to stay,

25    obviously.  But you could log off and come back on at 2:30 and

162

1   and do something else with that hour of your life.

2         MR. ENDRES:  Okay.  I appreciate that.  Thank you,

3   Your Honor.

4         THE COURT:  You're welcome.  All right.  So with that

5   and hearing no one else chime in about anything else that needs

6   to be done before hearing from Mr. Huebner on behalf of the

7   debtor to wrap up the confirmation discussion.

8         Mr. Huebner?

9         MR. HUEBNER:  Thank you, Your Honor.

10         Your Honor, let me first take a step back.  We cite

11   case after case after case after case after case.  It was kind

12   of remarkable to listen to an hour of oral argument from the

13   objectors and there were either zero or one cases cited.  And I

14   think that's for very good reason, because no court ever

15   anywhere, no court ever anywhere has adopted the categorical

16   rule that the trustee is requesting that opt outs are simply

17   legally impermissible.  Quite the contrary, and I won't belabor

18   it.  There are very, very, very few cases, all approved things

19   far less protective of creditors, including mandatorily tying a

20   yes vote on a plan to the granting of third-party releases.

21         Her opening words more or less where creditors are not

22   unimpaired unless there -- unless there is an opt in.  I may be

23   slightly off, but I think I'm hopefully very close to right.

24   This is the equivalent of I want what I want because I want it.

25   The notion that a creditor is impaired under the Bankruptcy

163

1   Code because the U.S. Trustee's Office, with no case law,

2   prefers an opt in to an opt out, is completely meritless.  We

3   actually went on for two full pages in our reply brief, citing

4   Harrington and LATAM showing why this cannot possibly be right.

5   No response.

6          But let's go to the statute, because that's actually

7   kind of helpful, too.  1123 A4 is kind of interesting because

8   it's actually the lead in to 1124, which is what is impairment.

9   The impairment section begins except as provided in Section

10  1123 A4 of this title.  1123 A4 says, "provides the same

11  treatment unless the holder agrees to less favorable treatment

12  of such claim or interest."  So there's only one question

13  today, which is, have people manifested agreement in light of

14  being paid in cash, in full, and having their contracts assumed

15  to give up claims against the parties who made it possible when

16  they had multiple ways, including with the click of a mouse, to

17  decide not to give those releases?  This is an issue of

18  consent, and there are, as I keep saying, about 80 cases that

19  have found that this is more than sufficient for consent.

20         Ms. Cornell goes on to question Congress and the

21  president, who passed into law a statute that says that

22  unimpaired predators do not vote.  She just kept saying only 25

23  percent of the creditors voted or were allowed to vote.  That's

24  true because that's the law of the land in this country.

25  People who are unimpaired don't vote because it would be not

1  sensible to do so.  And they're also allowed to agree to

2  separate, slightly less than full treatment.  So even if you

3  assume that the payment in full of all their claims, the

4  assumption of their contracts, there somehow is not enough,

5  they agreed to that treatment, and under 1123 A4 and 1124, as a

6  matter of clear statutory drafting, they are unimpaired.

7          Next point, Your Honor.  They just don't have any

8  courts that say what they want them to say, that only opt ins

9  work.  Look at their cases.  Jasics -- you know what?  I'll

10 leave that point.  It's just not going to touch that.

11         Your Honor, there was then a colloquy of some length

12 including the representation that nonvoting creditors never

13 received any consideration from the released parties.  This is

14 totally, demonstrably false.  The nonvoting creditors are only

15 getting what they're getting under this plan, which is an

16 extraordinary, incredible outcome, precisely and exclusively

17 because of the consideration being provided via the debtors

18 from the released parties.  Your Honor asked a few times, kind

19 of confirming that everybody agrees that things would have been

20 way, way, way worse without the concessions of 800 million

21 dollars of acquisition, 350 million dollars of new equity

22 capital, et cetera, et cetera.  And I referenced, without the

23 numbers in front of me at the time, the liquidation analysis.

24 Again, I would hope we would have figured something else out,

25 but for the avoidance of doubt, the liquidation analysis says,

165

1    and it is uncontested evidence in these proceedings, that the

2    recoveries would be between seven and fourteen percent for

3    general unsecured creditors in liquidation, which is between

4    seventy-six and ninety-three percent less of a recovery than

5    they are getting here.

6          Your Honor, we then spent a bunch of time with Ms.

7    Cornell in particular saying, but it's confusing.  What if it's

8    confusing?  Maybe it's confusing.  That is legally foreclosed.

9    We had a hearing on the adequacy of the materials, and this

10   Court entered an order to which no party objected that

11   expressly found, quote, "the manner of notice, service, and

12   publication thereof" dot, dot, dot, "under the circumstances,

13   constitutes sufficient notice to all interested parties," and

14   went on to also talk about the form of notices being provided,

15   all in paragraph 6.

16         And this sort of love affair that they have, that opt

17   ins are not confusing and opt outs are confusing, I'm going to

18   give you the exact opposite theory.  If I'm an unsecured

19   creditor and I want to make sure I get my distribution and I

20   don't understand stuff, and the box says check this if you want

21   to opt in, I think it's at least more likely than not that I

22   think that in order to get what I'm promised under the plan, I

23   have to opt in, because that's how lots of other stuff works.

24   And so again, this sort of unspoken subtext that somehow an opt

25   in is wonderful and sort of clarion, exquisite clarity, but an

166

1    opt out is somehow sort of misleading or inappropriate, A, no

2    court has ever agreed with that.  And two, I just think as a

3    matter of common sense, it's not true at all.  I actually think

4    it's at least equally likely that Carter says, oh, I better

5    make sure I opt in, because this plan looks like it's very good

6    for me.  And if I don't do that, maybe I don't get my stuff.

7         Ms. Cornell then spends a little time on Section 5-

8    1103 of the New York General Obligation Law.  Let's go to it,

9    because I actually think it couldn't really apply much less.

10   "Written agreement for modification or discharge.  An

11   agreement, promise or undertaking to change or modify or to

12   discharge in whole or part any contract obligation or lease or

13   mortgage or other security interests in personal real property

14   shall not be invalid because of the absence of consideration

15   provided that the agreement, promise, or undertaking, changing,

16   modifying or discharging such contract, obligation, lease,

17   mortgage or interest shall be in writing or signed by the party

18   against whom it is sought to enforce the change, modification

19   or discharge by or by his agent."

20        So what this says is if there is no consideration and

21   it is a modification or change to a contract, obligation,

22   lease, mortgage or security interest, then it's not inherently

23   invalid if it's signed.  It's a flawed syllogism.  And here

24   there is consideration; it just doesn't apply at all.

25        Next is the choice of law question, which Ms. Cornell

1    quite understandably said, I don't want to get into a choice of

2    law battle because the real answer is it's an unthinkable

3    morass that no court would ever entertain.  As I tried to say

4    in the opening, the choice of law issue almost proves the point

5    why this is an issue of federal law and due process and

6    propriety of consent, not what law governs the contract.  We

7    have counterparties all over the world, in addition to probably

8    in most of the fifty states.  The real answer is you might have

9    one hundred parties, each arguing that their own law applies.

10   And that's just completely, utterly unworkable, which is why no

11   court has ever entertained it.

12        Next, Your Honor, she briefly referenced -- and I

13   agree with her completely, I'm not sure how to pronounce it

14   either, but I'm going to go with Norcia just as a guess, and I

15   apologize to I believe it was Mr. Norcia who bought the cell

16   phone.  We spent three pages discussing that case in our brief,

17   and it's totally unresponded to.  A person bought a Samsung

18   phone at a Verizon store.  They left with just the phone, and

19   they didn't even take the box and the little teeny weeny fine

20   print documents with them.  Samsung then later said, oh, the

21   tiny document in the box you never got, and the document you

22   never saw, binds you to arbitrate with Samsung when you enter

23   Verizon and bought the phone.  The customer doesn't even know

24   that document existed and never saw it.  To say that a

25   federally court approved set of notices in a major U.S.

168

1    bankruptcy case is analogous to that just holds absolutely no

2    water.

3            Ms. Cordell's next point was that of the creditors who

4    got the notices, ninety percent or so did not send in opt outs.

5    I'm just totally comfortable with that.  The fact that dozens

6    of parties sent in opt outs in a case where they're being paid

7    in cash in full and probably have no claims to preserve, and

8    were like, whatever, but still took the time nonetheless to

9    preserve their rights makes perfect sense.  And the fact that

10   the other eighty-seven percent said, this is great.  We called

11   Davis Polk, we said, where's our money?  They wired us the next

12   day.  We have nothing outstanding.  Our contracts being

13   assumed, there isn't even a bar date.  They sent me the all-

14   trade motion.  Like whatever, moving on, right?

15           So to sort of say that this sort of proves anything

16   that helps them is completely, I think, backwards.  If five

17   people had opted out and you could say like, no one did this,

18   this can't be right, maybe that would be something.

19   But given the number of -- the response level to all sorts of

20   things, including voting on a plan where you're very deeply

21   affected and impaired directly by the debtor, which is not this

22   plan, I'm actually very comfortable with that.  And by the way,

23   that would hypothetically -- the sort of notion of like people

24   get confused by bankruptcy notices.  Well, then I guess barred

25   aid (ph.) order shouldn't work because they're awfully long and

169

1   complicated.  Confirmation objection deadline notices shouldn't

2   work because they can be complicated.  I'm assuming your

3   contract and here's the cure, that can be complicated.

4        Again, this sort of notion that there are somehow

5   massively unsophisticated people, but only if it were an opt

6   in, that would solve all of these problems and we would be sort

7   of up in Nirvana somewhere, it's just not appropriate and not

8   correct.  It's not -- they're allowed to argue it.  It's just

9   not correct.

10        And that's why the confusion point has been rejected

11   by every court, basically, that has considered it, including

12   their cases like Smallhold, where this Trustee specifically

13   said it can't be right, Your Honor, that rejecting creditors --

14   some of them didn't opt out.  They must have been confused.

15   And the court said, you lose.  People filled out the documents.

16   I'm going to assume they read them.

17        If a bankruptcy court had to ensure that the

18   sophistication of every one of the hundreds of thousands or

19   millions of stakeholders in every large bankruptcy case was

20   sufficient, they fully understood every single document, we

21   should just shut down the US bankruptcy system.

22        Next, Your Honor, we went back and checked PBSD

23   because you raised it and we like to always be responsive.  We

24   don't think it relied on the default theory at all.  If my

25   memory is right, Judge Goldblatt in Smallhold said he believed

1    that Judge Gerber implied a default theory in PBSD, but we

2    don't think he did it, and certainly not in the opinion.

3          With respect to the restatement, Your Honor, since you

4    spent some time on this -- again, I know that you know that my

5    view is that we have to lose about eleven things in a row

6    before the restatement becomes relevant.  But I want to pause

7    just for a minute on exception three, because you did ask them

8    a lot about the -- because of previous dealings language, but

9    it goes on to say or otherwise.

10         And I think that that's actually quite important.

11   Here again we satisfy all three exceptions.  It's something

12   that we don't think applies.  But for the avoidance of any

13   doubt, I am very comfortable that the phrase "where because of

14   previous dealings or otherwise, it is reasonable that the

15   offeree should notify the offeror if he does not intend to

16   accept".  I think what we've done here is unbelievably

17   reasonable, including who we chose to apply them releases to

18   and who we chose not to apply them at all.

19         I'm not sure I could stand there at the podium and

20   defend it.  We had applied it to equity holders and said, they

21   could have read it.  They could have opted out even though

22   they're getting nothing.  We didn't do that.  These are the

23   most narrowly tailored, carefully thought about opt out

24   releases that at least I have ever seen.

25         Ms. Cornell then went on to talk about unfairness.  So

171

with apologies to her, I guess I see unfairness quite the other
way.  I think what's quite unfair is that the bondholders party
to the RSA are giving back 795 million dollars of debt, taking
very different debt with much longer lead time to get repaid,
investing 350 million dollars of equity, and the fact that they
asked for -- or that we ended up all agreeing to collectively
opt out releases that people can feel free not to give, and we
made it incredibly easy.  But we're here battling this for
hours, all at the expense of innocent creditors, and under the
unbelievable facts of this case, these objections were not
withdrawn.  I actually think that that's what's unfair.

Your Honor, with respect to state law, I just want to
note, we don't think that Smallhold relied on state law.  The
opinion, frankly, for all of its incredible clarity and the
like in other areas, I think is not super clear on sort of the
federal versus state question.  A lot of the cases that he
cites, particularly in some of the footnotes, like footnote
number 61 are just the regular due process cases that I think
rely pretty clearly on sort of -- on sort of the federal
bankruptcy concepts.

And then, Your Honor -- and I'm just about done; this
is the last page.  With respect to Mr. Jacobson's point about
unnamed third parties, with all due respect, I don't think
that's right either.  Every settlement agreement I have ever
seen says X and his officers, directors, agents,

172

1    representatives, assigns, blah, blah, blah, blah, blah.  Here

2    the releases were tailored to be tied to the debtors.  They

3    were set forth in extremely extensive documentation.  I think

4    they actually did a very good job identifying what the issues

5    were, what sort of the scope of the entities were.  They were

6    certainly no different than a laundry list of parties who

7    ultimately get released as part of pretty much all large

8    settlements.

9         Finally, Your Honor, it's Harrington, right?  And

10   really, the subtext here is, having lost the issue virtually

11   everywhere for decades, does Harrington somehow give the

12   trustees' sort of crusade in favor of opt ins, a new lease on

13   life?  So leaving aside that virtually every court other than

14   Judge Goldblatt and Smallhold, who has addressed the question

15   and said no, including three in the last three weeks alone,

16   it's just clear on the text of Harrington.  Think about how

17   through the looking glass debate, everybody agrees that

18   Harrington expressly said verbatim, as important as the

19   questions we addressed today are the ones that we do not.  We

20   are not addressing what constitutes consent.  But yet they're

21   up here saying Harrington radically changed and governs the

22   question what constitutes consent.

23        Well, that would surprise Justice Gorsuch quite a lot,

24   because I don't think he could have been more clear that he was

25   not addressing it.  And for the reasons that I set forth in the

173

1    opening and the brief and the cases we cited, I'm not going to

2    go back into why I think Harrington is not remotely an issue.

3    And in fact, if anything, I think it's helpful because it says,

4    among other things, they're not even saying that we couldn't

5    give -- we couldn't impose nonconsensual releases on unimpaired

6    creditors or the overall majority of the creditors in this

7    case, subject to voluntary opt out releases.  So I think we're

8    sort of a fortiori there as well.

9           Finally, Your Honor -- and this is the very last

10   point.  You spend a while worrying because you care and you

11   want to make sure and you want to get it right.  Is there sort

12   of some difference between impaired creditors and unimpaired

13   creditors?  Is one of them sort of less likely to read stuff

14   and the like?  I don't think there are any bright lines here.

15   I actually don't think ultimately there is a difference.  These

16   are all parties to the case who have put on clear notice of

17   exactly what was going on from the first day pursuant to court

18   approved documents that had -- I think the exhibits to our

19   reply brief has pages and pages of the bold caps, big font --

20   the notion someone missed this and somebody was confused -- and

21   by the way, we did these documents and the limited number of

22   people who reapplied them, I just don't think that survives

23   scrutiny.  The US legal system rests on a fundamental premise

24   that proper, clear, fair notice within certain contexts is

25   sufficient, and the parties have to speak up.

1        That's what all the cases say.  That's what the three

2   exceptions to the restatement say.  And by the way, a bunch of

3   the cases interpreting federal law and interpreting state law,

4   like the case out of Florida, even say under state law this is

5   totally fine given the context of the bankruptcy overlay.  So

6   Your Honor, I'm going to leave it at that.  I'm very mindful of

7   the time.  I certainly did not expect to go until a quarter to

8   2 on this single issue.

9        We are profoundly grateful for the extraordinary

10  intellectual focus of all parties on this issue, but obviously

11  the Court more than anybody.  And unless the Court has any

12  questions, I'll rest.  And there was a lot of stuff by the way

13  in our brief that we didn't bother reading.  And so, the other

14  issues, I think, will probably address in writing and certainly

15  not going to raise them now.

16       THE COURT:  All right.  Thank you very much.  And just

17  to magnify that point, I have everyone's briefs.  I have them

18  out here.  They're marked up.  I have read them before, or I've

19  read them again this morning.  I will continue to look at them

20  as I go through and make a decision.  So with that, unless I'm

21  missing something, I consider the confirmation hearing to be

22  closed based on the record and the arguments.  And what I would

23  do is I will take the matter under advisement and give you the

24  following explanations as to my intent.

25       My intent is to get the parties a decision very

175

1    quickly.  I understand the timing components here.  That could

2    take a couple of different forms.  It could take the form of me

3    telling you what my answer is and there's a decision to follow.

4    It could come where I say, here's my decision, my answer, and

5    here's the decision at the same time.  But it will be -- it

6    will be prompt.  I've been working on this for some time.  That

7    may have been painfully obvious by the amount of down the

8    rabbit hole kind of questions that I pestered you all with.

9          And so the only thing I would ask is to get a copy of

10   the transcript.  I took notes and -- but a transcript is always

11   helpful.  But my intent, again, is to get this done very

12   promptly.  I've learned in this job not to make precise

13   predictions on that, but suffice it to say, you will hear at

14   least something next week, one way or the other, whether it's

15   just -- even just an answer if I haven't finished up a

16   decision.

17         So with that let me ask first, Mr. Huebner, and I'll

18   ask anybody else if there's anything else before we take a

19   break and then resume after lunch with the rest of the agenda.

20         MR. HUEBNER:  Sure, Your Honor, one just soft, gentle

21   note on that.  I think that works great, but let me just

22   explain the sort of -- the other dates relevant to next week.

23   So we currently have an RSA milestones until February 17th to

24   procure the confirmation order.  By sort of our analysis, as

25   long as we know that answer by, call it, February 20th, which

176

1    is a week from today at the super outside, we could keep to our

2    current emergent schedule because there are quite a few things

3    we can't go do with respect to the closing of the rights

4    offering and the --

5          THE COURT:  The 20th is fine.  The 17th since it's a

6    federal holiday would be more problematic.  But the 20th is --

7    the 20th would be fine.  I can even -- as I -- once I get off

8    the bench, at a certain point, I may come back with some date

9    and time to get folks together.  But the 20th is a week from

10   now, and that should be fine.

11         Again, I can't promise the exact -- exactly what it

12   looks like.  You all have engaged very significantly in the

13   issues, and I'd like to thank all counsel involved for your

14   willingness to do that.  I asked a lot of very pointed

15   questions.  And on a -- on a subject where there's a lot of law

16   and a lot of arguments both sort of very clearly out there and

17   some that are nuanced.  So I want to make sure that my decision

18   lives up to the level of advocacy that I've been given by the

19   parties briefing and the arguments today.  But the 20th is

20   fine.

21         MR. HUEBNER:  So Your Honor, just to finish that

22   thought, forgive me for just ten more seconds.  So we would

23   need a waiver of the milestone to move from the 17th to the

24   20th, which I hope will be forthcoming, because we believe that

25   as long as it's by the 20th, we can adhere to our exit

1  schedule.  Obviously any day before that.  And we don't need --
2  assuming that Your Honor is going to write a super long,
3  awesome, thoughtful decision win, lose or draw, we certainly
4  don't need that.  We just need the confirmation order rendered.
5  And so, once you know the answer, while intellectually I'd love
6  to obviously see it, how it was arrived at, from our
7  perspective, not holding up this emergence of this company in
8  which so many people rely for their livelihoods and their
9  travel is by far the most important.  So at least speaking for
10 the debtors, if you said, my answer is either this or this,
11 decision to follow, we would take that Tuesday morning and just
12 have to live with the sort of unknown excitement about what
13 justifies it for a later date.
14         THE COURT:  All right.  So I think at the break,
15 people can have a conversation about timing.  You mentioned the
16 20th.  The 20th makes sense to me, so I'll sort of hold you to
17 that.  And frankly, even if you didn't offer it, that's
18 probably what I was going to suggest.  So it's a -- it's just
19 if that's any consolation.  So we can -- we can circle back.
20 And if folks want to put anything on the record vis a vis any
21 of what you just said, we can hash that out when we come back.
22         MR. HUEBNER:  Sure.  Thank you so much, Your Honor.
23 And to the chambers as well.  I know it's not simple stuff for
24 anybody.
25         MS. CORNELL:  Your Honor?

1           THE COURT:  Yes.

2           MS. CORNELL:  Sorry.  Since we're going to be coming

3    back later this afternoon, do you mind if I'm excused and Ms.

4    Wells takes over?  I actually have another confirmation hearing

5    at 3:00.

6           THE COURT:  No, that that would be fine.

7           MS. CORNELL:  Thank you.

8           THE COURT:  Absolutely.  I appreciate that.  So what I

9    will just make very clear is -- I think what we've concluded is

10   Number 1 in the amended agenda, dealing with final approval of

11   the disclosure statement and confirmation of the plan, meaning

12   that it has been submitted.  The only thing I can think of that

13   I would do is -- and again, I don't think anybody is -- to the

14   extent there's any value in saying that everything else but the

15   release issue is appropriate and complies with applicable law.

16   But I don't think anyone is saying otherwise.  But we can -- we

17   can deal with that.  But otherwise, Number 1 is done, and we'd

18   be returning to deal with Number 2, the sealing motion and

19   everything else after that.  So Mr. Huebner, is that consistent

20   with your understanding?

21          MR. HUEBNER:  It is, Your Honor.  I guess the way the

22   litigators want me to say it is, the record of the confirmation

23   hearing and the disclosure approval is now closed.  Argument

24   has concluded.  Given that there were objections, nothing other

25   than this, if it's not achieved yet, I think it is helpful for

179

1   the world to know that the Court is prepared to confirm the

2   plan, subject to its decision on this remaining issue.

3          THE COURT:  I think that's all accurate.  Anyone wish

4   to be heard on that in case I've somehow terribly misspoken or

5   missed some issue?  All right.  Hearing nothing.

6          Mr. Huebner, I agree with you.  The only issue that is

7   in dispute is the releases.  And everything else has been

8   fully -- everything has been submitted and everything else

9   there is no dispute about.  And I can say, subject to the

10  confirmation order, which we'll address this in more detail --

11  although in a pithy 19 pages as opposed to 70 pages -- that the

12  confirmation requirements are satisfied.  I may put something

13  else more fulsome on the record when we return, but it would be

14  consistent with the more standard statements that you all are

15  well used to in confirmation approvals.

16         So with that, it's now a couple of minutes to 2.  Mr.

17  Huebner, should we say 3:00 just to be in the interest of

18  having a clean time?

19         MR. HUEBNER:  We should say whatever the Court wants.

20  We're here for you.

21         THE COURT:  3:00 is fine.  I will make a point of

22  coming right back at 3, so we don't run out of runway to finish

23  up things.  That's an appropriate metaphor in an airline case,

24  isn't it?  And the only other thing I would ask is the

25  individual was here before who may still be here, if he is

180

1    here, he can know that he doesn't need to come back until 3:00.

2    If he isn't here, if somebody would just call him and let him

3    know that so that he can enjoy the rest of his life until 3:00.

4        MR. HUEBNER:  Yeah.  If we -- if we have his contact

5    data, we will Your Honor.  I'm not sure that we do.  We do?

6    Okay.  Yeah.  Your Honor, we do have some contact there for Mr.

7    Andrews, and we'll immediately try to contact him.

8        THE COURT:  Do the best you can.  Do the best you can.

9    All right.  And with that we will -- I guess people will log

10   off, I assume.  I will probably leave the Zoom running, but

11   it's the same link for this morning, this afternoon, for

12   anybody who decides to log off and log back in.  And with that,

13   thank you all again, and I'll see you at 3:00.

14       MR. HUEBNER:  Thank you, Your Honor.

15       (Recess from 1:54 p.m., until 3:06 p.m.)

16       THE COURT:  Good afternoon.  This is Judge Sean Lane

17   in the United States Bankruptcy Court for the Southern District

18   of New York.  And we are here for a continued hearing in Spirit

19   Airlines, Inc., Chapter 11 case.  And having concluded this

20   morning's hearing on item Number 1 of the amended agenda

21   dealing with final approval of the disclosure statement and

22   confirmation plan.  And we're moving on to the rest of the

23   items on the agenda.  The one thing I think I didn't explicitly

24   say this morning that I should have said is that I understand

25   not only is confirmation fully submitted, but so is the request

181

1   for final approval of the disclosure statement.

2           And I think I can actually say now that I'm happy to

3   approve the final approval of the disclosure statement as

4   containing adequate information, as that term is used in the

5   Code.  And I note that I don't have those earlier pleadings

6   about the appropriateness of a combined hearing.  I didn't have

7   any objections that were received as to the request for final

8   approval of the disclosure statement.

9           So that order will get submitted.  I'll sign that

10  order.  If it's combined with the confirmation order, then I'll

11  wait.  But I just wanted to make that clear on the record so

12  there was no stone left unturned.  And with that I think we

13  have many of the same folks on the line, Zoom.  We have no one

14  here in the courtroom.  So I will turn it over to Darren,

15  counsel, to start us off on the rest of the agenda.

16          MR. KLEIN:  Thank you, Your Honor.  Can I be heard?

17          THE COURT:  Yes, you can be heard just fine.

18          MR. KLEIN:  It's for the record, Darren Klein of Davis

19  Polk Wardwell LLP for the debtors.  And Your Honor, just before

20  I turn to agenda item Number 2, just on the confirmation order,

21  I wanted to preview for the Court that there is one more

22  paragraph we're going to be adding, and we'll send it to you

23  once we have it finalized and agreed among the parties.

24          It's just about additional exit financing language.

25  There were two paragraphs added, seven and eight, about exit

1   financing, revolver, and some aircraft financing.  There's a

2   third -- some of our letters of credit are going to be rolling

3   off; unclear if they'll roll off just before we emerge or just

4   after we emerge.  So we're going to drop in another paragraph

5   of the same kind once we get --

6           THE COURT:  All right.  And I assume that's really to

7   bring the order sort of up to speed with the planned supplement

8   and more recent events.

9           MR. KLEIN:  That's right, Your Honor.

10          THE COURT:  Okay.  Great.  Oh, I do want to make

11  sure -- I think this has been previewed by Chair Cornell -- I

12  see Ms. Wells here on behalf of the United States Trustee's

13  office.  I don't know if she wants to enter her appearance at

14  this point?

15          MS. WELLS:  Yes.  Thank you, Your Honor.  Annie Wells

16  for the United States Trustee, for the record.  It wasn't clear

17  to me if we had seen this for the revised one, or it was

18  already incorporated into the last circuit?

19          THE COURT:  I think it's -- I think it's being

20  contemplated, but hasn't been -- hasn't been shared with anyone

21  yet.

22          MS. WELLS:  I would ask if we could please just be

23  copied.  I think we'd appreciate that.

24          MR. KLEIN:  Absolutely.  Absolutely, Ms. Wells.

25          MS. WELLS:  Thank you.

1          MR. KLEIN:  All right.  So turning to agenda item

2     Number 2, Your Honor, and this one should be very quick.  It is

3     the sealing motion filed at docket number 358 and supported by

4     the declaration of Bruce Mendelsohn (ph.) at Docket 394, which

5     Mr. Huebner has previously moved into evidence.  No objections

6     have been received, as evidenced by the CNO filed at docket

7     number 438.  The CLA simply relates to certain fees in favor of

8     the lenders under our proposed exit facility and the agent.

9     And the commitment letter and engagement letter were filed in

10    full with just these redactions of the certain fee amounts.

11    Unless Your Honor has any questions, we would just ask you to

12    enter the sealing order.

13         THE COURT:  All right.  Thank you very much.  And I

14    know the U.S. Trustee's office sometimes has an interest in

15    sealing, or they have an interest generally in sealing order.

16    So I'll ask Ms. Wells if -- any comment from your office on

17    this request?

18         MS. WELLS:  Annie Wells for the U.S. Trustee again.

19    We did not take a position with respect to the sealing motion.

20    Thank you.

21         THE COURT:  All right.  Thank you very much.  And let

22    me ask if there's anybody else who wishes to be heard on item

23    Number 2, the sealing motion.  All right.  Hearing no response

24    and noting that there was no objection, I will grant the

25    request to redact the commercially sensitive information that

1    is the subject of the sealing motion at docket ECF Number 358.

2          Again, I think it comports with the Code requirements

3    and the statutory section dealing with the kind of information,

4    and I think it's targeted to specific commercial information.

5    So that motion is granted.  I'll get that order signed.  What I

6    would say is maybe, perhaps after we're done here, if you would

7    send over -- I don't know if some of these orders have changed.

8    And we were just talking about one changing -- send over sort

9    of the most updated set of orders.  In that way, I don't run

10   the risk of looking at something that's outdated.

11         MR. KLEIN:  We would do so, Your Honor.  Thank you

12   very much.

13         THE COURT:  All right.

14         MR. KLEIN:  With that, I'll cede -- I'll cede the

15   podium to my colleague Chris Robertson for the next item --

16   agenda item.

17         THE COURT:  All right.  Thank you.  Item Number 3?

18         MR. ROBERTSON:  Good afternoon, Your Honor,

19   Christopher Robertson, Davis, Polk and Wardwell, on behalf of

20   the debtors.  Can I be heard clearly?

21         THE COURT:  All right.  Good afternoon.  I can hear

22   you just fine.

23         MR. ROBERTSON:  Thank you, Your Honor.  I'll be

24   addressing the debtor's request for entry of a final cash

25   management order and the U.S. Trustee's objection thereto.  The

185

only issue you raised in the trustee's objection is the debtor's request to waive the requirements of Section 345 of the Bankruptcy Code with respect to certain bank accounts that are not established at authorized depositories.

Your Honor moved Mr. Cromer's declaration in respect of this matter into evidence this morning.  Your Honor, the company has maintained its existing cash management system throughout this brief Chapter 11 cases as permitted under a series of extensions approved by this Court for the period in which to comply with Section 345 or obtain a permanent waiver. However, we understand that the U.S. Trustee's office does not have the authority to grant a further extension to bridge us to emergence in a few short weeks, which is frankly why we are discussing this here today.

THE COURT:  So let me ask, one way maybe to navigate this is to grant another extension on interim basis until such time as this case, which is on the verge of conclusion one way or the other, gets passed -- gets to that point.  So that way nobody has to, sort of, worry about waiving any substantive rights.

So Ms. Wells, is that a path forward?

MS. WELLS:  Well, obviously, at the time that we noted our objection, we did not know how the outcome of the confirmation would go.  And I would have to -- I think I would have to speak with my client to get confirmation on the

1  further -- are we talking about just a couple of weeks?

2       THE COURT:  I will just make a ruling.  It's fine.  I

3  mean, it's fine.  Okay.

4       MS. WELLS:  Thank you, Your Honor.

5       THE COURT:  I'm sorry, I realized I cut you off, Ms.

6  Wells.  What else -- anything else you want to say on this

7  subject?

8       MS. WELLS:  No, I just -- all I was going to ask is if

9  we're just talking about a couple more weeks until -- I know

10  Mr. -- counsel had started to talk about the timeline for sort

11  of the next steps.  It just wasn't clear to me the length of

12  time that we're talking about.

13       THE COURT:  All right.  Counsel for the debtor,

14  anything else that you wanted to identify or address in the

15  context of all this?

16       MR. KLEIN:  No, Your Honor, I just want to be -- just

17  to clarify, just to make sure we're on the same page.  We're

18  discussing a waiver through effectiveness of the plan that

19  is -- was discussed this morning.

20       THE COURT:  All right.  And Ms. Wells, I guess the

21  thought is whether there's a reason for a waiver of 345 based

22  on the way the debtor conducts its cash management systems, and

23  whether it's putting anything at risk by proceeding with its

24  current cash management.  Is there anything substantively that

25  your office wants to say beyond what's in its papers?

 1          MS. WELLS:  Not at this point.  I don't -- I don't

 2  necessarily think that there's much change in terms of the cash

 3  management structure or set up, so no.  But I think that to the

 4  extent that we're only talking about, again, to the effective

 5  date, it's a short enough period that we can -- that would be

 6  acceptable to us.

 7          THE COURT:  All right.  All right.  Just give me a

 8  minute here.  I'm just pulling up the relevant --

 9          Counsel, could you -- I hate to bother you, could you

10  just let me know what tab number we're looking at here?  That

11  would be helpful.

12          MR. KLEIN:  Give me one second, Your Honor.  No

13  problem.

14          THE COURT:  Oh, I think -- I think I'm just on the

15  verge of getting there.  I think it's tab 44.  All right.  Give

16  me one minute.  All right.

17          So let me ask general counsel, anything else to say in

18  response to Ms. Wells' comments?

19          MR. KLEIN:  No, Your Honor.  We're happy to operate

20  under another ridge of the extension period through the plan.

21  The order that we attached to our plan contemplated just a

22  waiver of 345.  If it pleases Your Honor, we're happy to submit

23  a revised order that contemplates another extension for

24  effectiveness.

25          THE COURT:  Yeah, that's fine.  I think it makes

188

1    sense.  I mean, they're -- the alternative is to spend a little

2    more time discussing the facts relating to a waiver of Section

3    345(b).  I certainly have a record as to a number of the

4    factors which are identified in various cases, including the

5    sophistication of the debtor's business, the size of the

6    operations, the investments involved, the bank's rating, et

7    cetera, et cetera.

8            But I suspect if we're going to go to war and drop the

9    gloves on this, that you probably want to fill that out.  And I

10   don't know that that's a great use of anybody's time, frankly.

11   So if the parties are in agreement on extension, given the --

12   that we're on the verge of wrapping the case up one way or the

13   other, that seems to be the prudent way to go.  So I would

14   think --

15           Is there a particular time in mind, Counsel, for that?

16   A couple of weeks or what did you have in mind?

17           MR. KLEIN:  Yeah, Your Honor, we are totally happy to

18   extend the period for the effectiveness of the plan.  If that

19   doesn't work for the U.S. Trustee, we're also prepared to just

20   build a record and seek the full waiver.

21           MR. ROBERTSON:  Yeah, Your Honor, we're -- we are

22   totally happy to extend the period through effectiveness of

23   plan.  If that doesn't work for the U.S. Trustee, we're also

24   prepared to just build the record and seek the full waiver.

25           THE COURT:  All right.  So here's what I'm going to

189

1  do.  I'm going to let you all chat offline with the fervent

2  hope that you could reach an agreement on that and save

3  yourselves, and me, from a discussion of the factors of a

4  waiver of 345b.  But if for some reason you can't get there,

5  you'll let me know and certainly I will extend the time from

6  now until whenever I receive a proposed order on a temporary

7  extension for whatever time we would get together next to

8  discuss a full waiver, and therefore, I'll consider debtor's

9  reserving a right for a -- for the presentation of addressing

10 the factors to another day if we need to get there.

11        MR. ROBERTSON:  I appreciate it, Your Honor.  If I may

12 make one suggestion?  I'm happy to coordinate with Ms. Wells

13 offline.  If we can't get there, while the next item is

14 addressed, maybe we just adjourn this to the end of today's

15 hearing.  I don't want to have to come back and forth for this,

16 you know, this.

17        THE COURT:  Well, maybe the thing to do is, we were

18 talking about a date a week from today on the Thursday.  Maybe

19 I can extend the time until then.  Nobody -- I don't guess any

20 debate about that, and if we need to get into it on Thursday, I

21 looked at my calendar on Thursday afternoon.  It would work

22 either at 2:30 or 3 o'clock, or something to that effect.  That

23 way it gives you a little more time.  You don't have to do it

24 contemporaneously during the hearing.

25        MR. ROBERTSON:  I do appreciate that.  I don't want to

1  belabor the point.  If Ms. Wells would be amenable to a 30-day

2  extension, just so we don't have to restart this machine at the

3  hearing next week, we would be ok with that.

4          MS. WELLS:  We're okay with 30 days, Your Honor.

5          THE COURT:  All right.  30 days it is.  Sold.  Had me

6  at hello on that.  Thank you very much, and I'll wait for an

7  order consistent with that.  And with that, I believe we can

8  move on to the next item on the agenda, item number 4.

9          MR. KAMINETZKY:  Good afternoon, Your Honor.  Benjamin

10 Kaminetzky from Davis Polk for Spirit.  The next item on the

11 agenda is the Mr. Endres matter.  Mr. Endres was on the phone

12 before.  I just want to see if he's still there.

13         THE COURT:  Mr. Endres, are you there?  Stephen

14 Endres.

15         MR. ENDRES:  Yes, I am, Your Honor.

16         THE COURT:  Okay, thank you very much.

17         MR. KAMINETZKY:  Your Honor, I know you -- not because

18 we are trying to move along quickly, but because I think it's

19 also the right thing to do, let me just give you a word on

20 this, and I don't think we need to spend a lot of time given

21 what happened earlier today.  This -- Mr. Endres brought a

22 lawsuit in the United States District Court for the District of

23 Columbia against Spirit and nearly 20 other air carriers,

24 government agencies, and airport authorities.

25         He alleges antitrust claims and violations of the U.S.

191

1    Constitution, alleging that he invented a market for allocating

2    take off and landing reservations and that the defendants are

3    members of a cartel that restrained trade by price fixing and

4    boycotting this market that he allegedly invented.  He seeks

5    over 800 billion dollars in damages.  We at Spirit filed this

6    suggestion of bankruptcy on November 25th, 2024.

