UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK                 FOR PUBLICATION
-----------------------------------------------------------------x
In re:                                                          Chapter 11

SPIRIT AIRLINES, INC., *et al.*                                 Case No. 24-11988 (SHL)

                                        Debtors.                (Jointly Administered)
-----------------------------------------------------------------x

## MEMORANDUM OF DECISION

**A P P E A R A N C E S :**

**DAVIS POLK & WARDWELL LLP**
*Counsel for the Debtors and Debtors in Possession*
450 Lexington Avenue
New York, New York 10017
By:     Marshall S. Huebner, Esq.
        Darren S. Klein, Esq.
        Benjamin S. Kaminetzky, Esq.
        Marc J. Tobak, Esq.
        Christopher S. Robertson, Esq.
        Moshe Melcer, Esq.
        Kayleigh Yerdon, Esq.

**WILLIAM K. HARRINGTON**
*United States Trustee, Region 2*
Office of the United States Trustee
Alexander Hamilton U.S. Custom House
One Bowling Green, Room 534
New York, New York 10004
By:     Shara Cornell, Esq.
        Annie Wells, Esq.
        Eric Bradford, Esq.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
100 Pearl Street, Suite 20-100
New York, New York 10004
By:     Neal Jacobson, Esq.
        Alistaire Bambach, Esq.
        Morgan Bradylyons, Esq.

**PAUL HASTINGS LLP**
*Counsel for the Ad Hoc Group of Convertible Noteholders*
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
By:    Matthew L. Warren, Esq.
       Geoffrey M. King, Esq.
       William Reily, Esq.
       Valerie Eliasen, Esq.

**AKIN GUMP STRAUSS HAUER & FELD LLP**
*Counsel for the Ad Hoc Group of Senior Secured Noteholders*
One Bryant Park
New York, New York 10036
By:    Michael S. Stamer, Esq.
       Abid Qureshi, Esq.
       Jason P. Rubin, Esq.

-and-

2001 K Street N.W.
Washington, DC 20006
By:    Blaine Scott, Esq.

**WILLKIE FARR & GALLAGHER LLP**
*Counsel for the Official Committee of Unsecured Creditors*
787 Seventh Avenue
New York, New York 10019
By:    Brett H. Miller, Esq.
       Todd M. Goren, Esq.
       Christine Thain, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are two objections to the request of the above-captioned debtors

(collectively, the "Debtors") for final approval of the *Disclosure Statement for the Joint Chapter*

*11 Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates* [ECF No. 270][1] (the

"Disclosure Statement") and confirmation of the *First Amended Joint Chapter 11 Plan of*

---

[1]        Unless otherwise indicated, references in this *Memorandum of Decision* to docket entries on the Case
Management/Electronic Case Files ("ECF") system are to Case No. 24-11988.

2

*Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates* [ECF No. 354] (as further

amended and supplemented, the "Plan").  *See Debtors' Memorandum of Law in Support of Final*

*Approval of the Disclosure Statement and Confirmation of the First Amended Joint Chapter 11*

*Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates* [ECF No. 390] (the

"Confirmation Brief").[2]  The Plan before the Court is based upon a restructuring support

agreement (the "RSA")[3] that provides for a comprehensive series of restructuring transactions to

deleverage the Debtors' capital structure, preserve the going concern value of the business, and

maximize recoveries to all creditors.  *See generally* Confirmation Brief ¶ 6.  Statements in

support of confirmation have been filed by an ad hoc group of holders of the Debtors'

convertible senior notes (the "Ad Hoc Convertible Noteholder Group"), an ad hoc group of

holders of the Debtors' senior secured notes (the "Ad Hoc Senior Secured Noteholder Group"),

and the Official Committee of Unsecured Creditors appointed in the Debtors' cases (the

"Committee").  *See Statement of the Ad Hoc Group of Convertible Noteholders in Support of*

*Final Approval of the Disclosure Statement and Confirmation of the First Amended Joint*

*Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates* [ECF No.

455] (the "Ad Hoc Convertible Noteholder Statement"); *Statement of the Ad Hoc Group of*

---

[2]      In support of the requested relief, the Debtors have submitted a number of declarations, including: *Declaration of Fred Cromer in Support of Confirmation of the First Amended Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates* [ECF No. 391] (the "Cromer Declaration"); *Declaration of Robert M. Caruso in Support of Confirmation of the First Amended Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates* [ECF No. 392] (the "Caruso Declaration"); *Declaration of Diego Simonian in Support of Confirmation of the First Amended Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates* [ECF No. 393] (the "Simonian Declaration"); and *Declaration of Bruce Mendelsohn in Support of (I) Confirmation of the First Amended Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates and (II) Motion of the Debtors for Entry of an Order Authorizing the Debtors to Redact Commercially Sensitive Information* [ECF No. 394] (the "Mendelsohn Declaration").

[3]      A copy of the RSA is attached as Exhibit B to the *Declaration of Fred Cromer in Support of the Chapter 11 Proceedings and First Day Pleadings* [ECF No. 2] (the "Cromer First Day Declaration"), which was filed on November 18, 2024, the date that Spirit Airlines, Inc. filed for Chapter 11 (the "Petition Date").  A copy of the RSA is also attached as Exhibit F to the Disclosure Statement.

*Senior Secured Noteholders in Support of Confirmation of the First Amended Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates and Final Approval of the Disclosure Statement* [ECF No. 456] (the "Ad Hoc Senior Secured Noteholder Statement"); *Statement of the Official Committee of Unsecured Creditors in Support of Final Approval of the Disclosure Statement and Confirmation of the First Amended Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and its Debtor Affiliates* [ECF No. 473].

The two objections were filed by the Office of the United States Trustee (the "UST") and the U.S. Securities and Exchange Commission (the "SEC" and, together with the UST, the "Objectors").[4] *See Limited Objection by the Securities and Exchange Commission to Confirmation of the Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates* [ECF No. 408] (the "SEC Objection"); *United States Trustee's Objection to Debtors' Disclosure Statement and Plan* [ECF No. 412] (the "UST Objection"). Both of these objections challenge only the permissibility of the Plan's release of claims by certain non-Debtors against other non-Debtors (the "Third-Party Releases"). The Debtors contend that these

---

[4]    Numerous objections to the Plan have been resolved by the parties, as reflected in the agenda for the hearing on confirmation of the Plan and on the Court's docket. *See Amended Agenda for February 13, 2025 Hearing* [ECF No. 487]; *see also Limited Objection to Joint Chapter 11 Plan of Reorganization* [ECF No. 348]; *Joint Limited Objection of the Texas Taxing Authorities to the First Amended Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates* [ECF No. 401]; *Oracle America, Inc.'s Cure Objection and Reservation of Rights Regarding Debtors' First Amended Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates* [ECF No. 403]; *Reservation of Rights and Limited Objection of Masergy Communications, Inc. to the First Amended Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates* [ECF No. 405]; *Reservation of Rights of Dallas/Fort Worth International Airport Board* [ECF No. 407]; *Los Angeles World Airport's Limited Objection to the First Amended Joint Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates* [ECF No. 410]; *The City of Philadelphia's Reservation of Rights and Limited Objection Regarding Debtors' First Amended Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates* [ECF No. 413]; *Withdrawal of Limited Objection to Joint Chapter 11 Plan of Reorganization* [ECF No. 402]; *Notice of Withdrawal of Joint Limited Objection of the Texas Taxing Authorities to the First Amended Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates* [ECF No. 429]; *Notice of Withdrawal* [ECF No. 430]; *Notice of Withdrawal* [ECF No. 434]; *Notice of Withdrawal of the Reservation of Rights and Limited Objection of Masergy Communications, Inc. to the First Amended Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates* [ECF No. 448]; *Los Angeles World Airport's Withdrawal of Limited Objection to the First Amended Joint Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates* [ECF No. 450].

Third-Party Releases are consensual, noting that the Plan provides that those creditors and interest holders who do not wish to be bound by the Third-Party Releases may affirmatively opt out of them.  The Objectors disagree, arguing that the Third-Party Releases here do not satisfy the requirements for consent and therefore are in violation of the Supreme Court's recent decision in *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) ("*Purdue Pharma*").

A hearing was held on February 13, 2025 to consider both final approval of the Disclosure Statement and confirmation of the Plan.[5]  *See generally* Hr'g Tr. (Feb. 13, 2025) [ECF No. 509].  Setting aside the dispute over the Third-Party Releases, the Court found that the Disclosure Statement and Plan satisfied all other requirements of applicable law.  *See generally* Hr'g Tr. 181:2–15, 174:16–175:16 (Feb. 13, 2025); *see generally Notice of Filing of Status Conference Transcript*, Ex. A., Hr'g Tr. (Feb. 20, 2025) [ECF No. 511].  The Court informed the parties that it would enter the requested order granting final approval of the Disclosure Statement and confirmation of the Plan, with that order setting aside the issue of the Third-Party Releases for a separate subsequent written decision; that order was entered on February 20, 2025.  *See Findings of Fact, Conclusions of Law, and Order (I) Confirming the First Amended Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates and (II) Approving the Disclosure Statement on a Final Basis* [ECF No. 500] (the "Confirmation

---

[5]      In December 2024, the Court granted the request of the Debtors to conditionally approve the Disclosure Statement as containing adequate information under Section 1125 of the Bankruptcy Code and for a combined hearing for final approval of the Disclosure Statement and confirmation of the Plan.  *See Order (I) Approving the Disclosure Statement on an Interim Basis,(II) Scheduling a Combined Hearing for Final Approval of the Disclosure Statement and Confirmation of the Plan, (III) Establishing Certain Dates and Deadlines in Connection with the Solicitation and Confirmation of the Plan, (IV) Approving the Forms of Ballots, Solicitation Package, and Notices, (V) Approving the Solicitation and Tabulation Procedures, (VI) Approving the Equity Rights Offering Procedures and Related Materials, and (VII) Authorizing the Debtors to (A) Assume and Perform Under the Backstop Commitment Agreement and (B) Pay the Backstop Obligations* ¶¶ 10, 11 [ECF No. 246] (the "Disclosure Statement Order").

Order"); *see Notice of Filing of Status Conference Transcript*, Ex. A., Hr'g Tr. 21:18–25, 27:19–28:7 (Feb. 20, 2025).

This *Memorandum of Decision* constitutes the Court's findings of fact and conclusions of law on the issue of the Third-Party Releases. For the reasons set forth in detail below, the Court finds that the proposed Third-Party Releases here are consensual and that the opt-out mechanism utilized is appropriate given all the facts and circumstances.

## BACKGROUND

### I. Debtors' Prepetition Business Operations and Bankruptcy Filing

The Debtors and their subsidiaries and affiliates (collectively, "Spirit") operate as an ultra-low-cost carrier serving destinations throughout the United States, Latin America, and the Caribbean. *See Cromer First Day Declaration* ¶ 3.[6] In November 2024, Spirit commenced proceedings under Chapter 11 of the Bankruptcy Code with the goal of implementing a comprehensive financial restructuring through a plan of reorganization. *See id.* ¶ 4.

The proposed restructuring is to be carried out in accordance with the RSA that was entered into by the Debtors and certain of their stakeholders (the "Consenting Stakeholders").[7] *See id.* Specifically, the RSA provides the framework for a series of restructuring transactions (the "Restructuring Transactions") to be implemented through the Plan. These include: (a) a $300

---

[6]     The Court is permitted to take judicial notice of public filings on its own docket in a bankruptcy case, as well as those filed in other cases. *See* Fed. R. Evid. 201; *Teamsters Nat'l Freight Indus. Negotiating Comm. et al. v. Howard's Express, Inc. (In re Howard's Express, Inc.)*, 151 F. App'x 46, 48 (2d Cir. 2005) (stating that courts are empowered to take judicial notice of public filings, including a court's docket); *American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 96 n.17 (S.D.N.Y. 2004) ("The Court can take judicial notice of matters of public record . . . including filings in related lawsuits . . . .") (citing *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000)); *Katzenstein v. VIII SV5556 Lender, LLC (In re St. Vincent's Cath. Med. Ctrs. of New York)*, 440 B.R. 587, 599 (Bankr. S.D.N.Y. 2010).