7            Now, Mr. Endres filed a 4,500 page memoran -- what he

8    entitled something called a memorandum of the statutory scheme

9    in support of his motion for relief from the automatic stay,

10   and then he filed an ex parte motion to contest debtor's

11   petition for a leave and for a leave from the automatic stay.

12   So I'm not quite sure what all that means, but here we are.

13   All I can say is --

14           THE COURT:  Can I make an observation about what it

15   might mean?  Which is that Mr. Endres, before this bankruptcy

16   case was filed, had a lawsuit against the debtor airline and

17   many others, and that this case will shortly end and then that

18   lawsuit can continue in the court in which it was filed.

19           MR. KAMINETZKY:  Not to sound like Mr. Euchner (ph.)

20   because that would not be very good for me, but that's exactly

21   what I was going to say, is that I don't think we should spend

22   time talking about -- this case will end in the next couple of

23   weeks hopefully, and if Mr. Endres wants to continue his

24   lawsuit in the District of Columbia, go for it.  There's really

25   nothing more to say.  He could spend time now talking about it.

192

1    I don't think it was properly filed.  It's a relief from an

2    automatic stay on a lawsuit that could continue as soon as

3    we're done here.  The lawsuit rides through like everyone else.

4          There's lots more I could say, but I think that's --

5          THE COURT:  I get it.

6          And so Mr. Endres, I think the -- the idea is that you

7    have a lawsuit that existed before the bankruptcy and that the

8    bankruptcy will very soon end.  Then as soon as it ends and

9    then you're free to continue your lawsuit, and to the extent

10   that it would be helpful for purposes of clarity, to enter an

11   order to make that clear as to exactly when you can proceed, I

12   think we can manage to accomplish that, but it doesn't seem to

13   make a whole lot of sense to do anything other than that.

14   Certainly, I've had the pleasure of litigating an antitrust

15   case in an airline bankruptcy, but notwithstanding that, that

16   seems to be -- your ability to proceed outside of this court in

17   very short order seems to be the appropriate results.

18         So Mr. Endres, while I realize it's a lot of the

19   substance here, I think Mr. Kaminetzky stayed away from that.

20   I'm staying away from that.  And so my question to you, as a

21   procedural one, is whether procedurally allowing you to

22   continue your lawsuit in fairly short order, as soon as this

23   case gets confirmed, is that an appropriate result from where

24   you sit?

25         MR. ENDRES:  Yes, Your Honor.  I believe that we -- if

193

1    I can get an order to that effect, that would be sufficient.

2              THE COURT:  All right.  I think we can accomplish

3    that.  And so what I'd ask is, Mr. Kaminetzky, to put together

4    a proposed order and he can send you a copy.  He can send me a

5    copy.  And I think it may -- I don't see any reason why we

6    shouldn't be able to accomplish that and allow you to go your

7    own way.  I think the request should be to make sure to have

8    the confirmation order entered, and the question is whether it

9    would come right after the effective date, which I think is

10   contemplated to be fairly soon.  And so the order can lay that

11   all out, but I don't think there will be much of a delay.

12   Certainly, it won't be an extended period of time.  I know

13   bankruptcies can take years to fully play out, but I think

14   we're talking about weeks, or a month or two, as opposed to

15   anything longer than that.

16             MR. KAMINETZKY:  That's fine.  I will -- we will draft

17   something up.  We'll email it to Mr. Endres and then submit it

18   to the Court.  I think that's the -- I'm glad we were able to

19   resolve this so easily.

20             THE COURT:  All right.  Thank you very much.  So Mr.

21   Endres, with that, you'll wait to get a copy.

22             Let me ask Mr. Kaminetzky, do you have Mr. Endres'

23   contact information?

24             MR. KAMINETZKY:  Yes, we have his email.  We've been

25   emailing with him, so it's no problem.

194

1          THE COURT:  All right.  So Mr. Endres, make sure to

2     check your email in a couple of days, and you'll expect to get

3     an email from counsel with a proposed order and we'll take it

4     from there.  So Mr. Endres, with that, anything else that you

5     wanted to raise?

6          MR. ENDRES:  No, that's it, Your Honor.  Thank you.

7          THE COURT:  All right.  Thank you very much.  And with

8     that, have yourself a good day, Mr. Endres.

9          MR. ENDRES:  You, too.

10          THE COURT:  All right.  Next up is agenda item number

11     5 as we move smartly along to the last item, which is the pre-

12     trial conference in ZIM Aircraft Cabin Solutions, LLC v.

13     Spirit.  And so let me -- I'll start with debtor's counsel and

14     then obviously hear from ZIM Aircraft as well.  So take it

15     away, Counsel.

16          MR. KAMINETZKY:  It's still me, Ben Kaminetzky, Davis

17     and Polk, for the debtor, Spirit.  This is exactly what the

18     adversary proceeding said, that ZIM could commence against

19     Spirit.  I'm joined by my colleague on the other side, Clint

20     Morse.  I see he's back on camera now.  He's counsel for ZIM.

21          THE COURT:  All right.  Mr. Morse, I see you.  Thank

22     you very much.

23          MR. MORSE:  Thank you, Your Honor.

24          THE COURT:  So who wants to start off in terms of

25     where things are and what needs to be accomplished?

195

1          MR. MORSE:  Yes, thank you, Your Honor.  I guess I'll

2     start off.  I know that obviously this case has been about

3     moving toward this plan, which has been very good for most of

4     the -- most of the creditors.  At least that's the way that it

5     appears to ZIM and that's what everyone's been focused on.

6          So as a general background of this case really

7     quickly.  ZIM provides the seats for Spirit's airplanes and the

8     spare parts for those seats, and so they have a contract that's

9     supposed to run from 2021 to 2027 for ZIM to provide 100 sets

10    of seats for 100 airplanes.  The issue is, is that as the

11    debtor ran into cash flow problems and it doesn't buy as many

12    airplanes, they have said now they don't want to buy anymore

13    sets of seats until 2027, which changes up the whole deal from

14    ZIM's perspective.  So ZIM filed the lawsuit saying that the

15    contract was terminated pre-bankruptcy under the UCC.  That's

16    the allegations in the complaint.  It's fairly straightforward

17    with respect to what the facts are.

18         With respect to the initial conference, the good news

19    is the parties recently have been seriously negotiating a

20    settlement, which is good.  That's why we consented to another

21    three-week extension for the answer.  That being said, I do

22    think we want to check off the box in having our Rule 16

23    conference completed, because if we don't get done in the next

24    three weeks, then we run into an issue of purchase orders for

25    three ship sets that are currently outstanding.

196

1          I think ZIM would like to know the answer to -- would

2    like to be moving forward on the merits of this matter sooner

3    rather than later while those purchase orders are outstanding.

4    I would think the Spirit business people would agree to the

5    same.  That being said, the overwhelming hope is that we settle

6    within the next three weeks, but I personally want to get this

7    Rule 16 conference checked off the list so that if it doesn't,

8    we can start moving forward.

9          THE COURT:  All right.

10         Mr. Kaminetzky?

11         MR. KAMINETZKY:  Yeah, thank you, Your Honor.  So yes,

12   this lawsuit that Mr. Morse described, it's very simple.  It's

13   our position that we didn't breach any contract.  We certainly

14   didn't repudiate any contract.  The whole lawsuit is based on a

15   phantom term of a contract that's in writing that says if

16   there's some sort of schedule that we have to order the ship

17   sets.  Instead it says we have to order a whole number of ship

18   sets by 2027, so obviously, that date hasn't come.  We intend

19   and we hope that we can fully perform under the terms of the

20   contract.

21         Therefore, we were prepared, and are prepared, to file

22   a motion to dismiss and the basis of the motion to dismiss is

23   simply look at the contract, Your Honor.  There's no calendar

24   or provision that says we have to order a certain amount within

25   a certain time.  We think that that's, you know, kind of as a

197

1  matter of law; there's no need for discovery or anything else.

2  But I do agree with Mr. Morse that the parties are involved in

3  constructive dialogue in coming to a business solution.  Our

4  motion to dismiss has been ready for weeks now, but we've

5  happily agreed to put it off so we don't have to spend more

6  money on litigation.

7      If we don't reach a deal and we file our motion to

8  dismiss, it would be Spirit's view that there should be a stay

9  of discovery until Your Honor has the opportunity to just read

10  our very simple motion to dismiss, read the contract, and then

11  dismiss the case without having to do anything else.  So I'm

12  all for checking boxes and everything else, but the bottom line

13  is, you know, we have our motion to dismiss.  We think this is

14  a very simple matter and we wouldn't want to start -- commence

15  any sort of discovery until Your Honor has a chance to rule on

16  a motion to dismiss.

17      THE COURT:  All right.  Go ahead.  I don't want to

18  belabor this, so anything else briefly, Mr. Morse?

19      MR. MORSE:  I mean, yeah, the one part is that we

20  didn't file a proof of claim in the case.  Nobody did.  And we

21  did reserve our right to have the District Court issue final

22  judgements in this case.  And so I do hear --

23      THE COURT:  Well, you filed a lawsuit, so I'm a little

24  confused about that.  There's a -- there's a reasonable

25  question as to whether this should be here or not given the

1   impending -- impending emergence and the tricking of the

2   Bankruptcy's Court's jurisdiction after confirmation.  But it's

3   sort of odd.  If you filed a lawsuit here that -- that you sort

4   of by that action consented.  But be that as it may, I don't

5   think we need -- well, this is all fascinating and we all could

6   write a very interesting law school exam to torture students

7   about jurisdictional questions and things like that.  It seems

8   like everybody would be best served by putting a pin in this

9   for three weeks while you continue discussions, consider the

10  Rule 16 conference, to the extent it needed to be checked,

11  checked for today, and then we'll get back together and

12  everybody reserves the right to debate about what should and

13  shouldn't happen, including whether we should be here or

14  somewhere else.

15       And if a motion practiced before discovery makes

16  sense, then obviously the parties have a right to file a motion

17  to dismiss in lieu of an answer.  That's the way the rules

18  work.  But again, all very interesting questions and

19  conversations we could have, but we're all about efficiency

20  here, and it sounds like everybody agrees that you're all

21  talking.  So what I would suggest is that the parties continue

22  to talk with the three-week timeframe.  It's sounding like

23  everybody's on the same page about that.

24       And then reach out to my courtroom deputy with a

25  couple of proposed dates past that, and we can -- we can circle

199

1   back and see where we are.  And if you want to kick the can --

2   if everyone agrees you should kick the can down the road

3   another week or two because you're trying to -- you need the

4   time and everyone agrees it make sense, I'm happy to do that as

5   well.  Again, litigation is expensive and if you can resolve it

6   and want that opportunity before you spend money on litigation,

7   I certainly have no problem with that at all.

8          MR. KAMINETZKY:  Thank you, Your Honor.  Just

9   yesterday, Your Honor, in connection with the three-week

10  extension of our date to file a motion to dismiss in lieu of an

11  answer, we submitted a stipulation yesterday.  I think it was

12  to chambers, and otherwise the answer, or motion to dismiss as

13  the case is, would be due tomorrow.  So I know Your Honor has a

14  lot to do, but --

15         THE COURT:  I'm happy to approve that.  I haven't

16  gotten to it, but I'm happy to approve that and, in fact, I'll

17  do you one better.  I'll extend the time to a date to be set

18  the next time we get together if we need to get there.

19         MR. KAMINETZKY:  Okay.  I appreciate it, Your Honor.

20  Thank you.

21         THE COURT:  All right.  Mr. Morse, do you have any

22  objection to that?  Again, the idea is that everybody reserves

23  their rights, but while you're trying to negotiate you're not

24  being distracted by other -- other issues.

25         MR. MORSE:  I totally get that, Your Honor.  Basically

200

1   I think that my concern is I think I'd rather set it for three

2   weeks so that we're going to get on with the motion --

3            THE COURT:  Yeah, but I'm not doing a fire drill.  If

4   you want the chance to negotiate, you're getting the chance to

5   negotiate.  What you're not getting a chance to do is demand

6   something three weeks and a day from today and then I've got to

7   sort of worry about fitting you in the calendar or somebody's

8   in default and then we have a fire drill.  That doesn't make a

9   whole lot of sense, so let me -- let me make it easy for you.

10  I am on my own motion extending the time for answer or

11  otherwise respond until after we get together with the thought

12  that at some point, roughly three weeks past today, but if it

13  turns out to be four or whatever it is based on your consent

14  among the two of you to get to negotiations, that's fine.  If

15  nobody consents, then we'll make sure to get folks in here

16  timely.

17           MR. MORSE:  Okay.  Thank you, Your Honor.

18           MR. KAMINETZKY:  Thank you, Your Honor.

19           THE COURT:  All right.  Thank you very much.  And so

20  let me just -- Mr. Kaminetzky, I will sign the stipulation, but

21  consider it modified as I've set forth on the record here

22  today, so that it is a date that's not quite certain yet

23  because we haven't picked another day to get together.

24           MR. KAMINETZKY:  Okay, Your Honor.  Thank you.

25           THE COURT:  All right.

1       MR. KAMINETZKY:  I'll turn it over to Mr. Klein.

2       THE COURT:  All right.  Counsel?

3       MR. KLEIN:  Hello, Your Honor.

4       THE COURT:  And thank you for sitting through a

5  lengthy calendar.  I realize that you were somewhat a hostage

6  of the way things unfolded, and I appreciate your patience and

7  good humor.

8       MR. KLEIN:  Well, I will say, Your Honor, all the

9  matters to sit through and listen to, that one was fairly

10  entertaining to me to hear what the positions are going to be

11  on opt out releases going forward.  So I look forward to

12  reading the opinion that ultimately comes out.

13       THE COURT:  All right.  That's very kind of you to

14  say.  I appreciate that.  And again, really, counsel did a very

15  good job of delving into the details.  But again, thanks for

16  your patience.  I appreciate it.

17       MR. KLEIN:  Thank you.  All right.

18       THE COURT:  All right.  With that, let me turn back to

19  debtor's counsel for anything else that we need to address this

20  afternoon.

21       MR. KLEIN:  Thank you, Your Honor.  Again, for the

22  record, Darren Klein from Davis Polk for the Debtors.  I think

23  just scheduling, Your Honor, for next Thursday -- from our

24  point of view we'll take whatever, earliest slot in the day you

25  have that works for you.

202

1          THE COURT:  All right.  So I have a calendar in the

2    morning.  I have a judge's meeting at lunch.  So I would say

3    2:30 would make sense.  2:30 or 3 o'clock if you have a

4    preference.  We'll get together at that point if that works for

5    folks and you can send around a notice.

6          MR. KLEIN:  Yeah, 2:30 is great for us, Your Honor.

7    Thank you.

8          THE COURT:  Perfect.  2:30 it is.  And with that,

9    counsel, anything else to address here today?

10         MR. KLEIN:  That is the end of our agenda, Your Honor.

11   Thank you very much.

12         THE COURT:  All right.  Let me ask if any other party

13   has anything else that we need to address here today?  All

14   right, thank you very much.  Hearing nothing, the Court is

15   adjourned, and we'll see you all next Thursday at 2:30, and

16   again, that will be handled by Zoom.  In the meantime, be well.

17         (Whereupon, these proceedings were concluded at 3:39

18   p.m.)

19

20

21

22

23

24

25

203

1              C E R T I F I C A T I O N

2

3   I, Michael Drake, certify that the foregoing transcript is a

4   true and accurate record of the proceedings.

5

6

7

8   _____

9   Michael Drake

10  TTA-Certified Digital Legal Transcriber

11

12  eScribers

13  7227 North 16th Street, Suite #207

14  Phoenix, AZ 85020

15

16  Date:  February 13, 2025

17

18

19

20

21

22

23

24

25

**—**

**--- (1)**
186:16

**$**

**$1,503,000,004.17 (1)**
36:4
**$176,457.83 (1)**
36:4
**$297.67 (1)**
90:10

**[**

**[sic] (1)**
126:9

**A**

**A4 (4)**
163:7,10,10;164:5
**Abianca (1)**
89:3
**ABID (2)**
20:18;28:24
**abide (1)**
94:6
**ability (5)**
58:21;65:14;75:6;
130:19;192:16
**able (6)**
41:10;51:23;54:5;
112:18;193:6,18
**above (1)**
54:13
**absence (3)**
84:4;118:20;166:14
**absent (2)**
82:16;128:23
**absolute (4)**
42:19;46:25;47:1;
62:10
**absolutely (11)**
45:23;46:4,14;
51:24;60:14;61:16;
118:10;168:1;178:8;
182:24,24
**abundantly (1)**
66:23
**abusive (1)**
81:24
**accept (22)**
39:20;49:2;75:5;
79:1,1;85:17;86:5;
87:5,18,19;88:2,14,
19;89:16;91:1;92:2;
104:9;109:13;111:7;
131:19;132:2;170:16
**acceptable (2)**
124:10;187:6

**acceptance (6)**
69:24,25;72:11,12;
131:6,24
**accepted (11)**
40:21;41:9;84:22;
89:4;95:18;104:23;
153:16,21;155:11,12;
157:8
**accepting (3)**
56:6;73:24;76:23
**access (1)**
51:5
**accomplish (3)**
192:12;193:2,6
**accomplished (1)**
194:25
**according (1)**
60:3
**Accordingly (1)**
57:10
**accords (1)**
106:8
**accountants (1)**
148:22
**accounts (2)**
151:20;185:3
**accurate (1)**
179:3
**achieve (3)**
46:14;99:13;113:1
**achieved (1)**
178:25
**acknowledge (1)**
57:6
**acquisition (1)**
164:21
**across (2)**
57:2;136:6
**act (7)**
93:20;113:24;
117:19;119:2,7,12;
138:4
**action (16)**
36:22;67:13;79:25;
81:11;82:11;93:18;
134:11;139:5,15,17,
18;147:11,18,24;
148:7;198:4
**actions (2)**
64:5;132:14
**active (1)**
29:8
**actively (1)**
132:17
**actual (8)**
46:10;72:13;
117:12;131:1;148:5;
149:24;152:16;158:8
**actually (58)**
34:12;35:14;36:9,
20;39:10;42:11;
43:25;44:21;46:5;
47:25;59:3,4;60:11,

13,23,24;61:3;63:12;
64:16,19,21;66:14;
67:4;69:16;72:7;
73:22;74:6;77:9;79:7,
9;87:21;88:7;93:5,6;
100:24;114:14;118:6;
124:22;127:9;146:21;
148:15;153:6;154:13,
21;155:18;156:15;
163:3,6,8;166:3,9;
168:22;170:10;
171:11;172:4;173:15;
178:4;181:2
**Ad (16)**
18:20;19:3;28:13,
16,20;96:18,21,23,24;
97:4;98:21,24;99:6,
12;100:10;154:10
**ADAM (1)**
14:8
**ADAMS (2)**
5:8;25:22
**add (1)**
44:8
**added (1)**
181:25
**adding (1)**
181:22
**addition (3)**
38:24;39:18;167:7
**additional (2)**
161:17;181:24
**additions (1)**
36:10
**address (19)**
37:2;40:6;41:20;
43:16;44:24;68:10;
99:22;106:3,3;133:3;
145:19;157:3;160:16;
174:14;179:10;
186:14;201:19;202:9,
13
**addressed (6)**
44:4,22;70:17;
172:14,19;189:14
**addresses (2)**
45:20;143:9
**addressing (7)**
44:18;57:7;58:7;
172:20,25;184:24;
189:9
**adds (1)**
122:16
**Adelphia (1)**
53:15
**adequacy (1)**
165:9
**adequate (4)**
80:23,24;81:16;
181:4
**adequately (1)**
148:2
**adhere (2)**

36:7;176:25
**adjourn (1)**
189:14
**adjourned (1)**
202:15
**admirable (1)**
123:19
**admitted (2)**
33:2;45:1
**adopt (1)**
76:17
**adopted (2)**
151:3;162:15
**adopting (1)**
147:14
**advance (4)**
101:16;102:3;
103:11;157:14
**adversary (3)**
29:16;43:8;194:18
**advised (2)**
32:22;85:23
**advisement (1)**
174:23
**advising (1)**
48:9
**advisors (1)**
45:3
**advocacy (1)**
176:18
**advocate (1)**
76:20
**Aero (1)**
9:3
**AFA-CWA (1)**
11:20
**affair (1)**
165:16
**affect (1)**
131:21
**affected (2)**
93:21;168:21
**affidavit (1)**
49:22
**affiliates (1)**
31:17
**affirmative (11)**
67:13,15;113:21,
23,24;117:19;119:2,7,
12;134:11;138:4
**affirmatively (4)**
56:15;72:16;82:17;
116:18
**affirming (1)**
99:2
**afoul (1)**
58:9
**afternoon (9)**
138:22;178:3;
180:11,16;184:18,21;
189:21;190:9;201:20
**AG (3)**
100:25;101:15,18

**again (69)**
27:13;31:15;37:12;
42:8;44:24;46:6;
50:25;63:1;64:12;
69:3;76:2;87:8;90:17,
22;91:23;92:12,22;
93:8;98:24;100:6;
101:9;105:7;108:13,
16;115:11,20;119:8;
122:3;124:14;129:11;
131:4;132:24;134:22;
135:12;136:24;137:2;
138:13;144:4;145:13;
147:8;149:2,22;
150:12;151:15,25;
152:2,23;153:2;
160:1;164:24;165:24;
169:4;170:4,11;
174:19;175:11;
176:11;178:13;
180:13;183:18;184:2;
187:4;198:18;199:5,
22;201:14,15,21;
202:16
**against (15)**
36:3;53:25;56:13;
104:2;108:25;118:23;
139:18;148:8,17;
155:19;163:15;
166:18;190:23;
191:16;194:18
**agencies (1)**
190:24
**agency (1)**
144:6
**agenda (19)**
30:16;34:5;40:5;
42:25;159:17;160:19;
161:11;175:19;
178:10;180:20,23;
181:15,20;183:1;
184:16;190:8,11;
194:10;202:10
**Agent (5)**
8:15;22:4;118:25;
166:19;183:8
**agents (2)**
105:20;171:25
**aggressive (3)**
55:14;72:5;74:14
**AGI (1)**
17:3
**ago (2)**
52:15;53:10
**agree (21)**
41:2;62:25;65:20;
78:17;91:9;93:10;
104:19;110:15,17;
115:8;121:21;132:21;
146:6,7;152:11,14;
164:1;167:13;179:6;
196:4;197:2
**agreeable (1)**

41:17
**agreed (15)**
48:7;50:24;51:4,7,
7;70:10;78:21;99:24,
24;100:12;153:22;
164:5;166:2;181:23;
197:5
**agreeing (3)**
102:11;144:5;171:6
**agreement (23)**
38:12;42:4;45:24;
69:20;71:19;102:11,
18;110:22;111:12;
116:9;118:18,21;
129:17,18,22;153:22;
163:13;166:10,11,15;
171:24;188:11;189:2
**agreements (1)**
38:13
**agrees (6)**
163:11;164:19;
172:17;198:20;199:2,
4
**Agricole (1)**
19:13
**ahead (4)**
101:9;124:9,9;
197:17
**AHG (2)**
20:13;21:3
**aid (1)**
168:25
**Air (3)**
26:4,18;190:23
**Aircraft (12)**
5:3;10:13;12:20;
22:12;23:3;29:11,14;
38:20;43:7;182:1;
194:12,14
**airline (14)**
35:3,8,24;43:20;
44:5,6;46:18;90:11;
91:17;94:21;96:15;
179:23;191:16;
192:15
**Airlines (10)**
26:9,19;27:13;
31:16;43:24;44:7;
94:12;102:7,9;180:19
**airplanes (3)**
195:7,10,12
**Airport (6)**
14:3;38:23,25;39:5,
12;190:24
**Airports (1)**
21:12
**AKIN (5)**
20:12;21:2;28:23;
67:14;98:24
**AL (1)**
15:15
**alas (1)**
42:7

**ALEX (1)**
16:9
**ALFANO (1)**
5:17
**Alhambra (1)**
11:21
**aligned (1)**
45:6
**alike (1)**
59:9
**all- (1)**
168:13
**allay (1)**
27:11
**allegations (1)**
195:16
**allegedly (1)**
191:4
**alleges (1)**
190:25
**Allegheny (1)**
14:3
**alleging (1)**
191:1
**ALLEN (1)**
25:2
**allocating (1)**
191:1
**allow (4)**
37:3;76:24;81:24;
193:6
**allowed (11)**
46:23;61:20;64:23;
65:22;73:25;78:16;
90:11;112:8;163:23;
164:1;169:8
**allowing (2)**
57:21;192:21
**allows (1)**
70:8
**almost (9)**
34:23;54:10;59:2;
84:13;89:24;93:8;
99:9;124:1;167:4
**alone (4)**
51:15;57:15;
117:19;172:15
**along (5)**
31:25;44:2;135:21;
190:18;194:11
**ALSTON (2)**
7:2,12
**altering (1)**
57:8
**alternative (2)**
126:6;188:1
**although (21)**
32:11,22,23;36:14;
39:15;52:24;53:10;
65:20;120:3;130:18;
138:18;141:14,24;
143:9;144:20;146:10,
24;149:22;152:15;

160:15;179:11
**Alvarez (3)**
25:25;26:3;32:5
**always (9)**
74:8,9;122:20,24,
24;134:15;153:11;
169:23;175:10
**ambushed (1)**
103:21
**amenable (1)**
190:1
**amended (4)**
30:16;34:4;178:10;
180:20
**Amendment (1)**
82:16
**America (1)**
38:21
**American (2)**
32:11;43:24
**Americas (3)**
6:4;14:15;19:14
**among (6)**
38:10;41:20;71:8;
173:4;181:23;200:14
**amount (8)**
39:19;41:7;46:12;
133:13,14;139:4;
175:7;196:24
**amounts (2)**
94:20;183:10
**amplification (1)**
106:22
**analogous (1)**
168:1
**analogy (4)**
66:4;79:25;147:24,
25
**analysis (13)**
34:11;45:21;51:18;
71:23;72:2;73:20;
128:13;129:16;130:5;
149:22;164:23,25;
175:24
**analytic (2)**
64:22;84:25
**analytical (1)**
73:13
**analytically (2)**
64:20;69:18
**analyze (1)**
121:15
**analyzes (1)**
121:14
**analyzing (1)**
136:3
**anchored (2)**
129:21;160:1
**and/or (1)**
34:4
**ANDREA (1)**
6:16
**Andres (1)**

43:6
**ANDREW (5)**
5:17;6:7,25;16:7;
26:17
**Andrews (1)**
180:7
**Angeles (3)**
7:16;18:6;38:23
**ANNIE (3)**
11:8;182:15;183:18
**announced (1)**
41:9
**announcement (1)**
42:3
**announcing (1)**
73:11
**answered (2)**
77:24;78:3
**antitrust (3)**
41:21;190:25;
192:14
**anymore (1)**
195:12
**apart (1)**
77:23
**apologies (6)**
90:25;91:16;102:3;
107:1;121:20;171:1
**apologize (4)**
37:8;100:7;126:19;
167:15
**appeal (1)**
68:9
**Appeals (1)**
142:12
**appear (1)**
102:19
**appearance (6)**
29:7,10,22;30:5;
107:11;182:13
**appearances (2)**
27:15;132:16
**appeared (1)**
39:5
**appears (2)**
139:2;143:4;
152:15;195:5
**Appellants (1)**
73:2
**Apple (2)**
6:3,11
**applicability (1)**
86:21
**applicable (7)**
62:3;64:12;97:14;
98:18;99:19;147:12;
178:15
**application (2)**
141:3;149:25
**applied (9)**
49:8;58:13;77:14;
84:11;120:23;140:20;
142:16;151:14;

170:20
**applies (14)**
49:16;87:11;88:24;
90:20,20;92:16;
105:4;131:12;134:17;
141:17,18;146:19;
167:9;170:12
**apply (32)**
49:4,6;66:24;70:22;
86:15;87:12,23;
92:16;115:15;117:15,
21;121:2;134:14;
135:6,10;136:6;
137:12,15;140:20;
141:2;142:15;148:1;
149:4;151:10,17,22;
154:14,18;166:9,24;
170:17,18
**applying (3)**
102:21,22;141:4
**appointed (1)**
81:8
**appreciate (15)**
27:5;104:20;
106:16;138:13;
147:11;156:24;162:2;
178:8;182:23;189:11,
25;199:19;201:6,14,
16
**approach (8)**
39:15;58:14;74:16;
123:2;136:11;137:10;
141:23;142:16
**approached (1)**
74:17
**appropriate (30)**
38:15;40:6;48:23;
52:15;57:4,14,22;
66:19;67:5;70:18;
71:12;80:19;84:9;
92:8;93:3,3,19;
101:10;106:13;
109:17;131:2;133:12;
141:3;142:10;147:25;
169:7;178:15;179:23;
192:17,23
**appropriately (4)**
57:3;71:2;77:14;
92:9
**appropriateness (2)**
71:24;181:6
**approval (11)**
31:25;34:7;41:21;
42:25;43:2;178:10,
23;180:21;181:1,3,8
**approvals (2)**
44:4;179:15
**approve (8)**
62:11;82:3;83:16;
89:9;99:20;181:3;
199:15,16
**approved (24)**
41:23;49:2,3,6;

52:10,14;54:15;
55:12;57:22;69:5;
77:1;80:22;85:22;
88:11;91:8;93:11,25;
94:7;130:5;159:21;
162:18;167:25;
173:18;185:9
**approves (2)**
72:4;87:2
**approving (1)**
80:18
**approvingly (1)**
112:13
**approximately (2)**
37:22;139:2
**arbitrate (1)**
167:22
**arbitration (2)**
82:10,10
**Arch (1)**
9:12
**areas (1)**
171:15
**ARENTFOX (1)**
14:12
**arguably (2)**
63:4;65:19
**argue (8)**
73:10;76:12,13;
84:22;87:11;88:18;
153:13;169:8
**argued (1)**
139:21
**argues (2)**
55:23;79:24
**arguing (2)**
129:23;167:9
**argument (31)**
30:20;35:21;61:17,
23;77:19;89:13;96:4;
103:4;108:20;110:15,
17;112:3;121:16;
127:18;131:4;138:24;
142:20;144:8,14;
146:10,11,11,15,16,
17;147:21;152:10,20;
160:12;162:12;
178:23
**arguments (7)**
115:15;123:1;
144:5;158:4;174:22;
176:16,19
**arises (1)**
102:8
**armor (1)**
63:5
**ARNOLD (2)**
12:2,11
**around (4)**
126:21;138:14;
142:17;202:5
**arrive (1)**
38:3

**arrived (2)**
69:21;177:6
**arrows (1)**
78:9
**arsenal (1)**
69:5
**ARSHT (1)**
13:2
**article (2)**
76:19;81:22
**articles (1)**
40:8
**articulate (5)**
60:19;61:3;69:4;
150:14;153:12
**articulated (2)**
68:2;74:9
**articulating (1)**
75:11
**asbestos (1)**
139:10
**ascent (2)**
85:15;87:3
**aside (7)**
44:10;69:15;95:13;
106:5;120:7;132:4;
172:13
**aspect (1)**
35:14
**aspects (1)**
101:5
**assent (3)**
131:17,23;132:5
**assert (1)**
54:18
**asserted (1)**
40:9
**asserting (1)**
145:6
**assertion (1)**
56:16
**assess (3)**
44:6;67:6;123:3
**assessing (1)**
74:19
**assessment (1)**
111:18
**assessments (1)**
41:1
**Asset (1)**
26:6
**assigns (1)**
172:1
**Association (5)**
6:20;12:20;24:13;
26:4,18
**assume (11)**
37:11;72:14;89:8;
94:6;153:3,18,19;
164:3;169:16;180:10;
182:6
**assumed (2)**
163:14;168:13

**assuming (6)**
124:16;125:13;
144:22;146:18;169:2;
177:2
**assumption (4)**
82:1,3;88:1;164:4
**asymptotic (1)**
76:6
**Atlanta (1)**
13:17
**attached (2)**
34:11;187:21
**attempting (1)**
67:12
**attend (1)**
48:8
**attention (6)**
30:11;54:9;93:24,
25;124:23;156:3
**ATTORNEY (7)**
18:2;29:23,24;
102:1,2,7;104:14
**Attorneys (48)**
5:3,13;6:3,11,20;
7:3,13;8:3,14;9:3,12;
10:3,13,21;11:20;
12:3,12,20;13:3,14;
14:3,13;15:3,12,21;
16:3,13;17:3,12;18:3,
12,20;19:3,13;20:3,
13;21:3,12,21;22:3,
12;23:3,12;24:3,12;
25:3,13;148:22
**attorneys' (1)**
102:18
**attorney's (3)**
102:10,11,13
**Audio (1)**
114:21
**authorities (1)**
190:24
**Authority (17)**
14:3;38:21;53:12;
58:19;68:1;72:4;
82:13;111:11;112:16;
117:10,13;122:2;
135:9,16;142:2;
149:4;185:12
**authorization (1)**
99:9
**authorized (4)**
57:13;58:22;95:21;
185:4
**authorizing (1)**
157:12
**automatic (4)**
159:19;191:9,11;
192:2
**availability (1)**
58:3
**available (4)**
32:19;65:8,8,12
**Avenue (14)**

6:4;7:4,14;8:4,16;
12:13;14:15;15:4;
17:4;18:21;19:14;
22:5,13;23:13
**average (1)**
148:23
**Avianca (3)**
53:8;83:10;121:3
**Aviation (1)**
23:12
**avoid (3)**
46:4,13;136:12
**avoidance (2)**
164:25;170:12
**awaiting (1)**
91:14
**aware (4)**
69:2;97:8;139:7,10
**away (11)**
41:14;42:7;46:6;
58:21;80:12;94:10;
138:3;160:8;192:19,
20;194:15
**awesome (2)**
61:2;177:3
**awfully (1)**
168:25

**B**

**back (40)**
46:13;48:16;63:15;
65:18;67:23;68:7;
74:2,5;83:13;89:23;
108:17;112:4;116:4,
4;122:3;125:10;
141:8;159:1,4,7;
161:3,10,22,25;
162:10;169:22;171:3;
173:2;176:8;177:19,
21;178:3;179:22;
180:1,12;189:15;
194:20;198:11;199:1;
201:18
**background (3)**
72:9;104:11;195:6
**backstopped (2)**
37:23;99:11
**backwards (1)**
168:16
**badgering (1)**
145:14
**Baisier (1)**
71:17
**BAKER (1)**
13:13
**balance (1)**
37:25
**BALLARD (1)**
25:12
**ballot (16)**
61:14,19;62:6,14;
66:8;83:13,14;88:12,

19;89:4,7;138:25;
139:5;145:22;146:12;
152:13
**ballots (3)**
32:13;153:4,10
**Balyasny (1)**
26:6
**Bank (6)**
6:3,3,11,11;15:12;
185:3
**bankers (1)**
46:10
**bankruptcies (3)**
35:9;91:17;193:13
**bankruptcy (66)**
35:2;37:5;46:22;
47:2;59:16;60:5;
61:18;64:2;66:12;
67:1;70:17;71:5,14,
15,25;72:3,4;78:4;
83:21;84:19;92:24;
93:24;96:12;97:14;
99:18;108:23;115:18;
117:9,14,17;121:15;
122:13;130:8;134:18;
136:7;139:8,11,19,22;
141:4,18;143:3;
147:3,23;148:5;
149:17,20;150:3,4,5;
151:1;162:25;168:1,
24;169:17,19,21;
171:20;174:5;180:17;
185:3;191:6,15;
192:7,8,15
**Bankruptcy's (1)**
198:2
**bank's (1)**
188:6
**bar (4)**
54:19,22;65:5;
168:13
**BARBRA (1)**
22:17
**bargain (6)**
41:20;70:3,5,11;
72:13;78:10
**bargains (1)**
42:18
**BARNES (1)**
21:11
**Barneys (1)**
53:9
**barred (1)**
168:24
**base (2)**
60:9;75:22
**based (21)**
27:7;43:20;49:22;
50:16;55:7;79:2;
104:12;105:18;
109:24;112:7;116:24,
25;129:15;134:7,9;
139:23;142:2;174:22;

186:21;196:14;
200:13
**basically (5)**
64:22;75:1;90:12;
169:11;199:25
**basis (12)**
66:1;71:17;78:6;
92:18;99:20;110:23;
112:2;121:22;130:12;
150:13;185:16;
196:22
**BATEMAN (1)**
6:24
**Battery (1)**
6:21
**battle (3)**
118:12;119:9;167:2
**battling (1)**
171:8
**bearing (1)**
131:10
**BEARMAN (1)**
13:13
**bears (1)**
57:18
**beautifully (1)**
159:2
**Beckerman (1)**
53:3
**becomes (2)**
141:10;170:6
**bed (1)**
104:24
**bedrocks (1)**
47:1
**began (1)**
36:9
**begin (2)**
114:23;136:13
**beginning (1)**
137:24
**begins (1)**
163:9
**behalf (23)**
27:16,22;28:1,3,5,7,
9,13,16,20;29:24;
31:16;33:24;95:6;
96:21;98:24;100:22;
107:13;138:23;159:7;
162:6;182:12;184:19
**behind (3)**
40:14;64:6;97:7
**belabor (3)**
162:17;190:1;
197:18
**Belatedly (1)**
55:22
**bell (2)**
58:23;64:7
**Ben (2)**
31:18;194:16
**bench (2)**
93:18;176:8