[7]     As of the Debtors' bankruptcy filing, the Consenting Stakeholders collectively held approximately 80% of the debt to be restructured under the Plan, and over two-thirds in amount of each of the Plan's voting classes. *See* Cromer First Day Declaration ¶ 5. As explained below, the percentage of stakeholders signing onto the RSA has increased significantly since the filing of this case.

million senior secured superpriority debtor-in-possession financing facility provided by certain of the Consenting Stakeholders, (b) the exchange of $700 million of Senior Secured Notes (as defined in the Plan) and $140 million of Convertible Notes (as defined in the Plan) for an exit secured notes financing, (c) equitization of the remaining Senior Secured Notes and Convertible Notes (approximately $795 million in the aggregate) in the form of new equity interests in the reorganized parent entity, (d) a fully backstopped equity rights offering through which the reorganized entities would raise $350 million of new equity interests to further support the reorganized balance sheet, and (e) an exit revolving credit facility.  *See* Disclosure Statement Art. I.B; Confirmation Brief ¶ 6.  The RSA contemplates that allowed priority claims and general unsecured claims against the Debtors will be paid in full or otherwise remain unimpaired (*i.e.*, "ride through" the Debtors' bankruptcy cases).  *See id.* ¶ 8; Cromer First Day Declaration ¶ 4. The value needed to provide for full recovery by the unsecured creditors is being provided by the Consenting Stakeholders' agreement to convert their debt to equity; without such agreement, it is undisputed that unsecured creditors would get nowhere near a full recovery in these cases.  *See* Cromer Declaration ¶ 38 (noting that creditors are unimpaired "in large part due to the equitization and DIP and equity financing being provided by the Consenting Stakeholders . . . .").[8]

The RSA was entered into on November 18, 2024, prior to the Debtors' bankruptcy filing.  *See* Cromer First Day Declaration ¶ 54; Cromer First Day Declaration, Ex. B; *see also* Disclosure Statement, Ex. F.  The RSA required each party to it to support the consummation of the Restructuring Transactions through the Plan.  *See* Cromer First Day Declaration ¶ 54.  A plan

---

[8]     The exact recovery for these unsecured creditors absent the actions of the Consenting Stakeholders is, of course, impossible to know because we do not know exactly how these cases would progress.  *See* Hr'g Tr. 50:12–52:4 (Feb. 13, 2025).  But the undisputed valuation evidence that has been presented suggests that such recoveries would be substantially less.  *See id.* at 50:18–51:17 (recounting, among other things, the value being provided in the case by the Consenting Stakeholders); *see id.* at 51:18–25 (discussing recoveries for unsecured creditors in the Chapter 7 liquidation analysis); *see also* Caruso Declaration ¶ 7; *see generally* Simonian Declaration.

based on the RSA was filed on the Petition Date as "Exhibit A" to the RSA.  *See* Cromer First

Day Declaration, Ex. B.  The Plan has remained essentially unchanged since its initial filing on

the Petition Date, including the (i) unimpaired treatment of Classes 1, 2, 3, and 6, and

(ii) impaired treatment of Classes 4 and 5, which include the Consenting Stakeholders who

signed onto the RSA.  *Compare* Cromer First Day Declaration, Ex. B at Ex. A, Art. III.A, *with*

Plan Art. III.A.

## II.    **Plan of Reorganization**

The Plan divides those with claims against and interests in the Debtors into the following

ten classes:

| Class | Claims or Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Deemed to accept |
| 2 | Other Priority Claims | Unimpaired | Deemed to accept |
| 3 | Prepetition Revolving Credit Facility Claims | Unimpaired | Deemed to accept |
| 4 | Senior Secured Notes Claims | Impaired | Entitled to vote |
| 5 | Convertible Notes Claims | Impaired | Entitled to vote |
| 6 | General Unsecured Claims | Unimpaired | Deemed to accept |
| 7 | Section 510(b) Claims | Impaired | Presumed to reject |
| 8 | Intercompany Claims | Unimpaired or Impaired | Deemed to accept or presumed to reject |
| 9 | Intercompany Interests | Unimpaired or Impaired | Deemed to accept or presumed to reject |
| 10 | Existing Interests | Impaired | Presumed to reject |

*See* Plan Art. III; Disclosure Statement Art. I.C; Cromer Declaration ¶ 6.  The Plan designates

these classes in the following manner:

- Classes 1, 2, 3, and 6 are designated as "unimpaired" by the Plan. Each holder of a claim in these classes is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

- Classes 4 and 5 are designated as "impaired" by the Plan. Each holder of a claim in these classes is entitled to vote to accept or reject the Plan. The Consenting Stakeholders are included in Class 4 (Senior Secured Notes Claims) and Class 5 (Convertible Notes Claims).

- Classes 8 and 9 are designated as either "unimpaired" or "impaired" by the Plan. If designated as unimpaired, the holders of such claims or interests are conclusively deemed to have accepted the Plan. If designated as impaired and receiving no distributions under the Plan (and retaining no interest in property), the holders of such claims or interests are presumed to have rejected the Plan. Whether designated as unimpaired or impaired, such holders are not entitled to vote to accept or reject the Plan.

- Classes 7 and 10 are designated as "impaired" by the Plan. Holders of claims or interests in these classes are deemed to have rejected the Plan and shall not receive distributions on account of their claims or interests. Such holders are not entitled to vote to accept or reject the Plan.

*See* Plan Art. III.C. Both Classes 4 and 5 voted overwhelmingly in favor of the Plan. Specifically, Class 4—Senior Secured Notes Claims—voted 100% in favor of the Plan, both by number and dollar amount of claims. *See Declaration of Stephenie Kjontvedt of Epiq Corporate Restructuring, LLC Regarding the Solicitation and Tabulation of Ballots Cast on the Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates* at Ex. A [ECF No. 452] (the "Kjontvedt Declaration"). Class 5—Convertible Notes Claims—voted 99.97% in favor by dollar amount and 95.56% in favor by number. *See id.*

The Plan also provides for the Third-Party Releases. Article VIII.F describes the Third-Party Releases as follows:

> Except as otherwise specifically provided for in the Plan or Confirmation Order, on and after the Effective Date, for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, *each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever*, whether known or unknown, foreseen or

unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal, state, or other applicable laws, or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise that such Releasing Party would have been legally entitled to assert (whether individually or collectively) . . . .

Plan Art. VIII.F (emphasis added). A "Released Party" is defined in the Plan as:

(a) the Debtors; (b) the Reorganized Debtors; (c) each DIP Secured Party; (d) each Consenting Senior Secured Noteholder; (e) each Consenting Convertible Noteholder; (f) each Prepetition Agent/Trustee; (g) each RCF Secured Party; (h) each Backstop Commitment Party; (i) the Distribution Agent; (j) any Committee and all members thereof; and (k) with respect to each of the foregoing Entities in clauses (a) through (j), such Entity's Related Parties; *provided, however*, that an Entity that (i) affirmatively elects to "opt out" of being a Releasing Party by timely objecting to Confirmation or by checking the appropriate box on such Holder's timely and properly submitted Ballot or Opt-Out Form, thereby indicating that such Holder elects to opt out of the Plan's release provisions, or (ii) timely objects to the releases herein and such objection is not resolved before Confirmation shall not be considered a "Released Party" notwithstanding anything to the contrary herein.

Plan Art. I.A.168. Under the Plan, the Releasing Parties are limited to those creditors that are either (a) in an unimpaired class (Classes 1, 2, 3, and 6), or (b) in an impaired voting class (Classes 4 and 5), 98.1% of whom are Consenting Stakeholders that have already agreed through the RSA to grant the Third-Party Releases. *See* Cromer Declaration ¶ 38; *see also* Kjontvedt Declaration ¶ 11.[9] The Plan defines a "Releasing Party" as:

(a) the Debtors and their Estates; (b) the Reorganized Debtors; (c) each DIP Secured Party; (d) each Consenting Senior Secured Noteholder; (e) each Consenting Convertible Noteholder; (f) each Prepetition Agent/Trustee; (g) each RCF Secured Party; (h) each Backstop Commitment Party; *(i) each Holder of a Claim entitled to vote to accept or reject the Plan that does not affirmatively elect to "opt out" of being a Releasing Party by checking the appropriate box on such Holder's timely and properly submitted Ballot to indicate that such Holder elects*

---

[9]       Classes 8 and 9 are composed of intercompany claims and interests. *See* Plan Art. III.A.8; Plan Art. III.A.9). Classes 7 and 10 are specifically carved out of the definition of Releasing Party. *See* Plan Art. III.A.7.b ("Notwithstanding anything to the contrary herein, no Holder of a Class 7 Section 510(b) Claim (in its capacity as such) shall be a Releasing Party, Released Party, or Exculpated Party."); Plan Art. III.A.10.b ("Notwithstanding anything to the contrary herein, no Holder of a Class 10 Existing Interest (in its capacity as such) shall be a Releasing Party, Released Party, or Exculpated Party.").

> *to opt out of the Plan's release provisions; (j) each Holder of a Claim or Interest*
> *in a Nonvoting Class (with the exception of Holders of Existing Interests) that*
> *does not affirmatively elect to "opt out" of being a Releasing Party by checking*
> *the appropriate box on such Holder's timely and properly submitted Opt-Out*
> *Form to indicate that such Holder elects to opt out of the Plan's release*
> *provisions; and (k) with respect to each of the foregoing Entities in clauses (a)*
> *through (j), such Entities' Related Parties; provided, that, for the avoidance of*
> *doubt, any opt-out election made by a Consenting Stakeholder (that has not*
> *terminated the Restructuring Support Agreement as to itself and remains a party*
> *thereto) in any capacity shall be void ab initio.*

Plan Art. I.A.169 (emphasis added).

Under the procedures put in place by the Debtors, the Third-Party Releases apply to the affected creditors unless they elect not to consent (*i.e.*, opt out) of the Third-Party Releases by submitting a form or ballot with a checked opt-out box, or by objecting to the Third-Party Releases.  *See* Cromer Declaration ¶ 38; Kjontvedt Declaration ¶ 11.  Specifically, creditors that were eligible to vote on the Plan could opt out of the Third-Party Releases by checking a separate box on a timely and properly submitted ballot.  *See Motion of the Debtors for Entry of Orders (I) Approving the Disclosure Statement on an Interim and Final Basis, (II) Scheduling a Combined Hearing for Final Approval of the Disclosure Statement and Confirmation of the Plan, (III) Establishing Certain Dates and Deadlines in Connection with the Solicitation and Confirmation of the Plan, (IV) Approving the Forms of Ballots, Solicitation Package, and Notices, (V) Approving the Solicitation and Tabulation Procedures, (VI) Approving the Equity Rights Offering Procedures and Related Materials, and (VII) Authorizing the Debtors to (A) Assume and Perform Under the Backstop Commitment Agreement and (B) Pay the Backstop Obligations* ¶ 18 n.9 [ECF No. 115] (the "Disclosure Statement Motion"); Kjontvedt Declaration ¶ 11.  To the extent creditors were deemed to accept and were therefore ineligible to vote on the Plan, they could opt out by checking a box on a timely and properly submitted opt-out form (the "Opt-Out Form") that had been provided to them or by opting out using an online portal on the

Case Information Website maintained by Epiq Corporate Restructuring, LLC ("Epiq"), the

Debtors' claims and noticing agent. *See id.* All creditors, whether eligible to vote or not, could

also opt out of the Third-Party Releases by timely and properly filing an objection to the Third-

Party Releases. *See id.*

Under the Plan, therefore, a creditor is deemed to have consented to the Third-Party

Releases if the creditor (i) timely and properly voted to accept or reject the Plan but did not

check the opt-out box on their ballot, (ii) abstained from voting on the Plan and did not check the

opt-out box on a timely and properly submitted ballot, (iii) failed to timely and property submit

an Opt-Out Form with the opt-out box checked, or (iv) failed to timely and properly file an

objection. *See* Disclosure Statement Motion ¶ 18 n.9.

Information regarding the Third-Party Releases and instructions on the procedures to opt

out of them were featured prominently in the Plan and Disclosure Statement.[10] *See* Plan Art.

VIII.F; Disclosure Statement Art. I.C, I.D, I.F. This information also appeared on the ballots, the

Unimpaired Claims Notice (as defined below), and the Combined Hearing Notice (as defined

below).[11] *See generally* Combined Hearing Notice; Master Ballot (Class 4); Beneficial Ballot

(Class 4); Master Ballot (Class 5); Beneficial Ballot (Class 5); Unimpaired Claims Notice.

---

[10]     Bankruptcy Rule 3016(c) provides that "[i]f the plan provides for an injunction against conduct not
otherwise enjoined by the Code, the plan and disclosure statement must . . . describe in specific and conspicuous
language (bold, italic, or underlined text) all acts to be enjoined and . . . identify the entities that would be subject to
the injunction." Fed. R. Bankr. P. 3016(c); *see also* Fed. R. Bankr. P. 2002(c) (requiring notices to contain similar
disclosures).