**benefit (8)**
41:19;42:18;85:4;
108:24;127:14;
130:16,19;151:9
**benefiting (3)**
49:12;85:9;131:13
**benefits (8)**
50:14;72:18;74:6;
81:3,20;112:18;
152:21,23
**Benjamin (1)**
190:9
**Bentley (1)**
53:4
**BERKOWITZ (1)**
13:13
**Bernstein (3)**
53:19;54:6;64:9
**best (12)**
30:12;37:6;52:23,
23;95:25;96:13;
113:1,3;150:15;
180:8,8;198:8
**betray (1)**
125:14
**better (11)**
31:5,12;63:18;
76:21;91:3;98:17;
107:24;114:3;143:18;
166:4;199:17
**beyond (3)**
56:7;91:7;186:25
**big (9)**
47:11;60:3;103:4;
108:21,21;142:13,15;
146:25;173:19
**bigger (2)**
110:6;131:7
**biggest (1)**
35:23
**bilateral (1)**
72:12
**Bill (1)**
69:22
**billion (8)**
35:4;40:17;41:3;
46:20;50:23;51:15;
81:18;191:5
**billionaire (1)**
81:11
**billions (3)**
46:19;51:24;114:19
**binary (1)**
43:23
**bind (2)**
67:12;123:3
**binders (1)**
34:4
**binding (3)**
61:7;94:3;141:12
**binds (1)**
167:22
**BIRD (2)**

7:2,12
**Birmingham (1)**
15:15
**Biscayne (1)**
6:12
**bit (16)**
31:3,3,9,9;38:4;
50:19;57:5;86:3;
112:16;126:21;130:7,
10,12;145:16;156:3;
161:16
**bizarre (1)**
55:25
**bizarrely (1)**
73:23
**BLACKWELL (1)**
10:17
**blah (5)**
172:1,1,1,1,1
**BLAINE (1)**
21:8
**blanket (1)**
139:13
**blasts (1)**
155:2
**blatantly (1)**
56:10
**blindly (1)**
125:8
**block (1)**
151:19
**Bloomalex (1)**
53:4
**blue (2)**
69:21;102:9
**blunt (1)**
158:15
**BNP (1)**
5:13
**board (5)**
42:13;45:2;46:9;
47:8;136:6
**board's (1)**
45:5
**bold (2)**
85:24;173:19
**bombing (1)**
114:23
**bond (1)**
151:21
**bondholders (3)**
42:14;81:1;171:2
**bonds (3)**
80:5;104:8,22
**Boston (1)**
11:14
**both (23)**
40:8;42:14;48:25;
52:5;53:19;54:6,13;
55:25;56:1;57:5;
60:15;61:24,24;
62:17;64:14;71:20;
80:11;101:16;123:7;

143:10;156:24;158:9;
176:16
**bother (2)**
174:13;187:9
**bottom (1)**
197:12
**bought (4)**
79:17;167:15,17,23
**Boulevard (2)**
6:12;16:14
**bound (8)**
53:24;56:24;88:15;
93:13,13,14;116:14,
15
**bounded (1)**
79:20
**Bowling (1)**
11:4
**box (13)**
61:14;62:14;66:8;
71:4;78:15;83:15;
88:9;93:13;146:13;
165:20;167:19,21;
195:22
**boxes (3)**
44:3;116:25;197:12
**boycotting (1)**
191:4
**BR (1)**
62:9
**BRADFORD (1)**
11:16
**BRADLEY (1)**
20:8
**brand (1)**
94:20
**Brands (1)**
53:11
**Brasfield (1)**
13:14
**BRASWELL (2)**
11:19,25
**breach (1)**
196:13
**break (6)**
86:12;161:3,10,17;
175:19;177:14
**breakdowns (1)**
87:10
**BRETT (3)**
14:19;15:8;27:25
**BRIAN (1)**
23:8
**bridge (1)**
185:12
**brief (21)**
42:24;43:12;52:17,
19;53:2;55:5,22;
56:21;67:4;70:19;
84:10;96:23;99:1;
102:6;118:11;163:3;
167:16;173:1,19;
174:13;185:8

**briefed (1)**
119:10
**briefing (1)**
176:19
**briefly (5)**
40:6;44:22,24;
167:12;197:18
**briefs (1)**
174:17
**bright (4)**
115:14;140:16,18;
173:14
**bright-line (1)**
150:8
**bring (4)**
53:17;69:2;121:8;
182:7
**broad (1)**
148:21
**Broadway (1)**
10:5
**BRODY (1)**
25:23
**broker (1)**
153:25
**brokerage (1)**
151:20
**BROOKE (1)**
10:17
**BROOKS (1)**
5:2
**brothers (1)**
93:17
**brought (4)**
35:18;142:23;
143:1;190:21
**BROWN (1)**
18:11
**BRUCE (3)**
26:16;32:7;183:4
**Bryant (1)**
20:14
**budging (1)**
41:14
**build (2)**
188:20,24
**Building (2)**
18:22;88:17
**bunch (3)**
142:1;165:6;174:2
**burden (1)**
92:9
**BURKE (1)**
5:18
**Burnham (1)**
73:6
**BURR (1)**
15:11
**BURU (1)**
9:17
**bus (1)**
121:17
**business (6)**

39:3;44:6;91:13;
188:5;196:4;197:3
**butcher (1)**
119:16
**BUTLER (1)**
25:24
**Butner (1)**
117:16
**button (1)**
160:17
**buttress (1)**
86:19
**buy (3)**
81:18;195:11,12
**buying (1)**
100:5

## C

**CA (2)**
7:16;18:6
**Cabin (5)**
5:3;29:11;38:20;
43:7;194:12
**calculation (1)**
112:8
**CALDWELL (1)**
13:13
**calendar (5)**
189:21;196:23;
200:7;201:5;202:1
**CALIFORNIA (14)**
18:2,3;29:24;
100:25;101:19;102:3,
7;104:14,16,16;
105:17,19;106:1,16
**call (6)**
39:11;46:1;58:12;
110:15;175:25;180:2
**called (4)**
65:1;106:10;
168:10;191:8
**calls (1)**
106:7
**came (1)**
43:23
**camera (1)**
194:20
**can (106)**
27:8,18;28:11;
42:20;48:18,20;
50:16;51:16;56:3;
59:3,22,24;60:13;
64:24;65:2;67:1;69:2;
71:2;72:2;74:2,5,18;
76:12;78:14;92:12;
94:24;96:15,16;
100:16;102:25;
104:23;105:24;
106:18;107:11,15,20;
109:23;110:10,15;
111:3;115:8;120:15;
122:3;125:2;131:5,

18,23,24;132:12,13;
135:8,10;143:15;
150:10,11;152:25;
155:1,9;156:14;
157:18;161:10,13;
169:2,3;171:7;176:7,
25;177:15,19,19,21;
178:12,16,17;179:9;
180:1,3,8,8;181:2,16,
17;184:20,21;187:5;
189:19;190:7;191:13,
14,18;192:11,12;
193:1,2,4,4,10,13;
196:8,19;198:25,25;
199:1,2,5;202:5
**canceled (2)**
38:6;42:2
**candidly (1)**
91:18
**canon (1)**
59:24
**canvased (1)**
45:10
**capacious (1)**
60:2
**Capital (6)**
25:22;26:10,17,22;
70:7;164:22
**caps (2)**
85:24;173:19
**captain (1)**
76:3
**caption (2)**
139:14;148:13
**care (4)**
124:15;126:6,11;
173:10
**carefully (1)**
170:23
**Carolina (1)**
5:6
**carrier (4)**
35:24;79:19;91:19;
99:14
**carriers (3)**
42:1;45:14;190:23
**carries (1)**
53:13
**carry (1)**
74:4
**cartel (1)**
191:3
**CARTER (2)**
12:8;166:4
**CARUSO (2)**
25:25;32:5
**carved (3)**
40:3;103:24;104:17
**carves (1)**
103:12
**CASE (114)**
6:2,10;27:14;35:18;
36:7;39:6,24;40:12;

43:24;44:12,16,24;
50:10;52:3,7;54:9;
56:7;57:25;61:11;
62:4;67:25;69:5,16;
71:25;76:4;77:20;
78:2,18,24;80:14;
83:13,25;84:7;86:4,8,
10,17;87:21;91:5,10;
92:19;94:2,16;95:12;
100:1;104:6;105:15,
22;108:3;109:18;
112:4,7;113:11;
115:7;116:8;117:16;
119:17,24;122:25;
123:6,15,23;124:21;
127:12,19;129:14;
132:1,19;133:6;
135:7;136:1,8,14;
137:15,23;138:7;
139:20;140:3;143:19;
147:1;149:15,20;
150:1;153:25;162:11,
11,11,11,11;163:1;
167:16;168:1,6;
169:19;171:10;173:7,
16;174:4;179:4,23;
180:19;185:17;
188:12;191:16,17,22;
192:15,23;195:2,6;
197:11,20,22;199:13
**cases (92)**
34:25;35:12,13,15,
22;38:3;39:4;40:3;
41:22;42:17,18;
43:20;44:5;52:17,19;
53:17,20,21;54:13;
55:8,12,13;56:1;
57:10,24;63:9,14;
64:2;65:8,9,11,21;
67:5;68:18;71:1;
72:23;74:17;76:11;
78:23,23;79:15;
82:10,11;84:19;
85:19;86:3,9;87:23;
88:7;91:5;92:6,17;
93:1;97:20;110:3,3,8;
111:17;112:13,13;
113:6,9,19;115:21;
120:15;121:2,15;
122:10;131:20;
132:23;133:19;134:3,
3,15;136:7;139:10,
15;143:3;147:22;
148:6;162:13,18;
163:18;164:9;169:12;
171:16,18;173:1;
174:1,3;185:8;188:4
**cash (18)**
32:15,23;39:16;
43:3;72:14;76:1;
78:19;80:25;104:7,
22;163:14;168:7;
184:24;185:7;186:22,

24;187:2;195:11
**CASHMAN (1)**
24:11
**CASSIDY (1)**
7:7
**cast (1)**
69:23
**casting (1)**
62:6
**CATALANELLO (1)**
7:8
**categorical (3)**
54:19,22;162:15
**categorically (4)**
52:20;55:3;59:15;
61:17
**categories (2)**
75:6;76:10
**category (1)**
89:14
**category-by-category (1)**
121:22
**CATHY (1)**
19:18
**caught (1)**
70:20
**cede (4)**
100:24;138:9;
184:14,14
**cedement (1)**
90:10
**cell (1)**
167:15
**cent (1)**
81:17
**Centric (1)**
53:10
**Century (1)**
53:6
**Cenveo (1)**
53:7
**CEO (1)**
66:10
**CEO's (1)**
66:15
**CEPHAS (1)**
26:9
**CERRA (1)**
8:8
**certain (12)**
76:24;97:22;123:9;
152:22;173:24;176:8;
183:7,10;185:3;
196:24,25;200:22
**certainly (39)**
27:8;42:8;43:23;
44:15;47:8;51:10,19;
60:16;69:1;76:2;
86:17;92:4;94:3;
109:2;112:22;113:16;
119:23;122:3;133:9;
140:13;142:24;146:6,
9;150:3,11;152:9;

154:23;160:9;170:2;
172:6;174:7,14;
177:3;188:3;189:5;
192:14;193:12;
196:13;199:7
**certainty (1)**
42:22
**cetera (8)**
70:24;85:22;93:4,4;
164:22,22;188:7,7
**CFO (1)**
32:4
**Chair (1)**
182:11
**challenge (1)**
119:5
**chambers (3)**
37:1;177:23;199:12
**CHANCE (8)**
21:20;48:15;89:17;
161:18;197:15;200:4,
4,5
**chances (1)**
50:25
**change (8)**
118:19,24;142:4;
150:19;166:11,18,21;
187:2
**changed (9)**
40:23;58:15;63:11;
69:4;138:1;141:5;
150:17;172:21;184:7
**changes (4)**
45:12;57:4;155:3;
195:13
**changing (3)**
118:22;166:15;
184:8
**Chapman (1)**
53:5
**Chapman's (1)**
93:16
**Chapter (12)**
27:14;34:25;35:22;
39:4;41:22;47:11;
57:24;70:15,16;
94:25;180:19;185:8
**characterized (2)**
59:20;130:14
**Charlotte (1)**
25:6
**Chassix (9)**
52:25;53:18;54:3,7,
18;56:2;64:9;73:23;
133:7
**chat (2)**
101:9;189:1
**check (12)**
50:6;61:14;66:7;
78:15;88:8;93:12;
145:22,23;146:13;
165:20;194:2;195:22
**checked (7)**

44:3;83:15;146:5;
169:22;196:7;198:10,
11
**checking (6)**
62:14;71:3;146:8,8;
152:17;197:12
**Chicago (3)**
10:15;12:6;19:6
**Chief (2)**
82:23,23
**children (1)**
66:10
**chime (2)**
30:4;162:5
**choice (11)**
47:3,12;113:21;
118:11;119:8;124:2;
149:17,22;166:25;
167:1,4
**choose (3)**
72:16;78:12;92:10
**chose (3)**
88:11;170:17,18
**CHRIS (3)**
26:15;31:18;184:15
**CHRISTINA (1)**
9:17
**Christopher (1)**
184:19
**Church (1)**
9:4
**Cincinnati (1)**
18:14
**Cir (1)**
73:8
**Circle (4)**
11:21;108:17;
177:19;198:25
**Circling (1)**
112:4
**Circuit (15)**
57:19;65:4,7,19;
66:22;68:2,9,14;
72:21,23,24;73:2;
83:20;142:17;182:18
**circuits (2)**
65:21;142:25
**circulating (1)**
147:22
**circumstance (2)**
103:2;125:24
**circumstances (27)**
47:10;57:4;58:16;
74:18,19,25;75:12;
76:18;78:23;86:15;
89:21;91:3,5,24;
92:19;93:19;111:19;
120:18;121:25;
122:16;123:9;130:25;
136:16;139:23;142:3;
150:6;165:12
**citadel (1)**
69:14

**cite (10)**
55:1;67:24;68:18;
69:16;78:4;82:22;
83:25;112:12;135:5;
162:10
**cited (9)**
52:17,19;58:13;
64:3;76:18;140:16;
151:14;162:13;173:1
**cites (2)**
117:22;171:17
**citied (1)**
93:17
**citing (1)**
163:3
**CITY (5)**
16:12,13;38:22;
55:18;83:23
**CLA (1)**
183:7
**claim (19)**
50:7;56:1;72:21;
73:2;83:6;86:17;
90:10;102:13;104:2,
5,7;105:18;115:18;
128:9;136:15;151:2,
2;163:12;197:20
**claimants (6)**
50:4;56:14;90:9;
104:14;136:14;
137:14
**claiming (1)**
126:10
**claims (18)**
36:2;39:9,19;50:23;
56:19,23;70:6;85:21;
104:4;108:23,24;
132:15;139:17;148:8;
163:15;164:3;168:7;
190:25
**clarification (1)**
114:11
**clarify (1)**
186:17
**clarion (1)**
165:25
**clarity (6)**
55:7;106:17;158:7;
165:25;171:14;
192:10
**class (32)**
39:9;47:5;52:23;
56:19,22;64:5;79:19,
25;80:2,8,10;81:5,11;
82:10,17,18,20,20;
83:5,8;91:25,25;92:3,
18;123:10;139:15,17;
147:11,18,24;148:7;
153:4
**classes (24)**
49:4,11,24;56:10,
12,12,14,17,18,18,24;
75:13,24;80:5,11,11;

87:10;115:9,9,10;
132:10,11;135:25;
153:14
**clause (1)**
82:15
**clean (1)**
179:18
**cleaner (1)**
76:21
**clear (41)**
34:14,16;44:5;48:8;
58:22;66:23;74:17;
76:7,8;80:20;83:20,
20,22;86:11;88:11;
92:22;95:11,14,19;
103:21,25;105:25;
119:11;131:20;
133:23;141:7;150:10,
13;155:1;159:2;
164:6;171:15;172:16,
24;173:16,24;178:9;
181:11;182:16;
186:11;192:11
**clearer (1)**
133:22
**clearest (3)**
133:12,13;134:6
**clearly (18)**
27:19;52:11;58:9;
62:5;68:22;83:14;
85:18;86:2;88:12;
93:19;96:13;127:2;
137:4;143:15;156:9;
171:19;176:16;
184:20
**click (6)**
85:13;90:5,5,6;
92:12;163:16
**client (2)**
103:7;185:25
**clients (2)**
99:6,24
**client's (1)**
98:1
**CLIFFORD (1)**
21:20
**CLINT (3)**
5:9;29:13;194:19
**close (9)**
35:4;36:3;71:21;
91:2;93:6,23;100:2;
125:9;162:23
**closed (3)**
41:24;174:22;
178:23
**closer (4)**
31:3;55:13;107:21,
22
**closing (2)**
41:20;176:3
**CNO (1)**
183:6
**CO (1)**

24:6
**Code (16)**
58:19,21;59:16,22;
60:6,16;66:13;97:14;
99:18;117:9;134:18;
135:3;163:1;181:5;
184:2;185:3
**codified (1)**
58:1
**coerced (1)**
74:7
**coercion (1)**
62:8
**coercive (1)**
74:1
**COHEN (1)**
9:8
**coin (1)**
126:12
**collaboration (1)**
99:5
**collapses (1)**
65:16
**colleague (2)**
184:15;194:19
**colleagues (1)**
31:17
**collectively (1)**
171:6
**college (4)**
66:9,9,15;67:14
**colloquially (1)**
46:25
**colloquy (3)**
159:1;161:6;164:11
**Columbia (2)**
190:23;191:24
**combination (1)**
42:1
**combined (5)**
157:18;158:2,3;
181:6,10
**combining (1)**
157:9
**comers (1)**
80:12
**comfortable (4)**
83:19;168:5,22;
170:13
**comforting (2)**
90:16,17
**coming (5)**
50:22;129:16;
178:2;179:22;197:3
**comma (1)**
41:16
**commence (2)**
194:18;197:14
**commenced (1)**
39:4
**comment (9)**
64:11;74:21;76:4;
96:2;101:8;114:23;

147:10,15;183:16
**comments (10)**
82:11;95:17;96:23;
97:18;99:1;102:5;
137:8;138:8;156:16;
187:18
**commercial (1)**
184:4
**commercially (1)**
183:25
**COMMISSION (7)**
17:11,12;21:12;
28:5;101:16;138:10,
23
**commitment (2)**
99:10;183:9
**Committee (12)**
15:3;27:23;28:1;
39:21;81:6;95:4,6,17,
20,22,24;96:8
**committees (1)**
36:19;91:20,21
**committee's (1)**
95:14
**common (2)**
150:4;166:3
**commonplace (1)**
41:12
**commonsense (1)**
146:15
**Communications (2)**
25:13;38:22
**companies (2)**
44:8;47:11
**Company (13)**
8:3;9:12;24:12;
25:3;40:16;45:18;
50:23;94:25;96:12;
148:8;149:20;177:7;
185:7
**comparable (1)**
139:11
**compare (1)**
120:21
**compared (1)**
49:16
**compel (2)**
49:2;56:6
**compendium (1)**
117:25
**compensation (4)**
85:7;127:17;
129:13,15
**complain (1)**
49:18
**complainant (1)**
73:6
**complaint (1)**
195:16
**complete (3)**
27:9;50:1;78:12
**completed (1)**
195:23

**completely (9)**
56:7;63:2;83:21;
103:25;114:14;163:2;
167:10,13;168:16
**completeness (1)**
84:25
**completion (1)**
35:23
**complex (2)**
35:9;57:25
**complexity (1)**
35:6
**compliance (1)**
80:16
**complicated (4)**
115:7;169:1,2,3
**complication (1)**
122:19
**complies (2)**
97:14;178:15
**comply (2)**
98:18;185:10
**component (2)**
41:7;97:2
**components (2)**
40:16;175:1
**comports (2)**
150:6;184:2
**comprehensive (3)**
70:9;98:13;101:3
**comprehensively (1)**
97:10
**compromises (1)**
70:10
**Computershare (1)**
24:12
**concede (1)**
91:16
**conceding (1)**
92:15
**concept (1)**
157:9
**concepts (4)**
70:18;147:11,18;
171:20
**conceptually (1)**
152:15
**concern (2)**
66:2;200:1
**concerned (2)**
48:17;105:17
**concerns (4)**
27:8,11;103:6;
157:11
**concessions (7)**
49:9;51:14;63:17;
67:10;70:6;94:18;
164:20
**conclude (1)**
53:21
**concluded (5)**
71:16;178:9,24;
180:19;202:17

**conclusion (2)**
128:17;185:17
**conclusions (1)**
155:22
**conclusively (1)**
65:23
**conduct (4)**
156:13,14,18,19
**conducts (1)**
186:22
**cone (1)**
81:18
**conference (10)**
29:16;34:24;43:5,7;
160:14;194:12;
195:18,23;196:7;
198:10
**conferred (1)**
71:10
**confirm (8)**
33:15;35:6;39:12;
97:16;99:21;107:11;
114:2;179:1
**confirmation (49)**
27:15;29:18;31:24;
33:12;34:7;36:7,15;
38:17;39:1,7,12;42:3,
15;43:1,4,10,11;
45:16;48:4;55:20;
56:21;62:23;66:13;
94:4;99:18;103:12;
159:20;160:11,17;
161:15;162:7;169:1;
174:21;175:24;177:4;
178:4,11,22;179:10,
12,15;180:22,25;
181:10,20;185:24,25;
193:8;198:2
**confirmed (10)**
39:8,13;71:5;94:24;
95:24;96:1,16;97:15;
100:16;192:23
**confirming (1)**
164:19
**confused (13)**
61:25;88:10;89:9;
105:9;109:23;110:5;
125:16,23;155:5;
168:24;169:14;
173:20;197:24
**confusing (11)**
116:16,22;124:19;
125:6;131:3;158:12;
165:7,8,8,17,17
**confusion (7)**
62:2;109:6;116:19;
124:2;133:15,17;
169:10
**Congress (1)**
163:20
**conjurers (1)**
96:4
**connection (2)**

66:13;199:9
**CONNIE (1)**
21:17
**consensual (16)**
35:7;48:24;54:15;
57:8,14;58:7,9;60:20;
68:12,15;71:21;75:6;
113:8;129:25;130:1;
134:18
**consensus (1)**
35:12
**consent (80)**
54:21;57:9;58:16;
61:20;62:13,23;
67:20;68:18;71:2,13,
19,24;75:3;76:12;
78:16;83:8;98:15;
109:24;110:1,2,4,11,
25,25;111:12;112:14;
113:7,25;114:4;
115:21;116:16,18,20;
117:18,20;119:4,6,11;
123:17;132:3;133:2,
13,14,19,20,25;134:1,
2,2,7,12,16;138:4;
139:6,9,25;140:4;
141:13,15,15,19;
143:5,13,15,16;
144:18;146:20;148:5;
150:23,24,25;151:4;
152:10,17;163:18,19;
167:6;172:20,22;
200:13
**consented (6)**
49:15;61:15;140:7;
143:7;195:20;198:4
**consenting (5)**
50:14;55:24;70:5,
10;77:17
**consents (1)**
200:15
**consequences (5)**
68:21,22;70:14;
149:16;150:20
**conservatism (1)**
60:8
**conservative (1)**
49:1
**consider (4)**
174:21;189:8;
198:9;200:21
**consideration (20)**
72:17,23,25;73:4,5,
13,21;77:10;84:5;
108:16,19;116:10;
118:21;148:18,19;
164:13,17;166:14,20,
24
**considerations (3)**
98:3;112:21;147:16
**considered (5)**
72:10;103:2,2;
105:2;169:11

**considering (1)**
119:14
**consisted (1)**
40:13
**consistency (3)**
111:9;140:14;151:9
**consistent (6)**
97:7;99:18;133:6;
178:19;179:14;190:7
**consolation (1)**
177:19
**consortium (1)**
39:5
**conspicuously (1)**
85:18
**CONSTANTINE (1)**
23:17
**constitute (2)**
113:25;117:19
**constitutes (6)**
57:9;110:4;133:2;
165:13;172:20,22
**Constitution (3)**
71:11;83:4;191:1
**constructive (2)**
39:15;197:3
**construing (2)**
112:19;114:4
**consulted (1)**
102:16
**Consulting (1)**
18:12
**contact (4)**
180:4,6,7;193:23
**contacted (1)**
49:18
**contain (1)**
99:25
**contained (1)**
34:3
**containing (1)**
181:4
**contains (1)**
45:21
**contemplated (4)**
71:8;182:20;
187:21;193:10
**contemplates (2)**
81:25;187:23
**contemporaneously (1)**
189:24
**content (2)**
27:10;108:24
**contention (1)**
82:15
**contest (2)**
159:18;191:10
**contested (2)**
35:21;43:13
**context (10)**
68:19;83:12;98:1,5;
109:1;115:25;139:11;
148:6;174:5;186:15

**contexts (2)**
131:23;173:24
**Continental (2)**
65:7,13
**continue (17)**
39:2;44:6;58:17;
98:10;108:3;117:7;
123:12;128:23;
130:11;174:19;
191:18,23;192:2,9,22;
198:9,21
**continued (2)**
58:20;180:18
**contours (1)**
100:5
**contract (35)**
39:10;49:15;51:13;
67:20;68:25;69:13;
70:18,25;71:7,18,20,
23;72:7,15;73:14;
75:20;84:2;99:3;
111:1;119:13;135:4;
147:4;166:12,16,21;
167:6;169:3;195:8,
15;196:13,14,15,20,
23;197:10
**contracts (3)**
38:2;39:3,7;163:14;
164:4;168:12
**contractual (5)**
78:6;110:22;
111:12;112:1;119:18
**contrary (3)**
62:19;82:6;162:17
**contrast (3)**
35:11;63:8;79:18
**contributed (1)**
108:22
**contribution (1)**
66:9
**contributions (3)**
63:16;76:1;81:4
**controls (1)**
64:2
**controversy (3)**
103:19;105:15,22
**convened (1)**
36:20
**conversation (3)**
79:10;131:25;
177:15
**conversations (1)**
198:19
**Convertible (19)**
18:20;19:3;28:14,
16;37:19,21;39:21;
80:9;96:18,22,24;
97:6,8;99:6;120:12;
137:3,6;139:4;153:17
**cooperate (1)**
30:8
**coordinate (3)**
106:2,11;189:12

**copied (1)**
182:23
**copier (3)**
91:14;120:8;137:2
**copy (6)**
124:14,18;175:9;
193:4,5,21
**Coral (1)**
11:23
**Cordell's (1)**
168:3
**CORNELL (131)**
11:7;28:8,8;32:22,
25;33:24,24;75:17;
101:7,14,15,20,23;
106:18,21;107:2,5,9,
13,13,16,17,18,22,24;
108:1;109:2,7,10,16,
21;110:7,17;111:2,5,
14;112:4,11,22;113:4,
10,13,18,20;114:6,8,
10,18;115:1,2,13,19;
116:3,8,23;117:2,4,6,
8,24;118:2,5,10,17;
119:22;120:1,11,17;
121:4,6,13,19;122:1,
6,8,14,18,23;123:6,
13;124:5,12,25;
125:12,19,25;126:4,
16,20,23,25;127:5,9,
12,24;128:6,19;129:1,
3,11,20;130:3,7;
131:7;132:8;133:11,
21,24;134:9,19,21,25;
135:17;136:5,19,25;
137:11,21;138:12,15;
145:16;151:8;163:20;
165:7;166:7,25;
170:25;177:25;178:2,
7;182:11
**Cornell's (3)**
75:25;140:15;
156:24
**Corporation (2)**
14:14;78:21
**correction (1)**
52:18
**correctly (2)**
66:24;105:15
**cost (2)**
35:10;99:14
**costs (2)**
39:2
**counsel (27)**
30:23;62:22;76:25;
79:14;80:8,9;110:23;
114:17;116:6;117:7;
137:20;156:23;
176:13;181:15;
186:10,13;187:9,17;
188:15;194:3,13,15,
20;201:2,14,19;202:9
**count (1)**

37:15
**counter (2)**
40:19;91:18
**Counterparties (4)**
10:13;79:18;99:3;
167:7
**countless (1)**
122:9
**country (6)**
35:3;52:20;53:13;
86:18;142:17;163:24
**country's (2)**
35:23;79:19
**County (1)**
14:3
**couple (10)**
106:5;120:3;175:2;
179:16;186:1,9;
188:16;191:22;194:2;
198:25
**coupled (2)**
46:10;119:7
**coupon (1)**
81:17
**course (30)**
35:25;36:9,18;39:2,
8;43:16;45:21;50:20;
53:9;54:1;57:13;61:6;
66:21;69:25;70:22;
72:12;73:20;75:17;
84:24;85:10;86:19;
93:15;97:20;103:24;
104:8;128:23;151:9;
154:8;156:13,14
**COURT (380)**
27:2,21;28:2,6,10,
19,25;29:19,25;31:2,
6,11,13;32:20;33:3,5,
19;34:1,21;35:19;
36:11,12;37:8,14;
39:22;43:9,15;45:16;
46:6,21;47:14,16,18,
24;48:14,17;50:12;
51:2;52:1,11,14,21;
56:10,24;57:6;58:4,
12;59:7,9,23;61:8;
63:23,25;66:22;67:1,
22;68:7,8,9,11,20;
69:9;71:4,11;72:4;
73:1,9;74:8,15;75:11;
76:7;77:19;78:2,13,
22;80:13,16,17;82:2,
9,13,22;83:20;84:14,
20;85:22;86:1;87:2,9;
88:11,18;89:12;
90:16;91:7,9,22;
92:14,24,24;93:11,25;
94:5,5,6;95:1,10;96:2,
7,17;97:17;98:8,20;
99:19,21;100:4,17,19;
101:4,6,8,18,21,24;
102:24;103:9,18;
104:25;105:13;

106:14,16;107:6,10,
15,20,23,25;108:18;
109:5,8,11,20,22;
110:8,9,21;111:3,6,
16;112:10,12;113:2,5,
11,14,19;114:1,7,9,
11,22;115:11,14,20;
116:6,21,24;117:3,5,
7,11,21,25;118:3,6,
16;119:21,23;120:2,
12,25;121:5,7,14,15,
20;122:5,7,9,15,19,
24;123:12;124:3,6,
13;125:11,13,21;
126:1,15,19,21,24;
127:1,6,11,13;128:3,
7,25;129:2,6,19,21;
130:4,15;131:15;
132:21;133:18,22,25;
134:14,20,24;135:2,
20;136:18,22;137:1,
17,22;138:11,13,16;
139:8;140:9,11,13;
141:11,14,20,22,25;
142:6,7,12;143:17;
144:19;145:5,9,16,24;
146:1,4,17;147:6;
149:2,12,15;150:9,16,
23;151:6,8,23;152:5,
8,16,19;153:8;154:4,
7,19;155:21;156:6,16,
21,23;157:2,13,15,17,
22;158:1,14,17,20,22,
25;159:11,13,16,25;
160:6,8,22;161:7,12;
162:4,14,15;165:10;
166:2;167:3,11,25;
169:11,15,17;172:13;
173:17;174:11,11,16;
176:5;177:14;178:1,
6,8;179:1,3,19,21;
180:8,16,17;181:17,
21;182:6,10,19;
183:13,21;184:13,17,
21;185:9,15;186:2,5,
13,20;187:7,14,25;
188:25;189:17;190:5,
13,16,22;191:14,18;
192:5,16;193:2,18,20;
194:1,7,10,21,24;
196:9;197:17,21,23;
199:15,21;200:3,19,
25;201:2,4,13,18;
202:1,8,12,14
**courtroom (8)**
30:10;32:19;33:22;
48:5;101:13;106:23;
181:14;198:24
**courts (26)**
57:18;67:4;68:14;
69:10;71:6,14;76:23,
24;77:1,5;83:1,21;
84:24;86:22;91:24;

117:14,17;139:22;
140:1;141:4;142:17;
143:10;147:23;150:5,
11;164:8
**Court's (6)**
58:6;141:16;
150:11;158:2;161:10;
198:2
**cover (2)**
105:16;137:19
**covered (4)**
95:9;105:2,3;
119:25
**COVID (1)**
30:13
**CRAIG (1)**
26:13
**cram (1)**
51:2
**cream (1)**
81:18
**creates (1)**
116:15
**creating (1)**
128:10
**creature (1)**
71:9
**Credit (5)**
19:13;38:1,12;51:4;
182:2
**creditor (23)**
49:19;54:13;66:7;
73:4,25;79:4;83:12,
15,17;88:21;91:13;
92:18;94:22;97:21,
21;100:1,1;104:22;
106:5;119:15;140:6;
162:25;165:19
**Creditors (139)**
15:3;28:1;36:2,23;
38:3;39:14,24;42:5,
17;45:8;46:20,21,24;
47:3;49:2,6,8,10,13,
14,16,23;50:17;51:3;
52:13;53:23;54:4,9,
11,20;55:19,20;60:13,
17;61:21;62:4,7,12,
15,19,25;63:7,20;
70:8,11,23,23;71:9;
72:13,25;73:6;75:25;
76:23;77:1,5,9,13,22;
79:22;80:6,20;81:7;
84:20;85:7,18,23;
88:6,8,14;89:25;92:9;
93:12,23,25;94:14,15,
17;95:7,25;96:14;
97:19;100:14;102:12,
23;103:16;104:21;
108:4,9,13;112:7,8;
116:9;119:17,20;
120:7;123:23,24,25;
124:14;125:4,9,12;
126:8;128:22;129:14;

130:9;131:8;132:12,
17,19;133:14;135:25,
25;136:8,9,9,15;
137:1,23;140:2;
143:21;144:15;
151:17;153:4;154:11;
162:19,21;163:23;
164:12,14;165:3;
168:3;169:13;171:9;
173:6,6,12,13;195:4
**Creditors' (3)**
39:21;91:20,21
**critical (1)**
97:2
**CROMER (3)**
26:3;32:4,14
**Cromer's (1)**
185:5
**cross (1)**
32:25
**cross-examination (1)**
32:19
**cross-examine (4)**
32:21;33:7,16,21
**crusade (1)**
172:12
**CT (1)**
9:6
**culmination (2)**
84:18;99:4
**cumbersome (1)**
88:1
**Cumulus (2)**
53:6;93:16
**cup (1)**
101:22
**cure (2)**
39:2;169:3
**current (3)**
125:6;176:2;186:24
**currently (2)**
175:23;195:25
**customer (1)**
167:23
**customers (1)**
99:3
**cut (2)**
51:11;186:5
**cutting (3)**
36:22,22,24
**cut-you-choose (1)**
41:18
**Cyrus (1)**
26:22

## D

**d1 (1)**
68:18
**Dallas (1)**
23:6
**Dallas- (1)**
38:24

**damages (1)**
191:5
**Dania (1)**
14:13
**DANIEL (1)**
5:8
**Darren (4)**
31:17;181:14,18;
201:22
**data (1)**
180:5
**date (13)**
35:5,7;97:1;168:13;
176:8;177:13;187:5;
189:18;193:9;196:18;
199:10,17;200:22
**dates (2)**
175:22;198:25
**dating (1)**
89:8
**DAVID (2)**
19:17;26:19
**Davis (10)**
27:19;31:16;36:17;
48:5;168:11;181:18;
184:19;190:10;
194:16;201:22
**DAY (25)**
9:2;35:19;60:5;
63:9;85:19;94:12,12,
13,15,16,19;99:2;
103:21;104:6;108:3,
6;122:7;168:12;
173:17;177:1;189:10;
194:8;200:6,23;
201:24
**day- (1)**
87:2
**days (5)**
35:7;94:22;190:4,5;
194:2
**DBSD (4)**
67:25,25;68:6;72:8
**DC (3)**
12:14;14:6;21:5
**DE (4)**
8:6;13:6;25:16;
49:6
**deadline (2)**
102:15;169:1
**deal (21)**
41:23;46:3,16;
50:15;51:6,23;63:22;
78:20;82:2;97:20;
98:16;108:21;128:12;
129:25;130:2;143:20;
156:1;178:17,18;
195:13;197:7
**dealing (5)**
70:22;159:23;
178:10;180:21;184:3
**dealings (9)**
86:14;90:23;91:10;

135:22;136:16,20;
154:8;170:8,14
**deals (2)**
101:3;131:16
**debate (5)**
111:7;134:5;
172:17;189:20;
198:12
**debates (1)**
140:19
**debating (1)**
128:17
**debt (14)**
40:14,15,18,23;
41:6;42:10;46:11;
70:6;81:3;87:24;99:9;
102:8;171:3,4
**debtor (29)**
27:16;31:17;66:10,
14;70:16;71:8;81:9;
91:12;108:6;110:16;
119:15;123:13;
126:10;134:23;135:2;
139:21;149:6;152:24,
25;157:6,22;159:4;
162:7;168:21;186:13,
22;191:16;194:17;
195:11
**debtors (42)**
27:20;30:22;32:3;
36:6;37:24;38:8;
56:11;62:18;85:17;
88:16;95:19;96:24;
97:11;99:7;104:2;
108:4,11,13;110:16;
112:16;115:6,8,9;
118:12;119:5,20,24;
121:7;123:19,22;
126:5;136:17,20;
147:21;157:20;
159:20;164:17;172:2;
177:10;181:19;
184:20;201:22
**debtor's (15)**
54:16;97:15;103:5;
128:20;129:15;
152:20;184:24;185:2;
188:5;189:8;191:10;
194:13;201:19
**decades (5)**
57:20;71:7;91:5;
117:15;172:11
**decide (8)**
88:14,22,22;123:7;
134:3;142:13;143:19;
163:17
**decided (5)**
57:12;115:22,22;
124:8;147:17
**decides (2)**
88:21;180:12
**deciding (2)**
60:19;71:3