[11]     The Disclosure Statement, the Plan, the ballots, the Unimpaired Claims Notice, and a notice of the
combined hearing on final approval of the Disclosure Statement and confirmation of the Plan (the "Combined
Hearing Notice") all informed the creditors of the Third-Party Releases and the opportunity and procedures to opt
out. *See* Plan Art. VIII.F; Disclosure Statement Art. I.C, I.D, I.F; Combined Hearing Notice at 1 n.2, 4; Master
Ballot (Class 4) at 2, 5, 9, 11; Beneficial Ballot (Class 4) at 2–5, 8–9; Master Ballot (Class 5) at 2, 5, 9, 11;
Beneficial Ballot (Class 5) at 2–5, 8–9; Unimpaired Claims Notice at 1 n.2, 3–5.

        A copy of the Master Ballot for Class 4 is attached as Exhibit B-1 to the Disclosure Statement Order; a
copy of the Beneficial Ballot for Class 4 is attached as Exhibit B-2 to the Disclosure Statement Order; a copy of the
Master Ballot for Class 5 is attached as Exhibit B-3 to the Disclosure Statement Order; and a copy of the Beneficial
Ballot for Class 5 is attached as Exhibit B-4 to the Disclosure Statement Order. A copy of the Combined Hearing

Creditors in the impaired voting classes were sent an appropriate ballot for their class. *See* Disclosure Statement Motion ¶ 30; Disclosure Statement Order ¶ 20. These ballots included information regarding the Third-Party Releases, instructions on opting out of the Third-Party Releases, and a box to check in order to opt out of the Third-Party Releases.

A Notice of Unimpaired Status (the "Unimpaired Claims Notice"), was sent to creditors in the classes that were designated as unimpaired. *See* Disclosure Statement Motion ¶ 33; Disclosure Statement Order ¶ 21. The Unimpaired Claims Notice included information regarding the Third-Party Releases, instructions on opting out of the Third-Party Releases, and an "Opt-Out Form" with a box to check in order to opt out of the Third-Party Releases.

The deadline to opt out of the Third-Party Releases was January 21, 2025 at 5:00 p.m. *See* Kjontvedt Declaration ¶ 11. As of the deadline, 190 opt-out elections were received, five of which were received on paper versions of the Opt-Out Form, 166 of which were submitted through the online portal on the Case Information Website maintained by Epiq, and nineteen of which were received on ballots from voting creditors. *See id.* ¶ 12; *see also Supplemental Declaration of Stephenie Kjontvedt of Epiq Corporate Restructuring, LLC Regarding the Solicitation and Tabulation of Ballots Cast on the Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor Affiliates* ¶ 5 [ECF No. 503] (the "Kjontvedt Supplemental Declaration").

## III.    The Request for Confirmation and Objections

All objections and reservations of rights with respect to final approval of the Disclosure Statement and confirmation of the Plan have been resolved, except for the objections of the SEC

---

Notice is attached at Exhibit A to the Disclosure Statement Order. A copy of the Unimpaired Claims Notice is attached as Exhibit C-1 to the Disclosure Statement Order.

and the UST.[12]  The Objectors' opposition to confirmation raises one central question: whether the Third-Party Releases are consensual and appropriate.  The UST argues that the opt-out mechanism contained in the Plan results in imposition of the Third-Party Releases without first obtaining the affirmative consent of the parties through an opt-in ballot and thus is in violation of the Supreme Court's ruling in *Purdue Pharma*, 603 U.S. 204 (barring imposition of nonconsensual third-party releases in Chapter 11 bankruptcy case).  The SEC focuses more narrowly on the classes of noteholders entitled to vote under the Plan, arguing that the failure to return a ballot that opts out of the Third-Party Releases is insufficient evidence of consent.  The Debtors counter that the Third-Party Releases are consensual and that the opt-out mechanism is an adequate manifestation of consent in the circumstances of the Debtors' cases.

## **DISCUSSION**

### I.    **Legal Standard**

In *Purdue Pharma*, the Supreme Court held that the Bankruptcy Code does not authorize nonconsensual third-party releases in Chapter 11 plans of reorganization, meaning the nonconsensual release of a creditor's claim against a non-debtor.  *See Purdue Pharma*, 603 U.S. at 227 ("Confining ourselves to the question presented, we hold only that the bankruptcy code does not authorize a release and injunction that, as a part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants.").

While holding that nonconsensual third-party releases are not permissible, the Supreme Court in *Purdue Pharma* made it clear that *consensual* third-party releases were not the subject of its decision.  As the Supreme Court explained, "[n]othing in what we have said should be

---

[12]    *See supra* n.4.

14

construed to call into question *consensual* third-party releases offered in connection with a

bankruptcy reorganization plan; those sorts of releases pose different questions and may rest on

different legal grounds than the nonconsensual releases at issue here." *Id.* at 226 (citing *In re

Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993)).  Not surprisingly then, the Supreme

Court in *Purdue Pharma* expressly declined to discuss how parties may manifest their consent to

third-party releases.  *See id.* ("Nor do we have occasion today to express a view on what

qualifies as a consensual release . . . "); *see also In re Roman Cath. Diocese of Syracuse*, 2024

Bankr. LEXIS 2807, at *5 (Bankr. N.D.N.Y. Nov. 14, 2024) ("Contention now lies in the

method by which consent may be obtained, as the Supreme Court in *Purdue Pharma* specifically

declined to define methods by which consent is achieved . . . .").

Turning then to an issue not decided by *Purdue Pharma*, the Court first looks to the

larger context for the Third-Party Releases contained in this Plan.  A Chapter 11 plan is

> the crucible by which the parties' claims and rights in property dealt with by the
> plan are transformed and governed post-confirmation—a 'super-contract'—not
> because it is signed by all the parties with claims against the debtor and holders of
> interests affected by the plan who participated in the case, but because of
> applicable provisions of the Bankruptcy Code and principles of *res judicata*.

*Lawski v. Frontier Ins. Grp., LLC (In re Frontier Ins. Grp., Inc.)*, 585 B.R. 685, 693 (Bankr.

S.D.N.Y. 2018).  These applicable provisions of the Bankruptcy Code include Sections 1123 and

1124.  Generally speaking, Section 1123 of the Bankruptcy Code lists the required contents for a

proposed reorganization plan in Chapter 11 bankruptcy, including both mandatory provisions

(Section 1123(a)) and discretionary provisions (Section 1123(b)).  *See* 11 U.S.C. § 1123(a), (b).

Section 1124 defines the concept of "impairment" of claims or interests while also making clear

that both secured and unsecured claims may be impaired in a case under Title 11.  *See* 11 U.S.C.

§ 1124.

Of particular interest here, Section 1123 specifically contemplates that "a plan shall . . . provide the same treatment for each claim or interest of a particular class, *unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest . . . .*" 11 U.S.C. § 1123(a)(4) (emphasis added). It is well established that consenting to a less favorable treatment under Section 1123(a)(4) of the Bankruptcy Code does not make that party "impaired" under Section 1124(1) of the Code. *See, e.g.*, *In re Hanish, LLC*, 570 B.R. 4, 20 (Bankr. D.N.H. 2017) ("[A]n agreement to less favorable treatment under 11 U.S.C. § 1123(a)(4) does not create an impairment, it removes one."); *see also In re Dow Corning Corp.*, 244 B.R. 634, 669 (Bankr. E.D. Mich. 1999), *aff'd*, 255 B.R. 455 (E.D. Mich. 2000), *aff'd on remand*, 280 F.3d 648 (6th Cir. 2002) ("Section 1123(a)(4) was satisfied when the creditor agreed to a settlement providing it less favorable treatment than treatment provided to other members of its class.") (*citing and summarizing In re Texaco Inc.*, 84 B.R. 893, 905 (Bankr. S.D.N.Y. 1988)); *In re Quigley Co.*, 377 B.R. 110, 118 (Bankr. S.D.N.Y. 2007) ("Agreeing to settle . . . would permit a claimant to be treated differently . . . .  This treatment is allowed under 1123(a)(4).") (citation omitted); *Del. Trust Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 527 B.R. 157, 168 (D. Del. 2015), *aff'd sub nom.*, *Energy Future Holdings Corp. v. Del. Trust Co.*, 648 F. App'x 277 (3d Cir. 2016) ("[C]ourts have interpreted the same treatment requirement to mean that all claimants in a class must have the same opportunity for recovery.") (citing *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013)). In sum, the Bankruptcy Code contemplates the possibility of a creditor consenting to specific treatment that is less than the creditor's full legal and equitable rights, with such agreed upon treatment not constituting impairment.

The Bankruptcy Code does not define what it means to "agree" under Section 1123(a)(4). This is not surprising. Statutes such as the Bankruptcy Code often use undefined terms that have generally understood meanings. *See* Robert E. Gerber, U.S.B.J. (ret.), *Yes, There Very Much is a Common Law of Bankruptcy. Why Not Give It The Recognition It Deserves?* at 3–4 (Oct. 24, 2024) (unpublished manuscript used in connection with 7th Annual Connecticut Bankruptcy Conference) (noting that the Bankruptcy Code repeatedly employs terms and expressions that are exceedingly general, such as "for cause," "appropriate," and "fair and equitable"). Where a term is not defined in the Bankruptcy Code, "we look to the ordinary meaning of the term." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011); *see U.S. v. Little Lake Misere Land Co.*, 412 U.S. 580, 593 (1973) (stating that it is a "basic responsibility" of federal courts to fill the interstices of congressional legislation); *see also Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980) ("It is [] commonplace that courts will further legislative goals by filling the interstitial silences within a statute or a regulation."); *Ingram Micro, Inc. v. Airoute Cargo Express, Inc.*, 154 F. Supp. 2d 834, 839 (S.D.N.Y. 2001) ("[F]ederal common law is properly applied where the particular facts of a case may fall outside the literal coverage of a federal statute, but the use of common law will fill gaps in the congressional statutory pattern.") (citing *Little Lake Misere*, 412 U.S. at 593). The verb "agree" is a general term that calls out for such an interpretive exercise here. As a transitive verb, it is generally understood to mean either "to concur in (something, such as an opinion)" or "to consent to as a course of action." *See* Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/agree (last visited Feb. 27, 2025).

Given this statutory framework, consensual third-party releases have been permitted in the Second Circuit. *See Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re*

*Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d Cir. 2005) ("Nondebtor releases may

also be tolerated if the affected creditors consent.") (citing *In re Specialty Equip.*, 3 F.3d at

1047)); *see also In re LATAM Airlines Grp. S.A*., 2022 Bankr. LEXIS 1725, at *144 (Bankr.

S.D.N.Y. Jun. 18, 2022) ("It is well settled that, as a general proposition, creditors may consent

to third-party releases.") (collecting cases); *In re Avianca Holdings S.A.*, 632 B.R. 124, 133

(Bankr. S.D.N.Y. 2021) ("If third-party releases are consensual . . . 'courts generally approve

them unless they are truly overreaching on their face.'") (quoting *In re MPM Silicones, LLC*,

2014 Bankr. LEXIS 3926, at *32 (Bankr. S.D.N.Y. Sept. 9, 2014)).

Against this background, we return to the central question: What does consent look like?

In addressing this question, this Court does not write on a blank slate but instead looks to the

existing case law in this District and Circuit. *See In re Roman Cath. Diocese of Syracuse*, 2024

Bankr. LEXIS 2807, at *6 ("In the absence of Supreme Court guidance, this Court looks to

Second Circuit case law to determine the method by which consent may be established and

whether silence or inaction can be deemed consent.").  Courts have been presented with two

choices for showing consent: an opt-out and an opt-in.  An opt-out provides that a third-party

release will be effective as to each party who is sent a ballot or opt-out form that clearly explains

that the ballot or opt-out form must be returned and the opt-out box checked if the party elects

not to approve the third-party release.  *See In re Avianca Holdings*, 632 B.R. at 137.  An opt-in

provides that no party (even a party voting in favor of the proposed plan) would be deemed to

have granted a third-party release unless that party elected to submit a form that opted into a

release, with that election being separate from that party's vote with respect to the plan.  *See In

re Chassix Holdings, Inc*., 533 B.R. 64, 77 (Bankr. S.D.N.Y. 2015).

II.    **Analysis of the Third-Party Releases Here**

A.  The Authority in This District

The Objectors' view is that an opt-in mechanism is the only permissible way to manifest

consent and that an opt-out is never appropriate.  *See, e.g.*, UST Objection at 1, 19 n.6.  But this

is not the view expressed by the majority of judges in this District.  Decisions in this District

generally permit use of an opt-out mechanism if the affected parties receive clear and prominent

notice and explanation of the releases and are provided an opportunity to decline to grant them.