**decision (19)**
61:7;68:8;72:24;
97:22;142:22;146:9;
147:2;150:20;152:11;
174:20,25;175:3,4,5,
16;176:17;177:3,11;
179:2
**decisions (10)**
54:7;55:7;58:12,15;
68:3;73:22;75:8;
133:1;150:11,13
**declarants (1)**
32:18
**declaration (10)**
32:8,14;34:10;
45:10,19;76:5;139:2;
144:9;183:4;185:5
**declarations (4)**
32:3,17;33:6;34:3
**deem (2)**
89:16;139:8
**deemed (24)**
47:5;49:5;55:24;
56:6,11;75:4,5,7;
82:17;87:18,18,18,19,
25;88:9;92:2;109:13;
111:7;121:7,8;
123:17;124:23;
139:13;143:13
**deep (1)**
51:11
**deeper (1)**
63:21
**deeply (3)**
36:20;69:18;168:20
**default (13)**
64:20;65:1,15,16,
24;67:23;68:1;69:1;
116:15;141:8;169:24;
170:1;200:8
**defaulted (1)**
65:2
**defective (1)**
112:1
**defend (1)**
170:20
**defendants (1)**
191:2
**defense (1)**
92:22
**defined (2)**
80:2,3
**definite (1)**
105:6
**definitely (4)**
60:10;105:5;
143:15;160:19
**definition (2)**
108:19;151:18
**DEHNEY (1)**
13:8
**DEKARLOS (1)**
26:7

**Delaware (3)**
8:4;118:13;119:4
**delay (1)**
193:11
**delaying (1)**
68:23
**delighted (2)**
31:23;106:11
**Delonis (1)**
53:3
**delving (1)**
201:15
**demand (1)**
200:5
**demanding (1)**
65:6
**demands (1)**
36:25
**Demonbreun (1)**
9:13
**demonstrably (1)**
164:14
**denied (1)**
124:23
**Denver (1)**
24:6
**DEPARTMENT (3)**
11:2,11;18:3
**dependent (2)**
54:23,23
**depends (1)**
141:22
**depositories (1)**
185:4
**Deputy (6)**
29:23;100:25;
101:15,18;102:1;
198:24
**described (2)**
52:12;196:12
**descriptive (1)**
82:19
**designed (1)**
131:5
**desire (3)**
33:16,20;124:11
**Despite (6)**
35:5;43:3;56:13;
57:20;58:6;128:7
**detail (2)**
38:5;179:10
**details (1)**
201:15
**determine (2)**
139:24;140:3
**determined (1)**
42:12
**determining (1)**
141:16
**detract (1)**
37:3
**devastating (1)**
51:24

**develop (2)**
64:13;135:24
**developed (2)**
92:5;137:4
**device (1)**
79:17
**devices (1)**
106:25
**dialogue (1)**
197:3
**DIAMANTOPOULOS (1)**
12:25
**DIEGO (2)**
26:21;32:6
**Diego's (1)**
76:4
**differ (2)**
59:10,20
**difference (9)**
67:9;119:14;126:9;
137:9,9;148:4,13;
173:12,15
**different (40)**
41:1;54:24;55:9;
57:15;60:20;66:7;
67:15;74:7;78:23,24;
81:14,15;83:25;
87:10,21;106:3;
109:8;117:5;120:18;
129:8;130:7,10;
132:10,22;136:7,9,23,
24;137:13;140:1,2;
143:14;149:9,24;
150:2;151:12;152:2;
171:4;172:6;175:2
**differentiate (2)**
124:4;136:22
**differently (2)**
61:12;141:25
**differing (1)**
136:4
**difficult (4)**
122:22;136:6;
137:12,14
**difficulty (1)**
141:16
**DILLON (1)**
26:11
**DIP (2)**
8:14;22:3
**direction (1)**
73:24
**directives (1)**
47:1
**directly (2)**
61:22;168:21
**director (1)**
32:5
**directors (3)**
42:14;148:22;
171:25
**disagree (1)**
122:22

**discharge (5)**
118:19,24;166:10,
12,19
**discharging (2)**
118:22;166:16
**disclosure (13)**
31:25;34:7,11;43:1;
45:20;157:10,17;
178:11,23;180:21;
181:1,3,8
**disclosures (1)**
38:14
**Discover (1)**
15:12
**discovery (4)**
197:1,9,15;198:15
**discuss (4)**
40:1;108:10;
161:23;189:8
**discussed (5)**
63:12;155:15;
159:17;161:23;
186:19
**discussing (5)**
93:12;167:16;
185:14;186:18;188:2
**discussion (9)**
50:13;64:1;78:3,25;
126:22;132:10;
154:23;162:7;189:3
**discussions (2)**
43:21;198:9
**dismiss (11)**
196:22,22;197:4,8,
10,11,13,16;198:17;
199:10,12
**disparate (1)**
139:25
**dispense (1)**
48:3
**dispositive (1)**
67:18
**dispute (3)**
95:16;179:7,9
**disqualify (1)**
62:2
**disrespect (1)**
48:13
**dissent (1)**
107:16
**distinction (1)**
134:23
**distortion (1)**
62:8
**distract (1)**
123:14
**distracted (1)**
199:24
**distribution (6)**
47:6;70:4;77:1,3;
87:25;165:19
**distributions (5)**
49:4,7,11;67:11;

88:7
**district (16)**
52:22;53:2,16,18;
55:2;57:25;68:14;
84:1;93:15;94:19;
142:16;180:17;
190:22,22;191:24;
197:21
**dive (1)**
32:2
**DIZENGOFF (1)**
8:19
**docket (25)**
30:17;31:19;32:5,6,
7,13,15;34:8,10;
37:16;38:9,15;43:6,
12;44:16;45:17;
63:13;96:19;99:16;
106:6;139:1;183:3,4,
6;184:1
**doctor (1)**
31:7
**document (4)**
167:21,21,24;
169:20
**documentation (3)**
38:11;131:1;172:3
**documented (2)**
41:23;53:2
**documents (8)**
38:13;77:8;93:13;
104:13;167:20;
169:15;173:18,21
**dog (1)**
32:10
**DOJ (1)**
81:7
**dollar (5)**
41:16;66:8;90:9;
94:21;99:11
**dollars (33)**
35:4,10;37:18,18,
20,22,24;40:13,17;
42:10;46:11,12,19,20;
50:7,22,23;51:5,15,
24;70:7;78:15;81:19,
19;99:9;102:8;139:3,
4;164:21,21;171:3,5;
191:5
**domestic (1)**
105:6
**donate (1)**
66:15
**done (24)**
58:15;68:10;84:13;
87:24;94:21;107:19;
108:2;115:25;126:2;
127:9;130:20;132:3,
18;142:21;144:2;
157:16;162:6;170:16;
171:21;175:11;
178:17;184:6;192:3;
195:23

**DONELSON (1)**
13:13
**dot (3)**
165:12,12,12
**double-check (1)**
160:4
**doubt (3)**
159:2;164:25;
170:13
**DOUGLAS (2)**
7:18;22:8
**down (13)**
36:22,23,24;51:2;
74:19;86:18;102:16;
105:14;142:9;156:25;
169:21;175:7;199:2
**dozens (2)**
71:14;168:5
**draft (1)**
193:16
**drafting (1)**
164:6
**Drain (3)**
53:6;74:8;112:17
**dramatic (1)**
35:11
**draw (2)**
134:22;177:3
**drawing (1)**
128:19
**Drexel (5)**
72:24;73:6,7;77:11,
12
**drift (1)**
58:24
**drill (2)**
200:3,8
**Drive (2)**
19:4;57:18
**driver (1)**
64:22
**drives (1)**
90:1
**drop (2)**
182:4;188:8
**D's (1)**
77:12
**DUANE (1)**
15:20
**duck (2)**
158:5,6
**due (19)**
59:16;61:4;65:3;
68:23;71:23;82:15,
21;83:2;94:17;
102:20;104:21;142:3;
148:14;149:7;150:6;
167:5;171:18,23;
199:13
**during (2)**
30:13;189:24
**duties (1)**
45:5

**DYLAN (1)**
7:7

**E**

**earlier (5)**
39:6;62:3;123:15;
181:5;190:21
**earliest (1)**
201:24
**early (4)**
44:12;63:12;76:4;
95:18
**ease (1)**
30:19
**easier (2)**
134:3;136:10
**easiest (3)**
110:15,17;140:15
**easily (1)**
193:19
**East (1)**
18:13
**easy (4)**
52:12;90:14;171:8;
200:9
**easy-access (1)**
62:21
**ECF (1)**
184:1
**ECHO (3)**
13:9;97:15;151:8
**echoes (1)**
64:8
**echoing (3)**
107:2,6;158:5
**eclipse (1)**
94:11
**economic (9)**
38:18;40:3;47:10;
67:10;79:18;93:23;
114:20;115:3;120:6
**economics (2)**
128:1,3
**EDELMAN (1)**
10:9
**education (2)**
66:9,9
**eerily (1)**
93:8
**effect (2)**
189:22;193:1
**effective (3)**
83:16;187:4;193:9
**effectiveness (5)**
39:7;186:18;
187:24;188:18,22
**efficiency (2)**
35:11;198:19
**efficient (1)**
161:9
**egregious (1)**
120:22

**DYLAN** (already)
**eight (3)**
81:18;93:17;181:25
**eighty (1)**
52:17
**eighty-seven (2)**
35:7;168:10
**eight-zero (1)**
52:17
**either (23)**
40:7;43:22;44:22;
46:2;56:9;70:12;
88:13;89:3;102:19;
117:14;124:1;125:1;
131:12;145:2;149:19;
150:13;156:2,2;
162:13;167:14;
171:24;177:10;
189:22
**elaborate (1)**
68:19
**election (1)**
123:25
**elections (1)**
123:23
**elects (1)**
83:15
**elegant (1)**
40:20
**eleven (2)**
161:8;170:5
**ELI (1)**
14:8
**eliminated (1)**
56:23
**ELLISON (1)**
26:4
**Elm (1)**
5:4
**else (48)**
29:21;30:2;43:12;
48:16;51:16,20;
63:16;77:10;79:11;
93:22;96:7;100:19;
101:23;103:2;111:23;
112:3;127:6;131:15;
157:2;158:22;159:5,
6;162:1,5,5;164:24;
175:18,18;178:14,19;
179:7,8,13;183:22;
186:6,6,14;187:17;
192:3;194:4;197:1,
11,12,18;198:14;
201:19;202:9,13
**else's (2)**
67:14;81:20
**email (7)**
27:6;106:3;153:25;
193:17,24;194:2,3
**emailed (1)**
103:23
**emailing (1)**
193:25
**emails (2)**

104:18;105:8

**embarrassed (1)**
48:13
**embodied (1)**
71:11
**emerge (2)**
182:3,4
**emergence (4)**
96:16;177:7;
185:13;198:1
**emergent (1)**
176:2
**eminently (1)**
40:20
**EMMA (1)**
21:7
**employee (2)**
26:9,19
**employees (3)**
46:19;99:3;105:2
**empty (1)**
56:23
**enable (1)**
46:13
**enabling (1)**
36:24
**encompasses (1)**
72:17
**end (8)**
51:22;93:7;147:8;
189:14;191:17,22;
192:8;202:10
**ended (2)**
51:9;171:6
**Enders (1)**
161:14
**ending (1)**
160:5
**endorsement (1)**
37:5
**ENDRES (28)**
26:5;159:10,12,12,
14,24;160:4,7;162:2;
190:11,11,13,14,15,
21;191:7,15,23;192:6,
18,25;193:17,21;
194:1,4,6,8,9
**Endres' (1)**
193:22
**ends (1)**
192:8
**enforce (2)**
118:24;166:18
**engage (2)**
41:17;159:1
**engaged (5)**
87:16;91:12;126:1;
132:5;176:12
**engagement (4)**
42:9;87:16;95:15;
183:9
**Engines (1)**
9:3

**enjoin (1)**
102:9
**enjoined (1)**
73:4
**enjoy (1)**
180:3
**enough (18)**
33:10;45:7,25;
59:12;60:2;81:23;
94:8;96:7;114:5;
131:22;134:24;
137:17;143:5;146:24;
155:23,25;164:4;
187:5
**ensure (5)**
41:2,11,19;80:16;
169:17
**enter (4)**
167:22;182:13;
183:12;192:10
**entered (5)**
64:24;96:25;116:9;
165:10;193:8
**entering (1)**
119:18
**enterprise (2)**
44:13;45:4
**entertain (1)**
167:3
**entertained (1)**
167:11
**entertaining (1)**
201:10
**entire (3)**
57:3;72:18;80:10
**entirely (6)**
38:3;40:3;43:11;
48:23;49:12;67:15
**entirety (1)**
35:22
**entities (3)**
103:13;148:25;
172:5
**entitled (3)**
56:13;116:17;191:8
**entity (1)**
139:13
**entries (1)**
104:13
**entry (1)**
184:24
**envelope (2)**
88:16,17
**ephemeral (1)**
66:6
**epiphany (1)**
122:11
**Epiq (3)**
26:8;32:12;49:24
**Epiq's (1)**
49:22
**equal (3)**
27:9;74:1;138:19

**equally (2)**
63:14;166:4
**equitable (3)**
66:21;115:4,5
**equitization (1)**
100:13
**equitized (2)**
37:22;128:10
**equitizing (1)**
50:24
**Equity (35)**
26:23;37:23;38:5;
40:15,23,25;41:4,7,
11;42:6,20;44:13;
45:25;46:8,13,15,24;
47:4,9;50:22;51:1,3,
15;67:1,10;70:7;73:5;
81:3,20;87:24;99:11;
128:4;164:21;170:20;
171:5
**equivalent (1)**
162:24
**ERIC (3)**
8:10;11:16;14:9
**especially (3)**
44:25;66:13;119:13
**ESQ (73)**
5:8,9,17,18;6:7,16,
24,25;7:7,8,9,18;8:8,
9,10,19;9:8,17,18;
10:9,17,25;11:7,8,16,
25;12:8,16,25;13:8,9,
10,19;14:8,9,19;15:7,
8,17,25;16:7,8,9,18;
17:8,17;18:8,16,25;
19:8,9,17,18;20:8,17,
18,19,20,21;21:7,8,
17,25;22:8,17;23:8,
17;24:8,17,18,25;8,9,
18
**essence (3)**
37:17;40:21;41:12
**essentially (18)**
41:14;46:15;51:16;
58:20;76:10,19;
80:10;86:6,7;87:15;
105:2;115:25;120:5;
125:21;147:15;
153:10;157:23;
158:14
**established (1)**
185:4
**et (8)**
70:23;85:22;93:3,4;
164:22,22;188:6,7
**Euchner (1)**
191:19
**evaluating (1)**
142:2
**even (52)**
38:18;42:5;44:10,
16;54:19;61:19,21;
62:13;63:4,19;64:14;

67:18;69:1,6;70:22,
25;72:6;81:24;82:10;
84:11;87:13;88:16;
111:18,24;115:23;
116:12;124:9;125:6;
126:18;130:4;132:19;
133:7;136:8,8,13;
139:14,18;146:18;
152:12;153:20;154:2,
15;164:2;167:19,23;
168:13;170:21;173:4;
174:4;175:15;176:7;
177:17
**event (2)**
61:7;67:16
**events (1)**
182:8
**EVERGREEN (1)**
12:16
**everybody (26)**
27:10;28:11;36:21;
46:14;51:10,16;
63:10;77:16;78:19;
80:25;91:6;96:13;
107:11,15;110:14;
111:23;112:3;115:16;
125:17;145:17;
164:19;172:17;198:8,
12,20;199:22
**everybody's (1)**
198:23
**everyone (10)**
34:23;63:15;74:25;
77:10;78:11;151:4;
157:8;192:3;199:2,4
**everyone's (2)**
174:17;195:5
**everywhere (3)**
57:2;72:1;172:11
**evidence (7)**
32:17;33:2;45:1;
100:8;165:1;183:5;
185:6
**evidenced (1)**
183:6
**evidentiary (1)**
32:3
**evil (1)**
87:7
**eviscerated (2)**
61:22;72:21
**evolving (2)**
150:3,5
**ex (1)**
191:10
**exact (6)**
56:2;59:22;70:13;
90:4;165:18;176:11
**exactly (21)**
33:9;51:8;52:3;
55:15;78:10;79:21;
80:4,6;83:11;87:4;
89:25;95:19;103:13;

117:6;160:23;161:20;
173:17;176:11;
191:20;192:11;
194:17
**exam (1)**
198:6
**example (8)**
46:22;55:2,9,17;
74:22;87:12;114:24;
137:2
**exceedingly (1)**
35:9
**excellent (1)**
97:11
**except (5)**
81:1;86:4;104:8,22;
163:9
**Exception (18)**
85:4,14,25;86:2,2,
25;91:10;131:12;
134:8;136:4;137:10,
12,14;141:7;152:5;
154:14,18;170:7
**exceptions (18)**
83:2;85:2;86:21;
90:18;127:1;131:4;
134:17;135:6;149:8;
151:10,13,17,22;
152:20;154:7;156:25;
170:11;174:2
**EXCHANGE (10)**
17:11,12;28:5;
72:15;101:16;104:17;
105:8;108:15;138:9,
23
**exchanged (1)**
37:19
**excitement (1)**
177:12
**exclusively (2)**
36:14;164:16
**excused (1)**
178:3
**execute (1)**
83:6
**execution (1)**
42:21
**executory (1)**
39:3
**exemplar (1)**
35:2
**exemption (1)**
90:22
**exercise (2)**
71:10;145:3
**Exhaustless (1)**
26:5
**Exhibit (3)**
34:12,12;76:5
**exhibits (1)**
173:18
**exist (2)**
108:25;143:21

existed (2)
167:24;192:7

existing (5)
50:16;56:19;79:2;
149:6;185:7

exists (1)
144:20

exit (8)
37:20;38:1,10,11;
176:25;181:24,25;
183:8

ex-parte (1)
43:5

expect (5)
94:1,6;120:4;174:7;
194:2

expectation (6)
85:6;127:15,17;
129:15;152:22,22

expectations (1)
129:13

expecting (2)
119:18;148:16

expense (1)
171:9

expensive (1)
199:5

experience (1)
30:9

experienced (1)
42:13

experts (2)
45:18;46:9

explain (4)
84:10;87:22;160:3;
175:22

explaining (2)
61:5;106:24

explains (1)
83:14

explanation (1)
82:21

explanations (1)
174:24

explicated (1)
55:6

explicitly (4)
54:7,21;103:24;
180:23

exploded (1)
136:23

explore (2)
41:1,17

express (4)
60:12;110:2,24;
133:19

expressed (2)
60:15,16

expressing (1)
122:11

expression (1)
111:8

expressly (16)

54:20;55:7;57:7;
58:1;60:9;63:6,7;
71:10;75:20;84:2;
89:2;103:22,24;
142:4;165:11;172:18

exquisite (1)
42:21;65:10;165:25

extend (5)
188:18,22;189:5,
19;199:17

extended (2)
81:23;193:12

Extending (2)
119:20;200:10

extension (9)
185:12,16;187:20,
23;188:11;189:7;
190:2;195:21;199:10

extensions (1)
185:9

extensive (3)
154:24,24;172:3

extent (10)
30:7;61:10;95:11;
105:17;107:1;161:21;
178:14;187:4;192:9;
198:10

extra (1)
78:14

extraordinary (9)
35:1;36:25;45:13;
52:7;65:9;94:12,13;
164:16;174:9

extremely (3)
46:4;92:9;172:3

eye (1)
31:7

# F

F2d (1)
73:7

face (1)
111:10

facility (4)
38:1,12;51:4;183:8

facing (1)
45:12

fact (44)
35:1;40:17,20;41:3,
12;42:4,5;43:3;47:13;
48:12,24;49:18,20;
54:8;55:13;56:3,6;
65:8;69:4;70:15;
71:25;72:2;76:18,21;
81:21;82:6;83:25;
85:12;86:21;87:25;
88:15;111:10,11;
117:1;124:21;125:22;
127:24;135:8;154:25;
168:5,9;171:5;173:3;
199:16

factor (1)

79:5

factors (7)
66:23;67:3,6;93:4;
188:4;189:3,10

facts (35)
52:7,24;54:10,23,
24;55:8,10,13;58:16;
61:9;67:21;74:17;
75:12;76:17;78:23;
86:15;89:13,20;
90:15;91:23;92:19;
119:24;120:17,19;
122:15,21;123:9;
139:23;142:3;143:19;
145:12;150:6;171:10;
188:2;195:17

factual (10)
44:25;91:5;92:2,5,
17;128:7,18;135:24;
137:4;144:20

fail (4)
66:7;78:15;93:20;
143:6

failed (4)
66:16,18;88:8;
93:12

fails (2)
139:12,15

failure (5)
83:8;86:13;139:8,
16;143:4

fair (12)
40:20;70:13;80:22,
24;81:16;96:6,7;
114:6;134:24;135:17;
137:17;173:24

fairly (8)
68:13;76:8;79:3;
138:19;192:22;
193:10;195:16;201:9

fairness (2)
102:20;149:7

faith (2)
66:17;99:5

fall (1)
127:22

fallback (1)
73:19

false (3)
56:16;104:11;
164:14

familiar (1)
68:1

familiarity (1)
78:25

fantastic (1)
94:24

far (12)
41:22;42:11,11,22;
55:14;72:5;74:18;
114:5;141:19;154:21;
162:19;177:9

FARR (3)

15:2;27:25;95:6

fascinating (1)
198:5

fatal (1)
61:16

fathom (1)
154:20

favor (31)
36:4;39:18;53:24;
54:3;55:24;56:3;
57:11;76:11;79:23;
94:14;107:20;112:6,
20;113:7,23;114:3,4;
115:10;123:20;129:9;
144:11,12,16,22,23;
145:1;146:12,22;
152:13;172:12;183:7

favorable (1)
163:11

favorite (2)
61:11;137:2

February (6)
40:13,19;42:8;48:7;
175:23,25

federal (23)
47:4;68:20;70:17;
71:8,9,10,11,25;81:9;
82:6;83:3;86:8;87:1;
140:21;149:6;167:5;
171:16,19;174:3;
176:6

federally (3)
91:7;93:10;167:25

fee (1)
183:10

feel (3)
31:6;114:14;171:7

fees (2)
35:10;102:10,11,
13,18;183:7

FELD (4)
20:12;21:2;28:23;
98:24

fell (2)
42:11;46:11

fervent (2)
51:19;189:1

few (21)
30:19;31:25;32:2;
38:5;40:4;52:16,19,
25;56:1;60:24;68:19;
95:2;96:22;99:1;
138:18;144:13;157:7;
162:18;164:18;176:2;
185:13

fiduciaries (1)
82:2

fiduciary (2)
81:8,10

field (1)
69:25

fifteen (1)

114:24

Fifth (2)
57:19;65:19

fifty (6)
50:7;70:20,21,23;
140:21;167:8

figure (2)
126:13;141:17

figured (3)
31:21;51:20;164:24

file (7)
102:13;104:4;
196:21;197:7,20;
198:16;199:10

filed (29)
29:1;32:3;35:19;
38:8;39:22;43:6;
44:14,16,17;63:8;
85:19;95:7;96:19;
99:16;122:9;132:15;
159:16;183:3,6,9;
191:5,7,10,16,18;
192:1;195:14;197:23;
198:3

filing (5)
62:17;76:25;102:3;
151:2,2

fill (4)
37:10;83:13;88:12;
188:9

filled (2)
89:4;169:15

filling (1)
89:7

final (13)
31:24;34:7;42:25;
43:2;44:23;99:20;
178:10;180:21;181:1,
3,7;184:24;197:21

finalized (1)
181:23

Finally (5)
67:3,8;104:10;
172:9;173:9

financial (2)
45:15;63:16

financing (3)
181:24;182:1,1

find (9)
27:16,22;28:3,13;
47:10;48:11;50:5;
75:23;102:5;103:19;
119:5;125:1;129:22;
150:1

finding (2)
68:8,10

fine (27)
29:8;30:5;42:17;
48:19;73:1;77:3;
84:12;85:1;101:21;
105:7;113:15;118:16;
167:19;174:5;176:5,
7,10,20;178:6;

179:21;181:17;
184:22;186:2,3;
187:25;193:16;
200:14
**finish (4)**
161:7,13;176:21;
179:22
**finished (2)**
59:5;175:15
**fire (3)**
161:9;200:3,8
**firm (1)**
99:10
**firms (1)**
81:14
**first (24)**
32:12;33:4;36:6,7;
40:24;47:19,23;
59:14;61:9,13;63:9;
64:19;70:16;71:5;
72:10;82:20;101:12;
108:6;127:13;152:20;
159:8;162:10;173:17;
175:17
**first-day (1)**
45:10
**first-lien (1)**
40:14
**fiscal (1)**
35:5
**fit (4)**
39:10;54:5;147:19;
153:1
**fits (1)**
121:12
**fitting (1)**
200:7
**five (4)**
42:25;43:6;142:9;
168:16
**five-zero (1)**
50:7
**fixed (2)**
42:10;157:18
**fixing (1)**
191:3
**FL (2)**
11:23;17:6
**flag (3)**
27:3;37:14;84:14
**flawed (2)**
69:18;166:23
**Floor (10)**
9:5;10:6;12:22;
13:5;14:16;16:15;
19:5;22:14;23:14;
25:15
**Florida (4)**
6:14;84:7,8;174:4
**flow (1)**
195:11
**flush (1)**
129:9

**fly (1)**
111:10
**flying (1)**
86:18
**focus (3)**
123:10;144:14;
174:10
**focused (3)**
143:21;144:7;195:5
**focusing (5)**
89:15;111:23;
124:18;127:20;
145:21
**folks (45)**
29:7,9;44:1;69:11;
75:7;76:9;87:12,17;
91:11,25;108:22,25;
109:15;110:23;
111:21;119:25;120:5;
121:23,23,24;126:6;
127:19,21;128:8,8,11,
12;129:24;130:17;
132:22;133:4,5,10;
134:7;136:4;143:24;
145:7,9;146:4;
151:24;176:9;177:20;
181:13;200:15;202:5
**follow (5)**
36:6;68:22;70:14;
175:3;177:11
**followed (2)**
82:19;139:22
**following (6)**
38:19;57:5;118:8;
121:20;129:10;
174:24
**font (1)**
173:19
**fools (1)**
59:10
**footnote (5)**
79:7,24;84:10;
148:1;171:17
**footnotes (1)**
171:17
**forbade (1)**
65:21
**forbidden (1)**
59:23
**forced (5)**
54:3;62:22;74:4;
102:13;108:10
**foreclosed (1)**
165:8
**forefront (1)**
143:2
**foreign (1)**
140:21
**forgive (1)**
176:22
**form (19)**
62:20;71:3;83:6;
85:21;87:14;88:20,

23;89:25;94:7;99:10;
112:2;116:20;123:24;
125:9;126:7,13,14;
165:14;175:2
**forma (1)**
40:15
**formally (3)**
38:20;55:20;62:22
**FORMAN (1)**
15:11
**forms (14)**
49:23,24,25;50:3;
51:13;83:13;89:23;
90:3,4,13;91:8;99:21;
126:11;175:2
**FORNELL (1)**
26:6
**Fort (1)**
38:25
**forth (6)**
67:23;159:1;172:3,
25;189:15;200:21
**forthcoming (1)**
176:24
**fortiori (4)**
65:5;73:16;79:22;
173:8
**forward (11)**
30:21;44:7;48:20;
50:16;150:15;159:21;
185:21;196:2,8;
201:11,11
**fought (2)**
99:5
**found (8)**
61:18;74:12;77:14;
80:19;117:11;143:15;
163:19;165:11
**foundation (1)**
60:20
**four (19)**
36:1,1;43:5;49:23;
56:14,17,24;63:4;
64:17,18;66:11;71:1;
79:8,25;80:1;81:14;
104:4;160:13;200:13
**fourteen (2)**
37:16;165:2
**Fourteenth (1)**
82:16
**Fourth (1)**
18:13
**frame (1)**
150:19
**framework (2)**
73:13;147:14
**framing (1)**
42:24
**FRANCISCO (1)**
26:6
**frankly (12)**
36:24;47:11;64:14;
67:25;74:18;105:13;

111:20;160:2;171:14;
177:17;185:13;
188:10
**Fraternal (1)**
12:20
**FRED (1)**
26:3
**free (5)**
72:16;114:15;
161:24;171:7;192:9
**freedom (1)**
78:12
**freefall (1)**
50:17
**free-floating (1)**
84:17
**free-standing (1)**
69:19
**freewheel (1)**
75:16
**fresh (2)**
51:5;70:7
**front (6)**
44:25;97:23;
106:22;128:11;
143:19;164:23
**Frontier (11)**
40:6,9,9,16,21;41:5,
13;42:4,7;43:19;
45:24
**Frontier's (2)**
40:12;42:23
**FROST (1)**
18:11
**frustrated (1)**
121:11
**frustrating (1)**
111:24
**frustration (3)**
115:12;120:25;
122:12
**FSB (1)**
22:3
**Ft (1)**
17:6
**FTI (1)**
18:12
**full (26)**
39:16;45:8;46:24;
47:3;49:9;63:10;
72:14;76:1;78:19;
80:25;84:20;85:8;
104:8,22;108:5;
124:16;128:13;163:3,
14;164:2,3;168:7;
183:10;188:20,24;
189:8
**FULLBRIGHT (1)**
19:12
**fully (10)**
37:23;45:5;48:18;
82:19;97:14;169:20;
179:8;180:25;193:13;

196:19
**fulsome (1)**
179:13
**Fund (4)**
8:14;22:3;66:9,15
**fundamental (2)**
102:20;173:23
**fundamentally (2)**
75:22,25
**funding (7)**
41:21;49:9,12;
63:17;67:10,13;94:18
**funds (3)**
108:22;129:15,16
**funny (1)**
93:5
**FURR (1)**
13:19
**further (5)**
37:24;65:18;
130:12;185:12;186:1
**furthest (1)**
98:7

**G**

**GA (2)**
10:3;13:17
**Gables (1)**
11:23
**GABRIEL (1)**
20:17
**galaxy (1)**
57:3
**GALLAGHER (2)**
15:2;27:25
**gap-filling (1)**
58:21
**Garrity (1)**
53:7
**gate (1)**
66:16
**gating (1)**
64:20
**gave (3)**
61:19;63:10;100:7
**gendered (1)**
90:25
**GENERAL (32)**
18:2;29:24,24;36:6;
38:2;59:16;60:8;
66:21;88:6;91:13;
92:3;96:14;102:2,2,7,
22;104:14;118:17;
120:7;131:21;132:12;
137:1,7;143:8;144:5;
148:14;150:25;
154:11;165:3;166:8;
187:17;195:6
**generally (8)**
50:19;52:2;75:9;
95:12;123:4,8;135:1;
183:15

**gentle (1)**
175:20
**GEOFFREY (3)**
19:8;28:15;96:21
**GEORGE (1)**
12:25
**GERARD (1)**
7:8
**Gerber (3)**
36:12;53:15;170:1
**GERCHICK (1)**
14:8
**gesture (1)**
30:11
**gets (12)**
58:4;63:15;74:15;
78:11;91:23;106:1,
11;115:11;148:23;
185:18,18;192:23
**Given (31)**
31:18;43:9;44:23;
52:7;62:16;63:1;
68:21,21;75:19;76:4;
85:14;86:25;88:19,
20;93:21;115:25;
120:13,14;121:12,14;
122:21;128:4;131:16;
154:9;168:19;174:5;
176:18;178:24;
188:11;190:20;
197:25
**gives (2)**
62:12;189:23
**giving (7)**
46:15;97:19;108:9;
113:22;116:16;
148:16;171:3
**glad (1)**
193:18
**glass (1)**
172:17
**Glen (1)**
36:19
**Glenn (3)**
53:8;121:3,9
**Glenn's (1)**
83:10
**Glidemaster (1)**
53:4
**glo (1)**
87:3
**Global (2)**
26:14;51:6
**gloss (1)**
146:21
**gloves (1)**
188:9
**goal (2)**
46:14;99:14
**goes (2)**
163:20;170:9
**Goldblatt (16)**
61:2,13,22;62:2,25;

63:4,19,19;64:4;69:3;
76:18;89:1;93:9;
147:2;169:25;172:14
**Goldblatt's (3)**
66:2;147:2,9
**Goldman (1)**
26:20
**Good (50)**
27:2,5,18,21,24;
28:2,4,6,8,10,15,19,
22,25;29:13,19,23,25,
25;30:24;31:14;
59:13;66:17;73:3;
82:1;95:13;96:11,20;
98:23;99:2,5;104:15;
114:24;138:22;143:5;
154:6;162:14;166:5;
172:4;180:16;184:18,
21;190:9;191:20;
194:8;195:3,18,20;
201:7,15
**GOODMAN (1)**
14:19
**GOREN (7)**
15:7;27:25;95:5,5,
17;96:6,9
**Gorrie (1)**
13:14
**Gorsuch (3)**
60:4,11;172:23
**govern (2)**
70:25;151:1
**governed (1)**
67:15
**government (4)**
103:17;105:1,20;
190:24
**governmental (4)**
103:13;105:5,6,16
**Government's (2)**
37:2;103:21
**governs (5)**
70:18;92:23;148:5;
167:6;172:21
**grab-and-go (2)**
64:17;79:8
**gracious (1)**
81:23
**Graham (1)**
25:22
**Grand (2)**
7:14;36:1
**grandmother (1)**
59:10
**grant (11)**
49:3;53:23;54:4;
55:21;72:15;75:20;
76:23;157:14;183:24;
185:12,16
**granted (4)**
54:21;143:1;
146:14;184:5
**granting (2)**

67:9;162:20
**granularity (1)**
105:14
**grapple (1)**
113:6
**grateful (3)**
32:24;79:10;174:9
**gratifying (2)**
36:21,21
**great (26)**
29:7;36:13;53:16;
55:6,9;59:9;61:1,1,5;
79:6;84:6;89:5,22;
94:15,16,19;98:9;
104:19;105:8;135:18;
137:16;168:10;
175:21;182:10;
188:10;202:6
**greatest (2)**
34:18;117:8
**Green (2)**
11:4;27:3
**Greensboro (1)**
5:6
**GREGG (1)**
6:24
**Ground (1)**
17:3
**Group (21)**
18:20;19:3;23:12;
28:14,16,20;30:3;
51:3;79:13;96:18,21,
24,25;97:4;98:6,21,
25;99:6;111:25;
129:14;143:25
**groups (7)**
36:19;39:23;99:12;
100:10;109:8;143:20;
154:10
**guardrails (1)**
66:12
**guess (40)**
32:11;59:19;74:20;
78:3;87:9,15;100:4;
103:20;114:1;121:18;
124:19;125:9,20;
128:19;130:15;131:3;
132:23;134:4,8;
135:3;136:19;140:23;
141:1;142:15;145:9;
150:16,17;152:6;
154:4,19;156:16;
161:16;167:14;
168:24;171:1;178:21;
180:9;186:20;189:19;
195:1
**guidance (1)**
118:8
**guidelines (3)**
36:8;94:20;145:13
**GUMP (4)**
20:12;21:2;28:23;
98:24

**GUNN (1)**
26:7
**guy (1)**
89:6

## H

**HAITHCOCK (1)**
15:17
**HALEE (1)**
25:8
**half (1)**
85:13
**hand (2)**
140:16;155:25
**handed (1)**
86:18
**handle (1)**
47:20
**handled (2)**
39:3;202:16
**handling (1)**
160:18
**hang (2)**
74:2,5
**HAO (1)**
7:9
**happen (7)**
43:24,25;127:25;
128:2,2;130:22;
198:13
**happened (3)**
51:23;132:19;
190:21
**happening (2)**
100:2;110:9
**happens (1)**
51:22
**happily (1)**
197:5
**happy (16)**
44:24;59:2;101:6,7,
24;109:2;127:8;
181:2;187:19,22;
188:17,22;189:12;
199:4,15,16
**hard (9)**
36:18;51:11;79:13;
88:3;99:4,4;134:5;
144:13;154:19
**harder (1)**
88:15
**HARMEYER (1)**
16:7
**HARPER (1)**
16:18
**Harrington (16)**
57:5,7,13,21,24;
58:10,11;59:24;
71:19;163:4;172:9,
11,16,18,21;173:2
**HARRIS (1)**
7:18

**HARTOG (2)**
17:2,8
**hash (1)**
177:21
**HASTINGS (4)**
18:19;19:2;28:16;
96:21
**hate (1)**
187:9
**HAUER (4)**
20:12;21:2;28:23;
98:24
**Haven (1)**
9:6
**head (4)**
63:22;129:12;
154:21;156:6
**heads (1)**
28:12
**headwinds (1)**
45:12
**hear (20)**
28:11;30:9;33:10;
47:19,19;48:19;
58:18;95:2;100:22;
101:11,12,24,24;
107:11,15;175:13;
184:21;194:14;
197:22;201:10
**heard (12)**
27:19;33:11;
100:20;106:20;107:7;
112:5;154:20;179:4;
181:16,17;183:22;
184:20
**hearing (43)**
27:13,14,15;29:15,
18;30:14,23;31:19;
33:5;39:12;42:3;43:4;
44:22,24;47:22;48:4;
102:4,4;103:11;
105:23;106:21;
107:16;108:6,7;
157:18;158:2;159:8;
160:12;162:5,6;
165:9;174:21;178:4,
23;179:5;180:18,20;
181:6;183:23;189:15,
24;190:3;202:14
**hearings (1)**
158:3
**heart (1)**
68:6
**heck (1)**
94:25
**height (1)**
30:13
**held (10)**
47:9;54:20;61:13;
62:2;70:17;72:8;84:8;
90:5;150:12;151:20
**hello (2)**
190:6;201:3