In assessing the permissibility of an opt-out, courts also look to the circumstances of each case to

determine whether consent exists.

In *Avianca Holdings*, for example, the court found an opt-out provision for a release to be

"permissible provided that a clear and prominent explanation of the procedure is given[,]"

consistent with federal bankruptcy cases in the Bankruptcy Court for the Southern District of

New York and elsewhere.  *In re Avianca Holdings*, 632 B.R. at 137.  The court reasoned that the

failure to opt out of releases would manifest consent to the releases where the ballot clearly

explained the opt-out procedure and put affected parties on notice that their rights would be

affected.  *See id.*  The *Avianca* court approvingly cited to another decision from the Southern

District of New York, *In re Cumulus Media Inc.*, Case No. 17-13381 (SCC) (Bankr. S.D.N.Y.

2018).  In *Cumulus Media*, the court stated: "Inaction is action under appropriate circumstances.

When someone is clearly and squarely told if you fail to act your rights will be affected, that

person is then given information that puts them on notice that they need to do something or else.

That's not a trap."  *In re Cumulus Media Inc.*, Case No. 17-13381 (SCC), Hr'g Tr. 27:7–11

(Bankr. S.D.N.Y. Feb. 1, 2018) [ECF No. 434].  Thus, the *Avianca* court concluded that "[i]f a

creditor with a right to vote is sent a ballot that clearly explains that the ballot must be returned

and the opt-out box checked if the creditor elects not to approve the third-party release, the release is effective as to that creditor." *In re Avianca Holdings*, 632 B.R. at 138.[13]  In reaching its decision, the *Avianca* court also noted that the opt-out structure was consistent with the Supreme Court's authority on consent in the context of class action releases.  *See id.* at 137 (noting the Supreme Court's approval of an opt-out structure where the plaintiff received notice and an opportunity to be heard, with such notice "reasonably calculated . . . to apprise interested parties of the pendency of the action and the afford them an opportunity to present their objections.") (quoting *Philips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)).  Applying all these principles, the *Avianca* court approved opt-out releases of (i) creditors who voted to accept the plan, (ii) unimpaired creditors and interest holders who had the opportunity to, but did not, opt out of the releases, and (iii) creditors who voted to reject the plan or abstained from voting and did not opt out of the releases.  *See In re Avianca Holdings*, 632 B.R. at 133.[14]

Adopting the rationale in *Avianca*, the court in *LATAM Airlines* approved an opt-out structure because it was clearly and prominently noticed and explained.  *See In re LATAM Airlines Grp.*, 2022 Bankr. LEXIS 1725, at *146–47 (citing *In re Avianca Holdings*, 632 B.R. at 137).  The *LATAM* court noted that "courts in this district routinely approve opt out release language in cases in which creditors and interest holders have been provided with a 'clear and

---

[13]     *Cf. Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683–84 (2015) ("Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express.  Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent; it states only that a bankruptcy court must obtain 'the consent'—consent *simpliciter*—'of all parties to the proceeding' before hearing and determining a non-core claim. § 157(c)(2).")).

[14]     Notably, the court in *Avianca* was not called upon to assess the validity of proposed release for non-voting creditors deemed to accept or reject the plan who were not given the right to opt out; the debtors in *Avianca* amended the plan to add an opt-out as to the release for creditors who were deemed to accept the plan and dropped the request for a release entirely as to those creditors deemed to reject the plan.  *In re Avianca Holdings*, 632 B.R. at 133.  Like *Avianca*, this Court is not being asked to approve a release for those creditors who are deemed to reject the Plan, which consists of equity holders whose interests are being eliminated.  For the reasons explained below, such a request would raise additional concerns beyond those present here.

prominent explanation of the [opt-out] procedure.'" *Id.* at *146 (citations omitted). In that case,

the debtors had (i) included a discussion of the releases in the disclosure statement, (ii) included

the full text, in bold typeface, of the releases, an explanation of the consequences of not opting

out, and instructions for opting out in the notices of non-voting status and ballots, and (iii)

offered multiple ways for a party to effect its opt-out. *See id.* at *147–49. Accordingly, the

*LATAM* court found consent to the third-party releases by holders of claims and equity interests

who (i) voted to accept the plan, (ii) rejected or abstained from voting on the plan and failed to

opt out, and (iii) were presumed to accept the plan and failed to opt out. *See id.* at *143.

Other decisions in this District have analyzed a variety of other circumstances—beyond

the clarity and prominence of the language used for the release—in assessing the propriety of an

opt-out mechanism, including:

- the circumstances of the proposed releasing parties in the bankruptcy case, including whether these creditors have any economic disincentive to follow the bankruptcy case, *see In re SunEdison*, *Inc.*, 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017); *In re Chassix*, 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015); *see also In re Emerge Energy Services LP*, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019);

- the procedural history of the bankruptcy case and whether the requested release has been clearly and consistently presented to the affected creditors, *see, e.g.*, *In re LATAM Airlines Grp.*, 2022 Bankr. LEXIS 1725, at *147; *see also In re Washington Mut., Inc*., 442 B.R. 314, 352–53 (Bankr. D. Del. 2011); and

- general principles of contract law, *see In re SunEdison, Inc.,* 576 B.R. at 458 (explaining that courts look to general principles of contract law embodied in the Restatement of Contracts in deciding whether a creditor consents to a third-party release).

Numerous judges in this District have utilized these principles to approve opt-out releases

in a variety of cases when appropriate given the facts and circumstances of each case. *See, e.g.*,

*In re Stearns Holdings, LLC*, 607 B.R. 781, 788 (Bankr. S.D.N.Y. 2019) ("[A]ffected parties

were on clear notice of the Third-Party Releases, including the option to opt out of the Third-

Party Releases, rendering such releases consensual, as this Court has held in prior cases

involving similar facts and circumstances.") (Judge Shelley C. Chapman); *In re Ditech Holding Corp.*, 606 B.R. 544, 630 (Bankr. S.D.N.Y. 2019) (approving third-party consensual release with opt-out) (Judge James L. Garrity); *In re Reader's Dig. Ass'n, Inc.*, 2010 WL 11822562, at *11 (Bankr. S.D.N.Y. July 15, 2010) (approving third-party releases because releasing parties were given "notice and opportunity for hearing and opt out") (Judge Robert D. Drain); *In re Automotores Gildemeister SPA*, Case No. 21-10685 (LGB), Hr'g Tr. 89:12–91:17 (Bankr. S.D.N.Y. May 27, 2021) [ECF No. 156] (holding at confirmation hearing that creditors manifested consent to releases when provided with notice of releases and an opt-out form) (Judge Lisa G. Beckerman); *In re MatlinPatterson Glob. Opportunities Partners II LP*, Case No. 21-11255 (DSJ), Hr'g Tr. 63:22–64:11 (Bankr. S.D.N.Y. Apr. 27, 2023) [ECF No. 888] (noting at disclosure statement hearing that opt-out mechanisms are regularly approved so long as the affected parties are given robust, clear, and adequate notice) (Judge David S. Jones).[15]

---

[15]     *See also In re Endo Int'l PLC*, Case No. 22-22549 (JLG) (Bankr. S.D.N.Y. Mar. 22, 2024) [ECF No. 3960] (approving use of opt-out mechanism); *In re Celsius Network LLC*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y. Nov. 9, 2023) [ECF No. 3972] (same); *In re PacificCo Inc.,* Case No. 23-10470 (PB) (Bankr. S.D.N.Y. Apr. 28, 2023) [ECF No. 157] (approving opt-out mechanism in which voting creditors were provided ample notice and opportunity to opt out); *In re Revlon, Inc*., Case No. 22-10760 (DSJ) (Bankr. S.D.N.Y. Apr. 3, 2023) [ECF No. 1746] (same); *In re Lumileds Holding B.V.*, Case No. 22-11155 (LGB) (Bankr. S.D.N.Y. Oct. 14, 2022) [ECF No. 204] (approving opt-out release; *In re China Fisheries Grp. Ltd*., Case No. 16-11895 (JLG) (Bankr. S.D.N.Y. Feb. 24, 2022) [ECF No. 2978] (same); *In re Times Square JV LLC*, Case No. 22-11715 (JPM) (Bankr. S.D.N.Y. Mar. 21, 2023) [ECF No. 260] (same); *In re Century 21 Dep't Stores*, Case No. 20-12097 (SCC) (Bankr. S.D.N.Y. Apr. 26, 2021) [ECF No. 883] (approving opt out mechanism in which voting and non-voting creditors were provided ample notice and opportunity to opt out); *In re Centric Brands Inc*., Case No. 20-22637 (SHL) (Bankr. S.D.N.Y. Sept. 21, 2020) [ECF No. 657] (approving opt-out mechanism for non-voting classes deemed to accept the plan and voting classes in which the RSA parties' claims resided); *In re New Cotai Holdings, LLC*, Case No. 19-22911 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2020) [ECF No. 509] (approving use of opt-out mechanism for consensual release); *In re Barneys New York, Inc.*, Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Feb. 5, 2020) [ECF No. 789] (same); *In re Nine W. Holdings, Inc*., Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 27, 2019) [ECF No. 1308] (same); *In re Cenveo, Inc*., Case No. 18-22178 (RDD) (Bankr. S.D.N.Y. Aug. 21, 2018) [ECF No. 685] (same); *In re Old Mkt. Grp. Holdings Corp*., Case No. 20-10161 (JLG) (Bankr. S.D.N.Y. Oct. 5, 2020) [ECF No. 806] (same); *In re 4Kids Ent., Inc.*, Case No. 11-11607 (SCC) (Bankr. S.D.N.Y. Dec. 13, 2012) [ECF No. 1036] (approving opt-out mechanism because releasing parties were given "due and adequate notice"); *In re Mesa Air Grp., Inc*., 2011 WL 182450 (Bankr. S.D.N.Y. Jan. 20, 2011) (same); *In re Almatis B.V.*, Case No. 10-12308 (MG) (Bankr. S.D.N.Y. Sept. 20, 2010) [ECF No. 444] (same).

After the *Purdue Pharma* decision, several courts in the Second Circuit have analyzed the question of consent in the context of a release.  In one case, the Bankruptcy Court for the Northern District of New York relied on pre-*Purdue Pharma* precedent to allow creditors to manifest consent via an opt-out procedure.  *See In re Roman Cath. Diocese of Syracuse*, 2024 Bankr. LEXIS 2807, at *8.  In the *Diocese of Syracuse* case, the proposed ballots contained an optional form allowing sexual abuse survivors to opt out of third-party releases; if a survivor did not check the opt-out box or return a ballot, the survivor was deemed to consent to the releases.  *See id.* at *6.  Recognizing that "there is no hard and fast rule on when [releases] would be appropriate" the court stated that releases "should be addressed on a case-by-case basis given the particular circumstances, just like any other plan provision[,]" with adequate notice and satisfaction of due process requirements remaining part of that analysis.  *Id.* at *7–8, *15.  The *Diocese of Syracuse* court also factored in "additional considerations unique to [that] case that support allowing an opt-out ballot," such as (i) counsels' representation of creditors and active involvement in the case, (ii) $50 million in additional consideration from the released parties provided in exchange for the releases, which resulted in meaningful recoveries to creditors; and (iii) the risk that using an opt-in procedure would cause the released parties to withdraw their contribution.[16]  *Id.* at *12–15.  After reviewing the applicable case law, the court in the *Diocese of Syracuse* case ultimately found "the reasoning provided in the *LATAM* and *Avianca* cases [to be] persuasive in allowing the opt-out procedure."[17]  *Id.* at *8.

---

[16]    The *Diocese of Syracuse* case had additional complicating factors.  Approximately 25% of survivors were expected not to vote on the plan due to their trauma.  *See In re Roman Cath. Diocese of Syracuse*, 2024 Bankr. LEXIS 2807, at *14–15.  Given that prediction, even if all voting creditors voted for the plan, the released parties would still be exposed to 25% of the abuse claims, which could have caused the released parties to withdraw their contribution, cut proposed distributions in half, and possibly caused the debtor to withdraw its plan.  *See id.* at *15.