**help (2)**
47:25;53:22
**helpful (10)**
43:16;47:15;
118:15;150:7;163:7;
173:3;175:11;178:25;
187:11;192:10
**helps (2)**
82:5;168:16
**hence (1)**
115:21
**here's (8)**
65:4,10;79:12;
87:20;169:3;175:4,5;
188:25
**HEROD (1)**
9:11
**HERRERA (1)**
11:19
**herself (1)**
75:18
**hews (1)**
122:20
**hey (5)**
69:21;106:10;
146:11,22;154:1
**HEYN (9)**
18:8;29:23,24;
102:1,2;103:8,10;
105:11;106:2
**H-E-Y-N (1)**
102:2
**hiding (1)**
87:7
**high (3)**
45:4;82:13;90:13
**higher (3)**
36:24;80:13,13
**highest (1)**
94:22
**highlight (1)**
109:18
**highlighting (1)**
99:1
**highlights (1)**
120:22
**historical (1)**
60:5
**history (1)**
80:24
**hit (5)**
59:17;60:24,25;
61:1,1
**hobbies (1)**
34:21
**hobgoblin (1)**
111:9
**Hoc (16)**
18:20;19:3;28:14,
16,20;96:18,21,23,24;
97:4;98:21,25;99:6,
12;100:10;154:10
**hold (7)**

36:2;56:2;57:11;
109:25;141:8;142:13;
177:16
**holder (6)**
26:23;51:1;120:12,
13;155:16;163:11
**holders (10)**
46:24;47:4;87:24;
97:6;151:19;153:17,
18,22;154:15;170:20
**holding (1)**
177:7
**Holdings (2)**
10:4;86:10
**holds (1)**
168:1
**hole (2)**
74:19;175:8
**holiday (1)**
176:6
**holistic (1)**
103:4
**holistically (2)**
99:23;100:12
**HOLLAND (2)**
22:11;23:2
**home (4)**
39:10;57:18;60:16;
90:1
**Homer (1)**
55:18
**honest (2)**
68:17;86:14
**honestly (2)**
36:16;91:15
**Honor (181)**
27:18,24;28:4,8,15,
22;29:13,23;30:24;
31:5,14,20,23;32:16;
33:18,25;34:20,25;
35:8;36:5,16;37:17;
38:17,24;40:5,6;
42:24;43:9;44:21;
45:10;47:17,21;48:2,
13,21;50:18;51:20;
52:4;53:10;59:1,14,
20;60:15;62:10,11,
15;63:4;66:2;67:3,8,
17;68:16;69:17;
73:15;75:17;76:16;
79:6;81:5,21;82:12;
84:13;86:16;87:20;
90:17;91:15;92:4,21;
93:5;94:7;95:5;96:6,
20,22;98:4,11,23;
100:11,24;102:1;
103:8,20;105:4,11,25;
107:18;111:14;116:4;
117:2,4;118:10;
122:3,6;123:11;
127:10;132:9;135:18;
137:11,16;138:6,8,22;
140:1;142:19;154:12;

156:11;157:6;158:19,
24;159:10;160:18;
161:4;162:3,9,10;
164:7,11,18;165:6;
167:12;169:13,22;
170:3;171:12,21;
172:9;173:9;174:6;
175:20;176:21;177:2,
22,25;178:21;180:5,6,
14;181:16,19;182:9,
15;183:2,11;184:11,
18,23;185:5,6;186:4,
16;187:12,19,22;
188:17,21;189:11;
190:4,9,15,17;192:25;
194:6,23;195:1;
196:11,23;197:9,15;
199:8,9,13,19,25;
200:17,18,24;201:3,8,
21,23;202:6,10
**Honor's (4)**
38:7;61:6;62:3;
63:15
**hope (9)**
51:19;60:21;69:11;
154:5;164:24;176:24;
189:2;196:5,19
**hoped (1)**
89:25
**hopeful (1)**
96:15
**hopefully (5)**
31:22;39:17;44:23;
162:23;191:23
**hoping (1)**
32:24
**host (1)**
148:22
**hostage (1)**
201:5
**hour (3)**
161:5;162:1,12
**hours (1)**
171:9
**housekeeping (1)**
32:2
**hub (1)**
58:4
**Hudson (1)**
16:4
**HUEBNER (92)**
27:18,19;30:24;
31:2,5,8,12,14,16;
34:18,23;36:16;
37:13,15;44:21;
47:15,17,21,25;48:21;
50:18;52:4;59:1,8,12;
63:24;64:16;68:5,16;
69:13;73:15;74:12;
75:10,15;76:16;78:1,
7;79:6;82:12;86:16;
87:20;89:1,22;91:15;
92:4,21;95:8;96:10;

97:10;103:5,18,20;
105:4,25;106:15;
107:4;108:20;113:16;
115:8;126:22;128:1;
130:15;131:25;132:3;
141:24;147:7;148:1;
157:22,23;159:7,8;
160:15,18,24;161:2,3,
4;162:6,8,9;175:17,
20;176:21;177:22;
178:19,21;179:6,17,
19;180:4,14;183:5
**Huebner's (5)**
97:7;127:3,18;
135:23;138:18
**huge (1)**
91:19
**human (1)**
143:8
**humanly (1)**
45:5
**humor (1)**
201:7
**HUMPHREY (1)**
5:2
**hundred (1)**
167:9
**hundreds (7)**
35:10;46:11;57:24;
65:21;70:7;148:25;
169:18
**hurriedly (1)**
103:11
**hybrid (2)**
48:18;71:7
**hyper-efficient (1)**
42:21
**hypothetical (3)**
58:2;62:1;69:14
**hypothetically (1)**
168:23

**I**

**I- (1)**
41:17
**IAN (1)**
26:20
**ice (1)**
81:18
**idea (7)**
56:24;60:14;98:9;
132:4;158:11;192:6;
199:22
**ideas (1)**
64:5
**identified (3)**
34:3,4;188:4
**identify (2)**
79:13;186:14
**identifying (1)**
172:4
**ie (1)**

146:19
**ignore (1)**
93:10
**ignored (1)**
124:1
**II (1)**
14:13
**iii (1)**
59:5
**IL (3)**
10:15;12:6;19:6
**illustrative (2)**
51:21;114:24
**imagine (4)**
29:3,7;88:3;144:20
**imagining (2)**
155:4;156:6
**immediately (1)**
180:7
**impaired (11)**
36:2;39:24;40:18;
46:21;49:10,14;
60:17;75:25;162:25;
168:21;173:12
**impairment (6)**
51:17;114:20;
115:3,3;163:8,9
**impending (2)**
198:1,1
**impermissible (2)**
61:18;162:17
**implication (1)**
150:18
**implications (1)**
110:6
**implied (2)**
126:2;170:1
**imply (1)**
142:10
**importance (1)**
53:16
**important (12)**
36:17;46:5;59:18;
70:14;72:20;77:11;
83:7;119:13,17;
170:10;172:18;177:9
**importantly (1)**
63:14
**impose (2)**
65:15;173:5
**imposed (2)**
60:13;73:17
**impression (1)**
100:7
**improper (1)**
102:22
**improved (1)**
67:2
**impute (1)**
125:21
**inaction (6)**
85:16;87:4;93:18;
131:5,18,24

**inactive (3)**
  85:17;87:5;131:19
**inadvertence (1)**
  124:2
**inappropriate (4)**
  54:18;67:2;89:10;
  166:1
**inappropriately (1)**
  69:23
**Inc (10)**
  18:12;23:12;24:3;
  25:13;26:5;27:13;
  31:16;38:22,22;
  180:19
**incentive (1)**
  124:20
**inclined (1)**
  121:9
**include (2)**
  38:10;136:20
**included (2)**
  85:20;100:12
**includes (4)**
  34:6;95:22;105:5;
  115:3
**including (32)**
  27:14;32:4,25;38:9;
  41:21;43:11;44:4;
  51:12;53:5,7;55:13;
  57:14;71:14;72:24;
  73:23;80:20;85:23;
  89:3;93:16;99:8;
  116:13;151:17;156:1;
  162:19;163:16;
  164:12;168:20;
  169:11;170:17;
  172:15;188:4;198:13
**inclusion (1)**
  38:25
**inconsistent (4)**
  66:19;86:13;
  110:19;155:22
**incorporated (2)**
  149:20;182:18
**incorrectly (1)**
  84:22
**increasing (1)**
  41:7
**increasingly (1)**
  45:14
**incredible (3)**
  37:4;164:16;171:14
**incredibly (4)**
  48:25;136:6,10;
  171:8
**indeed (3)**
  57:2,25;121:9
**indenture (1)**
  38:11
**independent (4)**
  42:13;85:2;90:18,
  22
**independently (2)**

42:13;85:3
**in-depth (1)**
  149:21
**indicate (1)**
  139:5
**indication (1)**
  62:13
**indicia (1)**
  61:20
**indiscernible (6)**
  43:14;60:22;86:21;
  92:25;99:20;122:15
**indisputable (1)**
  57:6
**individual (5)**
  111:19;123:10;
  136:14;151:19;
  179:25
**individuals (2)**
  50:4;79:16
**indulging (1)**
  137:18
**industry (3)**
  45:12;96:15;99:15
**inequitable (1)**
  67:2
**inferior (1)**
  42:14
**information (6)**
  93:21;181:4;
  183:25;184:3,4;
  193:23
**informed (10)**
  62:5;85:18;113:25;
  116:20;117:18;119:4,
  6,11,12;138:4
**inherently (4)**
  131:3;153:11;
  158:11;166:22
**initial (1)**
  195:18
**injunction (1)**
  67:15
**innocent (1)**
  171:9
**ins (5)**
  81:25;82:7;164:8;
  165:17;172:12
**insolvent (1)**
  47:13
**instance (1)**
  151:1
**instances (1)**
  49:25
**instead (8)**
  36:8;41:6,13;53:1;
  81:11;126:8,14;
  196:17
**instructions (3)**
  93:10,14;94:7
**instructs (1)**
  62:10
**Insurance (1)**

9:12
**intellectual (2)**
  65:10;174:10
**intellectually (4)**
  65:16;79:10;135:8;
  177:5
**intend (4)**
  88:2;91:1;170:15;
  196:18
**intended (1)**
  90:1
**intends (4)**
  85:17;86:4;87:5;
  131:19
**intense (2)**
  42:9;97:1
**intent (7)**
  86:6;88:25;89:20;
  100:9;174:24,25;
  175:11
**intentionality (1)**
  89:6
**intercompany (1)**
  56:19
**interest (12)**
  38:5;53:15;84:3;
  95:25;96:13;140:7;
  163:12;166:17,22;
  179:17;183:14,15
**Interested (4)**
  13:3;16:3;105:13;
  165:13
**interesting (6)**
  64:5;84:7;147:12;
  163:7;198:6,18
**interests (3)**
  76:9;80:10;166:13
**interference (1)**
  114:21
**interim (1)**
  185:16
**intermediate (1)**
  143:25
**International (3)**
  9:3;10:3;70:23
**interpret (1)**
  117:15
**interpreting (2)**
  174:3,3
**interrupting (1)**
  116:7
**into (35)**
  30:19;32:17;33:2;
  37:19;45:1;47:11;
  50:22;58:12;63:21;
  74:15;80:11;82:3,4;
  83:13;87:10;91:23;
  96:25;116:9;118:11;
  119:8;133:16;141:9;
  149:16,21;156:11;
  163:21;167:1;173:2;
  182:18;183:5;185:6;
  189:20;195:11,24;

201:15
**intrusively (1)**
  52:11
**invalid (4)**
  84:4;118:20;
  166:14,23
**invented (2)**
  191:1,4
**investing (1)**
  171:5
**investment (3)**
  81:20;99:11;100:13
**investments (1)**
  188:6
**investor (1)**
  156:6
**investors (3)**
  144:6,7;145:11
**involved (14)**
  74:20;124:8;
  129:25;132:13,17,18;
  140:2,3;154:13,15;
  156:15;176:13;188:6;
  197:2
**involves (1)**
  154:2
**iota (1)**
  119:6
**ironic (1)**
  55:25
**ironically (1)**
  81:7
**irony (1)**
  65:10
**irrefutable (1)**
  55:10
**irrelevant (1)**
  54:2
**irrevocably (1)**
  54:15
**Isgur (1)**
  97:23
**issue (44)**
  34:15;41:14;43:10,
  13;57:13;58:17;63:7;
  68:3;70:17;71:19;
  74:10;75:22,25;83:4,
  11;87:19,22;95:8,13,
  15;106:17;131:2;
  141:18;142:2,7,23;
  143:10;146:25;152:8;
  163:17;167:4,5;
  172:10;173:2;174:8,
  10;178:15;179:2,5,6;
  185:1;195:10,24;
  197:21
**issued (2)**
  40:8;57:23
**issues (19)**
  29:3;43:17;44:3;
  48:1;59:16;69:10;
  91:6;103:14;105:21;
  107:6;123:16;131:8;

142:13;147:9;150:19;
  172:4;174:14;176:13;
  199:24
**item (14)**
  64:20;180:20;
  181:20;183:1,22;
  184:15,16,17;189:13;
  190:8,8,10;194:10,11
**items (4)**
  31:19;32:1;34:8;
  180:23

**J**

**JACOBSON (57)**
  17:17;28:4,5;33:15,
  18;100:22,24;101:5;
  138:22,23;140:10,12;
  141:6,12,21;142:19;
  144:4,25;145:8,15,20,
  25;146:3,6;147:1,20;
  149:11,14,19;150:10,
  21,24;151:7,15;152:4,
  7,9,23;153:13;154:6,
  12;155:8;156:5,8,20,
  22;157:1,4,14,21,25;
  158:13,16,19,21,23,
  24
**Jacobson's (1)**
  171:22
**JAKE (2)**
  13:10;24:18
**JAMES (2)**
  8:2;15:17
**Jasics (2)**
  112:15;164:9
**JASON (4)**
  8:9;20:19;28:22;
  98:23
**Jenny (1)**
  69:22
**Jet (1)**
  102:9
**JFK (1)**
  16:14
**job (4)**
  45:2;172:4;175:12;
  201:15
**JOHN (1)**
  25:24
**joined (4)**
  28:17,23;153:8;
  194:19
**Jones (1)**
  53:8
**JOSEPH (2)**
  26:10,22
**JOSHUA (2)**
  9:8;26:4
**JOY (1)**
  18:16
**JR (1)**
  11:25

**JSA (1)**
10:3
**Judge (62)**
36:12,19;53:3,4,5,6,
7,8,8,8,9,14,18,18;
54:6,6,14,19;55:15,
17;57:23;61:2,13,22;
62:2,25;63:4,19,19;
64:4,8,9;65:12,14;
66:2;69:3;70:16;
71:15,17;72:8;74:8;
76:18;83:10;86:18;
89:1;93:9,16;97:23;
112:15,17;121:3,9;
133:7;147:2,2,8;
152:18;157:15;
169:25;170:1;172:14;
180:16
**judgements (1)**
197:22
**judges (24)**
36:25;49:1,3,5;
52:22;53:2;55:2,11,
15;57:12,15;65:24;
68:23;74:13;87:12;
89:2;93:15;112:17;
122:13;132:2,23;
142:2;143:18;146:21
**judge's (1)**
202:2
**judicial (1)**
53:12;57:2
**Judson (1)**
26:13
**jump (2)**
114:15;138:14
**jumped (1)**
138:18
**jumping (3)**
37:8;43:13;126:21
**jurisdiction (2)**
52:20;198:2
**jurisdictional (1)**
198:7
**jurisdictions (3)**
57:16;118:1;140:21
**jurist (1)**
69:12
**JUSTICE (10)**
11:2,11;18:3;60:4,
11;82:23,24,24;83:3;
172:23
**justification (1)**
111:21
**justifies (1)**
177:13
**justify (1)**
68:3
**JV (1)**
53:9

**K**

**Kaminetzky (21)**
31:18;160:20;
190:9,10,17;191:19;
192:19;193:3,16,22,
24;194:16,16;196:10,
11;199:8,19;200:18,
20,24;201:1
**Kansas (1)**
82:19
**KAPLAN (1)**
14:2
**KATHLEEN (1)**
13:19
**KATTEN (1)**
10:20
**KAYE (2)**
12:2,11
**Kaylee (1)**
74:3
**keep (5)**
96:23;102:5;116:7;
163:18;176:1
**keeping (1)**
50:2
**kept (1)**
163:22
**KEVIN (1)**
20:21
**Keystone (1)**
21:21
**kick (2)**
199:1,2
**kid (1)**
67:14
**kid's (1)**
66:15
**Kimco (1)**
14:13
**kind (26)**
55:21;58:23;66:4;
69:14;86:23;92:17;
98:5,12,13,16,19;
103:4;129:11;135:1;
143:7;144:13;154:3;
162:11;163:7,7;
164:18;175:8;182:5;
184:3;196:25;201:13
**kindly (1)**
76:18
**kinds (3)**
97:22;98:3;112:20
**KING (9)**
19:8;28:15,15;
96:20,21;98:4,10,11;
99:23
**KIRSCH (1)**
14:2
**KISSEL (1)**
6:19
**kitchen (1)**
155:5
**K-J-O-N (1)**
32:9

**Kjontvedt (1)**
32:9
**KJONVEDT (1)**
26:8
**Klein (21)**
31:18;181:16,18,
18;182:9,24;183:1;
184:11,14;186:16;
187:12,19;188:17;
201:1,3,8,17,21,22;
202:6,10
**KLEISINGER (1)**
18:16
**KNAPP (1)**
20:8
**KNAUSENBERGER (1)**
26:9
**knew (1)**
36:12
**KNIGHT (3)**
22:11;23:2;63:5
**knowing (5)**
113:25;117:18;
119:12;126:4;138:4
**knowingly (1)**
113:22
**knowledge (3)**
36:5;78:13;92:7
**known (3)**
33:1;151:4;153:14
**knows (6)**
35:8;39:23;45:10;
51:2;80:13;84:20
**Kore (2)**
26:10,17
**KORN (1)**
20:17
**KOSINSKI (1)**
26:10
**KOTEEN (1)**
14:8
**KRENZ (1)**
26:11
**KROPP (1)**
6:16
**KUMAR (1)**
26:12

**L**

**LA (2)**
20:6;39:12
**lack (2)**
42:9;98:16
**LAHN (1)**
21:17
**laid (3)**
55:5;67:19;68:22
**land (1)**
163:24
**landing (1)**
191:2
**landscape (2)**

57:8;106:25
**Lane (1)**
180:16
**language (10)**
39:1;90:25;116:25;
133:9;153:9;158:8,
12,17;170:8;181:24
**laptops (1)**
104:10
**large (3)**
151:19;169:19;
172:7
**larger (2)**
40:14;45:13
**largest (2)**
35:3;79:19
**LaSalle (1)**
10:14
**LASKOWSKI (1)**
18:25
**last (18)**
38:8;41:15;42:23;
44:22;57:14;59:2;
69:15;83:23;106:5;
135:21;154:5,5;
161:5;171:22;172:15;
173:9;182:18;194:11
**LATAM (2)**
53:7;163:4
**Latan (1)**
89:3
**later (9)**
30:4;31:19;108:11;
114:13;142:9;167:20;
177:13;178:3;196:3
**Latin (1)**
59:24
**laudatory (1)**
46:14
**Lauderdale (1)**
17:6
**laundry (1)**
172:6
**LaVie (2)**
67:6;71:17
**law (123)**
46:23;47:4;57:1;
58:5,13,24;59:5,16,
17;60:22;61:18;
62:13;63:21;64:2,12;
67:20,20;68:25;
69:14;70:17,17,18,22,
25;71:5,8,14,22;
72:3,7;75:14;78:4,7;
81:9,14;83:24;84:7,9,
11,24;90:20;91:6;
92:25;97:14;98:18;
99:19;100:13;103:25;
110:20,24;111:17,18;
117:12,13,16,21;
118:1,11,13,13,13,17;
119:2,4,4,6,8,10,13;
132:1;133:6;135:13,

14,15;136:1;138:5;
139:22;140:20,22,24;
141:3,4,10,17,18;
143:9;146:19;147:3,
4,17,18;149:4,5,6,11,
13,17,18,22;150:4,14;
151:10,10;163:1,21,
24;166:8,25;167:2,4,
5,6,9;171:12,13;
174:3,3,4;176:15;
178:15;197:1;198:6
**lawful (1)**
48:23
**laws (5)**
117:15,17,18;
141:2;150:2
**lawsuit (14)**
190:22;191:16,18,
24;192:2,3,7,9,22;
195:14;196:12,14;
197:23;198:3
**lawyer (1)**
81:11
**lawyers (1)**
30:10
**lay (2)**
67:6;193:10
**laying (1)**
66:23
**lead (3)**
54:24;163:8;171:4
**leading (1)**
99:14
**leads (1)**
121:20
**lean (1)**
31:9
**learned (1)**
175:12
**lease (5)**
84:3;166:12,16,22;
172:12
**leases (2)**
52:23;72:11
**least (13)**
63:13;65:23;70:14;
81:14;84:14;130:25;
140:17;165:21;166:4;
170:24;175:14;177:9;
195:4
**leave (17)**
34:18,21;37:12;
45:8;48:6;59:10;
63:24;70:8;81:12;
94:9;137:22;138:6;
164:10;174:6;180:10;
191:11,11
**Leaving (3)**
56:8;69:15;172:13
**led (2)**
54:8;125:23
**LEE (1)**
23:11

**left (6)**
63:7,19;81:22;
102:16;167:18;
181:12
**legal (16)**
43:10;65:25;68:20;
72:1;78:25;83:18;
91:5;96:4;115:3,4;
139:12;146:11,16,21;
150:12;173:23
**legally (2)**
162:17;165:8
**lenders (1)**
183:8
**length (2)**
164:11;186:11
**lengthy (1)**
201:5
**LEONARD (1)**
5:2
**less (11)**
79:14,14;133:22;
150:7;162:19,21;
163:11;164:2;165:4;
166:9;173:13
**lesser (1)**
64:25
**Lessors (2)**
22:12;23:3
**letter (2)**
183:9,9
**letters (5)**
40:7;43:17;44:11,
15;182:2
**level (12)**
41:8,9;64:6;88:5;
91:12;105:14;119:3;
120:13;122:17;124:6;
168:19;176:18
**levels (1)**
45:24
**LEVIN (1)**
8:9
**liabilities (1)**
35:4
**liable (1)**
149:1
**lien (3)**
40:14,24,24
**lieu (2)**
198:17;199:10
**life (4)**
27:8;162:1;172:13;
180:3
**light (6)**
60:1,2;92:9;101:8;
142:23;163:13
**lighter (1)**
92:11
**lightly (1)**
47:7
**likely (8)**
44:23;51:13;79:14;

94:22;154:16;165:21;
166:4;173:13
**likewise (3)**
30:14;47:9;48:9
**limit (5)**
81:23;114:20;
115:2;138:24;144:8
**limitation (1)**
73:3
**Limited (5)**
21:21;37:3;144:4;
156:17;173:21
**limiting (3)**
66:3,12;144:14
**Line (6)**
26:4;92:22;115:15;
140:18;181:13;
197:12
**Lines (3)**
26:18;140:16;
173:14
**link (1)**
180:11
**lipstick (1)**
158:14
**liquidated (1)**
51:20
**liquidation (8)**
45:21;51:18,21;
128:13;129:16;
164:23,25;165:3
**liquidity (2)**
51:5;63:17
**list (2)**
172:6;196:7
**listed (3)**
50:4;102:12;104:14
**listen (2)**
162:12;201:9
**listening (1)**
44:20
**literally (1)**
59:5
**litigating (1)**
192:14
**litigation (5)**
97:24;102:8;197:6;
199:5,6
**litigators (1)**
178:22
**littering (1)**
106:25
**little (26)**
31:3,3,9,9;38:4;
50:19;53:22;61:12;
77:12;97:25;107:21;
121:11;126:21;130:7,
10,12;145:10;156:3;
158:15;160:8;161:16;
166:7;167:19;188:1;
189:23;197:23
**Live (10)**
14:13;33:12;36:10;

43:23;98:8;103:19;
105:15;114:22,25;
177:12
**lived (1)**
32:11
**livelihoods (1)**
177:8
**lives (1)**
176:18
**living (1)**
57:19
**LLC (8)**
5:3;10:4;13:14;
14:13;17:3;26:13;
38:21;194:12
**LLP (36)**
5:2,12;6:2,10,19;
7:2,12;8:2,13;9:2;
10:20;12:2,11,19;
13:2;14:2,12;15:2,11,
20;16:2;18:11,19;
19:2,12;20:2,12;21:2,
11,20;22:11;23:2;
24:2,11;25:12;181:19
**located (1)**
27:11
**LOCKE (1)**
20:2
**log (5)**
161:24,25;180:9,
12,12
**logic (1)**
42:1
**logical (3)**
146:10,11;161:7
**LOMAZOW (1)**
16:8
**long (8)**
33:9,10;51:12;
161:5;168:25;175:25;
176:25;177:2
**longer (3)**
41:22;171:4;193:15
**long-standing (1)**
119:13
**long-term (1)**
99:13
**look (33)**
51:21;67:3,19;68:7;
76:16;86:24;91:24;
92:6;100:6;104:13;
113:11;117:12,13,17,
17;121:25;123:9;
129:8;131:19;132:22;
133:1;135:9,14;
140:1;147:16;153:20,
23;154:2;156:14;
164:9;174:19;196:23;
201:11
**looked (7)**
55:8;58:16;67:25;
92:18;116:1;160:1;
189:21

**looking (21)**
58:18;60:8;75:12;
81:14;86:8;93:4;
104:10;117:15;
119:10;120:18,19;
121:21;132:6;134:16;
142:3;145:11;150:5;
156:12;172:17;
184:10;187:10
**looks (6)**
81:7;143:5,5,8;
166:5;176:12
**Lopez (1)**
57:23
**Los (3)**
7:16;18:6;38:23
**lose (4)**
61:16;169:15;
170:5;177:3
**losing (1)**
138:2
**lost (2)**
51:24;172:10
**lot (29)**
29:7;36:23;44:2;
51:9,9,9;76:11;78:24;
80:18;94:7;96:11;
97:18;123:14;124:25;
131:11;136:10;
154:23;170:8;171:16;
172:23;174:12;
176:14,15,16;190:20;
192:13,18;199:14;
200:9
**lots (6)**
30:12;81:15;110:8;
111:4;165:23;192:4
**louder (1)**
31:15
**love (6)**
76:17,20;104:16,
16;165:16;177:5
**loved (3)**
42:2;45:23;66:4
**loving (1)**
79:10
**lower (2)**
31:3;40:25
**LP (1)**
26:6
**LUCAS (1)**
24:8
**Lumen (1)**
24:3
**lunch (4)**
161:3,17;175:19;
202:2

## M

**M&A (2)**
41:12;45:11
**MA (1)**

11:14
**machine (1)**
190:2
**Macy's (1)**
86:10
**Madison (2)**
12:4;23:13
**madly (1)**
104:10
**magical (2)**
27:3;58:17
**magnify (1)**
174:17
**mail (2)**
82:20;153:24
**mailings (1)**
90:7
**Main (2)**
12:21;79:13
**maintained (1)**
185:7
**major (4)**
93:23;141:18;
148:13;167:25
**majority (5)**
50:24;65:24;120:2;
144:16;173:6
**makes (15)**
59:2;73:22;86:5;
95:2;107:7;123:11;
130:24;137:9;143:6;
157:17;161:12;168:9;
177:16;187:25;
198:15
**making (11)**
30:18;54:1;89:17,
18,19;95:11;102:25;
120:5,6;130:16,22
**malayed (1)**
92:8
**MALE (1)**
98:7
**manage (1)**
192:12
**Management (11)**
26:6;32:15,23;43:3;
45:2;47:8;184:25;
185:7;186:22,24;
187:3
**managing (1)**
32:5
**mandate (1)**
76:23
**mandatorily (2)**
56:4;162:19
**mandatory (1)**
82:8
**Manhattan (1)**
21:22
**MANIER (1)**
9:11
**manifest (3)**
110:10;113:7;

131:23
**manifestation (7)**
86:6;88:24;89:20;
132:5;143:15;144:18;
146:20
**manifestations (1)**
87:16
**manifested (12)**
71:2;75:3;85:15;
87:3,15;89:7;119:12;
131:17;133:12,14;
152:6;163:13
**manifests (2)**
112:14;115:21
**Manigault (1)**
86:9
**manner (3)**
58:23;98:13;165:11
**manually (1)**
116:11
**many (40)**
36:18;40:11;45:4;
49:1,1,5,20;51:13;
52:22;53:5,5;55:11,
12;67:18;71:24;
72:23;73:22;74:13;
76:23,24,25;77:5,9;
79:15,22;87:23;89:2;
91:18,19,19;93:15;
99:4;102:17;112:6;
136:7;153:19;177:8;
181:13;191:17;
195:11
**Marc (1)**
31:18
**MARCUS (1)**
11:25
**MARGARET (1)**
25:18
**MARJORIE (1)**
12:8
**mark (1)**
70:20
**marked (1)**
174:18
**markedly (2)**
42:14;132:22
**Market (5)**
13:4;25:14;46:7;
191:1,4
**market-based (2)**
41:2,10
**MARKOWITZ (1)**
17:2
**Marsal (3)**
25:25;26:3;32:6
**Marshall (2)**
27:19;31:15
**Mart (1)**
84:6
**Masergy (2)**
25:13;38:22
**mass (6)**

78:23;79:15,23;
110:12;122:16;
139:10
**Massachusetts (1)**
12:13
**massive (8)**
46:1;53:12,13;
57:10;67:10;70:6;
94:2,20
**massively (2)**
85:9;169:5
**Mastando (1)**
53:8
**material (5)**
49:11;52:18;54:11;
85:23;88:6
**materially (1)**
53:19
**materials (11)**
30:19;52:10,13;
62:1,4;87:2,4;88:11;
89:9;159:23;165:9
**mathematical (1)**
50:20
**mathematically (1)**
50:20
**MATOTT (1)**
6:25
**Matt (2)**
28:17;29:24
**matter (17)**
35:19;52:6;102:20;
110:10;111:1;135:4;
153:15;155:12;
158:12;164:6;166:3;
174:23;185:6;190:11;
196:2;197:1,14
**matters (5)**
32:2,4;34:6;42:25;
201:9
**MATTHEW (5)**
18:8,25;19:9;24:17;
102:2
**maximize (1)**
45:3
**maximum (1)**
133:14
**may (55)**
29:3,4;39:11;40:6;
50:6;61:24,25;64:13;
75:14;76:7;85:15;
87:3,17;88:6,15;
91:13;92:1;94:2;
103:4;108:24,25;
110:8;120:4;124:15,
22;131:17,23;139:24,
24;140:20,21,22;
143:13;144:11;
145:25,25;146:4;
147:12;149:2,3;
151:19,24;152:16;
154:2;155:8,8,14;
162:22;175:7;176:8;

179:12,25;189:11;
193:5;198:4
**maybe (22)**
31:3;41:5;45:22;
52:23;63:13;78:2,13;
97:18;120:18;129:7;
142:15;148:19;152:1;
161:8;165:8;166:6;
168:18;184:6;185:15;
189:14,17,18
**MCBETH (1)**
26:13
**MCCABE (1)**
26:14
**MCGILL (1)**
26:15
**MCGREAL (1)**
21:25
**McKinney (1)**
118:18
**MCLENDON (1)**
5:2
**meager (1)**
54:8
**mean (32)**
37:17;51:14;58:20;
62:17;82:12;87:22;
91:22;96:3,9;105:21;
106:4;108:2;112:23,
25;122:5;128:10;
130:15;142:6,11,21;
143:23;145:13;
146:17;147:20;
149:21;150:18,25;
154:22;186:3;188:1;
191:15;197:19
**meaning (10)**
50:5;64:6;100:4,5;
125:22;129:24;
140:19;156:18;158:2;
178:11
**meaningful (2)**
64:8;134:1
**meaningfully (2)**
126:17,17
**means (14)**
58:9;74:18;75:13;
76:11;100:10;116:8;
124:1;135:10;136:2;
150:18,19;161:14,18;
191:12
**meant (2)**
89:9;142:10
**meantime (1)**
202:16
**measurably (1)**
161:6
**mechanic (3)**
63:9;71:13;100:15
**Mechanics (1)**
12:20
**mechanism (12)**
41:2,10,18;46:7;

49:16;55:18;62:7;
67:11,12,21;70:13;
125:2
**medical (1)**
79:16
**meeting (2)**
160:5;202:2
**mega (1)**
36:7
**MEGAN (1)**
16:18
**Melcer (4)**
31:22;49:21;
104:12;106:3
**MELTZ (1)**
12:19
**member (3)**
82:20;83:5,8
**members (2)**
82:18;191:3
**memoran (1)**
191:7
**memorandum (1)**
191:8
**memorized (1)**
89:5
**memory (2)**
105:9;169:25
**MENACHEM (1)**
25:23
**MENDELSOHN (3)**
26:16;32:7;183:4
**mention (4)**
34:15;44:1;57:18;
64:5
**mentioned (5)**
43:17;44:2;147:11;
161:20;177:15
**mentions (1)**
34:12
**merely (3)**
40:22;46:7;54:21
**merger (4)**
43:21,22;44:1;
102:9
**meritless (1)**
163:2
**merits (1)**
196:2
**met (1)**
65:14
**metaphor (1)**
179:23
**Metlife (1)**
18:22
**Metromedia (3)**
72:21;77:11;78:4
**Metropolitan (1)**
21:12
**Miami (1)**
6:14
**mic (3)**
98:8;114:22,25

**MICHAEL (6)**
5:18;10:9;20:20;
25:22;26:23;28:24
**MICHELLE (1)**
21:25
**microphone (2)**
31:4;107:21
**microphones (1)**
106:22
**micro-quibble (1)**
60:21
**might (29)**
43:18;44:19;52:24;
54:24;60:15;87:12,
21;101:1,14;102:25;
103:1,7;109:2;114:6;
134:5;140:2,3;143:7,
14;146:19,20;147:16;
149:1,25;153:18,25;
161:19;167:8;191:15
**MILBANK (1)**
16:2
**milestone (1)**
176:23
**milestones (1)**
175:23
**MILLER (5)**
15:8;16:9;26:17;
27:24,25
**million (22)**
37:18,19,20,22,24;
40:13,24,24;42:10;
46:11;50:22;51:5;
99:9,11;139:3,4;
153:17,17;164:20,21;
171:3,5
**millions (4)**
35:10;46:12;70:7;
169:19
**mind (6)**
50:19;62:12;100:6;
178:3;188:15,16
**mindful (1)**
174:6
**minds (2)**
59:9;111:9
**minimis (1)**
49:6
**minimum (1)**
62:11
**Minneapolis (1)**
21:15
**MINTZ (1)**
22:8
**minute (10)**
30:18;35:21;78:8;
85:13;101:12;109:25;
160:2;170:7;187:8,16
**minutes (11)**
38:5;40:4;52:16,25;
60:24;64:18;68:19;
71:1;106:5;114:24;
179:16

**miscellaneous (1)**
32:1
**mischaracterize (1)**
69:19
**mischaracterizes (1)**
56:10
**misdescribed (2)**
48:25;53:19
**misleading (2)**
86:14;166:1
**misrepresentation (1)**
52:18
**miss (1)**
106:12
**missed (3)**
149:3;173:20;179:5
**missing (5)**
68:4;105:22;155:6;
159:5;174:21
**misspeak (1)**
76:3
**misspoke (1)**
129:7
**misspoken (1)**
179:4
**mistakenly (1)**
56:1
**misunderstands (1)**
56:9
**MN (1)**
21:15
**modification (4)**
118:24;166:10,18,
21
**modified (1)**
200:21
**modify (2)**
118:19;166:11
**modifying (2)**
118:22;166:16
**mom (2)**
151:20;155:16
**moment (1)**
30:4
**Monday (1)**
102:5
**money (13)**
36:23;46:13;94:21;
99:11;100:13;106:6,
10,10;110:11;128:4;
168:11;197:6;199:6
**month (2)**
38:8;193:14
**months (1)**
99:4
**MONZO (1)**
8:10
**MOORE (1)**
25:2
**morass (1)**
167:3
**more (71)**
31:9,10;34:21;38:5;

40:4,10,18;41:3,18;
42:2,22;45:23;50:19;
54:19;55:14;60:9;
63:13;66:5,5,6;67:14;
68:23;72:5;74:14;
76:14,14,17;80:3,24;
83:4;84:14;88:1;
90:15;92:5;93:10;
94:7,10;101:1,2,5;
103:4,5;111:3;123:5;
132:3;137:4;146:15,
21;149:21;154:9;
158:15;159:21;
161:21;162:21;
163:19;165:21;
172:24;174:11;176:6,
22;179:10,13,14;
181:21;182:8;186:9;
188:2;189:23;191:25;
192:4;197:5
**Moreover (6)**
36:5;52:16;54:6,13;
71:19;72:20
**morning (31)**
27:2,5,18,21,24;
28:2,4,6,8,10,15,19,
22,25;29:13,19,23,25;
30:25;31:14;48:11,
23;96:20;98:23;
174:19;177:11;
180:11,24;185:6;
186:19;202:2
**morning's (1)**
180:20
**MORRIS (4)**
8:2;13:2;15:20;
53:9
**MORSE (14)**
5:9;29:13,13;
194:20,21,23;195:1;
196:12;197:2,18,19;
199:21,25;200:17
**mortgage (4)**
84:3;166:13,17,22
**mortifying (1)**
48:4
**most (21)**
34:6;42:17;47:11;
49:20;57:12;65:8;
68:23;77:13;84:19;
86:2;88:7;103:11;
142:25;154:16;161:6;
167:8;170:23;177:9;
184:9;195:3,4
**mostly (4)**
31:21;81:22;93:2;
127:9
**motion (29)**
32:15;34:8;43:2,3,
5;159:17;160:13;
168:14;178:18;183:3,
19,23;184:1,5;191:9,
10;196:22,22;197:4,7,