[17]    While the *Diocese of Syracuse* court approved the opt-out mechanism, it did not approve the proposed form of the solicitation procedures and ballots, and instead required the debtor to modify the forms to provide creditors with sufficient, clear notice of the opt-out releases.  *See generally In re Roman Cath. Diocese of Syracuse*, 2024 Bankr. LEXIS 2807, at *16–22.  The court later approved, among other things, the form of the ballots.  *See Order*

But in another case, the Bankruptcy Court for the Western District of New York held that "the mere ability to opt out of a release is insufficient to establish [] consent." *In re Tonawanda Coke Corp.*, 662 B.R. 220, 223 (Bankr. W.D.N.Y. 2024).  In that case, under the proposed plan, unsecured creditors and tort victims would be deemed to grant third-party releases unless they opted out.  *See id.* at 221.  The court noted that the plan proposed the same distribution, regardless of whether a creditor opted out, and no additional consideration was provided in exchange for the third-party releases.  *See id.* at 222.  The *Tonawanda* court reasoned that "any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent" governed by state law (in that case, New York law) and went on to find that a "creditor must affirmatively sign a writing under which it expressly agrees to discharge the non-debtor parties."  *Id.* at 222–23.  As a result, "[a]bsent a writing expressly agreeing to a release of non-debtors, creditors have not given consent" to the third-party releases.  *Id.* at 223.

Given the weight of the authority in this Circuit, the Court concludes that the proposed Third-Party Releases here are consensual—and the proposed opt-out mechanism permissible—for several reasons.  First, the Third-Party Releases here are clearly worded and prominently presented in all of the Plan materials, including the ballots and the Opt-Out Form itself.  As such, the opt-out mechanism here is reasonably calculated to appraise interested parties of their rights in these bankruptcy cases.  *See In re Avianca Holdings*, 632 B.R. at 137.  Indeed, no party—including the Objectors—has argued that the language and presentation here was anything other than clear and fulsome.  *See* Hr'g Tr at 52:9–11 ("[N]either the U.S. Trustee nor the SEC

---

*(I) Approving Disclosure Statement; (II) Approving Solicitation Packages and Distribution Procedures; (III) Approving the Forms of Ballots and Establishing Procedures for Voting on Fifth Amended Joint Plan and Consenting to Third Party Releases; (IV) Approving the Form, Manner, and Scope of Confirmation Notices; (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of Fifth Amended Joint Plan; and (VI) Granting Related Relief, In re Roman Cath. Diocese of Syracuse*, Case No. 20-30663 (WAK) (Bankr. N.D.N.Y. Dec. 23, 2024) [ECF No. 2398].

objected to the solicitation materials approved by this Court . . . ."); *id.* at 85:17–24 ("[T]his

Court [received] no objection [to] the material that [] advised creditors multiple times [to opt out

of the releases in order to preserve any included claims], including in bold and all caps."); *id.* at

88:11 ("The Court approved the materials, they were clear . . . .") (Feb. 13, 2025).[18]  Second, the

history of these cases as to the proposed release has been clear and consistent.  The Third-Party

Releases have been consistently part of the proposed Plan here since the very beginning of the

bankruptcy, and there have been no changes to the proposed releases that might serve to confuse

any party.  *See* Cromer Declaration ¶ 38 (explaining that the instructions for opting out were

featured "prominently, conspicuously, and in plain English on the Ballots, Unimpaired Claims

Notice, and Combined Hearing Notice[,]" all of which were publicly filed on November 26,

2024 as part of the Disclosure Statement Motion at ECF No. 115); *see also* Hr'g Tr. 63:8–11

(Feb. 13, 2025) ("We filed a plan on the first day of the cases that had this [opt out] mechanic in

Technicolor for all to see.  We gave full notice to everybody.  Nothing ever changed."); *cf. In re

Washington Mut., Inc*., 442 B.R. 314, 345, 352–53 (Bankr. D. Del. 2011) (noting that the

releases were modified just before confirmation).  Third, these cases are not a situation where the

affected parties have little or no economic incentive to pay attention to the bankruptcy, such as

where a creditor is receiving no recovery or a *de minimus* one.  Since the beginning, the

proposed releasing parties here have all been promised a full or substantial recovery and have

had every incentive to follow the case to see if the promised recoveries come to fruition.  Those

recoveries are based upon the agreement struck by the Debtors with the Consenting Stakeholders

and that agreement is embodied in the Plan, which includes the proposed Third-Party Releases.

---

[18]     *See also* Hr'g Tr. at 116:16–25 (Feb. 13, 2025) (clarifying the UST's view that neither the specific
language nor the specific opt-out boxes are confusing); *but see id.* at 117:1–2 (expressing the UST's view, that the
use of an opt-out, in and of itself, is confusing).  Indeed, neither objection has suggested improvements to the
language used in the notices sent to creditors.

*See* Cromer Declaration ¶ 38 (noting that unimpaired classes' recovery is in large part due to the

proposed equitization of debt and the DIP and equity financing being provided by the Consenting

Stakeholders). The only impaired creditors here are those parties who are subject to the RSA,

which has overwhelming support. *See id.* (explaining that 98.1% of holders in the impaired

voting classes already agreed in, and are bound by, the RSA to grant the releases); *Debtors'*

*Reply in Further Support of Final Approval of the Disclosure Statement and Confirmation of the*

*First Amended Joint Chapter 11 Plan of Reorganization of Spirit Airlines, Inc. and Its Debtor*

*Affiliates* ¶ 2 [ECF No. 454] (the "Debtors' Reply") (noting only approximately 2% of Spirit's

impaired creditors had not previously consented by contract to the releases in the RSA); Hr'g Tr.

49:14–15 (Feb. 13, 2025) (explaining that "ninety-eight percent of all impaired creditors

consented in writing by contract to the releases.").[19]

Several additional observations should be made in parsing these Third-Party Releases.

Not all of the releasing parties have the same set of circumstances, making the Court's task here

more nuanced than the blunderbuss approach advocated in the UST Objection. *See generally*

UST Objection (arguing that an opt-in mechanism is the only appropriate way to manifest

"express consent" for any and all the releasing parties, including even the parties who signed the

RSA); *see also* Hr'g Tr. 109:24–25, 110:1–2, 133:13–16, 18–21 (Feb. 13, 2025) (UST arguing

that the "clearest way to know that creditors have manifested the maximum amount of consent"

is to provide an opt-in mechanism for all the parties, including those who signed onto the RSA).

Ignoring the factual distinctions among the various classes of creditors here, the UST provided

---

[19]    Given the Court's conclusions, the Court rejects the UST's argument that unimpaired classes are not truly "unimpaired" because they are "forced to give a release" and are therefore giving away their rights to sue. *See* UST Objection at 19 n.6 (arguing that "[c]reditors not allowed to vote [] cannot be unimpaired because they are bound by those releases."); *see also* SEC Objection ¶ 9 ("A critical implication of [the Supreme Court's decision in *Purdue Pharma*] is that a third-party release provision is not just another plan provision that can bind non-objecting creditors and equity holders under Section 1141(a).") (citing *Purdue Pharma*, 603 U.S. 204 at 218–19).

no justification in its Objection or at oral argument for disregarding the clear consent manifested

by the creditors who signed onto the RSA.[20]  In fact, the Court believes that it is exceedingly

easy to conclude that a party who signs a contract such as the RSA here has manifested its

consent.[21]  As for parties who voted on the Plan but did not exercise the opt-out, those parties

have manifested their intent by taking the affirmative act of voting on the Plan while declining to

exercise the opt-out.  *See infra* Section II.C.[22]  Given that the Plan consistently provides a

uniform approach to the requested releases—an opt-out form for every class of affected

creditors—the Court believes that a consistent and clear message has been sent to all parties

about their rights.  *See, e.g.*, *In re Cumulus Media Inc.*, Case No. 17-13381 (SCC), Hr'g Tr.

24:17–25:20, 26:2–10, 27:6–11, 29:25–30:4 (Bankr. S.D.N.Y. Feb. 1, 2018) [ECF No. 434]

(dispelling concerns when every holder of a claim or interest—whether entitled to vote or not—

received an opt-out form that clearly indicated that one's rights would be affected if no action

was taken).  The message to creditors here appears to have been received.  Some 190 opt-out

---

[20]    Section 5.03(b) of the RSA states that:

> [E]ach Consenting Stakeholder agrees . . . that it shall . . . (i) to the extent it is permitted to elect
> whether to opt out of the releases set forth in the Plan, elect not to opt out of such releases and (ii)
> to the extent it is permitted to elect whether to opt in to the releases set forth in the Plan, elect to
> opt in to such releases, in each case by delivering its duly executed and completed ballot(s)
> indicating such election prior to the deadline for such delivery. . . .

RSA § 5.03(b).

[21]    Notably, the SEC did not object to the releases for those parties who signed onto the RSA.  *See* Hr'g Tr.
144:17–18 (Feb. 13, 2025) ("So in our view, signing the RSA is sufficient manifestation of consent."); *see also* SEC
Objection at 1 (objecting only to the release for the small number of creditors in Classes 4 and 5 who are not
signatories to the RSA).  After oral argument, the UST withdrew its objection to the Third-Party Releases for those
parties who signed the RSA.  *See* Letter of the UST, dated February 13, 2025 [ECF No. 488].

[22]    There is ample authority for the proposition that voting in favor of a plan that contains a third-party release
provision constitutes consent to the release.  *See In re Chassix*, 533 B.R. at 79 (collecting cases); *In re SunEdison,
Inc.*, 576 B.R. at 460; *see also In re Smallhold, Inc.*, 665 B.R. 704, 710 (Bankr. D. Del. 2024). But the Court
believes that it is preferable to offer creditors a separate and distinct opportunity to opt out of a third-party release
contained in a plan regardless of how that creditor voted on the plan.  *See In re Tops Holding II Corp.*, Case No. 18-
22279 (RDD), Hr'g Tr. 46:3–21, 73:14–74:1 (Bankr. S.D.N.Y. Nov. 8, 2018) [ECF No. 783] (favorably noting at
the confirmation hearing that the opt-out mechanism was separate from a vote on the plan, thus allowing a creditor
to support the plan while nonetheless still reserving its rights as to any proposed release of a claim against third
parties).

ballots have been returned, most of which were submitted using an online portal set up by the

Debtors.  *See* Hr'g Tr. 49:20–21, 89:23–24 (Feb. 13, 2025); Kjontvedt Supplemental Declaration

¶ 5.  Indeed, the additional option of an online portal makes it easier for creditors to make their

views known, a factor also favoring the Third-Party Releases.

The decision on the proposed Third-Party Releases is most difficult for non-voting

parties: creditors who were deemed to accept the Plan (and thus did not have the right to vote)

and those who chose not to vote on the Plan despite having that option.  Courts have struggled

the most with this circumstance and reached a variety of conclusions.  But considering all the

circumstances here and the weight of the case law, the Court concludes that the opt-out

procedure is appropriate for these creditors here.  The Court bases its conclusion on the analysis

above of the circumstances here, including a clear and prominent vehicle for opting out, the

consistent presentation of the Third-Party Releases during the case, and the clear economic stake

in these proceedings for all those affected creditors.  The Court also notes the well-publicized

nature of these bankruptcy cases as the seventh largest airline in the United States, and the fact

that no concerns as to the Third-Party Releases were raised by the Committee, which represents

all unsecured creditors (and thus all of the classes of creditors who are being asked to provide the

Third-Party Releases).  *See In re Mallinckrodt PLC*, 639 B.R. 837, 880 (Bankr. D. Del. 2022)

(approving use of opt-out mechanism for a consensual release while noting that the case

"generated significant public interest" and had been "frequently reported on");[23] *In re Clovis*

*Oncology Inc.*, Case No. 22-11292 (JKS), Hr'g Tr. 11:23–16:16 (Bankr. D. Del. Jun. 9, 2023)

[ECF No. 875] (approving opt-out mechanism for consensual release where, among other things,

---

[23]  *See, e.g.*, *Spirit Airlines Files for Bankruptcy*, CNN ONLINE (Nov. 11, 2024), https://www.cnn.com/
2024/11/18/business/spirit-airlines-bankruptcy/index.html (last visited Feb. 27, 2025); *Spirit Airlines Cuts 200 Jobs
Amidst Bankruptcy Scramble*, CNN ONLINE (Jan. 16, 2025), https://www.cnn.com/2025/01/16/business/spirit-
airlines-cuts-200-jobs-bankruptcy/index.html (last visited Feb. 27, 2025).

there was an official committee representing the interests of unsecured creditors who were being
asked to provide a release).[24]

The Objectors rely on the *Chassix* decision to argue that an opt-out mechanism is not an
appropriate way for creditors to manifest consent to a third-party release. *In re Chassix*, 533
B.R. 64. But to understand the significance of *Chassix* here, one needs to parse the specific
circumstances of that case. As a threshold matter, the *Chassix* court concluded that creditors
who voted to accept the plan were deemed to consent to the third-party releases in the plan. *See
id.* at 79–80 (finding a vote in favor of the plan to be consent to the release in the plan absent
evidence of coercion). While the *Chassix* court rejected the releases for creditors who voted to
reject the plan or were deemed to reject the plan (and did not vote), it reached those conclusions
based on the facts in that case. *See id.* at 80. Those circumstances included a small *pro rata*
recovery in the cases, changes to the plan shortly before the voting deadline, and the widely
publicized fact that other creditor groups had endorsed the proposed plan. *See id.* The *Chassix*
court concluded that all these circumstances together "could easily have prompted an even
higher than usual degree of inattentiveness or inaction among affected creditors in these cases."
*Id.* By contrast here, the circumstances are different: the affected creditors are receiving
substantial recoveries (most full recoveries) based on the agreement struck before these cases
were filed; creditors' treatment (including the proposed releases) has remained unchanged since
the beginning of these cases so there is little prospect for confusion; and there is no publicity
surrounding the case that would suggest a heightened degree of inattentiveness. *See id.* at 79
(noting that "circumstances may justify a different approach in different cases."). Indeed, the

---

[24]    The Debtors take issue with the UST's contention that an opt-in procedure is clearer and more preferable
than an opt-out in all circumstances; the Debtors argue that an opt-out mechanism can be a clearer procedure to
assess consent in some circumstances. *See* Hr'g Tr. at 66:6–25–67:1–16 (Feb. 13, 2025). Consistent with the
Court's decision today, the Court does not determine the best method for demonstrating consent in all cases.