10,13,16;198:15,16;
199:10,12;200:2,10
**mouse (2)**
85:13;163:16
**mouth (1)**
114:12
**movant (1)**
47:22
**move (17)**
30:21;32:17;41:15;
48:20;57:1;58:21;
96:16;105:24;107:20;
112:3;124:13;150:15;
161:13;176:23;190:8,
18;194:11
**moved (2)**
183:5;185:5
**moving (8)**
35:22;89:13;
135:20;168:14;
180:22;195:3;196:2,8
**much (46)**
29:20;30:24;33:3,
19;40:14;42:1;43:23;
47:14,16,22;76:14,14;
77:7;80:4;84:14;88:1;
93:6;96:17;98:20;
100:17;114:19;127:2;
138:11,20;149:21,23;
150:7;153:9;166:9;
171:4;172:7;174:16;
177:22;183:13,21;
184:12;187:2;190:6,
16;193:11,20;194:7,
22;200:19;202:11,14
**MUCHIN (1)**
10:20
**MULLER (1)**
26:18
**multibillion (1)**
94:21
**multibillion-dollar (1)**
70:3
**multifaceted (1)**
70:3
**multiple (8)**
38:9;52:12;56:11;
66:3;85:23;91:20;
148:12;163:16
**must (13)**
56:14;72:10,22;
73:4;80:2,8,16,22;
83:5,14;143:7;
146:13;169:14
**mute (1)**
27:17
**mutually (1)**
41:17
**myopically (1)**
69:23
**myself (1)**
48:13

10,13,16;198:15,16;
199:10,12;200:2,10

## N

**name (1)**
119:16
**named (3)**
139:14,18;148:12
**narrowly (1)**
170:23
**Nashville (1)**
9:15
**National (2)**
6:20;24:12
**Nationwide (1)**
25:24
**nature (2)**
34:13;143:8
**navigate (1)**
185:15
**NC (1)**
25:6
**NEAL (3)**
17:17;28:4;138:22
**nearly (1)**
190:23
**necessarily (6)**
59:21;92:16;141:1;
147:14;155:16;187:2
**necessary (4)**
46:4,12;77:10;
129:4
**need (37)**
34:21;44:3,3;52:2;
61:9;71:22,23;91:8,
22;92:5;93:22;
104:15;113:24;
117:12,13,18;121:25;
134:11,15;135:24;
138:17;147:16;149:8;
176:23;177:1,4,4;
180:1;189:10,20;
190:20;197:1;198:5;
199:3,18;201:19;
202:13
**needed (1)**
198:10
**needs (11)**
30:4;86:5;111:16;
119:1,2,11,11;156:11,
18;162:5;194:25
**negative (1)**
66:14
**neglect (1)**
82:4
**negotiate (4)**
126:18;199:23;
200:4,5
**negotiated (4)**
82:2;99:23;120:20;
156:10
**negotiating (5)**
98:14;154:13;
156:8,15;195:19

**negotiations (9)**
97:1;99:5;120:14;
154:10,15,16,20,24;
200:14
**neither (3)**
52:9;62:18;106:12
**New (48)**
5:15;6:5,22;7:5;
8:17;9:6;10:7,23;
11:5;14:17;15:5;16:5;
17:15;18:23;19:15;
20:6,15;21:23;22:6,
15;23:15;24:15;
32:25;36:7;37:20;
38:1,13;40:14;50:22;
67:10;81:3;84:1,1,11;
94:19,20;99:11;
100:13;117:14,16;
118:13,17;119:2,4;
164:21;166:8;172:12;
180:18
**news (3)**
40:8;104:15;195:18
**newspaper (1)**
155:15
**next (27)**
59:4;60:23;67:17;
112:24;142:8;164:7;
166:25;167:12;168:3,
11;169:22;175:14,22;
184:15;186:11;189:7,
13;190:3,8,10;
191:22;194:10;
195:23;196:6;199:18;
201:23;202:15
**nice (3)**
101:11;138:16;
149:13
**niceties (1)**
96:4
**NICHOLS (1)**
13:2
**nifty (1)**
66:4
**nine (1)**
93:17
**nineteen (1)**
40:15
**ninety (4)**
124:1;125:10,23;
168:4
**ninety-eight (4)**
39:23;49:13,14;
51:6
**ninety-nine (2)**
123:20,21
**ninety-one (1)**
49:21
**ninety-one-second (1)**
62:21
**ninety-three (1)**
165:4
**Ninth (1)**

65:19
**Nirvana (1)**
169:7
**Nobody (9)**
47:7;80:12;131:1;
141:9;157:7;185:19;
189:19;197:20;
200:15
**nobody's (1)**
106:9
**nodding (1)**
28:12
**non- (1)**
94:21
**nonconsensual (18)**
57:19,21;58:3;60:1,
12,16;64:24;65:5,6,
12,15,21;66:24;73:10,
11,17;142:25;173:5
**nondebtor (1)**
73:3
**non-debtors (1)**
139:9
**none (5)**
48:8;57:4;73:6;
75:23;136:19
**nonetheless (2)**
83:7;168:8
**non-impairment (2)**
51:11;104:5
**nonlegal (1)**
159:9
**non-objection (1)**
94:23
**nonparties (1)**
148:17
**non-RSA (2)**
151:18,22
**nontrivial (1)**
46:1
**non-trivial (1)**
42:5
**nonvoters (1)**
126:16
**nonvoting (24)**
55:19;56:10,12;
62:15;63:20;109:19;
115:9;116:9,11;
120:21;132:11,21;
133:4;137:23;138:25;
143:22;144:15;
151:17,18;153:3,4,4;
164:12,14
**nor (5)**
41:20;52:9;106:12;
116:9;119:19
**Norcia (3)**
119:17;167:14,15
**normal (1)**
31:3
**normally (1)**
27:12
**North (8)**

5:4,6;10:14;13:4;
15:4,13;25:4,14
**Northeast (1)**
17:4
**Northwest (2)**
14:4;21:4
**NORTON (1)**
19:12
**Norway (1)**
32:12
**notably (1)**
34:6
**note (10)**
52:9;55:22;64:4;
120:12,13;153:17;
155:16;171:13;
175:21;181:5
**noted (7)**
53:15;54:13;56:21;
71:17;84:24;99:16;
185:22
**noteholder (6)**
97:9;137:3,4;
153:16;154:22;155:6
**Noteholders (33)**
18:20;19:3;20:13;
21:3;28:14,17,21;
80:9;91:11;96:19,22,
24;98:22,25;99:6;
129:17;136:21;137:5,
6,6;138:24,25;144:7,
8,9;145:21;148:2,18;
151:18,22;153:15;
154:9;155:4
**noteholders' (2)**
80:9;99:10
**notes (14)**
37:18,19,20,21,21;
38:11;39:20,21;
96:25;97:6;139:3,4;
151:20;175:10
**noteworthy (1)**
36:15
**Nothing's (1)**
138:1
**notice (34)**
62:5,13;63:10;
66:14;70:18;71:23;
80:18,20;82:19;92:8;
93:3,11,14,22;102:4,
15,19,21;104:12;
106:1;139:12,14,16;
148:8,14,15,23;
154:25;155:14;
165:11,13;173:16,24;
202:5
**noticed (1)**
155:14
**notices (12)**
68:20;79:21;80:6;
93:25;106:12;132:16;
158:8;165:14;167:25;
168:4,24;169:1

**notify (3)**
90:24;91:4;170:15
**noting (1)**
183:24
**notion (21)**
73:24;74:2,9;78:4,
5;92:23;115:17,20;
120:8;129:22;142:15;
148:14;152:5,21;
153:1,10;158:11;
162:25;168:23;169:4;
173:20
**notions (2)**
142:2;149:7
**notwithstanding (2)**
73:2;192:15
**novel (1)**
117:16
**November (6)**
35:19;42:8;46:6;
104:7;106:7;191:6
**nuance (1)**
115:16
**nuanced (5)**
76:14;121:1;123:2,
5;176:17
**nuances (1)**
123:1
**null (1)**
146:1
**number (48)**
29:1;31:19;34:6;
36:13;37:10;42:10;
43:6;46:10;49:10;
55:1;64:17;79:8,12,
20;81:1;85:25;89:23;
90:21,22;92:13;
99:17;103:21,25;
104:2,4;112:12;
128:14;160:13,25;
168:19;171:18;
173:21;178:10,17,18;
180:20;181:20;183:2,
3,7,23;184:1,17;
187:10;188:3;190:8;
194:10;196:17
**numbers (5)**
38:9;80:13;90:4;
91:20;164:23
**NY (21)**
5:15;6:5,22;7:5;
8:17;10:7,23;11:5;
12:23;14:17;15:5;
16:5;17:15;18:23;
19:15;20:15;21:23;
22:6,15;23:15;24:15

## O

**object (8)**
55:20;62:22;68:21;
74:23;88:15;92:12;
104:1;109:23

**objected (10)**
49:19;52:10;75:24;
80:19;94:15;97:9;
106:9;157:7,9;165:10
**objecting (8)**
43:4;47:19;58:8,25;
75:18;100:20;106:20;
143:24
**objection (34)**
33:5,11,16,20,25;
34:2;35:18;38:18,24;
44:14;55:23;56:9;
58:11;62:17;75:18;
81:8;85:22;101:2;
103:1;144:7;145:6;
157:10,13,15;158:1,6,
7,10;169:1;183:24;
184:25;185:1,23;
199:22
**objections (21)**
32:16;33:12;35:17;
37:3;38:19;39:15,25;
40:1;47:18;48:25;
52:5;58:5;76:25;
94:11;97:16;122:9;
145:19;171:10;
178:24;181:7;183:5
**objector (2)**
48:5,11
**objectors (10)**
52:21;53:17,22;
55:1;57:5;69:18;
73:10;84:22;90:17;
162:13
**objectors' (2)**
52:19;61:17
**objects (1)**
141:9
**obligation (11)**
84:2;86:12;92:11;
105:18;118:17,20,22;
166:8,12,16,21
**obliquely (1)**
45:22
**observation (2)**
43:20;191:14
**observations (1)**
137:8
**obsessive-compulsive (1)**
34:13
**obtain (3)**
70:11;104:1;185:10
**obtained (1)**
94:4
**obtaining (3)**
55:19;67:20;116:18
**obtains (1)**
73:20
**obvious (4)**
32:11;39:8;95:13;
175:7
**obviously (26)**
29:6;45:13;48:3;

50:25;51:18;64:1;
68:8;83:20;86:16;
95:7,25;96:9;97:2;
98:14;136:1;146:13;
154:8;161:25;174:10;
177:1,6;185:22;
194:14;195:2;196:18;
198:16
**occasions (1)**
53:5
**occurred (1)**
154:16
**o'clock (3)**
161:20;189:22;
202:3
**October (1)**
102:10
**odd (2)**
90:3;198:3
**off (19)**
30:23;42:5;81:17;
161:24,25;162:23;
176:7;180:10,12;
181:15;182:3,3;
186:5;191:2;194:24;
195:2,22;196:7;197:5
**offensive (2)**
120:9;124:7
**offer (25)**
40:13,22;41:4,9;
42:23;43:19;45:25;
69:24;72:11,12;79:2;
84:16,17,22;85:14,17;
86:5,25;87:1,6;118:8;
124:8;127:14;131:19;
177:17
**offered (13)**
40:9;42:11;70:12;
72:13;85:5,6,11;
91:11;127:14,17;
130:16;147:10;
152:21
**offeree (10)**
85:4,15,16;86:4;
87:5;90:24;91:4;
131:17,18;170:15
**offeree's (1)**
86:7
**offering (5)**
37:23;129:12;176:4
**offeror (4)**
90:25;91:4;131:16;
170:15
**offers (1)**
42:21
**Office (45)**
11:3,12,13;18:2;
28:7,9;33:22,23,24;
64:4;74:23;101:12;
106:19;107:14;
109:23;110:13,24;
113:5;115:14;117:22;
118:3;120:25;121:21;

122:7,10,20,25;123:3;
125:16;128:17;
133:19;140:17;146:7,
24;149:5;151:13;
152:1;153:8;158:10;
163:1;182:13;183:14,
16;185:11;186:25
**officers (2)**
148:22;171:25
**office's (5)**
111:19;113:2,12;
114:1;116:21
**Official (8)**
15:3;27:23;28:1;
81:6;95:4,6;111:15,
16
**offline (2)**
189:1,13
**often (3)**
36:25;94:20;101:9
**ok (1)**
190:3
**omnibus (1)**
27:14
**once (10)**
63:13,13;82:1;93:7;
94:3;136:23;176:7;
177:5;181:23;182:5
**One (112)**
6:21;30:18,20;
33:13;34:9;35:16,21;
36:3;39:11;42:25;
43:10,13,15;44:22;
47:1;48:6,15;49:17;
50:6;52:24;53:1,14,
19,20;56:1,16;57:5,
17;58:5,8;59:13,14;
60:12;66:11;67:8,18;
70:2;74:14;75:15,16;
76:12,22;77:5,6,6,25;
79:12;85:3;86:3,20;
87:9,11,22;88:5;89:3;
90:8;92:6,15;95:9,16;
103:3,22;104:5,24;
106:22;107:6;108:4;
109:25;117:8;121:12;
122:2;124:15,19;
130:18;131:7;132:1;
135:21;139:12;
144:13;146:20;
147:16;155:23,24;
157:4,11,11;159:9;
162:5,13;163:12;
167:9;168:17;169:18;
173:13;175:14,20;
180:23;181:13,21;
182:17;183:2;184:8;
185:15,17;187:12,16;
188:12;189:12;
192:21;197:19;
199:17;201:9
**one- (1)**
77:5

**one-point-x (2)**
75:23;80:4
**ones (2)**
92:19;172:19
**only (54)**
33:12;35:7;39:25;
40:2;46:3;47:12;49:8,
16,25;53:24;65:9;
72:22;74:25;76:24;
78:9;80:5;81:5;82:1,
6;90:2,7,21;95:21;
97:24;112:8;120:22;
123:23;124:21;125:1,
9,17,19,22;135:10,14;
138:5;140:6;144:6;
147:18;156:13,14;
161:7;163:12,22;
164:8,14;169:5;
175:9;178:12;179:6,
24;180:25;185:1;
187:4
**open (5)**
29:21;63:7,19;
80:12;154:1
**opening (4)**
84:15;162:21;
167:4;173:1
**operate (2)**
131:5;187:19
**operating (1)**
130:9
**operations (1)**
188:6
**opining (1)**
141:14
**opinion (11)**
46:9;64:22;69:3,10;
83:11;93:16;118:7;
142:9;170:2;171:14;
201:12
**opinions (2)**
55:1;69:11
**opportunities (2)**
44:7;68:21
**opportunity (15)**
32:21;63:1;70:12;
73:19;85:5,12;88:14;
126:16,18;127:16;
138:19;159:6;160:9;
197:9;199:6
**opposed (8)**
55:3;79:1;81:16;
82:4;91:13;124:23;
179:11;193:14
**opposite (4)**
54:10;56:2;77:16;
165:18
**opt (134)**
52:12;54:5,14;
56:15,18,25;61:21;
62:5,7,16;63:1;64:21;
65:11;67:5;73:19,25;
74:5,24;76:25;77:1;

79:21;80:21;81:24;
82:1,7,7,7,8,17,18,21;
83:4,6,15;84:9;85:18,
20,21;88:20,22,23;
89:10,17,24;90:2,13,
13;92:10;93:12;
99:25;100:15;102:15,
19;109:4,4,14,15,17;
110:13,18;112:19,23;
113:3;114:3;115:22;
116:11,12,18;117:1;
123:4,5,22,24;125:2,
8,15,17;126:7,13,14,
17;130:18;134:16;
136:12;139:8,16,16,
24;140:8;143:4,6;
144:10;145:2,2,22,23;
146:12;148:10,20,24;
149:23;150:8,12;
151:9;152:12,12,12,
14,17;153:10;155:17;
157:16;158:11;
162:16,22;163:2,2;
164:8;165:16,17,21,
23,24;166:1,5;168:4,
6;169:5,14;170:23;
171:7;172:12;173:7;
201:11
**opt- (1)**
43:13
**opted (10)**
39:13;49:20;90:6;
102:14;103:3;105:3;
125:22;144:12;
168:17;170:21
**opting (4)**
87:14;133:16;
143:12;152:10
**option (6)**
61:19;74:25;86:7;
133:16;145:1,2
**options (1)**
140:25
**opt-out (28)**
49:16,23;52:23;
53:25;54:19,22;
55:18;57:3,14,22;
61:14,17,19;62:20,21;
63:20;64:25;65:22,
25;66:7;67:7,11,12,
21;69:5;71:3;74:13,
24
**opt-outs (7)**
52:21;55:4,12;58:1;
61:20;62:2,11
**Oracle (1)**
38:21
**oral (2)**
35:21;162:12
**Order (46)**
36:6,7,8,15;37:9;
39:1;46:18;52:14;
71:11;85:20;101:10;

103:12;129:5;155:19;
160:16,20;165:10,22;
168:25;175:24;177:4;
179:10;181:9,10,10,
20;182:7;183:12,15;
184:5,25;187:21,23;
189:6;190:7;192:11,
17,22;193:1,4,8,10;
194:3;196:16,17,24
**orders (5)**
36:22;184:7,9;
195:24;196:3
**ordinary (3)**
39:2;104:8;128:23
**organizational (1)**
38:13
**Orleans (1)**
20:6
**O's (1)**
77:12
**others (13)**
36:17,17,18,20;
40:11;47:8;55:11,14;
60:15;65:19;112:15;
156:7;191:17
**Otherwise (16)**
33:1;40:12;57:8;
86:7;90:23,24;
105:23;126:1,2;
140:10;170:9,14;
178:16,17;199:12;
200:11
**ours (6)**
55:9,13,14;62:20;
92:11;101:3
**ourselves (1)**
47:11
**out (193)**
27:16,22;28:3,13;
29:5;30:17,19;31:21;
34:14;37:9,10;38:14;
39:13;40:3;41:10;
43:14;44:14;47:9;
48:11;49:20,24;
51:20;52:12;54:14;
55:5;56:15,18,25;
59:23;61:21;62:5,8,
16;63:1,5;64:2,21;
65:11;66:16,23;67:6,
19;68:22;69:21;
73:16,19,25;74:5;
76:25;77:2,8,13;78:5;
79:21;81:7,15,22;
82:6,7,18,21;83:13,
15,25;84:9;85:18,19,
20,21;87:14;88:3,12,
20,23;89:4,7,10,17,
23;90:2,6,13,14;
92:10;93:12;94:10,
25;96:12;97:5,24;
100:15;102:5,14,15,
19;103:3,13,19,24;
104:17;105:3;106:8;

109:4,14;110:11;
112:19,20,23;114:3;
115:23;116:11,12,18;
117:1;121:2;123:5,
23,24,24;124:24;
125:1,8,8,15,17,22;
126:7,13,13,14,17;
129:9;130:12,18;
133:7;136:1;137:12;
139:8,16,16,24;
141:17;143:4,6;
144:10,12;145:2,3,18,
22,23;146:12;147:15,
22;148:10,24;150:12;
152:10,12,12,17;
153:10;155:2,17,24;
157:5,16;158:9,11;
159:23;160:16;163:2;
164:24;166:1;168:17;
169:14,15;170:21,23;
171:7;173:7;174:4,
18;176:16;177:21;
179:22;188:9;193:11,
13;198:24;200:13;
201:11,12
**out' (1)**
83:6
**outcome (6)**
42:16;67:7;164:16;
185:23
**outdated (1)**
184:10
**outline (2)**
75:14;127:2
**outs (13)**
67:5;80:21;82:1,8;
83:4;89:24;90:2;
99:25;110:19;162:16;
165:17;168:4,6
**outset (1)**
142:20
**outside (9)**
45:18;55:2;60:6;
110:9,9;139:10,11;
176:1;192:16
**outstanding (3)**
168:12;195:25;
196:3
**over (26)**
30:22;36:20;38:8;
39:23;43:16;53:13;
66:12;71:6;86:3;
90:12;91:17;97:5;
100:23;103:18;
107:17;108:13,13;
116:19;159:7;167:7;
178:4;181:14;184:7,
8;191:5;201:1
**overall (2)**
70:5;95:15;97:10;
98:16;173:6
**overbroad (1)**
78:14

**overlap (1)**
151:24
**overlay (2)**
66:25;174:5
**overrule (1)**
97:16
**overruled (2)**
35:17;57:16
**overture (1)**
41:17
**overwhelming (7)**
35:1;37:4;39:18;
57:1;65:23;72:4;
196:5
**overwhelmingly (4)**
53:3;83:22;97:3;
123:20
**owe (1)**
106:6
**owed (4)**
102:18;105:18;
106:10;130:11
**Owens (3)**
55:3,11,15
**owes (2)**
102:7,10
**own (6)**
48:4;73:12;151:10;
167:9;193:7;200:10
**Owner (2)**
8:3;25:3
**owns (1)**
151:21

**P**

**PA (4)**
11:19;15:23;16:16;
17:2
**PacificCo (1)**
53:5
**page (10)**
34:17;56:9;81:23;
82:23;84:10;93:6;
171:22;186:17;191:7;
198:23
**pages (13)**
36:8;55:6,23,25;
56:5;67:4;68:11;
163:3;167:16;173:19,
19;179:11,11
**paid (27)**
39:2,16;42:4;46:24;
49:8;73:4;76:1;77:12,
16;78:11,19;80:25;
84:20;105:20;106:8;
108:5;124:21;128:8,
13,23;130:11,13;
131:8,12;137:25;
163:14;168:6
**painfully (1)**
175:7
**pandemic (1)**

30:13
**paper (6)**
55:6;153:9;155:5,9,
18;159:17
**papers (14)**
29:1;43:11;64:1;
67:23;76:8;97:5,12;
98:17;109:22,24;
116:1;153:23;160:1;
186:25
**paperwork (1)**
36:22
**paradigm (2)**
130:8,10
**paragraph (6)**
56:22;103:12;
105:1;165:15;181:22;
182:4
**paragraphs (1)**
181:25
**parcel (1)**
77:25
**Paribas (1)**
5:13
**Park (4)**
6:21;7:4;18:21;
20:14
**PARLIN (1)**
22:17
**parse (3)**
111:4;112:20;
113:14
**part (29)**
54:8;70:2,4,9,15;
75:1;76:9;77:24;
78:12;84:18;87:8;
97:9;98:6,16,19;
113:8;118:19;120:19;
125:4;128:9;129:17,
18;135:11,14;141:10;
144:11;166:12;172:7;
197:19
**parte (1)**
191:10
**participants (1)**
29:8
**participation (1)**
64:8
**particular (8)**
45:19;91:12;96:3;
109:18;123:6;161:19;
165:7;188:15
**particularly (11)**
44:12;58:10;89:15;
96:14;119:25;120:9;
127:20;129:24;
132:12;159:21;
171:17
**parties (77)**
29:1;38:15,19;40:2,
25;47:19;48:9;49:10;
50:14;51:6;54:17;
58:8,25;69:20,21;

74:22;75:19;76:2,24;
77:9,17;81:4;85:9;
90:10;91:18;93:23;
94:6,18;95:2;100:20;
102:17,21;103:25;
106:20;108:10,21;
109:11,19,24;110:5,
10,14;111:22;116:10,
11,15;119:19;120:19,
21;132:1;136:24;
139:14,18;143:10;
148:7,12;152:25;
156:14;163:15;
164:13,18;165:13;
167:9;168:6;171:23;
172:6;173:16,25;
174:10,25;176:19;
181:23;188:11;
195:19;197:2;198:16,
21
**partner (4)**
28:17,24;32:6,8
**Partners (5)**
10:21;26:16,21;
32:7;91:12
**parts (3)**
121:16,17;195:8
**Party (30)**
13:3;16:3;32:20;
33:10;35:18;56:18;
57:8;63:17;65:7;
74:20;83:16;85:8;
97:20;100:14;101:22;
106:19;118:23;124:7;
139:12,15;140:7;
142:25;143:6;151:5;
154:13;155:20;
165:10;166:17;171:2;
202:12
**party-in-interest (1)**
38:19
**pass (4)**
59:25;86:7;101:22;
137:24
**passed (2)**
163:21;185:18
**passing (2)**
108:5,14
**past (6)**
108:2;139:22;
142:21;150:14;
198:25;200:12
**patently (2)**
56:16,25
**path (3)**
46:4;50:15;185:21
**patience (2)**
201:6,16
**patronize (1)**
88:10
**patronizing (1)**
89:10
**pattern (1)**

76:21
**patterns (1)**
88:16
**PAUL (4)**
18:19;19:2;28:16;
96:21
**pause (1)**
170:6
**pay (10)**
45:8;47:3;54:9;
72:14;81:2;93:24,25;
102:11;124:17,22
**paying (4)**
104:3,7,22;156:2
**payment (5)**
85:8;91:14;130:24;
131:10;164:3
**payments (2)**
106:12;129:5
**PBSD (2)**
169:22;170:1
**PC (5)**
9:11;10:2,12;13:13;
23:11
**peace (1)**
100:5
**Peachtree (1)**
13:15
**Pearl (1)**
17:13
**pending (1)**
149:20
**penned (2)**
55:17,18
**penny (1)**
80:4
**people (56)**
27:7;36:9;45:4;
58:20;61:24;65:2,11;
73:19;77:7;79:13;
81:15;82:3;90:3;
92:13;94:5;96:11;
101:9,11;104:10;
106:8;109:8,12,13,13,
13;110:21,25;111:6,6,
25;112:10;113:21;
123:16;124:6,11;
130:21;143:25;
147:11;148:23,25;
151:16;154:25;
157:19;161:2;163:13,
25;168:17,23;169:5,
15;171:7;173:22;
177:8,15;180:9;196:4
**PEPPER (1)**
20:2
**perceive (1)**
58:24
**percent (46)**
35:6;36:2,3;38:2;
39:19,23;40:15;
48:15;49:13,14,17;
50:3;51:6;75:23;77:6,

6,7;80:4,11;81:19;
85:7;90:3,7,8;94:14,
17;97:5;104:9;112:5,
8;123:21,21,22;
124:1;125:10,10,14,
22,23;153:21,22;
163:23;165:2,4;
168:4,10
**percentage (1)**
70:21
**Perella (5)**
10:21;26:16,21;
32:7,8
**perfect (6)**
63:8;85:10;86:18;
107:13;168:9;202:8
**perfectly (6)**
30:5;79:20;101:21;
108:24;113:15;153:1
**perform (1)**
196:19
**perhaps (11)**
36:13;40:7;117:8;
122:1;139:3,23;
142:22;149:22;
155:10;160:15;184:6
**period (6)**
185:9;187:5,20;
188:18,22;193:12
**permanent (1)**
185:10
**permeates (1)**
35:14
**permissible (5)**
123:4,9;129:23,23;
138:5
**permit (2)**
59:8;60:21
**permits (2)**
67:20;139:8
**permitted (3)**
60:10;142:25;185:8
**permutations (1)**
143:14
**person (10)**
48:8,10,12,15;
93:21;138:18;148:16,
23;160:18;167:17
**personal (1)**
166:13
**personally (2)**
104:16;196:6
**personnel (1)**
73:7
**perspective (3)**
83:3;177:7;195:14
**pestered (1)**
175:8
**PETERSEN (1)**
12:19
**petition (5)**
35:5,7;97:1;159:18;
191:11

petitioner's (1)
82:15
Petroleum (1)
82:14
ph (11)
53:4,4,4;74:3;89:3,
3;90:10;112:15;
168:25;183:4;191:19
phantom (1)
196:15
Philadelphia (5)
15:23;16:12,13,16;
38:22
Phillips (2)
20:3;82:14
phone (8)
28:18;33:13;39:11;
167:16,18,18,23;
190:11
phrase (1)
170:13
picked (1)
200:23
picking (1)
112:17
picture (2)
63:8;103:4
piece (5)
40:25;155:5,9,18;
159:16
PIERCE (1)
5:2
pig (1)
158:15
piles (2)
30:18,19
pill (1)
79:17
PILLSBURY (1)
5:12
Pilots (2)
26:4,18
pin (2)
82:22;198:8
pitch (4)
89:18,18,19;92:20
pithy (1)
179:11
PITNEY (1)
9:2
PITTMAN (1)
5:12
place (3)
45:8;73:16;86:3
Plains (1)
12:23
plaintiffs (1)
82:16
plan (163)
29:17;31:24;32:22,
25;35:7,25;36:1,3;
37:17;38:7,9;39:8,19,
22,25;40:10;42:15,

21;43:1;46:21;49:2;
51:11;53:24,25;54:3,
14,16,20;55:24,25;
56:3,4,13,15;61:20;
62:8,17;63:9;66:13,
14,17;67:11;70:2,3,8,
15;71:6;72:10,19;
74:3,7,10;75:21;
76:11;78:10,11,12,16;
84:18;85:19;87:13,
14;88:19;94:1,14,23;
95:8,16,22,24;96:1,
10,13,15;97:1,7,9,12,
13,16;98:13,14,14,18;
99:8,17,21,23,24;
100:12,15;105:19;
109:17;110:10;112:6,
6,7,9,14,18;113:7,23;
114:3,4;115:10;
116:13,17;119:15,19,
19;120:6;121:23,24,
25;123:16,18,19;
127:18;129:16;
130:22;131:9,10;
132:2,20;133:2,8,8;
141:9,10;144:10,11,
17,23,24;145:1;
146:12;151:1,2,25;
152:13,17;153:16,21;
155:9,11;157:9;
159:20,22;162:20;
164:15;165:22;166:5;
168:20,22;178:11;
179:2;180:22;186:18;
187:20,21;188:18,23;
195:3
planet (2)
57:2;81:1
planned (2)
37:10;182:7
plans (2)
49:1;112:25
plan's (3)
48:22;71:12,13
plant (1)
56:11
play (2)
86:7;193:13
playing (1)
69:25
Plaza (2)
6:21;10:22
pleaded (1)
52:4
pleading (2)
57:16;161:22
pleadings (2)
143:23;181:5
Please (7)
27:2;30:10;114:14;
116:7;117:7;123:12;
182:22
pleases (2)

43:9;187:22
pleasure (2)
161:10;192:14
plenty (1)
97:20
plethora (1)
57:10
PLLC (1)
25:2
pm (3)
180:15,15;202:18
podium (10)
100:23,25;101:14;
104:20;107:16;
137:22;138:9;159:7;
170:19;184:15
point (45)
36:17;37:11;48:2,
18,24;57:18;58:24;
67:8;78:10;86:5;90:1,
93:15;95:1,21;100:1,
21;114:15;118:12;
119:9;127:10,24;
128:18;130:16;134:5;
140:15;145:20;
151:25;157:5;164:7,
10;167:4;168:3;
169:10;171:22;
173:10;174:17;176:8;
179:21;182:14;
185:18;187:1;190:1;
200:12;201:24;202:4
pointed (3)
97:5;137:12;176:14
points (6)
114:17;123:14;
127:12;137:20;149:5;
161:8
polar (1)
54:10
policing (1)
67:5
Polk (10)
27:19;31:16;36:18;
48:5;168:11;181:19;
184:19;190:10;
194:17;201:22
pool (1)
128:9
poor (1)
79:25
pop (2)
151:21;155:16
population (1)
137:7
portal (6)
49:20;62:21;85:22;
90:5,14;92:12
PORTER (2)
12:2,11
position (25)
30:21;40:16;69:4;
95:12,15,20,23;103:6;

109:17;110:18;
111:15,16,20,21;
114:11;118:9;121:1;
134:10,22;144:3;
145:6;152:11;156:13;
183:19;196:13
positioned (2)
99:13,13
positions (1)
201:10
possible (11)
45:5,7,7,9;67:11;
70:4;108:22;120:6;
130:25;140:25;
163:15
possibly (9)
36:4;65:25;80:3,23;
90:15;111:3;116:3;
132:11;163:4
Post (1)
11:13
post-filing (1)
130:9
post-Harrington (2)
57:20;66:3
posture (1)
79:3
potential (1)
45:11
potentially (2)
103:6;148:25
POURAKIS (1)
23:17
power (1)
71:10
Poydras (1)
20:4
practical (3)
103:5;153:15;
155:12
practically (1)
92:24
practice (2)
30:13;34:8
practiced (1)
198:15
PRATEEK (1)
26:12
pre- (1)
194:11
pre-agreed (1)
75:20
pre-bankruptcy (1)
195:15
precarious (1)
45:14
precedent (2)
60:5;150:14
precedential (1)
61:7
preceding (1)
35:5
precise (3)

128:14;160:23;
175:12
precisely (3)
129:10;136:2;
164:16
predators (2)
81:19;163:22
predictability (1)
53:15
predictions (1)
175:13
preference (1)
202:4
prefers (1)
163:2
pre-Harrington (3)
57:10;64:23;65:22
premise (1)
173:23
prepack (1)
94:22
pre-pack (2)
158:4,4
prepackaged (1)
35:13
prepared (6)
39:16;179:1;
188:19,24;196:21,21
pre-petition (1)
154:17
preponderance (1)
53:12
presaging (1)
57:21
prescient (1)
93:8
PRESENT (3)
25:21;26:2;87:21
presentation (5)
97:8,11;101:10;
159:3;189:9
presentations (1)
138:17
presented (2)
94:24;99:21
preserve (4)
85:20;155:19;
168:7,9
President (2)
114:23;163:21
press (1)
155:16
presumed (1)
83:7
presumption (1)
117:11
pretend (1)
84:25
pre-trial (2)
29:16;43:7
pretty (11)
34:14;39:8;74:16;
82:13;93:6;104:24;

131:20;149:23;155:1;
171:19;172:7
**preview (1)**
181:21
**previewed (1)**
182:11
**previous (6)**
90:23;135:22;
136:16,20;170:8,14
**previously (1)**
183:5
**PRICE (3)**
10:2,12;191:3
**primarily (1)**
30:7
**primary (1)**
64:22
**prime (1)**
47:1
**principal (1)**
102:25
**principle (3)**
52:6,7;66:3
**principled (1)**
69:6
**principles (1)**
66:12
**print (1)**
167:20
**prior (11)**
27:8;35:16;43:20;
68:3;69:5;78:3;91:10;
96:25;135:22;154:8;
156:18
**priority (2)**
42:19;46:25
**privilege (1)**
142:12
**privy (1)**
120:22
**pro (1)**
40:15
**probability (1)**
76:5
**probably (16)**
31:20;32:12;61:11;
79:14;104:23;105:24;
144:23;151:18;152:8;
161:6;167:7;168:7;
174:14;177:18;
180:10;188:9
**probe (1)**
100:9
**problem (13)**
65:3;69:17;74:1;
75:2;78:18;88:8;
106:2;138:15;141:23;
157:16;187:13;
193:25;199:7
**problematic (3)**
153:11;158:11;
176:6
**problems (3)**

30:14;169:6;195:11
**procedural (2)**
48:2;192:21
**procedurally (1)**
192:21
**procedure (1)**
136:12
**procedures (5)**
58:1;80:18;82:19;
157:7,12
**proceed (2)**
192:11,16
**proceeding (9)**
33:7;34:6;43:8;
51:12;68:20;118:13;
160:25;186:23;
194:18
**proceedings (5)**
72:1;78:25;93:24;
165:1;202:17
**proceeds (2)**
73:7;90:11
**process (21)**
59:16;62:9;68:24;
71:23;82:15,21;83:2;
87:17;102:20;125:3,
6,23;132:5;136:10,
12;142:3;148:14;
149:7;150:6;167:5;
171:18
**processes (1)**
45:11
**procure (2)**
45:7;175:24
**product (1)**
79:16
**proffered (3)**
41:19;46:8,10
**profoundly (3)**
56:9;114:14;174:9
**Program (1)**
110:18
**prohibited (1)**
60:10
**prohibits (1)**
52:21
**promise (8)**
27:9;118:18,21;
135:21;154:4;166:11,
15;176:11
**promised (2)**
41:11;165:22
**prompt (1)**
175:6
**promptly (2)**
96:16;175:12
**prong (1)**
67:17
**pronounce (2)**
59:25;167:13
**proof (7)**
40:23;65:18;
102:13;104:5;105:18;