Plan here provides one measure of extra protection beyond that found in *Chassix* because the opt-out mechanism here allows creditors to withhold their consent to the releases even if they wish to vote in favor of the Plan. This is an important fact considering the likelihood of creditor support for the Plan given the substantial recovery here.[25]

The Objectors also rely on *In re SunEdison, Inc.*, 576 B.R. 453. In *SunEdison*, the debtors proposed that third-party releases be granted by creditors who voted in favor of the plan or abstained from voting. Like *Chassix*, the *SunEdison* court was not troubled by providing a release from creditors who voted in favor of the plan. *See id.* at 457–58 (noting that the plan provided for the release of holders of claims who voted in favor of the plan and citing cases holding the same). But the *SunEdison* court did not approve the proposed release for creditors who were entitled to vote on the plan but failed to do so. The *SunEdison* court found that the abstaining creditors did not manifest consent to the releases through their silence. *See id.* at 459 (analyzing three exceptions to the rule that silence does not constitute consent, including (1) the parties' ongoing course of conduct, (2) the offeree's acceptance of benefits, and (3) the offeror has given reason for the offeree to understand that silence constitutes acceptance and the offeree intends for its silence to equal acceptance). The court in *SunEdison* found that these exceptions did not apply and that other plausible inferences from the facts supported the opposite conclusion; these facts included the meager recovery available to the affected creditors and that a creditor might have refused to return the ballot if it supported the plan but did not want to give the release. Once again, however, the circumstances here are different. First, the plan in *SunEdison* did not have an opt-out mechanism at all and so the only way to withhold consent

---

[25]     The court in *Chassix* also was concerned about the potential for confusion given the use of two different forms for the releases: an opt-in mechanism for releases as to those creditors voting to reject the plan as compared with an opt-out mechanism for those creditors who were deemed to reject the plan. *See In re Chassix*, 533 B.R. at 79. By contrast, the Plan here provides only for use of an opt-out mechanism.

was to vote against the plan.  By contrast, the Debtors here have included an opt-out mechanism

for all voting creditors regardless of whether they voted in favor of or against the Plan, thus

allowing affected creditors to reflect their views separately on the Plan and on the Third-Party

Releases.  Second, the affected creditors here are all receiving a substantial recovery—with most

being fully paid—thus removing any concern about incentivizing inaction based on a meager

recovery.  Third, the Plan here does not propose any release for parties deemed to reject the Plan,

thus avoiding any concern about the incentive of such parties to act given their lack of any

recovery in these cases.  *See id.* at 461.[26]

### B. The Authority Outside This Circuit

The result here is also supported by authority outside this Circuit.  Since *Purdue Pharma*,

the majority of courts outside this jurisdiction have permitted an opt-out mechanism for a

consensual release given circumstances similar to those presented here.  For example, the court

in *Lavie Care Centers* was recently confronted with a third-party release under a plan that

provided for a $10.75 million payment from the plan sponsor, waiver of a $20 million DIP loan,

restructuring and assumption of obligations of secured lenders and landlords, payment of

administrative and priority creditors, and distributions to various classes of unsecured creditors

ranging from 1% to 10.9%.  *See In re Lavie Care Ctrs.*, 2024 Bankr. LEXIS 2900, at *12, *15–

---

[26]    Notwithstanding all the distinctions identified above in this case when compared with the *Chassix* and *Sun Edison* decisions, this Court recognizes that not every judge will necessarily reach the same conclusion as to what constitutes consent under a given set of facts.  *See Chassix*, 533 B.R. at 79 (concluding that implying consent to a third-party release based on inaction "is simply not realistic or fair, and would stretch the meaning of 'consent' beyond the breaking point.").  In short, the courts are not in universal agreement.  *See, e.g.*, *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 684–88 (E.D. Va. 2022) (holding failure to opt out, without more, cannot form the basis for consent to non-debtor releases, whether under a contract framework or class action framework); *In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) (agreeing with courts that hold consent cannot be based solely on a vote in favor of a plan and finding that, in this asbestos case, unambiguous assent was not established, in part due to the complicated nature of the plan and use of master ballots by claimants' representatives).  Of course, the views expressed in this decision are the views of this Court only.  But the Court hopes that a fulsome discussion of the issues here will advance the development of the law in this area in future cases.

16 (Bankr. N.D. Ga. Dec. 5, 2024).  The plan included releases in favor of third parties who made substantial contributions to the case and their affiliates.  *See id.* at *12.  Without those contributions, the plan would not have been possible and general unsecured and certain secured creditors would likely not have received any distribution.  *See id.* at *12–13.  The plan provided that creditors voting in favor of the plan were deemed to consent to the third-party releases with no option to opt out.  *See id.* at *14.  The plan also provided that, if a creditor did not consent to the releases, the creditor had to vote to reject the plan or abstain from voting *and* elect to opt out of the release by checking the box on the ballot.  *See id.*  Given these facts, the court in *Lavie* approved the opt-out releases.  First, the court agreed with the "overwhelming majority of cases [that] find that a creditor's vote to accept a plan containing a third-party release . . . makes the release consensual[.]"  *Id.* at *29, *36.  The *Lavie* court found that the opt-out releases were appropriate as to creditors who voted to reject the plan or abstained from voting and who failed to opt out, or to creditors whose votes were not counted and did not opt out, because those creditors reviewed, signed, and returned the ballots without checking the conspicuous opt-out box.  *See id.* at *36–37.  As to creditors who took no action, the opt-out releases were appropriate and the creditors' failure to act rendered the releases consensual because such parties were required to pay attention to mailings, especially those warning that if they took no action, they would be bound by a release.  *See id.* at *37.[27]

Likewise, the Bankruptcy Court for the Southern District of Texas has approved the use of an opt-out mechanism for a consensual release.  For example, the court in *Robertshaw US Holding Corp.* approved an opt-out release, stating that *Purdue Pharma* had left consensual

---

[27]     The court in *Lavie* also adopted a rebuttable presumption whereby creditors who failed to opt out could, after confirmation, show the court why they should not be bound.  *See In re Lavie Care Ctrs.*, 2024 Bankr. LEXIS 2900, at *38–39.  No party in this case has suggested such an approach here.

releases untouched and noting that prior case law in that district had approved consensual third-party releases with an opt-out feature.  The court explained:

> [T]he consensual third-party releases in the Plan are appropriate, afforded affected parties constitutional due process, and a meaningful opportunity to opt out.  There is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan . . . .  And what constitutes consent, including opt-out features and deemed consent for not opting out, has long been settled in this District . . . .  Hundreds of chapter 11 cases have been confirmed in this District with consensual third-party releases with an opt-out.  And, again, *Purdue* did not change the law in this Circuit.

*In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) (citations omitted).

The Objectors rely on several cases outside the Second Circuit that are distinguishable from the facts here.  For example, the Objectors cite *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) for the proposition that a third-party release using an opt-out mechanism cannot be imposed on those who do not vote on the plan in a case.  *See* UST Objection at 19, 21; SEC Objection ¶ 12.  But the facts of *Washington Mutual* raised serious concerns that are not present here.  In *Washington Mutual*, voting creditors could opt out of the third-party releases by checking a box, but the plan, as originally drafted, also separately provided that those parties who purportedly opted out would still be bound by the releases and would receive the distributions afforded to their respective classes.  *See In re Washington Mutual*, 442 B.R. at 351.  To compound the problem, the debtors modified the plan just one week before confirmation—and after the voting deadline—to provide that no releases would be granted by any entity that opted out, but that any entity that opted out would not be entitled to a distribution.  *See id.* at 352, 354.  Given these contradictory and confusing facts, the court did not approve the releases.  The *Washington Mutual* court first found that "the original language in the Plan that would mandate third-party releases even in the place of an indication on the ballot that

the party did not wish to grant the release would not pass muster." *Id.* at 352. Given the last

minute material revisions to the releases, the *Washington Mutual* court also found the opt-out

mechanism to be insufficient with respect to parties who did not return a ballot or were not

entitled to vote at all. *See id.* at 355. The court concluded that "any third-party release is

effective only with respect to those who affirmatively consent to it by voting in favor of the Plan

and not opting out of the third party releases." *Id.*

By contrast here, the Debtors have not made any material or last-minute changes to the

Plan or Third-Party Releases that might create confusion. *See* Debtors' Reply ¶ 25. Second, the

Plan does not contain any provisions that would override a party's opt-out election or mandate

that a party who opts out of the release does so at the expense of receiving a distribution. *See id.*

By contrast here, the decision of an affected creditor on the releases is separate and distinct from

his or her right to vote on the Plan and to receive a distribution. It is noteworthy that the same

judge who curtailed the releases in *Washington Mutual* has subsequently approved the use of an

opt-out mechanism for a consensual release in a variety of cases that did not present the profound

flaws found in *Washington Mutual*. *See, e.g.*, *In re Homer City Generation, L.P.*, Case No. 17-

10086 (MFW) (Bankr. D. Del. Feb. 15, 2017) [ECF No. 157] (finding claimants in voting classes

manifested consent to releases by failing to check the opt-out box on their ballot, and non-voting

classes manifested consent by not objecting to the releases); *see also In re EYP Group Holdings,

Inc.*, Case No. 22-10367 (MFW) (Bankr. D. Del. Nov. 1, 2022) [ECF No. 568] (same); *In re

Clarus Therapeutics Holdings, Inc.*, Case No. 22-10845 (MFW) (Bankr. D. Del. Feb. 9, 2023)

[ECF No. 320] (same).

The UST also relies on opt-out provisions recently rejected in *In re Lumio Holdings, Inc.*,

Case No. 24-11916 (JKS). *See* UST Objection at 19–20. In *Lumio*, the court required use of an

opt-in mechanism for impaired classes to grant third-party releases because the projected

recovery for two impaired classes was zero, and the recovery for the impaired general unsecured

creditor class was unknown. *See In re Lumio Holdings, Inc.*, Case No. 24-11916 (JKS), Hr'g Tr.

24:1–25:5 (Bankr. D. Del. Jan. 3, 2025) [ECF No. 428]. But once again, the circumstances here

are quite different with all affected creditors receiving a substantial recovery, and general

unsecured creditors receiving 100% distributions *with* the option to opt-out of the Third-Party

Releases. For similar reasons, the Objectors are mistaken in relying on *In re Emerge Energy*

*Servs. LP*, 2019 Bankr. LEXIS 3717 (Bankr. D. Del. Dec. 5, 2019). Both the UST and SEC cite

*Emerge Energy* for the proposition that consent cannot be inferred from a party's failure to opt

out. *See* UST Objection at 21–22; SEC Objection ¶¶ 12, 15. In that case, the plan provided that

general unsecured creditors and holders of equity interests were deemed to consent to releases

unless they completed and returned an opt-out form or ballot. *See In re Emerge Energy*, 2019

Bankr. LEXIS 3717, at *52. General unsecured creditors would receive no distribution under the

plan, but if they voted in favor of the plan and triggered a "death trap" provision, they would

receive certain ownership interests and new warrants. *See id.* at *10–11. Relying on *SunEdison*,

*Chassix*, and *Washington Mutual*, the *Emerge Energy* court stated that those who failed to return

a ballot or form did not necessarily intend to grant a release because those parties were receiving

no distributions under the plan and did not have previous dealings with the released parties, such

that carelessness, inattentiveness, or mistake could have factored into their decisions not to return

an opt-out. *See id.* at *53–54 (looking to the Restatement of Contracts for guidance on when

silence can be construed as acceptance). But once again, the facts of *Emerge Energy* are quite

different from the substantial recovery to be received by general unsecured creditors here

regardless of how they decide on the Third-Party Releases. Moreover, equity holders here—the

only parties who receive no recovery under this Plan—are not subject to the Third-Party

Releases at all. *See id.* at *52–54 (no recovery for equity holders in class 9, who were subject to

releases unless they opted out under proposed plan).