132:15;197:20
**proper (4)**
62:13;71:13;106:1;
173:24
**properly (2)**
107:7;192:1
**property (4)**
50:5;90:9;117:16;
166:13
**proposal (2)**
41:8,15
**propose (2)**
32:17;43:12
**proposed (13)**
39:1;43:22,25;
66:14,17;94:1;
112:25;136:11;183:8;
189:6;193:4;194:3;
198:25
**propriety (2)**
65:25;167:6
**protect (1)**
83:5
**protecting (3)**
50:10;76:9;144:6
**protective (1)**
162:19
**prove (2)**
59:3;77:9
**proves (2)**
167:4;168:15
**provide (12)**
53:21;70:10;94:2;
108:10;111:21;
117:10;125:2;133:15;
136:12;139:13;
140:18;195:9
**provided (20)**
40:10;42:5;49:9,12;
51:16;52:13;62:7;
71:2;72:18;75:21;
77:10;95:17;118:21;
140:4;148:19;152:24;
163:9;164:17;165:14;
166:15
**provides (2)**
163:10;195:7
**providing (2)**
70:6;73:12
**proving (1)**
65:23
**provision (7)**
59:22;66:18;
103:23;104:19;105:3;
159:22;196:24
**provisions (3)**
66:19;95:18;98:15
**prudent (1)**
188:13
**PRYOR (1)**
24:11
**public (2)**
45:17;46:19

**publication (1)**
165:12
**publicity (1)**
155:10
**publicly (1)**
40:22
**pull (1)**
30:17
**pulling (1)**
187:8
**purchase (2)**
195:24;196:3
**Purdue (10)**
66:22;114:19;
117:9;141:5,5,6;
142:4,22;150:16,18
**purely (1)**
43:10
**purity (1)**
84:25
**purport (2)**
50:10;88:10
**purported (1)**
130:1
**purportedly (2)**
41:4,19
**purposes (12)**
33:6;34:5;44:8,15,
19;75:13;100:10;
106:23;107:7,21;
133:2;192:10
**pursuant (3)**
87:1;100:14;173:17
**push (1)**
88:16
**pushed (1)**
41:6
**put (16)**
38:15;40:22;45:14;
46:12;97:25;98:1;
104:24;114:12;141:9;
146:20;159:21;
173:16;177:20;
179:12;193:3;197:5
**puts (2)**
93:21;123:3
**putting (7)**
92:9;95:13;120:7;
132:4;158:14;186:23;
198:8

## Q

**QIAN (1)**
13:9
**quantum (2)**
40:21;94:22
**quarter (2)**
35:5;174:7
**quick (2)**
59:12;183:2
**quickly (6)**
41:10;96:12;

104:24;175:1;190:18;
195:7
**quite (23)**
40:20;41:25;62:19;
65:20;67:4;69:23;
82:6;84:8;91:16;
112:16;119:10;
145:10,11;146:25;
162:17;167:1;170:10;
171:1,2;172:23;
176:2;191:12;200:22
**quiver (1)**
78:9
**quote (14)**
56:11;57:23;61:24,
25;71:21;73:1;83:14;
89:5;90:23;91:2;
93:18,23;110:24;
165:11
**QURESHI (2)**
20:18;28:24

## R

**rabbit (2)**
74:19;175:8
**RACHBERG (1)**
13:10
**radically (2)**
55:9;172:21
**railroad (1)**
90:1
**raise (4)**
37:24;157:5;
174:15;194:5
**raised (2)**
169:23;185:1
**ran (1)**
195:11
**rapid (1)**
161:9
**rare (2)**
65:9;83:5
**rarity (1)**
96:14
**rate (1)**
90:14
**Rather (10)**
49:8;50:19;53:10;
54:15;82:17;84:18;
92:18;141:1;196:3;
200:1
**rating (1)**
188:6
**rational (2)**
125:18,20
**rationale (1)**
75:11
**RCF (2)**
51:3,7
**reach (4)**
51:23;189:2;197:7;
198:24

**reached (2)**
42:4;45:24
**read (17)**
53:21;58:10;61:12;
75:18;83:10;88:12;
93:1;94:6;118:14;
132:20;169:16;
170:21;173:13;
174:18,19;197:9,10
**reading (5)**
36:11;77:8;147:2;
174:13;201:12
**ready (2)**
160:20;197:4
**Reagan's (1)**
114:23
**real (5)**
126:13;153:23;
166:13;167:2,8
**realize (3)**
155:17;192:18;
201:5
**realized (2)**
141:15;186:5
**really (33)**
29:15;41:8;44:12;
46:22;50:9;53:20,20;
65:20;69:14;73:23;
95:23;96:10;98:4;
108:8,12;109:18;
123:21;125:3;126:4;
128:2;137:11;140:6;
141:2;148:13;149:24;
157:19;158:1;166:9;
172:10;182:6;191:24;
195:6;201:14
**Realty (1)**
14:13
**reaping (1)**
81:20
**reapplied (1)**
173:22
**reason (23)**
30:4;63:15;65:11;
74:10;78:20;85:6,10,
15;87:1;93:1;102:14;
108:20;124:22;
127:16,22;131:17;
153:19,23;155:11;
162:14;186:21;189:4;
193:5
**reasonable (16)**
40:19;41:2;70:13;
80:23,24;81:16;85:5,
11;88:1;90:24;91:4,7;
127:16;170:14,17;
197:24
**reasons (8)**
53:14;79:25;87:9;
105:16;144:14;
147:25;153:11;
172:25
**recap (1)**

37:7
**recapitalize (1)**
35:23
**receive (3)**
34:2,5;189:6
**received (11)**
34:4;72:18;73:6;
102:19;104:11;116:9;
123:22;124:8;164:13;
181:7;183:6
**receiving (9)**
33:6;47:5;49:4,6,
11;87:24;88:6;
125:10;131:13
**recent (4)**
58:11;97:22;
103:11;182:8
**recently (1)**
195:19
**Recess (1)**
180:15
**recipients (1)**
50:3
**re-clarifies (1)**
39:1
**recognition (1)**
115:16
**recognize (1)**
117:22
**recognizing (1)**
123:2
**record (44)**
31:1,15;32:9,18;
34:16,24;37:11;
44:19,25;45:16;63:6,
8,18;91:22;92:2,5;
95:11;96:20;110:10;
123:15;128:7,11,16,
16,18;130:24;135:24;
137:5,13;154:9,24;
156:19;174:22;
177:20;178:22;
179:13;181:11,18;
182:16;188:3,20,24;
200:21;201:22
**recorded (1)**
27:4
**records (1)**
133:23
**recover (1)**
85:8
**recoveries (7)**
36:24;54:8,12;74:7;
94:2,3;165:2
**recovery (10)**
42:6,20;45:4;46:1,
16,24;77:11;85:10;
108:22;165:4
**redact (1)**
183:25
**redactions (1)**
183:10
**redirecting (1)**

128:20
**reducing (1)**
76:10
**refer (3)**
48:22;71:18,20
**reference (8)**
30:20;67:23;68:1;
69:2;76:5;77:20;82:9;
132:24
**referenced (6)**
34:10;67:24;68:11;
147:23;164:22;
167:12
**references (1)**
37:16
**referencing (2)**
34:14;152:3
**referred (1)**
46:25
**refers (1)**
105:6
**reflected (1)**
35:12
**refuge (1)**
83:24
**refund (1)**
50:6
**refused (1)**
41:16
**regard (1)**
64:11
**regarding (3)**
32:13;43:5;63:6
**regardless (3)**
27:10;61:15;88:21
**regime (1)**
83:18
**registration (1)**
38:12
**regrettably (2)**
37:2;38:4
**regular (1)**
171:18
**regulators (1)**
41:24
**regulatory (1)**
44:4
**Rehnquist (2)**
82:23;83:3
**reinstating (1)**
46:15
**reiterated (1)**
108:7
**reject (19)**
36:1;47:5;49:5;
52:22;54:5;61:19;
75:5,7;82:14;85:5,12;
87:18,18,25;88:19;
121:7,8;127:16;
144:10
**rejected (5)**
38:2;39:10;88:13;
89:5;169:10

**rejecting (5)**
39:7;61:21;88:5,8;
169:13
**rejection (1)**
39:9
**rejections (1)**
51:13
**relate (1)**
45:18
**related (1)**
27:8
**relates (2)**
129:9;183:7
**relating (4)**
29:2;38:11;155:6;
188:2
**relationship (1)**
119:18
**relatively (2)**
41:12;90:13
**release (74)**
54:15;56:17,21;
57:20;58:3;64:24,25;
65:16;67:9;69:22,24;
70:4;72:22,22,25;
73:17,21,25;74:10;
75:6,19;77:17,23;
78:11;83:16,16;84:2,
17;85:9;94:18;95:8,
13,18;97:20;100:14;
102:21;103:13;
108:10,15,18;112:18;
113:8,22,24;115:4;
119:14,15;130:20;
134:18,19,21;139:6,9,
9,13,17,19,23;140:8,
8;141:9;143:13;
144:10,12;145:2;
146:14;148:21;151:5;
152:14;154:3;155:13,
17;159:23;178:15
**released (10)**
49:10;63:17;69:20;
77:9;95:20;108:25;
148:20;164:13,18;
172:7
**releases (138)**
40:4;48:22,23;49:3,
15,18,19;53:23;54:4,
5,19,21,22;55:21,25;
56:4,7,15;57:4,9,14,
21,23;58:7;60:1,13,
17,20;61:15;62:6,16,
24;63:20;64:21;65:6,
7,11,12,22,22;66:25;
67:7;68:4,12,12,15;
69:6,19;70:2,11,13,
15;71:2,12,18,20,21;
72:5,10,15;73:3,
10,11;74:5;75:21;
76:24;77:3,14;78:15;
84:9,11,16;85:11,19;
87:23;88:9,17;93:3;

95:22,23;98:2,5,6,12,
16;102:14;104:1;
114:18;116:12,13,16;
117:10,11;120:23;
123:17;124:1;125:5;
126:7,12,17;129:1,3,
4,18;130:1,1,18;
131:9,13,14;133:17;
134:12,23,23;135:2;
136:21;141:7,13,15;
142:23,25;145:3;
150:21,24;152:24;
153:2;156:1;162:20;
163:17;170:17,24;
171:7;172:2;173:5,7;
179:7;201:11
**releasing (7)**
54:16;69:20;76:2;
116:11;148:7,12,25
**relevant (7)**
58:8;98:2;141:1;
157:6;170:6;175:22;
187:8
**relied (2)**
169:24;171:13
**relief (8)**
29:2;51:13;96:5;
97:12;159:18,18;
191:9;192:1
**relies (1)**
84:1
**rely (4)**
113:6;150:11;
171:19;177:8
**relying (2)**
92:20;150:13
**remain (1)**
131:18
**remaining (8)**
37:21;39:25;46:4;
85:16;87:5;88:2,4;
179:2
**remains (1)**
97:3
**remarkable (1)**
162:12
**remarkably (1)**
54:15
**remedy (2)**
60:3;64:25
**remember (3)**
90:2,7,9
**reminding (1)**
137:22
**remiss (1)**
137:21
**remotely (1)**
173:2
**rendered (1)**
177:4
**rendering (1)**
42:12
**reorganization (3)**

31:24;46:5;71:6
reorganized (2)
    37:24,25
repaid (3)
    50:25;51:17;171:4
repeated (1)
    42:23
repeatedly (5)
    40:22;41:8;48:24;
    52:11;112:5
repeating (1)
    123:14
replaced (1)
    42:3
reply (2)
    163:3;173:19
reported (1)
    35:4
represent (2)
    39:6,23
representation (2)
    64:7;164:12
representatives (4)
    39:20;81:6;148:2;
    172:1
represented (5)
    80:8,10;110:22;
    148:3;156:10
repudiate (1)
    196:14
request (15)
    29:2;33:1;39:5;
    97:16;156:1;159:6;
    160:10;161:19;
    180:25;181:7;183:17,
    25;184:24;185:2;
    193:7
requested (6)
    32:20;54:18;96:5;
    97:13;129:25;130:19
requesting (1)
    162:16
require (11)
    67:13;83:4;88:4;
    92:1;110:24;111:18;
    119:6;122:6;140:8;
    141:13,15
required (18)
    55:19;66:8;73:5;
    92:6;93:24,25;98:14;
    104:4;109:4,15;
    111:3;116:17,19;
    121:2;129:5;144:23,
    25;150:8
requirement (5)
    85:20;110:14;
    111:13;115:24;153:6
requirements (7)
    80:17;97:13;99:18;
    143:1;179:12;184:2;
    185:2
requires (3)
    81:25;82:16;108:19

research (1)
    103:22
researching (1)
    103:10
reservations (1)
    191:2
reserve (2)
    32:23;197:21
reserves (3)
    118:6;198:12;
    199:22
reserving (1)
    189:9
resolvable (1)
    39:17
resolve (4)
    103:6;104:15;
    193:19;199:5
resolved (2)
    29:3;38:25
resolves (1)
    103:14
resolving (1)
    39:15
respect (22)
    32:15;38:7;61:4;
    65:3;79:23;104:21;
    109:19;134:12;
    136:13;150:21,23;
    153:3;170:3;171:12,
    22,23;176:3;183:19;
    185:3,5;195:17,18
Respectfully (1)
    59:19
respond (4)
    92:10;139:12;
    161:5;200:11
responding (1)
    41:13
response (13)
    58:23;59:13;116:2;
    125:18,20;128:20;
    134:13;135:23;
    156:17;163:5;168:19;
    183:23;187:18
responses (1)
    47:20
responsible (1)
    144:6
responsive (1)
    169:23
rest (11)
    43:11;54:11;55:5;
    58:2;60:20;161:11;
    174:12;175:19;180:3,
    22;181:15
restart (1)
    190:2
restatement (38)
    59:17;64:3;84:21,
    23,23;85:2;86:24;
    87:6;90:18,20;91:1;
    92:16,23;115:23;

117:22;119:5;121:12;
    126:24;127:13;131:6,
    20,22;132:25,25;
    134:8;135:5,5,11,12;
    143:14;146:19;149:6,
    15,25;151:14;170:3,
    6;174:2
restatement's (1)
    149:13
rested (1)
    54:7
restrained (1)
    191:3
rests (1)
    173:23
resubmit (1)
    41:15
result (10)
    54:25;95:13;
    124:10;139:17,25;
    140:25;141:2;142:4;
    155:3;192:23
results (1)
    192:17
resume (1)
    175:19
Retail (1)
    86:10
retain (1)
    62:22
reticulated (1)
    81:13
return (4)
    71:3;138:25;139:5;
    179:13
returned (4)
    49:25;61:14;83:15;
    90:8
returning (3)
    61:18;85:21;178:18
REUBEN (1)
    8:19
re-up (1)
    51:4
review (2)
    139:1;143:3
reviewed (1)
    153:4
revised (2)
    182:17;187:23
revisit (1)
    142:7
revisited (1)
    111:17
Revlon (1)
    53:8
revolver (1)
    182:1
revolving (3)
    38:1,11;51:4
rides (1)
    192:3
ridge (1)

187:20
right (204)
    27:21;28:2,6,10,11,
    19,25;29:19,25;30:3,
    22;32:23;33:3;34:1,8;
    43:13,15;44:16;
    47:14,24;50:13,15,21;
    52:4;53:14;59:7,25;
    61:5;62:5;66:11;69:7;
    73:16,24;74:20;76:6,
    22;78:24;79:7,17;
    80:12,15;82:14,21,24;
    83:12,12;86:20,25;
    87:7;88:4,13;89:12;
    92:1,21,25;93:8;94:5;
    95:1;96:2,7,17;97:17,
    21;98:20;100:17,21;
    101:4,8,18;102:16;
    105:9;106:14,21;
    107:15,16;108:2;
    110:1;112:24;113:1,
    15;114:7,13,16,18,22;
    115:1,5;116:6,6;
    117:5,7;121:3;
    122:16;123:12;
    126:15;127:11,19;
    129:19;130:2,20;
    131:9,15;135:20,20,
    20;136:18;137:17,17;
    138:2,2,3,11,21;
    141:11;142:19,22;
    143:8,17;144:4,19,19;
    145:3,5,24;146:13;
    149:5,12,14;150:9;
    151:5,23;152:4,7,19;
    154:4,12,19;156:20,
    21,23;157:21;158:20,
    22;159:8,13,19;
    160:22;161:12;162:4,
    23;163:4;168:14,18;
    169:13,25;171:24;
    172:9;173:11;174:16;
    177:14;179:5,22;
    180:9;182:6,9;183:1,
    13,21,23;184:13,17,
    21;186:13,20;187:7,7,
    15,16;188:25;189:9;
    190:5,19;193:2,9,20;
    194:1,7,10,21;196:9;
    197:17,21;198:12,16;
    199:21;200:19,25;
    201:2,13,17,18;202:1,
    12,14
rightfully (1)
    128:1
rights (16)
    37:23;38:12;52:12;
    79:2;93:20;109:3;
    115:4;118:6;120:5;
    148:17;155:6,19;
    168:9;176:3;185:20;
    199:23
rigorous (2)

66:23;67:5
RINGEL (1)
    17:2
ringing (1)
    37:5
rise (1)
    119:3
risk (5)
    54:9;62:8;157:24;
    184:10;186:23
risks (1)
    41:21
Road (2)
    13:15;199:2
ROBERT (3)
    13:8;25:25;32:5
Robertshaw (2)
    57:23;58:14
Robertson (8)
    31:18;184:15,18,
    19,23;188:21;189:11,
    25
ROCHESTER (1)
    10:25
Rockefeller (1)
    10:22
roll (1)
    182:3
rolling (1)
    182:2
room (1)
    34:24
ROSA (1)
    12:16
ROSE (1)
    19:12
ROSENMAN (1)
    10:20
ROSENZWEIG (1)
    19:17
ROSS (1)
    17:8
ROTH (2)
    8:13;22:2
rough (1)
    161:16
roughly (2)
    123:24;200:12
Routh (1)
    23:4
routinely (1)
    53:6
row (1)
    170:5
RSA (48)
    49:17;51:6;74:22;
    75:1,19;76:9,13;79:1;
    80:5;85:8;91:11;
    96:25;97:3;99:24;
    109:11,24;110:5,14;
    111:8,11,19,22;
    119:25;120:14,20,20;
    121:23;122:21;124:8;

127:25;129:3,4,17;
143:24;144:12,16,17,
22,23;145:7;153:15,
22;154:9;156:9,10,
15;171:3;175:23
**RSA's (1)**
128:24
**Ruben (2)**
28:22,22
**RUBIN (5)**
20:19;98:23,23;
100:11,18
**rubric (1)**
68:18
**rule (21)**
42:19;46:25;55:16;
81:25,25;85:2;86:11;
112:2;131:21;139:7;
148:5;150:3,4,8;
151:3,4;162:16;
195:22;196:7;197:15;
198:10
**rules (7)**
36:19;67:16;
119:13;151:1;158:3,
3;198:17
**ruling (5)**
54:22;62:3;142:9;
157:18;186:2
**rulings (1)**
139:25
**run (4)**
179:22;184:9;
195:9,24
**rung (1)**
64:7
**running (1)**
180:10
**runs (2)**
58:9;149:16
**runway (1)**
179:22
**RYAN (2)**
15:25;26:18

**S**

**Sabadell (2)**
6:3,11
**Sachs (1)**
26:20
**sacrifice (1)**
120:6
**sad (1)**
41:25
**safeguards (1)**
81:14
**salesman (1)**
124:15
**salesperson (2)**
124:15,18
**same (22)**
31:6,7;34:17;73:20;

87:14;88:17,20;93:2;
112:13;118:14;
126:12;142:15;
151:11;152:1;163:10;
175:5;180:11;181:13;
182:5;186:17;196:5;
198:23
**Samsung (3)**
167:17,20,22
**sand (1)**
154:21
**SANZOTTA (1)**
21:7
**sat (1)**
91:20
**satisfied (2)**
85:3;179:12
**satisfies (3)**
82:21;97:13;99:17
**satisfy (6)**
111:12;115:24;
132:7;134:1,2;170:11
**save (3)**
46:18;94:20;189:2
**saving (1)**
36:23
**Savings (2)**
8:14;22:3
**saw (3)**
54:5;167:22,24
**saying (29)**
58:15,18;77:24;
86:19;98:12;104:20;
119:1;124:20;129:8;
132:5;135:1,4,6,9,13;
146:24;147:15;
150:16;151:8;152:5;
153:9;163:18,22;
165:7;172:21;173:4;
178:14,16;195:14
**schedule (4)**
102:12;176:2;
177:1;196:16
**scheduled (1)**
50:7
**schedules (1)**
50:4
**scheduling (1)**
201:23
**scheme (1)**
191:8
**SCHIFF (1)**
14:12
**SCHNEIDER (1)**
24:8
**SCHOLER (2)**
12:2,11
**school (1)**
198:6
**SCHULTE (2)**
8:13;22:2
**scope (1)**
172:5

**score (1)**
50:2
**SCOTT (3)**
9:18;21:8;26:14
**screw (1)**
31:22
**scrutiny (1)**
173:23
**SDNY (3)**
36:7;71:15;72:8
**sea (1)**
28:12
**sealing (9)**
43:2;178:18;183:3,
12,15,15,19,23;184:1
**Sean (1)**
180:16
**Seaport (1)**
26:14
**searched (1)**
102:16
**seated (1)**
27:2
**seats (4)**
195:7,8,10,13
**SEC (13)**
28:3;33:13;40:2;
50:10;52:5,10;74:23;
75:1;76:8;79:24;
100:22;138:21;
158:10
**SEC' (1)**
75:22
**second (21)**
29:15;30:17,20;
32:14;40:24;60:18;
61:22;66:2,22;70:25;
72:20,23,24;73:1;
83:20;86:1;115:24;
124:18;132:4;136:23;
187:12
**second- (1)**
40:13
**secondary (1)**
133:16
**second-lien (2)**
42:10;46:11
**seconds (3)**
49:21;94:10;176:22
**SEC's (7)**
79:7;141:3;143:23;
144:3;145:6;149:10,
18
**Section (10)**
114:19;115:2;
155:14;163:9,9;
166:7;184:3;185:2,
10;188:2
**Secured (17)**
20:13;21:3;28:20;
37:18,20,21;39:20;
50:23;51:2;96:25;
98:22,25;120:13;

128:8;137:3,6;139:3
**SECURITIES (6)**
17:11,12;28:5;
101:16;138:9,23
**security (3)**
84:3;166:13,22
**seeing (1)**
28:11
**seek (2)**
188:20,24
**seeking (1)**
31:23
**seeks (1)**
191:4
**seem (11)**
58:12;75:2;86:3;
89:15;103:14,15;
105:21;124:14;
135:13;138:19;
192:12
**seemed (1)**
66:5
**seems (17)**
30:3;74:16;91:24;
111:8,10;112:15;
125:16;126:10;
142:14;150:7;154:19,
24;155:1;188:13;
192:16,17;198:7
**SEHAM (2)**
12:19,19
**seldom (1)**
59:10
**selectively (1)**
135:11
**selling (1)**
137:2
**send (12)**
88:12;116:19;
126:7,13;148:24;
168:4;181:22;184:7,
8;193:4,4;202:5
**sending (4)**
89:8;105:12;125:8;
126:11
**Senior (12)**
20:13;21:3;28:20;
37:18,21;39:20;
98:21,25;120:13;
137:3,6;139:3
**sense (17)**
47:19;95:2;101:1;
111:20;123:11;135:4;
143:6;161:12;166:3;
168:9;177:16;188:1;
192:13;198:16;199:4;
200:9;202:3
**senses (1)**
43:22
**sensible (1)**
164:1
**sensitive (1)**
183:25

**sent (16)**
49:23;62:20;79:21;
80:6;82:20;83:12;
89:23;90:2;93:11;
103:23;104:18;
106:11;123:24;158:8;
168:6,13
**separate (11)**
30:19;72:22;73:12,
21;77:23;85:1;
116:20;134:11,16;
146:8;164:2
**separately (3)**
42:12;51:19;56:14
**separating (3)**
73:12;74:9;78:5
**series (1)**
185:9
**seriously (1)**
195:19
**seriousness (1)**
60:1
**served (1)**
198:8
**service (2)**
50:2;165:11
**services (4)**
85:5;127:15;
129:12,13
**set (15)**
70:9;72:18;81:13;
106:24;111:19;146:1;
151:3;167:25;172:3,
25;184:9;187:3;
199:17;200:1,21
**sets (6)**
42:14;195:9,13,25;
196:17,18
**settle (1)**
196:5
**settled (1)**
148:9
**settlement (7)**
73:7;80:22;81:15;
102:11,17;171:24;
195:20
**settlements (1)**
172:8
**seven (2)**
165:2;181:25
**seventeen (1)**
68:17
**Seventh (4)**
22:13;35:3,23;
79:19
**seventy-six (1)**
165:4
**several (5)**
32:3;35:16;45:11;
59:2;102:24
**SEWARD (1)**
6:19
**shall (5)**

84:4;118:20,23;
166:14,17
**shape (1)**
112:1
**SHARA (4)**
11:7;28:8;33:24;
107:13
**shared (1)**
182:20
**shareholder (3)**
44:11;88:3;140:6
**shareholders (8)**
43:17,18;44:19;
45:6,8;56:19;121:8;
124:24
**shares (2)**
42:11;46:10
**SHAW (1)**
5:12
**SHAYA (1)**
10:25
**sheet (1)**
37:25
**SHERIDAN (1)**
26:19
**shining (2)**
46:22;63:5
**ship (3)**
195:25;196:16,17
**short (5)**
42:11;185:13;
187:5;192:17,22
**shortly (1)**
191:17
**shot (1)**
32:12
**show (7)**
59:22;78:14;
113:22;126:5;132:17,
18,19
**showed (2)**
97:10,11
**showing (2)**
92:17;163:4
**shows (1)**
69:6
**SHU (1)**
19:18
**shut (2)**
29:4;169:21
**Shutts (1)**
82:14
**shy (1)**
46:12
**sic (1)**
86:11
**side (9)**
42:9;53:3;61:10;
63:2,5;73:9;135:2;
141:24;194:19
**sides (1)**
126:12
**SIENA (1)**

8:8
**sight (1)**
61:16
**sign (7)**
70:21;88:12;112:1;
144:16;154:25;181:9;
200:20
**signal (1)**
30:10
**signaled (1)**
63:11
**signed (12)**
75:19;102:10;
110:22;118:23;120:2,
3;143:24;144:22;
145:7;166:17,23;
184:5
**significant (1)**
150:20
**significantly (1)**
176:12
**signing (3)**
89:7;110:25;144:17
**silence (13)**
62:14;84:23;85:16;
86:4,12,23;87:3;
117:19;119:3;131:5,
18,21,24
**silent (5)**
85:16;87:5;88:2,4;
131:18
**SILVERBRAND (1)**
26:20
**SILVERMAN (1)**
24:17
**similar (7)**
53:13;58:14,14;
84:8;113:17;133:9;
140:5
**similarly (3)**
49:13;105:19;126:3
**SIMONIAN (3)**
26:21;32:6;34:10
**Simonian's (1)**
45:19
**simple (5)**
62:7;177:23;
196:12;197:10,14
**simply (14)**
40:12;41:5;45:9;
46:6;47:2;50:24;54:9;
60:2;73:13;112:19;
114:3;162:16;183:7;
196:23
**simultaneously (1)**
57:22
**single (21)**
35:14,16,18,18,19;
38:18,18;41:14,16;
49:19;52:19;56:17;
67:18;71:15;72:11;
86:17;97:8;104:6,7;
169:20;174:8

**single-issue (1)**
40:1
**sinister (1)**
129:24
**sisters (2)**
65:4;93:18
**sit (4)**
155:24;161:21;
192:24;201:9
**sitting (2)**
155:4;201:4
**situated (3)**
49:13;105:20;136:7
**situation (4)**
45:15;50:17;
139:11;144:20
**situations (3)**
92:1;136:4;149:9
**six (1)**
67:6
**Sixth (1)**
21:13
**size (4)**
35:5;36:15;121:12;
188:5
**slated (1)**
40:14
**sleazy (1)**
86:22
**slightly (6)**
31:15;59:20;
141:25;160:16;
162:23;164:2
**slot (1)**
201:24
**small (3)**
54:7;111:9;141:8
**smaller (2)**
153:18;154:14
**Smallhold (23)**
61:2,10,11,13,16;
62:10,15,19;65:11;
67:19;69:9;89:2;93:9;
112:15;117:11;133:9;
146:9;147:3;152:18;
169:12,25;171:13;
172:14
**smartly (1)**
194:11
**smiling (1)**
36:12
**SMITH (4)**
14:9;23:8;25:8,9
**Society (2)**
8:14;22:3
**soft (1)**
175:20
**sold (3)**
91:14;120:8;190:5
**solicitation (4)**
32:13;52:10;62:1,4
**solution (1)**
197:3

**Solutions (5)**
5:3;29:12;38:21;
43:7;194:12
**solve (1)**
169:6
**solvent (1)**
42:12
**somebody (18)**
30:10;79:1;101:23;
115:17,21,22,24;
120:8;124:23;131:23;
133:1;137:2,3;
144:21;154:20;159:5;
173:20;180:2
**Somebody's (3)**
98:8;114:22;200:7
**somehow (8)**
62:1;159:5;164:4;
165:24;166:1;169:4;
172:11;179:4
**someone (12)**
29:11;30:4;31:4;
67:12,13;73:18;
81:20;93:19;133:12;
143:16;156:10;
173:20
**sometimes (2)**
140:18;183:14
**somewhat (5)**
40:23;83:5;141:1;
151:24;201:5
**somewhere (4)**
36:12;155:4;169:7;
198:14
**song (1)**
138:18
**soon (7)**
103:23;155:11;
192:2,8,8,22;193:10
**sooner (1)**
196:2
**sophisticated (9)**
79:3,14;110:23;
120:21;155:23,25;
156:2,9,11
**sophistication (7)**
79:4;120:14;124:6;
155:23;156:12;
169:18;188:5
**sorry (12)**
34:13;74:24;82:22;
98:11;101:20;109:14;
116:6;130:14;133:13;
135:18;178:2;186:5
**sort (83)**
51:22;57:5;58:20,
24;59:14;60:8,22;
64:24;66:5,6;68:23,
24;69:8;76:13;80:14;
81:22;86:22;91:23,
25;93:5;95:19;99:25;
100:8,9;106:4;
114:24;118:3;120:15;

121:17,22;123:1,2,4;
126:2;127:3,15;
136:22;140:19;
143:21;145:11,12;
146:18;149:8,18;
152:2;153:11;154:10;
155:22,25;156:17;
158:4;160:16;165:16,
24,25;166:1;168:15,
15,23;169:4,6;171:15,
19,19;172:5,12;173:8,
11,13;175:22,24;
176:16;177:12,16;
182:7;184:8;185:19;
186:10;196:16;
197:15;198:3,3;200:7
**sorts (2)**
118:7;168:19
**sought (3)**
80:11;118:24;
166:18
**sound (1)**
191:19
**sounding (1)**
198:22
**sounds (5)**
114:13;120:3;
145:10;146:23;
198:20
**source (12)**
45:7;58:5,13,19;
59:5,17;62:12;109:5;
135:9;140:24;149:4;
150:14
**South (6)**
6:12;7:14;15:22;
18:4;19:4;21:13
**Southern (5)**
55:2;57:25;93:15;
94:19;180:17
**SPAHR (1)**
25:12
**spare (1)**
195:8
**speak (13)**
27:3;31:9;52:2;
75:17;86:13;100:25;
101:16;142:11;159:6,
15;160:9;173:25;
185:25
**speaking (3)**
31:20;69:12;177:9
**speaks (1)**
51:18
**special (1)**
80:14
**species (1)**
83:5
**specific (19)**
58:19;68:2,24;
76:14;87:10;92:17;
95:23;116:5,25,25;
134:8;135:24,24,25;

143:9;146:21;158:17;
159:22;184:4
**specifically (8)**
33:15;58:22;75:7;
80:2,3;84:8;103:12;
169:12
**spectrum (2)**
51:22;63:2
**speculation (1)**
125:1
**speculative (1)**
61:23
**speech (1)**
121:18
**speed (2)**
35:11;182:7
**spelled (1)**
32:9
**spend (7)**
173:10;188:1;
190:20;191:21,25;
197:5;199:6
**spends (1)**
166:7
**SPENGLER (1)**
15:25
**spent (4)**
45:11;165:6;
167:16;170:4
**spike (1)**
90:2
**Spirit (32)**
26:9,19;27:13;
31:16;35:3;38:5;39:6;
40:8,8,21;41:11;45:2;
52:24;91:14;94:12;
99:2,10,12;102:7,9,9;
104:7;120:8;159:7;
180:18;190:10,23;
191:5;194:13,17,19;
196:4
**Spirit's (5)**
31:24;40:9,19;
195:7;197:8
**split (1)**
40:23
**spoken (1)**
142:11
**spot (1)**
132:22
**Springs (1)**
18:4
**Square (4)**
11:13;24:14;53:9;
135:8
**squared (1)**
73:17
**squarely (1)**
93:20
**stake (1)**
40:3
**stakeholders (8)**
40:10;42:22;50:15;

70:5,10;81:10;94:13;
169:19
**stakeholders/the (1)**
77:17
**STAMER (2)**
20:20;28:24
**stand (2)**
69:15;170:19
**standalone (3)**
69:19;72:12,22
**standard (3)**
65:13;86:20;179:14
**standing (1)**
104:1
**STARR (1)**
24:18
**start (13)**
27:12,15;30:23;
95:3;99:1;101:2;
107:2;181:15;194:13,
24;195:2;196:8;
197:14
**started (1)**
186:10
**starting (1)**
66:16
**state (47)**
59:16;67:20;70:18,
22,25;71:14,22;72:7;
75:13;78:7;83:24;
84:8;90:12,20;
110:19;111:17,18;
117:13,15,17,18,25;
119:6,10;135:13,14,
15;138:5;143:12;
146:19;147:4,14,17,
18;149:5,11,13,18,23;
150:1;151:10,10;
171:12,13,16;174:3,4
**stated (11)**
40:22;57:7;85:14;
86:25;131:16;141:14;
147:4,20,25;157:6,11
**statement (19)**
31:25;34:7;43:1;
45:20;95:7;96:19;
99:16,20;104:25;
143:4;147:7;153:1;
157:10,17;178:11;
180:21;181:1,3,8
**statements (6)**
29:17;34:11;39:22;
58:6;95:3;179:14
**STATES (29)**
11:2,3,11,12;12:3,
12;28:7,9;33:25;
35:17,20;70:23;
102:17;105:1;106:19;
107:14;109:16;
110:18;118:11;
134:10;136:11;
140:21;143:13;
149:24;167:8;180:17;

182:12,16;190:22
**station (1)**
87:2
**statistical (1)**
50:2
**status (2)**
43:5;160:14
**statute (6)**
60:6;71:9;84:1;
139:7;163:6,21
**statutory (4)**
81:13;164:6;184:3;
191:8
**stay (6)**
159:19;161:24;
191:9,11;192:2;197:8
**stayed (1)**
192:19
**staying (1)**
192:20
**Stearns (1)**
53:6
**Stein (1)**
84:6
**step (2)**
112:24;162:10
**Stephen (2)**
43:6;190:13
**STEPHENIE (2)**
26:8;32:8
**steps (2)**
44:2;186:11
**STEVEN (2)**
26:5;159:12
**STEVENS (1)**
23:11
**stick (1)**
154:21
**Stickles (3)**
55:3,12,15
**still (12)**
43:4;57:11,13;72:9;
74:6;77:13;128:4;
130:8;168:8;179:25;
190:12;194:16
**STINSON (1)**
24:2
**stipulation (2)**
199:11;200:20
**stockholder (1)**
40:7
**stone (1)**
181:12
**stop (2)**
72:2,6
**stopped (1)**
59:3
**store (1)**
167:18
**straggling (1)**
153:16
**straightforward (2)**
40:20;195:16

**STRAUSS (4)**
20:12;21:2;28:23;
98:24
**strawman (1)**
56:8
**stray (1)**
69:2
**Street (20)**
5:4,14;9:4,13;
10:14;12:21;13:4;
14:4;15:13,22;17:13;
18:4,13;20:4;21:4,13;
23:4;24:4;25:4,14
**strike (2)**
120:9;124:7
**stringent (1)**
143:1
**stronger (2)**
91:10;152:10
**struck (1)**
42:18
**structure (6)**
56:5,17;61:17;
78:11,17;187:3
**structured (2)**
57:3;131:11
**structures (1)**
74:13
**struggled (2)**
122:13;140:14
**struggling (4)**
135:3,7;142:18;
143:11
**STS (1)**
23:12
**stuck (2)**
77:5;124:14
**students (1)**
198:6
**stuff (7)**
130:20;165:20,23;
166:6;173:13;174:12;
177:23
**style (1)**
71:23
**subject (12)**
56:17,20;72:24;
75:8;130:18;131:9;
173:7;176:15;179:2,
9;184:1;186:7
**submit (8)**
72:2;88:23;123:22;
145:22,23;155:18;
187:22;193:17
**submitted (8)**
44:11;95:3;146:11;
178:12;179:8;180:25;
181:9;199:11
**subordinated (1)**
56:22
**subsequent (1)**
108:7
**subsequently (1)**

55:12
**subsets (1)**
92:18
**substance (1)**
192:19
**substantive (1)**
185:19
**substantively (1)**
186:24
**subtext (2)**
165:24;172:10
**subtleties (1)**
96:3
**success (4)**
35:1;37:5;45:13;
99:13
**successfully (1)**
39:13
**sue (2)**
124:11;138:2
**suffice (1)**
175:13
**sufficient (17)**
47:3;52:14;61:20;
62:14;73:3;80:19;
112:14;113:7;132:3;
144:17;149:23;
150:12;163:19;
165:13;169:20;
173:25;193:1
**sufficiently (1)**
90:16
**SUGARMAN (1)**
11:19
**suggest (7)**
100:4,5;101:14;
131:22;154:24;
177:18;198:21
**suggesting (1)**
100:7
**suggestion (4)**
160:25;161:4;
189:12;191:6
**suggests (1)**
128:16
**suitcase (1)**
50:6
**Suite (18)**
5:6;13:7;15:8;5:
9:14;11:22;12:5;
13:16;14:5;15:14;
17:5,14;18:5;20:5;
21:14;23:5;24:5;25:5
**summary (1)**
42:24
**sum-up (1)**
135:12
**SunEdison (5)**
53:18,23;54:1,6;
64:9
**Sungard (1)**
53:7
**super (7)**