Rather than providing blanket support for the Objectors' position, the *Washington*

*Mutual*, *Lumio*, and *Emerge Energy* cases also demonstrate the need to evaluate third-party

releases based on the unique facts and circumstances of the case at issue including the clarity of

the language used, the history of the case, and the incentive for the affected creditors to engage

in the bankruptcy case.

Finally, the Objectors rely on the thoughtful discussion of releases in *In re Smallhold,*

*Inc.*, 665 B.R. 704 (Bankr. D. Del. 2024). In that case, the court found that creditors who voted

on the plan—regardless of how they voted—were deemed to consent to the third-party release in

the plan. *See id.* at 723–25. But the court also found that parties that did not have the

opportunity to vote on the plan could not be found to consent to the third-party release,

notwithstanding the ability to opt out. *See id.* at 717–23. The court found that its own prior

approval of such an opt-out release rested upon a "default" theory, namely the possibility that a

nonconsensual release could be imposed on an objecting creditor who did not act. *See id.* at

708–09, 717–23. With such relief available before the decision in *Purdue Pharma*, the theory

goes, it was permissible to require a creditor to act through an opt-out mechanism to avoid the

imposition of a third-party release by default; with a nonconsensual release no longer permissible

after *Purdue Pharma*, the *Smallhold* court found that consent could no longer be imposed

through an opt-out mechanism. *See id.* at 708–09, 716–19 (discussing its prior decision in *In re*

*Arsenal Intermediate Holdings, LLC*, 2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023)).

But while the *Smallhold* court's analysis revolved around a default concept, there is no authority in this Circuit or District that such a default theory was ever the basis for a consensual release prior to the Supreme Court's decision in *Purdue Pharma*.  As such, this Court takes the Supreme Court in *Purdue Pharma* at its word that nothing in that decision calls into question a consensual third-party release.  *See In re Robertshaw*, 662 B.R. at 323.  Indeed, the *Smallhold* court's default theory cannot be reconciled with the approach of the Fifth Circuit on this issue; the Fifth Circuit has never permitted the grant of nonconsensual third-party releases in bankruptcy cases, but courts in that Circuit have routinely allowed consensual releases using an opt-out mechanism before *Purdue Pharma*.  *See In re Smallhold*, 665 B.R. at 721 n.53; *In re Robertshaw*, 662 B.R. at 322–23.  Moreover, one of the concerns raised by the *Smallhold* court simply does not apply here.  More specifically, the court in *Smallhold* hypothesized about a so-called "college education fund plan," in which creditors that failed to opt out would be required to fund a contribution to the college fund for the children of the debtor's CEO.  *See In re Smallhold*, 665 B.R. at 710, 721–22.  The *Smallhold* court was concerned that there was no limiting principle that would distinguish a release under such a college education fund plan from the decisions that permit a third-party release using an opt-out.  *See id.*  But this Court has jurisdiction over consensual releases only where—as here—they affect the *res* of the estate.  *See In re Quigley Co.*, 676 F.3d 45, 53 (2d Cir. 2012) ("Bankruptcy jurisdiction is appropriate over 'third-party non-debtor claims that directly affect the *res* of the bankruptcy estate.'") (quoting *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52, 66 (2d. Cir. 2008) ("*Manville III*")).[28]  And unlike the "college education fund plan" theorized in

---

[28]    While the Supreme Court reversed the Second Circuit's decision in *Manville III, see Travelers Indemnity Co. v. Bailey*, 557 U.S. 137 (2009), the Second Circuit subsequently held that the Supreme Court "did not contradict the conclusion of [*Manville III*]'s jurisdictional inquiry," and reaffirmed its jurisdictional analysis.  *See Johns-*

*Smallhold*, the Third-Party Releases here are anchored in the agreement with the Consenting Stakeholders that forms the foundation of the reorganization accomplished by the Plan and that provides the basis for the robust recovery of the affected creditors. *Cf. In re Smallhold*, 665 B.R. at 723 (noting that "*Purdue Pharma* also left open the possibility that a nonconsensual third-party release might be appropriate in a 'paid-in-full plan.'") (emphasis removed).[29]

In any event, the court in *Smallhold* did not go as far as the Objectors seem to suggest. The court caveated its decision in several ways that are relevant here. It noted that, even if such third-party releases "may be imposed in an appropriate case, the argument for such a release is not sufficiently developed by the parties here to warrant its imposition." *Id.* at 710. By contrast, the Court here has been presented with a fulsome record as to the basis for the Third-Party Releases. The *Smallhold* court also did not hold that consent was governed by state law rather than federal law—the stance of the Objectors here—with the court reserving decision on that issue for another day. *See id.* at 722 n.57; *see infra* Section C. Indeed, the court referenced other areas of federal law that might be relevant to the consent analysis. *See In re Smallhold*, 665 B.R. at 711, 725 (noting that a different outcome on the opt-out question was not foreclosed where the plan process itself builds on the protections of Rule 23(b)(3), under which a named representative is authorized to bind class members subject to their right to notice and an ability to opt out).

---

*Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 600 F.3d 135, 152 (2d Cir. 2010); *see also Quigley*, 676 F.3d at 57 n.12.

[29]    Of course, there are also other checks on the permissibility of such a college education fund plan. *See, e.g.*, 11 U.S.C. § 1129(a)(3) (a Chapter 11 plan may be confirmed only if, among other things, "[t]he plan has been proposed in good faith . . . .").

C. <u>The Restatement of Contracts</u>

The UST argues that the Court must follow state law in determining whether the Third-Party Releases are consensual and notes that "ordinary choice of law principles govern which state's law applies to contracts between non-debtors . . . ." UST Objection at 9 n.4.[30] Instead of offering further insight on this issue, however, the UST "assert[s] no position as to choice of law" and relies almost exclusively on the Restatement (Second) of Contracts. *Id.* But as the discussion above makes clear, the question about whether a creditor has agreed to certain treatment is a matter of federal bankruptcy law, with an already existing and well-developed body of case law on consent in the context of a collective bankruptcy proceeding. *See supra* Section I.A. It is true that federal courts analyzing the issue of consensual releases in bankruptcy cases have looked to, among other things, the principles contained in the Restatement of Contracts. *See, e.g., In re SunEdison*, 576 B.R. at 459 (citing Restatement (Second) of Contracts § 69). But the Restatement of Contracts "itself is not the law anywhere" and it does not provide a solution on the choice of law if state law governed here. *In re Lavie Care Ctrs.*, 2024 Bankr. LEXIS 2900, at *34.[31]

Even if the Court were to meet the UST where it stands and look to the Restatement of Contracts as the sole governing authority, the Restatement clearly recognizes that silence and/or

---

[30]    The Plan provides that:

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection herewith (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters, without giving effect to conflict of laws principles; *provided, however*, that corporate governance matters relating to the (Reorganized) Debtors not incorporated in New York shall be governed by the laws of the state or other jurisdiction of incorporation of the applicable (Reorganized) Debtor.

inaction may constitute consent in certain circumstances.  So, while "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him a duty to speak," Restatement (Second) of Contracts Section 69, cmt. a (1981), the Restatement specifically identifies three circumstances where silence and inaction will operate as an acceptance:

(a) Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.

(b) Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer.

(c) Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept.

Restatement (Second) of Contracts § 69(1).[32]  These exceptions support the result here in several ways.

---

Plan, Art. I.D.  Debtor Spirit Airlines, Inc. is incorporated in Delaware, while the remaining Debtors are Cayman Islands exempted companies incorporated with limited liability.  *See* Disclosure Statement, Art. II.A.1, II.B.2.

[31]  The UST argues that while the Plan provides a New York choice of law provision, the Debtors cannot choose the law that applies between non-debtors.  Engaging in a separate choice of law analysis with respect to the formation of each so-called "contract" between a Released Party and a Releasing Party would create an unwieldy process.  As the court noted in *Lavie*, "there is no answer to the question 'which state's law should be applied?'  The law of the state where the bankruptcy court sits?  The law where the debtor is headquartered?  Some other state's law?"  *In re Lavie Care Ctrs.*, 2024 Bankr. LEXIS 2900, at *34.  As this case is international in scope and has thousands of creditors, the UST's position would result in a multitude of different outcomes for each of the creditors at issue—including creditors in the same class—based upon which law was applicable to their circumstances.  But applying different standards from fifty states, U.S. territories, and foreign jurisdictions would not facilitate development of uniform bankruptcy law in the United States.  *See, e.g., In re Frontier*, 585 B.R. at 693.

[32]  *See also Russell v. Raynes Assocs. Ltd. P'ship*, 166 A.D.2d 6, 15 (N.Y. App. Div., 1st Dep't 1991) (citing to Restatement Second of Contracts § 69 and noting that "[a]lthough, generally, intent to accept an offer may not be inferred from silence, a party's silence will be deemed an acquiescence where he or she is under such duty to speak that his or her conduct, accompanied by silence, would be deceptive and beguiling . . .  and failure to speak therefore misleads the other party.  Such a duty may be created by a course of conduct . . . , or, as here, *by an explicit statement by the offeree which gives the offeror reason to understand that silence will constitute acceptance*.") (emphasis added) (citations and quotations omitted); *Friedman v. Schwartz*, 2010 WL 3937304, at *3 (E.D.N.Y. Sept. 30, 2010) (noting that Section 69(1) of the Restatement (Second) of Contracts reflects the law of New York); *Karlin v. Avis*, 457 F.2d 57, 62 (2d Cir. 1972) ("New York law on silence as acceptance is firmly supported by the Restatement of Contracts."); *Andre v. Dollar Tree Stores, Inc.*, 2019 WL 2617253, at *9 (D. Del. June 26, 2019) (noting that "Delaware law, following the Restatement (Second) of Contracts, [] states there are three scenarios under which an offeree's silence and inaction operate to manifest consent or acceptance to a contract's terms" and

The first exception noted by the Restatement is "where an offeree has taken a benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation."[33]  Restatement (Second) of Contracts § 69(1)(a); *see also Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) ("It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree." (citing Restatement (Second) of Contracts § 69(1)(a))).

Here, the affected creditors are receiving the benefit of the agreement of the Consenting Stakeholders that is contained in the Plan, which makes clear that those benefits are being given with the understanding that the Third-Party Releases are being requested in the form of an opt-out.[34]  The Consenting Stakeholders made significant compromises in the Plan to the treatment of their claims and provided hundreds of millions of dollars in value through the Restructuring Transactions, all of which provide the basis for the Plan leaving the vast majority of affected creditors unimpaired.[35]  Those creditors that were asked to provide the Third-Party Releases had

---

citing the Restatement's delineated exceptions); *Brittingham v. Bd. of Adjustment of City of Rehoboth Beach*, 2005 WL 170690, at *5 (Del. Super. Ct. Jan. 14, 2005) (noting that "[s]ilence also manifests consent in some contracts cases" and citing to exceptions).

[33]    The Court notes that the first exception refers to "offered services."  While the situation in this case does not fall comfortably within that language, the comments to the Restatement helpfully reframe the inquiry by noting that "[t]he exceptional cases where silence is acceptance fall into two main classes[,]" one of which is situations "where the offeree silently takes offered benefits . . . ."  Restatement (Second) of Contracts § 69, cmt. a.

[34]    The Ad Hoc Convertible Noteholder Group and the Ad Hoc Senior Secured Noteholder Group clearly see the Third-Party Releases as one part of a package contained in the Plan that also includes, among other things, a new equity investment of $350 million that is backstopped by certain of the Convertible Noteholders and Senior Secured Noteholders, the equitization of over $300 million of the Convertible Notes and $400 million of the Senior Secured Notes and the unimpairment of all holders of General Unsecured Claims, which was "made possible only by the substantial concessions of and investments by the holders of the Senior Secured Notes Claims and Convertible Notes Claims." Ad Hoc Senior Secured Noteholder Statement ¶ 2; *see also* Ad Hoc Convertible Noteholder Statement ¶ 2.