71:7;76:13;90:14;
105:9;171:15;176:1;
177:2
**superior (2)**
112:19,22
**supervision (1)**
66:22
**Supp (2)**
86:9,11
**supplement (1)**
182:7
**supplemental (1)**
32:14
**supplements (3)**
37:10;38:8,9
**support (14)**
32:3;37:25;39:22;
56:2;57:2;94:23;95:2,
7;96:5;97:6,12,12;
99:24;191:9
**supported (4)**
72:22;81:3;97:3;
183:3
**supportive (2)**
96:9;100:15
**supports (2)**
54:18;95:22
**suppose (5)**
87:11;127:24;
130:18;131:4;132:8
**supposed (4)**
35:2;46:23;70:20;
195:9
**Supreme (10)**
57:6;58:6,12;59:23;
82:12;83:19;141:14,
25;142:6,7
**sure (65)**
30:15;31:5;33:14;
44:21;50:18;60:7;
70:19;75:10,15,15;
86:16;92:10;98:8;
103:1,14;106:1,6,7,
11,12;107:7;109:7;
111:5;113:13;115:13;
118:2;119:22;120:17;
122:18;126:25;127:5;
129:10,11;133:24;
134:25;136:25;
137:15,19;141:24;
144:1;145:12,17;
146:10,25;147:18;
149:24;150:1;157:5;
160:10;161:20;
165:19;166:5;167:13;
170:19;173:11;
175:20;176:17;
177:22;180:5;182:11;
186:17;191:12;193:7;
194:1;200:15
**surgery (1)**
79:16
**surprise (2)**

57:17;172:23
**surprised (2)**
52:25;53:20
**surprising (1)**
74:13
**survives (1)**
173:22
**suspect (1)**
188:8
**SUSSKIND (1)**
11:19
**swiftly (1)**
35:22
**syllogism (1)**
166:23
**system (7)**
35:2;37:5;46:22;
47:2;169:21;173:23;
185:7
**systems (1)**
186:22

**T**

**tab (2)**
187:10,15
**tabulation (3)**
32:13;49:22;139:1
**tailored (2)**
170:23;172:2
**takeaways (1)**
117:9
**talk (28)**
38:4;52:24;61:9;
64:19;68:12,12;
69:13;71:1,5;72:7;
76:11;78:22;83:2;
84:21;87:15;97:19;
111:17,24;112:10;
134:1;148:18;158:5;
159:25;161:15;
165:14;170:25;
186:10;198:22
**talked (4)**
60:19;68:14;83:1;
86:4
**talking (25)**
86:5;87:13;110:3,3,
11;137:5;140:24;
148:6,21;151:15;
152:20;155:13;
159:19,22;161:19;
184:8;186:1,9,12;
187:4;189:18;191:22,
25;193:14;198:21
**talks (4)**
77:20;86:11;87:6;
95:12
**tantamount (1)**
55:24
**targeted (1)**
184:4
**Taxing (1)**

38:21
**team (2)**
45:3;47:8
**Technicolor (2)**
63:10;87:3
**Technologies (1)**
24:3
**technology (1)**
30:8
**tedious (1)**
136:10
**teeny (1)**
167:19
**Telesis (1)**
10:3
**telling (2)**
104:12;175:3
**tells (1)**
31:22
**temporary (1)**
189:6
**ten (7)**
36:9;90:3;93:17;
125:10,22;161:8;
176:22
**tended (1)**
122:12
**tens (1)**
35:10
**Tenth (3)**
65:19;77:6;90:8
**term (9)**
41:16;70:2;98:17;
109:25;110:1,2,3;
181:4;196:15
**terminated (1)**
195:15
**terms (24)**
43:18;44:13,18;
64:7,12;77:24;87:17;
91:23;95:14;98:1;
111:4;116:13;118:8;
140:14,25;149:25;
150:17;156:1,12,18;
160:13;187:2;194:24;
196:19
**terribly (1)**
179:4
**test (5)**
65:6;73:11;76:18;
87:8;142:15
**testament (1)**
96:11
**testimony (1)**
45:17
**Texas (1)**
38:21
**Texas's (1)**
57:25
**thanks (2)**
105:9;201:15
**thematic (1)**
60:14

**theme (1)**
119:23
**theories (1)**
64:6
**theory (15)**
64:20;65:1,15,16,
24;67:23;68:3,25;
69:1;78:6;88:3;141:8;
165:18;169:24;170:1
**therefore (11)**
54:17;56:23;64:24;
65:14;72:17;89:16;
127:22;132:6;145:22;
189:8;196:21
**thereof (1)**
165:12
**thereto (1)**
184:25
**thinking (4)**
125:14;147:9;
148:24;160:3
**Third (18)**
17:4;54:16;57:8;
62:15;65:4,6;83:16;
97:19;100:14;108:10;
116:10;119:18;
139:13,18;148:7;
152:25;171:23;182:2
**third- (3)**
142:24;151:4;
155:19
**third-party (25)**
54:4;56:4,15;60:1;
65:15;116:16;119:14;
120:23;134:19,21,23;
136:21;139:9,19;
140:7;141:7,9,13,15;
142:23;150:21,24;
153:2;155:13;162:20
**thirty (1)**
94:10
**Thomas (2)**
32:10,10
**THORNBURG (1)**
21:11
**though (9)**
39:4;48:24;69:6;
91:9;103:15;116:12;
148:4;152:23;170:21
**thought (10)**
44:9;48:15;66:5;
100:21;132:7;138:6;
170:23;176:22;
186:21;200:11
**thoughtful (4)**
61:3;69:9,11;177:3
**thought-out (1)**
125:3
**thoughts (2)**
64:15;137:8
**thousands (1)**
169:18
**thousandth (1)**

77:6
**Three (22)**
43:2;57:15,15,15;
85:1;86:20;90:22;
104:2;151:13;167:16;
170:7,11;172:15,15;
174:1;195:24,25;
196:6;198:9;200:1,6,
12
**three-months (1)**
51:12
**three-week (3)**
195:21;198:22;
199:9
**throughout (2)**
132:9;185:8
**throw (2)**
83:18;147:14
**throwing (1)**
121:17
**thrown (1)**
97:6
**Thursday (5)**
189:18,20,21;
201:23;202:15
**Thus (1)**
49:15
**tied (4)**
58:2;77:21;130:1;
172:2
**timeframe (1)**
198:22
**timeline (1)**
186:10
**timely (1)**
200:16
**Times (10)**
24:14;48:18;53:9;
56:20;85:23;91:19;
93:17;138:19;157:7;
164:18
**timing (3)**
67:7;175:1;177:15
**tiny (4)**
49:10;55:1;81:1;
167:21
**TISCH (1)**
26:22
**title (2)**
66:20;163:10
**TN (1)**
9:15
**Toback (1)**
31:18
**today (41)**
28:23;29:2;31:17,
20,21,23;32:4,19;
35:6;37:4;40:1;42:15,
25;43:3;44:8,15;46:6;
55:16;60:12,19;
94:12;97:11;99:2,4;
103:20;108:7;158:9;
161:1;163:13;172:19;

176:1,19;185:14;
189:18;190:21;
198:11;200:6,12,22;
202:9,13
**today's (6)**
30:23;33:6;34:5;
63:7;122:7;189:14
**TODD (4)**
15:7;18:11;27:25;
95:5
**together (10)**
40:17;72:10;176:9;
189:7;193:3;198:11;
199:18;200:11,23;
202:4
**told (5)**
56:24;93:20;
103:22;104:6;137:24
**tomorrow (1)**
199:13
**took (9)**
40:16;49:21;79:16;
95:20;109:22;140:1;
143:23;168:8;175:10
**top (2)**
66:25;79:11
**topic (3)**
76:19;127:7;161:8
**Tops (1)**
53:7
**tormenting (1)**
145:16
**tort (5)**
78:23;79:15,23;
122:16;139:10
**torts (1)**
110:12
**torture (1)**
198:6
**total (2)**
36:1;104:5
**totality (3)**
69:24;98:12,19
**totally (12)**
54:2;83:19;94:17;
103:14;105:7;164:14;
167:17;168:5;174:5;
188:17,22;199:25
**touch (4)**
92:11;95:8,10;
164:10
**touching (3)**
142:1,5,8
**toward (1)**
195:3
**track (2)**
90:11;93:23
**tracking (1)**
43:18
**trade (2)**
168:14;191:3
**traditional (1)**
71:22

**transaction (2)**
98:19;99:8
**transactions (3)**
97:2,22,24
**transcript (2)**
175:10,10
**transfers (1)**
106:8
**transparent (1)**
147:9
**travel (1)**
177:9
**traveling (1)**
46:18
**Treasury (2)**
12:3,12
**treatment (7)**
74:1;104:9,23;
163:11,11;164:2,5
**tremendous (1)**
60:14
**trend (1)**
59:21
**triaging (1)**
106:7
**trial (3)**
68:7,11;194:12
**trickery (1)**
87:7
**tricking (1)**
198:1
**tried (3)**
87:23;123:13;167:3
**trip (1)**
156:25
**trivial (1)**
46:2
**trouble (4)**
115:15;154:22;
155:4;156:4
**troubled (1)**
61:3
**troubling (1)**
73:23
**TROUTMAN (1)**
20:2
**true (17)**
34:23;55:4;60:7,10;
70:1;71:24;86:20;
87:17;108:8,12;
113:21;132:11;
142:18;143:12;
144:20;163:24;166:3
**Trust (7)**
6:20;7:3,13;8:3;
24:12;25:3;110:12
**Trustee (29)**
8:3;11:3,12;25:3;
28:9;33:25;34:1;
35:17,20;40:2;43:4;
50:10;52:5,9;55:22;
61:24;63:11;101:2;
107:14;142:20;

152:14;157:4,8;
162:16;169:12;
182:16;183:18;
188:19,23
**Trustees (2)**
89:15;110:18
**trustees' (1)**
172:12
**Trustee's (33)**
28:7;33:21,22;56:8;
57:16;58:11;64:3;
72:21;74:23;101:2,
12;106:19;109:16,23;
134:10;136:11;140:5,
17;144:5;146:7,23;
149:5;151:13;152:1,
11;153:8;158:10;
163:1;182:12;183:14;
184:25;185:1,11
**TRUSTY (1)**
17:2
**truthfully (1)**
126:5
**try (13)**
27:11;31:9;36:14;
69:15,16,23;73:15;
83:24;100:9;142:13;
154:25;161:9;180:7
**trying (17)**
29:4;46:14;113:12;
114:9,15;122:25;
123:10;124:4;130:12;
132:23;140:23;
141:17;145:17;
147:13;190:18;199:3,
23
**Tryon (1)**
25:4
**Tuesday (1)**
177:11
**TUNNELL (1)**
13:2
**turn (21)**
29:21;30:22;31:4;
33:21;52:16;59:4;
78:7;90:11;96:18;
98:21;100:20;103:18;
106:18,20;107:16;
138:21;159:7;181:14,
20;201:1,18
**turned (1)**
80:12
**turning (7)**
34:20;38:17;40:5;
47:18;75:13;100:23;
183:1
**turns (2)**
63:5;200:13
**twelfth (1)**
92:22
**twelve (2)**
78:14;93:17
**twenty (2)**

91:17;161:15
**twenty-five (2)**
112:8;123:21
**twenty-nine (1)**
81:17
**twice (1)**
42:23
**twist (1)**
69:16
**Two (40)**
21:22;33:12;39:23;
40:16;42:1;43:1;
49:17,25,25;50:3,3;
53:14,14,17;56:4;
60:11;70:14;77:6;
78:8;81:17,19;90:9,
21;92:16;94:19;
99:12;101:11;103:25;
105:20,21;106:22;
117:5;126:12;131:16;
163:3;166:2;181:25;
193:14;199:3;200:14
**TX (1)**
23:6
**tying (1)**
162:19
**type (4)**
88:2;139:21;
141:13;150:4
**types (3)**
97:25;136:9;140:2
**typical (1)**
68:13
**typo (1)**
70:19
**TYSON (1)**
16:8

## U

**UCC (1)**
195:15
**ULCCs (1)**
45:12
**ulterior (1)**
97:24
**ultimately (6)**
50:1;67:2;71:11;
172:7;173:15;201:12
**ultra-low (1)**
99:14
**Um-hum (22)**
109:10;110:7;
111:2;113:4,10,18;
115:19;116:23;
117:24;118:5;120:1,
11;121:4,13,19;
122:14,23;124:5,12;
125:25;128:6;130:3
**unacceptable (1)**
54:8
**unavoidable (1)**
42:19

**unbelievable (1)**
171:10
**unbelievably (2)**
81:13;170:16
**uncertain (1)**
41:22
**unclaimed (2)**
50:5;90:9
**unclear (2)**
33:9;182:3
**uncontested (3)**
43:2,10;165:1
**undeliverable (2)**
50:1;90:8
**undelivered (1)**
90:13
**under (59)**
40:10;47:4;52:23;
61:18;65:14;67:21;
70:5;71:8;72:18;
74:25;75:21;84:8,19,
23;86:15;89:12,18,18,
19,20;93:18;94:4;
115:23;118:13,17;
119:2,4,15,19,24;
120:17;121:17;123:9;
127:22;129:3,4;
130:10,25;131:6,8,22;
138:5;147:3,4;
153:15,21;162:25;
164:5,15;165:12,22;
171:9;174:4,23;
183:8;185:8;187:20;
195:15;196:19
**undergirds (1)**
65:25
**underlie (1)**
97:3
**underlying (1)**
98:19
**understandable (1)**
130:4
**understandably (1)**
167:1
**understandings (1)**
105:21
**understands (1)**
127:10
**Understood (4)**
100:11;142:24;
153:5;169:20
**undertake (1)**
71:22
**undertaking (4)**
118:18,22;166:11,
15
**undeveloped (1)**
63:6
**unexpected (1)**
84:17
**unfair (6)**
64:14,16;138:5,7;
171:2,11

**unfairness (4)**
109:18;137:23;
170:25;171:1
**unfold (2)**
52:3;120:15
**unfolded (2)**
124:22;201:6
**unfortunate (4)**
40:1;41:25;42:16;
47:7
**Unfortunately (5)**
40:11;45:9,14;46:3;
91:18
**UNGER (1)**
26:23
**unhappiness (1)**
63:11
**UNIDENTIFIED (1)**
98:7
**uniform (1)**
149:17
**unimpaired (36)**
38:4;42:17;46:20;
49:24;54:11;55:19;
60:13;62:19;63:7,16,
20;70:9;72:14;79:22;
80:6,25;81:19;89:24;
94:17;96:13;108:5,
11,14,16,23;115:17,
18;127:20,21;153:14;
162:22;163:22,25;
164:6;173:5,12
**unimpairment (3)**
91:6;100:13;105:19
**unimportant (1)**
60:23
**UNITED (21)**
11:2,3,11,12;12:3,
12;28:7,9;33:25;
35:17,20;106:19;
107:14;109:16;
110:18;134:10;
136:11;180:17;
182:12,16;190:22
**units (3)**
105:5,6,17
**universal (1)**
35:12
**unknowable (2)**
50:21;58:17
**unknown (1)**
177:12
**unlawful (2)**
73:18;82:8
**unless (17)**
46:24;59:22;72:16;
78:13,14;101:21;
106:19;131:15;138:8;
148:10;159:5;162:22,
22;163:11;174:11,20;
183:11
**unlike (2)**
63:14;148:6

**unmistakably (1)**
52:11
**unnamed (1)**
171:23
**unprecedented (2)**
35:13,14
**unquestionably (4)**
45:5;55:7;103:24;
104:17
**unquote (1)**
110:25
**unreasonable (1)**
62:18
**unrepresented (1)**
56:8
**unresolved (1)**
38:18
**unresponded (1)**
167:17
**Unsecured (29)**
15:3;28:1;38:3;
39:21;50:17;81:7;
91:13;92:3;95:6,25;
96:14;100:14;102:22;
103:16;120:7;123:25;
124:14;128:9,22;
129:14;132:12,16;
136:8,15;137:1,7;
154:11;165:3,18
**unsolicited (1)**
84:17
**unsophisticated (1)**
169:5
**unspoken (1)**
165:24
**unsupported (1)**
61:23
**Unsurprisingly (1)**
57:12
**unsustainable (1)**
65:17
**unthinkable (1)**
167:2
**untrue (1)**
56:25
**unturned (1)**
181:12
**unwilling (1)**
83:6
**unworkable (1)**
167:10
**up (40)**
31:4,9,22;42:15;
43:23;51:9;59:12;
77:21;88:5;97:19;
101:19;102:16;108:9;
112:17;120:3;123:1;
128:4;148:16;154:1,
25;159:4;160:17;
162:7;163:15;169:7;
171:6;172:21;173:25;
174:18;175:15;
176:18;177:7;179:23;

182:7;187:3,8;
188:12;193:17;
194:10;195:13
**updated (1)**
184:9
**uphold (1)**
74:13
**upon (1)**
113:6
**use (14)**
36:6;57:3,13;58:1;
62:11;64:13;65:13;
68:18;90:14;101:14;
106:4;108:11;110:1;
188:10
**used (11)**
55:18;59:10;68:3;
71:6;79:16;89:25;
109:25;133:20;
158:17;179:15;181:4
**uses (2)**
110:2;133:19
**using (6)**
49:20;59:24;85:21;
90:14;132:25;135:11
**usually (1)**
35:9
**utilize (1)**
49:21
**utterly (1)**
63:2;167:10

**V**

**valid (2)**
139:24,24
**validate (1)**
46:7
**validity (1)**
70:19
**valuable (2)**
114:18;138:3
**valuation (8)**
34:11;41:18;44:13,
18;45:19,20;50:13,16
**value (21)**
40:10,21;41:1,4,8,
11;42:22;45:3,7;46:8;
47:2;51:16,25;77:21,
22;89:19;115:5;
128:3,10;130:23;
178:14
**value-maximizing (1)**
46:5
**VAN (1)**
25:2
**variety (1)**
105:16
**Various (7)**
23:3;40:25;45:18;
136:3;140:25;145:18;
188:4
**vast (1)**

120:2
**VEDDER (2)**
10:2,12
**vehicle (1)**
84:19
**vein (1)**
147:10
**venues (1)**
80:14
**verbatim (2)**
73:2;172:18
**verge (3)**
185:17;187:15;
188:12
**Verizon (2)**
167:18,23
**version (2)**
76:13,14
**versus (7)**
27:7;82:7;123:4;
137:2;149:17;156:12;
171:16
**VESPER (1)**
25:18
**via (2)**
67:12;164:17
**victim (1)**
110:12
**victims (1)**
79:15
**Victor (1)**
32:10
**view (49)**
48:18;58:12,24;
59:21;60:12;76:8;
98:4,5,12,18;108:18;
109:5,14;110:13;
113:2,12;114:2;
115:23;116:21,21;
118:4;122:20;124:19;
127:23;128:20;132:1;
133:4,5,10;134:15,17;
135:23;136:3,5,23;
140:5,5;141:3,23;
144:17;149:10,12,18;
151:25;152:1,16;
170:5;197:8;201:24
**viewed (2)**
98:6,15
**views (7)**
33:23;98:1;113:16,
17;120:16;151:12,12
**violations (1)**
190:25
**violence (10)**
60:14;97:21;100:1;
101:11;103:15;
104:21;127:2,3;
138:16;159:2
**virtual (2)**
32:19;100:23
**virtually (14)**
35:13;52:8;70:8,16;

71:15,25;72:1;78:19;
80:25;83:1;85:7;91:6;
172:10,13
**virtue (3)**
97:19;105:1;116:18
**vis (4)**
44:18,18;177:20,20
**vis-a-vis (1)**
120:5
**vocal (1)**
108:4
**voice (1)**
31:2
**volume (1)**
31:4
**voluntary (3)**
48:22;71:12;173:7
**vote (46)**
53:25;54:16;55:23;
56:3,13;74:3;83:12;
88:21,21,22;89:16;
109:14;110:9;111:6;
112:5,9,10,14,19;
113:6,21,23,23;114:2,
4;115:21,22;116:17,
19;121:24;126:18;
139:1;144:23;145:1,
21;146:12,22;151:16,
24;152:13;155:9,11;
162:20;163:22,23,25
**voted (22)**
36:2;49:2;53:24;
54:4,14;61:15;94:14;
104:9;112:6,7;
115:10;123:20;133:1;
143:25;144:10,11,12,
16,22;145:9;146:4;
163:23
**Votes (6)**
35:25;36:1;39:18;
56:6;62:6;75:4
**voting (40)**
39:19;49:24;54:3,
20,21;55:18;62:9,12;
75:3,4;76:11;87:13,
13;89:7;92:3;109:12,
12;115:8,9,18;
116:13;121:23,24;
123:14,15,17;127:21;
132:2;133:6,8,8,10,
16;134:7;146:8;
151:1,2;152:9,16;
168:20
**voucher (1)**
50:6

**W**

**Wacker (1)**
19:4
**wait (6)**
33:9;87:7;127:8;
181:11;190:6;193:21

**waited (1)**
33:10
**waiting (1)**
27:3
**waive (3)**
108:24;109:3;185:2
**waiver (10)**
176:23;185:10;
186:18,21;187:22;
188:2,20,24;189:4,8
**waiving (1)**
185:19
**walk (3)**
59:15;127:3;158:5
**walked (3)**
41:14;42:7;69:8
**Walrath (4)**
55:3,11,15,17
**WAMU (2)**
55:9,17
**wants (7)**
95:24;101:23;
179:19;182:13;
186:25;191:23;
194:24
**war (1)**
188:8
**Wardwell (2)**
181:19;184:19
**warrant (1)**
38:12
**WARREN (2)**
19:9;28:18
**Washington (3)**
12:14;14:6;21:5
**wasted (1)**
94:20
**water (1)**
168:2
**waterfront (1)**
95:9
**waved (1)**
61:23
**way (79)**
30:12;34:9;44:3;
53:24;59:20,23;60:4;
61:1,1;62:16;64:8;
69:15;74:13,13;
80:17;83:10;84:6;
85:9;87:15;91:17,24;
108:14;112:1,24,25;
113:1,1,3;118:14;
120:15;121:12,14;
122:2;124:15,21;
125:1,1;126:4,13;
130:13;131:1,10,12;
132:1,9;133:12,13;
134:6;139:24;140:6,
15;142:10,23;146:20;
150:15,19;152:6;
164:20,20,20;168:22;
171:2;173:21;174:2,
12;175:14;178:21;

184:9;185:15,17,18;
186:22;188:12,13;
189:23;193:7;195:4;
198:17;201:6
**ways (9)**
52:13;68:13,13;
79:22;102:24;142:22;
152:25;160:8;163:16
**weeds (1)**
120:9
**week (7)**
175:14,22;176:1,9;
189:18;190:3;199:3
**weeks (16)**
52:15;57:15;
172:15;185:13;186:1,
9;188:16;191:23;
193:14;195:24;196:6;
197:4;198:9;200:2,6,
12
**weeny (1)**
167:19
**weigh (1)**
98:14
**weighing (3)**
57:9;96:3,5
**weight (3)**
27:9;53:13;61:7;
72:4;73:5
**Weinberg (4)**
10:21;26:16,21;
32:7
**Weiss (1)**
86:10
**welcome (2)**
105:23;162:4
**welding (1)**
54:16
**WELLS (21)**
11:8;178:4;182:12,
15,15,22,24,25;
183:16,18,18;185:21,
22;186:4,6,8,20;
187:1;189:12;190:1,4
**Wells' (1)**
187:18
**weren't (6)**
50:15;126:1;
127:21;132:25;
143:23;160:5
**West (3)**
5:14;12:4;21:22
**Western (1)**
84:1
**whale (1)**
36:13
**whatever's (1)**
128:10
**what's (21)**
43:18;51:21;58:23;
61:1;65:18;68:10;
111:8;116:2;127:22;
133:2,9;135:25;

136:3;140:16;141:3;
149:9,12,18;171:2,11;
186:25
**whatsoever (1)**
133:15
**whenever (2)**
122:11;189:6
**where's (2)**
106:10;168:11
**Whereupon (1)**
202:17
**WHITE (4)**
6:2,10;12:23;36:13
**whole (14)**
98:18;104:6;
113:11;118:19;
122:16;142:1;148:22;
157:9;166:12;192:13;
195:13;196:14,17;
200:9
**who's (10)**
27:16,22;28:18;
33:13,22;81:12;
103:2;124:23;156:7,
10
**whose (4)**
29:3;67:9;83:6;
94:19
**who've (1)**
110:21
**wildly (2)**
30:11;54:17
**Wiles (7)**
53:18;54:7,14,20;
64:9;112:15;133:7
**WILLIAM (1)**
7:9
**WILLIAMS (1)**
9:18
**willing (1)**
157:24
**willingness (4)**
138:13;156:24;
159:1;176:14
**WILLKIE (3)**
15:2;27:25;95:6
**Wilmington (10)**
6:20;7:3,13;8:3,6,
14;13:6;22:3;25:3,16
**win (5)**
72:9;90:19,21;
121:16;177:3
**WINTHROP (1)**
5:12
**wiped (5)**
44:14;47:9;77:8;
88:3;124:24
**wire (1)**
106:7
**wired (1)**
168:11
**wisdom (1)**
117:25

**wish (4)**
33:7;40:11;89:5;
179:3
**wishes (5)**
33:5,11;100:20;
106:20;183:22
**withdraw (1)**
52:5
**withdrawn (2)**
38:20;171:11
**withhold (1)**
70:12
**within (3)**
173:24;196:6,24
**without (13)**
36:10;51:17;
115:16;116:16;123:1;
127:18;128:12;
132:24;135:15;138:3;
164:20,22;197:11
**witness (3)**
32:25;33:17,21
**witnesses (3)**
32:21;33:8,17
**wonderful (2)**
69:7;165:25
**wondering (1)**
159:14
**word (6)**
108:11;133:19,20;
142:14,16;190:19
**worded (1)**
86:2
**words (7)**
77:22;78:10;86:24;
92:7;108:19;114:12;
162:21
**work (17)**
30:12;35:2;36:18;
41:10,23;96:11;99:4;
110:19;140:19;149:8;
164:9;168:25;169:2;
188:19,23;189:21;
198:18
**worked (3)**
38:14;89:25;90:6
**working (5)**
36:19;82:3;129:11;
147:10;175:6
**workload (1)**
36:23
**works (8)**
30:11;85:1;131:1;
157:23;165:23;
175:21;201:25;202:4
**World (9)**
38:23;43:23;45:11;
57:20;67:9;104:6;
130:9;167:7;179:1
**worries (1)**
48:19
**worry (2)**
185:19;200:7

**worrying (1)**
173:10
**worse (4)**
51:9,14;143:18;
164:20
**Worth (3)**
38:25;40:17;114:19
**wrap (1)**
162:7
**wrapping (1)**
188:12
**wrestle (1)**
69:10
**write (3)**
118:7;177:2;198:6
**writing (9)**
48:7,9;49:15;84:4;
118:23;119:3;166:17;
174:14;196:15
**written (2)**
159:2;166:10
**wrong (15)**
55:10;60:4;65:3;
67:19;75:22;76:5,6;
77:2;80:1;93:6;
113:16;114:14;
122:20,24;144:21
**wrote (1)**
76:19

---

## X

**XYZ (1)**
148:8

---

## Y

**Yards (1)**
16:4
**years (10)**
35:9;36:14,20;
45:11;57:22;59:3;
81:17;91:17;142:9;
193:13
**yesterday (4)**
103:22;104:18;
199:9,11
**York (30)**
5:15;6:5,22;7:5;
8:17;10:7,23;11:5;
14:17;15:5;16:5;
17:15;18:23;19:15;
20:15;21:23;22:6,15;
23:24;25:8;4:1,1,
11;94:19;118:13,17;
119:2,4;166:8;180:18

---

## Z

**ZABEL (2)**
8:13;22:2
**ZACHARY (1)**
25:9

**ZATZ (1)**
6:7
**zero (8)**
38:2,2;52:22;53:1;
90:12,12;94:15;
162:13
**ZIM (14)**
5:3;29:11,14;38:20;
43:7;194:12,14,18,20;
195:5,7,9,14;196:1
**ZIM's (1)**
195:14
**Zoom (11)**
30:7;33:4,20;94:10;
106:23;107:7,11;
161:24;180:10;
181:13;202:16
**ZUZOLO (1)**
20:21

**0**

**01 (1)**
36:2
**02109 (1)**
11:14
**06510 (1)**
9:6

**1**

**1 (8)**
11:4;20:14;60:2;
85:4;156:25;178:10,
17;180:20
**1,500 (1)**
123:25
**1,600 (1)**
90:3
**1,615 (3)**
49:23,24;79:21
**1,621 (1)**
79:21
**1,700 (5)**
123:24;125:9;
126:8;132:16;136:15
**1.1 (1)**
50:23
**1.185 (1)**
41:3
**1.2 (1)**
51:15
**1.63 (1)**
46:20
**1.785 (1)**
40:17
**1:20 (1)**
161:1
**1:54 (1)**
180:15
**10 (2)**
56:12,19
**100 (10)**

17:13;36:3;38:2;
56:20;66:8;80:11;
85:7;125:14;195:9,10
**1000 (1)**
25:4
**10001 (2)**
16:5;21:23
**10004 (3)**
6:22;11:5;17:15
**10016 (1)**
7:5
**10019 (6)**
5:15;10:7;14:17;
15:5;19:15;22:15
**10020 (2)**
6:5;10:23
**10022 (3)**
8:17;22:6;23:15
**10036 (2)**
20:15;24:15
**101 (1)**
17:4
**10166 (1)**
18:23
**10601 (1)**
12:23
**11 (13)**
27:14;34:25;35:22;
39:4;41:22;47:11;
57:24;70:15,16;
94:25;112:2;180:19;
185:8
**110 (2)**
139:2;153:16
**1103 (1)**
166:8
**1123 (4)**
163:7,10,10;164:5
**1123b6 (2)**
60:2;66:18
**1124 (5)**
108:12;114:19;
115:2;163:8;164:5
**1129a3 (1)**
66:17
**1129a5 (1)**
38:14
**1141 (1)**
94:4
**1144 (1)**
24:4
**119 (1)**
36:8
**11th (2)**
25:15;48:7
**12 (2)**
50:2;90:7
**12.5 (2)**
139:3;153:17
**1201 (2)**
9:13;13:4
**1210 (1)**
17:5

**1221 (1)**
6:4
**123,000 (1)**
102:8
**12th (1)**
48:7
**1301 (2)**
14:15;19:14
**14 (2)**
103:12;105:1
**140 (1)**
37:18
**1401 (1)**
16:14
**15 (1)**
55:23
**150 (1)**
11:21
**1500 (3)**
8:5;13:16;23:5
**156 (1)**
86:9
**15th (3)**
9:5;24:4;102:10
**16 (3)**
195:22;196:7;
198:10
**1633 (1)**
10:5
**1634 (1)**
14:4
**16th (1)**
13:5
**17 (1)**
55:23
**1702 (1)**
18:5
**171 (1)**
90:2
**1722 (1)**
23:4
**1748 (1)**
14:13
**17th (4)**
15:22;175:23;
176:5,23
**18th (1)**
104:7
**19 (3)**
36:8;56:9;179:11
**190 (5)**
49:20;89:23;90:2;
123:22,23
**19102 (1)**
16:16
**19103 (1)**
15:23
**195 (1)**
9:4
**1950s (1)**
158:5
**19801 (2)**
8:6;25:16

**19899 (1)**
13:6
**199 (1)**
12:21
**1992 (1)**
73:8

**2**

**2 (8)**
85:14;156:25;
174:8;178:18;179:16;
181:20;183:2,23
**2:30 (9)**
161:19,23,25;
189:22;202:3,3,6,8,15
**20 (1)**
190:23
**200 (2)**
6:12;18:21
**2000 (1)**
5:5
**20001 (1)**
12:14
**20006 (2)**
14:6;21:5
**2001 (1)**
21:4
**20-100 (1)**
17:14
**2021 (1)**
195:9
**2022 (1)**
118:18
**2024 (1)**
191:6
**2027 (3)**
195:9,13;196:18
**20th (12)**
15:13;23:14;
175:25;176:5,6,7,9,
19,24,25;177:16,16
**21 (1)**
53:6
**21,000 (1)**
46:19
**219 (1)**
36:8
**222 (1)**
10:14
**225 (1)**
21:13
**230 (1)**
5:4
**23b3 (4)**
79:8,24;81:24;82:5
**2400 (1)**
24:5
**25 (2)**
84:10;163:22
**256 (1)**
86:10
**25th (1)**

191:6
**2660 (1)**
20:5
**27401 (1)**
5:6
**275 (1)**
51:4
**279.87 (1)**
50:8
**2800 (1)**
21:14
**28202 (1)**
25:6
**285 (1)**
73:8
**293 (1)**
73:8
**2d (1)**
86:9
**2nd (1)**
73:8

**3**

**3 (7)**
85:25;156:25;
161:20;179:22;
184:17;189:22;202:3
**3:00 (6)**
178:5;179:17,21;
180:1,3,13
**3:06 (1)**
180:15
**3:39 (1)**
202:17
**30 (4)**
15:22;67:4;190:4,5
**300 (2)**
14:5;18:4
**301 (1)**
18:13
**30326 (1)**
13:17
**30-day (1)**
190:1
**31 (2)**
5:14;67:4
**31st (2)**
10:6;22:14
**33131 (1)**
6:14
**33134 (1)**
11:23
**33301 (1)**
17:6
**3400 (1)**
15:14
**3414 (1)**
13:15
**345 (4)**
185:2,10;186:21;
187:22
**345b (2)**

Spirit Airlines

February 13, 2025

188:3;189:4

**350 (8)**
7:14;37:24;50:22;
51:15;81:2;99:10;
164:21;171:5

**35203 (1)**
15:15

**357 (1)**
38:9

**358 (3)**
86:11;183:3;184:1

**37203 (1)**
9:15

**390 (1)**
43:12

**391 (1)**
32:5

**392 (1)**
32:6

**393 (2)**
32:7;34:10

**394 (2)**
32:8;183:4

**3d (1)**
86:11

**3rd (2)**
8:16;22:5

---

**4**

**4 (5)**
40:13;49:11;75:24;
80:5;190:8

**4,500 (1)**
191:7

**400 (4)**
40:13,24;42:9;
46:11

**420 (1)**
15:13

**4200 (1)**
12:5

**428 (1)**
43:6

**42nd (1)**
14:16

**438 (1)**
183:7

**44 (1)**
187:15

**450 (1)**
41:6

**452 (2)**
32:14;139:1

**45202 (1)**
18:14

**455 (1)**
96:19

**456 (1)**
99:17

**45th (1)**
19:5

**4700 (1)**

---

25:5

**471 (1)**
38:9

**472 (1)**
82:22

**475 (1)**
32:15

**483 (1)**
38:10

**484 (1)**
38:10

**485 (1)**
23:13

**487 (1)**
30:17

**4900 (1)**
6:13

---

**5**

**5 (6)**
11:13;49:11;60:3;
75:24;80:5;194:11

**5- (1)**
166:7

**50 (3)**
10:22;56:22;90:9

**500 (2)**
8:4;41:6

**506 (1)**
86:9

**5100 (1)**
7:15

**510b (1)**
56:22

**5-1103 (1)**
118:18

**52nd (1)**
5:14

**55 (1)**
16:4

**55402 (1)**
21:15

**5th (1)**
16:15

---

**6**

**6 (1)**
165:15

**600 (2)**
40:24;41:6

**601 (2)**
12:13;20:4

**60601 (1)**
10:15

**60602 (1)**
12:6

**60606 (1)**
19:6

**61 (1)**
171:18

**634 (1)**

---

36:6

**66 (1)**
20:3

**665 (1)**
62:9

**69 (1)**
84:10

---

**7**

**7 (3)**
24:14;56:12,22

**70 (2)**
12:4;179:11

**700 (1)**
37:18

**70115 (1)**
20:6

**71 (1)**
19:4

**717 (1)**
62:9

**725 (1)**
11:22

**75201 (1)**
23:6

**787 (2)**
15:4;22:13

**795 (3)**
37:22;51:15;171:3

**797 (1)**
82:23

**7th (3)**
12:22;15:4;40:19

---

**8**

**8 (2)**
56:12,18

**8:30 (1)**
48:11

**80 (2)**
93:1;163:18

**800 (3)**
99:9;164:20;191:5

**80202 (1)**
24:6

**812 (1)**
82:23

**840 (1)**
37:19

**87 (1)**
94:22

**8-Ks (1)**
40:8

---

**9**

**9 (5)**
21:21;56:12,18;
79:7,24

**9.5 (1)**
35:4

---

**90 (1)**
7:4

**900 (1)**
9:14

**90013 (1)**
18:6

**90071 (1)**
7:16

**919 (3)**
8:16;22:5;25:14

**95 (3)**
97:5;153:21,22

**960 (1)**
73:7

**99 (1)**
94:16

**99.99 (5)**
35:6;39:19;94:14;
104:9;112:5

---