[35]    The Court finds that creditors will benefit substantially by receiving material plan distributions that were made possible by the Consenting Stakeholders and certain other Released Parties.  *See* Cromer Confirmation

reason to know of this bargain and the related benefits, as it is detailed in the Disclosure

Statement and the Plan; indeed, none of the Objectors argue to the contrary. Section VIII.F of the

Plan, states explicitly that "for good and valuable consideration, *including their cooperation and*

*contributions to the Chapter 11 Cases*, each Releasing Party shall be deemed to have

conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the

Released Parties . . . ."  Plan Art. VIII.F (emphasis added).

The Objectors argue that the Third-Party Releases do not provide the Releasing Parties

with a "benefit," and that each Third-Party Release is a separate bilateral contract entirely

unrelated to the Plan; they posit that such a release can only be consensual if separate

consideration is provided outside the Plan.  But the Objectors' view is divorced from the reality

here.  The Third-Party Releases are a term in the Plan that provides the value to the affected

creditors.  As such, the Court believes it is more appropriate to examine the consent question in

the larger framework of the benefits being provided through the financial restructuring contained

in the Plan.  As previously noted, the Plan is the "contract" that is at issue during the

confirmation process, and it includes the voluntary Third-Party Releases, which are an integrated

part of the Plan and not an unsolicited offer that is being given for no consideration.[36]

---

Declaration ¶ 38 (noting that unimpaired status of these classes was "in large part due to the equitization and DIP and equity financing being provided by the Consenting Stakeholders.").  The situation would be far different if the releases were sought for parties who did not provide the value that is being given to the affected creditors.

[36]    The UST relies on *In re Tonawanda Coke Corp.*, 662 B.R. 220, which sustained an objection that the UST made to the opt-out provision in that case.  The plan at issue in *Tonawanda* provided for approximately $300,000 in distributions on more than $282 million in unsecured claims.  *See id.* at 221.  The court in *Tonawanda* noted that the debtor owed far in excess of any proposed distribution and that "any payment under the plan serves as consideration for pre-petition obligations.  No further consideration is given on account of the separate liabilities of the non-debtor beneficiaries of the releases.  Indeed, the plan contemplates the same distribution whether or not a creditor opts out of the release.  Essentially, creditors are being asked to give releases to third parties for no consideration." *Id.* at 222.  But the meager recovery provided to creditors in *Tonawanda* is clearly distinct from the situation in the Debtors' cases, in which the Consenting Stakeholders (who, among others, are the parties receiving the Third-Party Releases) are providing hundreds of millions of dollars in fresh capital through the Restructuring Transactions incorporated into the Plan.  *See supra* Section II.B.

Moving onto the second exception in the Restatement, silence and inaction will constitute

acceptance of an offer when "the offeror has stated or given the offeree reason to understand that

assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive

intends to accept the offer."  Restatement (Second) of Contracts § 69(1)(b).  The Restatement

notes that "[t]he case for acceptance is strongest when the reliance is definite and substantial or

*when the intent to accept is objectively manifested though not communicated to the offeror*."

Restatement (Second) of Contracts, § 69 cmt. c (emphasis added); *cf. Manigault v. Macy's E.,*

*LLC*, 318 F. App'x 6, 8 (2d Cir. 2009) ("A contract may be formed by words *or by conduct that*

*demonstrate the parties' mutual assent.*") (emphasis added) (citing *Beth Israel Med. Ctr. v.*

*Horizon Blue Cross & Blue Shield of N.J.,* 448 F.3d 573, 582 (2d Cir. 2006); *Maas v. Cornell*

*Univ.,* 94 N.Y. 2d 87, 93–94 (1999)).

This exception is clearly met for (1) those creditors that signed the RSA, and (2) those

creditors that voted on the Plan and did not opt out of the Third-Party Releases.  Those creditors

---

The UST also cites to *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279 (9th Cir. 2017).  In *Norcia*, the plaintiff purchased a Samsung phone at a Verizon Wireless store and signed a "Customer Agreement" with Verizon that included an agreement to arbitrate disputes with Verizon.  *See id.* at 1282.  A Verizon employee unpacked the box containing the phone, and eventually the customer left the store with the new phone, charger, and headphones, but "declined the offer by the Verizon Wireless employee to take the box and the rest of its contents." *Id.*  Among those materials was a product safety and warranty brochure that contained a purported agreement that bound the customer to arbitrate disputes with Samsung unless the customer opted out by providing notice to Samsung within 30 days of the phone purchase.  *See id.*  The Ninth Circuit acknowledged that there were exceptions to the rule that silence or inaction does not constitute consent.  *See id.* at 1284–85.  But the Circuit ultimately held that the customer's failure to "opt out" of the Samsung arbitration agreement did not meet one of the exceptions because, among other things, the customer reasonably did not know Samsung had made any offer to arbitrate, the customer retained no benefits Samsung extended in the offer, no course of dealing made it reasonable for the customer to be bound by inaction, and nothing in the Customer Agreement with Verizon made any reference to Samsung or an agreement to arbitrate disputes with Samsung.  *See id.* at 1286–89.  The context for the releases here is far different from *Norcia*.  The consumer in *Norcia* had little reason to believe that he was being asked to waive any rights and, in fact, he never received notice of the proposed agreement to arbitrate.  By contrast, creditors here have been provided with actual and extensive, court-approved notice of the Plan and its terms, including the Third-Party Releases and the procedures to opt out from those releases.  The Court has found that such notice was reasonably calculated to appraise creditors of their rights as to the Third-Party Releases.  The Plan also provides that the Released Parties give up various rights in the Plan that will provide the affected releasing creditors material benefits as part of the comprehensive deal of which the Third-Party Releases are a part; no such analogous grand bargain existed in *Norcia*.

that signed the RSA have agreed in writing to the Third-Party Releases, a clear manifestation of

intent to be bound to the Third-Party Releases. The Court also finds that creditors entitled to vote

who returned a ballot but did not check the opt-out box on that ballot also clearly manifested

their consent to the Third-Party Releases.  As discussed above, the creditors were made aware of

the Third-Party Releases and the mechanics to opt out from them, both through the solicitation

materials and explicitly on the face of the ballots themselves.  *See* Master Ballot (Class 4) at 2, 5,

9, 11; Beneficial Ballot (Class 4) at 2–5, 8–9; Master Ballot (Class 5) at 2, 5, 9, 11; Beneficial

Ballot (Class 5) at 2–5, 8–9.  They undertook an affirmative act by returning a ballot, indicating

that the creditor was actively engaged in the process and affirmatively chose to not check the

opt-out box.  This reasoning is equally true whether the creditor voted to accept the Plan or to

reject the Plan, as an active choice was made in each circumstance to return the ballot without

checking the opt-out box.  *See In re Smallhold*, 665 B.R. at 723–25 (concluding that parties

voting for or against a plan have taken an affirmative step sufficient to hold them to the terms of

the release).

The Debtors also argue that this second exception applies to the remaining affected

creditors that failed to return a ballot or return an Opt-Out Form.  The Debtors contend that they

have provided all creditors, including these non-voting creditors, with reason to understand that

assent may be manifested by silence or inaction and that the solicitation materials distributed by

the Debtors provided several simple and accessible mechanisms for creditors to manifest their

consent or lack thereof to the Third-Party Releases.  *See* Restatement (Second) of Contracts § 19

(1981) ("manifestation of assent may be made wholly or partly by written or spoken words or by

other acts *or by failure to act. . . .*") (emphasis added); *see also id.*, cmt. a ("Purely negative conduct is sometimes, though not usually, a sufficient manifestation of assent.").[37]

But the application of this exception to the non-voting creditors here is tricky, lest the exception swallow the rule.  The comments to the Restatement mention one limiting principle by noting that it is the offeree's intent—or lack thereof—that will determine whether the offeree's silence constitutes acceptance.  *See* Restatement (Second) of Contracts § 69, cmt. c (illustrations).[38]  Federal courts discussing the significance of silence have invoked other principles, with one court noting that "[t]he duty to speak need not be purely legal, but may be based on principles of ethics and good faith."  *In re Teligent, Inc.*, 282 B.R. 765, 771–72 (Bankr. S.D.N.Y. 2002) (citing *Columbia Broad. Sys. v. Stokely–Van Camp, Inc.,* 522 F.2d 369, 378 (2d Cir. 1975) (discussing New York law of estoppel); *In re Ellison Assocs.,* 63 B.R. 756, 765 (S.D.N.Y. 1983) (discussing estoppel by silence)); *see also Friedman v. Schwartz*, 2011 WL 6329853, at *5 (E.D.N.Y. Dec. 16, 2011) ("New York recognizes that '[w]hen a party is under a duty to speak, or when his failure to speak is inconsistent with honest dealings and misleads another, then his silence may be deemed to be acquiescence.'") (quoting *Tanenbaum Textile Co., Inc. v. Schlanger*, 287 N.Y. 400, 404 (1942)).  Indeed, "[b]ankruptcies, in this regard, give rise to

---

[37]    New York law focuses on whether there is a duty to speak such that silence would be misleading.  *See Russell v. Raynes Assocs. Ltd. P'ship*, 166 A.D.2d 6, 15 (N.Y. App. Div., 1st Dep't 1991) ("a party's silence will be deemed an acquiescence where he or she is under such duty to speak that his or her conduct, accompanied by silence, would be deceptive and beguiling . . .  and failure to speak therefore misleads the other party.  Such a duty may be created by a course of conduct . . . , or, as here, by an explicit statement by the offeree which gives the offeror reason to understand that silence will constitute acceptance.") (citations and quotations omitted).

[38]    The Restatement also acknowledges that where an offer is accepted solely through silence, the risk will lie with the offeror.  This is because "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting."  Restatement (Second) of Contracts § 69, cmt. c.  Thus, while the "offeree is entitled to rely on such a statement if he chooses[,] . . . [e]ven though the intent to accept is manifested only by silent inaction . . . the offeror who has invited such an acceptance cannot complain of the resulting uncertainty in his position."  *Id*.

unique moral and ethical concerns because each creditor's action may affect the rights of every party in interest." *In re Teligent*, 282 B.R. at 771.

Ultimately, the Court does not need to decide if the releases for the non-voting creditors would be permissible based solely on the second exception given the Court's conclusions above that consent exists as to these creditors under applicable federal bankruptcy law. *See supra* Section II.B; *cf. In re Smallhold*, 665 B.R. at 711, 723 n.57, 725 (leaving for another day the question of whether state law governs the question of consent).

Finally, there is a basis to argue that, at least for some creditors, the third exception applies "where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept." Restatement (Second) of Contracts § 1(c); *see also Russell,* 166 A.D.2d at 15 (silence will be deemed acquiescence where under duty to speak through course of conduct). These can include "[e]xplicit statement by the offeree, usage of trade, or a course of dealing between the parties" that "may give the offeror reason to understand that silence will constitute acceptance." Restatement (Second) of Contracts § 69, cmt. d. "Under Subsection (1)(c) the offeree's silence is acceptance, regardless of his actual intent, unless both parties understand that no acceptance is intended." *Id.* The exception will generally apply where there is an ongoing course of conduct. *See Albrecht Chem. Co. v. Anderson Trading Corp.*, 298 N.Y. 437, 440–41 (1949) (silence can operate as acceptance where "the parties may have been advised and warned by a previous course of dealings that inaction would be taken as assent."). This exception clearly applies to the Consenting Stakeholders who signed onto the RSA after extensive negotiations.[39]

---

[39]     An argument can be made that this exception might also apply to any creditor actively involved in the negotiations of the RSA stretching back before the bankruptcy filing.

## <u>CONCLUSION</u>

For the reasons stated above, the Third-Party Releases and opt-out mechanism in the Plan are approved.  The Debtors should settle an order on five days' notice that is consistent with the terms of the Confirmation Order.[40]  The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Files docket, with a copy of the proposed order attached as an exhibit to the notice.  A copy of the notice and proposed order shall also be served upon the Objectors.

Dated: White Plains, New York
        March 7, 2025

*/s/ Sean H. Lane*_____
UNITED STATES BANKRUPTCY JUDGE

---

[40]   The Confirmation Order provided that the Debtors were authorized to consummate the Plan upon entry of the Confirmation Order but stated that no waiver of the time period in Fed. R. Bankr. P. 3020(e) would be granted with respect to the Third-Party Releases, with such period commencing after the Court entered this *Memorandum of Decision*.  *See* Confirmation Order ¶ 27.